# 2014 VEHICLE STOPS REPORT

Deborah G. Keeling, Ph.D.
Angela Schwendau
Department of Criminal Justice
University of Louisville

# 2014 Vehicle Stops Data Analysis

# Annual Report (January through December 2014)

## Introduction

"Do police officers engage in racial profiling? This is the million-dollar question being asked…by researchers, police administrators, court officials, citizen groups, and individual citizens across the country"[1].  While the term, racial profiling, is relatively new, concern over racial bias in decision-making by police is not and follows from historically "tense" relations between police and minorities.  The Rule of Law which underlies a democratic form of government and, therefore, democratic policing strategies, is based on the presumption that, unless specified under the law, individual characteristics such as age, ethnicity, economic and socio-demographic characteristics of individuals should not be taken into account in the administration of justice.  Biased policing occurs when "… (Intentionally or unintentionally) personal, societal, or organizational biases and/or stereotypes are applied in the decision-making processes in the administration of justice."[2]  Racially biased policing is only one form of bias that can be introduced into the administration of justice.  Racially biased policing occurs when the police inappropriately consider race or ethnicity in deciding with whom and how to intervene in an enforcement capacity".[3]  Racial profiling is a form of bias within policing and includes "…any police action that relies on the race, ethnicity or national origin of an individual rather than the behavior of an individual or information that leads the police to a particular individual who has been identified as being, or having been, engaged in criminal activity"[4]

Racial profiling and the larger category of biased policing have a number of specific consequences.  Those most significant consequences are:

- Hinders police effectiveness by eroding public confidence and trust and interferes with strong police and community partnerships;

- Hinders police effectiveness by leading police to believe that only "certain people" commit crimes;

- Violates federal and civil statutes; and

- It is a form of discrimination and is therefore, wrong.

---

[1] R. Engel, 2008, 'A Critique of the "Outcome Test" in Racial Profiling Research, Justice Quarterly, Vol. 25, Issue 1, pp. 1-36.
[2] Ronald Davis, National Organization of African American Law Enforcement Executives
[3] Police Executive Research Forum and National Organization of African American Law Enforcement Executives
[4] Ramirez, et.al., Department of Justice, 2000

This report, based on information available in the Louisville Metro Police Department Vehicle Stops Database for 2014, is a summary of some limited and exploratory findings concerning the nature of vehicle stops conducted by this agency.  It is the fifth year in which the data has been collected and analyzed in its current form and the fourth year in which the data was compiled over a 12-month calendar year.  It is not meant to be information from which a conclusion can be drawn concerning the presence or absence of biased-policing and/or racial profiling within an agency or unit within an agency.  The methodological issues related to determinations of the presence or absence of biased-policing are significant and no set of data or research design can conclusively determine the presence or absence of inappropriately based policing decisions and actions.  The information contained in this report is to be used as a management tool for review by agency leadership and policy-makers.  The purpose is to provide law enforcement leadership with information that will stimulate further analysis, thought and queries that will prompt more effective policing within Metro Louisville.  It is part of a multi-faceted approach to addressing biased policing as suggested by the International Association of Chiefs of Police and developed through the Police Executive Research Forum.  The components include:

- Accountability and supervision
- Policies prohibiting biased policing
- Recruitment and hiring
- Education and training
- Minority community outreach, and
- Data collection and analysis[5].

The current analysis of vehicle stops reports is only one of a multi-faceted approach to biased-policing that has been undertaken by the Louisville Metro Police Department.  The Louisville Metro Police have implemented several strategies designed to address biased policing, these include:  accountability and supervision related to ensuring that human and civil rights practices are inherent in all police activities and practices, specific policies prohibiting violations of human and civil rights to include a prohibition of biased policing, basic and in-service diversity training for police officers and civilian employees, implementation of a vehicle stops information database which includes the required completion of a form containing information related to the nature of the stop and characteristics of the driver, policies that make completion of this form mandatory, initial and "refresher" training related to the purpose and manner in which to complete this form, and the analysis of the vehicle stops data as a means of reviewing the nature of stops and forms of potentially biased responses by police officers. Lastly, the department has recently deployed Wearable Video which will affect trust, legitimacy as well as provide transparency to vehicle stops. While the influence of these video recordings will not be seen until CY 2016, they may additionally provide a means of randomly assessing the nature and quality of the police/civilian interaction during these stops.  A copy of the department's mission statement and policies and procedures related to initiatives to address biased policing are contained in Appendix A.

While a determination as to 1) whether police are biased in their decision-making, 2) if biased, how this bias is exhibited, and 3) who is exhibiting the bias is sought, unfortunately, there are no strategies to definitively identify biased policing within a law enforcement agency or even among a group of officers within a division or department.  The practice of data collection reflects

---

[5] Fridell, et.al., Police Executive Research Forum, 2001

"...accountability, openness, and sound management" [6] among police agencies.  There are, however, pros and cons to the data collection and it must be clearly understood that no form of data collection currently in existence can prove or disprove the existence of biased decision-making within an agency.

The Louisville Metro Police Department (LMPD) initiated the practice of collecting and analyzing vehicle stops information in 2004.  Data from vehicles stops was analyzed in 2004, 2005 and 2006.  The department re-initiated the analysis of vehicle stops information in January 2013.  This analysis assesses patterns in vehicle stops made by police officers as a means of addressing biased-policing.

## Findings

During this 12-month time period (2014), LMPD reported making 82,590 vehicle stops.  The stops were relatively evenly distributed across the annual time period.  The specific monthly distributions are contained in Table 1.  The variation in the proportion of stops by month is probably caused by a seasonal drop in calls for service resulting in officers having more time to respond to traffic violations.

**TABLE 1**
**PERCENTAGE OF TOTAL STOPS BY MONTH**
**Calendar Year 2014**

| MONTH | PERCENT TOTAL STOPS |
|-------|---------------------|
| January | 10.4 |
| February | 9.8 |
| March | 9.3 |
| April | 8.6 |
| May | 9.5 |
| June | 8.0 |
| July | 7.6 |
| August | 7.9 |
| September | 7.4 |
| October | 7.0 |
| November | 7.4 |
| December | 7.1 |

The distribution of stops across divisions is contained in the Table 2.  Given differences in size (population, geographic) as well as number and distribution of personnel, traffic corridors, etc., it is expected that divisions would account for differing proportions of total vehicle stops.  Specifically, the larger divisions have more roadways which provides for more traffic movement and therefore, more opportunities for traffic violations.  The larger divisions such as the 7th and 8th Divisions have expressways and also dedicated traffic officers.  These "opportunities" and these

---

[6] Fridell, et.al., Police Executive Research Forum, 2001, p. 115

3

"resources" increase both the potential for traffic violations as well as the chance of being caught. Additionally, the 5th Division receives a significant number of traffic complaints and the proportionately greater number of stops made by the division reflects a response to these citizen complaints. When comparing the 2014 distribution of stops across the divisions to the same distribution for the April 2013 thru March 2014 stops, the specific percentages may change but the rank ordering of divisions in terms of size of contribution remains almost constant.  The changes in the percentage of the total are due, in part, to the variation in total stops and the fact that January through March 2014 are represented in both 12-month periods.   However, the rankings reflect the constancy in the divisions in terms of the proportion of total vehicle stops performed annually within each jurisdiction.

**TABLE 2**
**PERCENTAGE OF TOTAL STOPS BY DIVISION**
**Calendar Year 2014 and April 2013 thru March 2014**

| DIVISION | PERCENT TOTAL STOPS 2014 | PERCENT APRIL 2013 THRU MARCH 2014 |
|---|---|---|
| 1 | 7.5 | 6.5 |
| 2 | 7.8 | 7.4 |
| 3 | 11.5 | 9.8 |
| 4 | 11.2 | 12.7 |
| 5 | 17.9 | 18.5 |
| 6 | 12.1 | 11.9 |
| 7 | 13.8 | 13.5 |
| 8 | 18.2 | 19.7 |

**CHART 1**
**RACE/ETHNICITY OF DRIVER**
**Calendar Year 2014 and April 2013 thru March 2014**



**Race of the driver**: During calendar year 2014 the majority, 66 percent, of drivers during the vehicle stops were Caucasian, 28.8 percent were African American, 3.8 percent were Hispanic, 1 percent were Asian American and . 4 percent were other races/ethnicities.   The findings for distribution of the race/ethnicity of the driver for the April 2013 thru March 2014 report not differ from those of calendar year 2014.

**CHART 2**
**METRO LOUISVILLE POPULATION ESTIMATES**
**U.S. Census - 2013**



**Gender of the driver**: During calendar year 2014, 37.4 percent of the drivers stopped were female.  Similarly, the percent of drivers stopped who were female during the 2013-2014 period was 37.6 percent.  No differences were noted in the two time periods.

**TABLE 3**
**AGE OF DRIVER**
**Calendar Year 2014 and April 2013 thru March 2014**

| Age | Percent 2014 | Percent 2013-2014 |
|---|---|---|
| 16 to 19 | 6.7 | 6.4 |
| 20 to 25 | 21.7 | 22.7 |
| 26 to 30 | 15.4 | 16.1 |
| 31 to 40 | 23.7 | 23.4 |
| 41 to 50 | 16.6 | 16.0 |
| 51 to 60 | 10.5 | 10.3 |
| Over 60 | 5.4 | 5.1 |
| **TOTAL** | 100.0% | 100.0% |

**Age of the driver:** During calendar year 2014, the majority of drivers stopped were between the ages of 20 (20 to 25, 21.7%) and 30 (26 to 30, 15.4%) years of age.  A total of 37.1 percent of all drivers stopped fell into this age range.  Table 3 contains the age distribution of the drivers stopped.  As noted in Table 3, the age distribution did not change from the 2013-2014 12-month reporting period to the current 2014 calendar year reporting period.

CHART 3
VEHICLE STOPS OUTCOMES
Calendar Year 2014



**Search conducted**:  During calendar year 2014, approximately 6.5 percent of the vehicle stops resulted in a search.  Chart 3 contains a representation of the various outcomes per 100 stops.  That is, for every 100 stops made, 25 resulted in a citation, 69 in a warning, 7 in a search and 6 in an arrest.  So, very few stops actually resulted in a search of the vehicle as part of the traffic stop.  The percentage of stops resulting in searches has decreased from 11 percent in 2006 to 6.5 percent in calendar year 2014.  It is, in all probability, due to a change in the laws defining when a police officer may conduct a search after an arrest made during a vehicle stop.  The 2009 Supreme Court ruling, Arizona V. Gant, limited the conditions under which a police officer could search an individual after making an arrest involving a vehicle stop.  Specifically, officers may now only search the vehicle of an individual they are arresting when they have reason to believe the vehicle contains evidence of the crime for which they are arresting the individual.  This has caused the transition away from solely searches of vehicles incidental to arrest and moved the search justifications into the probable cause and consent categories.[7]  Probable cause searches require

---

[7] For more information on this case, go to:
http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display_arch&article_id=2305&issue_id=22011

specific legal grounds for the search.  Consent searches require the citizen to "agree" to the search.  As such, the conduct of searches during vehicle stops and specifically when there is an arrest, are not as pro forma as prior to Arizona V. Gant. Thus, the reduction in the percentage of vehicle stops resulting in a search.

The greatest percentage of stops resulting in a search involved Caucasian drivers (52.2%) followed by African American (43.6%) and Hispanic (3.3%) drivers.  Table 4 contains information on the percentage of searches performed during stops based on the ethnicity of the driver.  As shown in this table, 9.8 percent of stops involving African American drivers resulted in a search while 5.1 percent of stops involving Caucasian drivers and 5.6 percent of stops involving Hispanic drivers resulted in the same.  This represents a decrease in vehicles searched during stops involving African American drivers from 13.7 percent in the 2013-2014 report to 9.8 percent in the current report with smaller drops in the percentages for vehicle stops with Caucasian and Hispanic drivers.

**TABLE 4**
**RACE OF DRIVER BY VEHICLE SEARCHED?**
**Calendar Year 2014 and April 2013 thru March 2014**

| VEHICLE SEARCHED? | Caucasian | African American | Hispanic |
|---|---|---|---|
| **2014** | | | |
| **Yes** | 5.1 | 9.8 | 5.6 |
| **No** | 94.9 | 90.2 | 94.4 |
| **Total** | 100.0% | 100.0% | 100.0% |
| **2013-2014** | | | |
| **Yes** | 7.6 | 13.7 | 7.2 |
| **No** | 92.4 | 86.3 | 90.8 |
| **Total** | 100.0% | 100.0% | 100.0% |

**TABLE 5**
**REASON FOR SEARCH**
**Calendar Year 2014 and Calendar 2006**

| REASON FOR SEARCH | 2014 | 2006 |
|---|---|---|
| **Consent** | 53.1% | 41.7% |
| **Probable Cause** | 37.5 | 10.9 |
| **Incident to Arrest** | 6.8 | 45.6% |
| **Total** | 100.0 | 100.0 |

 Table 5 compares the 2014 distribution of reasons for the conduct of a search to the same distribution for 2006, the most current year for which we have data prior to Arizona V. Gant in 2009.  The significant transition of searches from those conducted Incident to Arrest ( 45.6% in 2006 to 6.8% in 2014) as well as the increases in searches based on Probable Cause (37.5% in 2014) and Consent (53.1% in 2014) suggests that this Supreme Court Ruling may be, in part, contributing to this change.  Table 6 compares the 2014 calendar year to the April 2013 through

March 2014 reporting period.  There is no change noted in the types of searches conducted during vehicle stops from the earlier to the more current reporting period.

**TABLE 6**
**REASON FOR SEARCH**
**Calendar Year 2014 and April 2013 through March 2014**

| REASON FOR SEARCH | 2014 | 2013-2014 |
|---|---|---|
| Consent | 53.1% | 54.8% |
| Probable Cause | 37.5 | 36.5 |
| Incident to Arrest | 6.8 | 6.9 |
| Total | 100.0 | 100.0 |

**TABLE 7**
**FOR VEHICLES SEARCHED: REASON FOR SEARCH AND RACE OF DRIVER**
**Calendar Year 2014 and April 2013 to March 2014**

| Race of Driver | Reason for Search | | |
|---|---|---|---|
| | Caucasian | African American | Hispanic |
| **2014** | | | |
| Consent | 58.1 | 49.8 | 59.5 |
| Probable Cause | 33.3 | 45.5 | 28.6 |
| Incident to Arrest | 8.6 | 4.7 | 11.9 |
| | 100.0% | 100.0% | 100.0% |
| **2013-2014** | | | |
| Consent | 59.2 | 51.2 | 57.8 |
| Probable Cause | 33.2 | 43.0 | 27.8 |
| Incident to Arrest | 7.6 | 5.8 | 14.4 |
| **TOTAL** | 100% | 100% | 100% |

As shown in Table 7, stops involving drivers of all races were most likely to be involved in consent searches with stops of Caucasian (58.1%) and Hispanic (59.5%) drivers more likely than stops of African American (49.8%) drivers to be involved in a consent search.  A total of 45.5 percent of stops made with an African American driver resulted in a probable cause search.  Approximately one-third (33.3%) of stops of vehicles with Caucasian drivers and 28.6 percent of stops with Hispanic drivers also resulted in probable cause searches.  Lastly, stops involving Hispanic drivers (11.9%) were more likely than stops involving Caucasian (8.6%) and African American (4.7%) drivers to result in a search incident to arrest.  Additionally, no significant differences were noted in the reason for search by race of driver from the April 2013-March 2014 to calendar year 2014.

While, unfortunately, the data collected for this analysis does not contain information that can completely address the issue of a greater percentage of stops involving African American and Hispanic drivers resulting in searches, this data on the reason for the search and race of the driver lends some indirect evidence that can be used for a partial interpretation.  Specifically, 45.5 percent of the searches of stops involving African American drivers were conducted because the police officer had probable cause to do so.  Probable cause searches require some degree of legal

8

justification on behalf of the police officer.  Consent searches do not.  The higher rate of searches among stops involving African American drivers may be due to the fact that probable cause existed, during these stops, for a search.

**Outcome of search**: The percentage of searches that resulted in positive findings of contraband, fruits of the crime and/or evidence was 25.9 percent during the 2014 analysis.  This is a decrease from the 46.4 percent of stops in the April 2013 thru March 2014 12-month report.

Table 7 contains search outcome for each type of search conducted.  As was the case with the analysis of "reason for search" in Table 6, due to the small number of stops involving "other", "terry/pat down", and "plain view" searches, only those searches identified as "consent", "probable cause", and "incident to arrest" will be included in this analysis.

