# KENTUCKY VEHICLE STOPS DATABASE
# 2001 REPORT

KENTUCKY JUSTICE CABINET
NOVEMBER 2002

**KENTUCKY VEHICLE STOPS DATABASE**
# 2001 REPORT

**PREPARED FOR THE**
KENTUCKY JUSTICE CABINET
BY
DEBORAH G. WILSON, PH.D.
DEPARTMENT OF JUSTICE ADMINISTRATION
UNIVERSITY OF LOUISVILLE

NOVEMBER 2001

# KENTUCKY VEHICLE STOPS DATABASE
# 2001 REPORT

## INTRODUCTION

The Rule of Law which underlies a democratic form of government and, therefore, democratic policing strategies, is based on the presumption that, unless specified under the law, individual characteristics such as age, ethnicity, economic and socio-demographic characteristics of individuals should not be taken into account in the administration of justice. Biased policing occurs when "…(intentionally or unintentionally) personal, societal, or organizational biases and/or stereotypes are applied in the decision-making processes in the administration of justice.[1] Racially biased policing is only one form of bias that can be introduced into the administration of justice. Racially biased policing occurs when the police inappropriately consider race or ethnicity in deciding with whom and how to intervene in an enforcement capacity".[2] Racial profiling is a form of bias within policing and includes "…any police action that relies on the race, ethnicity or national origin of an individual rather than the behavior of an individual or information that leads the police to a particular individual who has been identified as being, or having been, engaged in criminal activity".[3]

Racial profiling and the larger category of biased policing has a number of specific consequences. Those most significant are:

- Hinders police effectiveness by eroding public confidence and trust and interferes with strong police and community partnerships;
- Hinders police effectiveness by leading police to believe that only "certain people" commit crimes;
- Violates federal and civil statutes; and
- It is a form of discrimination and is therefore, wrong.

The larger consequence of biased policing and, therefore, racial profiling is that it undermines the basic principles of a rule of law and democratic government and democratic policing through the erosion of public trust and police ineffectiveness that are the result.

### Recommended Strategies

Both the National Organization of Black Law Enforcement Executives and the International Association of Chiefs of Police recommend specific strategies to address biased policing. These strategies are as follows:

- Implementation of a policy specifically condemning discrimination of any kind;
- Implementation of policies defining and prohibiting racial profiling;
- Officer training;
- Accessible and transparent civilian complaint process; and
- Data collection for both analysis and periodic review to assess compliance.

### Kentucky Strategies

The Kentucky strategies to address biased policing and, therefore racial profiling, were initiated in April 2000. At this time, Governor Paul Patton signed an Executive Order specifying that"… no state law enforcement officer shall stop any person solely because of race, ethnicity or gender." During the summer

---

[1] Ronald Davis, National Organization of Black Law Enforcement Executives
[2] Police Executive Research Forum and National Organization of Black Law Enforcement Executives
[3] Ramirez, et.al., Department of Justice, 2000

and fall of 2000, representatives of the Justice Cabinet and state law enforcement met and developed a model policy prohibiting racial profiling and developed an instrument for the collection of data related to vehicle stops. Twenty-six local and county law enforcement agencies volunteered to participate in the vehicle stops data collection project along with the state law enforcement agencies. Throughout the fall of 2000, pilot data collection was conducted. Data collection began in January 2001.

During the 2001 session of the Kentucky General Assembly legislation passed (Senate Bill 76) that required all law enforcement agencies in the state to adopt a policy that met or exceeded the model policy developed by the Kentucky Justice Cabinet. This legislation additionally tied the continuation of Kentucky Law Enforcement Foundation Program funding to adoption of this biased policing/racial profiling policy.

Lastly, the Kentucky State Police and Department of Criminal Justice Training both instituted, in 2001, in-service training and units within basic law enforcement training that would address racial profiling, cultural awareness and/or model racial profiling policy definitions and strategies.

