1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                         LOUISVILLE DIVISION

3
UNITED STATES OF AMERICA,      )      Case No. 3:17-CR-00037-DJH
4                              )
           Plaintiff,          )
5                              )
v.                             )
6                              )
CHEROSCO BREWER,               )
7                              )      January 7, 2019
           Defendant.          )      Louisville, Kentucky
8

9                          *  *  *  *  *

10                            VOLUME 1
                      TRANSCRIPT OF JURY TRIAL
11              BEFORE HONORABLE DAVID J. HALE
                  UNITED STATES DISTRICT JUDGE
12
                           *  *  *  *  *
13
APPEARANCES:
14
For United States:        Corinne E. Keel
15                        Erin G. McKenzie
                          U.S. Attorney's Office
16                        717 West Broadway
                          Louisville, KY 40202
17
For Defendant:            David S. Mejia
18                        310 East Broadway, Suite 201
                          Louisville, KY 40202
19
     [Defendant present.]
20

21
                     Dena Legg, RDR, CRR, CCR-KY
22                     Official Court Reporter
                       232 U.S. Courthouse
23                   Louisville, KY 40202
                        (502) 625-3778
24
Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

1    (Begin proceedings in open court at 9:35 a.m.  Jury out.)

2         DEPUTY CLERK:  3:17-CR-37, United States of America

3    versus Brewer.

4         MS. MCKENZIE:  Good morning, Your Honor.  Erin

5    McKenzie on behalf of the United States, as well as Corinne

6    Keel.  Also present are Detective Holly Hogan and Brandi

7    Henderson, who is a paralegal in the United States Attorney's

8    Office.

9         MR. MEJIA:  Good morning.  I'm David Mejia.  To my far

10   left is Cherosco Brewer and to my immediate left is Robin

11   Tabler.  She's my paralegal/legal assistant.

12        THE COURT:  Good.  Good morning.  So let's begin with

13   the formalities.  Is the United States ready to proceed to

14   trial?

15        MS. MCKENZIE:  We are, Your Honor.

16        THE COURT:  And how about the defense, Mr. Mejia?

17        MR. MEJIA:  Yes, sir, we are.

18        THE COURT:  So we have a few housekeeping items we

19   need to cover.  And then once we're done with those, I'll give

20   you-all just a few minutes to get situated, and we'll bring the

21   jury pool in and begin the voir dire process.

22     I understand that we have -- I forget the final number I

23   gave you-all at the pretrial conference.  It might have been 53

24   or it could have been 55.  In any event, we have 51 jury pool

25   members that have arrived, and we believe that's the total that

1    we will have.  I think that two were excused by the magistrate

2    judge who reviews these matters within the last few days due to

3    understandable family difficulties, and then I believe we have

4    two that are no shows and so we will begin with 51.

5        As I said at the pretrial, we'll seat a jury of 13.  Each

6    side will have the number of strikes afforded by Rule 24, so it

7    will be 11 for the defense, seven for the Government.

8        Our break will also allow you some time to look through the

9    jury pool list, and I will remind you of what we discussed at

10    the pretrial conference.  You will need to take good notes

11    during the process.

12        Let me also tell you that -- and I might need everyone's

13    attention on this -- that during the voir dire process, when I

14    invite a jury pool member to the bench to discuss a matter

15    privately or when they request to come up to the bench, I'm

16    going to need a representative from each side but just one.  So

17    I don't want it to get too crowded here at the bench.

18        Let's see.  The next item I have on my list is the *Missouri*

19    *v. Fry* issue.  I do not want to belabor that, but I do want to

20    supplement the record with respect to the issues presented by

21    *Missouri v. Fry* and by the Sixth Circuit cases which have

22    followed *Missouri v. Fry*.  I believe we have complied with the

23    teaching of *Missouri v. Fry* in large part, but I do want to ask

24    a follow-up question.  And let me direct the question to you

25    first, Ms. McKenzie, and then get your response to that,

1    Mr. Mejia, in behalf of your client.

2        When we discussed the implications of *Missouri v. Fry* during

3    our pretrial conference last week, we talked about the fact that

4    the Government had in fact made an offer to compromise the case

5    with an eye towards a plea agreement.  Mr. Brewer acknowledged

6    that he had received that offer, it had been communicated to

7    him, and that despite the offer had made the decision to proceed

8    with a trial.

9        But I do believe, in revisiting the issue a bit since then,

10   that it's appropriate to ask a follow-up question and make sure

11   that we have a record clear that the offer presented by the

12   Government would likely have resulted in less prison time than

13   Mr. Brewer faces if he is convicted at trial on all counts.  Is

14   that a correct understanding of the offer?

15           MS. MCKENZIE:  It is correct, Your Honor.  And I can

16   say that reviewing the charges, if Mr. Brewer's convicted of all

17   counts, based on his criminal history, I believe he would be a

18   career offender.  The guideline range under the career offender

19   guideline, if convicted at trial, is 360 to life.  The offer

20   that the United States made involved dismissal of the 924(c)

21   count and a (C) plea to 180 months, 15 years.  So our offer

22   was -- would have cut in half the amount of time Mr. Brewer

23   could get if convicted of all counts.

24           THE COURT:  I see.

25       Mr. Mejia, as I have previously stated and as you

1    understand, my role with respect to this discrete issue is not

2    to mediate a plea agreement.  It is simply to ensure that your

3    client, Mr. Brewer, has made an informed decision with respect

4    to any plea offer and with respect to his decision to forego the

5    plea offer in favor of trial.

6        So I would just like for you to confirm with Mr. Brewer that

7    he received that level of detail regarding the Government's plea

8    offer and that he has rejected that offer in favor of a jury

9    trial.  I think it's particularly important that we make this

10   record, given the fact that you are successor counsel.

11           MR. MEJIA:  Yes, sir.  I appreciate Your Honor's

12   discussion here today.  The 15-year offer is, under the statute,

13   a mandatory minimum.  We have not received an offer below the

14   mandatory minimum provided by Congressional enactment as to what

15   penalty for this offense.

16       He is also aware and I will remind him again today that the

17   guidelines are advisory and not mandatory.  Three hundred and

18   sixty to life, of course, is available and an option and could

19   result.  I will apprise him of that again today and -- so that

20   I'm certain in my mind that the record is clear, I am successor

21   counsel.  The offer that was made was to predecessor counsel,

22   and I believe his position, as said to me earlier and said to

23   you in earlier proceedings, is that he wishes a trial by jury.

24           THE COURT:  That's fine.  I think what we'll do, as I

25   said at the outset this morning, we will take a few minutes.  I

1    will give you-all a few minutes --

2              MR. MEJIA:  Okay.

3              THE COURT:  -- to get organized before we bring the

4    jury pool in once we're done with these preliminary matters.  So

5    if you will use some of that time to confer with Mr. Brewer one

6    last time --

7              MR. MEJIA:  I'll do that.

8              THE COURT:  -- and confirm your understanding, and

9    then we'll put that back on the record when I return just prior

10   to bringing the jury pool in.  Is that adequate?

11             MR. MEJIA:  Yes, sir.

12             THE COURT:  Let's talk then about the statement of the

13   case.  I think a draft was provided to you this morning.  That's

14   simply the very brief description of the case so that the jury

15   pool is aware of what type of case this is.  Does either side

16   have any issues with the draft statement of the case?

17             MS. MCKENZIE:  No, Your Honor.

18             MR. MEJIA:  None here.  I think it succinctly

19   describes the charges.

20             THE COURT:  I'm sorry.  Ms. McKenzie?

21             MS. MCKENZIE:  No, Your Honor.  I'm sorry.

22             THE COURT:  Thank you.

23      What about the preliminary instructions?  Those also follow

24   the standard course that we give to the jury at the outset.

25             MS. MCKENZIE:  No objection from the United States.

1          MR. MEJIA:  None here, Judge.  They appear to be in

2    order.

3          THE COURT:  Now, you-all had raised at the pretrial

4    conference that the Government intended to offer into evidence

5    some video clips.

6          MS. MCKENZIE:  Yes.

7          THE COURT:  And there was some discussion, Mr. Mejia,

8    about either a stipulation or an agreement as to how -- how

9    those would be limited.  Did you-all reach agreement on that?

10          MR. MEJIA:  I think we have, Judge.  We have discussed

11    expurgating certain portions that, for instance, refer to a

12    felony conviction, other portions that are prejudicial, and

13    we're in accord as to what will be played.  I had suggested

14    possible transcripts to aid the jury.  That won't be done in

15    this trial, Judge.

16          THE COURT:  So the video clips that you have prepared

17    meet the parties' joint understanding and there will not be

18    offered a transcript?

19          MR. MEJIA:  That's correct.

20          THE COURT:  Now, the Government also submitted, I

21    believe, a couple of stipulations.  I guess we would say draft

22    stipulations, since they were submitted unsigned, three of them,

23    I believe.  The first one is the felon in possession.  I would

24    presume that would only be operable if we begin the trial on

25    Count 1; is that correct?

1          MS. MCKENZIE:  Correct.

2          MR. MEJIA:  Yes, sir.

3          THE COURT:  And so that's been agreed to?

4          MR. MEJIA:  Yes.

5          THE COURT:  So we'll just set that aside and then

6    after the jury's verdict on Counts 2, 3, and 4, when we come

7    back, that stipulation will then be operable.

8       Now, the second one has to do -- let's see here -- with the

9    physical drugs.  Mr. Mejia, does this mean that the defendant is

10   going to stipulate to the laboratory testing of the substance?

11         MR. MEJIA:  Yes, sir -- well, we have a lab on the

12   cocaine that it's 8.1 grams of identifiable cocaine.

13         THE COURT:  Yes.

14         MR. MEJIA:  We have, I believe, a description of the

15   marijuana in 12 separate packages.  I do not see, nor have I

16   seen a laboratory analysis of the marijuana.

17         MS. MCKENZIE:  That's correct, the marijuana did not

18   get tested in a lab.  It will be proven through other means.

19         THE COURT:  I see.  And so we're not going to have a

20   stipulation with respect to the -- that would be the

21   November 11 -- the marijuana was November 11, the cocaine

22   November 12; is that correct?

23         MR. MEJIA:  Yes, sir.

24         THE COURT:  So there won't be a stipulation as to the

25   marijuana?

 1          MR. MEJIA:  That's right.

 2          THE COURT:  Now, the last one is as to the firearm.

 3   First -- two parts to this stipulation.  First, that it is a

 4   firearm or it meets the statutory definition in Title 18; and,

 5   secondly, that it meets the jurisdictional requirement, having

 6   been manufactured outside the Commonwealth of Kentucky; is that

 7   correct?

 8          MR. MEJIA:  Yes, sir.

 9          THE COURT:  Now, with respect to these two

10   stipulations, do you-all have an agreement as to how and when

11   they will be read to the jury?

12          MS. MCKENZIE:  We hadn't actually discussed it.  The

13   United States --

14          THE COURT:  Well, why don't we, just in the interest

15   of time -- the stipulations look fine to me, and stipulations

16   always create efficiencies and allow counsel to decide for

17   themselves how best information is presented to the jury.  I'll

18   let you-all chat during the break.

19          MR. MEJIA:  Okay.

20          THE COURT:  And there isn't a wide range of ways to do

21   this.  It seems to me you can do it in between witnesses.  You

22   can do it at the close of evidence.  You can do it, if you have

23   another witness who has testified about these matters and so you

24   want it close in time so it makes sort of chronological sense,

25   that's -- any of those times is fine with me.

1      Typically what I do is give a very short explanation to the

2    jury that a stipulation is an agreement of the parties, and then

3    we include in the final jury instructions a reference or an

4    instruction to that, that it allows the jury to accept as true

5    the facts to which the parties have stipulated.

6      It is, in effect, a bit redundant, but I think it's

7    important that the jury -- stipulation is a lawyerly word, and

8    so I think it's important that we make clear for the jury that

9    it is simply an agreement as to an otherwise disputed fact that

10   they can now accept as true.  So you-all can talk about how you

11   want me to do that and when.

12     Let's see --

13          MS. MCKENZIE:  Your Honor, I did spot -- I apologize.

14   I spotted a typo in the stipulation regarding the drugs.  The

15   date -- I have the date wrong, so I can send a corrected version

16   to the court.

17          THE COURT:  That's fine, that's fine.  I don't think

18   we'll get to it this morning, so you-all can just submit

19   another -- before everybody signs it, you can submit a corrected

20   version.

21     Now, with respect to the -- I don't believe we talked about

22   this issue at the pretrial conference:  With respect to the

23   missing count, we will not be addressing Count 1 in the

24   indictment during the case that will proceed first to the jury.

25   We will only get to that once the jury has made its

1    determination with respect to Counts 2, 3, and 4.

2        What we typically do is we typically send a copy of the

3    indictment back with the jury.  That is the -- that's the

4    tradition here.  When a count is not addressed, we simply redact

5    that count and we use a standard instruction that tells the jury

6    that there is a missing count in the indictment that is not

7    before them and they are to reach no conclusions one way or the

8    other as to its absence.  That's how I propose to do it here.

9        So in the course of the trial, you'll refer to Counts 2, 3,

10   and 4, make no reference to Count 1.  The indictment that they

11   receive at the close of trial that goes back with them will

12   simply have no Count 1, and they will be instructed that there

13   is no Count 1 for them to consider.

14       Then after they've made -- they've rendered their verdict

15   with respect to Counts 2, 3, and 4, we will inform them at that

16   point that they have work to do with respect to the previously

17   absent Count 1.  Any questions about that?

18            MR. MEJIA:  None here.

19            MS. MCKENZIE:  No.

20            THE COURT:  So without objection then, that's how

21   we'll proceed on that issue.

22       Now, let me see.  I have some notes here and a ruling for

23   you, Mr. Mejia, on your motion in limine.  Mr. Brewer filed a

24   belated motion in limine concerning an issue that we discussed

25   at the final pretrial conference.  Specifically, whether

1    Government witnesses -- law enforcement witnesses would be

2    permitted to characterize the neighborhood in which Mr. Brewer

3    was stopped as a high crime area.  And in support of the motion,

4    the defense cited evidence Rule 403 but no case law in support

5    of that motion.

6        Our research shows that the Sixth Circuit has rejected the

7    argument that witness references to a neighborhood as "violent,

8    high-crime or high-vice" denies a defendant a fair trial by

9    suggesting guilt by association.  That's a holding in *U.S. v.*

10   *Dukes.*  That's D-U-K-E-S.  That's a 2005 Sixth Circuit case in

11   which the Sixth Circuit said the district court did not err in

12   permitting the witnesses to refer to the neighborhood in which

13   the defendant was arrested and its character as a high crime

14   area.

15       The Sixth Circuit also reached a similar conclusion in *U.S.*

16   *v. Quinn*, which is a 2000 case, finding that evidence Rule 403

17   did not require exclusion of testimony that the defendant was

18   arrested in an area known for drug trafficking where the

19   Government offered the testimony simply to provide preliminary

20   background information regarding why the arresting officers

21   acted as they did, rather than to suggest anything about Quinn,

22   the defendant there.

23       In this case, descriptions of the area in which Mr. Brewer

24   was arrested are likewise part of the background evidence that

25   are res gestae or necessary to tell the story of the charged

1    offenses, including why the particular unit was in the area when

2    it was when Mr. Brewer was arrested, so I'm going to deny the

3    motion in limine.

4         Now, having made that determination, I will caution the

5    United States that any such descriptions should not be

6    gratuitous, and I expect that the Government's witnesses will be

7    instructed accordingly to limit any such references to what is

8    necessary to describe the nature and circumstances of the arrest

9    and not to suggest any guilt by association.

10        Any questions about the ruling or the scope of the ruling?

11             MS. MCKENZIE:  No, Your Honor.

12             MR. MEJIA:  I don't question your ruling.  I accept it

13   but I do disagree with the court's analysis of the two cases,

14   but you've made your ruling.

15             THE COURT:  So that's all I have on my list in terms

16   of the housekeeping matters.  Does either side have anything

17   that they want to bring up at this point before we break?  The

18   break will give you, as I said, a chance to review the jury pool

19   list and to get organized for voir dire.

20             MR. MEJIA:  Nothing more here.

21             THE COURT:  I'll also ask you to confirm with respect

22   to the -- that last *Missouri v. Fry* issue.

23             MR. MEJIA:  Yes, sir.

24             THE COURT:  And then when I come back, we'll finalize

25   that issue and then have the jury pool brought in, and we'll

1    begin the jury process.

2        Now, Ms. McKenzie, do you have your first couple of

3    witnesses prepared?  I think it will take a little while to get

4    through jury selection with 51 folks, but I hope we can go right

5    to opening statements and then have a witness or two ready.

6            MS. MCKENZIE:  Your Honor, I had instructed my first

7    couple of witnesses to show up around the noon hour.

8            THE COURT:  I think that's probably fine.  Now, how

9    long do you have in mind for your opening statements?

10           MS. MCKENZIE:  Fifteen minutes.

11           MR. MEJIA:  About the same, 15, no more than 20.

12           THE COURT:  And you do expect to give one this

13   morning, Mr. Mejia?

14           MR. MEJIA:  Yes, sir.

15           THE COURT:  That will be fine.

16       Good.  I'll give you-all a few minutes, and then when I come

17   back, we'll deal with that one last issue before bringing the

18   jury pool in.  Thank you.

19       (Recess at 9:59 a.m. until 10:16 a.m.  Jury out.)

20           THE COURT:  We're back on the record in U.S. v.

21   Brewer.

22       Let's see.  Let's return to the *Missouri v. Fry* issue.

23   Mr. Mejia, have you had enough time to confer with Mr. Brewer

24   regarding the discrete issue of his understanding that the

25   Government's plea agreement offer presented a potential term of

1    imprisonment that would be substantially lower than that which

2    he potentially faces should he be convicted on all counts after

3    a jury trial?

4           MR. MEJIA:  I have.  I have informed him of the

5    guideline range as articulated by the Government.  I've also

6    told him of the mandatory minimum applicable to Count 1, should

7    he be convicted of that count, and of the 924(c) and its

8    implications, and as well as the charge with regard to narcotic

9    trafficking weight as well as balanced against his criminal

10   history.  He is aware of all of those, and with that knowledge,

11   he wishes to go forward to jury trial.

12          THE COURT:  Do you mind if I ask him to confirm what

13   you've just described?

14          MR. MEJIA:  Not at all.

15     Sir, please stand.

16          THE COURT:  Mr. Brewer, did you hear what Mr. Mejia

17   just said about the nature of your understanding?

18          THE DEFENDANT:  Yes, sir, Your Honor.

19          THE COURT:  And is what he stated correct?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  Thank you.

22     I see no need to add anything further to the record.  Do

23   you, Ms. McKenzie?

24          MS. MCKENZIE:  No, Your Honor.

25          THE COURT:  Mr. Mejia, I think that covers and

1    discharges our obligations with respect to the teaching in

2    *Missouri v. Fry*, unless you think we need to inquire further.

3              MR. MEJIA:  No, sir, nothing more.

4              THE COURT:  So did you-all talk about the issue with

5    respect to the stipulations?

6              MR. MEJIA:  We have, yes, sir.

7              MS. MCKENZIE:  I think the United States would ask the

8    court to read all the stipulations at the close of the case.

9              THE COURT:  The close of the Government's case?

10             MS. MCKENZIE:  Yes.

11             THE COURT:  And that's your preference as well,

12   Mr. Mejia?

13             MR. MEJIA:  Yes, the practice would be the Government

14   would stand to announce they wish to proceed by stipulation.

15   Your Honor would inform the jury as to what that means.  The

16   Government then would read the stipulations and I'll agree to

17   them.

18             THE COURT:  I typically read the stipulation.

19             MR. MEJIA:  That's fine too, Judge, if you wish to do

20   that.

21             THE COURT:  And as I said earlier, that process which

22   you described is fine with me.  That's fairly typical.  It's

23   just a matter of timing.  In a long trial -- this is not

24   necessarily a long trial, two to three days.  In a much longer

25   trial, the parties sometimes wish to have stipulations read at

1    different times other than saving, particularly a critical

2    issue, for the very end.  In this case, I think what you-all

3    have proposed is fine, and so you'll need to remind me of that,

4    that you intend to do that.  We'll have plenty of breaks between

5    now and then to talk further.

6        You've had a few minutes to review the jury pool list; is

7    that right?

8            MR. MEJIA:  Yes, sir.

9            THE COURT:  And let me ask you just a couple of

10   questions about that.  Does either side recognize any names on

11   the list?  Is there anything we need to talk about before

12   bringing the jury pool in?

13           MS. MCKENZIE:  There is one thing that I might raise

14   for the court's attention.

15           THE COURT:  You want to -- is this something you need

16   to come to the bench to discuss?

17           MS. MCKENZIE:  Maybe so, yes.

18       (Bench conference on the record.)

19           MS. MCKENZIE:  Your Honor, there is a -- it is Juror

20   Number 13 and he listed some, I guess, hardships on his juror

21   form that I'm sure the court will deal with in its normal

22   course.

23       The United States also believes this juror may have a very

24   old felony conviction for violation of 18 U.S.C. 371, conspiracy

25   to defraud the United States, so --

1        THE COURT:  So you're essentially saying he's not

2   qualified to serve as -- well, I think rather than single him

3   out, I think Mr. Mejia and I have both now made note of that and

4   we'll just flesh that out in the normal course.

5        MS. MCKENZIE:  Sure.

6        THE COURT:  And if he's not qualified, then he would

7   be excused for cause, but we'll confirm that during the course

8   of questioning.

9      Thank you.

10        MS. MCKENZIE:  That's the only issue.  Thank you.

11      (End of bench conference.)

12        THE COURT:  Mr. Mejia, do you have anything else with

13   respect to the jury candidate list before we bring the pool in?

14        MR. MEJIA:  No, sir, I don't.

15        THE COURT:  Are there any objections to the jury pool

16   list as constituted at this point in the process?

17        MS. MCKENZIE:  Not from the United States.

18        MR. MEJIA:  None from the defense side.

19        THE COURT:  Now, with respect to voir dire, I have

20   reviewed and incorporated some questions as submitted by each

21   side, and those will be, I'm sure, obvious to you when I ask

22   them.

23      Let me remind you both that early in the process I will ask

24   you, Ms. McKenzie, and you, Mr. Mejia, to stand, introduce

25   yourselves to the jury pool and those at your table so that the

1    jury pool will then be able to answer questions about whether

2    they know any of you or have had any relationship or business

3    with any of you-all.

4        Any other questions at this point about voir dire?

5            MS. MCKENZIE:  No.

6            MR. MEJIA:  No, sir.

7            THE COURT:  I think we're ready for the jury pool to

8    be brought in then.

9        (Jury pool in 10:28 a.m.)

10           THE COURT:  Ladies and gentlemen, good morning and

11   welcome to the U. S. District Court for the Western District of

12   Kentucky.  My name is Judge Hale.  I will be presiding over the

13   trial that will begin here today in this courtroom.

14       Let me, first of all, thank you for responding and showing

15   up here today.  The jury trial is a bedrock of the American

16   system.  It cannot function without full participation of all

17   eligible citizens, and you who have been called to serve are to

18   be thanked at the beginning of the process, as well as the group

19   of you who will serve through to the end of the process, and so

20   I want to do that now.  I want to thank you for being here today

21   and participating in this process.

22       Whether you are selected to sit on the jury or not,

23   participating in this process -- what we call "voir dire" or

24   "jury selection" -- is critical.

25       You are sitting in a historic courtroom.  This courtroom is

1   original to the building, which was built in 1932.  For that

2   entire time, this court has worked very hard to provide fair and

3   impartial jury trials.  But while this building is historic and

4   dates to 1932, the federal court in Kentucky dates to 1789.

5   Before Kentucky was even yet a state, George Washington

6   appointed the first federal judge in Kentucky.

7       This history is a proud one and you-all and all Kentuckians

8   share in it.  As I said, we have worked very hard, my

9   predecessors on this court, my fellow judges, all of the staff

10  that you see here today working, all of us work very hard to

11  ensure fair and impartial jury trials, and you are part of that

12  process now.

13      So, again, I want you to understand how important your

14  participation is in this process.  Whether you end up serving on

15  the jury or not, your participation here today, discharging your

16  civic duty, is critically important.  And so in behalf of the

17  entire court staff, the parties, and counsel, I want to thank

18  you at the outset.

19      Now, I'm going to talk to you a little bit more here in a

20  minute about how voir dire or jury selection works.  It's a lot

21  of questions.  It's a lot of answers.  It's a lot of getting to

22  know you-all better, but the first thing that we must do here

23  today is have you sworn in as members of the jury pool, and so

24  I'm going to ask the clerk to administer that oath to you now.

25      (Oath administered.)

1          THE COURT:  Does anyone on the jury pool decline to

2     take that oath?  I think I saw every hand go up, but I just want

3     to make sure.  No response.  Thank you.

4          Let's talk first about the purpose of what we call voir dire

5     or jury selection.  It's simple.  It's very simple.  It is to

6     seat a fair and impartial jury.  I emphasize and sometimes I am

7     teased about how much I emphasize the role of the jury in

8     helping to provide a fair and impartial trial.  Because it is so

9     critical and for those of us who sit up here behind the bench,

10    we understand how critically important the role of the jury is

11    in making critical decisions, and so that is the -- that is

12    where we start is we start with trying to seat a fair and

13    impartial jury.

14         We do this simply by asking questions, first to enable the

15    court to determine whether any prospective juror should be

16    excused for cause.  Now, that may be that you have a very

17    serious conflict in your schedule.  You have a very important,

18    for instance, medical appointment or you have some other issue

19    that you need to bring to our attention.  We're going to give

20    you an opportunity to do that.

21         It may be that you have a reason that you cannot be fair and

22    impartial in this case and you need to bring that to our

23    attention.

24         The second reason is to enable counsel for the parties --

25    and they're going to introduce themselves to you here in a

1    minute -- to exercise their individual judgment with respect to

2    what are called peremptory challenges.  That is a challenge or a

3    decision to excuse a prospective juror for which no reason need

4    be given.

5        Now, that leads me to explain that there are, basically,

6    three reasons why you may not end up on the jury that is seated

7    in this box over here.  The first is, as I said, you may be

8    excused for cause.  That is you may give us a reason why you

9    cannot either be here at all that is a very -- a critically

10   important reason, and then the parties and I make the decision

11   to excuse you, or you may give a reason as to why you cannot be

12   fair and impartial, and then the decision will be made to excuse

13   you for cause.  That's one reason.

14       The second reason is that one or both of the sides chooses

15   to exercise a peremptory challenge.  That is a decision to

16   excuse you from jury service for which no reason may be given.

17       And then the third reason why you may not end up on the jury

18   is simply luck of the draw, because after all of the questions

19   are asked, we will then take those numbers off of our list and

20   13 names will be randomly -- or numbers, actually, I should say.

21   We will only be speaking in numbers -- 13 numbers will be

22   randomly drawn from what we refer to as "the wheel," and those

23   folks will then be seated in the jury box and the trial will

24   begin.

25       You will not be told the reason why you are not selected.  I

1    will have an opportunity to thank you again, those of you who

2    are not in the final 13, but absent unusual circumstances, we

3    expect that all of you will be together until those 13 numbers

4    are drawn, and then the rest of you will be excused.

5          Now, it can be a bit disconcerting to not know why you were

6    selected, but we want you to understand at the outset that

7    that's the way that we do it in every case, so that the lawyers

8    have their opportunity to utilize their peremptory challenges

9    and we have the opportunity to consider the reasons that you

10   bring to us during the course of our question-and-answer

11   session.

12         Now, a little bit about logistics.  I am going to do most of

13   the questions.  I'm going to ask most of the questions.  Some of

14   the questions that I will ask will elicit responses from a large

15   number of you.  So initially you'll just raise your hand and the

16   court security officer will go in order, and I will ask you to

17   stand and give your number.  It is our practice here to utilize

18   simply the number, so if you will stand and say your number and

19   then give your response.

20         Now, if a question requires you to answer in a way that you

21   need to give personal or private information, then I'll ask you

22   to approach the bench.  That's perfectly fine.  The lawyers that

23   are appearing before you are experienced lawyers and this is not

24   my first trial either.  I am used to having jurors from the pool

25   approach the bench.  That's typical and normal, so don't feel

1    uncomfortable about responding in that way.

2        When you get up here to the bench -- our system pumps white

3    noise out so that only those of us assembled here at the bench

4    can hear you, and you'll do the same thing when you get here.

5    You'll simply give your number.  There will be one lawyer from

6    each side and you and me, and the four of us will chat about

7    your response.

8        Now, we believe that the evidence in this case will take two

9    to three days to complete, absent any unforeseen or unusual

10   circumstances that may arise.  So two to three days.  That means

11   we should be done by the end of the day tomorrow or perhaps into

12   Wednesday.

13       So my first question for the jury pool is does this schedule

14   present a special problem for any of you?  In other words, do

15   you have a plane ticket to leave town tomorrow?  It needs to be

16   something significant and not merely an inconvenience to your

17   schedule, but if you have a special problem presented by a two-

18   to three-day schedule, please raise your hand.

19            A JUROR:  Juror Number 5.  I just started a new job

20   and training was supposed to start today and it's throughout the

21   week.  So I know it's not that serious, but it would cause me

22   less stress if I could focus on my job.  But if I need to do my

23   duty, I'm down with that.  I just thought I would put that out

24   there.

25            THE COURT:  Thank you.

1     I believe there was another one back there, Chris.

2          A JUROR:  Juror 98.  Your Honor, I work.  I travel for

3     my company and I'm supposed to go repair some frames and

4     everything for them, and if it's -- you're willing, I would

5     greatly appreciate to go do it, because I already didn't expect

6     to go two days or three days.  We had -- it's already set up for

7     tomorrow, so I would like to get off, if possible.

8          THE COURT:  Thank you.  I think you-all now know where

9     the phrase "make a federal case out of it" comes from.  Jury

10    trials sometimes cause interruptions to people's schedules and

11    so sometimes it's unavoidable.

12        Yes, ma'am.

13         A JUROR:  Number 95.  My job does not permit -- does

14    not pay for me to be here, and I have to pay my rent, and my

15    bills, and things to be able to, you know, function in life, so

16    I was asking to be excused for that.

17         THE COURT:  I understand.  We'll take that into

18    consideration.