**TABLE 8**
**REASON FOR SEARCH BY OUTCOME OF SEARCH**
**Calendar Year 2014 and April 2013 through March 2014**

| Search Outcome | Consent | Incident to Arrest | Probable Cause |
|---|---|---|---|
| **2014** | | | |
| Negative | 86.0 | 87.7 | 57.4 |
| Positive | 14.0 | 12.3 | 42.6 |
| **Total** | 100.0% | 100.0% | 100.0% |
| **2013-2014** | | | |
| Negative | 73.3 | 58.5 | 24.1 |
| Positive | 26.3 | 41.5 | 75.9 |
| **Total** | 100% | 100% | 100% |

As shown in Table 8, incident to arrest and consent searches were almost equally as likely to result in some type of finding by the officers.  Probable cause searches were the most likely to result in some type of finding during calendar year 2104 and the 2013-2014 timeframe.  During both time periods, the other types of searches, consent and incident to arrest, were the least likely to result in a finding.  Probable cause searches were almost equally as likely to find contraband, evidence, or fruits of the crime as to result in a negative outcome but were significantly more likely than other types of searches, in both report years, to result in a positive finding.  These findings simply reflect the nature of the justification for the search.  Consent searches being justified solely through driver consent with probable cause and incident to arrest searches requiring higher order and more specific legal justification.

It is interesting to note that the percentage of searches, of each type, resulted in fewer findings during the 2014 calendar year than in the 2013-2014 12-month report.  Positive findings during consent searches decreased from 26.3 percent to the current 14 percent.  Positive findings from probable cause searches decreased from 75.9 percent to 42.6 percent.  Lastly, positive findings from searches incident to arrest decreased from 41.5 percent to 12.3 percent.  These differences are significant and may indicate a change in officer decision-making that may require additional training on the various justifications for vehicle searches and/or training on how to conduct a more complete search.

**TABLE 9**
**SEARCH OUTCOME BY RACE OF DRIVER**
**Calendar Year 2014**

| Outcome | African American | Hispanic | Caucasian |
|---|---|---|---|
| Negative | 97.4% | 99.1% | 98.7% |
| Positive | 2.6% | 0.9% | 1.3% |
| TOTAL | 100.0 | 100.0 | 100.0 |

Table 9 contains information on the relationship between the outcome of a search and the race of the driver. The overall percentage of searches resulting in a positive finding was relatively small. Searches of vehicles with African American drivers (2.6%) were more likely than those of Caucasian drivers (1.3%) and Hispanic drivers (0.9%) to result in a positive finding. This is, in all probability, related to the type of search conducted.  African American drivers were more likely than Caucasian and Hispanic drivers to have a probable cause search conducted during a vehicle stop.  Probable cause searches (See Table 8) were the most likely to result in a positive finding.

Table 10 lends further insight into the rates of searches with positive findings by race.  When the relationship between race of the driver and search outcome is assessed within each type of search, differences by race of the driver are not evident.  [8]Specifically, within consent searches, no significant differences exist between searches conducted during stops with Caucasian drivers and stops with African American drivers (15% positive for Caucasian drivers versus 13.3% positive for African American drivers). The same absence of significant differences based on the race of the driver are evident for both probable cause and incident to arrest searches.

**TABLE 10**
**OUTCOME OF VEHICLE STOP BY RACE OF DRIVER BY TYPE OF SEARCH**
**Calendar Year 2014**

| TYPE OF SEARCH | OUTCOME | RACE | |
|---|---|---|---|
| | | Caucasian | African American |
| Consent | No | 85.0% | 86.7% |
| | Yes | 15.0 | 13.3 |
| | Total | 100.0% | 100.0% |
| Probable Cause | No | 56.3% | 57.7% |
| | Yes | 43.7 | 42.3 |
| | Total | 100.0% | 100.0% |
| Incident to Arrest | No | 87.8% | 89.4% |
| | Yes | 12.2 | 10.6 |
| Total | | 100.0% | 100.0% |

---

[8] Due to the small number of stops involving Hispanic drivers, this group has not been included in this section of the analysis.

**TABLE 11**
**OUTCOME OF VEHICLE STOP BY RACE OF DRIVER**
**Calendar Year 2014**

| Outcome | Caucasian | African American | Hispanic |
|---------|-----------|------------------|----------|
| **2014** | | | |
| Citation | 24.4% | 25.6% | 25.9% |
| Arrest | 7.2 | 8.8 | 8.6 |
| Warning | 68.4 | 65.6 | 65.5 |
| **Total** | **100.0%** | **100.0%** | **100.0%** |

**Outcome of stop**: The final outcome of a vehicle stop may take three general forms: written citation, verbal warning or arrest.  As shown in Table 11, during the 2014 reporting period, the majority of stops resulted in a "warning" to the driver (67.5%).  Another 24.7 percent resulted in the issuance of a citation and the smallest potion, 7.8 percent, resulted in an arrest.  This was a variable which was included only during the latter period of the April 2013 through March 2014 reporting period and, as such, is not included for comparative purposes.

Table 12 contains the distribution of vehicle stop outcome by the reason for the search.  As shown in this table, those stops resulting in a consent search were most likely to result in a warning (58.3%).  Those stops resulting in a probable cause search were most likely to result in a citation (50.3%) but more than twice as likely as consent searches to result in an arrest (13.3% versus 27.4%).  As noted for the data contained in Table 10, only data from the 2014 calendar year are included this portion of the analysis.

**TABLE 12**
**OUTCOME OF STOP BY REASON FOR SEARCH**
**Calendar Year 2014**

| | Outcome | Consent | Probable Cause | Incident to Arrest |
|---|---------|---------|----------------|--------------------|
| **2014** | Citation | 28.4% | 50.3% | .6% |
| | Arrest | 13.3 | 27.4 | 99.4 |
| | Warning | 58.3 | 22.3 | 0.0 |
| | **Total** | **100.0%** | **100.0%** | **100.0%** |

**Recommendations and Conclusions**

While analysis of this data cannot confirm nor eliminate a finding of biased policing within the Louisville Metro Police Department, collection of the data reflects an openness and willingness to sustain transparency within police community relations.  The following items were made as recommendations and have been completed or are implemented and ongoing as a as a means of promoting this transparency and supporting positive police and community relations.

1. Continue to conduct an annual analysis of vehicle stops data.

   *Louisville Metro Police Department continues to collect vehicle stops data and to work with the analysts to improve the quality of the data and resultant analysis.*

2. Gathered information from police officers to identify explanations for the decrease in positive findings from searches based on probable cause and incident to arrest.

   *Officers have responded to focus group meetings and other inquiries concerning the decrease in positive findings.  Some of the comments from officers suggest that additional training for the influx of new recruits on the conduct of more complete searches is necessary.  Additionally, some officers noted a concern of "needle sticks" during searches of vehicles due to the increased use of heroin as a concern that could detract from the quality of their search.  LMPD is providing gloves for officers to use during searches that will address these concerns.  Lastly, LMPD will conduct additional training on the varied justifications for searches for all LMPD officers as a means of ensuring that these officers have the information they need to make an appropriate discretionary decision concerning whether or not it is necessary and/or legal to conduct a search during a vehicle stop.*

3. A "quality control system" has been established to ensure officers provide all of the information required on the data collection form.

   *LMPD regularly analyzes vehicle stops reports and the completeness of vehicle stops reports to ensure officers are providing complete information for analysis.  They have additionally worked with supervisors within LMPD to reiterate the need for this information and to increase supervisor cooperation with their quality control efforts.*

4. Implementation of the multi-faceted approach to biased policing as developed by the Police Executive Research Forum and supported by the International Association of Chiefs of Police.  This approach incorporates a wide range of actions, on the part of police agencies, that contribute to transparency; strong community relations; respect for human dignity, human rights and diversity; and public accountability.  A detailed listing of the components to this approach are contained in Appendix A.  The following section highlights some of the items that are ongoing, have been implemented or are scheduled for implementation to accomplish this multi-faceted approach to biased policing in the Louisville Metro Police Department.

   *Leadership in the department has continued to pursue full implementation of the multi-faceted approach to biased policing, as developed by the Police Executive*

*Research Forum, and supported by the International Association of Chiefs of Police. See Appendix A for a detailed accounting for these accomplishments.*

*The following items are examples of actions taken by LMPD to implement the broad-based approach to biased policing:*

- *Reviewed and revised department policies and procedures, to include those related to vehicle stops and searches, for consistency with practices that respect human and civil rights.*

- *Ensured that department policies and procedures related to the responsibilities and privileges of policing directly hold the individual officers and their supervisors hold accountable for their actions in all policing activities.*

- *Effective 2015, the department has engaged in mandatory training, for all police officers, that addresses topics of biased policing as well as means to minimize biased policing through the development of cultural appreciation, understanding of implicit bias, and the practice of procedural justice. Effective 2016, the department will expand the content of this training to include policing in a democratic society and the principles of community policing.*

- *The conduct of annual citizens' attitude surveys that provide a means for members of the community to evaluate the quality of police services.*

- *Protection of confidentiality in the complaint review and resolution process.*

- *Tracking of use of force incidents and biased policing complaints so that officers involved can be held accountable for their actions.*

- *Processes have been made available so that civilians may file a complaint online making access to the civilian complaint process more open.*

- *Compilation and posting of quarterly personnel action reports – documenting commendations and disciplinary actions – on the LMPD Web site.*

- *Continuation of the vehicle stops database through the mandatory completion of a vehicle stops form which includes information related to the nature of the stop and characteristics of the driver.*

- *Implementation of Wearable Video cameras for all police officers which will increase transparency and accountability as well as trust for police officers.*

- *Sustained efforts to recruit and retain minority police officers within the department.*

A copy of the department's mission statement and policies and procedures related to initiatives to address biased policing are contained in Appendix B.

# APPENDIX A

# LOUISVILLE METRO POLICE

## RACIALLY BIASED POLICING:

## A Principled Response

## Chief of Police

## Steve Conrad

The Louisville Metro Police Department (LMPD) obtained a copy of the Police Executive Research Forum (PERF) report titled "Racially Biased Policing: A Principled Response" by Lorie Fridell, Robert Lunney, Drew Diamond, and Bruce Kubu. This publication explores the issues surrounding racially biased policing and the steps that law enforcement agencies can take to prevent these types of incidents from occurring.

The following is the LMPD's response to the recommendations stated in this report:

| Recommendation | LMPD's Response |
|---|---|
| Police policy gives direction and authority to mission and value statements. Procedures provide the operating details to guide personnel in conducting their duties. Policies and procedures are critical to achieving agency goals.<br><br>These policies represent an important effort to convey to both citizens and police that "racial profiling" will not be tolerated. Unfortunately, the vast majority of these policies do little to clarify how officers can conduct their activities in racially neutral ways (albeit some agencies may address this in training). Of particular concern is the lack of guidance that we provide officers with regard to whether and how they can use race as one factor in a set of factors to establish reasonable suspicion or probable cause and to make other law enforcement decisions. | • Kentucky Revised Statute (KRS) 15A.195 prohibits profiling:<br><br>No state law enforcement agency or official shall stop, detain or search any person when such action is solely motivated by consideration of race, color or ethnicity, and the action would constitute a violation of the civil rights of the person.<br><br>• The LMPD requires members to immediately report any profiling incident in SOP 8.8.5:<br><br>All members are required to immediately report any profiling incident in writing, through the appropriate chain of command, to the Chief of Police.<br><br>• The LMPD prohibits profiling in SOP 8.8.6:<br><br>The Louisville Metro Police Department (LMPD) neither condones, nor tolerates, profiling. Officers engaging in such conduct shall be subject to disciplinary action.<br><br>• The LMPD prohibits prejudice in SOP 5.1.20:<br><br>Members shall not express any prejudice concerning race, ethnicity/national origin, gender, gender identity, sexual orientation, religion, socio-economic status, disability, politics or other similar personal characteristics.<br><br>• All LMPD sworn personnel received training in 2015 on implicit bias, procedural justice and de-escalation.<br><br>• Since 2015, all recruit classes receive training in implicit bias and procedural justice.<br><br>• LMPD requires the use of a "STOPS" form on every traffic stop. This documents the |

| | |
|---|---|
| | details of the stop and occupants of the vehicle to include race and whether or not a search was conducted.<br><br>• LMPD has an annual contract with the University of Louisville to analyze the STOPS data and produce a report which explains the data.<br><br>• LMPD conducted focus groups in response to the 2014 STOPS study to further examine discrepancies in the data and look for ways to improve performance. |
| Police agencies have the potential to reduce racial bias by hiring officers who can police in an unbiased way, and by hiring a workforce that reflects the community's racial demographics. | • The LMPD shall work with the Recruitment and Selection Unit to come up with questions for new hires.<br><br>• The LMPD strives to hire individuals who are representative of the city's demographics pursuant to SOP 2.27.1:<br><br>The LMPD shall strive to actively recruit and select applicants based on the best qualified applicant pool, which is representative of the demographics of the community as a whole.<br><br>• LMPD tracks the demographics of its employees in the Mayor's LouieStat Program.<br><br>• LMPD creates a monthly census report to track the demographics of both sworn and non-sworn personnel.  This report is posted on the department's website under a transparency link.<br><br>• LMPD sworn employees are required to pass a psychological exam to ensure they are mentally fit for duty and aren't exhibiting any signs of prejudicial behavior. |
| The chief executive sets the tone by word and deed, articulating the mission and the style of operation for all to understand. Chiefs must consistently practice the organizations values in their professional and personal behavior. When things go wrong, such as with highly charged accusation of biased policing, leadership must respond.<br><br>• The chief establishes operational and administrative priorities and bears primary responsibility for ensuring a | • The LMPD Mission Statement and the Law Enforcement Code of Ethics stress the importance of protecting the constitutional rights of all, prohibiting personal feelings or prejudices from affecting decisions, the importance of ethical behavior and accountability, showing respect for all people and being objective through fair and impartial enforcement of laws without bias.<br><br>• In 2015 all sworn employees received training in de-escalation, implicit bias and procedural justice. |

| | |
|---|---|
| positive working relationship with the policing authority, other government agencies and all elements of the community.<br>• The chief is responsible for ensuring that the police function lawfully, protecting the rights of all.<br>• The chief is responsible for ensuring that the community's diverse needs and interests are addressed openly and equitably, with respect and dignity for all.<br>• The chief is responsible for shaping and guiding the organizational culture, and for ensuring that the police meet quality standards.<br>• Chiefs' direction of the performance appraisal process is another critical function, as it affects all staff development. | • Starting in 2015, all LMPD academy classes receive training in de-escalation, implicit bias and procedural justice.<br><br>• LMPD 2016 training will incorporate policing in a democratic society, principles of community oriented policing and more de-escalation review.<br><br>• The principles found in the President's Report on 21st Century Policing have been embedded into all facets of LMPD training. |
| The chief executive should direct an audit of the agency mission and value statements, code of ethics and all policies, procedures and practices to ensure they consistently reflect a commitment to integrity, justice, protection of human rights, and unbiased performance of duties. This audit should be embedded in the ongoing professional standards or quality assurance processes in all agencies, regardless of size. We further recommend that the chief executive consider engaging a qualified professional specializing in human rights in creating the standards that will be used for self-evaluation.<br><br>• Awareness of human rights and correction of improper practices are best ensured by integrating policy amendments into the basic and in-service training curriculum, reinforced by frontline supervisors.<br>• Chief executives are responsible for ensuring that officers' conduct complies with and promotes basic human rights. | • The LMPD Mission Statement stresses ethical behavior and accountability by performing duties with an unwavering commitment to integrity, professionalism and dependability.<br><br>• These responsibilities are shared with the city's Human Rights Commission and the city's Ombudsman.<br><br>• The LMPD Research and Development Unit conducts audits of policy and does best practice research from other police departments from around the country. |
| The chief executive should assess the organizational culture, its strengths and vulnerabilities, identifying occupational stress factors for remedial action and reinforcing activities reflecting appreciation | • It is the responsibility of the Chief of Police to assess the department's organizational culture, including its strengths and vulnerabilities. The LMPD, in conjunction with the Louisville Metro |

| | |
|---|---|
| for good work, individual differences and respectful interaction among all employees.<br><br>• Leaders' ability to support, encourage and build on the internal culture's positive aspects is critical to the acceptance of progressive policies and control over attitudes and behavior threatening isolation of the police and disengagement from the public. A heavy burden rests with the chief executive's leadership capacity. | Police Foundation, has monthly and annual awards for civilians and officers for the purpose of recognizing and rewarding employees. The LMPD also has letters of commendation/appreciation for the purpose of recognizing employee actions.<br><br>• LMPD creates a quarterly personnel action report which lists both commendations and discipline of the department. This report is posted on the departments website as well as the Metro open data portal.<br><br>• LMPD creates a quarterly newsletter to highlight and recognize officer's good work throughout the department.<br><br>• LMPD nominates officers for national awards: In 2014 *Officer Andre Bottoms received the Liberation Award for Human Rights from ICAP.* |
| The chief executive should focus the agency on quality assurance methods in all aspects of operation directing, supporting and managing internal controls and employing state, local and national standards, whenever possible.<br><br>• The first level of quality assurance with decentralized systems rests with recruitment and selection. The good character and personal integrity of the officer are paramount to ensuring honesty and respectful behavior.<br>• The next most critical element is the means by which the department's values are communicated.<br>• The third level is quality control. Quality control and organizational integrity are founded on standards, inspection and audit systems.<br>• Audit and inspection systems provide the structure for institutional overview and quality assurance. | • The LMPD is accredited through the Kentucky Association of Chiefs of Police (KACP).<br><br>• The LMPD Records Unit monitors reports and assists with quality control.<br><br>• The LMPD is subject to review from the Metro Office of Internal Audit.<br><br>• The LMPD Property Room conducts regular audits of its inventory.<br><br>• The Office of Management and Budget conducts fiscal reviews and audits grant spending.<br><br>• The LMPD has an Inspections and Compliance Unit. This unit inspects physical properties and ensures compliance with all department, state, local and federal guidelines.<br><br>• The Chief of Police routinely speaks at academy classes, graduations, ceremonies and other public events to promote the department values both in practice and in speech.<br><br>• LMPD conducts background checks on all employees to include psychological testing. |