## Vehicle Stops 2001 Data Collection and Report

This report, based on information available in the Kentucky Vehicle Stops Database for 2001, is a summary of some limited and exploratory findings concerning the nature of vehicle stops conducted by the agencies participating in this project. It is not meant to be information from which a conclusion can be drawn concerning the presence or absence of biased-policing and/or racial profiling within an agency or unit within an agency. The data is too limited and is only baseline information. The methodological issues related to determinations of the presence or absence of biased-policing and/or racial profiling are extremely complex and no set of data has yet been developed that can conclusively determine the presence or absence of these types of inappropriate policing decisions and actions.

This is the first set of quantitative information that has been developed to provide information on some of the characteristics of vehicle stops made by law enforcement agencies in Kentucky. These agencies are not deemed to be representative of all law enforcement agencies in the Commonwealth nor is the data to be construed as statewide data. Without information over a number of years, this data cannot be considered representative of agency activities. It is, at best, data collected on official actions taken over a maximum of 12 months and, in some instances, less than 12 months. Some agencies in the database did not begin submitting data until several months following January 1, 2001. It is also not a complete analysis of the data since numbers of cases, limited representation of minority group drivers, limited qualitative information and limited research resources prohibited a more definitive analysis.

The data is presented as a preliminary analysis of vehicle stop information. It is presented as information to be used as a management tool to be reviewed by statewide as well as individual agency leadership and policy-makers. It may suggest characteristics of vehicle stops that require further review and, especially, the collection of additional qualitative information. It has prompted a number of improvements in the Kentucky Vehicle Stops Database form that have already been implemented. These include the addition of more ethnic categories for drivers, information on why a search was conducted and information on whether the vehicle stopped had an in- or out- of-state license plate. The analysis has additionally presented the need for more qualitative information such as the nature of the violation that prompted the vehicle stop. The purpose is to provide law enforcement leadership with information that will stimulate further analysis, thought and queries that will prompt bias-free and therefore more effective policing within the Commonwealth.

## FINDINGS

Stops reported in the Kentucky Vehicle Stops Database totaled 311,393 between January 1 and December 31, 2001. Most of the agencies contributing to the database were state law enforcement agencies (81percent). The remainder were local (15 percent) and county (sheriff's departments and county police) law enforcement agencies (3 percent).



**Chart 1**
**Types of Stops**

As noted in Chart 1, the greatest portion (78 percent) of these stops were for traffic violations. The remaining stops were compliance (19 percent), courtesy (2 percent) and complaint/criminal (1 percent).



**Chart 2**
**Ethnicity of Driver**

The ethnicity of drivers stopped by the participating agencies during 2001 is displayed in Chart 2. Most of the drivers (90 percent) were Caucasian. The remaining drivers were African American (8 percent), Hispanic (2 percent), Asian American (1 percent) and Native American (.05 percent).

Table 1 shows the ethnic distribution of drivers stopped for the various types of stops. When the small numbers of stops for complaint/criminal violations is taken into consideration, the ethnic distribution of drivers within each stop type mirrors the distribution for total stops.

**Table 1**
**ETHNICITY OF DRIVER BY TYPE OF VEHICLE STOP**

**TYPE OF STOP**

| ETHNICITY OF DRIVER | TOTAL STOPS | TRAFFIC | COMPLAINT/ CRIMINAL | COURTESY | COMPLIANCE |
|---|---|---|---|---|---|
| TOTAL NUMBER | 304788 | 237876 | 4342 | 5473 | 57097 |
| Asian American | 1% | .08% | .4% | .3% | .3% |
| African American | 8% | 8% | 10% | 7% | 8% |
| Hispanic | 2% | 1% | 3% | 2% | 2% |
| Caucasian | 90% | 90% | 87% | 91% | 89% |
| Native American | .05% | .05% | .1% (N=6) | (N=1) | (N=20) |
| TOTAL | 100% | 100% | 100% | 100% | 100% |