19        I do want to make clear to all of you that it is -- it is

20    not allowed under the law for an employer to tell you that you

21    are not permitted to serve on a jury, so I want to make that

22    clear.  If anyone's employer has told them that, I would ask you

23    to approach the bench and give me that information.  It's

24    possible they misunderstand their obligations.  I'm not

25    suggesting that we're going to get anybody in trouble, but I do

1    want you-all to understand it's consistent with what I told you

2    at the outset about how critically important this American

3    system is to us.  Jury trials are important and so employers are

4    not permitted to tell you that you cannot participate.

5        Yes, sir.

6            A JUROR:  Yes, sir, Juror 51.  Request permission to

7    approach the bench.

8            THE COURT:  Yes, please.

9        (Bench conference on the record outside the hearing of the

10   jury.)

11           A JUROR:  Yes, Your Honor.

12           THE COURT:  Let's wait on them.  Go ahead.

13           A JUROR:  I'm susceptible to blood clots, so it kind

14   of takes -- sitting long periods of time kind of scares me a

15   little bit.  Plus, I have a case of gout right now in my foot,

16   so it's kind of hurting.

17           THE COURT:  I see.  I appreciate you bringing that to

18   my attention.  One of the questions I typically ask is whether

19   folks have problems sitting for extended periods of time.

20       I will tell you we'll take that into consideration, of

21   course, but I will also tell you that we take breaks with some

22   frequency.  It also is not a problem for a juror to simply stand

23   up.

24           A JUROR:  Okay.

25           THE COURT:  And I will tell the jury, if -- or when

```
 1    the jury is seated, I will tell them, if -- I have a minor back
 2    issue myself, and so I will occasionally need to simply stand to
 3    relieve that condition and so everyone will have that
 4    opportunity.  So I'll reassure you with that information, but we
 5    will -- we will make note of it.
 6              A JUROR:  All right.  Thank you, sir.
 7              THE COURT:  All right.
 8         (Juror exiting bench.)
 9              MR. MEJIA:  What was the first thing he said?  I
10    missed it.
11              THE COURT:  He is susceptible to blood clots.
12              MR. MEJIA:  Okay.  Thank you.
13              THE COURT:  Why don't you-all just stay here.
14         Come ahead, ma'am.  Thank you.
15         (Juror approaching bench.)
16              THE COURT:  Hi.
17              A JUROR:  Hi.
18              THE COURT:  You're Number --
19              A JUROR:  I am Number 60.
20              THE COURT:  Yes, ma'am.
21              A JUROR:  I may need to be excused because I've
22    already recognized some people that I know at church here.  I
23    don't know if they're --
24              THE COURT:  I'm having trouble -- you recognize who?
25    I'm sorry.
```

1          A JUROR:  Some people that I go to church with.

2          THE COURT:  I see.

3          A JUROR:  So I don't know if they're on trial or their

4    people is on trial or not, and I don't think that would be fair,

5    you know, if I'm --

6          THE COURT:  Right.

7          A JUROR:  So I'm like --

8          THE COURT:  And who is it that you recognize?

9          A JUROR:  I don't know their names, but it's one lady

10   that's got the gray hair and -- it's two of them.  I noticed

11   some mother and daughter.

12         THE COURT:  They're here in the courtroom?

13         A JUROR:  Uh-huh.

14         THE COURT:  In the --

15         A JUROR:  In the back.

16         THE COURT:  I see.  So they're folks that are in the

17   gallery?

18         A JUROR:  Yes, sir.

19         THE COURT:  Thank you.

20      Any quick follow-up?

21         MR. MEJIA:  You don't know any of their names?

22         A JUROR:  No.

23         MR. MEJIA:  Have you ever talked to them?

24         THE COURT:  I just asked her that.

25         A JUROR:  I talk to them, you know, in church and

1    speak to them and stuff like that.  They know that I know them.

2           MR. MEJIA:  Okay.  All right.  Nothing more.

3           THE COURT:  Thank you.

4       (Juror exiting bench.)

5           MR. MEJIA:  At what point were you going to follow up

6    or did you want us to follow up with "Would that interfere with

7    your ability to be fair?"  Whatever your procedure is going to

8    be, Judge.

9           THE COURT:  Well, that was sort of a preliminary

10   response to a question not yet asked, "Do you recognize

11   anybody?"  So if --

12          MR. MEJIA:  I didn't know what you wanted us to do

13   with that.

14          THE COURT:  You're -- at that point, I'm inviting any

15   follow-up questions you have.

16          MR. MEJIA:  Okay.

17          THE COURT:  Now, in her case, I think she has

18   identified folks sitting in the gallery that I believe are

19   probably --

20          MR. MEJIA:  Family.

21          THE COURT:  -- associated with your client, so we

22   would probably make a note of that, and she would -- that would

23   be a very solid basis on which to excuse her.  Just simply

24   given --

25          MR. MEJIA:  Family member.

1              THE COURT:  -- the fact that she knows them and goes

2     to church with them, it might be uncomfortable for both sides.

3         Why don't you-all just stay here because we have a line.

4         Yes, sir, come ahead.

5         (Juror approaching bench.)

6              A JUROR:  Number 97.  I have a great deal of problems

7     with my back and it takes a lot of attention, and I don't know

8     for sure if I'll be able to give the case the attention that it

9     deserves.

10             THE COURT:  I see.  Okay.  We typically ask a question

11    about -- you'll hear it come up about whether you have any

12    problems sitting for --

13             A JUROR:  Yes.

14             THE COURT:  -- trial.  And so what I will tell you is

15    we do take frequent breaks.  I have a minor disk problem myself,

16    and so on occasion I will need to stand.  And so I am fine with

17    the jury -- if any member of the jury simply needs to stand up

18    during the course of the trial, whether we're on a break or not,

19    and I'll instruct the jury about that.  So I don't know whether

20    that relieves any concern that you might have about it.

21             A JUROR:  I can see where it could help, but I've got

22    the disks between five and six and six and seven, and unless

23    I'm -- I've got some support in my back, like sitting back in a

24    recliner or something, my right arm goes numb.

25             THE COURT:  I see.

1          A JUROR:  I'm having a good day today.  You might have

2    me good for a couple of hours, but if I turn my head wrong on

3    the way home, I might not have ten minutes tomorrow.

4          THE COURT:  Right, right.  I understand.

5       Mr. Mejia, you have any follow-up?

6          MR. MEJIA:  No, sir.

7          THE COURT:  Ms. McKenzie?

8          MS. MCKENZIE:  No, sir.

9          THE COURT:  Thank you.

10         A JUROR:  Thank you.

11      (Juror exiting bench.)

12         THE COURT:  Yes, ma'am.

13      (Juror approaching bench.)

14         A JUROR:  I had sent two --

15         THE COURT:  I'm having trouble hearing you.

16         A JUROR:  I'm sorry.  I had sent two medical letters

17    up here about my medical conditions.  I only work four hours a

18    day because of my medical condition.

19         THE COURT:  I see.

20         A JUROR:  And because of my disease, I don't think

21    it'd be fair for the person that I can't stay woke or whatever

22    to be listening to a trial.  I don't think it would be

23    impartially fair to whoever it is that I'm not physically able

24    to do this.

25         THE COURT:  I see, I see.  Tell me --

1           MS. MCKENZIE:  What's your juror number?

2           A JUROR:  Ninety-five.

3           MS. MCKENZIE:  Ninety-five?

4           A JUROR:  Uh-huh.

5           THE COURT:  So your medical condition prevents you

6    from working a full day?

7           A JUROR:  Yes, that's why I work part-time.

8           THE COURT:  Yes.  And what exactly is the nature?

9           A JUROR:  I have HIV/AIDS and I have high blood

10   pressure also.  I'm diabetic and I have to have my diabetes and

11   things checked on a basis because I'm on medication for that.

12   And with that other condition, I cannot stay woke too long,

13   because after four hours or five hours a day, I go have to be in

14   the bed because of the pain that I'm in.  I am on four different

15   pain pills a day, and I'm not -- I don't think I'm able to be

16   listening, focused on someone's sittings or whatever is going on

17   with the trial, and I don't think it's right to that person.

18           THE COURT:  Okay.  Thank you.  Do you have anything?

19           MS. MCKENZIE:  Ma'am, I was having trouble hearing

20   you.  Did you say that you take four pain pills a day?

21           A JUROR:  A day.

22           THE REPORTER:  I'm sorry, ma'am.  I can't hear you.

23           A JUROR:  Because with my HIV/AIDS, I have a lot of

24   pain with that.

25           MS. MCKENZIE:  Okay.  I understand.

1          THE COURT:  Thank you, ma'am.

2      (Juror exiting bench.)

3      (Juror approaching bench.)

4          A JUROR:  Fifty-seven.  I have a dentist appointment

5  on -- I have a dentist appointment on Wednesday at 9:00 a.m.

6          THE COURT:  Okay.

7          A JUROR:  And my second reason will be that since

8  English is my second language, I will need a translator because

9  the legal terms and all of those are going to be difficult for

10  me to understand.

11          THE COURT:  There shouldn't be too many legal terms.

12  We try and put everything into -- and the lawyers try and do

13  this, to put everything into everyday terms.  Do you -- let me

14  ask you if you need a translator -- for instance, when you go to

15  the dentist on Wednesday, would you need a translator to --

16          A JUROR:  No, no, no, no.

17          THE COURT:  Do you work, ma'am?

18          A JUROR:  I just retired.

19          THE COURT:  You just retired.

20          A JUROR:  But I have worked my whole life and -- as a

21  secretary, but like today when they were showing the video, they

22  used quirky.  That word quirky, I say, "What quirky is?"

23          THE COURT:  I'm not sure I know which word.  They used

24  what word?

25          A JUROR:  Quirky.  They say quirky.  I can't remember

 1    what they use it.

 2            THE COURT:  I'm not sure what that -- I'm not sure

 3    what that is either.

 4            A JUROR:  I would like to make sure that when it's

 5    time to make a decision, I don't have any misunderstanding --

 6            THE COURT:  I understand.

 7            A JUROR:  -- with some words or something like that.

 8            THE COURT:  I understand.  Now, tell me about the

 9    nature of your work as a secretary.  Was that -- tell me about

10    that, the type of business that that --

11            A JUROR:  That was the University of Louisville, the

12    admission office, the School of Medicine, and I used to process

13    applications, but my work was more databases.  I'm very good in

14    databases, and my contact with a student was to request papers

15    that they were missing to completed applications, and they --

16    you know, through the process, logistics for interviews at the

17    end, but everything was database related.  And communication was

18    more, you know, we not yet received your transcript, your

19    pictures, and things like that.

20            THE COURT:  Right.  That sounds like important work,

21    processing medical school applications.

22            A JUROR:  Yeah.

23            THE COURT:  And I will tell you that you speak very

24    well, and I appreciate your concern and I thank you for bringing

25    that to our attention.  We will make note of it --

1          A JUROR:  Yeah.

2          THE COURT:  -- and we will consider it.

3          A JUROR:  Yeah, it's like if I watch movies, you know,

4   sometime I ask my son, "put it back or put the letter, the

5   captions," because sometimes it's easy for me to read, but there

6   is always, always words that I don't know the meaning.  I learn

7   English when I was 35-years-old.

8          THE COURT:  Is that right?

9          A JUROR:  Yeah, when I came here 30 years ago, but

10  it's my second language.

11         THE COURT:  I understand.

12     Mr. Mejia.

13         MR. MEJIA:  Did you understand everything the judge

14  said --

15         A JUROR:  Yeah.

16         MR. MEJIA:  -- this morning?

17         A JUROR:  Yes, yes, I do.

18         MR. MEJIA:  And is there anything that was -- been

19  said right here now that you don't understand?

20         A JUROR:  No, I understood everything.

21         MR. MEJIA:  Okay.

22         A JUROR:  I am just afraid, if things get technical

23  vocabulary that I will not be able to discern, to understand.

24         THE COURT:  Would it help you to know that if you do

25  have a question, if you were on the jury and at some point you

1    had a question because you didn't understand a word that either

2    a lawyer, or a witness, or I spoke, would it help you to know

3    that there would be no problem with you simply raising your hand

4    and ask that it be repeated?

5              A JUROR:  Okay.  The same idea, a word that --

6              THE COURT:  Yes, exactly, exactly.

7              A JUROR:  Okay.

8              THE COURT:  Would that make you feel a little better?

9              A JUROR:  Yeah, I was just concerned about

10   misunderstandings.

11             THE COURT:  Sure.

12             A JUROR:  If they get into technical things, you know.

13             THE COURT:  That's a fair concern, believe me.

14             A JUROR:  Yeah.

15             THE COURT:  But I want to make sure you understand

16   that we would not -- first of all, we -- it doesn't make good

17   sense for any lawyer or judge to use a lot of jargon with a jury

18   because juries are made up of folks that are pulled throughout

19   the community, and so lawyers and judges try and put things in

20   everyday terms.  We can't always do that, but when we can't, we

21   try and explain what we're talking about.

22             A JUROR:  Okay.

23             THE COURT:  And so if you had a problem hearing or if

24   you had a problem understanding, we would not have any issue

25   with you or any other juror simply raising your hand and saying

 1    "I didn't hear that" or "I couldn't make out what was said."

 2              A JUROR:  Or if I would have the opportunity, maybe

 3    after a session or something, come to you and say, "I am

 4    confused.  I lost what we was -- whatever because there were so

 5    many words that they were -- be inside of my brain," that would

 6    be -- that's my only concern.  Okay?

 7              THE COURT:  Okay.

 8              A JUROR:  To misunderstand part of the explanations.

 9              THE COURT:  Right, right.  Thank you.

10              A JUROR:  I am really good with, like I would say,

11    popular English, you know, but when it gets -- like when the

12    doctors we're talking at my work, you know, I --

13              THE COURT:  Right.

14              A JUROR:  But when they say about the patients are

15    good, oh, I got that one.

16              THE COURT:  I see.  Thank you for bringing this to our

17    attention.  We'll make a note of it.  Thank you very much.

18              A JUROR:  Okay.

19              MR. MEJIA:  Thank you.

20         (Juror exiting bench.)

21              THE COURT:  Yes, sir.

22              MR. MEJIA:  Like many of my relatives.

23              THE COURT:  Very nice lady.  She's obviously very

24    bright.

25         (Juror approaching bench.)

1          THE COURT:  Yes, sir.

2          A JUROR:  Juror Number 13.  The court's been good

3     enough to excuse me two prior occasions.  I've got a greenhouse

4     business and it's a very small business.  I have ten greenhouses

5     and just -- there's just a few of us working.

6         And since the -- you or the court denied it last time, my

7     request to be excused, but since then the lady that does the

8     seeding, actually runs the machine and puts the seeds in the

9     flow trays we'll call them, making baby plants so we can put

10    them in the containers later on, her husband has lung cancer.

11    And she told me a few days ago that she'll have to be out with

12    him to take him every day to radiology and chemotherapy.

13        So there's no doubt my business will really suffer if I

14    can't -- I'm the only other one that can run the machine, that

15    knows how to run the machine.  Of course, there's always a risk

16    at this time of the year of snow or ice storms crushing my

17    greenhouses.

18        Three years ago I lost two of the seven I had.  Now I have

19    ten and no one else even knows how to hook up the generator to

20    be sure that it doesn't go back through the lines and hurt the

21    line I'm trying to restore power.

22          THE COURT:  Okay.

23          A JUROR:  And if you don't, I understand.

24          THE COURT:  You sound like a person that doesn't get

25    very many vacations.

1        A JUROR:  I work every day.  I was out there on

2   Christmas day, you know, so something you can't -- especially

3   the size of that, too big to quit and I'm not big enough to have

4   enough people to do anything.

5        THE COURT:  I see.

6        A JUROR:  Actually, at this point I have two workers.

7   One of them hadn't started yet.  She starts after we get ready

8   to put the little plugs.  So one is all I really have -- had

9   right now and now she's gone.

10       THE COURT:  I see.  Thank you for telling us about

11   that.

12     Do you have anything?

13     Thank you, sir.

14        A JUROR:  Thanks a lot.

15     (Juror exiting bench.)

16       MR. MEJIA:  If the time is okay, I have no objection

17   to a cause on him.

18       THE COURT:  Okay.  Just keep a note of it.  We'll take

19   all of that up once we get through it.

20       MR. MEJIA:  Okay.

21     (End of bench conference.)

22       THE COURT:  Thank you-all for bringing your issues to

23   us.  We're making notes of everything that you bring to us.

24     Now, at this point, I'm going to read a very brief

25   description of the case so that you can know the name of the

 1    defendant, and the nature of the case, and then I'll have some

 2    follow-up questions for you.

 3        The United States alleges that Defendant Cherosco Brewer

 4    possessed marijuana and cocaine with the intent to distribute

 5    them.  It further alleges that he possessed a firearm in

 6    furtherance of a drug trafficking crime.  Mr. Brewer denies that

 7    he committed the crimes charged.

 8        Now, has any member of the jury pool heard or read anything

 9    about this case?  As I mentioned, this is a criminal case.  It

10    is brought by the Government against Mr. Brewer.  Has anyone

11    heard anything about this case?  I see no responses.

12        Now, at this point, I'm going to ask each side to introduce

13    themselves to you, along with the folks that are sitting at

14    their respective tables.  Once they complete their

15    introductions, I'll have some follow-up questions for you.  Let

16    me start with you, Ms. McKenzie.

17            MS. MCKENZIE:  My name is Erin McKenzie.  I work in

18    the United States Attorney's Office.  My co-counsel is Corinne

19    Keel.  Also seated at our table is Brandi Henderson.  She's a

20    paralegal in our office, and this is Detective Holly Hogan with

21    Louisville Metro Police Department.

22            THE COURT:  Now, does anyone on the jury pool know any

23    of the people that were just introduced?  Have you had any

24    dealings with them or perhaps were ever represented by the

25    lawyers that were introduced or had any dealings with the U.S.

Case 3:17-cr-00037-DJH-HBB  Document 214  Filed 12/13/19  Page 41 of 207 PageID #: 1492

Volume 1, Page 41

```
1    Attorney's Office?  No responses.

2        Does anyone know Russell Coleman, who is the United States

3    attorney?  Ms. McKenzie introduced herself and her co-counsel.

4    They are assistant U. S. attorneys.  Russell Coleman is the

5    U. S. Attorney for the Western District of Kentucky.  Does

6    anyone know him?  I see no responses.

7        Mr. Mejia.

8            MR. MEJIA:  Good morning.  My name is David Mejia.

9    I'm a private attorney here in Louisville, Kentucky.  With me at

10   counsel table is my assistant/paralegal, Roberta Tabler, and to

11   her left is Mr. Cherosco Brewer.

12           THE COURT:  The same questions would apply here as

13   well.  Does anyone here know Mr. Mejia or ever had any dealings

14   with him or his law office?  I see no responses -- or is there

15   one?  Did I miss one?

16       Does anyone know the defendant, Mr. Brewer?  I see no

17   responses.

18       Does anyone on the jury pool know me?  I see one person sort

19   of kind of responding.  Go ahead.

20           A JUROR:  Number 56.  I believe I've worked with your

21   wife before, so I may know you through her.

22           THE COURT:  All right.  Why don't you come up and

23   we'll chat about my wife for a minute.  I'm always happy to do

24   that.

25           (Bench conference on the record outside the hearing of the
```

```
1    Attorney's Office?  No responses.

2        Does anyone know Russell Coleman, who is the United States

3    attorney?  Ms. McKenzie introduced herself and her co-counsel.

4    They are assistant U. S. attorneys.  Russell Coleman is the

5    U. S. Attorney for the Western District of Kentucky.  Does

6    anyone know him?  I see no responses.

7        Mr. Mejia.

8            MR. MEJIA:  Good morning.  My name is David Mejia.

9    I'm a private attorney here in Louisville, Kentucky.  With me at

10   counsel table is my assistant/paralegal, Roberta Tabler, and to

11   her left is Mr. Cherosco Brewer.

12           THE COURT:  The same questions would apply here as

13   well.  Does anyone here know Mr. Mejia or ever had any dealings

14   with him or his law office?  I see no responses -- or is there

15   one?  Did I miss one?

16       Does anyone know the defendant, Mr. Brewer?  I see no

17   responses.

18       Does anyone on the jury pool know me?  I see one person sort

19   of kind of responding.  Go ahead.

20           A JUROR:  Number 56.  I believe I've worked with your

21   wife before, so I may know you through her.

22           THE COURT:  All right.  Why don't you come up and

23   we'll chat about my wife for a minute.  I'm always happy to do

24   that.

25           (Bench conference on the record outside the hearing of the
```

1    jury.)

2            A JUROR:  If your wife is Ann, I work at the hospital

3    with her.

4            THE COURT:  It is, yes.  You work at Baptist East?

5            A JUROR:  Yes, sir.

6            THE COURT:  And what type of work do you do?

7            A JUROR:  Anesthesia.

8            THE COURT:  Are you an anesthesiologist?

9            A JUROR:  Yes, sir.

10           THE COURT:  Okay.

11           A JUROR:  I haven't worked with her for a couple of

12   years, since she moved down to the other area.

13           THE COURT:  She's down now in the P-A-T, as they call

14   it.

15           A JUROR:  Right.

16           THE COURT:  She always has very good things to say

17   about Baptist anesthesiologists, so I'm sure that she would have

18   great things to say about you.

19      Let me ask you if the fact that you had a prior professional

20   familiarity with my wife, if that would cause you any difficulty

21   here in being fair and impartial?

22           A JUROR:  No, sir.

23           THE COURT:  Would it cause you to be uncomfortable in,

24   say, following my instructions?

25           A JUROR:  No, sir.

1          THE COURT:  The role of the judge in a jury trial is

2    to instruct on the law.  The jury decides the facts and so in a

3    few minutes, as I go through these questions, you will begin to

4    hear me say repeatedly can you put aside any preconceived

5    notions you have, or despite an issue that a jury pool member

6    might raise, can you put aside that concern and be fair and

7    impartial with respect to the facts and the instruction that I

8    give you on the law.

9          A JUROR:  Yes, sir.

10          THE COURT:  Is that something you can do?

11          A JUROR:  Yes, sir.

12          THE COURT:  Mr. Mejia, do you have any follow-up

13    questions?

14          MR. MEJIA:  I have no questions.  Thank you, sir.

15          THE COURT:  Any follow-up questions, Ms. McKenzie?

16          MS. MCKENZIE:  No.

17          A JUROR:  I hope it wasn't inappropriate to say that

18    out loud.

19          THE COURT:  No, it was not.  It was not.  Thank you

20    very much.

21      (End of bench conference.)

22          THE COURT:  I do need to ask you -- I failed to write

23    down your number.

24          A JUROR:  Fifty-six.

25          THE COURT:  Fifty-six.  Thank you.

1     Anyone else?

2     Do any of you know anyone else on the jury pool?  In other

3  words, do any of you know one another?  Yes, sir.

4          A JUROR:  My jury number is 15 and I'm not sure the

5  juror's number that I know, but I know someone.  We've worked

6  together for four or five years.

7          THE COURT:  Does the other person here also recognize

8  Juror Number 15?

9          A JUROR:  Fifty-seven.

10          THE COURT:  So Juror Number -- that's who you were

11  referring to.  So Jurors Number 15 and 57 are acquainted through

12  work; is that right?

13          A JUROR:  Yes, sir.

14          THE COURT:  Is that correct, ma'am, Juror Number 57?

15  You-all are acquainted through work?

16          A JUROR:  Yes.

17          THE COURT:  Now, would the mere fact that you-all are

18  acquainted through work, would that cause you-all any difficulty

19  in being fair and impartial on the jury?

20          A JUROR:  No, sir.

21          A JUROR:  No.

22          THE COURT:  Now, if you both were to serve on the

23  jury, would it cause you any difficulty in listening to all of

24  the other members of the jury?  In other words, would you tend

25  to favor each other to such a degree that you could not be fair

 1    and listen to your fellow jurors during your deliberations?

 2            A JUROR:  No, sir.

 3            THE COURT:  Does either side, Mr. Mejia, Ms. McKenzie,

 4    have any follow-up questions here?

 5            MR. MEJIA:  No, sir.

 6            THE COURT:  Thank you.  Thank you for bringing that to

 7    our attention.

 8        Anyone else?

 9        Now, I'm going to ask you a broad question now.  The

10    language you may hear me repeat in part with respect to other

11    questions that I ask going forward, and so I will probably end

12    up reading this to you twice to let it sink in a bit.

13        If you are selected to sit on this case, will you be able to

14    render a verdict solely on the evidence presented at the trial

15    and in the context of the law as I will give it to you in my

16    instructions, disregarding any other ideas, notions, or beliefs

17    about the law that you may have encountered in reaching your

18    verdict?

19        I'll read that to you again as you consider it.  If you are

20    selected to sit on this case, will you be able to render a

21    verdict solely on the evidence presented at the trial and in the

22    context of the law as I will give it to you in my instructions,

23    disregarding any other ideas, notions, or beliefs about the law

24    that you may have encountered in reaching your verdict?

25        Does everyone agree that you will be able to render a

1    verdict based solely on the evidence that you hear and see as

2    presented in this courtroom and my instructions on the law?  Can

3    everyone do that?  If you cannot do that, let me ask you to

4    raise your hand.

5        I see one person.  Yes, ma'am.  Why don't you come to the

6    bench and we'll discuss your response.

7        (Bench conference on the record outside the hearing of the

8    jury.)

9            A JUROR:  Juror 49.

10           THE COURT:  Yes, ma'am.  What part of my question gave

11   you pause?

12           A JUROR:  I cannot be impartial if there's anything

13   involving drugs.  I lost a beautiful, bright 24-year-old

14   granddaughter a year and a half ago to a drug overdose.

15           THE COURT:  I see.

16           A JUROR:  Her mother has been in and out of prisons

17   all of her life for drug addictions, and I --

18           THE COURT:  I'm sorry, ma'am.  This is your

19   granddaughter?

20           A JUROR:  My granddaughter.

21           THE COURT:  I see.  I'm very sorry about that.

22           A JUROR:  Last year nursing school at U of L.

23           THE COURT:  She was in nursing school?

24           A JUROR:  Uh-huh.

25           THE COURT:  I'm very sorry to hear that.  When did

1    this occur?

2           A JUROR:  A year and a half ago, April 13th.

3           THE COURT:  And what was the -- what was the type of

4    drug at issue?

5           A JUROR:  Well, she thought she had heroin or cocaine

6    one and it was fentanyl.

7           THE COURT:  I see.

8           MR. MEJIA:  I'm sorry.

9           A JUROR:  Thanks.

10          THE COURT:  It's quite understandable.  I just want to

11   make sure that I understand.  That experience makes it too

12   difficult for you to be fair and impartial and put aside that --

13   now, nobody can erase their memory and jurors are not asked to

14   erase their memory.

15          A JUROR:  Right.

16          THE COURT:  But we do ask jurors to set aside and base

17   their decision only on what they hear in this courtroom and the

18   instructions that I give them and not on the basis of --

19          A JUROR:  I don't think I can do that because the

20   granddaughter I lost, her mom has been in and out of prison all

21   of her life for drug addiction.

22          THE COURT:  So she has interacted with the criminal

23   justice system as a result of drug issues?

24          A JUROR:  Absolutely.

25          THE COURT:  And that's your daughter?

1          A JUROR:  That's my daughter.

2          THE COURT:  I know it's very difficult to talk about

3     these things.  Thank you for bringing them to our attention.

4          A JUROR:  Yeah.  I just don't think I would -- I would

5     not be good.

6          MR. MEJIA:  I'm so sorry, ma'am.  Let me ask, have you

7     communicated anything that you've told us here to any of the

8     other jurors?

9          A JUROR:  I have not.

10         MR. MEJIA:  Okay.

11         A JUROR:  I've not spoken to any of the other jurors.

12         MR. MEJIA:  Thank you.

13         THE COURT:  Okay.

14         MS. MCKENZIE:  I have no follow-up.  I'm so sorry.

15         THE COURT:  Thank you, ma'am.

16         A JUROR:  Thanks.

17       (End of bench conference.)

18         THE COURT:  Anyone else?  Thank you.  Then we will

19    move on.

20       As I said, that is a foundational question and so you will

21    hear me repeat that in whole or in part again as we talk about

22    other issues.  So the next question I have for you is have you

23    ever served as a juror in a criminal or civil case or as a

24    member of a grand jury in either federal or state court?  In

25    other words, have you ever served on a jury before, a trial jury

```
 1    or a grand jury, in state or federal court?  Got a few
 2    responses.
 3              A JUROR:  Juror 13.
 4              THE COURT:  Yes, sir.  Tell me about when and where
 5    you served on a jury.
 6              A JUROR:  Memory is not too good.  Union Springs,
 7    Alabama.  It would have been 30 something years ago, I guess.  I
 8    served on a grand jury there in state court or local court.
 9              THE COURT:  How long was your term?
10              A JUROR:  One month, I believe.
11              THE COURT:  And a grand jury hears cases.  They only
12    hear one side of a criminal case.  It's presented to them by a
13    prosecutor, and then the grand jury is asked to decide whether
14    to indict or charge a defendant.  They are not asked to decide
15    guilt or innocence.  Is that description I just gave you
16    consistent with your experience there?
17              A JUROR:  Yes, sir.
18              THE COURT:  Now, was there anything in your
19    experience, sitting as a member of a state grand jury in
20    Alabama, that would make it difficult for you to be fair serving
21    as a member of a trial jury here?
22              A JUROR:  No, sir.
23              THE COURT:  Drawing on that long question I asked you,
24    anything from that experience make it difficult for you to
25    render a decision here that is based solely on the evidence
```

1    presented in this courtroom and my instructions on the law?

2            A JUROR:  No, sir.

3            THE COURT:  Thank you.

4            A JUROR:  Juror 18.  I served on a civil trial, and I

5    don't remember how long ago it was -- probably ten years or

6    so -- here in Louisville.

7            THE COURT:  Was that in Jefferson Circuit Court

8    perhaps?

9            A JUROR:  I believe so.

10           THE COURT:  Do you recall the nature of the dispute in

11   the civil trial?

12           A JUROR:  I believe it was a medical issue.

13           THE COURT:  Medical malpractice --

14           A JUROR:  Yes.

15           THE COURT:  -- or something along those lines?  And do

16   you recall the outcome of that case?

17           A JUROR:  No.

18           THE COURT:  Do you recall whether or not you agreed

19   with the verdict that was rendered?

20           A JUROR:  I believe I agreed.  I served as the

21   foreman.