| | |
|---|---|
| The chief executive should assess the need to introduce or reinforce an integrated approach for encouraging police awareness and appreciation of racial/ethnic diversity and cultural differences.<br><br>• Agencies have found that integrating the theme of racial and cultural diversity into mainstream curriculum subjects, and into normal and everyday functions, is a much more successful approach.<br>• The chief must be acutely aware of the community's social environment and ensure that officers are educated about the community's racial and cultural diversity, and about diversity beyond the local jurisdiction's limits.<br>• Police agencies that understand and value diverse communities create structures and systems that reach outward, enjoining and empowering police officers and citizens to collaborate in problem-solving on issues of crime and disorder. | • The LMPD has issued Training Bulletins and offers recruit/in-service on implicit bias, racial profiling and cultural sensitivity.<br><br>• All LMPD personnel received procedural justice, implicit bias and de-escalation training in 2015.  These philosophies are now woven into all aspects of LMPD training.<br><br>• LMPD participates in Metro Government's One Love Louisville Program.  Under goal 12 of this program, LMPD leads or participates in numerous community outreach efforts.  Many of these efforts focus on the youth with an emphasis of allowing interaction with police in a non-enforcement environment. |
| The chief executive should direct regular reviews of the complaint reception process to ensure that complainants are not subject to any form of discouragement, intimidation or coercion in filing their complaints. We further recommend that the public complaint management system include a separate category to permit clear and accurate monitoring of complaints of biased policing, with the capacity to identify patterns and practices inimical to equal treatment of citizens.<br><br>• It falls to the chief executive to set the tone, establish the policies, systems and procedures and, in many cases, ultimately decide the merit of public complaints.<br><br>• A record system with a separate category for complaints of biased policing will afford the chief an opportunity to monitor and respond publicly to questions of alleged improper discrimination by race, | • The LMPD protects complainant confidentiality in SOP 2.10:<br><br>The Professional Standards Unit (PSU) shall conduct administrative investigations of complaints against members of the department and shall be a central repository of all complaints, administrative investigations and disciplinary actions taken by supervisors.  All investigations shall be conducted with strict confidentiality.<br><br>• The LMPD Special Investigations Division (SID) utilizes a software program (IAPro) to track use of force incidents and biased policing complaints against officers. This program tracks these incidents by recording the race of the officer and the race of the complainant or suspect. The SID's PSU tracks complaints by race of the complainant and the race of the officer. The LMPD command staff shall continue to work with the PSU to find better ways to track and analyze complaint data, which may include requiring the PSU to produce a quarterly report of biased policing complaint |

| | |
|---|---|
| perceived or well-founded. Above all, the reception system must ensure that complainants are not subject to any form of discouragement, intimidation or coercion. | data. The LMPD is looking to enhance the tracking capabilities of IAPro.<br><br>• A responsibility of the city's Ombudsman is to ensure that citizens have an open, unbiased source to file complaints. The Ombudsman audits this process.<br><br>• LMPD has a policy which addressed bias policing and officers are subject to discipline for violating this category of policy.<br><br>• LMPD now allows for citizens to file complaints against officers on-line.<br><br>• LMPD creates and posts a quarterly report of all complaints and discipline against LMPD members.<br><br>• LMPD is working to create a real time reporting system so the public can be informed about complaints and discipline as they occur. |
| The chief executive should provide for regular audits of the complaint system, comparing performance against policy and using spot-checks and reviews to evaluate effectiveness and efficiency.<br><br>• The chief executive should monitor complaint systems through periodic reviews of the nature and incidence of complaints and spot-checks of individual files.<br>• Agencies contemplating the introduction of integrity testing will prudently obtain legal advice, review the impact on discipline codes and labor agreements, and consult with union representatives. | • This is a responsibility of the city's Ombudsman.<br><br>• The Citizen's Commission on Police Accountability conducts reviews of the complaint system.<br><br>• An Administrative Incident Report (AIR) is completed on each use of force incident, via BlueTeam, and these AIRs are reviewed by division commanders.<br><br>• A monthly report is created and aggregate data is analyzed to identify issues that need to be pursued by the Professional Standards Unit and the Training Unit. |
| The chief executive should study the advantages offered by early warning systems and consider a design appropriate to the agency's particular conditions and needs.<br><br>• Many progressive law enforcement organizations are implementing record systems with decision-prompting mechanisms called "early warning systems." These systems collect occurrence data on a broad selection of individual | • The LMPD utilizes an early warning system software program (IAPro) for the purpose of identifying work-related problematic behavioral patterns among members.<br><br>• The LMPD is looking to enhance the tracking capabilities of IAPro.<br><br>• LMPD is in the process of developing a new early warning system to identify potential issues with employees before |

| | |
|---|---|
| performance indicators, not only from public complaints, but other elements of an officer's performance from disciplinary actions, vehicle collisions, absenteeism reports, performance appraisals, personal problems, and training results. | they get to an unacceptable level of performance. |
| As a preliminary to focusing an action program on bias-free performance, chief executives must first clarify for middle managers and supervisors the agency expectations regarding their responsibilities. Top leadership must support and encourage middle managers and supervisors by visibly promoting and enforcing high professional standards.<br><br>• While top management's influence is always important, it is the frontline supervisor and middle manager who capture frontline officers' attention.<br>• Sergeants, lieutenants and captains wield by far the most powerful influence over the day-to-day activity, attitude and behavior of operational police officers. These supervisors must take responsibility for carrying out any effective program of change or reinforcement of behavior. They cannot do this without clarity in their assignments and expectations. | • Supervisors have the responsibility to investigate administrative violations (e.g. sick leave abuse, tardiness, pursuit violations, etc.). The findings of these administrative investigations shall be forwarded, through the appropriate chain of command, to the Chief of Police.<br><br>• LMPD commanders at the rank of major and above are appointed by and report directly to the Chief of Police.<br><br>• Regular staff meetings are conducted at every level of the department. At these meetings, the Chief's expectations are communicated down to the rank and file.<br><br>• LMPD is planning to hold a seminar in 2016 for all sergeants to attend. This will be an opportunity for the Chief to speak directly to front line supervisors and set clear expectations for current and future performance.<br><br>• LMPD commanders at the rank of major and above completed a week long training event in January of 2016. During this event, new strategies and expectations were discussed.<br><br>• The LMPD explains the role of supervisors in SOP 2.28.3:<br><br>The member's supervisor is often the first to recognize changes in behavior/performance of those under his/her command. Therefore, supervisors are the key to early intervention and a successful outcome. Supervisors are encouraged to speak with those under their command whenever changes in behavior/performance are noticed. Documentation of any communication shall be made. Performance evaluations, disciplinary |

|  | actions, use of force incidents, traffic accidents and workers' compensation claims may reveal changes in member behavior/performance. Supervisors shall recognize and document these changes. Supervisors shall also be responsible for following-up with the member and/or other parties involved to ensure that the member is taking advantage of, or participating in, the appropriate resources for improvement.<br><br>• The LMPD utilizes roll call training and Training Bulletins to ensure that its members stay informed of legal/policy issues affecting the department. The department requires the completion of an Administrative Incident Report (AIR), via BlueTeam, on every use of force incident. All AIRs are reviewed by division commanders. Commanders receive supervisor training through the Southern Police Institute (SPI) AOC. |
|---|---|
| Middle managers and supervisors should ensure that all officers under their supervision are familiar with the spirit and intent of policy in dealing professionally, ethically and respectfully with the public, and that officer are complying with orders. This goes hand in hand with respecting officers' perceptions of offenders and encouraging them to gain insights into their own responses.<br><br>• Leaders at the supervisory level must exercise motivational and control practices that ensure officers are operating within policy at all times, and through word and action represent the agency's ethical commitments. | • The LMPD utilizes the policy tracking software program, PowerDMS, to ensure that all members have received and understand policy updates.<br><br>• All LMPD personnel received procedural justice, implicit bias and de-escalation training in 2015.<br><br>• Wearable Video Systems were deployed to the majority of LMPD in 2015 and allow for an accurate account of all interactions with citizens. The entire patrol bureau of LMPD should be equipped with WVS by early 2016. |
| Middle managers and first-line supervisors should pay particular attention to the assignment of probationary officers or officers undergoing field training to ensure they are partnered with experienced officers known to operate within policy. We further recommend that the field training reporting system have categories for evaluating skills in communicating, manner of dealing with the public, and knowledge relating to protection of human rights.<br><br>• A probationary officer assessment system should include a category for evaluating the probationer's skills in communicating, manner of dealing with them public and | • The LMPD has a Police Training Officer (PTO) Program, in which recruits are paired with experienced officers (Police Training Evaluators (PTEs)) who monitor their performance. PTEs receive training and the idea of having them recertified is being developed. The PTO Program is outlined in SOP 2.21.5.<br><br>• The LMPD PTO Program currently evaluates newly-sworn officers regarding communication and dealing with the public. The LMPD has added the protection of human rights to the PTO Program. |

23

| | |
|---|---|
| knowledge of the law relating to protecting human rights. | |
| Supervisors should monitor activity reports for evidence of improper practices and patterns. They should conduct spot-checks and regular sampling of in-car videotapes, radio transmissions, and in-car computer and central communications records to determine if both formal and informal communications are professional and free from racial bias and other disrespect.<br><br>• The first-line supervisor has the responsibility to spot-check officer performance.<br>• Agency activity reports, including all available data on officer-initiated vehicle stops, will be helpful to the supervisor's review.<br>• Middle managers and supervisors must be alert to new laws and court decisions affecting critical procedures of arrest, search and seizure, and use of force informing, monitoring and coaching officers about the impact of updated interpretations of the law.<br>• Supervisors must be alert to any pattern or practice of possible discriminatory treatment by individual officers.<br>• Periodic sampling of in-car videotapes, radio transmissions, and in-car computer and central communications records is effective for determining if both formal and informal communications are professional and free from racial bias and other disrespect. The department should inform officers of the monitoring procedure in advance, with periodic reminders.<br>• Corrective action, when warranted, should normally be carried out by the frontline supervisor. In some cases, disciplinary action may be warranted. Conversely, officers consistently observed to operate within policy should be favorably recognized through their annual and periodic appraisal reports. | • MetroSafe and LMPD supervisors monitor radio transmissions from LMPD sworn personnel.<br><br>• The Professional Standards Unit (PSU) tracks use of force incidents.<br><br>• Metro Technology Services (MTS) monitors online communications.<br><br>• The Kentucky State Police (KSP) conducts National Crime Information Center (NCIC) audits.<br><br>• The department has implemented wearable video systems.  This allows for an accurate account of officer interaction with citizens.  This video is also subject to random review by command staff.<br><br>• Division commanders randomly audit the in-car camera footage of officers under their command.<br><br>• LMPD conducts yearly in-service training during which, every officer receives legal updates from the department's legal advisor on clearly established law.<br><br>• Disciplinary action at LMPD is carried out in accordance with the collective bargaining agreement. |
| Middle managers and supervisors should accept responsibility for ensuring that citizen complaints of biased policing are given a formal and respectful hearing, and that | • The LMPD states how supervisors should handle citizen complaints in SOP 2.10.2: |

| | |
|---|---|
| complaints are documented in accordance with agency policy. The ranking police representative should ensure that complainants are not subjected to any form of discouragement, intimidation or coercion in filing their complaints at the police station or in bringing their complaints to the attention of any officer. We further recommend that middle managers and supervisors provide the complainant with information on how the department deals with complaints, and with the name of the office responsible for handling them.<br><br>• The ranking police representative should ensure that complainants are not subjected to any form of discouragement, intimidation or coercion.<br>• The complainant's comments should be recorded and provided to the departmental investigation unit and the information on how the department deals with complaints should be provided to the complainant. | Commanding officers are encouraged to resolve minor concerns if the concern can be resolved to the satisfaction of all parties. However, the commanding officer must advise the citizen that no disciplinary action will result if the concern is resolved in this fashion.  If the citizen wishes to file a formal complaint, the commanding officer shall advise the citizen to contact the PSU.  Only members of the PSU may take affidavits.  The commanding officer shall assist the citizen by providing the working hours, telephone number and location of the PSU.<br><br>• A responsibility of the city's Ombudsman is to ensure that citizens have an open, unbiased source to file complaints. The Ombudsman audits this process.<br><br>• LMPD now allows citizens to file complaints against officers online.<br><br>• LMPD creates and posts a quarterly report of all complaints and discipline against LMPD members.<br><br>• LMPD is working to create a real time reporting system so the public can be informed about complaints and discipline as they occur. |
| The development of a policy based on the recommendations stemming from focus groups, the national survey, existing policies, constitutional law scholars, law enforcement agency counsel and others with expertise will address racially biased policing and perceptions thereof.<br><br>Departments adopt the policy set forth in this chapter.<br><br>The proposed policy:<br><br>• Emphasizes that arrests, traffic stops, investigative detentions, searches and property seizures must be based on reasonable suspicion or probably cause;<br>• Restricts officers' ability to use race/ethnicity in establishing reasonable suspicion or probable cause to those situations in which | • The LMPD has a policy to address racially biased policing issues titled "Biased Law Enforcement Practices" and includes sections regarding training and data audits/analysis. The SOP was extensively revised in January 2015 by adding language mentioned in the 2014 United States Department of Justice (USDOJ) publication titled "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation or Gender Identity." |

| | |
|---|---|
| trustworthy, locally relevant information links a person or persons of a specific race/ethnicity to a particular unlawful incident(s);<br>• Applies the restrictions above to requests for consent searches and even those "nonconsensual encounters" that do not amount to legal detentions;<br>• Articulates that the use of race and ethnicity must be in accordance with the equal protection clause of the 14th Amendment; and<br>• Includes provisions related to officer behavior during encounters that can serve to prevent perceptions of biased policing. | |
| Personnel staff should carefully evaluate applicants' character, reputation and documented history as they relate to racially biased attitudes and behavior.<br><br>• Police recruitment messages should appeal not merely to potential applicants' desire for the adventure of policing or the wages and benefits offered, but also to a spirit of fairness, justice and racial equality.<br>• Police executives should solicit input from the community, particularly minority communities, as well as from professional advertisers and marketers in crafting and delivering recruitment messages.<br><br>Background investigations should explore many facets of applicants' lives and may include:<br><br>• What people of other races and cultures say about the applicant;<br>• Whether the applicant has ever experienced being in the racial minority in any setting;<br>• Whether the applicant has ever been in a situation where there was a racial tension or conflict, and if so, how the applicant handled the situation. | • The LMPD has a Recruitment and Selection Unit that carefully evaluates each applicant's character in order to ensure that he/she does not have any racially biased attitudes/behavior.  This process includes a background check of each applicant's employment history and use of social media.<br><br>• Police applicants are required to undergo psychological testing as a pre-requisite for employment. |
| Police executives should strive to hire a workforce that reflects the highest professional standards and the racial and | • The LMPD has increased the hiring of minority officers and requires its employee composition to be representative of the |