5

### Table 2
### TYPE OF VEHICLE STOP BY ETHNICITY OF DRIVER

#### TYPE OF STOP

| ETHNICITY OF DRIVER | TRAFFIC | COMPLAINT/ CRIMINAL | COURTESY | COMPLIANCE | TOTAL PERCENT (NUMBER) |
|---|---|---|---|---|---|
| Asian American | 89% | .9% (N=18) | .8% (N=16) | 9% | 100% (1995) |
| African American | 78% | 2% | 2% | 9% | 100% (24878) |
| Hispanic | 68% | 2% | 2% | 19% | 100% (4546) |
| Caucasian | 78% | 1% | 2% | 19% | 100% (273235) |
| Native American | 80% | 5% (N=6) | 1% (N=1) | 15% (N=20) | 100% (134) |

Table 2 contains information on the distribution of vehicle stop types for each ethnic group of driver. Asian American drivers were stopped for traffic violations more often than drivers from other ethnic categories. Hispanic drivers were less likely to be stopped for traffic violations than members from other ethnic categories. The percentages of drivers stopped for complaint/criminal and courtesy stops did not vary significantly. However, Asian American and African American drivers were stopped in lower proportions for compliance violations than Caucasians, Hispanics and Native American Drivers.

### Chart 3
### Searches Conducted



As shown in Chart 3, searches were conducted in 5 percent of all stops logged in the database during 2001. This consisted of a total of 17,914 searches. Of these searches, 23 percent resulted in a positive finding. Most searches (79 percent) were conducted during traffic violation stops. The remaining searches were conducted during complaint/criminal violation (10 percent), compliance (9 percent) and courtesy (2 percent) stops.

Ethnicity of the driver was found to be related to the probability that a vehicle stop would result in a search. Vehicle stops involving Hispanic drivers (14 percent) were more likely than vehicle stops involving African American (6 percent), Caucasian (5 percent) or Asian American (2 percent) drivers to result in a search.[4]

Since both ethnicity of the driver and type of vehicle stop were related to the probability of a search, the proportion of drivers from the various ethnic groups who were searched during each type of stop was examined. The findings of this assessment are contained in Table 3.

---

[4] The small number of Native American drivers stopped as well as the small number of drivers searched makes conclusions regarding this ethnic group statistically invalid.

Table 3
SEARCH CONDUCTED BY ETHNICITY OF DRIVER BY TYPE OF STOP

PERCENT SEARCHED

TYPE OF STOP

| ETHNICITY OF DRIVER | TRAFFIC STOPS | COMPLAINT/ CRIMINAL | COURTESY STOPS | COMPLIANCE |
|---|---|---|---|---|
| TOTAL STOPS | 235924 | 4288 | 5378 | 56873 |
| TOTAL SEARCHES | 11490 | 1508 | 233 | 1256 |
| Asian American | 2% | 22% (N=4) | | 2% (N=3) |
| African American | 7% | 34% | 6% | 3% |
| Hispanic | 16% | 43% | 14% | 9% |
| Native American | 7%(N=7) | 33% (N=2) | | 15% (N=3) |
| Caucasian | 5% | 35% | 4% | 2% |

As shown in Table 3, when the influence of the type of stop on the probability of search is controlled, a statistically significant relationship remains between the ethnicity of the driver and the probability that a search will be conducted during a vehicle stop. That is, when those instances of fewer than 10 stops within an ethnic category are eliminated, Hispanics have a greater probability of being searched, overall, regardless of the type of vehicle stop. Caucasians and African Americans do not differ significantly in the proportions of drivers from these two ethnic groups who are searched while involved in the various types of vehicle stops. [5]

Among those vehicle stops that resulted in a search, the proportion of the searches that resulted in a positive finding was found to be related to the ethnicity of the driver. Searches conducted of vehicle stops involving Caucasian (23 percent) and African American (22 percent) drivers most often resulted in a positive finding. Searches conducted involving vehicle stops with Hispanic drivers (12 percent) were the least likely to result in a positive finding. As shown in Table 4, this relationship between ethnicity and the outcome of a search was evident for each type of traffic stop.