22           THE COURT:  You were the foreperson of the jury?

23           A JUROR:  Right.

24           THE COURT:  So do you recall whether or not you

25   awarded a sum of money?

```
 1              A JUROR:  No.
 2              THE COURT:  You don't recall or you didn't award a --
 3              A JUROR:  No money.
 4              THE COURT:  No money?
 5              A JUROR:  Right.
 6              THE COURT:  So it was likely then that it was a
 7    verdict in favor of the defendant in that civil case?
 8              A JUROR:  I believe so.
 9              THE COURT:  So you heard me ask your fellow jury pool
10    member this question.  I'll repeat it for you.  Is there
11    anything that you drew from that experience that would make it
12    difficult for you to be a fair and impartial juror here in this
13    case as I've described it to you thus far?
14              A JUROR:  No.
15              THE COURT:  And will you set aside that prior
16    experience and make your decision here based solely on the
17    evidence you hear in this courtroom and the instructions I give
18    you on the law?
19              A JUROR:  Yes.
20              THE COURT:  Thank you, ma'am.
21              A JUROR:  I'm Juror 52.
22              THE COURT:  Yes, ma'am.
23              A JUROR:  I served probably about five years ago, and
24    I believe it was on a federal court case in Louisville,
25    Kentucky.
```

1          THE COURT:  It was in this building?

2          A JUROR:  No, it was where the jail is, the

3    criminal -- it was not in this building.

4          THE COURT:  It wasn't here?

5          A JUROR:  No.

6          THE COURT:  It perhaps then wasn't a federal case.

7    Was it perhaps down in Jefferson Circuit Court?

8          A JUROR:  Yes.  I just know it was the one where the

9    jailhouse is at the moment.

10          THE COURT:  That's probably where it was.  And it was

11    a criminal case?

12          A JUROR:  Yes.  There were two.

13          THE COURT:  In very simple terms, a criminal case, a

14    jury is called upon to decide guilt or innocence.

15          A JUROR:  Yes.

16          THE COURT:  Guilty/not guilty is what a jury typically

17    does in a criminal case.  Whereas, a civil case is, generally

18    speaking, a dispute over money.  And so do you recall your case

19    as being a criminal case?

20          A JUROR:  Yes.

21          THE COURT:  And do you recall the outcome of the case?

22          A JUROR:  The first case was settled out of court and

23    the second case we found not guilty.

24          THE COURT:  And do you recall the nature of the

25    charges in that case?

1          A JUROR:  The not guilty?

2          THE COURT:  The one that settled would not have gone

3     to a jury verdict; is that correct?

4          A JUROR:  Correct.

5          THE COURT:  So the one that did go to a jury verdict

6     where you say the jury found not guilty, do you recall the

7     nature of those charges?

8          A JUROR:  Yes.  It was a gentleman was accused of

9     shooting someone else.

10          THE COURT:  And the verdict was not guilty?

11          A JUROR:  Correct.

12          THE COURT:  Now, again, you've heard me ask these

13     questions of your fellow jury pool members.  Is there anything

14     that you drew from that experience that would make it difficult

15     for you to be a fair and impartial juror in this case?

16          A JUROR:  No, sir.

17          THE COURT:  Thank you.  Let's talk with the next

18     person.

19          A JUROR:  Number 53.

20          THE COURT:  Yes, sir.

21          A JUROR:  I served on a criminal trial in New York

22     City in the early '90s.

23          THE COURT:  Do you recall the nature of the case?

24          A JUROR:  It was a murder trial.

25          THE COURT:  And what was the outcome of that?

1          A JUROR:  Guilty.

2          THE COURT:  And did you agree with the verdict?

3          A JUROR:  Yes.

4          THE COURT:  Now, that was in -- was this a case

5    prosecuted by the district attorney in state court there in New

6    York City?

7          A JUROR:  Yes.

8          THE COURT:  And, again, the same question.  From that

9    experience, did it impact you in such a way that it would make

10   it difficult for you to serve again on a jury and be fair and

11   impartial in doing so?

12         A JUROR:  No.

13         THE COURT:  Would you be able to base your decision in

14   this case solely on the evidence produced in this courtroom and

15   the instructions that I give you on the law?

16         A JUROR:  Yes.

17         THE COURT:  Thank you.

18         A JUROR:  Number 58.

19         THE COURT:  Yes, ma'am.

20         A JUROR:  I served at the Jefferson County Circuit

21   Court last year -- I believe it was June of 2018 -- for a

22   two-week service, and I served on three juries that, from what I

23   recall, were all civil cases.

24         THE COURT:  Three civil and they all -- they all went

25   to trial?

1          A JUROR:  One of them settled before we started the

2     trial and then the other two went to trial.

3          THE COURT:  And do you recall what type of verdicts

4     were rendered in those two cases?

5          A JUROR:  Yes, on one of them was -- I'm trying to

6     recall.  One of them was a -- like a medical custody sort of

7     case.  I'm not sure what the terms --

8          THE COURT:  Was it perhaps --

9          A JUROR:  -- the terms are.

10          THE COURT:  -- guardian ad litem?

11          A JUROR:  Yes, guardian, yeah.  So that was one of

12     them, and that one was, you know, a unanimous decision to allow

13     guardianship in that case.

14       And then the other one was a dispute over damage to a

15     vehicle and whether, you know, the person being accused actually

16     caused that damage and whether they owed for the cost of having

17     that damage repaired.

18          THE COURT:  And do you recall which side won that

19     case?

20          A JUROR:  In that case, again, it was a unanimous

21     decision by the jury that that person did not cause the damage.

22          THE COURT:  So you didn't give them money, in other

23     words?

24          A JUROR:  Right, correct.

25          THE COURT:  Again, you've heard me ask this question

1    numerous times.  Anything from your prior experience serving on

2    those civil juries that would make it difficult for you to be

3    fair and impartial here in this case?

4              A JUROR:  No.

5              THE COURT:  Thank you, ma'am.

6              MR. MEJIA:  Your Honor, may we approach?

7              THE COURT:  Yes.

8         (Bench conference on the record outside the hearing of the

9    jury.)

10             MR. MEJIA:  This is the second juror or prospective

11   juror who has said that she has served on a civil jury.  I would

12   request that Your Honor follow up with a question or an

13   understanding that the burden in a civil case is preponderance.

14   In a criminal case it's different.  It's beyond a reasonable

15   doubt and whether they understand that and can follow that.

16             THE COURT:  I'll be instructing them on that.  I don't

17   really want to belabor the process here.

18             MR. MEJIA:  It's just the opportunity at that

19   particular moment that's --

20             THE COURT:  Well, they'll be well instructed on the

21   burdens that are applicable in this case, and the point of this

22   portion of voir dire is to find out who's got jury experience.

23             MR. MEJIA:  Okay.  All right.

24             THE COURT:  And so I don't really want to belabor that

25   at this point.

1         MR. MEJIA:  Okay.

2     (End of bench conference.)

3         THE COURT:  Anyone else wish to report their prior

4  jury service?

5         A JUROR:  Juror 89, served in federal court here in

6  Louisville for a civil trial ten to 12 years ago.

7         THE COURT:  Do you recall what type of case that was?

8         A JUROR:  Commercial vehicle accident on the Snyder.

9         THE COURT:  And do you recall what the result of the

10  case --

11         A JUROR:  It was settled before we were sworn in

12  totally.

13         THE COURT:  I see.  So in that case you didn't need to

14  hear evidence; is that right?

15         A JUROR:  Right.

16         THE COURT:  So I'll ask you in any event, but was the

17  significant disappointment you must have felt at not getting

18  that opportunity, did that affect you in such a way that you

19  could not be fair and impartial here, should you be selected to

20  serve on our jury?

21         A JUROR:  No.

22         THE COURT:  And that's your only prior jury service?

23         A JUROR:  I've been in my local county court but never

24  been selected for jury duty for the court case.

25         THE COURT:  Thank you very much.

```
 1        Anyone else with prior jury service?

 2             COURT SECURITY OFFICER:  Your Honor, may she approach

 3    the bench?

 4             THE COURT:  Sure.

 5        (Bench conference on the record outside the hearing of the

 6    jury.)

 7             A JUROR:  My best friend's husband, who's actually

 8    more like my sister, her husband was -- he's retired KSP.  He

 9    was the head of the DESI West for -- which is Drug Enforcement

10    Special Investigation unit for the western part of the state.

11    In addition to that, I have two parents in my classroom who are

12    undercover marshals working for drug enforcement.

13             THE COURT:  Okay.  We do have -- we do have some

14    questions that we ask about whether anyone is employed by or

15    previously employed by law enforcement or has a close friend or

16    family.  So what I typically ask folks to do -- and since you've

17    brought it up, obviously, we'll do that now -- is to tell me,

18    first of all, whether your best friend's husband -- whether he

19    talks to you about his work.

20             A JUROR:  We have talked about work but not with names

21    or certain case -- does that make sense?

22             THE COURT:  Sure.  So he's talked about the nature of

23    his work?

24             A JUROR:  How to gather evidence and what his job is

25    like.
```

1          THE COURT:  Okay.  My follow-up question is does he

2    talk to you about how he goes about doing his work?

3          A JUROR:  To some extent, more so when he was with

4    KSP.  Now that he's with Anchorage police, not as much because

5    we don't see each other as much.

6       When he was with KSP, we were seeing each other basically

7    nightly, and so we would, you know, just talk about days of

8    work.  Now that we all have children and he is working here in

9    Louisville daily on night shift and we're working days, we don't

10   see each other --

11         THE COURT:  As much?

12         A JUROR:  -- as much.

13         THE COURT:  I see.  So, now, you also mentioned that

14   you have -- you're a teacher?

15         A JUROR:  Yes.

16         THE COURT:  And so you have folks in your classroom

17   that are --

18         A JUROR:  I have one marshal who is undercover.

19         THE COURT:  And have they talked to you about the

20   nature of their work?

21         A JUROR:  Because we are friends outside of school, I

22   know when he is out on duty because sometimes his children stay

23   with us.

24         THE COURT:  I see.  And so is there anything from

25   those relationships, the fact that you have these close

1    relationships, anything from that that you think would make it

2    difficult for you to be fair and impartial?

3            A JUROR:  Knowing how far a case would have to come to

4    make it to this point, I would think that the evidence that they

5    have is pretty substantial.  So I would like to say that I would

6    be impartial, but I'm not really sure.  Does that make sense?

7            THE COURT:  It does.  Now, earlier I asked everyone to

8    tell me whether they could base a decision solely on the

9    evidence produced in this courtroom and my instructions on the

10   law, and so I think you agreed that you could do that.

11           A JUROR:  That's when I called Steve over to ask him

12   this question, because that was my concern is that knowing the

13   people that I know and the discussions we've had and --

14           THE COURT:  Who's Steve?

15           A JUROR:  Isn't that his name, the security officer?

16           THE COURT:  Oh, Chris.

17           A JUROR:  Chris.  I'm sorry.

18           THE COURT:  No, that's okay.  That's fine.  So let me

19   ask you.  Every juror brings a certain amount of life experience

20   to the task.  We don't ask you to erase your memories.  We don't

21   ask you to come in as a blank slate.  What we do though ask you

22   to do is to set aside any preconceived ideas or notions that you

23   might have about how law enforcement is done in a criminal case,

24   if that is the case, and make your decision only on the evidence

25   that's here.  You certainly would not be permitted, if you were

1    on the jury, during the course of the trial to speak with your

2    friend's husband or --

3              A JUROR:  Right, right.

4              THE COURT:  -- the marshals that have students in your

5    classroom.  You would only be able to make your decision on the

6    case based on the evidence that's produced here.  Do you think

7    you can do that?

8              A JUROR:  I would do my very best.

9              THE COURT:  Okay.  Mr. Mejia, do you have any follow-

10   up?

11             MR. MEJIA:  I do.  Do you believe, based upon your

12   conversations and your life experiences, that Mr. Brewer is

13   probably guilty even before we start?

14             A JUROR:  I wouldn't know because I don't know what

15   the whole evidence is.

16             MR. MEJIA:  Okay.  Well, what I'd like to find out is

17   whether you coming here, based upon what you've told us with

18   your experiences and with your relationships, that somebody who

19   is charged, arrested, prosecuted, placed on trial, even before

20   we start, is probably guilty?

21             A JUROR:  I would like to say no, but I don't know the

22   evidence, so I can't -- does that --

23             MR. MEJIA:  Okay.  You may hear testimony of law

24   enforcement officers here.  Do you believe, based upon your

25   experience, you're more likely to believe them and give higher

1    weight to their testimony as any other witness?

2           A JUROR:  Probably, based on my experience with my

3    friends and family members who are in law enforcement, I would.

4           MR. MEJIA:  Okay.  And do you believe that if the

5    evidence is insufficient to establish guilt, that you would be

6    able to say not guilty?

7           A JUROR:  If there was insufficient evidence, yes.

8           MR. MEJIA:  Okay.  Would you be able to follow the

9    judge's law as to the amount of evidence needed and that it is

10   your decision --

11          A JUROR:  Yes.

12          MR. MEJIA:  -- and no one else's?

13          A JUROR:  Uh-huh.

14          MR. MEJIA:  Do you believe you could be fair to both

15   sides here?

16          A JUROR:  I would do the very best I could.

17          MR. MEJIA:  I'm going to ask whether you could say

18   yes, I can be fair or, no, I can't?

19          A JUROR:  I can't say that without knowing all the

20   evidence.

21          MR. MEJIA:  It's a matter of fairness.  Do you believe

22   you could be fair or do you believe that you're on the side of

23   the prosecution before we go?

24          A JUROR:  I think that I could be fair.

25          MR. MEJIA:  Okay, okay.

1           MS. MCKENZIE:  I just have a couple of follow-up

2   questions.  You said you're a teacher.

3           A JUROR:  Yes.

4           MS. MCKENZIE:  What age?

5           A JUROR:  I teach elementary school.

6           MS. MCKENZIE:  Okay.  So in your classroom, I assume

7   that it's small children.  You have a set of -- a number of

8   rules --

9           A JUROR:  Uh-huh.

10          MS. MCKENZIE:  -- that are in effect in that

11  classroom.

12          A JUROR:  Yes.

13          MS. MCKENZIE:  If in the course of this case and this

14  trial Judge Hale gives you a set of rules to follow, do you

15  think you would have any trouble doing that?

16          A JUROR:  No.

17          MS. MCKENZIE:  And if among those rules the judge

18  instructs you that you are to only base your decision on the

19  evidence in this courtroom, whether it's testimony or physical

20  evidence, could you follow that?

21          A JUROR:  Yes.

22          MS. MCKENZIE:  And if --

23          THE COURT:  Let me interrupt you at this point and add

24  to that question, if I also instruct you that you're to make no

25  presumptions about the evidence -- the only presumption that you

1    are to make is that the defendant is innocent until proven

2    guilty beyond a reasonable doubt -- can you follow those rules?

3            A JUROR:  Yes.

4            THE COURT:  Go ahead.

5            MS. MCKENZIE:  And, likewise, if the judge instructs

6    you that you are to judge each witness's credibility on what you

7    hear, and what you observe, and your individual evaluation of

8    their credibility -- for instance, the law does not weigh police

9    officer testimony any heavier than any other witness.  You are

10   going to be instructed as a juror to individually determine

11   whether you believe each witness.  Could you do that?

12           A JUROR:  Yes.  The other thing I need to tell you is

13   that when I was going to college, I did work for Hardin District

14   and Hardin Circuit Court as a file clerk.

15           THE COURT:  As a file clerk?

16           A JUROR:  Uh-huh.

17           THE COURT:  Anything from your work down there at

18   Hardin County, seeing the files come and go, that --

19           A JUROR:  I mean, other than just having to, you know,

20   be in the courtroom, take the file and take it to the file room

21   to file it where it was supposed to be.

22           THE COURT:  Anything from that experience that you

23   took away that hardened your views one way or another about the

24   criminal justice system process?

25           A JUROR:  No, no.  There's just a lot of papers.

```
1              THE COURT:  There always are.
2         Anything further, Mr. Mejia?
3              MR. MEJIA:  Nothing.  Thank you.
4              THE COURT:  Anything further?
5         Thank you, ma'am.
6         (End of bench conference.)
7              A JUROR:  Juror Number 100.
8              THE COURT:  Yes, ma'am.
9              A JUROR:  I served on a jury here in Louisville about
10        five years ago for a malpractice suit.
11             THE COURT:  Here in state court?
12             A JUROR:  Yes.
13             THE COURT:  And do you recall the outcome of the case?
14             A JUROR:  Not guilty.
15             THE COURT:  Now, not guilty is typically what we think
16        of in a criminal case.  In a med mal or medical malpractice
17        case, it's typically a decision for the jury as to whether the
18        defendant has committed malpractice and the decision as to
19        whether to award money.  Do you recall, in your case that you
20        served on, whether the jury found in favor of the plaintiff or
21        the defendant?
22             A JUROR:  The doctor was -- it was not his fault.  It
23        was the --
24             THE COURT:  So you found in favor of the defendant
25        there and did not award money to the plaintiff.  And did you
```

 1    draw anything from that experience, serving on that civil jury

 2    in Jefferson Circuit Court, that would make it more difficult

 3    for you to serve here in this criminal case and make your

 4    decision solely on the evidence that's produced in this

 5    courtroom and the instructions that I give you on the law?

 6              A JUROR:  No.

 7              THE COURT:  Thank you.

 8         Anyone else with prior jury service to tell us about?  Thank

 9    you.

10         Have you or any member of your family, or any close friend,

11    ever been employed by a law enforcement agency?  You, a family

12    member -- and we're talking about a family member that you know

13    and have contact with -- any member of your family or close

14    friend ever been employed by a law enforcement agency?

15         Now, if on a prior visit to the bench you brought this to

16    our attention, you do not need to bring it to our attention

17    again.  You, family member, close friend employed by law

18    enforcement agency?

19         We'll start over here.  Yes, sir.

20              A JUROR:  Juror 28.  My father's a retired member of

21    the old Jefferson County Police Department.

22              THE COURT:  How long did he work there?

23              A JUROR:  Twenty-six years.

24              THE COURT:  Did he talk to you about his work?

25              A JUROR:  Occasionally, not much.

1          THE COURT:  And do you think as a result of having a

2    father who is a retired policeman, do you think it would -- that

3    the experience of that would make it difficult for you to serve

4    impartially on a jury where we can expect to hear testimony from

5    law enforcement officers?

6          A JUROR:  No, sir.

7          THE COURT:  Do you think you could be fair to both

8    sides, despite -- again, despite having a father who's a retired

9    police officer?

10          A JUROR:  Yes, sir.

11          THE COURT:  Can you base your decision, if you're on

12    the jury, solely on the evidence that's produced in this

13    courtroom and my instructions on the law?

14          A JUROR:  Yes, sir.

15          THE COURT:  Would you tend to believe the testimony of

16    a police witness over any other witness just because your father

17    was a policeman?

18          A JUROR:  No, sir.

19          THE COURT:  Thank you.

20          A JUROR:  Juror Number 21.  My son-in-law is a

21    detective with LMPD.

22          THE COURT:  Ma'am, why don't you approach, if you

23    don't mind.

24      (Bench conference on the record outside the hearing of the

25    jury.)

1            THE COURT:  The reason I asked you to come up here,

2     ma'am, is because we can expect in this case to hear testimony

3     from LMPD detectives.  Is that correct?

4            MS. MCKENZIE:  Yes, sir.

5            THE COURT:  And so I'm going to ask Ms. McKenzie to

6     give you the names and ask you if you recognize any of the

7     names.

8            MS. MCKENZIE:  Okay.

9            A JUROR:  I'll tell you up front, he is in the

10    Narcotics Unit.

11           MS. MCKENZIE:  Okay.  Detective Tyler Holland,

12    Detective Chad Stewart, Detective Holly Hogan, Detective Kevin

13    McKinney.

14           A JUROR:  No.

15           MS. MCKENZIE:  Detective Tony James.

16           A JUROR:  Uh-uh.

17           MS. MCKENZIE:  I believe that's all.

18           MR. MEJIA:  Casse?  Adams?

19           MS. MCKENZIE:  I'm sorry?

20           MR. MEJIA:  Casse, Adams, I don't know if you intend

21    to call them.

22           MS. MCKENZIE:  I don't plan on calling them.

23           THE COURT:  How long ago has your son been employed by

24    LMPD?

25           A JUROR:  Six years.

```
 1              THE COURT:  And does he --

 2              A JUROR:  Son-in-law.

 3              THE COURT:  I'm sorry.  Son-in-law.

 4              A JUROR:  That's okay.

 5              THE COURT:  I have a son-in-law, so I understand how

 6    that's both the same and different.

 7              A JUROR:  Correct.

 8              THE COURT:  Does he talk -- when he's with your side

 9    of the family, does he talk about his work?

10              A JUROR:  Not much.

11              THE COURT:  So he doesn't talk about how he goes about

12    his work as a narcotics detective?  Has he ever talked with you

13    about testifying in court?

14              A JUROR:  Only the fact that he has to go to court to

15    testify because I watch the kids.

16              THE COURT:  I see.  But not about the mechanics of it

17    or the process of --

18              A JUROR:  No.

19              THE COURT:  The preparation that goes into it, nothing

20    along those lines?

21              A JUROR:  No, sir, but I do have to tell you, I'm a

22    legal secretary and I work in a law firm, so I know some --

23              THE COURT:  Good.  Well, that's another question that

24    I have on my list, "Does anyone have any legal training or work

25    for a law office?" so we can talk about that as well.  Where do
```

 1   you work?

 2            A JUROR:  Wyatt, Tarrant & Combs.  I'm in corporate

 3   and healthcare.

 4            THE COURT:  Who do you work with?  What are the

 5   lawyers down there you work with?

 6            A JUROR:  Rick Northern, Tad Myer, Tom Luber, Jim

 7   Nitsche, Laura Theilmann, Aaron Zibart, and Billy Hopkins.

 8            THE COURT:  I know some of those names.  I was at Reed

 9   Weitkamp just downstairs from you-all for many years, so I know

10   a lot of those lawyers there.

11       Now, helping in the corporate area means that you're not

12   helping prep lawyers to come to court.  You're doing deal work;

13   right?

14            A JUROR:  And healthcare, yeah.  I don't do any

15   litigation.

16            THE COURT:  So the closest you would get is regulatory

17   type work.  Does that group do much in the way of mergers and

18   acquisitions?

19            A JUROR:  They do.  I haven't done it, no, sir.

20            THE COURT:  I see.  Okay.  Let's talk first about your

21   son-in-law, the LMPD detective.  Is there anything about his

22   work as an LMPD detective that would make it uncomfortable for

23   you as his mother-in-law to sit on a jury and decide the

24   credibility of fellow LMPD detectives?

25            A JUROR:  No, sir, I don't think so.

1        THE COURT:  You could be fair to both sides in doing

2    that?  You will -- if you haven't already, you will hear me say

3    that it's the job of the jury to decide the facts, and it's my

4    job to instruct you on the law.  In the course of deciding the

5    facts, if you are on the jury, would you have any discomfort in

6    deciding guilt or innocence in a case that is of the type your

7    son-in-law works on?

8        A JUROR:  I would be fine.

9        THE COURT:  Follow-up, Ms. McKenzie?

10       MS. MCKENZIE:  Yes.  At some point the judge will

11   probably instruct the jury that they are not to discuss this

12   case with anybody outside or among yourselves until the case is

13   concluded.  In your case, if you were seated as a juror, that

14   would, of course, be the instruction.

15     Would you have any difficulty -- say you go home after a day

16   of trial and the conversation at dinner is, "What kind of case

17   is it?  Who are the lawyers?" would you have any difficulty in

18   following the judge's instruction to not discuss the case?

19       A JUROR:  No.  Because of the type of work I do, I

20   don't discuss work at home.

21       THE COURT:  Now, is there anything from your work at

22   the law firm that would make it difficult for you here to be

23   fair and impartial to both sides?

24       A JUROR:  No, sir.

25       THE COURT:  Anything that you draw from working with

1    lawyers that creates any issues for you in being fair to both

2    sides?

3             A JUROR:  No, sir.

4             THE COURT:  Mr. Mejia.

5             MR. MEJIA:  You are Number 21?

6             A JUROR:  Yes, sir.

7             MR. MEJIA:  Is there anything about your experience in

8    the practice of law that would make you unable to be fair to

9    either the Government or to the individual defendants in this

10   case?

11            A JUROR:  No, sir, uh-uh.

12            MR. MEJIA:  Do the lawyers that you work with have any

13   contact with the Government attorneys, or attorney generals,

14   commonwealth attorneys, U.S. attorneys?

15            A JUROR:  They probably do, but that doesn't -- I've

16   not.

17            MR. MEJIA:  Okay.  Nothing more.

18            A JUROR:  Not personally.

19            MR. MEJIA:  Thank you very much, ma'am.

20            THE COURT:  Thank you.

21       (Juror exiting bench.)

22            THE COURT:  Stay up here.

23       (Juror approaching bench.)

24            A JUROR:  Juror 18.

25            THE COURT:  Yes, ma'am.

1          A JUROR:  My father-in-law was a career law

2     enforcement officer with the sheriff's office in Kern County,

3     Bakersfield, California.

4          THE COURT:  So he was a deputy sheriff there?

5          A JUROR:  Yes.  And then he also served in the

6     narcotics division, where he was involved in a pursuit of a

7     criminal as it related to robbery and drugs, and he was shot and

8     shot back.

9          THE COURT:  This is your father-in-law?

10         A JUROR:  My father-in-law, yeah.

11         THE COURT:  How long ago did that occur?

12         A JUROR:  It's been a long time.  It's like back in

13    the '70s.

14         THE COURT:  And did he recover from that?

15         A JUROR:  He recovered.  He went back to work and then

16    he retired.  He served as a security officer at the casinos in

17    Bakersfield, and then he passed away a few years ago.

18         THE COURT:  I see.  Now, during the time that you knew

19    him, did he talk with you about his work?

20         A JUROR:  Not a lot.  My husband talked about it more.

21         THE COURT:  I see.

22         A JUROR:  He also served -- my husband served as a

23    security police officer in the Air Force for a couple of years

24    back in the '80s.

25         THE COURT:  So the fact that you had a father-in-law

```
 1    who suffered a serious service-related injury and a husband that

 2    also served as a law enforcement officer for a while, do those

 3    experiences inform you in such a way that you would tend to

 4    favor the law enforcement side in a dispute?

 5              A JUROR:  I would probably have to admit yes.

 6              THE COURT:  Now, we all come to our court service with

 7    certain experiences.

 8              A JUROR:  Right.

 9              THE COURT:  And we don't ask jurors to erase their

10    memory.  What we do ask them to do is set aside any presumptions

11    that they may have made that are informed by those experiences

12    and instead essentially promise to be fair and impartial.

13              A JUROR:  Right.

14              THE COURT:  And make their decisions based only on the

15    evidence, not based on the assumptions that they brought to

16    court informed by family member experiences and so forth.

17              A JUROR:  Right.

18              THE COURT:  So is that something that you can do?  Can

19    you set aside that presumption that you may have walked in here

20    with and tell Mr. Mejia, and Ms. McKenzie, and me that despite

21    my father-in-law's experience, I can be fair to both sides?  I

22    can listen to the evidence, and I can, for instance, not favor

23    law enforcement testimony over anyone else's testimony.  Can you

24    do those things?

25              A JUROR:  I don't know.
```

1          THE COURT:  That's a fair response.

2      Mr. Mejia, do you have follow-up?

3          MR. MEJIA:  Do you -- if selected as a juror and

4   looking even further beyond that, if you deliberated and with

5   other jurors rendered a verdict of not guilty, would that cause

6   you either some discomfort or some difficulty in relaying that

7   to family members?  "I sat on a jury involving a criminal

8   accusation, and I rendered a verdict of not guilty."

9          A JUROR:  Not if he's innocent.

10          MR. MEJIA:  Okay.  Thank you.

11          THE COURT:  Can you base your decision solely on the

12   evidence that you hear in the courtroom and the instructions

13   that I give you on the law?

14          A JUROR:  I would try, but until I hear, I don't know.

15   Right?  Things sway you.

16          THE COURT:  Well, I think we can know.  I think

17   folks -- I think folks can resolve, going into a process, once

18   they understand the gravity -- we're in this grand old

19   courtroom.  These courtrooms were designed to be imposing and

20   significant to help reinforce the notion that what goes on here

21   is important.

22          A JUROR:  Right.

23          THE COURT:  And part of that is to ensure, as I said

24   at the outset, fair and impartial juries.  And so I do believe

25   that honest jurors -- and you are that because you have come

1    forward and said these are my issues, and so I'm glad we're

2    having this discussion.  This is part of the process.

3        But I do believe that when potential jurors understand that

4    it's okay to have these experiences, and these presumptions, and

5    these ideas, as long as they're open-minded and willing to set

6    those aside and resolve that I will make my decision solely on

7    the evidence, and I will be fair and impartial to both sides,

8    and my understanding of the law will come from the instructions

9    I get from the judge, my understanding of the facts will come

10   from the evidence that is presented in the courtroom, if you can

11   do those things, then you can be a qualified juror.  Can you do

12   those things?

13            A JUROR:  I can try.

14            THE COURT:  All right.  Ms. McKenzie, any follow-up?

15            MS. MCKENZIE:  Just briefly.  Obviously, you will hear

16   testimony in this case, if you are seated on the jury, from

17   members of law enforcement, police detectives.  The judge will

18   instruct you that you are to determine whether you believe each

19   witness in whole, in part, or not at all based on your

20   individual assessment of their believability, their body

21   language, their demeanor, whether what they say makes sense,

22   whether they have a motive to lie, a relationship with any

23   particular side of the case.  Do you believe that you're capable

24   of evaluating individual credibility, for instance, in that

25   manner?

```
1              A JUROR:  I would think so.

2              THE COURT:  Anything further, Mr. Mejia?

3              MR. MEJIA:  Nothing further.

4              THE COURT:  Thank you, ma'am.

5         (Juror exiting bench.)

6         (Juror approaching bench.)

7              A JUROR:  Hi, Your Honor.  Number 55.

8              THE COURT:  Yes, ma'am.

9              A JUROR:  My cousin is a police officer in Lexington,

10   has been for about ten years.  He's on a S.W.A.T. team possibly.

11   And, also, my best friends and neighbors, he is an officer with

12   LMPD in the Second Division.

13             THE COURT:  Okay.  So you have a cousin and is your

14   cousin somebody you're close to?

15             A JUROR:  Oh, yeah, like, he's my closest cousin.

16   Actually, he's my aunt's son.

17             THE COURT:  And so does your cousin or do your

18   neighbors talk about their work?

19             A JUROR:  I mean, vaguely, not like in, you know,

20   names and dates and, you know, just --

21             THE COURT:  Do they talk about how they do their work

22   as police officers?

23             A JUROR:  Sometimes, like what goes into, you know,

24   certain aspects of it, I guess.

25             THE COURT:  Right.  Would it be the type of
```

 1    information where if you were sitting on the jury and you heard

 2    a police witness testify that they took a certain action or did

 3    a certain thing, would it cause you to say, huh, that's not how

 4    my cousin does it?