| | |
|---|---|
| cultural demographics of the community they serve. <br><br> • Conveys a sense of equity to the public. <br> • Increases the probability that the agency will be able to understand the perspectives of its racial minorities and communicate effectively with them. <br> • It increases the likelihood that officers will come to better understand and respect various racial and cultural perspectives through their daily interactions with one another. | community's demographics as a whole pursuant to SOP 2.27.1. <br><br> • The LMPD shall strive to actively recruit and select applicants based on the best qualified applicant pool, which is representative of the demographics of the community as a whole. <br><br> • The LMPD tracks and reports out on demographic information during the Mayor's LouieStat Forums. <br><br> • The LMPD creates a department census report and posts that on the transparency link contained on our public website. |
| Police executives should ensure that special recruiting initiatives designed to attract minority applicants supplement the agency's general recruitment program. <br><br> • Police recruiters should reflect the community's racial and cultural makeup. <br> • Recruiting materials should depict a diverse group of police officers from the agency. <br> • An agency's hiring standards need not and will not be lowered to achieve racial diversity. <br> • Try to get police union support for minority recruitment. <br><br> Examples of minority recruitment strategies include: <br><br> • Recruiting at historically black colleges and universities. <br> • Recruiting through military channels. <br> • Recruiting through current minority police officers. <br> • Recruiting through the religious community. <br> • Recruiting from other fields. | • The LMPD regularly posts job openings at community colleges, social service agencies and in print media. SOP 2.27.3 states the following: <br><br> Louisville Metro Human Resources (HR) shall be responsible for posting employment vacancies on the city's website and also advertise employment vacancies through other electronic media, print media and community/social service organizations. <br><br> • The LMPD Recruitment and Selection Unit have a diverse mix of both male and female officers that includes different races of white, black and Hispanic. |
| Personnel selection processes should be geared principally to select in qualified and desirable applicants rather than screen out unqualified applicants. <br><br> • The proactive approach is designed to select in qualified and desirable applicants, and allows recruiters to focus on attracting the best candidates. | • The LMPD strives to recruit the best qualified applicants as stated in SOP 2.27.1: <br><br> The LMPD shall strive to actively recruit and select applicants based on the best qualified applicant pool, which is representative of the demographics of the community as a whole. |

| | |
|---|---|
| Police executives should periodically audit the personnel selection process to ensure that the hiring qualifications and standards are both valid and fair to applicants of all races and cultures.<br><br>An audit of the personnel selection process should gauge:<br><br>• The validity of each job qualification and testing standard;<br>• The fairness of each aspect of the selection process and whether the process as a hole, or at any stage, disproportionately disqualifies minority applicants. | • The LMPD command staff reviews every applicant file to ensure that the best qualified candidates are selected.<br><br>• The LMPD Training Division shall produce an annual report of the personnel hiring process. |
| Police executives should audit the personnel selection process to ensure that neither the sequencing of the testing stages nor the length of the selection process is hindering minority hiring objectives.<br><br>• The audit should assess whether the time between an initial application and a job offer is too long, resulting in qualified and desirable applicants being lost to employers who hire more expeditiously. | • The LMPD requested that Metro HR work with the Recruitment and Selection Unit in order to streamline the hiring process.<br><br>• The LMPD continues to work with Metro HR in order to identify hiring barriers and to correct them.<br><br>• LMPD is reviewing the job requirements for police officer and considering alternative options to college that would allow for a broader pull of applicants. |
| Police executives should consider using financial and other incentives to advance worthwhile higher education and community residency objectives, and in any case, ensure that these objectives do not hinder minority hiring objectives.<br><br>• With respect to both higher education and residency requirements, it may prove more effective and equitable to advance these worthwhile goals through financial incentives to applicants rather than mandatory requirements. | • Metro Government offers financial reimbursement to qualified employees to advance their education.<br><br>• LMPD offers a variety of educational opportunities for sworn employees to include:<br>    ○ Southern Police Institute (SPI)<br>    ○ FBI National Academy<br>    ○ LMPD Training Academy<br>    ○ And other local and non-local training opportunities that are relevant and necessary for job function<br><br>• The LMPD currently allows officers to participate in a take home vehicle program if they have a minimum three (3) years of sworn service and are residents of Jefferson County.  Non- residents are not allowed to take their vehicle out of county. |
| Police executives should avail themselves of sound legal and professional advice | • The LMPD has a full time legal advisor on its staff to provide counsel to the Chief as |

| | |
|---|---|
| when making decisions affecting personnel selection.<br><br>• The entire personnel selection process is the subject of much legislation and litigation, sound legal advice should be sought. | necessary.<br><br>• The LMPD can utilize the County Attorney as necessary for legal counsel and opinions. |
| Police executives should determine whether minority recruits are disproportionately dismissed from the agency during recruit training, field training and probationary employment periods, and if so, determine why and seek ways to reduce that disparate impact.<br><br>• Unless and until police officer applicants are serving on the street as permanent officers, their presence in the police organization does little to advance the goal of having a police workforce that reflects community diversity. | • The LMPD regularly consults with legal professionals, such as the Civil Service Board, Metro Human Resources, the departmental Legal Advisor and the County Attorney's Office on such matters.<br><br>• The LMPD Training Division shall produce an annual report of the personnel hiring process. |
| Police agencies should develop and deliver education and training programs relating to racial bias in policing as a means to help personnel understand and address a complex issue, without being accusatory.<br><br>• Education and training programs should not convey an accusatory tone; they should engage personnel in discussion, rather than preach to them. | • The LMPD Training Academy offers classes on community relationships, racial profiling, respect for all people, ethical behavior and interpersonal discipline and communication.<br><br>• All LMPD personnel received procedural justice, implicit bias and de-escalation training in 2015.  These philosophies are now ingrained into all aspect of LMPD training.<br><br>• LMPD 2016 In-service training is focused on philosophies in the President's Report on 21st Century Policing. |
| Police and community perspectives must be incorporated in education and training programs relating to racial bias. We further recommend that education and training programs should be tailored to agency and community-specific needs, concerns and experiences.<br><br>• Good programs and materials cannot merely be taken off a shelf and presented locally; they should be customized for each agency and community. | • The LMPD Training Academy offers classes on community relationships, racial profiling, respect for all people, ethical behavior and interpersonal discipline and communication.<br><br>• The LMPD Training Division is in the process of developing a Citizens Training Committee that will allow for input and review of current and future trainings. |
| Police agencies should integrate education and training relating to racial bias in policing into a wide range of curricula, although a single course of instruction | • The LMPD Training Academy offers classes on community relationships, racial profiling, respect for all people, ethical behavior and interpersonal discipline and communication. |

| | |
|---|---|
| may suit immediate needs.<br><br>• Fully integrating discussions of racial bias in policing into other education and training courses takes time, so it may be necessary to develop a single course of instruction for immediate needs. | • All LMPD personnel received procedural justice, implicit bias and de-escalation training in 2015. These philosophies are now ingrained into all aspect of LMPD training.<br><br>• LMPD 2016 In-service training is focused on philosophies in the President's Report on 21st Century Policing. |
| All police personnel should receive academy and supplemental recruit training that conveys the message that the protection of human and civil rights is a central part of the police mission, not an obstacle to it.<br><br>• The founding principles of modern policing should be revisited, as should the mission and value statements adopted by the trainees' own agencies.<br>• Police personnel should understand that the protection of human and civil rights is a central and affirmative part of the police mission, not an obstacle to effective policing. | • LMPD SOP 8.4.2 mentions the importance of protecting individual rights:<br><br>It is the policy of the department to protect the rights of all individuals regardless of their race, religion, disability, sexual orientation, ethnicity/national origin, gender or gender identity. Any crimes designed to infringe upon these rights are viewed seriously and given high priority.<br><br>• The LMPD Training Academy offers classes on community relationships, racial profiling, respect for all people, ethical behavior and interpersonal discipline and communication and is also considering future classes and Training Bulletins on the topic.<br><br>• The LMPD Training Division offers First Amendment training and the Department of Criminal Justice Training (DOCJT) offers protest training.<br><br>• The LMPD has embraced the recommendations from the Presidents Report on 21st Century Policing. These principles encourage police to step away from a warrior mentality and to train on de-escalation, implicit bias and procedural justice. |
| Education and training programs relating to racial bias in policing should more precisely define the numerous dimensions, complexities and subtleties of the problem.<br><br>Personnel must understand that racial bias is a complex issue, one that takes many forms.<br><br>Examples include:<br><br>• Targeting motorists for traffic stops on | • The LMPD Training Academy offers classes on community relationships, racial profiling, respect for all people, ethical behavior and interpersonal discipline and communication. The LMPD utilizes the Strategies and Tactics of Patrol Stops (S.T.O.P.S.) lesson plan, as outlined in SOP 7.12.7, when stopping violators:<br><br>  o The officer shall greet the violator and identify himself/herself by name. |

| | |
|---|---|
| the basis of racial profiles;<br>• Applying discretionary enforcement on the basis of race;<br>• Tolerating different degrees of disorder and deviance on the basis of race;<br>• Interfering with citizens; routine activities on the basis of race (e.g. stopping, questioning and searching citizens without adequate cause);<br>• Assuming someone is dangerous on the basis of race. | o  The officer should explain the reason for stopping the violator.<br>o  The officer shall ask the operator of the vehicle if there was a legitimate reason for doing what he/she did.<br>o  The officer shall ask where the driver's license, insurance and registration information is located before asking him/her to retrieve any of them.<br>o  The officer shall give instructions to the violator to follow (e.g. remain in the vehicle and buckle up) as he/she reviews documentation and decides what action to take.<br>o  The officer shall issue the appropriate warning or citation and let the violator know that the traffic stop is over. |
| Education and training programs should present the available data about racial bias in policing and throughout the criminal justice system.<br><br>• Racial bias in policing does not manifest itself the same way in every jurisdiction; local data should be presented.<br>• Discussions of racial bias in the prosecutorial, judicial and correction functions of the criminal justice system may be beneficial. | • The LMPD participates in the Disparate Minority Confinement Committee and related Crime Commission initiatives.<br><br>• All LMPD personnel received procedural justice, implicit bias and de-escalation training in 2015.  These philosophies are now ingrained into all aspect of LMPD training.<br><br>• LMPD 2016 In-service training is focused on philosophies in the President's Report on 21st Century Policing. |
| Education and training programs relating to racial bias in policing should convey the impact the problem has on individual citizens, police and the community as a whole.<br><br>• Personal testimonials from minorities who have suffered the effects of racial profiling or other forms of racial bias in policing can be effective in personalizing the problem and emphasizing the real harm caused to real people.<br>• Police personnel should consider how the level of public trust in the police affects their ability to carry out their duties. | • The LMPD Training Division shall incorporate real perspectives from individuals in future training classes. LMPD SOP 8.8.1 discusses how profiling affects citizens and law enforcement:<br><br>Profiling impairs investigative effectiveness, alienates citizens, fosters distrust of law enforcement and may subject officers to civil or criminal liability. Most importantly, profiling is unethical. The protection and preservation of the constitutional rights of individuals remains one of the paramount concerns of government and law enforcement. Therefore, per KRS 15A.195, profiling is strictly prohibited.<br><br>• All LMPD sworn members received training on implicit bias, procedural justice and de-escalation in 2015. The philosophies have been ingrained into every training that LMPD offers. |
| Education and training programs relating to | • The LMPD prohibits prejudice in SOP |

| | |
|---|---|
| racial bias in policing should explore the reasons it exists, especially at the institutional, organizational and social levels. | 5.1.20:<br><br>Members shall not express any prejudice concerning race, ethnicity/national origin, gender, gender identity, sexual orientation, religion, socio-economic status, disability, politics or other similar personal characteristics. |
| • Discussions of the reasons for racial bias in policing commonly start with the biases and prejudices of individual police officers.<br>• Today's police personnel should not be made to feel personally responsible for racial bias in policing, but should be able to recognize that larger societal forces – beyond those of individual police officers – have been responsible for some degree of racial bias in policing.<br>• One approach to addressing how police should respond to social and institutional pressures that can lead to racial bias in policing is to have officers consider the costs and benefits of being right and wrong about race-based suspicions. | • The LMPD Training Academy classes on racial profiling and respect for all people explore the issue of racial profiling and how this behavior undermines the mission of law enforcement.<br><br>• All LMPD sworn members received training on implicit bias, procedural justice and de-escalation in 2015. The philosophies have been ingrained into every training that LMPD offers. |
| Education and training programs relating to racial bias in policing should identify the key decision points at which racial bias can take effect, at the incident level.<br><br>At the incident level, racial bias can play a part at several key decision points for police officers including:<br><br>• Deciding who is worth surveilling;<br>• Deciding whom to contact or detain;<br>• Deciding what attitude to adopt during contacts and stops;<br>• Deciding what actions to make suspects take during stops;<br>• Deciding whether and how to explain to citizens the reasons for contacts or stops;<br>• Deciding how long stops will last;<br>• Deciding whether to search or ask for consent to search;<br>• Deciding how dangerous suspects are (level of force, if necessary);<br>• Deciding what enforcement action to take;<br>• Deciding what charges to file.<br><br>Education and training programs should cover | • The LMPD utilizes the Strategies and Tactics of Patrol Stops (S.T.O.P.S.) lesson plan, as outlined in SOP 7.12.7, when stopping violators:<br><br>  ○ The officer shall greet the violator and identify himself/herself by name.<br>  ○ The officer should explain the reason for stopping the violator.<br>  ○ The officer shall ask the operator of the vehicle if there was a legitimate reason for doing what he/she did.<br>  ○ The officer shall ask where the driver's license, insurance and registration information is located before asking him/her to retrieve any of them.<br>  ○ The officer shall give instructions to the violator to follow (e.g. remain in the vehicle and buckle up) as he/she reviews documentation and decides what action to take.<br><br>  ○ The officer shall issue the appropriate warning or citation and let the violator know that the traffic stop is over.<br><br>• The LMPD has developed a public information brochure regarding what to do when a citizen is stopped by a police officer and shall incorporate these and other relevant points into future training classes. |

| | |
|---|---|
| relevant laws and agency policies that guide and constrain police enforcement decisions where racial bias might come into play. | All officers shall complete Honing Interpersonal Negotiating Techniques (HINT) training in 2015.<br><br>• All LMPD sworn members received training on implicit bias, procedural justice and de-escalation in 2015. Those philosophies have been ingrained into every training that LMPD offers.<br><br>• Every sworn member of LMPD receives annual legal updates on clearly established law from the department legal advisor. |
| Police should review how operational strategy can contribute to racially bias policing and the perception thereof.<br><br>The discussion of how police operational strategy might contribute to racial bias in policing should begin by having police personnel challenge some of the assumptions underlying conventional police strategy, which emphasizes criminal and traffic enforcement as the primary means to control crime and disorder. | • The LMPD recognizes that some policing initiatives might be perceived to target a particular location or group (e.g. hot-spot policing); however, these initiatives are separate from the demographics of the area and are only used to target a particular type of criminal activity.<br><br>• The LMPD utilizes strategies of procedural justice when dealing with the public. |
| Education and training programs relating to racial bias in policing should teach police ways to reduce misunderstanding, conflict and complaints due to perceived racial bias.<br><br>• Officers should be well trained to articulate, verbally and in writing, what specific information they relied on to establish reasonable suspicion and probable cause.<br>• Officers should receive training that emphasizes the importance of providing citizens with adequate explanations for why they have been stopped. | • The LMPD Training Division has a block regarding identifying the legal and moral consequences of discriminatory attitudes and behaviors (i.e. hate crimes) in police work and society.<br><br>• LMPD SOP 8.8.3 states the basis for reasonable suspicion and probable cause:<br><br>All investigative detentions, traffic stops, searches, seizures and arrests shall be based upon reasonable suspicion or probable cause.<br><br>• In addition, LMPD SOP 8.8.7 requires officers to complete a Vehicle Stop Reporting form for each, and every, traffic stop, regardless of whether a citation is written or an arrest is made.<br><br>• Open communication is the key to a successful law enforcement stop. SOP 8.8.3 stresses the importance of communicating with citizens:<br><br>• Providing citizens with an explanation as to why they were stopped improves relations with the community and reduces the perception of bias on the part of the police. Therefore, officers should make a |

| | |
|---|---|
| | • reasonable effort to provide an explanation as to why the citizen was stopped, unless doing so would undermine an investigation or jeopardize the officer's safety. |
| | • The LMPD continues to expand upon these issues in its training. |
| | • All LMPD personnel received procedural justice, implicit bias and de-escalation training in 2015.  These philosophies are now ingrained into all aspect of LMPD training. |
| | • LMPD 2016 In-service training is focused on philosophies in the President's Report on 21st Century Policing. |
| Education and training programs relating to racial bias in policing should present alternative operational strategies, in particular, community and problem-oriented policing strategies.<br><br>• Community and problem-oriented policing strategies call for police personnel to develop a comprehensive knowledge of the area of the jurisdiction to which they are assigned.<br>• Actively solicit community input about crime and disorder problems. | • The LMPD embraces the community-oriented policing approach and offers several ways that the public can correspond with the department, including the website, 574-LMPD Crime Tip Line and the city's Ethics Line.<br><br>• LMPD participates in Metro Government's One Love Louisville Program.  Under goal 12 of this program, LMPD leads or participates in numerous community outreach efforts.  Many of these efforts focus on the youth with an emphasis of allowing interaction with police in a non-enforcement environment. |
| Police executives should publicly acknowledge that the potential for racial bias exists in policing, and commit themselves to reducing that potential. We further recommend police agencies should inform the public about their responsibilities and rights during an encounter with the police. They should reinforce the idea that effective crime control strategies need to be compatible with the protection of human rights and civil liberties.<br><br>Public information/training should:<br><br>• Inform citizens of what they are obliged to do upon lawful police request;<br>• Emphasize the need for positive police-community interactions, and encourage citizens to work with the police towards common goals; | • The Chief has talked about racial bias issues and implicit bias in interviews and at public forums. These issues shall continue to be addressed by the LMPD.<br><br>• The LMPD utilizes the Strategies and Tactics of Patrol Stops (S.T.O.P.S.) lesson plan, as outlined in SOP 7.12.7, when stopping violators:<br><br>  ○ The officer shall greet the violator and identify himself/herself by name.<br>  ○ The officer should explain the reason for stopping the violator.<br>  ○ The officer shall ask the operator of the vehicle if there was a legitimate reason for doing what he/she did.<br>  ○ The officer shall ask where the driver's license, insurance and registration information is located before asking him/her to retrieve any of them. |