Table 4
SEARCHES WITH POSITIVE FINDINGS BY ETHNICITY
BY TYPE OF VEHICLE STOP

TYPE OF STOP

| ETHNICITY OF DRIVER | TRAFFIC STOPS | COMPLAINT/ CRIMINAL | COURTESY STOPS | COMPLIANCE |
|---|---|---|---|---|
| TOTAL SEARCHES | 14269 | 1492 | 276 | 1442 |
| TOTAL POSITIVE | 3095 | 524 | 60 | 320 |
| Asian American | 15% (N=7) | 20% (N=1) | 0 | 0 |
| African American | 22%(N=303) | 31% (N=43) | 13% (N=4) | 12%(N=15) |
| Hispanic | 13%(N=63) | 18%(N=8) | 6% (N=1) | 7% (N=7) |
| Native American | 29%(N=2) | 0 | 0 | 0 |
| Caucasian | 22%(N=2716) | 36%(N=471) | 24% (N=55) | 25% (N=296) |

---

[5] The small number of Native American drivers searched during each type of stop as well as the small numbers of Asian Americans searched during stops other than traffic makes conclusions regarding these two ethnic groups statistically invalid.

With the exception of traffic stops, the numbers of searches conducted among drivers of the various ethnic categories is too small for meaningful interpretation. However, among traffic stops, Hispanic drivers (13 percent) had the lowest probability of the search resulting in a positive outcome.

The average time of the stops made by the contributing law enforcement agencies during 2001 was 13 minutes. The most frequent stop time among the 302,578 stops was 5 minutes. Sixty-seven percent of all stops lasted 10 minutes or less while 16 percent of all stops were more than 20 minutes in duration.

Table 5
LENGTH OF STOP (MINUTES) BY ETHNICITY OF DRIVER

| ETHNICITY OF DRIVER | LENGTH OF STOP |
|---|---|
| Caucasian | 13 |
| African American | 14 |
| Hispanic | 20 |
| Asian American | 11 |
| Native American | 13 |
| TOTAL | 13 |

Statistically significant differences were noted in the average duration of vehicle stops based on the driver's ethnicity. Vehicle stops involving Hispanic drivers (20 minutes) had the longest average stop time. Vehicle stops involving African American (14 minutes), Caucasian (13 minutes), Native American (13 minutes) and Asian American (11 minutes) drivers had relatively comparable stop times that were significantly shorter than those for Hispanic drivers.

The average length of duration for a vehicle stop was also found to be related to the type of stop. Vehicle stops involving compliance violations (26 minutes) or complaints/criminal violations (21 minutes) lasted significantly longer than stops for traffic violations (10 minutes) or courtesy stops (9 minutes).

Since ethnicity of the driver and type of vehicle stop were related to the duration of the stop, the length of stops for each ethnic category of driver were assessed within each type of vehicle stop category. The findings are contained in Table 6.

Table 6
LENGTH OF STOP (MINUTES) BY ETHNICITY OF DRIVER BY VEHICLE STOP TYPE

TYPE OF STOP

| ETHNICITY OF DRIVER | TRAFFIC STOPS | COMPLAINT/ CRIMINAL | COURTESY STOPS | COMPLIANCE |
|---|---|---|---|---|
| TOTAL STOPS | 10 | 21 | 9 | 26 |
| Asian American | 9 | 16 | 5 | 28 |
| African American | 11 | 16 | 8 | 28 |
| Hispanic | 16 | 24 | 13 | 30 |
| Native American | 10 | 11(N=6) | 10 (N=1) | 27 |
| Caucasian | 10 | 21 | 10 | 26 |

The findings in Table 6 show statistically significant differences in vehicle stop times based on the ethnicity of the driver for all types of stops except courtesy stops. Given the small number of Hispanic drivers involved in courtesy stops (N=96), the differences in times had a better than 5 percent probability of being due to chance alone. However, among the three other types of stops, the trend is for those vehicle

8

stops involving Hispanic drivers to take longer periods of time than those stops involving drivers from other ethnic categories. This "difference" is greatest for vehicle stops made for traffic violations.