 5              A JUROR:  No, probably not.

 6              THE COURT:  All right.  And is the fact that you have

 7    a very close cousin who's a police officer, would that make it

 8    uncomfortable for you to judge the credibility of the police

 9    witness?

10              A JUROR:  No, I don't think so.

11              THE COURT:  Would you tend to believe someone -- a

12    witness who is a police officer solely because they're a police

13    officer?

14              A JUROR:  Probably not.

15              THE COURT:  Would you have the ability to base your

16    decision solely on the evidence you hear in this courtroom and

17    the instruction that I give you on the law and not based upon

18    information that you've gotten in casual conversation with your

19    neighbors or your cousin?

20              A JUROR:  Yes, sir.

21              THE COURT:  Okay.  Mr. Mejia.

22              MR. MEJIA:  You may be instructed about the

23    presumption of innocence and the burden of proof as the law.  As

24    he sits here now, based upon your conversations, your life

25    experiences, your relationships, have you formed a belief or a

1    conclusion as to whether this man is guilty or not?

2            A JUROR:  No, I have not, but I feel like I recognize

3    his face, but I've worked at UPS for like 17 years.  I feel like

4    a lot of people have worked at the airport.  So I feel like I've

5    seen his face somewhere, but I don't -- I can't say for sure.

6            MR. MEJIA:  Okay.

7            A JUROR:  I mean, just -- but, no.

8            MR. MEJIA:  Would that have been -- can you tell us

9    when that was or in what context that was?

10           A JUROR:  I can't say.  He just looks familiar, like,

11   I mean, I can't say for sure.

12           THE COURT:  You think maybe you've seen him at UPS?

13           A JUROR:  I feel like maybe on the shuttle or maybe --

14   I don't know.  Definitely, when I look in his face --

15           THE COURT:  Is that possible, Mr. Mejia?

16           MR. MEJIA:  I don't think so.

17           A JUROR:  Has he ever worked at UPS?

18           MR. MEJIA:  No, I don't think so.

19           THE WITNESS:  Okay.

20           THE COURT:  Might just be someone who looks like

21   someone you know.

22           A JUROR:  I mean, there's been a million people out

23   there.

24           MR. MEJIA:  The hairstyle?  The complexion?  The

25   look --

1            A JUROR:  The face.  I have not -- nothing else,
2   that's all.
3            THE COURT:  Anything else, Ms. McKenzie?
4            MS. MCKENZIE:  No.
5            THE COURT:  Anything further, Mr. Mejia?
6            MR. MEJIA:  No.
7            THE COURT:  Thank you, ma'am.
8       (Juror exiting bench.)
9            THE COURT:  This question always causes us to get
10  bogged down.  Everybody knows police officers.
11      (Juror approaching bench.)
12           THE COURT:  Yes, ma'am.
13           A JUROR:  My son is a detective with the --
14           THE COURT:  If you can step just a little closer to
15  the mike.
16           MR. MEJIA:  Your number, ma'am?
17           A JUROR:  Eighty-seven.
18           THE COURT:  And it's your son?  I'm sorry.
19           A JUROR:  Uh-huh.
20           THE COURT:  And where does he work?
21           A JUROR:  LMPD.
22           THE COURT:  LMPD.  And what type of work does he do?
23           A JUROR:  He's a detective.
24           THE COURT:  And does he do work in drug enforcement?
25           A JUROR:  No, I don't think so.

```
 1              THE COURT:  Ms. McKenzie, I plan for you to give these
 2   names to the jury pool in any event a little later in this
 3   process, but why don't you go ahead and give Juror Number 87 the
 4   names of the LMPD witnesses you anticipate and see if -- ma'am,
 5   just tell us if you've heard any of these folks.
 6              MS. MCKENZIE:  Detective Holly Hogan.
 7              A JUROR:  Uh-uh.
 8              MS. MCKENZIE:  Detective Tyler Holland.
 9              A JUROR:  Uh-uh.
10              MS. MCKENZIE:  Detective Chad Stewart.
11              A JUROR:  Uh-uh.
12              MS. MCKENZIE:  Detective Tony James.
13              A JUROR:  Uh-uh.
14              MS. MCKENZIE:  Detective Kevin McKinney.
15              A JUROR:  Uh-uh.  I live in Nelson County.
16              THE COURT:  I'm sorry?
17              A JUROR:  I've never lived in Jefferson County.
18              THE COURT:  Okay.  You live where?
19              A JUROR:  In Nelson.
20              THE COURT:  In Nelson County, okay.  Does your son
21   talk with you much about his work?
22              A JUROR:  No.
23              THE COURT:  Would it be uncomfortable for you to sit
24   on a jury knowing that you will have to judge the credibility,
25   the witness testimony of colleagues of your son?
```

1          A JUROR:  No, it wouldn't bother me.

2          THE COURT:  Would it cause you any discomfort if, for

3     instance, you were to be convinced by the evidence that the

4     defendant was not guilty of the charges?  Would you worry about

5     your son hearing that you found a defendant not guilty --

6          A JUROR:  No.

7          THE COURT:  -- someone who was investigated by his

8     colleagues?

9          A JUROR:  No.

10         THE COURT:  Would you be able to be fair and impartial

11    to both sides in this case?

12         A JUROR:  Yes.

13         THE COURT:  Would you be able to base your decision

14    only on the evidence that you hear in this room and the

15    instruction that I give you on the law?

16         A JUROR:  Yes.

17         THE COURT:  Mr. Mejia.

18         MR. MEJIA:  How many years has your son been on the

19    force?

20         A JUROR:  Three.

21         MR. MEJIA:  Three years.

22         A JUROR:  He's only been a detective a couple --

23         THE REPORTER:  I'm sorry, ma'am.  I didn't hear the

24    last part.

25         A JUROR:  I'm sorry.  He's only been a detective for

```
 1    three months and --
 2             MR. MEJIA:  And before that he was a patrolman?
 3             A JUROR:  Yes.
 4             MR. MEJIA:  Okay.  And you live in Nelson and he lives
 5    in Louisville?
 6             A JUROR:  No, he lives in the same county.  He just --
 7             MR. MEJIA:  But he works for LMPD?
 8             A JUROR:  Yes.
 9             MR. MEJIA:  Okay.  Do you live in the same home?
10             A JUROR:  Temporarily, yes, right now.
11             MR. MEJIA:  Okay.  And with what frequency, if at all,
12    do you and he talk about his work as a detective?
13             A JUROR:  None.
14             MR. MEJIA:  Okay.  I have nothing more.  Thank you
15    very much.
16             THE COURT:  Anything, Ms. McKenzie?
17             MS. MCKENZIE:  No.
18             THE COURT:  Thank you.
19        (Juror exiting bench.)
20        (Juror approaching bench.)
21             THE COURT:  Yes, ma'am.
22             A JUROR:  There are like four police officers that
23    attend my church that I'm very close friends with and one that
24    doesn't attend our church.  He comes to our church sometime, but
25    we became friends because he came to my house during a drug raid
```

1    and that's how we knew each other like that.

2            THE COURT:  I see.  And the type of questions we ask

3    other folks who are coming up here and have family members and

4    close friends that are police officers, these are the questions

5    I'm going to ask you.

6        Having a friend who's a police officer creates potential

7    challenges, one of which is I need to ask you if you would feel

8    uncomfortable serving on a jury when you -- we can anticipate

9    you will hear testimony from different police officers, and so

10   would that cause you any discomfort knowing that you have a

11   friend who works for LMPD and you would have to judge the

12   credibility of his colleagues?

13           A JUROR:  That's depending on which one it was.  I

14   have a problem with a couple of them.

15           THE COURT:  You have a what?

16           A JUROR:  A problem with a couple of them.

17           THE COURT:  Of police officers?

18           A JUROR:  Narcotics officers, yes.

19           THE COURT:  I'm going to have Ms. McKenzie give you

20   the names of some of the LMPD witnesses she anticipates calling

21   to the trial.  I'm going to ask you if you recognize any of

22   them.

23           A JUROR:  Okay.

24           MS. MCKENZIE:  Okay.  Detective Holly Hogan, Detective

25   Tyler Holland, Detective Chad Stewart, Detective Kevin McKinney,

1    Detective Tony James.

2              A JUROR:  No.  Does the Holly have long blonde hair?

3              MS. MCKENZIE:  No, ma'am.

4              A JUROR:  Okay.  It's not her then.

5              THE COURT:  Despite your friendship with one police

6    officer or two and your -- and your difficult relationship with

7    a couple of others, would you be able to be fair and impartial

8    to both sides in this case?

9              A JUROR:  It's kind of hard to say because -- like I

10   said, because of the drug raid incident and the treatment that I

11   felt like my family received I didn't think was fair and just,

12   which it was throwed out of court, but it's just the way they

13   came in there, and the things that they did, and then all the

14   things we went through during trial, I didn't think it was fair,

15   so I don't know how impartial I would be.

16             THE COURT:  So your home was subject to a police

17   search?  I see.  And one of the questions that we'll be asking

18   in a few minutes is about whether anybody has been a -- the

19   subject of a criminal investigation, or a witness, or had any

20   involvement along those lines, and so we can just go ahead and

21   talk about that now, because you would be responding the same.

22        So tell me a little bit more about that.  When did that

23   occur?

24             A JUROR:  That was 1998, I believe, 1998.  And then

25   the other one at my sister house in -- I think it was 2002, and

1   the one 2018 of this year at my nephew's house, and they threw

2   him out of the wheelchair.  I just got issues with a whole lot

3   of it.  But anyway, he was found not guilty too, but it's

4   just -- there's some incidents that's been going on with our

5   family.

6           THE COURT:  Do you believe that despite those

7   incidents that you could be fair and impartial to both sides in

8   this case?

9           A JUROR:  I could be, depending on what the evidence

10  was, you know, the scene.  It's like I said, why my nephew's

11  case was throwed out, because the evidence that was no

12  eye-to-eye contact evidence.  It was something about they never

13  placed him in there, but they were saying he lived there and he

14  didn't have an address there.  And the intervention, like I

15  said, threw it out of court, but there's just some of it -- I

16  just don't go along with it.

17    I actually don't go along with -- with the jury pooling.  I

18  know it's like 60 people in here, and I don't see how a person

19  could get a fair trial when you got like 60 people in here and

20  only four people in here are black.  I don't see how a person

21  could get a fair trial if they were --

22          THE COURT:  There are more than four people.

23          A JUROR:  Maybe about six, maybe about six.

24          THE COURT:  Well, that's an issue for the lawyers.

25  The jury pool is randomly selected.

1    A JUROR:  I know.  I know y'all don't have a choice --

2  I know y'all pick people who's registered and things like that.

3  I'm not saying that it's intentionally done, but I still don't

4  see how that -- if you have 13 people on the trial and the

5  person that was being tried is black, how could that be fair, if

6  only one was black and the other 12 was white?  I don't see how

7  that would be a fair trial in any of it.

8    THE COURT:  Well, we don't know what the composition

9  of the jury is yet.  Right?

10    A JUROR:  Yes, you right.

11    THE COURT:  Aside from that particular issue, based on

12  your own experience, is there anything from your interactions

13  and observations of LMPD that would keep you from being fair and

14  impartial?

15    A JUROR:  I think it would be.  I just think it would

16  be, because like I said, the difference --

17    THE COURT:  It would be what?  I'm sorry.

18    A JUROR:  I think I would be impartial because of the

19  way my family has been treated in the past is what I'm thinking.

20    MS. MCKENZIE:  Do you mean -- when you say impartial,

21  do you mean you would be affected by that?

22    A JUROR:  I think I would be because, you know, they

23  threw a flash bomb in my sister house and gave her a heart

24  attack.  I mean, I just don't see any of this is fair to the

25  person who's on trial of the way they come in and get the

1    information that they give -- that they get and bring it to

2    trial for that person that's on trial.  I don't think it's fair.

3             THE COURT:  I see.  Anything further, Mr. Mejia?

4    Anything further, Ms. McKenzie?

5             MS. MCKENZIE:  No.

6             THE COURT:  Thank you, ma'am.

7             MR. MEJIA:  Thank you, ma'am.

8        (Juror exiting bench.)

9             THE COURT:  Yes, sir.

10            MR. MEJIA:  I think when she said impartial, she meant

11   partial.

12            THE COURT:  Yes, I think that's right.  That's why I

13   was having a little troubling understanding her.

14       (Juror approaching bench.)

15            THE COURT:  Go ahead.

16            A JUROR:  Yes, sir.  1979, 1980 --

17            MR. MEJIA:  Excuse me a second.  What is your number?

18            A JUROR:  I'm sorry.  Fifty-one.

19            MR. MEJIA:  Thank you, sir.

20            A JUROR:  '79 through '83, I was employed by the

21   Cleveland County Sheriff's Office in Norman, Oklahoma, in the

22   detention facility.  That's not really that big of a deal, but

23   in a 1988, as chief of counterintelligence for Seventh Special

24   Forces group, I worked with DEA on Operation Snowcap in Bolivia,

25   Le Paz, Bolivia.

1           THE COURT:  So you were in the military then?

2           A JUROR:  Yes, sir.

3           THE COURT:  And this was a joint military/DEA

4   operation --

5           A JUROR:  Yes.

6           THE COURT:  -- in Bolivia?

7           A JUROR:  Yes, sir.

8           THE COURT:  And I don't anticipate that we'll have any

9   testimony here whatsoever regarding any foreign incursions of

10   any type, so I don't know that your experience would be directly

11   impacted by the anticipated testimony, but let me just ask you

12   if that experience in the military back in the 1980s -- is that

13   right?

14           A JUROR:  Yes, sir.

15           THE COURT:  -- if that impacted you in such a way as

16   it would make it difficult for you to be fair and impartial to

17   both sides in a case that involves, as I described earlier, an

18   allegation of possessing with intent to distribute drugs?

19           A JUROR:  No, sir.

20           THE COURT:  Could you -- we don't ask that you erase

21   your memory, but could you set aside the presumptions that your

22   prior experiences may have provided you and base your decision

23   only on the evidence you hear in this courtroom and the

24   instructions that I give you on the law?

25           A JUROR:  Yes, sir.

 1          THE COURT:  Any follow-up, Mr. Mejia?

 2          MR. MEJIA:  Based upon your experiences, do you

 3   believe Mr. Brewer to be guilty as he sits here now?

 4          A JUROR:  I don't know anything about his case, so I

 5   wouldn't have anything to say about it so --

 6          MR. MEJIA:  Okay.  So do you think you could afford

 7   him the presumption of innocence and give him a fair trial?

 8          A JUROR:  Yes, sir.

 9          MR. MEJIA:  Thank you very much.

10          THE COURT:  Anything?  Thank you, sir.

11       (Juror exiting bench.)

12          MR. MEJIA:  I think we've already heard from her,

13   haven't we?

14          THE COURT:  We have, yeah.

15       (Juror approaching bench.)

16          A JUROR:  Juror 49.

17          THE COURT:  Yes, ma'am.

18          A JUROR:  My deceased husband was a Jefferson County

19   sheriff for ten years.

20          THE COURT:  Okay.  Did he talk with you about his

21   work?

22          A JUROR:  Yes, just on really bad days.

23          THE COURT:  I understand.  Do you have any follow-up,

24   Mr. Mejia?

25          MR. MEJIA:  Nothing more, nothing more.  Thank you,

1    ma'am.

2            THE COURT:  Do you have any follow-up, Ms. McKenzie?

3            MS. MCKENZIE:  I don't.

4            THE COURT:  Thank you.

5        (Juror exiting bench.)

6            THE COURT:  Once we are done with this question,

7    Ms. McKenzie, I'm going to ask you to go ahead and read the --

8    or give the jury pool the names of the Government's anticipated

9    witnesses.  We'll ask folks if they recognize any of the names.

10       (End of bench conference.)

11           A JUROR:  I'm Number 45.

12           THE COURT:  Yes, ma'am.

13           A JUROR:  My uncle was sheriff in Barren County, and

14   I've got a cousin that's a retired state trooper.

15           THE COURT:  Thank you for that information.  Now, did

16   either your uncle or your cousin talk with you about their work?

17           A JUROR:  No.

18           THE COURT:  And despite the fact that you have

19   relatives who served in law enforcement, would you be able to

20   set aside any presumptions that you may have developed over the

21   years from their work and base a decision here in this trial

22   solely on the evidence that is produced in this room and the

23   instructions that I give you on the law?

24           A JUROR:  Yes.

25           THE COURT:  Can you be fair to both sides?

1          A JUROR:  Yes.

2          THE COURT:  Can you be fair to both sides when you are

3     hearing the testimony of a law enforcement officer?

4          A JUROR:  Yes.

5          THE COURT:  Would you be able to avoid giving more

6     weight to the testimony of a law enforcement officer because you

7     have relatives who are also law enforcement officers?

8          A JUROR:  No.

9          THE COURT:  No?

10         A JUROR:  I wouldn't give them any more weight.

11         THE COURT:  Great.  That's a good answer.  Thank you,

12     ma'am.

13       Next on the list.  Anyone else?

14         COURT SECURITY OFFICER:  He would like to approach,

15     Your Honor.

16         THE COURT:  That'd be fine.  Number 86.

17       (Bench conference on the record outside the hearing of the

18     jury.)

19         A JUROR:  Number 86.

20         THE COURT:  Yes, sir.

21         A JUROR:  I have multiple problems with this one.

22     I've got a daughter-in-law that's an attorney, and I also know

23     multiple --

24         THE COURT:  What type of lawyer is she?

25         A JUROR:  I believe she's mostly contracts and that

1    type of thing, but she does discuss with us some criminal things

2    out of their office and things.

3        And then I also have a judge I shoot with that -- he's out

4    of Clinton County.  And then I'm also in the real estate

5    business, so we have -- know a lot of -- we have a lot of issues

6    with the drug scene and multiple sheriffs, and evictions, and

7    that type of thing through the drug people.

8            THE COURT:  Okay.  So let me -- I was writing a couple

9    of notes here, but let me make sure I understand.  So you have a

10   daughter-in-law who is a lawyer?

11           A JUROR:  Yes, sir.

12           THE COURT:  And where does she practice?

13           A JUROR:  Louisville, Kentucky.

14           THE COURT:  Here in Louisville.

15           A JUROR:  I don't know which firm.

16           THE COURT:  And she occasionally discusses criminal

17   matters with you that she's involved in?

18           A JUROR:  Yeah, when we have dinner, sometimes we'll

19   talk.

20           THE COURT:  As a lawyer, obviously, is what I mean.

21           A JUROR:  Yeah.  So, you know, sometimes over dinner,

22   if there's a case that's going around the community or whatever,

23   sometimes we'll discuss.

24           THE COURT:  Anything from those discussions or from

25   that experience that informs you in such a way that you cannot

1    be fair and impartial to both sides in this case?

2            A JUROR:  Nothing from that issue.  The only issue

3    that I possibly could have is I've lost some housing because of

4    drugs and things.  And I believe that I can be fair and

5    impartial, but I don't know.  I don't know that -- I don't know

6    how to answer that, I guess.

7            THE COURT:  Well, it's somewhat aspirational in that

8    we don't expect people, when they walk through that door to be

9    on the jury pool, to erase their memory, but what we do ask is

10   that they follow instructions.  And so one of the instructions

11   is that you base your decision solely on the evidence that's

12   produced in this trial and that you not base your decision in

13   the case as a member of the jury based on something that you

14   heard a friend, a law enforcement officer friend, a judge

15   friend, a lawyer friend say about the law, about criminal

16   justice.

17      In other words, you agree to limit the information that you

18   base your decision on to the evidence that's produced in the

19   trial and the instructions that I give you on the law.

20      And so when folks walk in, they don't necessarily understand

21   how that works.  We ask them -- after informing them how it

22   works, we ask them to agree that that's -- that that's what

23   they'll do.  Is that something you can do?

24            A JUROR:  I believe that is something that I can do.

25   The only issue that concerns me is I'm not sure how to react

1    with the drug case, being that I have lost property and it cost

2    me in excess of about 60 to $80,000.

3            THE COURT:  When you say you've lost property, how

4    have you lost it?

5            A JUROR:  The drug people tore the house up so bad

6    that it was condemned and it was tore down.

7            THE COURT:  I see.

8            A JUROR:  So become land value and not property value.

9            THE COURT:  No insurance applicable, no insurance

10   recovery there?

11           A JUROR:  No, sir.

12           THE COURT:  We would not anticipate any testimony

13   along those lines, no real estate involved whatsoever in this

14   case.  Does that change the calculation for you?

15           A JUROR:  I don't believe that I'll have an issue with

16   it.  I just wanted to make sure that you're aware that I have

17   that history and, honestly, I don't know.  This is -- it's

18   fairly recent so -- it's within the last several months.  I

19   don't -- I don't know that I have any issues or prejudices over

20   that, but I just honestly don't know.

21           THE COURT:  Mr. Mejia, do you have any follow-up

22   questions?

23           MR. MEJIA:  Considering the nature of the charge here,

24   that Mr. Brewer's accused of possessing with intent to

25   distribute narcotics and your experience has been with

1   narcotics, obviously, in your homes and the loss you've

2   suffered, does that somehow make you unable to be fair or does

3   it cause you some discomfort that would interfere with your

4   ability to be fair to both sides?

5          A JUROR:  I don't honestly believe so, but I don't

6   know that I can say definitely.  I honestly just don't know.

7          MR. MEJIA:  Okay.  It may?  It could?

8          A JUROR:  I don't know.  You know, I haven't had an

9   issue yet to where I had to make that decision, I guess.

10        MR. MEJIA:  Well, if you're selected as a juror and

11   you render a decision based upon your life experiences, rather

12   than what you hear in this courtroom, then we'll find out that

13   you couldn't be fair, so we need to ask you up front.  And if

14   you don't know whether you can be fair, then we'd just ask that

15   you say "I don't know that I can be fair."  If that's the best

16   you can say, then that's what we'll accept.

17        A JUROR:  Okay.  I do have the belief -- I'm a scout

18   leader and I do believe that everybody has the right to their

19   religions and --

20        MR. MEJIA:  Yes.

21        A JUROR:  -- so I don't know -- I don't know that -- I

22   mean, I honestly just don't know how to answer that.

23        THE COURT:  Do you believe that you can set aside

24   anything that you've heard about the law from your daughter-

25   in-law or from your friend who's a judge and follow my

1  instructions?

2          A JUROR:  Yes, sir, I could do that.  That's not an

3  issue.

4          THE COURT:  Even if you think, huh, that sounds a

5  little different than what I heard my friend say or my

6  daughter-in-law say?

7          A JUROR:  Yeah, that would not be an issue.

8          THE COURT:  So if I instruct you, as I will if you're

9  on the jury, that Mr. Brewer is entitled to a presumption of

10  innocence until he is proven guilty beyond a reasonable doubt,

11  can you go into the trial with that presumption?

12          A JUROR:  I believe that I can do that, yes, sir.

13          THE COURT:  Anything further, Mr. Mejia?

14          MR. MEJIA:  I just -- I would be remiss -- what is the

15  name of the daughter-in-law or her law firm?

16          A JUROR:  Her name is Nicole Crump and I do not know

17  the law firm.

18          MR. MEJIA:  Okay.  Thank you.

19          THE COURT:  Thank you, sir.

20      (Juror exiting bench.)

21      (End of bench conference.)

22          A JUROR:  Juror 83.

23          THE COURT:  Yes, sir.

24          A JUROR:  Yes, sir.  I have an uncle, a nephew, a

25  niece, and myself who have all served in law enforcement.

1          THE COURT:  Let's start with you.  Where did you

2    serve?

3          A JUROR:  I was on the security force out at Fort Knox

4    for approximately three years ten years ago.

5          THE COURT:  I see.  And so let me just ask you the

6    general question.

7          A JUROR:  Okay.

8          THE COURT:  Anything from that experience or the

9    experiences of your relatives that would make it difficult for

10   you to be fair and impartial to both sides if you are selected

11   to serve on the jury?

12         A JUROR:  No, sir.

13         THE COURT:  Now, having been a law enforcement officer

14   yourself, albeit -- I believe you said ten years ago; is that

15   right?

16         A JUROR:  Yes, sir.

17         THE COURT:  -- would that make it difficult for you to

18   weigh the testimony of a law enforcement officer and be fair?

19         A JUROR:  I would be fair, sir.

20         THE COURT:  All right.  Thank you, sir.

21         COURT SECURITY OFFICER:  We're good with this section

22   here.  Anybody in this section?  We'll start right here.

23         A JUROR:  I'm 42.  I have an uncle who is a state

24   trooper, and I have a cousin who's a detective with the

25   Louisville police.

1          THE COURT:  Here in Louisville?

2          A JUROR:  Yes.

3          THE COURT:  Now, does your uncle or your cousin, do

4     either of them speak with you about the nature of their work?

5          A JUROR:  I've spoken with my cousin, the detective,

6     quite a bit.

7          THE COURT:  And has he spoken with you about how he

8     goes about his job?

9          A JUROR:  Sometimes, yes.

10         THE COURT:  Why don't you come up and we'll talk a bit

11    more about that.

12       (Bench conference on the record outside the hearing of the

13    jury.)

14         THE COURT:  Thank you for responding.

15         A JUROR:  Yeah.

16         THE COURT:  So in a minute Ms. McKenzie is going to

17    tell the entire jury pool the names of the witnesses the

18    Government intends to present, so I'm going to ask her to give

19    you those names now and ask you if you recognize any of them,

20    perhaps folks that your cousin knows or has mentioned to you.

21         A JUROR:  Okay.

22         MS. MCKENZIE:  Detective Holly Hogan, Detective Tyler

23    Holland, Detective Chad Stewart, Detective Tony James.

24         A JUROR:  No.

25         MS. MCKENZIE:  Detective Kevin McKinney.

1            A JUROR:  No.

2            THE COURT:  Now, having a cousin that you -- you have

3    some closeness with --

4            A JUROR:  Yes, yes.

5            THE COURT:  We all have cousins that we don't know

6    well and cousins that we're close to or most of us do.  So you

7    would put him in the category of someone you're close with; is

8    that right?

9            A JUROR:  Yes.  And the reason -- sorry -- the reason

10   that we speak of it, he specialized for a while in financial

11   fraud investigations and I'm an auditor, so it was very

12   interesting.  And I think now he mostly does lie detector tests.

13   He --

14           THE COURT:  I see.  So has he given you any

15   instruction on how to detect when somebody is being deceptive?

16           A JUROR:  We've talked about it a little bit.  It's

17   very interesting.

18           THE COURT:  So you've learned, for instance, about the

19   interaction between the machine and the officer who's asking the

20   questions?

21           A JUROR:  A bit.  I'm not an expert though.

22           THE COURT:  Right, right.  Is there anything about

23   that relationship with your cousin who's a -- he is a detective;

24   is that right?

25           A JUROR:  I believe he currently is still.

1        THE COURT:  Anything about that relationship that

2   would make it uncomfortable for you to sit on a jury here

3   knowing that this is a case brought by the -- in large part by

4   the Louisville Metro Police Department?

5        A JUROR:  No.

6        THE COURT:  That would not be uncomfortable for you?

7        A JUROR:  No.

8        THE COURT:  Would it be uncomfortable if you were to

9   go back and discuss the jury's -- if you were to serve and at

10  the conclusion of your service go back and tell your cousin

11  about your experience, would you worry that he would be upset

12  with you if you found against the police side of the case?

13       A JUROR:  No.

14       THE COURT:  Would you be able to base your decision

15  solely on the evidence that's produced here in this courtroom

16  and my instructions on the law in setting aside anything that

17  you've learned from your cousin or your uncle?

18       A JUROR:  Yes.

19       THE COURT:  And you could be fair and impartial to

20  both sides?

21       A JUROR:  Yes.

22       THE COURT:  Mr. Mejia.

23       MR. MEJIA:  Have either of them told you about their

24  experience, if it included testifying in courts, if you know?

25       A JUROR:  I know that they have, but we haven't spoken

1     about that.

2              MR. MEJIA:  Okay.  And so there's nothing about that

3     that would make you somehow unable to be fair to either side in

4     this case?

5              A JUROR:  No.

6              MR. MEJIA:  And, obviously, as we sit here now, if the

7     judge -- and will tell you of the presumption of innocence, you

8     can presume the accused innocent until proven guilty?

9              A JUROR:  Yes.

10             MR. MEJIA:  Nothing more.  Thank you.

11             THE COURT:  Thank you.

12             A JUROR:  Thanks.

13        (Juror exiting bench.)

14        (Juror approaching bench.)

15             A JUROR:  Good afternoon, Your Honor.  I'm Number 69.

16    From 2005 to 2017, I was with Louisville Metro Government human

17    resources, and I conducted training, hiring, and testing for

18    LMPD.

19             THE COURT:  Okay.  What do you do now?

20             A JUROR:  I'm with MSD in their human resources.

21             THE COURT:  Okay.  So did you develop any close

22    relationships as a result of working as an HR person --

23             A JUROR:  Yes.

24             THE COURT:  -- with LMPD?

25             A JUROR:  Yes.

1          THE COURT:  Ms. McKenzie's going to give these names

2    to the full jury pool here in a few minutes, but I'm going to

3    ask her to go ahead now while you're here and give you the names

4    of the LMPD witnesses she anticipates testifying to see if you

5    know any of them.

6          A JUROR:  Okay.

7          MS. MCKENZIE:  Holly Hogan.

8          A JUROR:  No.

9          MS. MCKENZIE:  Tyler Holland.

10         A JUROR:  No.

11         MS. MCKENZIE:  Chad Stewart.

12         A JUROR:  No.

13         MS. MCKENZIE:  Tony James.

14         A JUROR:  No.

15         MS. MCKENZIE:  Kevin McKinney.

16         A JUROR:  No.

17         THE COURT:  Now, would it -- knowing that the

18   Government intends to call witnesses who are LMPD detectives and

19   officers, would that make it uncomfortable for you to sit on a

20   jury?