| | |
|---|---|
| • Be disseminated through the mass media, community meetings, citizen police academies and personal contacts between police and citizens. | • The officer shall give instructions to the violator to follow (e.g. remain in the vehicle and buckle up) as he/she reviews documentation and decides what action to take.<br><br>• The LMPD has developed a public information brochure regarding what to do when a citizen is stopped by a police officer and shall incorporate these and other relevant points into future training classes. |
| Police executives should publicly acknowledge that the potential for racial bias exists in policing and commit themselves to reducing that potential. Police agencies should inform the public about their responsibilities and rights during an encounter with the police. They should reinforce the idea that effective crime control strategies need to be compatible with the protection of human rights and civil liberties.<br><br>• Trust between the police and the community is built through long-term engagement.<br>• Allowing citizens to participate in decision-making affecting how they are policed ensures a shared responsibility between the police and the community.<br>• Police departments' efforts to provide significant means for community input into police operations and policy decisions are the backbone of community engagement. | • The LMPD has developed a public information brochure regarding what to do when a citizen is stopped by a police officer and shall incorporate these and other relevant points into future training classes. |
| Police department personnel should strive to achieve competence in the areas listed below.<br><br>• The ability to communicate with residents in their primary language.<br>• An understanding of cultural issues relating to policing and public safety.<br>• A respectful approach to relationships with residents.<br>• The ability to be fair and provide equal treatment.<br>• The willingness to examine assumptions about links between race/ethnicity and crime in the jurisdiction, in order to bring stereotypes to light.<br>• Interpersonal skills and a sincere interest in engaging with the community. | • The LMPD utilizes bilingual officers and the Language Line in order to communicate with individuals whose primary language is not English.<br><br>• The LMPD utilizes strategies of procedural justice when dealing with the public. All LMPD personnel shall receive Procedural Criminal Justice training in 2015.<br><br>• The LMPD Mission Statement and the Law Enforcement Code of Ethics stress the importance of protecting the constitutional rights of all, prohibiting personal feelings or prejudices from affecting decisions, the importance of ethical behavior and accountability, showing respect for all people and being objective through fair and impartial |

| | |
|---|---|
| • The willingness to focus community outreach activities on traditionally underserved populations.<br>• A departmental approach to human resources that conveys the same respect for diversity that the department is trying to convey to the community at large.<br><br>The competencies listed are necessary for the police to effectively interact with minority groups. Some items apply to all department personnel including administrative, records and communications staff as well as line staff and commanders. | enforcement of laws without bias.<br><br>• The LMPD Training Division offers a block on community issues, which addresses interacting with and distinguishing members of the community whose culture and life experiences may be different from their own. In addition, this block defines the perception of the LMPD and law enforcement in general from the viewpoint of the community collectively, as well as specific groups/individuals of the Louisville Metro population. The LMPD shall continue to work with the Training Division on in-service classes regarding these issues. |
| Police departments should organize police-citizen task forces to identify how the jurisdiction can effectively respond to racially biased policing and the perceptions thereof.<br><br>• Police departments should have long-term sustained programs for reaching out to minority communities. | • The LMPD routinely engages department-citizen discussions including the Interdenominational Ministerial Coalition to identify areas for improvement. The LMPD offers Citizens Police Academies for certain groups in order to let participants have a greater understanding of law enforcement and responding to criminal behavior.<br><br>• LMPD participates in Metro Government's One Love Louisville Program.  Under goal 12 of this program, LMPD leads or participates in numerous community outreach efforts.  Many of these efforts focus on the youth with an emphasis of allowing interaction with police in a non-enforcement environment. |
| Police departments should use a combination of contemporary and progressive approaches to provide multiple opportunities for minority group interactions with the police. | • The LMPD produces the Blue Report, which covers all aspects of community policing. The LMPD also actively participates in many activities, such as the Dirt Bowl, West End Appreciation, Crime Prevention College, National Night Out, Citizens Police Academies, Team Street Safe and youth chats with the LMPD, in order to foster minority interaction with the department.<br><br>• LMPD participates in Metro Government's One Love Louisville Program.  Under goal 12 of this program, LMPD leads or participates in numerous community outreach efforts.  Many of these efforts focus on the youth with an emphasis of allowing interaction with police in a non-enforcement environment. |

| | |
|---|---|
| Police executives, in collaboration with citizen leaders, should review the pros and cons of data collection and decide in light of the agency's political, social, organizational and financial situation, either to initiate data collection or to allocate available resources to other responses to racially biased policing and the perceptions thereof.<br><br>• Agency executives may responsibly choose to invest resources in responses other than data collection however, while rejecting a full-fledged data collection system, they might consider a small scale and/or periodic data collection effort as one aspect of an overall assessment and response effort.<br>• Police executives have concerns that questionable data interpretations will be used irresponsibly by agency critics, including the media, and/or used in lawsuits against the agency. | • The LMPD has participated in various vehicle stop studies and requires its officers to complete a Vehicle Stop Reporting form on each traffic stop. These statistics are then analyzed.<br><br>• The LMPD conducts citizen satisfaction surveys to allow citizens to rate their experiences and express their opinions regarding departmental operations.<br><br>• The LMPD gathers and tracks many different data sets on a regular and on-going basis. Many of these data sets are shown in the Mayor's LouieStat Forums and are also shown on both the department's website as well as Metro Louisville open data portal. |
| If agencies are mandated or choose to collect data, they should consider targeting <u>all vehicle stops</u>. This includes all detentions and arrests of motorists, including stops for traffic violations, criminal violations and suspicious person/activities. It does not include pedestrian stops or nonconsensual encounters that do not amount to detentions.<br><br>• Traffic Stops-many agencies that collect data focus on traffic stops only.<br>• Vehicle Stops-Collecting data for traffic stops excludes obtaining information about general investigative stops of motorists.<br>• Detentions-Collecting data on all detentions including traffic, vehicle and pedestrian stops.<br>• Nonconsensual Encounters-When an officer engages a citizen in a manner not invited by the citizen but that does not amount to a legal detention. | • LMPD requires the use of a "STOPS" form on every traffic stop. This documents the details of the stop and occupants of the vehicle to include race and whether or not a search was conducted.<br><br>• LMPD has an annual contract with the University of Louisville to analyze the STOPS data and produce a report which explains the data. |
| Agencies that choose or are mandated to collect data should include data elements and response options. See pages 126-134 for more detail. | • The LMPD conducts a monthly review of reports prepared by the Professional Standards Unit (PSU).<br><br>• A monthly report is created and aggregate |

| | |
|---|---|
| • The data should be just one aspect of an "early warning system" for racially biased policing.<br>• Policing and statutes that link individual officer "results" directly to disciplinary measures are unfair and misguided. | data is analyzed to identify issues that need to be pursued by the Professional Standards Unit and the Training Unit. |
| Police departments should consider the pros and cons of linking data to officer identify. If a department chooses not to collect data with link to individual officers, the data should be linked to units of the department such as assignment or beat.<br><br>• Assessing racially biased vs. equitable policing requires looking not only at whom police engage, but also at what happens during the engagement.<br>• It is critically important for command staff to understand that their data collection system cannot rule out all competing hypotheses that might explain why data for an officer indicate disproportionate stops of racial/ethnic minorities. | • Biased law enforcement data is linked to the patrol divisions and not directly linked to the officer's identity. |
| Agencies should obtain independent researchers assistance for analyzing their racial bias data.<br><br>• The analyst(s) should be trained in social science methods and has general knowledge of law enforcement as well as knowledge of specific issues associated with analyzing police detention/stop data.<br>• Capable analysts are most likely to be associated with a college or university or independent research firm.<br>• The researcher(s) should work in conjunction with a police-citizen task force.<br>• The police-citizen group should advise the agency executive, and the executive should set clear parameters for the group regarding the type of input being sought. | • The LMPD consults with Dr. Keeling and the University of Louisville to analyze data and conduct research for the department. This allows an unbiased view of the data and increases transparency.<br><br>• The LMPD routinely utilizes outside researchers when completing special projects: Alexander Weiss conducted the 2014 Staffing Study. |

# APPENDIX B

# STOPS Study Information



# Steve Conrad
# Chief of Police

# *Our Mission Statement*

It is the mission of the Louisville Metro Police Department to deliver professional, effective services, fairly and ethically, at all times, to all people, in order to prevent crime, control crime, and enhance the overall quality of life for citizens and visitors. We will encourage and promote community involvement on all levels to achieve these ends.

# *Values*

### *Making the Community our Primary Focus*

We are committed to a police-community partnership in providing the delivery of police services. We shall accept a leadership role in developing relationships with the citizens of our community that foster mutual trust and open communications.

### *Ethical Behavior and Accountability*

We shall perform our duties with an unwavering commitment to integrity, professionalism and dependability. We will be accountable to those we serve for our decisions and actions.

### *Trustworthy*

We embrace honesty and openness with the community as vital to securing the public's trust. Without reservation, we will adhere to a code of conduct that promotes truthfulness and straightforwardness.

### *Respect for All People*

We manifest commitment to justice, equal treatment of individuals, tolerance for and acceptance of diversity by demonstrating respect for human dignity and rights.

### *Objectivity*

We are committed to the fair and impartial enforcement of all laws. We value treating all persons equitably and without bias, with the highest regard for individual and constitutional rights.

# *Law Enforcement Code of Ethics*

As a law enforcement officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice.

I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession . . . law enforcement.

# SOP 7.12
# Traffic Enforcement

# Louisville Metro Police Department

| | |
|---|---|
| **Standard Operating Procedures** | SOP Number: 7.12 |
| | Effective Date:  08/09/04<br>Prv. Rev. Date:  10/20/13<br>Revised Date:   04/10/14 |
| Chapter:  Traffic Control and Collisions | Accreditation Standards:<br>CALEA: 1.2.6-1.2.7, 61.1.1-61.1.3, 61.1.5, 61.1.7-61.1.8, 61.1.10-61.1.12, 61.2.1, 61.3.1-61.3.2, 61.3.6, 61.4.2, 61.4.4, 82.3.3-82.3.4<br>KACP: 21.1, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2 |
| Subject:  Traffic Enforcement | |

**7.12**         **TRAFFIC ENFORCEMENT** (KACP 22.1)

**7.12.1**         **TYPES OF TRAFFIC ENFORCEMENT ACTION**  (KACP 22.3, 22.4a-b, 23.2)

Officer discretion is encouraged when enforcing traffic laws. He/she may choose to give a verbal or written warning, issue a citation or arrest a violator (CALEA 1.2.6, 1.2.7, 61.1.2a-c). Officers shall consider the totality of the circumstances, the uniqueness of the violation, the driver's state of mind and the seriousness of the violation when deciding which enforcement option to exercise. Any actions taken by the officer shall be commensurate with applicable laws and Standard Operating Procedures (SOPs). The following list includes some, but not all, of the traffic violations listed under the Kentucky Revised Statutes (KRS):

- Operation of a vehicle by a driver under the influence (DUI) of alcohol/drugs (refer to SOP 7.12.6 and SOP 10.1) (CALEA 61.1.5a, 61.1.11)
- Operation of vehicle after driving privileges have been suspended or revoked (CALEA 61.1.5b)
- Speed violations (CALEA 61.1.5c)
- Hazardous violations (CALEA 61.1.5d)
- Off-road vehicle violations (CALEA 61.1.5e)
- Equipment violations (CALEA 61.1.5f)
- Public carrier/commercial vehicle violations (CALEA 61.1.5g)
- Pedestrian and bicycle violations (CALEA 61.1.5l)

Officers shall refer to the KRS regularly in order to stay informed of newly enacted laws and/or regulations concerning motor vehicle violations and citations (CALEA 61.1.5j).

To help decrease the number of traffic violations and accident fatalities, traffic safety tips are available on the Louisville Metro Police Department (LMPD) website (CALEA 61.4.4).

**7.12.2**         **CITATIONS**

Officers may issue a citation electronically, using the Kentucky Open Portal Solution (KYOPS) system, to any motor vehicle operator found to be in violation of any of the offenses listed in KRS chapters 186 and 189 (CALEA 61.1.5h). Accountability for issued eCitations and voided eCitations is the responsibility of the Kentucky State Police (KSP).

Paper citations, which shall only be used if the KYOPS system is down or the officer does not have access to a Mobile Data Terminal (MDT), shall be issued to officers from their respective division/section/unit (CALEA 82.3.4a). All officers must sign the Citation Accountability Log (LMPD #06-0017) for all paper citations issued to them. Any voided paper citations must be turned in to the division/section/unit and logged on the Voided Citation Log (LMPD #06-0048) (CALEA 82.3.4b, KACP 22.4a). Unused paper citations shall be stored in a secure location in each division/section/unit (CALEA 82.3.4c).

# Louisville Metro Police Department

| | SOP Number: 7.12 |
|---|---|
| **Standard Operating Procedures** | Effective Date: 08/09/04<br>Prv. Rev. Date: 10/20/13<br>Revised Date: 04/10/14 |
| | Accreditation Standards: |
| Chapter: Traffic Control and Collisions | CALEA: 1.2.6-1.2.7, 61.1.1-61.1.3, 61.1.5, 61.1.7-61.1.8, 61.1.10-61.1.12, 61.2.1, 61.3.1-61.3.2, 61.3.6, 61.4.2, 61.4.4, 82.3.3-82.3.4 |
| Subject: Traffic Enforcement | KACP: 21.1, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2 |

**7.12.2        CITATIONS (CONTINUED)**

Traffic enforcement data is kept by the KSP. This data is kept in the KYOPS system. The KYOPS system allows for daily reporting of crime data and the ability to query all data that is contributed to the repository. The Traffic Unit can retrieve this data at any time, using queries based on location, in order to better utilize resources (CALEA 82.3.3b).

Traffic citations for non-residents of Jefferson County shall be processed in the same manner as a citation for a local resident (CALEA 61.1.3a). Traffic citations received by licensed juveniles, under the age of 18, shall be processed in the same manner as any adult receiving a traffic citation (CALEA 61.1.3b).

When citing a driver for multiple traffic violations, officers shall list all applicable charges in the "Charges" section of the traffic citation. Each line in the "Charges" section must be completed before moving to the next citation to list additional violations. Officers are prohibited from writing multiple traffic citations to one (1) operator when all of the charges would appropriately fit on one (1) citation. Any motor vehicle operator receiving citation(s) for multiple violations, either simultaneously or at different times, shall be required to satisfy the requirements of the citation(s) (CALEA 61.1.5i).

**7.12.3        METROCALL COMPLAINTS**

MetroCall complaints regarding traffic violations on surface streets shall be forwarded to the appropriate division/section/unit for assignment, investigation and handling. An officer assigned a complaint shall evaluate the complaint and take appropriate enforcement action. A log shall be maintained, indicating the date and time that the complaint is received, the officer assigned and any action taken. MetroCall complaints shall be returned by the assigned suspense date with documentation of the action taken. The Traffic Unit shall handle complaints on the interstate system.

**7.12.4        REEXAMINATION BY LICENSING AUTHORITY** (CALEA 61.1.12)

If an officer observes an operator who demonstrates physical or mental infirmities that render it unsafe for that person to operate a motor vehicle, the officer may request the state to recertify the operator.

To request recertification, the officer shall complete a Medical Review Board Affidavit. In the statement section, the officer shall list any known, or suspected, medical impairment (e.g. low visual acuity, hearing problems, incoherency, etc.). The officer shall also report his/her observations and reasons for the request. If it is the officer's opinion that the operator has caused a motor vehicle collision, the officer shall attach a photocopy of the collision report to the request form. A copy of this form and its attachments shall be retained in the division/section/unit files.