The length of time for a vehicle stop was also found to be related to whether or not a search was conducted and to whether or not the search resulted in a positive outcome. Those vehicle stops in which a search was conducted lasted, on the average, 28 minutes while those in which no search was conducted lasted, on the average, 13 minutes. When a search was conducted and the outcome was positive, the stop took a longer period of time (32 minutes) than those stops during which a search was conducted but the findings were negative (22 minutes).

**Chart 4**
**Disposition**



The final disposition of vehicle stops by the contributing law enforcement agencies during 2001 and reported in the database is contained in Chart 4. As shown in this chart, the greatest portion of all stops made resulted in a citation issued (64 percent) followed in frequency by written or verbal warning (18 percent), arrest or detention (5 percent), other action (8 percent) and no action (6 percent).

## CONCLUSIONS AND RECOMMENDATIONS

This data is not representative of all agencies within the Commonwealth. It is based on vehicle stops information from all state law enforcement agencies and a small subset of local and county law enforcement agencies within the Commonwealth. As noted previously, this report, based on information available in the Kentucky Vehicle Stops Database for 2001, is a summary of some limited and exploratory findings concerning the nature of vehicle stops conducted by the agencies participating in this project. It is not meant to be information from which a conclusion can be drawn concerning the presence or absence of biased-policing and/or racial profiling within an agency or unit within an agency. The data is too limited and is only baseline information. The methodological issues related to determinations of the presence or absence of biased-policing and/or racial profiling are extremely complex and no set of data has yet been developed that can conclusively determine the presence or absence of biased-policing and/or racial profiling are extremely complex and no set of data has yet been developed that can conclusively determine the presence or absence of these types of inappropriate policing decisions and actions.

Overall, the data reflect the following:

- Ethnic distribution of drivers stopped for various reasons does not differ substantially by reason for stop. That is, the ethnic distribution of drivers stopped for traffic, complaint/criminal, courtesy and compliance stops does not vary.

- Variation does exist within the various ethnic groups of drivers among the types of stops. That is, the percentage of drivers within each ethnic category that were stopped for the various reasons does differ. For example, Hispanic drivers were stopped for traffic violations proportionately less than drivers from

- other ethic categories. Whether this reflects driving patterns and habits or the discretion of law enforcement officers cannot be determined.

- When drivers were stopped, the probability that a search would be conducted was related to the ethnicity of the driver. Vehicle stops involving Hispanic drivers were more likely to result in a search than vehicle stops involving drivers from other ethnic categories.

- While the numbers of drivers stopped for reasons other than traffic violations who were not Caucasian or African American is relatively small, the data suggest that some relationship between the ethnicity of the driver and the probability of a search exists regardless of the type of stop. Vehicle stops involving Hispanic drivers were more likely to result in a search than vehicle stops involving drivers from other ethnic categories.

- When searches were conducted, regardless of the type of vehicle stop, the outcome was more likely to be negative when the driver was Hispanic than when the driver was Caucasian or African American.

- The duration of a vehicle stop was found to be related to the ethnicity of the driver for traffic, complaint/criminal, and compliance stops. Vehicle stops involving Hispanic drivers lasted longer periods of time than those involving drivers from other ethnic categories.

Based on the findings from the vehicle stops database, the following recommendations are made:

➢ Attempt to determine what factors may be influencing the various trends related to stops involving Hispanic drivers.

➢ Implement the proposed amendments to the vehicle stops data collection form to include the driver's age; expanded driver ethnic categories; residence of the driver; if a search is conducted, the reason for the search; and additional details concerning the justification for the vehicle stop.

➢ Continue the data collection and annual analysis as a means of monitoring and imposing accountability.

➢ Expand the data collection process to include qualitative information using civilian focus groups and random consumer audits/surveys.

➢ Expand the data collection process to include qualitative information on the police reaction to the strategies implemented to address racially biased policing.

➢ Implement community education programs to familiarize the public with appropriate police tactics and strategies.

➢ Develop means to assess, and if necessary to enhance, the accessibility and transparency of civilian complaint processes.

➢ Ensure the bias-free policing is a theme throughout all phases of police basic and in-service training.

➢ Continue to promote and maintain the current integrated approach to biased policing through policies, discipline, accountability and training.