21         A JUROR:  Not at all.

22         THE COURT:  It would not be uncomfortable for you to

23   essentially judge the credibility of those folks?

24         A JUROR:  Not at all.

25         THE COURT:  You could be fair to both sides?

1           A JUROR:  Absolutely.

2           THE COURT:  You wouldn't go into it with sort of a

3    natural bent to believe the police officers?

4           A JUROR:  I'm with HR.  No, sir.

5           THE COURT:  Fair enough on that respect.  So the

6    question you've heard me ask repeatedly:  Can you base your

7    decision solely on the evidence produced in this courtroom and

8    the instructions that I give you and the law?

9           A JUROR:  Yes, sir.

10          THE COURT:  Mr. Mejia, anything?

11          MR. MEJIA:  Nothing.  Thank you very much.

12          A JUROR:  Okay.  Thank you.

13       (Juror exiting bench.)

14          THE COURT:  Yes, sir.

15       (Juror approaching bench.)

16          A JUROR:  Ninety-eight.

17          THE COURT:  Yes, sir.

18          A JUROR:  I used to work for Department of Corrections

19   for KSR/Luckett.  I used to transport inmates all over the state

20   for KSR, Luckett, and Roederer to the courts and all that.

21          THE COURT:  Was that at out LaGrange?

22          A JUROR:  And I do -- huh?

23          THE COURT:  Was that at out LaGrange?

24          A JUROR:  Yes, LaGrange, yes, at KSR.  That was where

25   we were stationed at was in KSR's -- there was Wood Dunn

1   [phonetic], Luckett, and Roederer's.  I have taken them to

2   court, and to be honest, I don't know for certain, but I do

3   believe I sat in court with this man here and -- both of them,

4   sat in as an officer, you know, watched the court and all that.

5   I can't say for certain, but they both do look familiar in

6   court.

7        MS. MCKENZIE:  Do you mean both attorneys?

8        A JUROR:  Both attorneys, yes.  I mean, I could say

9   some names and I think he would probably be the one that would

10  really -- but I think you was -- you and him was against each

11  other in one of the courts that I was sitting -- standing behind

12  the guy, but I don't want to say the person's name because

13  it's -- you know.

14       THE COURT:  It does occur.  I mean, Louisville is a

15  pretty big city, but it's not so big that we don't anticipate

16  folks coming into court and saying a lawyer or defendant --

17       A JUROR:  Like I said, I don't want to say 100

18  percent, but I do believe --

19       THE COURT:  Right.

20       A JUROR:  -- he was really the one that I mainly -- I

21  don't know that for certain, so that's why I didn't come up a

22  while ago saying I knew both of them.

23       THE COURT:  When you say he, you mean Mr. Mejia or his

24  client?

25       A JUROR:  Yes, Mr. Mejia.

1          THE COURT:  Okay.  Mr. Mejia has a significant

2   practice here in town, so he practices in both state and federal

3   court, and you think you've run across him --

4          A JUROR:  I think I run across him over at the one by

5   Ninth Street.

6          MS. MCKENZIE:  The Judicial Center.

7          A JUROR:  Judicial Center.

8          THE COURT:  In state court?

9          A JUROR:  In state court, yes.

10          THE COURT:  I see.  Now, what I was getting at is it's

11   not altogether unusual for folks on a jury pool to recognize

12   someone else in the courtroom, but what's important to know is

13   whether that familiarity causes you to have difficulty in being

14   fair.

15          A JUROR:  No.

16          THE COURT:  So the fact that you might have seen

17   Mr. Mejia in court on a prior occasion, does that make it any

18   more likely that you would defer to him or --

19          A JUROR:  No, sir.

20          THE COURT:  -- or the same question with respect to --

21          A JUROR:  No, sir.

22          THE COURT:  -- Ms. McKenzie?  Could you be fair and

23   impartial to both sides?

24          A JUROR:  Yes, sir.

25          THE COURT:  Can you base your decision solely on the

1    evidence you hear in the courtroom and the instructions that I

2    give you on the law?

3            A JUROR:  Yes, sir.

4            THE COURT:  Now, you're wearing a shirt there that has

5    the name of a company.

6            A JUROR:  Metalsa.

7            THE COURT:  Metalsa.  Is that where you work now?

8            A JUROR:  That's where I work at now, yes, sir.

9            THE COURT:  What's the nature of your work there at

10   Metalsa?

11           A JUROR:  I'm a welder and like I was telling you

12   earlier, that I go and repair frames for Ford, and that's

13   what -- I didn't want to elaborate to everybody, but I go up

14   there and I repair frames for Ford.

15       Tomorrow, the reason I asked for tomorrow is Ford had us

16   come up -- I wasn't expecting to be -- you know, I didn't know

17   it was going to be two or three days.  Next time I'll make sure

18   that it's not set up, but we set up to go up there and repair

19   the frames tomorrow, to fix them, because I got two frames up

20   there I got to take off body mounts and put them back on so --

21   put the cab on and all that, so that's why I was asking if I

22   could.  If not, I totally understand.  It's -- you know, I'm

23   just -- that's the only reason I asked earlier about the

24   question about it, but like I said, I wasn't trying to --

25           THE COURT:  No, no, that's perfectly fine, what you

1    told us.  That's the information we want.  We do our best to

2    accommodate folks when we can, but we obviously have to

3    prioritize.

4              A JUROR:  Right, no, I understand that.  I mean, I

5    just --

6              THE COURT:  Now, you don't have anything to do -- at

7    Metalsa, you don't have anything to do with their human

8    resources or anything?

9              A JUROR:  No, no, I have nothing -- like I said, I'm

10   just a product tech.  I go and repair -- repair the frames and

11   stuff like that.  I don't -- you know, I mean, I do the welding

12   there and, actually, we're building the new -- which y'all

13   probably don't care -- but the new two thousand -- the job that

14   I'm actually doing right now is we're building the new 2020

15   hybrid truck that's getting ready to come out, F-150 hybrid, and

16   that's what I'm building right now, but they sent me up to

17   repair frames and stuff like that.

18             THE COURT:  I see.  All right.

19             A JUROR:  I'm one of the lucky ones.

20             THE COURT:  Anything further, Mr. Mejia?

21             MR. MEJIA:  For how many years were you transporting

22   prisoners?

23             A JUROR:  I transported three years.

24             MR. MEJIA:  Was there anything about that experience

25   with the court system, with judges, with staff, with sheriffs,

 1   or any personnel that somehow make you uncomfortable in this

 2   setting?

 3             A JUROR:  I mean, no, not nothing to do with the court

 4   system and stuff like that.  It was -- I had a bad experience at

 5   the prison is why I quit.  An inmate spit on me and I felt me

 6   going in after him.  And I said, "It's time for me to go find

 7   somewhere else before I end up in court over it."

 8             MR. MEJIA:  Right.  And I was going to follow up to

 9   ask you, have you ever had any negative experiences with an

10   inmate?  You were telling us you have.

11             A JUROR:  Yes, I have.  Yes, I have.  I mean, you

12   know, I just felt myself going -- I went after the keys.

13   Luckily, another officer hollered at me and got my attention

14   before I did go in, but I did -- you know, I did -- the inmate

15   told me I was going in after him.  I lost total conscious of

16   what I did, so -- I mean, then two weeks later I quit.

17             MR. MEJIA:  Okay.  Thank you.  Sorry about that.

18             A JUROR:  That's fine.

19             THE COURT:  That experience aside, you believe that if

20   you're selected for this jury, you could be fair to both sides?

21             A JUROR:  Yes, that's in the past.  That has nothing

22   to do --

23             THE COURT:  You wouldn't hold against the defendant

24   here what that --

25             A JUROR:  No.

 1          THE COURT:  -- different person did to you years ago?

 2          A JUROR:  No, that was totally -- my thing is, well,

 3     you know, it's whoever.  It's got nothing to do with me and that

 4     person.  This is totally different, you know.

 5          THE COURT:  Thank you.

 6        (Juror exiting bench.)

 7          THE COURT:  Just so you know, Metalsa -- I have a case

 8     with Metalsa as a defendant.  It's new.  I haven't looked at it.

 9     I have no idea what it's about.  I couldn't tell you who the

10     lawyers are.  I couldn't tell you what the claims are, but I'm

11     sure he doesn't have anything to do with it, because I believe

12     it's an employment case.  That's why I asked him if he had

13     anything to do with HR.

14        (End of bench conference.)

15          THE COURT:  Yes, ma'am.

16          A JUROR:  Juror Number 40.  My father is a retired

17     Cleveland police officer.

18          THE COURT:  And did your father talk with you much

19     about his work as a police officer?

20          A JUROR:  Occasionally.

21          THE COURT:  And did you learn anything from his

22     experience that would make it difficult for you or perhaps

23     uncomfortable for you to serve on a jury and weigh the testimony

24     of police witnesses?

25          A JUROR:  No.

1         THE COURT:  Could you be fair and impartial to both

2    sides?

3         A JUROR:  Yes.

4         THE COURT:  And can you, if you are selected for the

5    jury, make your decisions based solely on the evidence that you

6    hear and see in this courtroom and the instructions that I give

7    you on the law, setting aside anything that you might have

8    learned from your father's experience?

9         A JUROR:  Yes.

10        THE COURT:  Thank you.

11        THE REPORTER:  Ma'am, what was your number?

12        A JUROR:  Forty.

13        COURT SECURITY OFFICER:  40.

14        A JUROR:  Juror 36.  My father's a retired

15   correctional officer, and I'm friends with several members of

16   the LMPD.

17        THE COURT:  Why don't we do this -- remind me your

18   number again.

19        A JUROR:  Thirty-six.

20        THE COURT:  I'm going to ask Ms. McKenzie, the

21   prosecutor, to give the entire jury pool the names of the

22   anticipated police witnesses, and I'll start with you and ask

23   you if you recognize any of these names.  And if anyone else

24   recognizes a name that she gives, we'll just have a brief

25   follow-up for you.

1          MS. MCKENZIE:  The United States expects to call the

2     following police witnesses:  Detective Robert Tyler Holland,

3     Detective Chad Stewart, Detective Anthony James, Detective Kevin

4     McKinney, Detective Holly Hogan.

5          THE COURT:  Any of those names sound familiar to you,

6     sir?

7          A JUROR:  No, Your Honor.

8          THE COURT:  Now, you mentioned having several friends

9     that are members of LMPD; is that correct?

10         A JUROR:  Yes, sir.

11         THE COURT:  Do they talk with you about their work?

12         A JUROR:  No.

13         THE COURT:  Would the mere fact that you're friends

14    with LMPD officers make it uncomfortable for you or do you think

15    it would be difficult for you to serve on a jury where LMPD is

16    associated with one side versus the other?

17         A JUROR:  No, sir.

18         THE COURT:  Would you be able to be fair and impartial

19    to both sides?

20         A JUROR:  Yes.

21         THE COURT:  Would you be able to weigh the testimony

22    of the police witnesses that you hear fairly without regard to

23    your friendship with other LMPD folks?

24         A JUROR:  Absolutely.

25         THE COURT:  Could you base your decision solely on the

1    evidence that you hear in this courtroom and the instructions

2    that I give you on the law?

3              A JUROR:  Yes, sir.

4              THE COURT:  Thank you.

5         Anyone else?

6              A JUROR:  Juror 1.

7              THE COURT:  Yes, ma'am.

8              A JUROR:  Just for clarification, you're specifically

9    asking about law enforcement, not someone who practices law here

10   in Louisville?

11             THE COURT:  Well, I've got a question I'm about to get

12   to.  This is always the question that garners the most

13   responses, and so we're going to get to training and so forth in

14   the law but, no, just for now law enforcement.  Anybody else

15   that has a law enforcement relationship that you need to bring

16   to our attention?  No.

17        So the next question is have you ever received any legal

18   training, practiced law, or worked in an attorney's office?

19   Now, if you've already told us about your professional

20   experience along these lines, you don't need to repeat it.  But

21   for everyone else, have you received any legal training,

22   practiced law, or worked in an attorney's office?  No responses.

23        We have just a few more questions to go through.  Does

24   anyone need a brief break?  A few of you?

25        Here's what we're going to do:  We're going to take a

 1    ten-minute break, a bathroom break.  It's about 12:40.  I'm

 2    hoping we'll get through and we'll be able to allow you to break

 3    for lunch before we make the final selections.  And then -- the

 4    lawyers and I will do that while you are gone.  And then when

 5    you come back, we'll be able to finalize the jury selection

 6    process.

 7        We'll be as efficient as possible in working to do that, but

 8    for now I'm going to give you a brief ten-minute break.  I'm

 9    going to ask you to follow the court security officer's

10    instructions and return to the exact same seat you are occupying

11    now.

12        Let me ask you to please do not talk about the case with

13    anyone, with your fellow jury pool members, or with anyone that

14    is not participating in the case, caution you not to speak with

15    anyone in this room about the case.  You can talk about college

16    basketball.  You can talk about the NFL playoffs.  You can talk

17    about the weather, but please do not discuss the voir dire

18    process or what you have heard thus far about the case, and

19    we'll see you back here in about ten minutes.

20        (Jury out 12:38 p.m.)

21            THE COURT:  Either side have anything you need to take

22    up now that the jury pool has left the courtroom?

23            MR. MEJIA:  I'm from Chicago.  I'd ask that we not

24    discuss the NFL playoffs.

25            THE COURT:  I can understand why, having watched most

1    of that game.  Anything else?

2              MS. MCKENZIE:  No.

3              MR. MEJIA:  Nothing, sir.

4              THE COURT:  Thank you.  I'll see you in ten minutes.

5         (Recess at 12:40 p.m. until 12:49 p.m.  Jury out.)

6              THE COURT:  While we're waiting, Mr. Mejia,

7    Ms. McKenzie, if I could see you-all at the bench.

8         (Bench conference on the record.)

9              THE COURT:  I have four categories of questions left

10   to cover.  These are ones that I don't necessarily anticipate a

11   lot of response to, standard categories.

12        Once we get through those, I will ask you-all to come up

13   again, and we'll talk about any extraneous issues that you-all

14   have.  And then I'll ask the -- you know, the general wrap-up

15   about does anything else occur to you that may make it difficult

16   for you to be a fair and impartial juror, that wrap-up question.

17        Once we get that done, given the -- that we're about half an

18   hour behind where I had hoped to be at this point, we will let

19   the jury pool go for a lunch break.  And then I will give you a

20   few minutes to work through, first, what we're going to take up

21   for cause.  I'll ask you-all to confer on that, to the extent

22   you-all agree -- some of these, I think, are sort of obvious

23   candidates for cause excuse -- and then, also, work on your

24   strike issues on a preliminary basis, your peremptories.

25   Obviously, you need to know what we're going to do on the cause

1    before you get to that.  And I'll give you some time on that

2    after I make the decisions on the cause so that when we bring

3    them back in after their lunch break, we're in a position to go

4    ahead and select the 13.  Any questions about that?

5              MR. MEJIA:  None about that, no.

6              THE COURT:  Thank you.

7         (End of bench conference.)

8         (Jury in 12:55 p.m.)

9              THE COURT:  So members of the jury pool, we're going

10   to continue through to the conclusion of our questions.  I

11   believe we've gotten through the most involved questions, but

12   the next question in particular may elicit a response that is of

13   a personal or sensitive nature, and so you are welcome, again,

14   to raise your hand and discuss your response at the bench.

15        Here is the question:  Have you ever been involved in any

16   court in a criminal matter that concerned yourself, any member

17   of your immediate family, or a close friend either as a

18   defendant, a witness, or a victim?

19        Now, I'm going to read the question again:  Have you ever

20   been involved in any court in a criminal matter that concerned

21   yourself, any member of your immediate family, or a close friend

22   either as a defendant, a witness, or a victim?

23        Our court security officer will pick a section and move

24   through that section.

25        Counsel, you'll be needed at the bench.

1      (Bench conference on the record outside the hearing of the

2  jury.)

3           THE COURT:  Yes, sir.  Tell me your number.

4           A JUROR:  Twenty-eight, Juror 28.

5           THE COURT:  Yes, sir.

6           A JUROR:  When I was in college in 1982, I was

7  arrested and charged with shoplifting, pled guilty, paid my

8  fine.  It was in Fayette County, Kentucky.

9           THE COURT:  Anything from that youthful indiscretion

10  that would cause you to harbor hard feelings one way or the

11  other for or against either side in this case?

12           A JUROR:  No, sir.

13           THE COURT:  Would you be able to be fair and impartial

14  to both sides as a result of that experience?

15           A JUROR:  Yes, sir.

16           THE COURT:  Any follow-up questions, Counsel?

17           MR. MEJIA:  Nothing here.

18           MS. MCKENZIE:  No.

19           THE COURT:  Thank you, sir.

20      (Juror exiting bench.)

21           THE COURT:  Yes, ma'am.

22      (Juror approaching bench.)

23           A JUROR:  Hi.  I'm 32.

24           THE COURT:  Thirty-two, yes, ma'am.

25           A JUROR:  I just need to clarify from you whether it

1    would be civil or criminal.

2            THE COURT:  Okay.

3            A JUROR:  We had to sue our builder here in Louisville

4    because he left contractors unpaid, and they were putting liens

5    against our house.  It was a jury trial.

6            THE COURT:  That's a civil matter.

7            A JUROR:  Okay.

8            THE COURT:  A civil dispute is typically over money.

9    And so unless anybody was charged with a crime -- was your

10   contractor charged with fraud or anything like that?

11           A JUROR:  He was not convicted of it.  He was charged

12   with it.

13           THE COURT:  He was?

14           A JUROR:  Uh-huh.

15           THE COURT:  So that's a separate proceeding, different

16   from when you sued him; right?

17           A JUROR:  No, it was part of ours.

18           THE COURT:  Okay.  So you accused him of fraud --

19           A JUROR:  Correct.

20           THE COURT:  -- in the civil case.

21           A JUROR:  Yeah.

22           THE COURT:  That's a civil case.

23           A JUROR:  Okay.

24           THE COURT:  Now, while we've got you here, we'll just

25   make sure that that experience didn't harden your views on the

```
 1   court system in such a way that you couldn't be fair here to

 2   both sides.

 3           A JUROR:  No.

 4           THE COURT:  So you could make your decision based

 5   solely on the evidence you hear in the courtroom and the

 6   instruction that I give you on the law?  Is that right?

 7           A JUROR:  Yes, sir.

 8           THE COURT:  All right.  Anything further?

 9           MR. MEJIA:  Did you have much contact with lawyers in

10   connection with that action in court?

11           A JUROR:  My own attorney.

12           MR. MEJIA:  Okay.

13           A JUROR:  Not his.

14           MR. MEJIA:  And how many years ago was that?

15           A JUROR:  Twenty.

16           MR. MEJIA:  Anything about that experience that makes

17   you uncomfortable being in a court of law?

18           A JUROR:  No.

19           MR. MEJIA:  Nothing more.  Thank you.

20           THE COURT:  Thank you, ma'am.

21           A JUROR:  Okay.

22       (Juror exiting bench.)

23       (Juror approaching bench.)

24           THE COURT:  Hi.

25           A JUROR:  Myself, I was in court for a DUI before.
```

1       THE COURT:  And how did that -- how was that resolved?

2       MR. MEJIA:  I'm sorry, ma'am.  What is your number?

3       A JUROR:  I'm 16.  I'm sorry.

4       MR. MEJIA:  Sixteen, okay.  Thank you.

5       A JUROR:  I did like a diversion program.

6       THE COURT:  I see.

7       A JUROR:  And then like 30 days with suspended license

8  and paid like some fees and stuff but, yeah.

9       THE COURT:  And so anything -- well, first of all, how

10  long ago was that?

11       A JUROR:  Maybe about five, six years, something like

12  that.

13       THE COURT:  Okay.  So it's been some time ago.

14       A JUROR:  Yeah.

15       THE COURT:  Anything from that experience that causes

16  you to have hard feelings about --

17       A JUROR:  No.

18       THE COURT:  -- the criminal justice system?

19       A JUROR:  No.

20       THE COURT:  Can you be fair to both sides?  And

21  Ms. McKenzie read the names of the police officers who might

22  testify here.  Did you recognize any of those?

23       A JUROR:  No.

24       THE COURT:  All right.  So you can make your decision

25  in a fair and impartial way and only on the evidence that's

1    produced here and my instructions on the law?

2              A JUROR:  Yes.

3              THE COURT:  Okay.  Any follow-up questions?

4              MR. MEJIA:  No, no.  Thank you.

5              MS. MCKENZIE:  I have -- just briefly.  Did that

6    happen here in Louisville?

7              A JUROR:  Yes.

8              MS. MCKENZIE:  So were you pulled over by Louisville

9    Metro police officers?

10             A JUROR:  Yes.

11             MS. MCKENZIE:  What time of day was it?

12             A JUROR:  It was my birthday, so it was like late,

13   like in the morning, like maybe about two, three, somewhere in

14   there.  I was coming from being out so, yeah.

15             MS. MCKENZIE:  Do you feel like you were treated

16   fairly by those police officers?

17             A JUROR:  From where I was at -- I think it was more

18   like the area I was in.  So it was just like -- I don't know.  I

19   don't know.  I don't know, because I feel like in that area that

20   I was in, I felt like you get pulled over a lot.  You know what

21   I mean?  So I just kind of felt like, based on the area I was in

22   and the time of day that it was, I was pulled over.  That's how

23   I feel.

24             MS. MCKENZIE:  Okay, okay.  Do you -- is there

25   anything about that experience that you think would make it hard

1   for you --

2                A JUROR:  No.

3                MS. MCKENZIE:  -- to fairly judge the evidence here --

4                A JUROR:  Yeah.

5                MS. MCKENZIE:  -- in a case where someone was pulled

6   over by the police?

7                A JUROR:  Say it one more time.  I'm sorry.  Do I feel

8   like I would be fair towards that?

9                MS. MCKENZIE:  Listening to a case where another

10  person was pulled over by the police --

11               A JUROR:  Yeah, I feel like I could be fair, yeah.

12               MS. MCKENZIE:  -- could you be fair to the defendant

13  and to the United States?

14               A JUROR:  Yeah, yeah.

15               MS. MCKENZIE:  Okay.

16               THE COURT:  Anything further?

17               MR. MEJIA:  Nothing.

18               THE COURT:  Thank you, ma'am.

19       (Juror exiting bench.)

20       (Juror approaching bench.)

21               A JUROR:  Number 96.  In college my roommate and I had

22  a noise complaint in our apartment complex.

23               THE COURT:  I'm sorry.  Had what?

24               A JUROR:  Had a noise complaint in our college

25  apartment complex.  And we had marijuana and he came in and

```
 1   smelled it, and the officer -- I didn't get arrested, but my

 2   roommate did.  But I just thought maybe that's something y'all

 3   would want to know about.

 4             THE COURT:  Okay.  Anything from that youthful

 5   experience cause you to have hardened feelings towards the

 6   criminal justice system or towards the police in general?

 7             A JUROR:  To be honest, a little bit.

 8             THE COURT:  Okay.  Tell the me about that.

 9             A JUROR:  I just felt like we were being picked on

10   unfairly.  And I think that, you know, marijuana medicinally

11   should be legalized.  And I think in this situation, you know --

12   you know, I don't think it's that big a deal.

13             THE COURT:  And where did that occur?

14             A JUROR:  Bowling Green, Kentucky.

15             THE COURT:  So you were at Western?

16             A JUROR:  Uh-huh.

17             THE COURT:  And was that campus police or was that --

18             A JUROR:  It was BG.

19             THE COURT:  -- Bowling Green police?

20             A JUROR:  It was BGPD.

21             THE COURT:  So would you have any problem setting

22   aside that experience -- you seem to be a young man, so it

23   couldn't have been that long ago.

24             A JUROR:  It was like four years ago.

25             THE COURT:  So from that experience four years ago,
```

1    would you have any problem setting aside the feelings that you

2    have about that experience when it comes to judging the facts in

3    this case?

4            A JUROR:  To be honest, I don't think I would be as

5    impartial as I should be.

6            THE COURT:  Even if I instructed you that it was your

7    obligation as a juror to be fair and impartial to both sides,

8    you think it would be difficult for you?

9            A JUROR:  If I needed to, I could.

10           THE COURT:  All right.  Now, this case, as you heard

11   me say, involves a charge regarding marijuana.

12           A JUROR:  Right.

13           THE COURT:  And you've told us you have this

14   experience of where you're -- was your roommate arrested or just

15   cited?

16           A JUROR:  Just cited.  He wasn't arrested.  I wasn't

17   arrested or cited.

18           THE COURT:  And so the fact that your roommate

19   received a citation, would that experience make it difficult for

20   you to be fair and impartial to either side in this case?

21           A JUROR:  I would be -- yeah, a little bit.  I'm

22   leaning more towards the defendant.

23           THE COURT:  I see.  Now, you've heard me say several

24   times now throughout the course of this voir dire process that a

25   juror's obligation is to base their decision solely on the

1   evidence that's produced in this courtroom and the instructions

2   that I give on the law.  Do you think that your prior experience

3   as a college student would prevent you from doing just that?

4            A JUROR:  Yeah.

5            THE COURT:  Ms. McKenzie.

6            MS. MCKENZIE:  I have no further questions.

7            MR. MEJIA:  Nothing.  Thank you very much for the

8   information.

9       (End of bench conference.)

10           A JUROR:  Ninety-five, 95.

11           THE COURT:  Yes, ma'am.

12           A JUROR:  I think we discussed that, I believe.

13           THE COURT:  I believe we did.  Thank you, ma'am.

14      (Bench conference on the record outside the hearing of the

15  jury.)

16           A JUROR:  Juror Number 94.  I was arrested at the age

17  of 19 for possession of marijuana and possession of alcohol by a

18  minor.

19           THE COURT:  Okay.  And is there anything from that

20  youthful indiscretion that has hardened your views on the

21  criminal justice system such that you could not be fair and

22  impartial as a juror in this case?

23           A JUROR:  No.

24           THE COURT:  Where did that --

25           A JUROR:  It was in Bowling Green, Kentucky.

```
 1              THE COURT:  And --

 2              A JUROR:  I was a student at Western.

 3              THE COURT:  You were down at Western?

 4              A JUROR:  Uh-huh.

 5              THE COURT:  So do you think you would have any trouble

 6    being fair and impartial to both sides in this case?

 7              A JUROR:  No.

 8              THE COURT:  Now, you may recall that earlier when I

 9    read the little very brief description of what this case is

10    about, I mentioned that marijuana is involved in this case.

11              A JUROR:  Right.

12              THE COURT:  Does that give you any pause?  Does it

13    make you uncomfortable?

14              A JUROR:  A little.

15              THE COURT:  Okay.

16              A JUROR:  A little.

17              THE COURT:  Tell me about why.

18              A JUROR:  Well, I didn't think I'd be standing here,

19    but I still use marijuana.  And I feel that it may be

20    hypocritical of me to accuse or convict somebody of selling

21    something that I partake in.

22              THE COURT:  I see.  First of all, thank you for your

23    honesty.  I mentioned earlier that I sometimes get teased for

24    talking about how important it is for citizens to be involved in

25    this process, but this is why I feel so strongly about it,
```

 1    because I believe that people are basically honest, and they

 2    participate fairly, and they make a contribution when they're

 3    honest, and so I want to thank you for you that.

 4         Now, is your situation such that you would have a hard time

 5    following my instructions on that part of the case that deals

 6    with the marijuana?

 7              A JUROR:  I want to say no, you know, no, that I -- I

 8    want to be a part of the process.  I just -- I think that I

 9    could look at the evidence and take it for face value.

10              THE COURT:  So you could be fair and impartial to both

11    sides?

12              A JUROR:  Yes, I believe so.

13              THE COURT:  Okay.  And would you have any trouble

14    being -- weighing the testimony of the Government's witnesses

15    regarding the marijuana counts fairly?  Would you have any

16    trouble doing that?

17              A JUROR:  Yeah, yes, I mean, that would be --

18              THE COURT:  That would be the hard part for you or it

19    would not be?

20              A JUROR:  No, no, no, that would not be hard.

21              THE COURT:  So you could make a decision based solely

22    on the evidence that's here in this courtroom --

23              A JUROR:  Yes.

24              THE COURT:  -- not based on your own personal

25    experience?

1            A JUROR:  Right.

2            THE COURT:  You could, basically, set that aside and

3    make your decision on the evidence that's presented here and the

4    instruction that I give you on the law?

5            A JUROR:  I believe so.

6            THE COURT:  All right.  Mr. Mejia.

7            MR. MEJIA:  No questions.  Thank you very much.

8            THE COURT:  Ms. McKenzie.

9            MS. MCKENZIE:  No.

10           THE COURT:  Thank you, ma'am.

11      (Juror exiting bench.)

12           MR. MEJIA:  That's extraordinary.  You're doing a good

13   job.

14           THE COURT:  That's a first for me.

15           MS. MCKENZIE:  Yeah.

16      (Juror approaching bench.)

17           THE COURT:  Yes, ma'am.

18           A JUROR:  This same best friend I spoke to you

19   earlier, her cousin was murdered on Fort Knox in the mid '90s,

20   and the trial was here at federal court.  I was here with her

21   every day.

22           THE COURT:  You were a witness or just --

23           A JUROR:  No, we were just with her every day.  Her

24   cousin had been murdered execution style on post, and the body

25   wasn't found for about seven months.  And so we were -- we came

1    here to the court after everything was found and for the trial.

2              THE COURT:  And there was a trial here?

3              A JUROR:  Yes.

4              THE COURT:  Okay.  Anything from that experience that

5    you would draw upon that would give you hard feelings about the

6    criminal justice system?

7              A JUROR:  No.

8              THE COURT:  What was the result of the trial?

9              A JUROR:  The man was found guilty and sent to prison

10   for 20 years, I think.

11             THE COURT:  And anything from that experience, do you

12   think, would make it difficult for you to be fair and impartial

13   to both sides in the case?

14             A JUROR:  No.

15             THE COURT:  Could you essentially set that experience

16   aside and make your decision solely on the evidence that's

17   produced in this trial and the instructions that I give you on

18   the law?

19             A JUROR:  Yes.

20             THE COURT:  Any follow-up?

21             MR. MEJIA:  We've seen you before, ma'am.  What is

22   your number?