# Louisville Metro Police Department

| | |
|---|---|
| **Standard Operating Procedures** | SOP Number: 7.12 |
| | Effective Date:  08/09/04<br>Prv. Rev. Date:  10/20/13<br>Revised Date:    04/10/14 |
| Chapter:  Traffic Control and Collisions | Accreditation Standards:<br>CALEA: 1.2.6-1.2.7, 61.1.1-61.1.3, 61.1.5, 61.1.7-61.1.8, 61.1.10-61.1.12, 61.2.1, 61.3.1-61.3.2, 61.3.6, 61.4.2, 61.4.4, 82.3.3-82.3.4<br>KACP: 21.1, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2 |
| Subject:  Traffic Enforcement | |

## 7.12.4        REEXAMINATION BY LICENSING AUTHORITY (CONTINUED)

The officer shall forward the completed form and its attachments to the Bureau Commander or the Patrol Services Commander within his/her chain of command. The commander shall forward the information to the Division of Driver Licensing, located in Frankfort, Kentucky. The Division of Driver Licensing shall notify the operator of the pending recertification.

## 7.12.5        TRAFFIC COLLISIONS (CALEA 61.1.5k, KACP 23.2)

Officers issuing a citation or making an arrest as a result of a traffic collision shall record the assigned incident control number (ICN) on the citation. In the case of injury collisions, the severity of the injuries shall be noted in the post arrest complaint section (CALEA 61.2.1a). Information of other persons involved may be listed in the witness section.

Traffic collision data is maintained by Records Management (CALEA 82.3.3a). Electronically-entered traffic collision data shall be reviewed and approved by the Data Information Center of Records Management in the KSP Accident Database (refer to SOPs 7.2 – 7.4). Officers shall refer to SOP 7.1 on requirements for writing these reports.

The Traffic Unit shall review traffic collision data to identify the locations where traffic engineering issues may need to be improved or corrected (CALEA 61.1.1a). The Traffic Unit shall also review traffic collision data and traffic enforcement data to see if increased enforcement results in the reduction of the number of collisions at identified locations (CALEA 61.1.1c).

TRIMARC holds quarterly Freeway Incident Management meetings for District 5 (Jefferson County, Bullitt County, Franklin County, Henry County, Oldham County, Shelby County and Trimble County) in Kentucky. The Traffic Unit, Louisville Metro Emergency Medical Services (LMEMS), KSP, towing agencies, etc. participate in these meetings to discuss highway closures and traffic-related issues (CALEA 61.3.6).

## 7.12.6        DRIVING UNDER THE INFLUENCE (CALEA 61.1.5a, 61.1.11, KACP 21.1c, 23.1d)

Driving under the influence (DUI) presents a grave danger to public safety. Given this danger, it is the policy of the LMPD that officers arrest operators where probable cause exists that a violation of DUI has occurred. There are certain circumstances where it is not possible to arrest an operator who has violated these statutes (e.g. hospitalization). In these circumstances, blood evidence shall be drawn and an officer shall request the approval of a commanding officer before a suspect may be cited in lieu of arrest. Under no circumstances may an officer issue a warning to operators who have committed a DUI violation.

When an officer's observations lead him/her to believe that an operator may be committing a DUI offense, the officer shall conduct field sobriety exercises. If conducting the field sobriety exercises poses a danger to the

# Louisville Metro Police Department

| | SOP Number: 7.12 |
|---|---|
| Standard Operating Procedures | Effective Date:  08/09/04<br>Prv. Rev. Date:  10/20/13<br>Revised Date:   04/10/14 |
| | Accreditation Standards: |
| Chapter:  Traffic Control and Collisions | CALEA: 1.2.6-1.2.7, 61.1.1-61.1.3, 61.1.5, 61.1.7-61.1.8, 61.1.10-61.1.12, 61.2.1, 61.3.1-61.3.2, 61.3.6, 61.4.2, 61.4.4, 82.3.3-82.3.4 |
| Subject:  Traffic Enforcement | KACP: 21.1, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2 |

**7.12.6        DRIVING UNDER THE INFLUENCE (CONTINUED)**

safety of the officer or the operator, the officer may elect not to use them and should make note of such reasons in the post arrest complaint. The officer shall take appropriate enforcement action based upon the results of the field sobriety exercises and his/her observations.

If the officer arrests the operator and has reason to believe that alcohol is the primary influencing factor, he/she shall transport the subject, as soon as possible, to Louisville Metro Department of Corrections (LMDC), if medical attention is not required, and present him/her to the Breath Alcohol Technician. The technician shall take custody of the prisoner. He/she shall be responsible for requesting that the individual take a chemical test and offering the individual the chance to contact an attorney. After the technician completes the testing, he/she shall turn the prisoner back over to the officer, along with the results of the test.

If the officer arrests the operator and has reason to believe that the primary influencing substance is not alcohol, or the operator's actions are not consistent with his/her physical condition, he/she shall transport the suspect, as soon as possible, to the LMDC, if medical attention is not required, and present him/her to a Breath Alcohol Technician. If the subject's breath alcohol level is below .08, the arresting officer should consider contacting a Drug Recognition Expert (DRE), through MetroSafe, to evaluate the suspect's condition (CALEA 61.1.10). Officers shall obtain approval of a Traffic Unit commanding officer before contacting a DRE. A blood and/or urine sample shall be requested by the Breath Alcohol Technician, the DRE (if present) or the arresting officer, following the evaluation. The operator must consent to any and all blood, breath and/or urine tests requested by the officer or he/she shall be charged with refusal to submit to a chemical test (KRS 189A.105).

Only after complying with all tests requested by the officer, may the operator request, at his/her own expense, to have an independent blood test conducted by an authorized medical technician (refer to SOP 7.6).

An operator may only be cited and released for a DUI offense when all of the following conditions are met:

- The operator is to be hospitalized. Hospitalization is defined as placing a person in the hospital as a patient for a period of time. Treatment in the emergency room (ER) does not constitute hospitalization.
- The operator is physically injured to such a degree that he/she is no longer a danger to himself/herself or others due to intoxication and cannot voluntarily leave the hospital. If the operator is still physically capable of leaving the hospital, the officer must remain with the operator until he/she is no longer a danger to himself/herself or others due to intoxication, before citing the operator in lieu of arrest.
- Blood evidence has been drawn. This may be done at the request of the officer or for treatment purposes.
- A commanding officer has granted approval for the operator to be cited in lieu of arrest. In these circumstances, the commanding officer shall complete an Administrative Incident Report (AIR) (LMPD #03-03-0001). For the purpose of this policy, an acting sergeant shall not be considered a commanding officer.

# Louisville Metro Police Department

| | SOP Number: 7.12 |
|---|---|
| Standard Operating Procedures | Effective Date: 08/09/04<br>Prv. Rev. Date: 10/20/13<br>Revised Date: 04/10/14 |
| Chapter: Traffic Control and Collisions | Accreditation Standards:<br>CALEA: 1.2.6-1.2.7, 61.1.1-61.1.3, 61.1.5, 61.1.7-61.1.8, 61.1.10-61.1.12, 61.2.1, 61.3.1-61.3.2, 61.3.6, 61.4.2, 61.4.4, 82.3.3-82.3.4 |
| Subject: Traffic Enforcement | KACP: 21.1, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2 |

**7.12.7        STRATEGIES & TACTICS OF PATROL STOPS** (CALEA 61.1.8, KACP 22.5)

Traffic stops can be very serious situations for officers. Unknown and high-risk situations can create a problematic mood for both officers and violators. As a result, officer discretion and caution shall be exercised while conducting traffic stops. Officers shall use caution while approaching violators in order to evaluate the behavior of the violator and the seriousness of the situation (CALEA 61.1.7a-c).

Officers making contact with violators during a traffic stop shall observe the following, as outlined in the Strategies and Tactics of Patrol Stops (S.T.O.P.S.) lesson plan, whenever possible:

- The officer shall greet the violator and identify himself/herself by name.
- The officer should explain the reason for stopping the violator.
- The officer shall ask the operator of the vehicle if there was a legitimate reason for doing what he/she did.
- The officer shall ask where the driver's license, insurance and registration information is located before asking him/her to retrieve any of them.
- The officer shall give instructions to the violator to follow (e.g. remain in the vehicle and buckle up) as he/she reviews documentation and decides what action to take.
- The officer shall issue the appropriate warning or citation and let the violator know that the traffic stop is over (CALEA 61.1.2b-c).

**7.12.8        HAZARDOUS ROADWAY CONDITIONS** (CALEA 61.4.2)

All officers encountering hazardous roadway conditions shall be responsible for reporting these conditions to the appropriate agency for corrective action. If an officer discovers a visual obstruction (e.g. debris, defects in the roadway, missing or damaged road signs, lighting, traffic control devices or roadside hazards), the officer shall immediately contact MetroSafe, via radio or telephone. The officer shall report the nature of the problem and the exact location. MetroSafe will contact the appropriate agency responsible for addressing or correcting the problem. If the roadway hazard presents a potential danger to motorists, the officer shall take the necessary action to ensure the safety of the motorists and expedite the flow of traffic. If the officer is off-duty, then the officer shall request assistance from on-duty personnel. The action taken may require the manual direction of traffic, using temporary control devices or physically removing the obstruction or hazard from the roadway (CALEA 61.3.1a, 61.3.2d).

Citizen complaints or suggestions regarding traffic engineering deficiencies (e.g. signs, potholes, markings, traffic lights, etc.) shall be referred to MetroCall at (502) 574-5000 or 311. MetroCall shall be responsible for notifying the appropriate agency for improvement or correction (CALEA 61.3.1a).

The Traffic Unit and MetroSafe shall be responsible for reporting traffic engineering deficiencies and traffic enforcement data to the appropriate agency (e.g. Public Works and Assets, Kentucky Transportation Cabinet, etc.) for improvement or correction (CALEA 61.3.1b).

# Louisville Metro Police Department

| | |
|---|---|
| **Standard Operating Procedures** | SOP Number: 7.12 |
| | Effective Date:   08/09/04<br>Prv. Rev. Date:   10/20/13<br>Revised Date:    04/10/14 |
| Chapter:  Traffic Control and Collisions | Accreditation Standards:<br>CALEA: 1.2.6-1.2.7, 61.1.1-61.1.3, 61.1.5, 61.1.7-61.1.8, 61.1.10-61.1.12, 61.2.1, 61.3.1-61.3.2, 61.3.6, 61.4.2, 61.4.4, 82.3.3-82.3.4 |
| Subject:  Traffic Enforcement | KACP: 21.1, 22.1, 22.3, 22.4, 22.5, 23.1, 23.2 |

**7.12.9       SUPERVISORY REVIEW**

Commanding officers shall review paper citations and arrest slips of those officers under their direct supervision. The commanding officer shall place his/her code number on the upper right hand corner of the citation indicating that he/she has reviewed the citation. Commanding officers shall review the citation for, including, but not limited to:

- Missing/incomplete personal information of the offender.
- The Vehicle Stop Reporting form control number (if applicable).
- The appropriate charges.
- The arrest or citation date, time and location.
- The arrest or citation narrative, statement of probable cause and elements of the crime.
- The valid court date, time and location.
- The report number, if the citation or arrest is related to clearing a reported incident.
- Language indicating how the defendant posed a risk of danger (if applicable) (refer to SOP 10.1).
- Language describing how the defendant failed to follow the officer's reasonable instructions (if applicable) (refer to SOP 10.1).
- Language indicating why there are reasonable grounds to believe that the defendant will not appear in court (if applicable) (refer to SOP 10.1).
- Legible handwriting.

# SOP 8.24 Warrantless Searches

| | SOP Number:  8.24 |
|---|---|
| Standard Operating Procedures | Effective Date:  08/23/04<br>Prv. Rev. Date: 04/08/13<br>Revised Date:   10/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.4, 11.3.1, 82.1.3<br>KACP: 1.4, 30.9 |
| Subject:   Warrantless Searches | |

**8.24**       **WARRANTLESS SEARCHES** (CALEA 1.2.4, 11.3.1b)


**8.24.1**       **POLICY**

In special circumstances and limited emergency situations, justification may exist for a Louisville Metro Police Department (LMPD) officer to conduct a search without a warrant. While search warrants are preferred from a legal standpoint, officers are authorized to conduct warrantless searches as outlined in this policy and by existing law. When searching without a warrant, officers must be able to articulate their justification for the search.


**8.24.2**       **DEFINITIONS**

**Search:** An examination of an individual's premises, person or property in which he/she has a reasonable expectation of privacy. The purpose of the search is discovering contraband, weapons or other evidence of guilt, to be used in a criminal prosecution. A search involves a prying into, or the manipulation of, concealed or hidden places trying to discover something inconspicuous. Items in plain view shall not constitute a search (KACP 1.4b). A search shall only be conducted pursuant to a warrant, with consent or under exigent circumstances with probable cause.

**Consent Search:** A search made by law enforcement officers based on the consent of the individual whose person or property is being searched.

**Probable Cause:** The level of evidence, held by a rational and objective observer, necessary to justify logically accusing a specific suspect of a particular crime, based upon reliable objective facts.

**Pat Down:** A "frisk," or the external feeling of the outer garments of an individual, for weapons. A pat down shall only be conducted on reasonable grounds that the individual being subjected to the pat down is armed and dangerous to the officer or others. A pat down does not include manipulating, or grasping, the outer garments or reaching inside of, or opening, the garments (e.g. pockets, jackets, etc.).

**Terry Stop:** A stop of an individual by law enforcement officers based upon reasonable suspicion that the individual may have been engaged, is engaging or is about to engage in criminal activity.


**8.24.3**       **SPECIAL CIRCUMSTANCES** (KACP 1.4c)

**Pat Down Search during a Terry Stop**

Officers may conduct a pat down search of an individual during a Terry Stop if there is reason to believe that the subject is armed and dangerous (refer to SOP 3.6). If, during the pat down, the officer feels something solid that could reasonably be, or contain, a weapon, he/she shall reach inside of the clothing and seize the object. Additionally, if through the officer's touch and experience, he/she immediately recognizes the object as contraband, then he/she shall seize it.

| Standard Operating Procedures | SOP Number:  8.24 |
|---|---|
| | Effective Date:  08/23/04<br>Prv. Rev. Date: 04/08/13<br>Revised Date:   10/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.4, 11.3.1, 82.1.3<br>KACP: 1.4, 30.9 |
| Subject:   Warrantless Searches | |

**8.24.3        SPECIAL CIRCUMSTANCES (CONTINUED)**

If the Terry Stop involves a person in a vehicle and the officer has reason to believe that the suspect is armed and dangerous and might gain control of weapons within the vehicle, the officer shall search the subject as outlined above and shall also search the passenger compartment of the vehicle, looking only in places where weapons may be hidden.

**Search Incident to a Lawful Arrest**

An officer shall search a subject immediately after arrest. The officer may search the entire person of the subject and the nearby area from which the subject might have been able to handle a weapon or destructible evidence.

An officer may search a vehicle, incident to a recent occupant's arrest, only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe that the vehicle contains evidence of the offense of the arrest (Arizona v Gant). The officer shall not search the trunk, motor compartment or other areas of the vehicle without a warrant, probable cause, consent or exigent circumstances.

**Search of a Vehicle Based on Probable Cause**

While search warrants are preferred in any search situation, an officer who has probable cause to believe that a vehicle contains evidence of a crime may search the vehicle before, or after, an arrest, or without making an arrest. The officer may search the vehicle at the scene where he/she stops it, or otherwise locates it in a public place, or after it has been moved elsewhere by the authorities. In such instances, the officer must be able to explain the exigency of the circumstances.

The officer may search the entire vehicle including the glove compartment, trunk, hubcaps, hood area and containers found within (e.g. bags, boxes, suitcases, etc.), providing only that he/she limit his/her search to those areas/containers which could physically contain the seizable item that he/she has probable cause to believe is in the vehicle.

If an officer has probable cause to believe that a container in a vehicle contains evidence of a crime, but his/her probable cause does not extend to the vehicle itself, the officer is allowed to stop the vehicle, seize the specific container and search within it, without obtaining a warrant.

**Entry of Premises without a Warrant**

Officers may legally enter premises without a warrant, or consent, if any of the following exigent circumstances exist:

- Entry of premises in fresh pursuit to arrest: when chasing a suspect after a crime has been committed and the suspect enters a building shortly before the police arrive (KACP 30.9).
- Entry of premises to protect life or health: when there is probable cause to believe that someone is injured and needs help or is threatened with injury or death.

| Standard Operating Procedures | SOP Number:  8.24 |
| --- | --- |
| | Effective Date:  08/23/04<br>Prv. Rev. Date: 04/08/13<br>Revised Date:   10/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.4, 11.3.1, 82.1.3<br>KACP: 1.4, 30.9 |
| Subject:   Warrantless Searches | |

**8.24.3        SPECIAL CIRCUMSTANCES (CONTINUED)**

- Entry of premises to prevent destruction of evidence: when there is probable cause to believe that evidence that could be easily destroyed is on the premises and there is good reason to believe that the evidence is being, or is about to be, destroyed.

**8.24.4        CONSENT SEARCH** (KACP 1.4d)

**Persons**

Consent searches of an individual's person can be granted only by the individual to be searched.