23             A JUROR:  Eighty-nine.

24             MR. MEJIA:  Thank you very much.  No, I have no

25   further questions.

```
 1              THE COURT:  Thank you.  Anything?

 2         Thank you, ma'am.

 3         (Juror exiting bench.)

 4         (Juror approaching bench.)

 5              A JUROR:  I'm Juror 15.

 6              THE COURT:  Yes, sir.

 7              A JUROR:  My brother was arrested and served seven

 8    years for possession and manufacturing of methamphetamine.  My

 9    daughter just got out yesterday for nine months serving for

10    possession of meth and possession of heroin.  And then I had --

11              THE COURT:  Yesterday?

12              A JUROR:  Yesterday.

13              THE COURT:  Wow.

14              A JUROR:  Yeah, which is -- I hope this helped and

15    stuff because before it didn't help at all, but I think that

16    she's got it this time, I hope.

17              THE COURT:  Good.

18              A JUROR:  I've been arrested myself for possession of

19    marijuana, and I'm also a part-time and stuff lobbyist for the

20    total legalization of marijuana and also that if you've been --

21    I'm trying to think the right word.

22              THE COURT:  Convicted?

23              A JUROR:  There you go, convicted.  It's like it

24    should all be expunged.

25              THE COURT:  I see.  Would you describe yourself as a
```

1  marijuana advocate?

2          A JUROR:  Yes, yes, totally advocated.  I think that

3  the whole reason that it was illegal in the first place was from

4  tainted evidence that was -- Bloomberg started it all back, you

5  know, when.  And it's like I feel that it should not be illegal

6  at all.  I feel that it should be legal, even though I've met

7  maybe one percent of the people that it makes crazy, but for the

8  most part it helps.

9          THE COURT:  Did you say Bloomberg?

10         A JUROR:  Yeah.  It's like I believe he was the

11  surgeon general at the time when they gave the report back in

12  the '20s or the '30s.

13         THE COURT:  You're not talking about the former mayor

14  of New York?

15         A JUROR:  No, no, no, prior to that.

16         THE COURT:  I see.  And so do you have such strong

17  feelings that even to the extent that you would not be able to

18  follow the law as I instruct you --

19         A JUROR:  No, sir.

20         THE COURT:  -- with respect to marijuana?

21         A JUROR:  I'm not sure, sir.  I just do not agree with

22  the law whatsoever, the federal law.  I understand that it's

23  still illegal.

24         THE COURT:  Right.

25         A JUROR:  But it's, like, I just can't agree with that

1    law.

2              THE COURT:  I see.  It's fair to not like a law.  It's

3    fair to disagree with a law.  It's fair to lobby against the law

4    or for changes to the law.

5              A JUROR:  Yes, sir.

6              THE COURT:  All of that is perfectly fair.  We as

7    Americans enjoy those rights.  Despite that, if you are on the

8    jury and I instructed you as to what the law required --

9              A JUROR:  Yes, sir.

10             THE COURT:  -- and you believed that the facts are

11   what they have been proven to be, would you have trouble

12   following the law because you disagree with it?

13             A JUROR:  No, sir.

14             THE COURT:  So even if -- is it fair to say that even

15   if you disagree with the law, you would still be able to follow

16   it as I instruct you?

17             A JUROR:  Yes, sir.  I respect the law.  I've served

18   in the military as well, so I have an admiration for the law and

19   respect it.

20             THE COURT:  So would you be able to be fair and

21   impartial to both sides even if you didn't like it?

22             A JUROR:  Yes, sir.

23             THE COURT:  Mr. Mejia, you have any follow-up

24   questions?

25             MR. MEJIA:  No.  Thank you for your honesty, sir.

1           THE COURT:  Ms. McKenzie, any follow-up questions?

2           MS. MCKENZIE:  I just want to make sure I understand.

3    So are you confident that if the Government proved the case

4    beyond a reasonable doubt and there is marijuana involved in

5    this case, even though you believe that it should not be illegal

6    and that individuals should have their records expunged, you

7    could still convict Mr. Brewer of an offense involving marijuana

8    if the proof was there?

9           A JUROR:  I suppose if a gun was involved, that's the

10   one thing that I wouldn't expunge would be -- it's like if they

11   used a gun in any other -- I mean, in any way regarding -- I

12   mean, when a gun comes in, I mean, it's a whole different, you

13   know, thing, but it's like as far as I could -- I can follow the

14   judge's instructions and try to be as fair as I can.

15          THE COURT:  Any follow-up, Mr. Mejia?

16          MR. MEJIA:  No.  Thank you.

17          THE COURT:  Thank you, sir.  I appreciate your

18   honesty.

19          A JUROR:  Thank you.

20     (Juror exiting bench.)

21     (Juror approaching bench.)

22          THE COURT:  Yes, sir.

23          A JUROR:  I'm 13.  Convicted in federal court, Middle

24   District of Alabama, overturned in New Orleans, Fifth Circuit,

25   Fifth Circuit.

1          THE COURT:  And what was the charge?

2          A JUROR:  Conspiracy to defraud the United States

3     Government.

4          THE COURT:  What was the subject of the fraud?  What

5     was the nature of the alleged fraud?

6          A JUROR:  It was 1972.  I was working for a milk

7     distributor.  I was delivering milk to all of the schools in

8     Bullock County, Alabama.  And as we all know, kids don't like

9     milk, so they were throwing out a lot of milk.  This is the way

10    I understand it.  It was going on when I got there, you know,

11    when I started and -- but they were throwing out a lot of milk.

12       So the principal came to my boss man and said, "Will you

13    swap some OJ for some of the milk?"  And so I know we were doing

14    the arithmetic right.  OJ was a little cheaper so, you know, you

15    got more OJ for milk.  It wasn't anything to do with that

16    though.

17       Supposedly this principal was taking that -- that was giving

18    him more and charging out more lunches, which, you know, they

19    were throwing away -- throwing milk away every day, and so --

20         THE COURT:  So did you go to trial?

21         A JUROR:  -- my boss did it out of the goodness of his

22    heart and not out of trying to beat anybody.

23         THE COURT:  So you --

24         A JUROR:  It was a trial, yeah.

25         THE COURT:  And you were convicted at the trial?

1          A JUROR:  Yeah.

2          THE COURT:  Did you serve any time before the

3     conviction was overturned?

4          A JUROR:  No, there was no -- I was on probation

5     for --

6          THE COURT:  I see.  But then the conviction was

7     overturned?

8          A JUROR:  Yeah.

9          THE COURT:  So from that experience did you develop

10    hard feelings towards the Government?

11         A JUROR:  No, no, no, not the Government.  I mean,

12    somebody was a little slick there, but anyway, it was 40 some

13    odd years ago.  I'm over it.

14         THE COURT:  Okay.  All right.  Would you be able to,

15    essentially, set aside that experience and -- if you were on the

16    jury and base your decision solely on the evidence that's

17    presented here in this courtroom and the instruction that I give

18    you on the law?

19         A JUROR:  Yes, sir, for sure.

20         THE COURT:  Would you be fair and impartial to both

21    sides?

22         A JUROR:  Yes.

23         THE COURT:  Ms. McKenzie.

24         MS. MCKENZIE:  No questions.

25         THE COURT:  Mr. Mejia.

1          MR. MEJIA:  As an innocent man convicted in a federal

2   court, do you have any feeling of discomfort, unease, or

3   emotional difficulty if you were selected as a juror in this

4   case?

5          A JUROR:  I don't think I'd have any of that.  The

6   only unease I feel like right now that I have to talk about it,

7   but since it was over -- I mean, over time, I mean, the system

8   worked as far as I'm concerned.  I don't have any ill-will.

9          MR. MEJIA:  Okay.  Were you charged alone or did you

10  have a co-defendant?

11         A JUROR:  No.

12         MR. MEJIA:  You mentioned the principal.

13         A JUROR:  Well, they made a pretty good size case out

14  of it.  The principal had already pled.

15         MR. MEJIA:  I see.

16         A JUROR:  He got a deal.

17         MR. MEJIA:  Okay.

18         A JUROR:  And along with my boss, there was three, I

19  think, lunchroom staff --

20         MR. MEJIA:  Okay.

21         A JUROR:  -- that was charged, and the assistant

22  board -- board of education -- she was the assistant whatever

23  that is, and so there were six or seven charged.

24         MR. MEJIA:  Apart from that case, have you ever been a

25  defendant in any criminal proceeding?

1          A JUROR:  No.

2          MR. MEJIA:  Thank you.

3          THE COURT:  Thank you, sir.

4     (Juror exiting bench.)

5          THE COURT:  That's the person you had mentioned.

6          MS. MCKENZIE:  Yes.

7          THE COURT:  That's why I asked that question.

8     (Juror approaching bench.)

9          A JUROR:  Pretty embarrassing, but 2003, I was going

10    to college, cultivating marijuana, and I was living on my own.

11    A couple of undercover detectives came by and saw me outside,

12    and said they knew what I was doing and let us clean you out,

13    and we'll just write you a citation.  So I didn't go to jail,

14    but I ended up having Bart Adams represent me.  I was over the

15    limit of misdemeanor/felony, so -- it was like seven, which was

16    a felony.

17       They ended up amending it down to a misdemeanor, but I had

18    five years probation, ended up staying clean.  It ended up

19    getting expunged off my record, but it didn't go to like a jury,

20    so I don't know if you-all needed to know that.

21          THE COURT:  You pleaded guilty to the --

22          A JUROR:  Yes.

23          THE COURT:  -- to the misdemeanor?

24          A JUROR:  Correct.

25          THE COURT:  And then later had it expunged?

1          A JUROR:  Yeah, like seven, eight years later.

2          THE COURT:  I see.  So, first of all, thank you for

3     being honest with us.  Let me tell you that I know this is an

4     uncomfortable situation.

5          A JUROR:  Sure.

6          THE COURT:  It's not all that unusual, speaking

7     broadly about all the trials.  We talk to a lot of prospective

8     jurors, and lots of folks have minor criminal infractions like

9     this that we discuss at the bench, so I don't want you to feel

10    like you're singled out.

11         A JUROR:  Okay.

12         THE COURT:  Now, having said that, does anything from

13    that experience sort of harden your views on the criminal

14    justice system, or the police, or enforcement of marijuana laws

15    that would make it difficult for you to be fair and impartial in

16    this case?

17         A JUROR:  I don't -- no, I don't believe so.

18         THE COURT:  So you think you could weigh fairly the

19    testimony that you hear in the case and make your decisions

20    solely on the basis of the evidence you hear in this courtroom

21    and the instruction that I give you on the law?

22         A JUROR:  Yes, sir.

23         THE COURT:  Ms. McKenzie, do you have any follow-up?

24         MS. MCKENZIE:  Was that here in Louisville?

25         A JUROR:  Yes.

 1          MS. MCKENZIE:  Were they Louisville police officers?

 2          A JUROR:  One was named Norbert Straw, Norbert Straw.

 3   This was like 2003.  They were all officers.

 4          MS. MCKENZIE:  Do you feel like that you were treated

 5   fairly by the police officers?

 6          A JUROR:  Yeah, I do, actually, for sure.

 7          THE COURT:  Anything further, Mr. Mejia?

 8          MR. MEJIA:  No, nothing.  Thank you.

 9          THE COURT:  Thank you, sir.

10      (Juror exiting bench.)

11      (Juror approaching bench.)

12          A JUROR:  Juror 44.  My family was a victim of -- my

13   brother and his family were killed by a drunk driver.  There was

14   a criminal case that --

15          THE COURT:  I'm sorry.  I want to make sure I heard

16   that correctly.  Your brother?

17          A JUROR:  And his family, so his fiancée and my niece

18   were killed by a drunk driver.  The criminal case was pleaded

19   down, and we're in the process of finishing a civil case, but

20   it's up in the air right now.

21          THE COURT:  So the civil case is still ongoing?

22          A JUROR:  Yes.  The criminal case is over.  The civil

23   case is --

24          THE COURT:  And where did that happen?

25          A JUROR:  In New Jersey.

1           THE COURT:  First of all, I'm very sorry --

2           A JUROR:  Thank you.

3           THE COURT:  -- to hear of that.  That's a tragedy, an

4    unspeakable tragedy.  I'm very sorry to hear of that, and I'm

5    sorry that you have to recount it here, but I appreciate you

6    doing so.  How would you describe your and your family's views

7    on the way that the criminal case was resolved?

8           A JUROR:  It's not -- we are not thrilled with the

9    idea that it was pleaded out, but it is what it is now.  We

10   can't control that.

11          THE COURT:  Right.  The person responsible pleaded

12   guilty?

13          A JUROR:  Uh-huh.

14          THE COURT:  And have they been sentenced?

15          A JUROR:  Yes.

16          THE COURT:  And what type of sentence did they

17   receive?

18          A JUROR:  Eighteen years.

19          THE COURT:  And did you and your family feel like you

20   were properly consulted?

21          A JUROR:  I mean, the prosecutor listened to my dad,

22   but we don't -- we feel that we didn't like the way that it

23   played out, but we understand that, like, wasn't our decision.

24          THE COURT:  I see.  So I can't imagine the impact that

25   such a tragedy would have on your family.  For our purposes

1    here, what I need to ask you is whether that experience caused

2    you to have hard feelings, to feel very strongly either for or

3    against law enforcement.

4         Now, this is not a case that's about a death or DUI,

5    anything like that, but I want to make sure that you feel like

6    you could be fair.  And, frankly, given the circumstances, I

7    don't know what you must be feeling, but I understand how

8    difficult it must be for you.

9         So my question is just really a simple one:  Do you think

10   that that experience has changed your views or hardened your

11   views in any way on the criminal justice system, or the police,

12   or the process?

13              A JUROR:  No.

14              THE COURT:  Do you think that despite the tragedy that

15   your family has gone through that you can be fair to both sides

16   in this case?

17              A JUROR:  Yes.

18              THE COURT:  And if you were on the jury, could you

19   make your decisions based only on the evidence you hear in this

20   courtroom about this case and the instructions that I give you

21   on the law, setting aside anything that you may have learned

22   during the course of dealing with your difficulty there in

23   New Jersey?

24              A JUROR:  Yes.

25              THE COURT:  Mr. Mejia, do you have any questions?

1        MR. MEJIA:  No doubt does this person who had the plea

2  agreement and who was sentenced had a lawyer.  You've expressed

3  your disappointment and the disappointment of your family with

4  the prosecutor.  Is there any resonant feeling that you have

5  about defense lawyers or defense attorneys, which is my position

6  here in this case?

7        A JUROR:  No.

8        MR. MEJIA:  That was a plea of guilty.  And, of

9  course, as you heard, Mr. Brewer has pleaded not guilty.  If you

10  were chosen as a juror in this case, do you think you could be

11  fair and impartial to both sides and render a verdict based upon

12  the facts, and evidence, and the law as the judge gives it to

13  you?

14        THE DEFENDANT:  Yes.

15        MR. MEJIA:  I too am sorry for your loss.

16        A JUROR:  Thank you.

17        THE COURT:  Anything further, Ms. McKenzie?

18        MS. MCKENZIE:  I'm sorry.

19        THE COURT:  Thank you.

20        A JUROR:  Thank you.

21  (Juror exiting bench.)

22  (Juror approaching bench.)

23        THE COURT:  You're fine.  You're fine.

24        A JUROR:  My number is 33.

25        THE COURT:  Yes, ma'am.

1      A JUROR:  I was hoping I could leave this part of my

2  past.  About five years ago, I had been charged with a

3  misdemeanor possession of marijuana and drug paraphernalia, a

4  pack of rolling papers.  When they came in, I gave them consent

5  to search my house and all that stuff.  They found a little box

6  that I kept everything in and put up, but all that was there was

7  a pack of papers and then some dust in the bottom of it.  It was

8  just enough to pop the charge of possession.  That was five

9  years ago.

10      I did two days, two years probation, supervised probation,

11  and been clean and, actually, it was the one thing that

12  straightened me out.  So in a way, I was grateful for it and in

13  another way, you know, I was, like, "Man, my clean record is no

14  longer clean," so -- but other than that, my husband has some

15  child support issues, like a decade ago, and a speeding ticket.

16  Other than that, everything's pretty much clear.

17      THE COURT:  First of all, thank you for your honesty.

18  I've said this to other folks.  It's very important to us and so

19  we're grateful.  We know it's difficult.

20      A JUROR:  Well, my dad raised me, you know, if you

21  don't learn from your mistakes, you're doomed to repeat them.

22      THE COURT:  Right.

23      A JUROR:  So I've kind of lived by that, you know.

24  And then I've now drilled in my kids -- I got teenagers, you

25  know, so I'm like, "Y'all watched what I went through.  Right?

1    So let's not do this again."

2           THE COURT:  Understand.  So is there anything from

3    that experience that you went through that would have hardened

4    your views about the criminal justice system?

5           A JUROR:  Actually, no, it kind of softened it really

6    in a way a little bit, because I didn't understand it.  You

7    know, I had never been in it, had never been in trouble, didn't

8    know exactly how things worked, but once I had been through it

9    and seen the process, kind of understood it a little more.

10      I became more open-minded about the -- you know, the

11   judicial system after that, when before I was pretty

12   close-minded about it.  So after I went through it, I was like,

13   "All right.  It's not as bad as everybody played it off to be."

14   And it was more fair than what, you know, my grandfather had

15   drilled into us from like 50 years ago so --

16          THE COURT:  Okay.  I'm sorry.  Remind me your number

17   again.

18          A JUROR:  Thirty-three.

19          THE COURT:  Thirty-three.  So have you developed any

20   strong feelings about the enforcement of marijuana laws that

21   would make it difficult for you to be fair in this case?

22          A JUROR:  No.

23          THE COURT:  So could you be fair to both sides?

24          A JUROR:  Oh, yeah, definitely.

25          THE COURT:  And could you base your decision here

1    solely on the evidence that is received in this courtroom and

2    the instructions that I give on the law, putting aside your

3    prior experience?

4         A JUROR:  Yeah.

5         THE COURT:  Mr. Mejia, any follow-up?

6         MR. MEJIA:  No.  Thank you very much.

7         THE COURT:  Ms. McKenzie, any follow-up?

8         MS. MCKENZIE:  I'm just guessing that was not in

9    Jefferson County.

10        A JUROR:  No, it was in Meade.

11        MS. MCKENZIE:  Okay.  Was there anything about the way

12   -- dealing with the police officers that left a bad taste in

13   your mouth?

14        A JUROR:  Actually, no.  I became really good friends

15   with them when they came to my house.

16        MS. MCKENZIE:  Okay.

17        A JUROR:  A matter of fact, I haven't spoken to him in

18   a couple of months, but, yeah, we see each other and talk.  You

19   know, actually, I talked the other day.  You know, I met a new

20   friend in the process, because not only did he save me and my

21   family when he came in and did what he did, you know, I'd

22   probably still be doing the same thing if it wasn't for that.

23   So in a way I got to be grateful for the experience.  I just

24   like to leave it in my past.

25        MS. MCKENZIE:  Sure.  I understand.

1          THE COURT:  We understand.  Thank you for your candor.

2          A JUROR:  Thank you.

3          MR. MEJIA:  Thank you.

4      (Juror exiting bench.)

5      (Juror approaching bench.)

6          THE COURT:  Yes, sir.

7          A JUROR:  Number 86.  I have two cases for you.  One

8   is my grandson was involved in one of the church scandals with

9   the priests and the molestation that -- and the other case is my

10  employee, a good friend of mine, his son was murdered and so

11  those are the two cases.  I don't know if they made a difference

12  to you or not.

13         THE COURT:  So your grandson, did he have to testify

14  in any proceeding?

15         A JUROR:  No, sir, he did not.

16         THE COURT:  Were you and the rest of your family

17  involved in any sort of proceeding to obtain compensation for

18  what he had to go through?

19         A JUROR:  My son was and I was talking to my son and

20  helped him advise through a sounding board for him as far as

21  what he wanted to do, so that was my only participation in that.

22         THE COURT:  I see.  And where did that happen?

23         A JUROR:  I think at St. Martha's.

24         THE COURT:  Well, I meant here in Louisville?

25         A JUROR:  Here in Louisville, yes, sir.

1          THE COURT:  I see.  And is your grandson okay now?

2          A JUROR:  Yes, sir -- well, he's doing okay.  He needs

3    therapy, which we're struggling with.

4          THE COURT:  Yes, yes.  Well, I'm sorry to hear about

5    that.  That's a terrible thing, your grandson being a victim

6    like that, and so I apologize that you've had to come up and

7    talk about that.  We wish we could avoid difficult subjects.

8          A JUROR:  Right.

9          THE COURT:  Now, as a result of your family's

10   difficulties and your friend's difficulties, have either of

11   those experiences caused you to develop strong feelings one way

12   or the other about the criminal justice system that would make

13   it difficult for you to be fair and impartial?

14         A JUROR:  No, sir.

15         THE COURT:  Any follow-up questions?

16         MS. MCKENZIE:  In either of those situations was there

17   someone who was prosecuted criminally --

18         A JUROR:  Yes.

19         MS. MCKENZIE:  -- as a result of that?

20         A JUROR:  In both cases.

21         MS. MCKENZIE:  Were you or your family -- did you go

22   to court to follow the criminal case or did you interact with

23   prosecutors on the case?

24         A JUROR:  Did not.

25         MS. MCKENZIE:  Did it leave you with any opinions or a

 1    bad taste in your mouth about prosecutors in general or the

 2    process of getting cases through the court system?

 3              A JUROR:  No.

 4              THE COURT:  Anything further, Mr. Mejia?

 5              MR. MEJIA:  Nothing.  Thank you very much, sir.

 6              THE COURT:  Thank you, sir.

 7         (Juror exiting bench.)

 8         (End of bench conference.)

 9              THE COURT:  Anyone else with a response to that

10    particular question?  No one else.  Thank you.

11         The next question is have you, or anyone in your immediate

12    family, or a close friend ever been involved in a lawsuit or

13    other dispute against any government agency?  And we're asking

14    in particular about the Bureau of Alcohol, Tobacco, Firearms &

15    Explosives or the Louisville Metro Police Department.

16              A JUROR:  Ninety-five again.  We've already talked

17    about --

18              THE COURT:  You've already mentioned it to us?  Thank

19    you, ma'am.

20         Anyone else?  This is a civil dispute.  We're not talking

21    about criminal cases any further now.  We've already talked

22    about that.  Have you, anyone in your immediate family, or a

23    close friend ever been involved in a lawsuit or other dispute

24    against any government agency, particularly the Bureau of

25    Alcohol, Tobacco, Firearms & Explosives or the Louisville Metro

1    Police Department?

2          COURT SECURITY OFFICER:  She would like to approach,

3    Your Honor.

4          THE COURT:  That'd be fine.

5       (Bench conference on the record outside the hearing of the

6    jury.)

7          A JUROR:  Hello.  Forty-two, 42.

8          MR. MEJIA:  Thank you.

9          A JUROR:  My family owns a sporting goods and a gun

10   store, and a couple of years ago there was an audit.  And I

11   believe that they had to go to court and dispute some things

12   that came up in the audit, but I think it was -- I think it was

13   settled before -- I mean, no one was in trouble from it.

14         THE COURT:  Right.  So it was an audit of a -- did you

15   say a gun store?

16         A JUROR:  Yes, so the NICs forms that they have to

17   fill out when people purchase firearms.  And so there was an

18   audit done, and I think that there was some issue with records.

19   And so the license transferred then from my grandfather to my

20   father, and I think that was the decision that they settled on.

21         THE COURT:  I see.  Anything -- well, first, let me

22   ask you this:  Was the audit conducted by the Bureau of Alcohol,

23   Tobacco & Firearms?

24         A JUROR:  Yes.

25         THE COURT:  And that's their civil regulatory side of

1    their agency?

2            A JUROR:  Yes.

3            THE COURT:  And so your father and grandfather have

4    had dealings with them in the past; is that right?

5            A JUROR:  Yes.  So it was just a routine thing, but

6    then there were issues that came up that they had to deal with

7    so --

8            THE COURT:  I see.  And as a result of your family's

9    experience in the gun business, which is regulated by ATF, have

10   you developed any strong feelings one way or the other about

11   ATF?

12           A JUROR:  You mean just the --

13           THE COURT:  Positive or negative.

14           A JUROR:  -- the entity?

15           THE COURT:  Yes.

16           A JUROR:  Oh, no, I think it's a fantastic service.  I

17   believe in it completely.

18           THE COURT:  So if you hear testimony from an ATF agent

19   or about the ATF, would you be able to be fair and weigh that

20   fair to both sides, whatever evidence there is about ATF --

21           A JUROR:  Yes.

22           THE COURT:  -- in this case?

23           A JUROR:  Yes.

24           THE COURT:  And you've heard me ask you this.  I

25   probably asked you this earlier.  Can you make your decision

 1    solely on the evidence you hear in this courtroom and the

 2    instructions that I give you on the law?

 3                A JUROR:  Yes.

 4                THE COURT:  Any follow-up, Ms. McKenzie?

 5                MS. MCKENZIE:  No.

 6                THE COURT:  Mr. Mejia?

 7                MR. MEJIA:  Thank you.

 8                THE COURT:  Thank you.

 9                A JUROR:  Thanks.

10         (End of bench conference.)

11                THE COURT:  Anyone else with a response to that

12    question?  No.

13         We'll move to the next question.  Do any of you hold such

14    strong views about drugs or drug law enforcement that you feel

15    that you could not be impartial in a case involving allegations

16    of illegal drugs?

17         Yes, ma'am.

18                COURT SECURITY OFFICER:  She'd like to approach.

19         (Bench conference on the record outside the hearing of the

20    jury.)

21                A JUROR:  Number 49.  I think you know.

22                THE COURT:  Let's wait on Mr. Mejia.

23         Anything to add from what we discussed in your prior visits?

24                A JUROR:  No, other than --

25                THE COURT:  Any follow-up, Mr. Mejia?

1          MR. MEJIA:  Nothing.  Thank you very much, ma'am.

2          MS. MCKENZIE:  No.

3          THE COURT:  Thank you

4     (End of bench conference.)

5          THE COURT:  Anyone else with a response to that

6     question?

7       Is there any member of the jury pool -- that's you-all --

8     who has any disability or problem that would make serving as a

9     member of this jury difficult or impossible?  For example, does

10    anyone here have any difficulty hearing, seeing, or sitting for

11    long periods of time?

12      And if you've already responded to that question during a

13    prior visit to the bench, we've made a note of that.  You won't

14    need to repeat yourself, but if there's anyone else who has not

15    made us aware of a disability or problem that would make serving

16    as a member of this jury difficult or impossible, now would be

17    an opportunity.  You're welcome to approach, if you would like,

18    or --

19          A JUROR:  Number 83.

20          THE COURT:  Yes, sir.

21          A JUROR:  Sir, I have a 50 percent hearing loss in

22    both ears with tinnitus, and I do have difficulty hearing.

23          THE COURT:  And I appreciate you letting us know that.

24    Can you hear me okay?

25          A JUROR:  Yes, sir.

1          THE COURT:  The sound in this courtroom, although it

2     is, as I said earlier, an old courtroom, it has been

3     appropriately updated through the years, and we also have the

4     ability to enhance further the sound.  Would that relieve any

5     concern that you would have about being able to hear properly

6     during a trial?

7          A JUROR:  I can hear fine in here, sir.  It's nice and

8     quiet.

9          THE COURT:  Thank you very much.

10     Anyone else?  Thank you.

11     We are very near the end of our questions and very near our

12     lunch break, albeit a late one.

13     If I could see the lawyers at the bench for just a minute.

14     If you need to stand and stretch or -- I'll ask you to just

15     stay in place -- you're welcome to do that now over the next

16     couple of minutes.

17     (Bench conference on the record outside the hearing of the

18     jury.)

19          THE COURT:  Any follow-up questions/concerns that you

20     need to address while we have the pool assembled?  I am now

21     through all of the prepared questions I have, save for the

22     general, standard wrap-up question.

23          MS. MCKENZIE:  I think you've covered it.

24          MR. MEJIA:  The defendant is African-American.  I did

25     pose a question -- there are many ways to ask it.  Obviously, is

 1   there anybody here who has any problem, difficulty, or hesitancy

 2   about being fair to anyone notwithstanding their race?

 3      We have one prospective black male in the venire.  It

 4   appears we have five or six females, but I think it's just

 5   something that should be said.  I don't think anyone's going to

 6   raise their hand and say "I'm a racist," but I think the

 7   sensitivity on the question of race and the criminal justice

 8   system that we have in America with regard to issues of race

 9   compel the court or the defense to say something about it in

10   some way.  "Is there anybody here who had any feelings about

11   race in a criminal justice system?" or "That the defendant is

12   African-American that would in any way impair your ability to be

13   fair?"

14          MS. MCKENZIE:  I hesitate to state a position on that.

15   I understand where the question comes from, and I think it is --

16   I can understand wanting to elicit responses on the topic.

17   Sometimes, in my experience, I worry about injecting an issue

18   into the juror's minds that may not already be there.

19          THE COURT:  I'm not going to ask the question.  I will

20   make the following couple of observations:  First of all, I am

21   extremely sensitive to matters of race, and that is something

22   that if I thought for one second, one second that any member of

23   this jury pool would hear -- and we interacted -- over the last

24   three plus hours, we've interacted with almost everyone on this

25   jury pool, not quite everyone, but almost.  If I thought for one

1    second that anyone had responded in a way that suggested racial

2    bias, that is something that I would have followed up directly

3    on myself and would have invited you-all to follow up on as

4    well.  I did not see that with any of the responses that we

5    received.

6        And I am very concerned that such a question could be

7    structured in a fair and straightforward way when I -- as I

8    said, I have not seen any racial animus displayed here by any

9    member of the jury pool that's responded thus far, so I don't

10   think that that is an appropriate question to ask under these

11   circumstances.

12        MR. MEJIA:  Just so the record is clear, it hasn't

13   been mentioned that this is a street encounter between police

14   officers and a black motorist.  Some people have issues with

15   that.  Some people have concerns about that, and it is an issue

16   in America today.  That's the reason I raise it, Judge.

17        I mean, who knows who might be there saying, "Gee, had I

18   known that, I might have responded to something," because nobody

19   in the courtroom yet knows of the nature of the stop and the

20   interaction with police and Mr. Brewer.

21        THE COURT:  No, they only know the very basics about

22   the case.  But the one thing that I feel confident that everyone

23   in this courtroom has heard repeatedly is, you know, they are

24   required -- if they are on the jury, they are required to base

25   their decision solely on the evidence and on my instructions on

 1   the law.  And there are folks that have difficulties with that.

 2   We've identified them and I'm sure we'll discuss them here

 3   shortly, but I am confident that the jury instructions will

 4   properly instruct our ultimate jury on their obligations.  And

 5   I've seen nothing throughout this voir dire process to suggest

 6   to me that we have a problem on this jury pool.