**Vehicles and Dwellings**

The use of the Consent to Search form (LMPD #06-0036) is mandatory for all consent searches of premises or vehicles.  An exception to this order would be situations where verbal consent is given to search a vehicle or home and consent is recorded using one (1) of the department's in-car cameras or a tape recorder.

In situations where a person verbally consents to a search, but refuses to sign the Consent to Search form, the refusal must be documented on the form and signed by a commanding officer.  Officers shall not conduct such a search until their commanding officer has signed the form and granted his/her approval.

If consent is granted, officers may conduct a protective sweep of a dwelling for their own safety; or incident to arrest if there is reasonable suspicion that other persons may be present; or if probable cause exists and there are exigent circumstances.  A "knock and talk" does not automatically give an officer the justification to perform a protective sweep. When a search is authorized by consent, the scope of the search is limited by the terms of its authorization. The consent does not extend to the entire dwelling, only the immediate area/room where the consent to search has been given. Any objects found and seized in the area/room where a consent to search has been given are admissible at trial as an exception to the warrant requirement. In the absence of consent, officers may not conduct a warrantless search or seizure of additional areas/rooms without both probable cause and exigent circumstances.

In order for a protective sweep to be justified, one (1) of the following must be present:

- Consent
- Reasonable suspicion (must be incident to an arrest)
- Probable cause and exigent circumstances

**Coercion**

Consent searches shall only be considered legal when consent is given voluntarily by a person with the authority to consent. The person must be aware of what he/she is doing, the area(s) to be searched and provide consent of his/her own free will.

| Standard Operating Procedures | SOP Number:  8.24 |
| --- | --- |
| | Effective Date:  08/23/04<br>Prv. Rev. Date: 04/08/13<br>Revised Date:   10/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.4, 11.3.1, 82.1.3<br>KACP: 1.4, 30.9 |
| Subject:   Warrantless Searches | |

**8.24.4        CONSENT SEARCH (CONTINUED)**

Officers shall not force, threaten or deceive an individual into consenting to a search (e.g. threatening to seize a vehicle or dwelling while a warrant is obtained and no probable cause exists for obtaining a warrant, etc.). If possible, no more than two (2) officers should be present when obtaining consent.

**Limiting/Withdrawing Consent**

An individual may limit his/her consent to cover only certain areas or may withdraw his/her consent at any time. As soon as the subject indicates that he/she wants the search to stop, no further search may be justified as a consent search.

**Consent to Search Form Retention/Submission**

The original hardcopy of the Consent to Search form shall be retained by the officer for inclusion in a case file (refer to SOP 8.35). A copy shall be forwarded to the Legal Advisor's Office, via interoffice mail, for filing. Consent to Search forms shall be retained pursuant to federal, state and local records retention schedules (CALEA 82.1.3).

**8.24.5        SEARCH SITUATIONS NOT PROTECTED BY THE FOURTH AMENDMENT**

The following situations are not protected by the Fourth Amendment:

**Open Fields**

An open field is any land area, whether open, wooded or otherwise, which is not included in the curtilage. An officer may search an open field without a warrant, without probable cause, despite notices or other efforts showing an expectation of privacy and despite the fact that the search may constitute a technical trespass. When in an open field area, the officer may not, on that account alone, search a building, person or non-abandoned car.

**Public Area**

An officer may search public areas such as roads, sidewalks, public parks, etc. Various commercial establishments such as bars and retail stores may also be searched by an officer in areas where prospective customers are allowed, at times when they are allowed to be there and making no closer examination of things therein than an ordinary customer would. However, individuals in public areas have a reasonable expectation of privacy, on their persons and in their luggage and vehicles, while in a public area.

**Abandoned Property**

An expectation of privacy may be lost either by discarding property in a place where others would have access to it or by disclaiming ownership of the property.

| Standard Operating Procedures | SOP Number:  8.24 |
|---|---|
| | Effective Date:  08/23/04<br>Prv. Rev. Date: 04/08/13<br>Revised Date:   10/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.4, 11.3.1, 82.1.3<br>KACP: 1.4, 30.9 |
| Subject:   Warrantless Searches | |

**8.24.6        IMPOUNDED VEHICLES**

Mere legal custody of an impounded vehicle does not automatically create a right to search.  In order to search a lawfully impounded vehicle, an officer must have the consent of the owner, exigent circumstances or a search warrant based on the officer's affidavit that the vehicle contains evidence or constitutes the fruit or instrumentality of a crime (KACP 1.4c-d).

Routine inventory searches of impounded vehicles are not permitted. However any evidence in plain view, seizable under the Plain View Doctrine, may be seized as evidence (KACP 1.4b). Other articles in plain view which are not evidence, but are considered valuable personal property, must be removed and taken to the Property Room or shall be removed from plain view within a secured vehicle.

**8.24.7        EXTRACTING EVIDENCE FROM A SUSPECT'S MOUTH**

Use of physical force to search a suspect's mouth for contraband is prohibited, unless:

- A lawful arrest of the person has been made, based upon probable cause;
- There is probable cause to believe that the suspect has hidden a seizable item (e.g. illegal drugs) within his/her mouth;
- There is a clear indication that a seizable item will be found within the suspect's mouth; and
- Either a search warrant has been issued authorizing an intrusion into the suspect's mouth or exigent circumstances (e.g. imminent destruction of evidence or a medical emergency) exist (KACP 1.4c).

Once all of the prerequisites listed above have been satisfied, an officer may use reasonable force to extract the contraband hidden in the suspect's mouth. A supervisor shall be notified and shall complete an Administrative Incident Report (AIR) (LMPD #03-03-0001) whenever force is used in these situations.

The Electronic Control Weapon (ECW) shall not be utilized to prevent the swallowing of evidence nor shall it be utilized to dislodge or retrieve evidence from a suspect's mouth or other body cavities (refer to SOP 9.1).

If an officer reasonably believes that a suspect has swallowed contraband that could have a negative effect upon his/her health, the officer shall seek medical attention for the suspect as soon as reasonably possible.

# SOP 8.8 Profiling

# Louisville Metro Police Department

| Standard Operating Procedures | SOP Number:  8.8 |
|---|---|
| | Effective Date:  07/20/03<br>Prv. Rev. Date: 01/17/13<br>Revised Date:  03/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.7, 1.2.9, 11.3.2, 26.1.1, 61.1.8 |
| Subject:   Profiling | KACP: 30.2 |

**8.8**　　　　**PROFILING** (KACP 30.2)


**8.8.1**　　　　**POLICY** (CALEA 1.2.9a)

Profiling impairs investigative effectiveness, alienates citizens, fosters distrust of law enforcement and may subject officers to civil or criminal liability. Most importantly, profiling is unethical. The protection and preservation of the constitutional rights of individuals remains one of the paramount concerns of government and law enforcement. Therefore, per KRS 15A.195, profiling is strictly prohibited.


**8.8.2**　　　　**DEFINITION**

**Profiling:** Engaging in any of the following activities based solely on an individual's actual or perceived race, ethnicity/national origin, gender, gender identity, sexual orientation, religion, socio-economic status, disability or other characteristics attributed to an individual as a member of such a group is strictly prohibited:

- Making discretionary decisions during the course of an enforcement activity (CALEA 1.2.7)
- Initiating a traffic stop, detention or other law enforcement activity
- Targeting individuals


**8.8.3**　　　　**OFFICER RESPONSIBILITY** (CALEA 61.1.8)

All investigative detentions, traffic stops, searches, seizures and arrests shall be based upon reasonable suspicion or probable cause.

It is not improper to target suspected criminals based on their conduct, nor is it improper to focus on a person of a particular race, ethnicity/national origin, gender, gender identity, sexual orientation, religion, socio-economic status, disability or other characteristics if the officer has suspect information.

Nothing in this policy shall prevent an officer from relying on an individual's actual or perceived race, ethnicity/national origin, gender, gender identity, sexual orientation, religion, socio-economic status, disability or other characteristics as a tool in the investigation of a crime or a violation of a law.

Providing citizens with an explanation as to why they were stopped improves relations with the community and reduces the perception of bias on the part of the police. Therefore, officers should make a reasonable effort to provide an explanation as to why the citizen was stopped, unless doing so would undermine an investigation or jeopardize the officer's safety.

# Louisville Metro Police Department

| Standard Operating Procedures | SOP Number: 8.8 |
| --- | --- |
| | Effective Date:  07/20/03<br>Prv. Rev. Date: 01/17/13<br>Revised Date:   03/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.7, 1.2.9, 11.3.2, 26.1.1, 61.1.8<br>KACP: 30.2 |
| Subject:   Profiling | |

**8.8.4**        **SUPERVISORY RESPONSIBILITY** (CALEA 11.3.2)

Supervisors shall:

- Familiarize their personnel with this policy and support its provisions.
- Observe officer behavior to identify, and prevent, profiling.
- Immediately report any profiling incident in writing, through the appropriate chain of command, to the Chief of Police.

**8.8.5**        **REPORTING REQUIRED**

All members are required to immediately report any profiling incident in writing, through the appropriate chain of command, to the Chief of Police.

**8.8.6**        **DISCIPLINE** (CALEA 1.2.9c, 26.1.1)

The Louisville Metro Police Department (LMPD) neither condones, nor tolerates, profiling. Officers engaging in such conduct shall be subject to disciplinary action.

**8.8.7**        **VEHICLE STOP REPORTING FORMS**

Officers are required to complete a Vehicle Stop Reporting form for each, and every, traffic stop, regardless of whether a citation is written or an arrest is made. The only exceptions shall be motorist assists, road blocks and traffic accidents. If an eCitation is issued for a traffic accident, members shall check "Other" in the Disposition area of the Vehicle Stop Reporting form and enter "accident" in the box. This will remove the Vehicle Stop Reporting form information from the profiling matrix. Officers shall use the following descriptions for searches:

- Consent
- Pat down
- Incident to arrest
- Probable cause
- Other

For traffic stops where a warning or a paper citation is issued in lieu of an eCitation, the officer shall complete an electronic Vehicle Stop Reporting form. A link to this form may be found on the right hand side of the LMPD Intranet. Officers shall complete the electronic Vehicle Stop Reporting form by the end of his/her tour of duty. If the officer conducts a stop while off-duty, the officer shall complete a Vehicle Stop Reporting form electronically by the end of his/her next tour of duty. Officers shall record the control number of the electronic Vehicle Stop Reporting form in the upper right hand corner of their paper citation.

# Louisville Metro Police Department

| Standard Operating Procedures | SOP Number:  8.8 |
| --- | --- |
| | Effective Date:  07/20/03<br>Prv. Rev. Date: 01/17/13<br>Revised Date:   03/10/13 |
| Chapter:  Field Operations | Accreditation Standards:<br>CALEA: 1.2.7, 1.2.9, 11.3.2, 26.1.1, 61.1.8 |
| Subject:   Profiling | KACP: 30.2 |

**8.8.7        VEHICLE STOP REPORTING FORMS (CONTINUED)**

Officers shall fill out the Vehicle Stop Reporting form, via the Kentucky Open Portal Solution (KYOPS) system, when using the eCitation system. A separate electronic version of the Vehicle Stop Reporting form must be submitted in lieu of the KYOPS version, if an eCitation is voided.

Reviewed 3/31/14

# LMPD Training Block Bias, Racial Profiling and Cultural Sensitivity

## LMPD Training Unit

LMPD Recruit training consists of four blocks of instruction that cover bias, racial profiling and cultural sensitivity.  These blocks are:

- Community Wins (2 hours)
- Racial Profiling (3 hours)
- Tactics for Controlling Behavior:  Respect for all People (7 hours)
- Tactics for Controlling Behavior: Ethical Behavior (7 hours)

The learning objectives are as follows:

| 2.2 | **Community Wins** | | **2.0 hours** |
|---|---|---|---|
| | At the conclusion of this session, the student will be able to: | | |
| | 2.2.1 | Interact with and distinguish members of the community whose culture and life experiences may be different from their own. | |
| | 2.2.2 | In a classroom setting discuss and define the relationship between the Louisville Metro Police Department and the communities that make up Louisville Metro. | |
| | 2.2.3 | Define the perception of the Louisville Metro Police Department and law enforcement in general from the viewpoint of the community collectively, as well as specific groups/individuals of the Louisville Metro population. | |
| LOCATIN WITHIN SCHEDULE: Week 24 | | | |
| Bibliography:  #1 | | | |

| 2.3 | **Racial Profiling** | | **3.0 hours** |
|---|---|---|---|
| | | At the conclusion of this session, the student will be able to: | |
| | 2.3.1 | Identify and explain the LMPD Standard Operating Procedure as related to racial profiling. | |
| | 2.3.2 | Identify the Federal and State Laws that apply to racial profiling. | |
| | 2.3.3 | Define the terms "racial profiling" and "ethnic profiling" as it pertains to this section. | |
| | 2.3.4 | Distinguish between racial / ethnic profiling and reasonable suspicion as it pertains to this section. | |
| | 2.3.5 | Explain the importance of supervisory oversight as it relates to racial profiling. | |
| | 2.3.6 | Explain the role that law enforcement played during the civil rights movement and the perceptions that were formed because of the actions of law enforcement. | |
| | 2.3.7 | Define the history of racism in America. | |
| | 2.3.8 | Participate in an analysis of the Equal Protection Clause of the 14th Amendment of the Constitution of the United States. | |
| LOCATION WITHIN SCHEDULE:  Week 4 | | | |
| Bibliography:  #137 through #143 | | | |

| 8.1 | Tactics of Controlling Behavior (TCB 1): Respect for All People (Wisdom) | | 7.0 hours |
|---|---|---|---|
| | At the conclusion of this session, the student will be able to: | | |
| | 8.1.1 | Identify the roles social/organizational systems play in societies. | |
| | 8.1.2 | Define the role of the criminal justice system of the United States. | |
| | 8.1.3 | Identify some of the fundamental issues and concerns surrounding the criminal justice system in the United States. | |
| | 8.1.4 | Define the ultimate goal of law enforcement in the United States. | |
| | 8.1.5 | Identify landmark events in law enforcement history leading to the practices and philosophies of modern day policing in the United States. | |
| | 8.1.6 | Identify the obstacles and challenges faced by law enforcement throughout its history. | |
| | 8.1.7 | Identify the different eras of law enforcement and how they have contributed to the philosophies and practices of modern day policing. | |
| | 8.1.8 | Explain the concept of Community Policing and Problem Solving. | |
| | 8.1.9 | Explain the future challenges facing law enforcement. | |
| | 8.1.10 | Explain the relationship between human interactions (episodes) and preserving the perception of justice. | |
| | 8.1.11 | Define the concept of organizational justice and its components (i.e. distributive, procedural, informational, and inter-personal justice). | |
| | 8.1.12 | Identify why perceptions of justice and protecting an individual's constitutional rights are important in nurturing police/community relations. | |
| | 8.1.13 | Define the philosophy of Tactics of Controlling Behavior (i.e. no ego/selflessness). | |
| | 8.1.14 | Define the concept of a plumb line. | |
| | 8.1.15 | Identify the practices in the "tenfold path". | |
| | 8.1.16 | Identify the principles of Tactics of Controlling Behavior (TCB). | |
| | 8.1.17 | Identify and explain the mission and values of the Louisville Metro Police Department, and how they guide the agency toward the accomplishment of its goals. | |
| | 8.1.18 | Explain the process of developing wisdom. | |

| | 8.1.19 | Distinguish between the two (2) types of wisdom.<br><br>    a.  Natural<br>    b.  Spiritual |
|---|---|---|
| | 8.1.20 | Explain how Maslow's Hierarchy of Needs illustrates our developmental process. |
| | 8.1.21 | Explain what it means to "move out of your comfort zone". |
| | 8.1.22 | Define how our attitudes and prejudices are learned and reinforced. |
| | 8.1.23 | Define practicing knowledge. |
| | 8.1.24 | Distinguish between the concepts of sensations and perceptions. |
| | 8.1.25 | Define the concept of "schemas". |
| | 8.1.26 | Identify our sources of obtaining knowledge. |
| | 8.1.27 | Explain how our culture contributes to our awareness of self and others, and the advantages/disadvantages of this process. |
| | 8.1.28 | Explain what it means to "relearn or retrain" ourselves. |
| | 8.1.29 | Define practicing attitude/intent. |
| | 8.1.30 | Define the components of an individual's attitude. |
| | 8.1.31 | Define the concept of cognitive dissonance. |
| | 8.1.32 | Define the concept of unconditional compassion, and explain why it is important in developing wisdom. |
| | 8.1.33 | Define the legal definition of "discrimination/profiling". |
| | 8.1.34 | Distinguish between "profiling" and "reasonable suspicion". |
| | 8.1.35 | Explain the equal protection clause of the 14th Amendment of the Constitution of the United States. |
| | 8.1.36 | Identify the Federal Equal Employment Opportunity Laws, State Laws, and LMPD Standard Operating Procedures prohibiting job discrimination. |
| | 8.1.37 | Define the legal definition of "hate crimes". |
| | 8.1.38 | Identify Federal and State Laws prohibiting hate crimes. |
| | 8.1.38 | Identify the legal and moral consequences of discriminatory attitudes and behaviors (i.e. hate crimes) in police work and society. |

| | 8.1.39 | Explain/Summarize how the practices of wisdom apply to protecting against discrimination and hate crimes. |
|---|---|---|