 7             MR. MEJIA:  I have nothing else then.  Thank you very

 8   much.

 9             THE COURT:  All right.

10        (End of bench conference.)

11             THE COURT:  That brings us then to our final question.

12   Having heard the questions put to you by this court, can you

13   think of any other reason why you could not sit on this jury and

14   render a fair verdict based on the evidence presented to you and

15   in the context of the court's instructions to you on the law?

16        I'll read that one more time and let you think about it.

17   Having now heard all of the questions put to you by the court,

18   can you think of any other reason why you could not sit on this

19   jury and render a fair verdict based on the evidence presented

20   to you in this courtroom and in the context of the court's

21   instructions to you on the law?

22        Any other reason occur to you as to why you could not be

23   fair to the defendant or why you could not be fair to the

24   Government?  Any reason occur to you as to why you could not be

25   a fair and impartial juror?  I see no responses.

1     So, now, at this point I am going to give you a break, an

2  opportunity to get some lunch, and our goal will be to have you

3  back here at 2:30.  That's 40 minutes from now.  And at that

4  time, we hope -- or within a few minutes of that time we hope to

5  then select the 13 members who will serve as the trial jurors.

6     (Jury out 1:51 p.m.)

7          THE COURT:  The jury pool is now out of the courtroom.

8  How much time, Ms. McKenzie, Mr. Mejia, do you need to confer

9  regarding potential motions for cause?

10         MS. MCKENZIE:  We may be able to agree on some of

11  them.

12         THE COURT:  What I would appreciate is if you-all

13  could come up with a list on which you agree first and then a

14  list on those that each side -- a list of those for each side

15  for which there is not an agreement, and then we'll deal first

16  with the ones on which you agree.  Then I'll take up the ones

17  about which you disagree.  And then once we've removed those

18  from the list, Natalie can give you the form for you to make

19  your peremptories.

20     As I mentioned to you in the pretrial conference last week,

21  I will ask you, once you have made your peremptories, to show

22  your list to each other, so that if there are any Batson

23  challenges or other objections to be made at that point, they

24  can be made on informed basis, and then we will narrow that down

25  even more.

 1        We're starting off -- am I correct, we're starting off with

 2   51?

 3             DEPUTY CLERK:  Yes, Judge.

 4             THE COURT:  Keep the math in mind as you discuss your

 5   agreed upon strikes for cause.  I'll give you-all -- is five

 6   minutes enough time, you think?

 7             MR. MEJIA:  Yes.

 8             MS. MCKENZIE:  That's fine.

 9             THE COURT:  I'll give you-all about five minutes then.

10        (Recess at 1:54 p.m. until 2:09 p.m.  Jury out.)

11             THE COURT:  Let's go over the list.  So this list that

12   you-all provided me, there are two categories.  You agree on

13   eight jurors to be removed for cause; is that correct?

14             MR. MEJIA:  Yes, sir.

15             MS. MCKENZIE:  Yes.

16             THE COURT:  And then there's one on which you-all have

17   a disagreement; is that right?

18             MS. MCKENZIE:  Yes.

19             MR. MEJIA:  Yes, sir.

20             THE COURT:  All right.  Let's take up the eight

21   beginning with Number 13.  This is the -- Juror Number 13 is the

22   fellow who told us he was in the greenhouse business and

23   indicated that serving on the jury would cause a hardship

24   because his one and only employee will be out.  Is that correct?

25             MR. MEJIA:  Yes, sir.

1          THE COURT:  I would agree that he should be excused,

2    so we will excuse Number 13.

3       The next one on your list is 15.  This is the person who

4    said that he was a marijuana lobbyist and indicated some

5    hesitation with being able to be fair with respect to the

6    marijuana laws.

7          MR. MEJIA:  That's correct.

8          THE COURT:  And you-all have agreed.

9          MS. MCKENZIE:  Yes.

10          THE COURT:  That he be excused.  I also agree, given

11   his responses.

12      The next one on the list is 49, and we spoke with this

13   person on numerous occasions.  She described herself as not

14   being impartial regarding drugs and described losing a

15   granddaughter to an overdose, and so I agree that she is an

16   appropriate candidate to be excused for cause.

17      The next one on the list is 64, and this juror indicated

18   that she recognized folks here in the courtroom that she goes to

19   church with.  That's what I have in my notes.  Anything else?

20          MR. MEJIA:  And that she felt very uncomfortable in

21   the position of being a prospective juror because of that.

22          THE COURT:  I think she's an appropriate candidate to

23   be excused, given that discomfort, so we will excuse Number 64.

24      Then Number 86 is next on your list.  This is a person that

25   we also spoke with on several occasions during the course of the

1    questioning.  He described himself as being in the real estate

2    business and indicated that he -- I put in quotes in my notes

3    "lost property to drugs," and you-all agree that he is an

4    appropriate candidate to be excused for cause; is that correct?

5              MR. MEJIA:  Yes, sir.

6              THE COURT:  I agree.  We'll excuse Number 86.

7         Next is Number 94.  This is the person who told us that she

8    is a marijuana user and was concerned about her ability to be

9    fair.  I think, while I found her candor to be refreshing and

10   she was straightforward and honest, I can understand why the

11   parties would agree under these circumstances here to excuse her

12   for cause, so I will do so.

13        Ninety-five is the next on the list.  She has a job

14   condition -- or a job situation that she is concerned about.

15   She also indicated she has a medical condition and takes pain

16   pills for that.  She said she's only able to work part-time

17   because of her medical condition, and she was concerned about

18   her ability to pay attention, to be an attentive juror.

19        She also described being friends with a police officer who

20   attends her church.  I believe she also described some negative

21   interactions with police.  For all of those reasons -- and any

22   others that I need to mention for the record that you-all

23   discussed?

24             MR. MEJIA:  No, I think Your Honor's covered it.

25             THE COURT:  -- we will excuse her for cause.

1      Ninety-six, I believe this was the young man who indicated

2   that he was roommates with someone who was cited for marijuana

3   possession.  And he described that situation as not being fair

4   and indicated his concern that he could not be impartial in this

5   case, given the issues here, so I think that's an appropriate

6   person to excuse for cause.

7      That's covered everyone on the list that you-all have agreed

8   to.  I have a couple others I want to ask you about.  And we can

9   also take up the one -- that's Number 21, and I suppose -- who

10  is -- who is going to move for --

11      MR. MEJIA:  I am moving for cause on Number 21.  And

12  I've just seen and I just conferred with the prosecution on

13  Number 98 as well.

14      But, meanwhile, on Number 21, I move for cause and the

15  Kentucky Supreme Court has been very active on this issue.  And

16  I don't know whether they filtered up to the federal court yet,

17  but Number 21 expressed that she would favor police.  And based

18  upon her son being a Louisville Metro Police Department officer

19  and based upon other experiences, she tentatively, when asked if

20  she could be fair, responded "I can try."  She also answered, "I

21  don't know.  I think I can."  At least I'm paraphrasing her

22  words.

23      And I believe this was a juror that I said, "We need to know

24  now, if you could be more clear, on whether you could put aside

25  whatever hesitancies you have or discussions you've had on

1  police officer's interdictions, arrests, prosecution in this

2  area."  And her tentative responses just, I think, made it so

3  that she didn't definitively say that she could be fair and

4  impartial.  I know Your Honor did get some positive answers from

5  her, but overall I found her to be too tentative to escape a

6  strike for cause.

7      And then I just brought this up to Ms. McKenzie.  Number 98

8  too --

9          THE COURT:  Let's talk about 21 and then we'll move on

10  to 98.

11          MR. MEJIA:  Okay.

12          THE COURT:  I don't recall her exchange in quite that

13  way.  What I noted is that Juror 21 has a son-in-law who is an

14  LMPD detective in the narcotics area.  Is that correct?  Is that

15  consistent with your-all's --

16          MR. MEJIA:  That what I have too, yes.

17          MS. MCKENZIE:  My notes were also to that --

18          THE COURT:  Ma'am, are you with them?

19          MS. MILLER:  Yes.

20          THE COURT:  Okay.

21          MS. MCKENZIE:  Sorry.

22          THE COURT:  That's all right.

23          MS. MCKENZIE:  She said that --

24          THE COURT:  I didn't recognize you as a juror, so --

25  but I was concerned that you might have come in and.

1          MS. MILLER:  No, I'm with them.  Sorry.

2          THE COURT:  That's all right.  Go ahead.

3          MS. MCKENZIE:  She stated that they do not talk about

4    his work much, that he's been with LMPD for six years.  I don't

5    have a lot of notes on her.  I did note that she said she can

6    follow the court's instructions.

7        I do think that -- and I don't recall specific jurors, but I

8    think sometimes, depending on how the idea first gets pitched

9    out to the juror, if the first question we ask them is sort of

10   in the abstract -- "Would you be more inclined to believe a

11   police officer because you are familiar with a police officers?"

12   -- I think a lot of people are inclined to say, "Well, sure."

13      Then when the court drills down on that concept and

14   specifies that, you know, in this court you have to set aside

15   your personal experience and you have to follow the court's

16   instructions, including evaluating each witness, then I think

17   this juror seemed fairly comfortable with that concept.  So I

18   don't know that she made any statements that are necessarily

19   disqualifying.

20          THE COURT:  Well, I'm going to grant the motion and

21   excuse 21 for cause.  I thought she handled herself very well.

22   I thought she was poised and gave good answers, but at the end

23   of the day, her son-in-law is an LMPD narcotics detective, and

24   this is a case that has been investigated by detectives with

25   LMPD.  And I just think that the appropriate thing here is to

1    relieve her of that uncomfortable position as a juror, so I will

2    grant that motion.  We will excuse 21 for cause.

3        Now, you mentioned that you might have something on Number

4    98; is that correct?

5            MR. MEJIA:  I do and I don't know whether the

6    Government would agree, but on Number 98, he seemed to express

7    some palpable distraction based upon work, based upon something

8    tomorrow.  He did apologize.  He said, "Any other time, of

9    course, I would stay.  I would be here.  I would attend, but

10   it's just that I have this work obligation tomorrow."  And I've

11   written tomorrow twice on there.

12       This was the man who transported inmates from the Luther

13   Luckett, Roederer, and KSR, but that's just what my note is

14   there.  And, clearly, somebody who is because of employment

15   taken to the point of distractions and expresses this, I

16   believe, it's cause for concern.

17           THE COURT:  What's your view there, Ms. McKenzie?

18           MS. MCKENZIE:  I am less concerned about his

19   employment situation relative to any of the other jurors.  I'm

20   inclined to not oppose the motion simply because he did say that

21   he recalled being in state court when both Mr. Mejia and I have

22   argued cases.

23       He doesn't remember specifics, but my concern there would be

24   that, you know, he doesn't remember specifics today, but after

25   spending a couple of days listening to both of us talk, and

1    fight, and squawk, that maybe that triggers additional

2    recollections of either positive or negative impressions that he

3    may have had about either one of us from that prior employment,

4    so I don't necessarily -- I don't oppose the motion.

5              THE COURT:  Well, I made note of his work schedule and

6    you're correct.  I had the same impression.  He was apologetic

7    for that.  He also indicated some familiarity with both counsel,

8    so it's probably -- the safest thing is to grant that motion and

9    excuse him for cause.

10        That gives us now the ten -- is that ten that we've excused

11   for cause?

12             DEPUTY CLERK:  Yes.

13             THE COURT:  So we're down to 41 and we have a total of

14   18 peremptories, so we have a little bit of wiggle room left.

15        There were a couple of folks who expressed some concern

16   about their ability to serve given health conditions.  Have

17   you-all discussed those folks?  There's one fellow -- I'm having

18   trouble in my notes here putting two and two together, but there

19   was one fellow -- big tall fellow.  I believe he was wearing

20   overalls and had a beard -- who indicated very serious concerns

21   about his back condition.  Do you-all remember that fellow?

22             MS. MCKENZIE:  I do.

23             MS. TABLER:  Number 97.

24             THE COURT:  I'm sorry?

25             MS. TABLER:  Ninety-seven.

1          THE COURT:  Yes, there you go.

2          MR. MEJIA:  I'd agree for cause on him.

3          MS. MCKENZIE:  I also agree.

4          THE COURT:  Then we will strike 97 for cause.  That

5     gets us to 40.

6        I believe 51 is somebody who has also indicated a medical

7     condition that gives him some pause, but I did not get the

8     impression that his -- the description he gave was quite as

9     serious.  Any thoughts on him?

10         MR. MEJIA:  My notes indicate that he has gout.  He

11    can't sit.  He may suffer a blood clot.  Your Honor informed him

12    that he could stand.  And beyond that -- I mean, he did come

13    forward early to express those concerns.  I don't know to

14    whatever extent or degree that is a potential, but I don't --

15    I'll defer to the Government on this.

16         THE COURT:  Any thoughts on whether we ought to

17    include him or exclude him?  I don't feel strongly about it

18    because he did seem somewhat relieved when I told him that we

19    would break with some frequency, that if he felt the need, he

20    was welcome to stand.

21        And, of course, my practice is -- I don't put it in the

22    formal written preliminary instructions, but I'll tell the jury,

23    if you need a break, raise your hand and we'll take a break.

24    That would certainly be the case here.  So I think maybe we'll

25    leave him in.

1      Another person that I had on my list to ask you-all about

2  is -- well, a couple.  Let's see here.  Number 57, this was the

3  recently retired U of L med school assistant.  She has a dentist

4  appointment upcoming.  She also expressed some concern about

5  serving on the jury because English is her second language,

6  although my observation of her was that she was very

7  intelligent, very well-spoken.  She did not have any trouble

8  understanding anything that was said through that point in the

9  voir dire process.

10     In fact, I think, Mr. Mejia, you asked her directly if she

11  had understood my questions and my instructions, and she had

12  said that she did.  But she raised it, so I think it is

13  incumbent upon us to at least discuss whether we ought to act on

14  her concerns.  Perhaps the more practical issue was she

15  indicated she has a dentist appointment.

16         MR. MEJIA:  Having come from a bilingual community, my

17  observation was the same as yours.  She was simply extremely

18  informative and very intelligent and, I think, maybe even self-

19  deprecating in her lack of English.  I thought her English was

20  great.

21         THE COURT:  I thought it was outstanding and she

22  described her work at the University of Louisville Medical

23  School.  It was not a job without some measure of

24  responsibility.  She obviously performed well.  She retired from

25  there after some lengthy career.

1    So I do not have any concerns about her ability to serve as

2    a juror, but she -- the first thing she said was, "I have a

3    dentist appointment."  So I'm not crazy about appointments

4    getting in the way of jury service.  Most of them can be

5    rescheduled, so I could go either way here.

6      As you-all have seen, we have jury pool members who say they

7    have an appointment with a specialist that takes months to get

8    in to see.  That's a little different.  Your dentist can usually

9    work you in.  So how does each side feel about Juror Number 57?

10           MR. MEJIA:  I think that she is not a cause juror and

11   I see no reason to excuse her.

12           MS. MCKENZIE:  I think the language issue is not a

13   reason to excuse her.  If the court wants to excuse her for

14   hardship for the dental appointment, I'm fine with that.

15           THE COURT:  As I said, I think if she had said she was

16   having a procedure, if she had said she was seeing a specialist

17   and it was very difficult to reschedule, that would be

18   different, but a routine dentist appointment, I think, can more

19   easily be rescheduled.  So if she does end up on the jury pool,

20   I don't think that's too much of a hardship to overcome, so

21   we'll leave her.

22      Now, another -- a note I made myself is to raise with you

23   Juror Number 56.  This is the physician at Baptist East who is

24   familiar with my wife, who is a nurse at Baptist and has been

25   there for many years.  I don't know Juror Number -- I'm sorry --

1   56.  I don't know Juror Number 56 myself, but I wanted to

2   underscore that and make sure that you-all did not have any

3   concerns you wanted to address with me.

4            MR. MEJIA:  No, I have no concern with Number 56 at

5   all.

6            MS. MCKENZIE:  No.

7            THE COURT:  Let's see.  I believe that's all that I

8   had in terms of concerns for scheduling issues.

9       Okay.  I did have one other note.  Number 89, did we talk

10  about 89?

11           MR. MEJIA:  We have not.

12           THE COURT:  I have a number of notes there, none of

13  which are dispositive on whether 89 is a candidate for cause,

14  but I left a note for myself to raise 89's response with

15  you-all.  So what do your notes say and is Juror Number 89 one

16  we should talk about in this cause context?

17           MR. MEJIA:  She did mention some family experience in

18  relation to drug cases.  She did mention she was a teacher.  You

19  did ask her a litany of questions about her ability to be fair

20  and impartial, about putting aside any other extraneous

21  experiences, and I thought that she was -- after being equivocal

22  was fairly straightforward in saying that she believed she could

23  be fair, she would follow the law, she would decide this case

24  only upon the evidence in this courtroom.  And while I had a

25  hesitancy about her at first, that was allayed by Your Honor's

1    colloquy with her.

2            MS. MCKENZIE:  I would agree.  I think after the

3    follow-up questions, she was confident that she could follow the

4    court's rules, presume the defendant innocent, and decide the

5    case based only on the evidence.

6            THE COURT:  Good.  We'll leave her in the pool.  Let's

7    see, that means we have removed 13, 15, 49, 64, 86, 94, 95, 96,

8    97, 98, and 21.  That's 11.  That means we have a remaining jury

9    pool of 40.  So that is plenty of margin, even if all 18 of the

10   peremptories are exercised independent of one another.  Is my

11   math correct?

12           MR. MEJIA:  We have not exchanged peremptories.  I

13   think you'd asked us to do that.

14           THE COURT:  No, no, not yet.  I'm just talking about

15   the remaining list, after we remove the for cause excuses, that

16   leaves 40; correct?

17       And so you can now give them a list.

18           DEPUTY CLERK:  Yes, I'll have to --

19           THE COURT:  Natalie will then give you a list with the

20   remaining 40.

21           MR. MEJIA:  Okay.

22           THE COURT:  And then you will be able to exercise your

23   peremptories, seven and 11.  I would ask you, once you have

24   marked your form, to please show each other and that way we can

25   take up any Batson challenges or other objections that need to

1    be raised.

2         If you need a few minutes, I can leave the courtroom.

3              MR. MEJIA:  I think it's going to take about five, six

4    minutes.

5              THE COURT:  It will take Natalie about five minutes to

6    prepare the form, so I'll give you ten minutes.

7         (Recess at 2:35 p.m. until 2:54 p.m.  Jury out.)

8              THE COURT:  Has each side had a chance to make their

9    strikes?

10             MR. MEJIA:  Yes, sir.

11             THE COURT:  And were you-all able to show each other

12   the lists yet?

13             MR. MEJIA:  Yes, sir, we have.

14             THE COURT:  Do we have any challenges or any

15   objections we need to take up at this point?

16             MR. MEJIA:  Not from this side, Judge.

17             MS. MCKENZIE:  Not from the U.S.

18             THE COURT:  Do you need another minute or two?

19             DEPUTY CLERK:  Let me just count these real quick,

20   Judge, and I should be ready.

21             THE COURT:  This has, obviously, taken us a little

22   longer than I had intended.  It won't take much longer now that

23   we're nearly done.  When the jury pool comes in and we make the

24   random selection of the 13, I'll give them at that point the

25   preliminary instructions.  Will you-all be ready to go directly

1  to opening statements?

2         MR. MEJIA:  Yes, sir.

3         THE COURT:  My preference would be to go ahead and go

4  straight to that, since they've had this break.  If you-all need

5  five minutes to organize, that's fine, but otherwise we'll do

6  that.  That may only take us to about 3:45.  Are you going to be

7  able to put a witness on the stand?

8         MS. MCKENZIE:  Yeah.

9         THE COURT:  Good.

10        MS. MCKENZIE:  I had two.  I can't really switch the

11  order of them, and the second witness needs to be out of here by

12  4:30 to pick up a child.  So if it is okay with the court, I

13  probably will only put on the first witness.

14        THE COURT:  My guess is that's as far as we would get.

15        MR. MEJIA:  I have no objection.

16        THE COURT:  I'm not going to keep the -- I'm not going

17  to keep the jury here late on the very first day.  This process

18  is tiring enough as it is.

19        MR. MEJIA:  I have no objection to it, to that

20  schedule.

21        MS. MCKENZIE:  I'll go tell them.

22        DEPUTY CLERK:  You want to see the list?

23        THE COURT:  Yes.

24     All right.  I have been provided with the jury list that

25  shows the -- Ms. McKenzie, I'm going to need you.  I have been

1   provided with the jury list that shows the -- each side's

2   peremptory challenges, and I want to make sure that my

3   understanding is correct.  You-all showed each side -- I'm

4   sorry -- each other your challenges; is that correct?

5        MR. MEJIA:  Yes, sir.

6        THE COURT:  And does the defense have any motions to

7   raise at this time?

8        MR. MEJIA:  Not at this time.  I see no Batson issue

9   in front of me, so nothing.

10       THE COURT:  Very well.  Then I believe we have 24

11  jurors who have not been excused or stricken for cause, nor the

12  subject of a peremptory challenge, so we have 24 from which the

13  13 will be randomly selected.

14     Any objections to the venire pool or the voir dire process

15  at this point that have not otherwise been made?

16       MR. MEJIA:  No, sir.

17       THE COURT:  Ms. McKenzie, is that true for you as

18  well?

19       MS. MCKENZIE:  Yes, Your Honor.

20       THE COURT:  So we will now call the pool in, and I

21  will again thank them for their service.  We will -- Natalie

22  will select randomly the 13 who will serve on the jury.  I will

23  thank and excuse the remaining pool members, and then I will go

24  directly to the preliminary jury instructions, which we

25  discussed briefly this morning.  Any questions about that

 1    procedure?

 2              MR. MEJIA:  No, sir.

 3              THE COURT:  Ms. McKenzie, Ms. Keel, any questions

 4    about that procedure?

 5              MS. MCKENZIE:  No, sorry.

 6              MS. KEEL:  No, Your Honor.

 7              THE COURT:  I realize you're in a trial so --

 8              MS. KEEL:  Your Honor, I will say, may -- if we could

 9    just have one second.  I am giving the opening and I do need to

10    run to the restroom before we get started.  I will be right

11    back.

12              THE COURT:  That's fine.  Why don't we -- if it's okay

13    with you, why don't we take a brief break after the preliminary

14    instructions?  Would that work?

15              MS. KEEL:  That's fine too.

16              THE COURT:  If you need to take a break now, that's

17    fine too.

18              MS. KEEL:  That will work.

19              THE COURT:  I just know that there are 25 people or so

20    that are probably anxious to get out of here.

21              MS. KEEL:  Absolutely.

22              THE COURT:  Mr. Mejia, do you intend to invoke the

23    rule on witness separation?

24              MR. MEJIA:  Yes, I move for separation of witnesses.

25    Thank you.

```
 1              THE COURT:  And, Ms. McKenzie, Mr. Mejia just moved
 2    for separation so --
 3              MS. MCKENZIE:  That's fine.
 4              THE COURT:  -- any witnesses that you have that have
 5    been in the courtroom, other than your case agent, you'll need
 6    to separate.
 7         (Jury in 3:04 p.m.)
 8              THE COURT:  Ladies and gentlemen of the jury pool, we
 9    are now at the point where we will select the 13 people who will
10    serve as jurors in this case.
11         As I mentioned at the outset, there are essentially three
12    ways that you end up not being selected.  One is the random draw
13    and we're about to experience that here shortly.  The clerk will
14    call 13 numbers.  If you hear your number called, please follow
15    the direction of the court security officer and take a seat in
16    the jury box.
17         Now, I talked about how there are also peremptory
18    challenges.  That is you could be excused and no reason given
19    for that.  And I also talked about how you could be excused for
20    cause.  That is you gave us an answer during the course of our
21    voir dire, either along the lines of a significant
22    inconvenience, or problem, or some issue specific to this case
23    that might cause you to have difficulty being fair.
24         And let me remind you again, as I said at the outset, you
25    will not learn of the reason that you are not selected.  So what
```

1    I do want to say now, just before we select the 13 who will

2    serve, is that if you are not selected, I will ask you to remain

3    in place for just one minute after the jury is seated so that I

4    can give you a parting thought.  So I'm now going to ask the

5    clerk to call the 13 numbers, please.

6            DEPUTY CLERK:  Number 56, Number 89, Number 91, Number

7    87, Number 92, Number 55, Number 53, Number 18, Number 82,

8    Number 78, Number 100, Number 4, and Number 32.

9            THE COURT:  Thank you.  To the newly designated

10   members of our jury, I will have important instructions for you

11   in just a minute.

12       To those of you who endured voir dire throughout the day but

13   were not selected, let me thank you for your service.  It is a

14   service.  You have discharged your obligations as citizens in a

15   very important role, and so I thank you for being here, for your

16   honesty, your participation.  On behalf of the entire court and

17   both sides, again, thank you for your service.  You are now

18   excused.

19       (Jury pool out 3:10 p.m.)

20           THE COURT:  Members of the jury, you were sworn as

21   members of the pool at the outset.  Now we have a new oath for

22   you to take as members of the jury.

23           DEPUTY CLERK:  If you-all can each raise your right

24   hand, please.

25       (Oath administered to jury.)

1          THE COURT:  First off, let me again thank you for your

2    patience and for your service.  You are about to embark on an

3    important role in our republic.

4       Now, here's how the rest of the schedule will go:  I'm going

5    to give you now what we refer to as preliminary instructions.

6    It will tell you a little bit about the case.  It will tell you

7    a little bit about your role as jurors.  Then we're going to

8    take a very brief break to allow counsel to get ready, and you

9    will hear opening statements.  At that point, we will then talk

10   a bit about scheduling.

11      So I'm going to start now with the preliminary jury

12   instructions.

13      Do the members of the jury have notebooks yet?

14          COURT SECURITY OFFICER:  I have them right here, sir.

15   If you want me to go ahead and distribute them, I will or I can

16   wait until after you give the --

17          THE COURT:  We'll wait until after.

18      You will have notebooks that you can utilize throughout the

19   course of the trial.  I'll give you some more thoughts about

20   that as we go through the instructions.  For now I would simply

21   ask you to listen carefully to the instructions that I have for

22   you.

23      Now that you've been sworn, I will give you these

24   preliminary instructions to guide you in your participation in

25   the trial.

1    First of all, regarding the duty of the jury, it will be

2    your duty to find from the evidence what the facts are.  You and

3    you alone will be the judges of the facts.  You will then have

4    to apply those facts -- to those facts the law as I will give it

5    to you.  You must follow that law whether you agree with it or

6    not.

7        Nothing that the court -- that's me -- may say or do during

8    the course of the trial is intended to indicate or should be

9    taken by you as indicating what your verdict should be.

10       Next, with respect to evidence, the evidence from which you

11   will find the facts will consist of the testimony of witnesses,

12   documents and other things received into the record as exhibits,

13   and any facts that the lawyers agree to or stipulate to or that

14   I may instruct you to find.

15       Certain things are not evidence and must not be considered

16   by you.  I will list them for you now.

17       First, statements, arguments, and questions by lawyers are

18   not evidence.

19       Second, objections to questions are not evidence.  Lawyers

20   have an obligation to their clients to make objections when they

21   believe evidence being offered is improper under the rules of

22   evidence.  You should not be influenced by the objection or by

23   my ruling on it.  If the objection is sustained, ignore the

24   question.

25       If it is overruled, treat the answer like any other.  If you

1    are instructed that some item of evidence is received for a

2    limited purpose only, you must follow that instruction.

3        Next, testimony that the court has excluded or told you to

4    disregard is not evidence and must not be considered by you.

5        Next, anything you may have seen or heard outside the

6    courtroom is not evidence and must be disregarded.  You are to

7    decide the case solely on the evidence presented here in the

8    courtroom.

9        There are two kinds of evidence, direct and circumstantial.

10   Direct evidence is direct proof of a fact, such as testimony of

11   an eyewitness.  Circumstantial evidence is proof of facts from

12   which you may infer or conclude that other facts exist.  I will

13   give you further instructions on these, as well as other matters

14   at the end of the case, but keep in mind that you may consider

15   both kinds of evidence.

16       It will be up to you to decide which witnesses to believe,

17   which witnesses not to believe, and how much of any witness's

18   testimony to accept or reject.  I will give you some guidelines

19   for determining the credibility of witnesses at the end of the

20   case.

21       The next section is regarding rules for criminal cases.  As

22   you know, this is a criminal case.  There are three basic rules

23   about criminal cases that you must keep in mind.

24       First, the defendant is presumed innocent until proven

25   guilty.  The indictment brought by the Government against the

1    defendant is only an accusation, nothing more.  It is not proof

2    of guilt or anything else.  The defendant, therefore, starts out

3    with a clean slate.

4        Second, the burden of proof is on the Government until the

5    very end of the case.  The defendant has no burden to prove his

6    innocence, or to present any evidence, or to testify.  Since the

7    defendant has the right to remain silent, the law prohibits you

8    from arriving at your verdict by considering that the defendant

9    may not have testified.

10       Third, the Government must prove the defendant's guilt

11   beyond a reasonable doubt.  I will give you further instructions

12   on this point later, but bear in mind that in this respect, a

13   criminal case is different from a civil case.

14       Next, with respect to summary of the case, in this case the

15   defendant is charged with possessing marijuana and cocaine with

16   the intent to distribute them and possessing a firearm in

17   furtherance of a drug trafficking crime.  I will give you

18   detailed instructions on the law at the end of the case, and

19   those instructions will control your deliberations and decision.

20       But in order to help you follow the evidence, I will now

21   give you a brief summary of the elements of the offenses that

22   the Government must prove to make its case:

23       To prove that the defendant possessed marijuana with the

24   intent to distribute it, the United States must prove beyond a

25   reasonable doubt, first, that Mr. Brewer knowingly possessed

1    marijuana, and, second, that he intended to distribute

2    marijuana.

3        To prove that Mr. Brewer possessed a firearm in furtherance

4    of a drug trafficking crime, the United States must prove beyond

5    a reasonable doubt, first, that Mr. Brewer committed the crime

6    of possessing marijuana with the intent to distribute it;

7    second, that he knowingly possessed a firearm; and, third, that

8    the possession of the firearm was in furtherance of the drug

9    trafficking crime, that is possession of marijuana with intent

10   to distribute it.