LOCATIN WITHIN SCHEDULE:  Week 4

Bibliography:  #1, #27, #60 through #69, #71, #77, #91 through #94

| 8.2 | Tactics of Controlling Behavior: Ethical Behavior | 7.0 hours |
|---|---|---|

At the conclusion of this session, the student will be able to:

| | 8.2.1 | Explain the process of developing ethical behavior. |
|---|---|---|
| | 8.2.2 | Explain how individuals develop "morals". |
| | 8.2.3 | Define and explain what it means to have "free will". |
| | 8.2.4 | Define what constitutes a "ethical dilemma". |
| | 8.2.5 | Identify how individuals make "ethical judgments". |
| | 8.2.6 | Identify the relationship between laws, ethical behavior, and perceptions of justice. |
| | 8.2.7 | Define practicing "purpose of duty". |
| | 8.2.8 | Define the fundamental characteristics of a "public servant/true professional". |
| | 8.2.9 | Define the duties and expectations of a public servant/police officer. |
| | 8.2.10 | Define the limitations of a police officer. |
| | 8.2.11 | Identify the stakeholders who may be affected by a police officer's decisions and actions. |
| | 8.2.12 | Define "practicing integrity of actions". |
| | 8.2.13 | Explain the importance of "critical thinking" in making an ethical decision. |
| | 8.2.14 | Identify the potential fallacies involved in critical thinking. |
| | 8.2.15 | Define the "Police Officer's Code of Ethics". |
| | 8.2.16 | Identify those factors that inhibit a police officer's commitment to the Code of Ethics. |
| | 8.2.17 | Identify those elements needed to support police officer's adherence to the Code of Ethics. |
| | 8.2.18 | Define "practicing responsibility to act". |

| | 8.2.19 | Identify why it can be unethical "not to act". |
|---|---|---|
| | 8.2.20 | Define the theory of "normative ethics" (i.e. "look good", "be good"). |
| | 8.2.21 | Explain how unethical conduct can be identified and determined and the measures that can be taken to address this type of conduct. |
| | 8.2.22 | Identify the four (4) don'ts of moral reasoning. |
| | 8.2.23 | Define and identify examples of police misconduct, and what conditions are needed to address police misconduct. |
| | 8.2.24 | Identify actions that an individual officer can take when witnessing misconduct. |
| LOCATIN WITHIN SCHEDULE: Week 4 | | |
| Bibliography:  #1, #27, #60 through #69, #71, #77, #91 through #94 | | |

| 8.3 | Tactics of Controlling Behavior (TCB 1): Interpersonal Discipline & Communication | 7.0 hours |
|---|---|---|
| At the conclusion of this session, the student will be able to: | | |
| | 8.3.1 | Explain the process of developing "mental discipline" as it relates to interpersonal communication. |
| | 8.3.2 | Distinguish between the various forms of communication. |
| | 8.3.3 | Define the nature of interpersonal communication. |
| | 8.3.4 | Identify why it is important to develop effective interpersonal communication skills. |
| | 8.3.5 | Identify the goals of effective communication skills. |
| | 8.3.6 | Define "practicing awareness". |
| | 8.3.7 | Define "message transfer" and identify its components. |
| | 8.3.8 | Define the nature of police/citizen relations. |
| | 8.3.9 | Define the concept of "No Ego" representation. |
| | 8.3.10 | Define "practicing intended message". |
| | 8.3.11 | Define the process and actions of active listening. |
| | 8.3.12 | Explain why it is important to develop effective active listening skills. |

| | 8.3.13 | Explain why it is important to understand the power and influence of words. |
|---|---|---|
| | 8.3.14 | Explain why it is important to understand the power and influence of non-verbal cues. |
| | 8.3.15 | Identify the methods in which messages can be clarified. |
| | 8.3.16 | Define "practice desired response". |
| | 8.3.17 | Define "human nature" as it relates to interpersonal communication. |
| | 8.3.18 | Define the nature and process of conflicts. |
| | 8.3.19 | Explain how the justice components are important in conflict resolution. |
| | 8.3.20 | Identify the different individual styles of conflict. |
| | 8.3.21 | Identify why it is important to develop effective response skills. |
| | 8.3.22 | Identify the various types of response skills. |
| | 8.3.23 | Identify the nature and process of persuasion. |
| | 8.3.24 | Identify the circumstances in which words must be replaced by actions (S.A.F.E.R.) |
| | 8.3.25 | Identify the process and components of effective communication. |
| | 8.3.26 | Demonstrate the ability to effectively read and understand the cultural and emotional context of a situation, as well as, non-verbal cues in a given situation. |
| | 8.3.27 | Demonstrate the ability to effectively resolve a conflict by using deflectors, effective response skills and persuasion. |

LOCATIN WITHIN SCHEDULE: Week 4

Bibliography:  #1, #27, #60 through #69, #71, #77, #91 through #94

This was also covered in LMPD's 2013 Mandated in-Service Training under the Ethics portion of the Roll-Call curriculum.

| 5 | Roll Call Training | 1.0 hours |
|---|---|---|
| | During this session, the student will: | |
| | 5.1 | List the four steps of PASS to properly use a portable fire extinguisher. |
| | 5.2 | List two ways blook borne pathogens can be transmitted. |
| | 5.3 | List the four United States agencies that define and regulate hazardous materials. |
| | 5.4 | List three potential warning signs that could indicate an elderly person is being financially abused. |
| | 5.5 | Explain why ethics is an important part of a police officer's training. |
| | Bibliography:  #11, #12, #13, #14, #15, #16 | |

# Racial Profiling Handout

## Module B: Law Enforcement and Racial Profiling

*Stereotypical and Criminal Profiles*

Few people of any race or ethnic group are ever convicted of a crime. The difficulty for law enforcement is, of course, finding those few individuals who are the bad elements in society. Profiling is a tool that is used to help narrow the odds in the difficult identification process. By studying common criminal characteristics, profiling purports to be able to help identify those who are criminals. When used judicially, this may be the case. Profiling for serial killers seems to have been a fairly successful exercise, given the common characteristics demonstrated by particular types of serial killers. However, the serial killer is an atypical sort of criminal, and the commonality between serial killers tends to consist of environmental and behavioral factors. Profiling based on the marked biological factor of race is another matter.

The guiding rationale for racial profiling is simply too broad to support. There is nothing inherent in race that could support a claim that one race of people is more potentially criminal than any other. Any profile based upon race, then, is logically and ethically suspect. Racial profiling is a simplistic justification for racial bias or, at best, a misapplication of simplistic logic to a complex issue. Studies have demonstrated conclusively that racial profiling occurs, and that even when it "works," it is a dubious method that seriously erodes the goodwill between community and law enforcement essential to a healthy society.

Stereotypical images that work their way into law enforcement through the use of racial profiles may be reinforced by media stories that put undue stigma on innocent members of these groups. A team of researchers at UCLA has found that African Americans and Hispanics are overly represented in TV news  depictions of violent crime, while Caucasians are not. Another social scientist has found that Asians are  overly identified with Asian gangs. This general cultural bias, driven by the media, contributes to law  enforcement's misapplication of criminal profiles to racial minorities.

Every incorrect traffic stop justified by a racially charged profile, even if cordial, is problematic in a free country. Over time, these unwarranted stops damage the reputation of the agencies involved. An article from the July 1998 issue of Police Chief reinforces the key issues for officers to remember in avoiding bias stops:

•Professional traffic enforcement is a vitally important tool that saves lives and reduces crime.

•Bias has no place in law enforcement, and traffic stops must be performed in a professional and fair manner.

•To stop and search an individual simply because of race, gender, or economic level is unlawful, unconstitutional, and should not be tolerated in any police organization.

# KYOPS STOPS
# Form Procedures

## KYOPS STOPS form procedure

1. Officers create an e-citation locally on the computer.
2. The stops form is only activated if the officer selects the options "traffic stop" at the beginning of the e-citation.   This activation also performs the following options
   a. Makes the e-citation a type one citation regardless of the charges.
   b. Enables the only way vehicle information can be entered on an e-citation.
   c. Mandates one of the charges be traffic related
   d. And for LMPD only the stops form is made available once completing the basic c e-citation
3. The following items are requested on the vehicle STOPS reporting form(from the e-citation user's manual) [\\svfs08\lmpdgroup$\HomePage\Crime Analysis\MANUALS\KYOPS MANUALS](\\svfs08\lmpdgroup$\HomePage\Crime Analysis\MANUALS\KYOPS MANUALS)



Start Time: Time is automatically completed based on the start of the citation
End Time: Time is grayed out until you tab the "NEXT" button, then it is auto completed

**Type of Stop**
- Traffic Violation:  Auto completed based on traffic stop being selected from the first page. You may manually update this field as necessary.
- Complaint/Criminal Violation: Select if stop was generated from complaint or investigation of criminal activity. You may manually update this field as necessary.
- Compliance Stop: Used only by DOT certified Stops. You may manually update this field as necessary.

**Type of License**

- In state, Out-of-State: Issued state of the driver's license is pre-filled based on your  selections when writing the citation. You may manually update this field as necessary.

**Gender of Driver**
- Male, Female: Gender of the driver is pre-filled based on your selections when writing the  citation. You may manually update this field as necessary.

**Race of Driver**
- Caucasian, African American, American Indian, Asian, Middle Eastern: Race is pre-filled based on your  selections when writing the citation. You may manually update this field as necessary.
- Hispanic: Hispanic is pre-filled based on your selections when writing the citation. This will  over-ride your race selection and just list Hispanic on the Vehicle Stop reporting Form. You  may manually update this field as necessary.

**Location**
- Interstate, Parkway, US Highway, State, county, City Roadway: Roadway Type is pre-filled  based on your selections when writing the citation. You may manually update this field as  necessary.
- Road: If one of the other location choices is not appropriate, select "road" and provide the  information desired in free form text box.


**Number of Passengers by Race**
- Caucasian, African American, Hispanic, American Indian, Asian, Middle Eastern: Numerically indicate  quantity of passengers by race occupying the vehicle at the time of stop. ( Note do not count  the driver, in this equation)

**Disposition**
- No Action: Should never be checked, this form is only available through E-citation when a  traffic ticket or traffic based arrest or summons is initiated.
- Arrest/Detention: Only check if Physical arrest is made based out of a traffic stop. You may  manually update this field as necessary.
- Citation issued: This is pre-filled based on your initial selection of traffic stop from the first  page. This is used for all Traffic, and "Citation Arrest" situations based out of a traffic stop.   You may manually update this field as necessary.
- Written Verbal Warning: Should never be checked, this form is only available through E- citation when a traffic ticket or traffic based arrest is initiated.
- Summons Served: Should never be checked, this form is only available through E-citation  when a traffic ticket or traffic based arrest is initiated. Summons needs to be a separate  citation and should not be incorporated with the Traffic Stop Selection from the Preliminary  page.
- Other: If one of the other Dispositions choices is not appropriate, select "Other" and provide  the information desired in free form text box. (Example: "Arrest Warrant" which could be  added to fresh charges arising from a Traffic Stop.)

**Age of Driver**

Age: This is pre-filled based on your initial selection of traffic stop from the driver's information page. You may manually update this field as necessary.

**Searched**
- Yes or No: "No" is pre-filled automatically, if you searched the vehicle select "Yes", and the grayed out boxes below will become available. A "Terry Stop/Pat Down" of an occupant outside of the car does merit a "Yes", only a physical search of the vehicle.
- **Results:** Based upon the search of the vehicle only was contraband located.
- **Reason for Search:** establish a brief summary of reasons for the search. (Examples: "Plain view Seizure", "Consent", "Probable Cause" etc.)

4. Once an e-Citation is completed it remains on the user's computer until transmitted. Transmission is a manual process. The user selects transmit and enters a username and password. The files are moved from the local machine via a file transfer process. Upon reaching the state message switch, the files are forwarded to the state repository, AOC, DOT, and returned to LMPD and imported into ILEADS.

5. Once the files have been received on LMPD's import server (currently SRVHQBIZTALK) they are decrypted and moved to the ILEADS server. Once on the ILEADS server they are held until processed (usually under 5 minutes). The files that are processed without errors are moved to the processed folder, files that error out are moved to the error folder. Record will routinely review the files in the error folder and reprocess them or enter them by hand.

6. Data imported into ILEADS from stops form not obtainable from cited driver (reference above)
   a. START and END times
   b. Number and race of passengers
   c. Dispositions (value 0 means citation or other chosen, 1 means arrest) and data of the "Other" text field
   d. Searched yes or no
   e. Results yes or no

   f. Reason for search text

# Sharepoint STOPS Form

**Sharepoint STOP form Physical Arrest Options**

| Arrest | Citation Control Number | Incident Number | Officer's AOC Code Number | Date of Stop | Time of Stop | Type of Stop | Division | Beat | Gender of Driver |
|---|---|---|---|---|---|---|---|---|---|
| | Text Box | Yes/No | Text Box | Text Box | Text Box | Complaint/Criminal Violation | 1-8 | 1-6 | Male/Female |
| | | If yes: enter number | | | | Compliance Stop (KVE ONLY) | Non LMPD | Non-LMPD | |
| | | | | | | Traffic Violation | | | |

| Race | Ethnicity | Age | Passengers in Vehicle | Was Vehicle Searched |
|---|---|---|---|---|
| Caucasian | Hispanic/Non Hispanic | Under 16 | Yes/No | Yes/No |
| African | | 16-19 | If yes:  Enter Number of Passengers | If yes: |
| American | | 20-25 | | **Reason for Search:** |
| Alaskia Native | | 26-30 | | Consent |
| American Indian | | 31-40 | | Terry Stop / pat-down |
| Indian/India/Burmese | | 41-50 | | Incident to Arrest |
| Middle Eastern Descent | | 51-60 | | Probable Cause |
| Asian/Pacific Islander | | Over 60 | | Other |
| | | | | |
| | | | | **Search Positive** |
| | | | | Yes/No |

**Sharepoint STOP form Citation Options**

| Citation | Citation Control Number | Incident Number | Officer's AOC Code Number | Date of Stop | Time of Stop | Type of Stop | Division | Beat | Gender of Driver |
|---|---|---|---|---|---|---|---|---|---|
| Text Box | Text Box | Yes/No | Text Box | Text Box | Text Box | Complaint/Criminal Violation | 1-8 | 1-6 | Male/Female |
| | | If yes: enter number | | | | Compliance Stop (KVE ONLY) | Non LMPD | Non-LMPD | |
| | | | | | | Traffic Violation | | | |

| Race | Ethnicity | Age | Passengers in Vehicle | Was Vehicle Searched |
|---|---|---|---|---|
| Caucasian | Hispanic/Non Hispanic | Under 16 | Yes/No | Yes/No |
| African | | 16-19 | If yes:  Enter Number of Passengers | If yes: |
| American | | 20-25 | | **Reason for Search:** |
| Alaskia Native | | 26-30 | | Consent |
| American Indian | | 31-40 | | Terry Stop / pat-down |
| Indian/India/Burmese | | 41-50 | | Incident to Arrest |
| Middle Eastern Descent | | 51-60 | | Probable Cause |
| Asian/Pacific Islander | | Over 60 | | Other |
| | | | | |
| | | | | **Search Positive** |
| | | | | Yes/No |

**Sharepoint STOP Form Warning Options**

| Warning | Incident Number | Officer's AOC Code Number | Date of Stop | | Time of Stop | | Type of Stop | Division |
|---|---|---|---|---|---|---|---|---|
| Yes/No | | Text Box | Text Box | | Text Box | | Complaint/Criminal Violation | 1-8 |
| | If yes: enter number | | | | | | Compliance Stop (KVE ONLY) | Non LMPD |
| | | | | | | | Traffic Violation | |

| Race | Ethnicity | Age | Passengers in Vehicle | Was Vehicle Searched |
|---|---|---|---|---|
| Caucasian | Hispanic/Non Hispanic | Under 16 | Yes/No | Yes/No |
| African | | 16-19 | If yes:  Enter Number of Passengers | If yes: |
| American | | 20-25 | | **Reason for Search:** |
| Alaskia Native | | 26-30 | | Consent |
| American Indian | | 31-40 | | Terry Stop / pat-down |
| Indian/India/Burmese | | 41-50 | | Incident to Arrest |
| Middle Eastern Descent | | 51-60 | | Probable Cause |
| Asian/Pacific Islander | | Over 60 | | Other |
| | | | | |
| | | | | **Search Positive** |
| | | | | Yes/No |