11       To prove that Mr. Brewer possessed cocaine with the intent

12   to distribute it, the United States must prove beyond a

13   reasonable doubt, first, that Mr. Brewer knowingly possessed

14   cocaine, and, second, that he intended to distribute cocaine.

15       Now, with respect to the conduct of the jury, let me give

16   you a few words about your conduct as jurors.  You as jurors

17   must decide this case based solely on the evidence presented

18   here within the four walls of this courtroom.  This means that

19   during the trial you must not conduct any independent research

20   about this case, the matters in the case, the individuals or

21   corporations involved in the case.

22       In other words, you should not consult dictionaries or

23   reference materials, search the Internet, websites, or blogs, or

24   use any other electronic tools to obtain information about this

25   case or to help you decide the case.  Please do not try to find

1    out information from any source outside the confines of this

2    courtroom.

3        Until you retire to deliberate, you may not discuss this

4    case with anyone, even your fellow jurors.  After you retire to

5    deliberate, you may begin discussing the case with your fellow

6    jurors, but you cannot discuss the case with anyone else until

7    you have returned a verdict and the case is at an end.

8        I know that most of you use cell phones, smartphones, the

9    Internet, and other tools of technology.  You also must not talk

10   to anyone at any time about this case or use these tools to

11   communicate electronically with anyone about the case.  This

12   includes your family and friends.

13       You may not communicate with anyone about the case on your

14   cell phone, smartphone, email, text messaging, or on Twitter, or

15   through any blog or website, including Facebook, Google Plus,

16   LinkedIn, Instagram, Snapchat, or YouTube.  You may not use any

17   similar technology or social media to communicate about this

18   case, even if I have not specifically mentioned it here.

19       I expect you will inform me immediately if you become aware

20   of another juror's violation of these instructions.  A juror who

21   violates these restrictions jeopardizes the fairness of these

22   proceedings and a mistrial could result, which would require the

23   entire trial process to start over.

24       Finally, do not form any opinion until all the evidence is

25   in.  Keep an open mind until you start your deliberations at the

 1   end of the case.  It is my hope for you that this case is

 2   interesting and noteworthy.

 3        Now, if you want to take notes during the course of the

 4   trial, you may do so.  However, it is difficult to take detailed

 5   notes and pay attention to what the witnesses are saying at the

 6   same time.  If you do take notes, be sure that your note taking

 7   does not interfere with your listening to and considering all of

 8   the evidence.

 9        Also, if you do take notes, do not discuss them with anyone

10   before you begin your deliberations.  Do not take your notes

11   with you at the end of the day.  Be sure to leave them here in

12   the jury room.  They will be cared for by the court security

13   officer.

14        If you choose not to take notes, remember that it is your

15   own individual responsibility to listen carefully to the

16   evidence.  You cannot give this responsibility to someone who is

17   taking notes.  We depend on the judgment of all members of the

18   jury.  You all must remember the evidence in this case.

19        Now, finally, the last portion of our preliminary

20   instructions deals with the course of the trial.

21        The trial will now begin.  First, the Government will make

22   an opening statement, which is simply an outline to help you

23   understand the evidence as it comes in.  Next, the defendant's

24   attorney may but does not have to make an opening statement.

25   Opening statements are neither evidence nor arguments.

1       The Government will then begin presenting its witnesses and

2    counsel for the defendant may cross-examine them.  Following the

3    Government's case, the defendant may, if he wishes, present

4    witnesses whom the Government may then cross-examine.

5       After all the evidence is in, the attorneys will present

6    their closing arguments to summarize and interpret the evidence

7    for you, and I will then instruct you on the law.  After that,

8    you will retire to deliberate on your verdict.

9       So that concludes our preliminary instructions.  The lawyers

10   need about five minutes or so in which to prepare for the

11   opening statements, so we will take a brief break now.  Before

12   we do, I want to ask you-all about your schedules.

13      We have some flexibility in when we start and when we

14   finish.  It is my general course of conduct to begin as close to

15   9:00 a.m. as possible, but as you-all know, we draw our jury

16   members from about 14 counties, and so some of you may have a

17   bit of a drive.  If it is difficult negotiating Louisville

18   traffic for you from a far distance and it's difficult for you

19   to be here in the building and ready to go at 9:00, then I would

20   like you to tell me so.  If not, my preference would be that the

21   lawyers and I will start our mornings most typically at about

22   8:30.  We will work through any issues that we need to work

23   through so that we can be as efficient as possible with your

24   time.

25      Does anybody have any issues getting here early enough in

1     the morning so that you can be in the jury box by 9:00?  No.

2         Now, as to the end of the day, we will do the best that we

3     can to manage the schedule so that we can end roughly by 4:30

4     each afternoon.  Does anybody have any issue with going as late

5     in the afternoon as 4:30?

6         We will take breaks throughout the day.  We will take a

7     lunch break every day.  The lawyers and I will typically use

8     those breaks, or at least a portion of those breaks, to work

9     through issues, again, to be as efficient as possible with your

10    time.

11        I want to give you an observation.  We've all seen movies/

12    TV shows about trials.  Some of you, I know from your answers to

13    our questions, have some experience as jurors or witnesses

14    perhaps, but -- and for you this will just serve as a reminder.

15    Trials in real life are not like they are on TV or in movies,

16    even perhaps in news type shows, which condense two- or

17    three-week long trials down to an hour format.

18        There are breaks that are expected, and we will give you

19    those, and there are occasionally breaks that are not expected.

20    In other words, we may tell you we need to take a break to

21    discuss an issue, and our prediction may be that it will take

22    only ten or 15 minutes and 30 minutes later you are returning to

23    the courtroom.

24        I want you to understand that some things are predictable in

25    a trial and many things are not.  And so the length of time for

1    witnesses is not always predictable and the length of time for

2    the lawyers and I to discuss issues and trial procedure are

3    sometimes not always predictable.

4        But what I want you to understand is that we will be working

5    to use our time as efficiently as possible, so that when you are

6    here in the courtroom, we can proceed and the lawyers will have

7    their witnesses ready, and we will work through any unexpected

8    scheduling glitches as quickly as we can.

9        I also want to tell you, if you need to stand up during the

10   course of a trial day, if you need a break and it doesn't appear

11   that I'm getting ready to call one, simply raise your hand.  The

12   court security officer can assist you.  He can let me know if I

13   don't see your hand go up.  That's not a problem.  Just let us

14   know if you need an unscheduled break.

15       So I think I asked this.  Does anybody have any problem

16   going past 4:30?  The reason I ask that is, if we have a

17   witness, we would probably -- in terms of the schedule, if they

18   begin at 4:00 and they're not done at 4:30, but they might be

19   done by 4:50, we might like to continue and get that witness

20   done so that we don't have to break up the testimony.

21       I will do that if you-all have scheduling flexibility.  I

22   will not do that if you do not have flexibility.  So I'll ask

23   you if anybody has any trouble going to, say, 5:00?  The goal

24   will be 4:30, but if it's more efficient to continue and finish

25   testimony by going a bit longer, I would like the flexibility to

1   do that, schedules permitting.  I see no responses -- some

2   people nodding their heads -- so I will keep that flexibility in

3   mind.

4       We're going to take about a five-minute break and allow the

5   lawyers to get organized, and then we'll have you back in to

6   begin the opening statements.  You will hear me give you this --

7   the following admonition at most breaks:  That is remember that

8   you are not to discuss the case with each other or with anyone

9   else until the end.  Other than that, you're welcome to talk

10  about with each other -- you're welcome to talk about any other

11  matter unrelated to the case, and we'll take about five minutes.

12      (Jury out 3:30 p.m.)

13          THE COURT:  You-all may be seated.  The jury is now

14  outside the courtroom.  Anything we need to take up at this

15  point?

16          MR. MEJIA:  Not from this side, no.

17          THE COURT:  Give you-all about five minutes.  Will

18  that be sufficient?

19          MS. KEEL:  Thanks.

20          THE COURT:  Five minutes work for you too, Mr. Mejia?

21          MR. MEJIA:  Yes, sir.

22      (Recess at 3:31 p.m. until 3:42 p.m.  Jury in.)

23          THE COURT:  Ms. Keel, are you ready?

24          MS. KEEL:  I am, Your Honor.

25      Good afternoon.  My name is Corinne Keel and I am one of the

1    assistant U.S. attorneys prosecuting this case, along with my

2    colleague, Erin McKenzie, who's sitting at counsel table.

3        Now, I'm going to start off, as the judge has already done

4    this morning, by thanking you for your service on this jury.

5    And you'll hear it over and over again, because we understand

6    that serving on a jury is an inconvenience and a sacrifice.

7    You're taking time away that you could be home with your

8    families, that you could be working.  And as the judge alluded

9    earlier, it's one of the more burdensome civic duties you could

10   be asked to do.  And I understand that, you know, our thanks

11   probably doesn't fully alleviate that burden and sacrifice, but

12   it is truly sincere thanks.

13       Now, the defendant, Cherosco Brewer, as you heard earlier

14   this morning, is charged with possession of cocaine with intent

15   to distribute, possession of marijuana with intent to

16   distribute, and possession of a firearm in furtherance of a drug

17   trafficking crime.

18       The evidence presented in this case is going to really focus

19   on events that took place over the course of two days, November

20   11th and November 12th of 2015.  And as the judge told you,

21   you're going to hear testimony.  You'll see physical evidence

22   that was recovered on those days.  You'll also see a few

23   documents.  You'll see photos.  And, importantly, you'll also

24   get the opportunity to review some clips of body camera footage

25   that was taken in the course of the investigation.

1      Now, through officer testimony, you'll learn that the

2   defendant was pulled over by two LMPD detectives on

3   November 11th, 2015.  Those are Tyler Holland and Holly Hogan.

4   You'll hear from both of them.  And he was stopped for having

5   excessive window tint on the car he was driving.

6      Now, you'll hear from the officers and you'll also be able

7   to see for yourself on the body camera footage that the window

8   tint was so dark that you really couldn't see inside the car,

9   even standing right outside the window with light shining in

10  from a street lamp.

11     In addition to the darkly tinted windows, you're also going

12  to see on the video and hear from officers that there was a

13  towel draped over the dash that was blocking some of the lights

14  from that internal display and making it even harder to see

15  inside.

16     You'll hear that after the traffic stop was initiated, the

17  officers removed the defendant from the vehicle to -- for

18  officer safety purposes and that part of the reason they did

19  that was because they couldn't see inside the car.

20     Now, you'll also learn that the detectives that pulled the

21  defendant over on November 11th work as part of an LMPD unit

22  that includes K-9 patrol officers.  And so Detective Tony James

23  and his K-9 partner Diesel responded to the traffic stop as well

24  and conducted a K-9 sniff on the outside of the stopped vehicle.

25     You'll learn that Diesel was trained to sniff out and locate

1   different types of narcotics, and you'll also hear about and get

2   to see footage of Diesel alerting on the driver's side door of

3   that stopped car.

4       And once that door was open, you'll see that Diesel zeros in

5   on a space on the inside of the driver's door, that little

6   compartment in the armrest where you might keep ChapStick or a

7   piece of gum.  And inside that little area, Detective James

8   recovered a small candy box with a baggie of marijuana inside.

9       Now, after the marijuana was removed from the car, Diesel

10   got another chance to take a sniff.  This time he got inside the

11   vehicle.  He sniffed the interior and he returned to the

12   driver's side of the car.  Now Diesel was focused on an area

13   near the steering wheel, not an ordinary storage compartment

14   like a glove box, but a little hidden area sort of down below

15   the steering column.

16       Now, inside there, the officers searched and removed a

17   Glock, .40 caliber handgun and another container with marijuana

18   inside, but instead of a simple baggie of marijuana, this was a

19   plastic canister and inside marijuana was individually packaged

20   in plastic.  Now, you'll hear officer testimony also that this

21   type of divided packaging is consistent with drug distribution

22   or package for sale.

23       A further search of the defendant's vehicle that night also

24   turned up seven different cell phones and over $900 in cash.

25   You'll hear more officer testimony that these items are also

1    consistent with drug distribution.

2         Now, I'm going to point out that this car that the defendant

3    was driving on November 11th was a rented vehicle.  And after

4    the defendant's arrest, that car was towed and then recovered by

5    the Enterprise rental car company.

6         Now, most of the time when you think about renting a car,

7    you're probably thinking about a business trip or a vacation.

8    Maybe you've rented a car for a few days or a few weeks when

9    you've had car trouble or a car accident while yours was being

10   repaired, but the defendant had this rental car for almost four

11   months before he was pulled over, so long, in fact, that he'd

12   made his own modifications to the car, and that includes adding

13   that dark tint that first drew the police attention.  And you're

14   going to hear from an Enterprise rental car employee, who will

15   tell you that later the defendant came to the rental company and

16   removed the tint that he had added.

17        And you're also going to hear testimony from experienced

18   officers that the use of rental vehicles or vehicles registered

19   to another person is another common tactic that's used in drug

20   distribution to avoid detection.

21        Now, after this first arrest on November 11th, Mr. Brewer

22   was released from jail.  However, he was stopped again by police

23   the very next night, on November 12th, driving a different car,

24   one that he told police was his wife's.  Now, this time he was

25   stopped by another officer from the same police unit, Chad

1    Stewart.  You'll hear from him too.

2        What drew Officer Stewart's attention to the defendant was,

3    again, his darkly tinted windows on the car he was driving.

4    Again, you'll hear from officers and you will have a chance to

5    see that window tinting in the body camera footage, and you'll

6    see that the windows were so darkly tinted that even when

7    there's an officer standing right outside shining a flashlight

8    through the window, you cannot see inside the vehicle.

9        Now, again, for the same reason, Mr. Brewer was removed from

10   the car, for officer safety.  And on November 12th, just as they

11   had been the day before, Detective James and his K-9 partner

12   Diesel were also on duty.  They responded again to this traffic

13   stop and Diesel sniffed the car.

14       Now, again, he alerted on the driver's side of the car, and

15   once the door was open, Diesel focused on an area next to the

16   steering wheel within reach of the driver, similar to the day

17   before.  This time, when officers searched the area, inside they

18   found a white powdered substance in baggies that they believed

19   to be cocaine and which was later confirmed by laboratory

20   testing to be cocaine, to contain cocaine.

21       Now, similar to the day before, the drugs were not in a

22   single container or baggie, but rather in smaller baggies inside

23   of a larger one.  Again, you will hear testimony that this kind

24   of divided packaging is consistent with package for sale and

25   drug distribution.

1    And, again, upon further search of the car, the officers

2    found a relatively large amount of money.  This time it was

3    about $885.  And during this second stop, Mr. Brewer drove a

4    different car from the day before -- that one had already been

5    towed -- and he was driving a car that was registered to his

6    significant other at the same address where he lived.  However,

7    much of what the police found in this second stop was the same

8    as the day before.  He was driving around with darkly tinted

9    windows that effectively concealed the inside of the car.

10    A K-9 sniff helped detect contraband that was hidden outside

11    of a normal storage compartment near the steering wheel, hidden

12    but within reach of the driver.  And though officers found

13    different drugs on the two stops, in both cases the drugs they

14    found were in divided packaging that is consistent with being

15    packaged for sale.

16    Now, these similarities don't really go along with mere

17    coincidence.  Instead, we expect that the evidence will show you

18    that this is a pattern of criminal activity that make up the

19    defendant's MO.

20    Now, I'm going to briefly address the burden of proof in

21    this case.  You've heard a little bit about it from the judge.

22    You will be instructed more fully by the judge at the end of the

23    case on the law of that burden before you deliberate, but it's

24    true that the United States bears the burden of proof in this

25    case, and that burden is to prove each element of the offense

1    beyond a reasonable doubt and that is a high burden, but I want

2    to take a moment just to differentiate the difference between a

3    reasonable doubt and a mere tiny sliver of a doubt that is

4    unreasonable and improbable or illogical.

5        Now, I bring this up because each of these crimes has an

6    element of knowledge.  In order to convict, you must believe

7    that the defendant knew about the gun, about the marijuana,

8    about the cocaine.

9        Now, the defense may attempt to introduce doubt by

10   suggesting that the defendant lacked this required knowledge

11   about these items because they were recovered from hidden areas

12   inside the cars or because he was driving a rental car or

13   significant other's car.

14            MR. MEJIA:  Judge, I'm going to object.

15            THE COURT:  I'm sorry?

16            MR. MEJIA:  I'm going to object.

17            THE COURT:  Overruled.

18            MS. KEEL:  Now, the defendant probably wants you to

19   believe that he is simply the unluckiest man that you have

20   ever heard --

21            MR. MEJIA:  Judge, I would object again and I would --

22            THE COURT:  Please approach.

23        (Bench conference on the record outside the hearing of the

24   jury.)

25            MR. MEJIA:  *Doyle v. Ohio* has ruled that the

1    prosecution cannot comment on the defendant's testimony or

2    failure to testify, or the defendant's words or what he

3    intended --

4              THE COURT:  How did she do that?

5              MR. MEJIA:  She says, "The defendant wants you to

6    believe, the defendant wants you to believe."

7              MS. KEEL:  I used "probably," I believe.

8              MR. MEJIA:  Well, first of all, it's argument for her

9    to tell the jury what the defense is.  She doesn't know.  Beyond

10   that, it's highly improper for her to say what the defendant

11   wants or what the defendant is saying.  That's improper, Judge.

12   I ask that the jury be told to disregard that comment or ask for

13   a mistrial.

14             THE COURT:  Well, first of all, I don't -- I don't

15   think that the prosecutor here crossed the line.  There was a --

16   the first reference was to defense generally.  I think that's

17   where you are safest in referring to arguments of the defense.

18      There is no suggestion -- having just reviewed from the

19   realtime transcript what was said, I am not concerned that the

20   jury is confused as to the defendant's -- as to some obligation

21   that has been placed on the defendant to testify.  Now, I don't

22   see that here.

23      I have already instructed the jury that the defendant has no

24   burden to testify, and I believe that that preliminary

25   instruction covers this.

1    You will want to be careful not to suggest that the

2    defendant personally has any obligation here to testify, but I

3    think referring to what the defense may argue is different.

4    That is to be distinguished from a reference to the defendant

5    testifying, but I will say that we don't want to veer too

6    closely toward argument.  This is just an outline.  I've already

7    instructed the jury that the opening statements are that,

8    statements, not argument.  Thank you.

9         MS. KEEL:  Thank you.

10    (End of bench conference.)

11         MS. KEEL:  All right.  I'll continue where I left off.

12    In viewing the evidence, you do not have to believe that the

13    defendant happens to be the unluckiest man that you've ever

14    heard of.

15         MR. MEJIA:  Judge, I'll object to argument, Judge.

16         THE COURT:  Overruled.

17         MS. KEEL:  That he was so unlucky that on two

18    consecutive nights he was stopped in two different cars that

19    just happened to have drugs hidden right in the same spot within

20    reach of the driver.

21    The defendant had access to both of these cars outside of

22    the times he's stopped.  He had the Enterprise rental car for

23    four months before his arrest, and the car that he drove on the

24    12th was registered to his own address.

25    Now, on both nights, he took pains to conceal the view of

 1  the inside of the car with darkly tinted windows.  And on the

 2  11th, he was driving with marijuana tucked right inside the

 3  door, perhaps so he could provide a sample to potential

 4  customers wanting to buy product that was deeper in the steering

 5  column.

 6      Now, in both instances, the drugs recovered were packaged in

 7  divided packaging, consistent with being packaged for sale.  On

 8  both nights the drugs were in almost exactly the same spot and

 9  within reach.  Now, all of this evidence is combined with other

10  indicators of drug trafficking, like the gun, the seven cell

11  phones, and the large amount of cash that was recovered at each

12  stop.

13      Now, you should view all of this evidence while applying

14  your own common sense, and in doing so, we expect that you will

15  find not that the defendant happens to be the unluckiest man

16  that you've ever heard of, but instead that he was a person

17  engaged in knowing and repeated patterns of criminal activity

18  and is guilty of the crimes charged.

19      I want to thank you just one more time for your time and

20  attention over the course of the next few days in this trial.

21  Thank you.

22          THE COURT:  Mr. Mejia.

23          MR. MEJIA:  Yes, sir.  There are three decisions you

24  will be called upon to make in this case.  We referenced them by

25  counts.  Count 2, you will be called upon to decide essentially

1    two things:  Did Cherosco Brewer possess something --

2    marijuana -- he knew he possessed it, and that he did so for the

3    purpose or the intent of delivering, transferring, or as the

4    indictment refers to as trafficking?  Trafficking is the word

5    that means selling, distributing, handing out.

6         You will hear no evidence in this case from any witness at

7    any time on November 11th, or 12th, or any three-month period

8    before, or any time period after that he ever had a sale of

9    marijuana to anyone, that he ever possessed it in his hand, on

10   his person, on or about him, or anyone ever saw him hand-

11   deliver, offer for sale, or sell to anyone.  You've heard here

12   about street trafficking, about selling it outside of a car.

13   You will hear no evidence of any such thing ever occurring in

14   this case.

15        The other allegation is Count 3, that Cherosco Brewer

16   possessed cocaine on November 11th or 12th, and he did so with

17   the intent or purpose of selling, distributing, or trafficking.

18        Again, you will hear no evidence from any witness that he

19   ever had it on his person, in his hand, delivered it,

20   transported it.  You'll hear of no seller to him or no buyer

21   from him in this case.

22        Members of the jury, you will also consider the next charge,

23   which is predicated upon the other two charges, which is that he

24   possessed a firearm for purposes of drug trafficking, that is

25   selling, transferring, or delivering marijuana.

1     Since there will be no evidence of drug trafficking,

2   selling, or possessing, you therefore will, I submit, have a

3   reasonable doubt of guilt as to possession of a firearm for that

4   purpose.

5     Now, you will take into account, of course, observations of

6   life.  You will take into account the evidence that you hear.

7   You will hear no evidence of any investigation of Cherosco

8   Brewer for such things as possession of narcotics or possession

9   of firearms in furtherance of drug trafficking offenses.

10     How this case begins, members of the jury, is by police

11   officers stopping him as he is driving his vehicle.  In fact,

12   you've heard it here.  You are going to hear it in the evidence.

13   Twice they stopped him.

14     Now, the first time they stopped him, the evidence, I

15   submit, will be a little bit in conflict, because the officers

16   will say three different things.  And, of course, in determining

17   what this is about, you will, of course, take into account the

18   testimony of the officers.  The officers have said different

19   things at different times.  We have their testimony from prior

20   proceedings.  The officers have said, "We stopped him for tinted

21   windows."  The officers have said, "We have stopped him for

22   speeding."

23     Two officers in one place at the same time, November 11th,

24   said two different things:  "We stopped him for speeding.  We

25   stopped him for tinted windows, excessive tinted windows," and

1    you will take that into account in assessing the credibility,

2    the believability, and the reliability of officers.

3        But they also said a third thing on November 11th:  "What

4    we're doing here is searching for guns.  That's why we stopped

5    you," the words from their own mouths.

6        In assessing the credibility of officers to determine

7    whether or not the Government has met its burden of proof beyond

8    a reasonable doubt, they will have you and they will seek to

9    have you rely upon the opinion of officers.  The opinion of

10   officers, because in the absence of evidence of possessing it in

11   his hands, having it on his person, delivering it to somebody,

12   having somebody from whom he received it, having somebody from

13   whom he would deliver it, absent all that, it will be the belief

14   of the officer that he is engaged in narcotic trafficking and

15   that he possessed a firearm for that purpose.

16       Members of the jury, as Judge Hale in his wisdom has told

17   you here earlier today, we are profoundly grateful for your

18   service.  Why?  Because you, members of the jury, the 13 of you

19   are the embodiment of what our system of laws and justice is in

20   America.  Without you there is no law or system of justice.  It

21   sets us apart from all countries, all citizens of the world.

22       Why?  Because you good 13 citizens determine guilt or

23   innocence, not police officers.  I'll repeat that.  Police

24   officers, and judges, and prosecutors don't decide guilt or

25   innocence.  You do, the 13 of you.

1          Members of the jury, you will hear evidence in this case

2     that on November 12th, again, Cherosco Brewer was stopped for

3     tinted windows.

4          In assessing the credibility of these officers, you will

5     also receive evidence in this case from these very officers that

6     as of their testimony today and over the course of the last two

7     or three years, they have been named, identified, served with

8     summons as defendants in a civil rights suit for violation of

9     Cherosco Brewer's rights for stopping him for tinted windows

10    over 12 to 14 times over a span of three years, repeatedly.

11    Why?  Because they have their own opinions of him, and who he

12    is, and what he's doing.

13         At no time, members of the jury, will you hear evidence in

14    this case of Cherosco Brewer ever receiving narcotics.  Now, the

15    prosecution did tell you and it is true that you will be called

16    upon to determine whether or not one possesses something in a

17    vehicle that's not his.

18         You also will receive evidence in this case, members of the

19    jury, that the first vehicle that he was driving on November

20    11th was not even his either.  It was a rental car.

21         And we will wait in this courtroom over the next two or

22    three days to hear evidence of his having driven this for three

23    to four months, that he was in this car every day or that he

24    used this car every day, because there will be no such proof.

25         Members of the jury, what you're going to be called upon to

 1    decide in this case is whether, on November 11th and then on

 2    November 12th, he was a drug trafficker.  That will be the

 3    decision you are called upon to decide.

 4         Why?  Because the car that he didn't own and a car prior to

 5    November 12th he was never seen in, he somehow was engaged in

 6    this activity, which they have just put upon themselves the

 7    burden of showing you, and you will hear no such evidence in

 8    this court of law.

 9         What will be the evidence?  The evidence will be that for

10    various reasons, although the claim is tinted windows, officers

11    repeatedly stopped Cherosco Brewer.  You will also hear evidence

12    despite that, in assessing the credibility of the officers, that

13    the charges with respect to tinted windows that were initially

14    placed upon him on November 11th and 12th were dismissed, that

15    the multiple times, 12 to 14 times that he has been stopped for

16    tinted windows have all been dismissed, that there has never

17    been any proof in a court of law of tinted windows, and that

18    these officers looked upon him, and focused upon him, and made

19    their conclusions upon him because that's what they do in their

20    own mind.

21         Now, what we know here and what the evidence will show by

22    physical evidence, and by photography, and by body cameras is

23    that these things were in two vehicles not owned by him and that

24    they could not be seen in plain sight.

25         You will be called upon to determine whether somebody knows

1    something is in a car that they can't see, in a dashboard, or in

2    a steering wheel, or in a compartment of a car door.

3        The proof, members of the jury, will be offered in this case

4    to convince you beyond a reasonable doubt.  And members of the

5    jury, at the close of the case, if you have a suspicion, if you

6    have a hunch, if you have some conclusion, then it will be you

7    and you alone to determine whether or not there is proof beyond

8    a reasonable doubt of guilt of these extremely, very serious

9    criminal charges in a federal proceeding.

10        As I said to you, prior to November 11 and 12, he was not

11   under investigation for anything.  What brings us here, members

12   of the jury, are these various beliefs or hunches of officers

13   that because somebody is driving a vehicle with tinted windows,

14   that therefore, according to them, he must be a narcotic

15   trafficker, and that is the case you will hear in this court of

16   law.

17        How many people -- other people drove these cars?  We will

18   see.  We will find out.  How many other people had access to

19   these compartments of this vehicle?  We will see, or we may see,

20   or we may find out.  But, members of the jury, ultimately what

21   you're going to be called upon to determine in this case is

22   whether you have been shown evidence, proof beyond a reasonable

23   doubt of possession with knowledge and the intent to sell,

24   distribute, or traffic, and in so doing had a firearm for the

25   purpose of furthering that proven offense.  And I submit to you,

1   members of the jury, at the end of this case you will have

2   substantial doubt.

3       Let me add one thing.  As these officers testify, I submit

4   they will acknowledge the civil suit under which they are facing

5   damages.  And in assessing their credibility, I will ask you to

6   keep in mind that they face potential consequences as the result

7   of defendants in that civil rights suit, and this too you may

8   take into account in assessing the credibility, believability,

9   and reliability of their evidence in this case.

10      And, again, it will be only the opinion of an officer that

11  he is engaged or was engaged in narcotics trafficking, certainly

12  not by any eyewitness, by any proof, by any testimony or any

13  evidence upon which you could rely beyond a reasonable doubt.

14      Now, on that basis, members of the jury, at the conclusion

15  of this case, I will ask that you find him not guilty, not just

16  because you have a doubt because, in fact, he isn't guilty.

17  Thank you.

18          THE COURT:  Thank you.  Members of the jury, given the

19  late hour, we will not start with witness testimony this

20  afternoon.  I think we're going to excuse you for the evening.

21      Remember the admonition I gave you during the break that you

22  are not to discuss this case, anything that you have heard here

23  today with anyone, including with each other at this stage, and

24  we will look for you back about 8:45 in the morning.  If you

25  could plan to assemble in the jury room at about 8:45, we hope

1    to start with our first witness at 9:00 a.m.  Thank you.

2         (Jury out 4:22 p.m.)

3         THE COURT:  The jury is now out of the courtroom.

4    Anything that either side needs to bring up at this point?

5    First from the Government?

6         MS. MCKENZIE:  No, Your Honor.

7         THE COURT:  Mr. Mejia, anything from the defense?

8         MR. MEJIA:  No, sir.  Thank you.

9         THE COURT:  We will be prepared to start.  Then I will

10   see you here at about 8:40 in the morning.  If there are any

11   preliminary matters that we need to discuss, we'll take them up

12   at that point.

13      You'll be prepared to go at 9:00?  Is that right?  And I

14   think probably the only housekeeping item that we will take up

15   in the morning, unless you-all have something else, will be the

16   day's schedule, which we can talk about in the morning.

17   Anything else?

18        MR. MEJIA:  I've forgotten.  About how long do you

19   take for lunch?

20        THE COURT:  Well, we'll play it by ear.  I generally

21   like to give the jury, because options here are very limited, 45

22   minutes, but if we find ourselves pressed, we'll take a little

23   less time.  Anything else from either side?

24        MR. MEJIA:  No, sir.

25        THE COURT:  All right.  I'll see you in the morning.

1       (Proceedings concluded at 4:25 p.m.)

2                   C E R T I F I C A T E

3       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

4   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6
          s/Dena Legg                    December 13, 2019
7   Certified Court Reporter No. 20042A157      Date
    Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    PRETRIAL CONFERENCE                          3

3    VOIR DIRE                                   19

4    PRELIMINARY INSTRUCTIONS                    177

5    GOVERNMENT OPENING                          187

6    DEFENSE OPENING                             197

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25