```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )     Case No. 3:17-CR-00037-DJH
 4                                  )
              Plaintiff,            )
 5                                  )
     v.                             )
 6                                  )
     CHEROSCO BREWER,               )
 7                                  )     January 8, 2019
              Defendant.            )     Louisville, Kentucky
 8

 9                          * * * * *

10                           VOLUME 2
                     TRANSCRIPT OF JURY TRIAL
11              BEFORE HONORABLE DAVID J. HALE
                  UNITED STATES DISTRICT JUDGE
12
                            * * * * *
13
     APPEARANCES:
14
     For United States:       Corinne E. Keel
15                            Erin G. McKenzie
                              U.S. Attorney's Office
16                            717 West Broadway
                              Louisville, KY 40202
17
     For Defendant:           David S. Mejia
18                            310 East Broadway, Suite 201
                              Louisville, KY 40202
19
     [Defendant present.]
20

21
                         Dena Legg, RDR, CRR, CCR-KY
22                         Official Court Reporter
                             232 U.S. Courthouse
23                        Louisville, KY 40202
                            (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1     (Begin proceedings in open court at 9:13 a.m.  Jury out.)

2          MS. KEEL:  Your Honor, Ms. McKenzie will be right

3     back.  I don't know if you want to get -- oh, I didn't realize

4     Mr. Mejia is also missing.

5          THE COURT:  Okay.  Everyone's here.  I understand the

6     IT issue has been resolved; is that correct?

7          MS. KEEL:  Yes.

8          THE COURT:  And I understand there was some minor

9     evidentiary issue you-all needed to discuss.

10         MS. KEEL:  Yes, Your Honor.  There are actually two,

11    but I think they're related and both have to do with topics that

12    we think the defense may have opened the door to, to some

13    extent, during the course of opening and want to draw those to

14    the court's attention.  And I think that -- and perhaps the --

15    you know, what should be done about them may be different

16    because of the --

17         THE COURT:  Let me ask you, does this issue have any

18    impact on the first couple of witnesses?

19         MS. KEEL:  Yes, Your Honor, it would.  So the first I

20    think is that we have gone through and briefed the issue of

21    404(b) evidence in this case, and Your Honor found that while

22    there were some existing prior convictions, the existence of

23    which was not in question that did have relevance for a proper

24    purpose, but that that -- there was a limited probative value,

25    considering other evidence that the Government had to put on and

1    considering the prejudicial nature of 404(b) evidence.

2        However, Mr. Mejia specifically told the jury, "You're not

3    going to hear about the defendant previously selling marijuana."

4    And I think he really emphasized that there wasn't any evidence

5    that he had ever done anything like this in the past, when in

6    fact Your Honor's order actually goes through the fact that

7    these priors involved marijuana and cocaine.  Many of them --

8    most of them involved the defendant having those items and using

9    those items in a vehicle.

10       Now, I did some research to sort of understand to what

11   extent one could open the door in opening to 404(b) evidence

12   that had previously been excluded, and many circuits explicitly

13   state that opening statements themselves can open the door.  The

14   Sixth Circuit does not have a case that I could find that was

15   directly on point to that extent.

16       However, the Sixth Circuit does have a case, *United States

17   v. Spikes*, that explicitly states that otherwise suppressed

18   evidence can come in after the door has been opened, and that

19   includes evidence that has been excluded by the court or by

20   agreement of the parties.

21       I also, you know, would point the court just to *United

22   States v. Latner*, which is a Sixth Circuit case also which

23   discusses a little bit more fully the concept of opening the

24   door specifically to 404(b) evidence, again, by asserting an

25   innocent presence or association.

1      Now, I understand that the Sixth Circuit precedent maybe is

2   not on our side, that one statement during opening is enough to

3   open the door to all the 404(b) evidence, but I would ask the

4   court perhaps to admonish the defense to be careful about

5   treading on that territory, because I do think that though the

6   court found there was limited probative value to using those

7   priors in the previous ruling, the probative value has now

8   actually been increased by setting up an expectation to the jury

9   that not only is there an innocent or unknown association with

10  these items that were found but that, you know, that is enhanced

11  by the lack of 404(b) evidence.  So that's one issue.

12      The other, in opening the -- in the opening statements, the

13  defense counsel specifically attributed a statement to Detective

14  Hogan, and that was one that we had not only agreed to keep out

15  of the video evidence between the parties, based on Mr. Mejia's

16  request that we not include statements that Detective Hogan went

17  to the passenger of the vehicle during the November 11th stop

18  and told her, "We're just out here looking for guns."

19      And that was also a statement that I believe Mr. Mejia

20  paraphrased and included in his motion in limine to exclude

21  mention of "high-crime area, violent crime area, drug crime

22  area," and the United States had, you know, voluntarily and I

23  think the court's ruling yesterday circumscribed that evidence

24  to some extent about -- you know, to the relevant aspect of the

25  police conduct and investigation.

1     However, now that that door has been opened and I -- based

2     on the defense using that in the opening, I would have an

3     expectation that it was going to be coming up on cross.  We

4     would actually like to expand the length of the video clips that

5     we show to place those statements into context better.

6          THE COURT:  Well, before Mr. Mejia responds, I will

7     observe that I would not characterize these as minor evidentiary

8     issues.  I think revisiting my 404(b) ruling is a significant

9     evidentiary issue.  With the traffic problems, we're already

10    starting late, so it puts us, me in particular, in a difficult

11    spot to have to determine whether Mr. Mejia crossed a line in

12    his opening and what the scope of your witness testimony is

13    going to be.  This is probably something we should have tried to

14    flesh out a little earlier.

15       Let's take them in reverse order, Mr. Mejia.  I do recall

16    you saying during your opening statement that Detective Holland

17    commented during the traffic stop that they were looking for

18    guns.  Was that a statement that you had asked the U.S. to

19    exclude from its body cam videos?

20         MR. MEJIA:  No.  What I asked them to exclude was we

21    are here or we're at this location because this is a high-crime

22    area.  This is an area with a lot of shootings, a lot of

23    violence, a lot of --

24         THE COURT:  You see a difference between or an

25    inconsistency between the detective's characterization of the

 1   area as high crime and characterization of their mission as

 2   looking for guns?

 3           MR. MEJIA:  No, what I see -- what I see is an

 4   inconsistent statement on the part of a prosecution witness.

 5   "We stopped him because he had excessive tinted windows.  We

 6   stopped him because we were looking for" --

 7           THE COURT:  I understand that and, really, you don't

 8   need to make your jury argument with me here.  I'm trying to, as

 9   quickly as possible, sort through what the legal issues are that

10   I've got to deal with.

11           MR. MEJIA:  Right.  Well --

12           THE COURT:  When you say to the jury, "Detective" --

13   is it Holland?

14           MS. KEEL:  Holly Hogan is our case agent here at the

15   table.

16           THE COURT:  Right.  But there is a Detective Holland;

17   right?

18           MS. KEEL:  Yes, there is.

19           THE COURT:  So who is it that made the statement about

20   the looking for guns?

21           MR. MEJIA:  Hogan.

22           THE COURT:  Okay.  So, obviously, since you brought it

23   up --

24           MR. MEJIA:  Right.

25           THE COURT:  -- in opening, you can't expect them to

1     avoid that discrete issue.

2             MR. MEJIA:  That's correct and I don't.

3             THE COURT:  But you think somehow you can get to that

4     issue but go no further?

5             MR. MEJIA:  That's right, and I will explain why.

6             THE COURT:  Okay.

7             MR. MEJIA:  Your Honor has overruled my objection to

8     "high-crime area."  You've said they could get it in, but don't

9     tread on it heavily.  Don't emphasize it, but it can come in.

10    You overruled my objection to it.  And having done that, it's

11    now coming in.

12        That being the case, the inconsistency of statement of the

13    purpose for the stop and what the officer was doing, they may

14    have been looking for a gun that somebody reported.  They may

15    have been looking for a gun because someone saw him with a gun.

16    They may have been looking for a gun because they saw one in a

17    window.  I don't know, but that was -- that's inconsistent with

18    what the reason for the stop is.

19            THE COURT:  But they may also -- the testimony may

20    just as plausibly be, "We're looking for a gun because this is a

21    high-crime area."

22            MR. MEJIA:  And Your Honor has said that can come in,

23    so Your Honor has made that ruling.  So that's what I'm stuck

24    with and that's what I'm defending on.  I can't do anything but

25    that, Judge.

1          MS. KEEL:  Your Honor, I think -- I do understand, I

2    think, Mr. Mejia's argument that he included that statement in

3    his opening because of Your Honor's ruling keeping in that

4    information.  We would simply ask that the portion of the video

5    where the statement actually occurs be played, which, again,

6    there wasn't a court ruling keeping that out previously, and

7    it's something that the defendant had never moved to suppress.

8    It was part of the evidence put on at the suppression hearing,

9    but it places that statement that's now been brought up by

10   Mr. Mejia into context.

11      So we would just simply ask that we be allowed to play that

12   portion of the video, question on direct Detective Hogan about

13   those statements and --

14          THE COURT:  What about that do you have a problem

15   with?

16          MR. MEJIA:  I have no problem with that.  Your Honor

17   has --

18          THE COURT:  Right.

19          MR. MEJIA:  -- has ordered that they can, so there's

20   nothing I can do, Judge.  You've said they can.

21          THE COURT:  Let me make one observation.  Well,

22   you-all are framing this conflict, not me.  I'm trying to sort

23   through the objection, the request to revisit my prior ruling.

24   So if anybody here is going to be exasperated, it's going to be

25   me.  All right?

1          MR. MEJIA:  Okay.

2          THE COURT:  So it seems that there is no conflict with

3    respect to your second issue.  Now, do you want to respond to

4    the first?

5          MR. MEJIA:  Yes.  In the opening statement, the

6    prosecution opened the door by saying what my client's defense

7    was, by he is asserting some kind of mistake, or accident, or

8    lack of knowledge, or that whatever explanation the defense is

9    going to give, he can't be simply a victim of poor luck.

10       Having opened that door, I'm certainly allowed to tell the

11   jury:  This is a case of a charge involving November 11 and 12.

12   You'll hear no evidence of the defendant having it in his hand,

13   giving it to anybody, receiving it from anybody, offering it for

14   sale, anybody who he ever got it from or anybody --

15         THE COURT:  I think your opening expanded the time

16   frame a bit more than that.  I think you said something to the

17   effect of three months prior, three months after, something

18   along those lines.

19         MR. MEJIA:  She opened the door on that too.  She said

20   he's been doing this for three months.  He's had the car for

21   three months.  The drugs have been there for three months.

22       I then responded to it.  I'll wait for evidence of him

23   having possessed it in three months, bought it in three months,

24   delivered it in three months.  They opened the door on that

25   beyond the indictment, which is November 11 and November 12.

1    They opened it.  I responded to it.

2            THE COURT:  I heard the same opening that you-all

3    heard.  She told the jury what the evidence would be with

4    respect to his rental of the car in question.

5        I don't see this as reopening the 404(b) issue, but I do

6    think that it foreshadows an issue that could reopen the door to

7    404(b) evidence, depending upon the scope of cross.  If cross is

8    to the effect -- to any of these officers who is familiar with

9    the defendant's criminal history, to the effect of "there is

10   nothing here," they cannot expected to not answer that question.

11   So if either side has a question about that scope, then before

12   the question is asked, you need to ask to approach, and we'll

13   make sure we're all on the same page.

14       I think it's fair for the Government to point out the length

15   of possession of the car per the rental agreement.  That's the

16   context of the case here, the res gestae, if you will.  I think

17   it's also fair for the defense to point out that there is no

18   evidence of drug dealing, or whatever else they want to point

19   out, in the time period of that -- of the possession of that

20   car.  But I also think that if it gets beyond that, if it gets

21   to trying to suggest to the jury that there is no evidence that

22   my client has that in his background, in his history, I think

23   that's going to be misleading the jury, and we're not going to

24   mislead the jury.

25           MR. MEJIA:  I agree.

1          THE COURT:  So if we get to a point where we need to

2    talk more about that, then you-all may approach.  Let me see the

3    lawyers at the bench for just a minute before we bring the jury

4    in.

5        (Bench conference on the record.)

6          THE COURT:  I didn't want to say this in open court so

7    as to embarrass your client or his family.  I would ask you to

8    ask him to refrain from gesturing.

9          MR. MEJIA:  Of course.

10          THE COURT:  We all get excited.

11          MR. MEJIA:  Of course.

12          THE COURT:  He has a lot of pressure on him.  I have

13    no doubt about that, but I can't have him holding his hands out

14    and looking at me as if I'm a referee in a provoking --

15          MR. MEJIA:  You're right.  I'll admonish him severely.

16          THE COURT:  That's best for him as well, especially

17    when the jury is in here.  So, again, I can't imagine the

18    pressure he's under, but he can't express himself in that way in

19    the courtroom in any event.  So are we ready to have the jury

20    come in and you-all are ready to start?

21          MR. MEJIA:  And I apologize for my response to you

22    this morning too, Judge.

23          THE COURT:  No, no, that's okay.  We're good.  We're

24    ready to go with the first witness?

25          MS. MCKENZIE:  Yes, Your Honor.

1    (End of bench conference.)

2    (Jury in 9:32 a.m.)

3        THE COURT:  Good morning, members of the jury.  We

4    are, as you can tell, starting just a few minutes late.  We had

5    a little bit of work to do this morning.  We hope that that work

6    will make the day's work for you-all a bit more efficient.  So

7    we are now ready to begin with our first witness.

8    Ms. McKenzie.

9        MS. MCKENZIE:  United States calls Detective Robert

10   Holland.

11   (DETECTIVE ROBERT TYLER HOLLAND, called by the Government,

12   sworn.)

13                    DIRECT EXAMINATION

14   BY MS. MCKENZIE:

15   Q.  Good morning.  Can you introduce yourself to the jury.

16   A.  Detective Robert Holland with the Louisville Metro Police

17   Department.

18   Q.  Do you -- excuse me.  Do you go by another name as well?

19   A.  Detective Robert Tyler Holland is my full name.  I go by

20   Tyler.

21   Q.  Detective Holland, how long have you been a police officer?

22   A.  I've been a police officer now for eight years.

23   Q.  And what is your current assignment in the police

24   department?

25   A.  Current assignment, I'm with the Ninth Mobile Fugitive Unit.

```
 1   At the time of this incident, I was with the Street Squads,

 2   which is in the same division.

 3   Q.  Okay.  And can you explain what that means?  Everything you

 4   just said --

 5   A.  Sure.

 6   Q.  -- can you explain it?

 7   A.  So the Ninth Mobile Street Squads, we are tasked with riding

 8   violent areas of town here in Louisville.  So where there's

 9   shootings, violent robberies, homicides, murders, things like

10   that, that's where we focus our attention.

11   Q.  So you're not -- like other divisions within the department,

12   not responsible for a defined geographic area; is that correct?

13   A.  Right, right.

14   Q.  Okay.  Do you drive marked cars?

15   A.  We drive unmarked cars.

16   Q.  Do you ride by yourself?  With a partner?

17   A.  No, we usually ride with another officer, if not two other

18   officers.

19   Q.  Do you wear a uniform?

20   A.  Yes, yes.

21   Q.  Is it --

22   A.  It's different than a patrol uniform.  So we wear a uniform

23   that says the Ninth Mobile.  It has "police" on the sides.  We

24   wear a tactical outer vest with tools that we use.  So I have

25   like a taser on the outside of my vest and extra magazines and
```

Holland - Direct

1    things like that.

2    Q.  So what are your duties in this unit?  Are they -- is this

3    an investigative unit?

4    A.  It is, but it's also a proactive unit.  So, again, one of

5    the main responsibilities is to take weapons off the streets

6    that are being used to, you know, commit murders and violent

7    crime.

8    Q.  To that end, are you -- I guess what I'm asking you is do

9    you spend -- how much of your time do you spend at a computer

10   versus on patrol?

11   A.  Right.  So we spend the majority of our shift on the

12   streets.  We don't sit at the desk.  We have a roll call for

13   maybe 30, 45 minutes, and then we're hitting the streets and

14   we're riding the areas that, again, are experiencing violent

15   crime.

16   Q.  How long have you been in this particular division in the

17   police department?

18   A.  Now it's probably about three-and-a-half, four years I've

19   been with the Ninth Mobile.

20   Q.  Were you in that division in November of 2015?

21   A.  Yes.

22   Q.  Do you recall November 11th, 2015, a traffic stop you made

23   at the intersection of Wilson Avenue and Olive Street --

24   A.  Yes, ma'am.

25   Q.  -- here in Louisville?

1   A.   Yes.

2   Q.   Do you know, is that location inside Jefferson County?

3   A.   Yes.

4   Q.   In the Western District of Kentucky?

5   A.   Yes, ma'am.

6   Q.   Do you recall about what time this happened?

7   A.   It was nighttime.  I'd say around 10:00 to 11:00 p.m.,

8   somewhere in there.

9   Q.   Okay.  Do you recall what kind of car you stopped?

10  A.   Yes, it was a dark-colored Dodge Charger.

11  Q.   And do you recall who was driving it?

12  A.   Yes, Cherosco Brewer.

13  Q.   Okay.  Do you see that individual in the courtroom?

14  A.   Yes.

15  Q.   Okay.  And could you indicate for the court record --

16  A.   Sure, black male wearing headphones wearing a blue shirt.

17  Q.   Thank you.  So do you recall why you stopped this car?

18  A.   Yes.

19  Q.   And can you explain to the jury how --

20  A.   Sure.

21  Q.   Just those circumstances and how this all came about?

22  A.   Sure.  So myself and Detective Hogan were, again, riding in

23  an area that had been experiencing violent crime.  We were

24  actually northbound on 18th Street, and Mr. Brewer actually

25  passed us southbound on 18th Street.  When he passed us, I

1   noticed that the vehicle was traveling at a high rate of speed.

2   So that initially drew my attention to that vehicle.

3       I then noticed the vehicle turn left -- I'm sorry.  It would

4   have turned right to go westbound onto Wilson Avenue.  When it

5   turned westbound to go on Wilson Avenue, I noticed, as I was

6   looking over my left shoulder, that the vehicle had excessive

7   window tint.  So it was so dark -- the vehicle's windows were so

8   dark that I couldn't see in who was driving, if that person was

9   wearing a seat belt or how many people were in the vehicle, so I

10  decided to stop the vehicle.

11      We stopped the vehicle at Wilson and Olive Avenue.  As I was

12  getting out of my car -- again, I noticed how dark his windows

13  were, Mr. Brewer's windows -- that I actually stayed at my door

14  frame so I would not approach his car, and I did that for

15  numerous reasons.  The most important reason is I don't want

16  to -- as a law enforcement officer, I don't want to approach a

17  vehicle that I can't see into.  So I don't know if there's

18  somebody, you know, sitting down behind those windows that has a

19  weapon that's wanting to do me harm, so I want to see inside the

20  car.  So I actually stayed at my door frame and gave loud

21  commands for him to roll down the windows, which he didn't.  He

22  actually cracked the window.

23      And now in eight years in law enforcement, I have not seen

24  that a lot.  So usually when I stop people and I give loud

25  commands, usually people are compliant and will roll down all

1    the windows so I can see in so they feel comfortable and I feel

2    comfortable, but Mr. Brewer didn't.  He actually cracked his

3    driver's side window, and I decided to approach anyway.  And I

4    remember going up to the driver's side window, and I could only

5    see -- it was so dark that I could only see where I shined my

6    flashlight and --

7    Q.  I'm sorry.

8    A.  Sure.

9    Q.  I just want to take a breath and -- before we lose a couple

10   of things that you said.  You mentioned that you noticed the car

11   traveling at a high rate of speed.

12   A.  Yes.

13   Q.  Is your vehicle equipped with a radar gun?

14   A.  No.

15   Q.  Okay.  So were you able to precisely tell how fast the car

16   was traveling?

17   A.  No.

18   Q.  Okay.  Did you cite him for speeding?

19   A.  No.

20   Q.  Okay.  When you say "I noticed it was traveling at a high

21   rate of speed," can you clarify?

22   A.  Sure.  It's really hard to clarify that and explain that.

23   It's just something that, you know -- I'm sure you guys have

24   been out driving and sitting at a red light or stop sign and you

25   notice a car was traveling pretty fast.  It's just something you

1    kind of know.  It's really hard to explain.  And maybe even

2    you've been sitting at a stop sign or a stoplight and you

3    actually could feel the car kind of shake your car a little bit

4    because that's how fast it was traveling, which I didn't in this

5    circumstance, but it was just something that I knew.  I just

6    knew it was traveling at a high rate of speed because we weren't

7    going fast.

8    Q.  It just caught your attention?

9    A.  Caught my attention, that's it.

10   Q.  Okay.  And so you said that -- before I rudely interrupted

11   you, you approached the vehicle after Mr. Brewer cracked the

12   window.

13   A.  Right.

14   Q.  And what did you do as you approached?

15   A.  So as I approached, again, I'm trying with my flashlight to

16   look in to see if I can see anything.  And I just do that for --

17   again, for safety reasons.  I want to see people's hands.  If I

18   can't see these, it's an issue for me and any law enforcement

19   officer so -- you want me to continue?

20   Q.  Yeah.

21   A.  So as I got up to his window, it was so dark, again, that

22   you could only see where the flashlight shined.  One of the

23   first things I noticed was there was a towel that he actually

24   had draped up on to the speedometer.  So he was covering all the

25   interior lights.  There was no interior lights because he was

Holland - Direct

1   covering it by a towel, which, again, I have not seen in that

2   eight years.

3        So for me -- you know, Spider-Man has like "Spidey senses."

4   It's the same with police officers sometimes.  You know, we see

5   certain things.  We feel certain things and I knew that there

6   was something different about this.  And I immediately felt

7   uncomfortable and I knew that I had to get him out of that car,

8   away from whatever may be in there.

9   Q.  Okay.

10  A.  Sure.

11  Q.  I want to take a pause again.  Were you wearing a body

12  camera at the time?

13  A.  Yes.

14  Q.  Was your body camera activated at this point in the traffic

15  stop?

16  A.  It was not.

17  Q.  Okay.  Why was it not activated yet?

18  A.  So we had just gotten our body cameras and it's not an

19  excuse, but it was really hard for me at first to train myself

20  to turn on a body camera when I already had a routine that I

21  would do when I would stop vehicles.

22       So when I stopped cars, the first thing that, you know, I

23  would think about at the time was I have to get out of the car

24  before they get out of the car as far as -- and I know that may

25  not make sense but -- and I'm trying to explain it a little bit

1  better, but there were certain procedures that I had to make

2  sure were in place before I turned on my body camera.  My safety

3  was first.

4      So I -- at the time, I just was not used to turning it on,

5  which I've gotten completely better at that and now it's muscle

6  memory for me to turn on my body camera.  But at the time,

7  muscle memory was not developed yet in doing that, so that's why

8  my body camera was not on.

9  Q.  Okay.  Would you agree with me that it should have been on

10  at this point?

11  A.  Yes, absolutely.

12  Q.  Okay.  And so I believe I interrupted you right after you

13  said you -- after seeing the towel, something said to you -- you

14  got Mr. Brewer out of the car for safety reasons.

15  A.  Right.  So we had -- we had a short conversation.  I don't

16  remember exactly what was said, but I know that I asked him to

17  step out of the vehicle, which he did.  He complied.  And he

18  actually stepped out of the vehicle actually recording with his

19  cell phone, which is not a problem.  I'm used to seeing that so,

20  you know, that didn't faze me to any extent at all.

21      So I asked him to step back to the car, to the back of his

22  car, which he did, complied.  And through talking with him, I

23  also noticed -- and a piece that I forgot to tell you about, so

24  as he was -- before he stepped out of the car -- so we'll go

25  back just a little bit.  Before he stepped out of the car, I

1    noticed that -- there's a carotid artery in your neck that we

2    all have that was pulsating very fast, and that was something

3    that I was trained to look for when talking with people, so I

4    knew that Mr. Brewer was nervous.

5        And just to kind of further explain this carotid artery.  So

6    when you work out or you're running and your heart rate gets

7    going, most people will check their pulse.  I mean, have --

8    you-all have seen that; correct?  So you'll check your pulse.

9    Maybe it's through your neck -- that's your carotid artery -- or

10   on your arm.  Well, his was moving so fast and I knew that he

11   didn't just get done working out.  I mean, he was out driving a

12   vehicle.  So I knew that he was very nervous and that was one of

13   the reasons too why I had him step out of the car.

14       So when I took him to the back of the car -- so we'll go

15   back there -- we had a bit more conversation, and then I

16   remember our K-9 dog showing up to the stop.  And the K-9 dog

17   actually got out and went around his vehicle and indicated on

18   the driver's side.  And, again, I'm with Mr. Brewer.  So when

19   the dog indicated on the driver's side, I immediately put him in

20   handcuffs to detain him, and I did this to prevent flight, to

21   prevent him from fighting and, really, the totality of

22   everything that's been going on.

23       So you have to think about the towel that was covering the

24   dashboard, his carotid artery that was pulsating pretty fast,

25   and I put all those things together and I said, "There's just

1    not -- something's not right."  So I'm going to put him in

2    handcuffs to prevent something bad from happening, for his

3    safety and mine.

4    Q.  At that point, you said the dog indicated on the car.  Is

5    that a dog that you have dealt with before?

6    A.  Yes.

7    Q.  Okay.  And the jury will hear from the dog's handler later

8    with more specificity, but at the point where the dog indicated

9    on the car, did you know what was inside the car?

10   A.  No, no idea.

11   Q.  Okay.  In your experience on the street squad, when a dog

12   makes an indication like that, is there usually something in the

13   car?

14   A.  Absolutely.

15   Q.  And so you said you put Mr. Brewer in cuffs at that point to

16   secure everything and maintain control of the situation.  Did

17   you have any -- did you have any further -- did you find out

18   what was in the car?

19   A.  Eventually, yes.

20   Q.  Okay.  Was the car searched?

21   A.  Yes.

22   Q.  And relative to the dog indicating on that car, what did

23   you-all find in the car?

24   A.  So after I detained Mr. Brewer, I heard someone and I cannot

25   clarify who --

1          MR. MEJIA:  Objection.  Hearsay.

2    BY MS. MCKENZIE:

3    Q.  Without saying what you heard --

4    A.  Okay.  So --

5    Q.  -- do you know what was retrieved from the car?

6    A.  Right.

7          MR. MEJIA:  Objection, unless he saw it.

8          THE WITNESS:  Which I did.

9          THE COURT:  He can answer the question.

10   BY MS. MCKENZIE:

11   Q.  Did you see what was retrieved from the car?

12   A.  Yes.

13   Q.  What was retrieved from the car?

14   A.  There was a black Glock handgun and multiple bindles of

15   marijuana.

16   Q.  And are you -- were you patrolling that night alone or with

17   others?

18   A.  With others.

19   Q.  Okay.  Were you riding in your police vehicle alone or with

20   anyone else?

21   A.  I was in my police vehicle with someone else.

22   Q.  Okay.  Who?

23   A.  Detective Hogan.

24   Q.  Detective --

25   A.  Holly Hogan.

1    Q.   Okay.  Another member of the Ninth Mobile Division?

2    A.   Yes.

3    Q.   Okay.  And are you the lead officer on the charges that came

4    from the stop?

5    A.   No.

6    Q.   Is that Detective Hogan?

7    A.   Yes, Detective Holly Hogan is the lead officer.

8    Q.   Do you know -- do you recall, was Mr. Brewer driving alone?

9    Did he have a passenger in the car?

10   A.   Mr. Brewer also had a passenger.  It was a female that was

11   with him.

12   Q.   Okay.  Was the female charged with anything?

13   A.   No, not that I can recall.

14   Q.   So in a situation like this where you have a vehicle that

15   has been stopped, searched, and drugs and a gun retrieved, what

16   do -- what happens with the things that come out of the car?

17   A.   So everything that comes out of the car we take to our

18   property room so it's secured.

19   Q.   Okay.  And did you assist Detective Hogan in keeping track

20   of what was coming out of the car and --

21   A.   Yes.

22   Q.   -- helping bag it?

23   A.   Yes.

24   Q.   For transport to property?  Did you also assist with

25   Mr. Brewer himself?

Holland - Cross

1   A.  Yes.

2   Q.  In what way?

3   A.  Obviously, placing handcuffs on him and then putting him

4   into my vehicle to be secured and transported to the jail.

5           MS. MCKENZIE:  Detective Holland, I don't have any

6   further questions for you at this time.  Mr. Mejia probably

7   does.  Please answer those.

8           THE WITNESS:  Yes, ma'am.

9                       CROSS-EXAMINATION

10  BY MR. MEJIA:

11  Q.  You have been a police officer for how many years?

12  A.  Eight years.

13  Q.  So by simple math -- I'll let you do it -- as of

14  November 11, 2015, you had been a law enforcement officer with

15  LMPD for how long?

16  A.  Five years.

17  Q.  About five, okay.  And in the five years you've had other

18  assignments?

19  A.  Yes, sir.

20  Q.  Okay.

21  A.  One other assignment.

22  Q.  Were you a patrolman as well?

23  A.  Yes, sir.

24  Q.  And as of November 11th at about 10:00 at night or 11, as

25  you say this -- these events occurred, had you ever before that

Holland - Cross

1    time seen Cherosco Brewer?

2    A.   No.

3    Q.   Okay.  You have said to us that you're in this unit that

4    isn't assigned any particular geographic area.  You go to

5    different -- all parts of the city, concentrating on trying to

6    find or enforce the laws as it relates to violent offenses,

7    shootings, guns, things of that nature; right?

8    A.   Yes, sir.

9    Q.   Okay.  Now, you were driving the car, the police vehicle

10   that night.  And you've said you were going on what street in

11   what direction when you first saw the Dodge?

12   A.   Northbound on 18th Street.

13   Q.   All right.  And the car was -- this car you observed coming

14   at you from the other direction?

15   A.   Right, southbound.

16   Q.   Now, you had never seen that vehicle before that night.  Is

17   that accurate to say?

18   A.   Right.

19   Q.   Okay.  Now, police officers, in the course of your duties,

20   you're sometimes called to a location to assist other officers;

21   right?  I mean, in the course of your duties as a policeman?

22   A.   As a patrolman, yes, sir.

23   Q.   Yes.  You weren't called to a location that night to Olive

24   and -- what was the intersection, Olive and what?

25   A.   Wilson -- well, Wilson and Olive.

1    Q.  Okay.  Just so the jury is clear, you weren't called to

2    Olive and Wilson before this event occurred, were you?

3    A.  No, I was not called there.

4    Q.  Okay.  And, of course, you didn't know the events that were

5    going to occur before they happened.  All of the events are

6    taking place in what we call realtime.  You've described that to

7    the jury here.

8    A.  Right, yes.

9    Q.  All right.  And what you observed as the driver of the

10   vehicle there, the police vehicle, was a car driving at an

11   excessive speed?

12   A.  Yes.

13   Q.  Okay.  Now, as of that time to the present day, has

14   Mr. Brewer ever been charged with the crime of speeding?

15   A.  I'm not sure, sir.

16   Q.  Okay.  You are aware, however, that as a result of the

17   events of November 11th, he was charged with tinted windows,

18   excessive tinted windows, aren't you?

19   A.  On that particular stop?

20   Q.  Yes.

21   A.  Yes, sir.

22   Q.  Okay.  Now, initially that charge of excessive tinted

23   windows and the charge with regard to marijuana and the charge

24   with regard to the possession of the firearm, those were brought

25   in the criminal proceedings in state court.  That was the first

1   steps after the investigative steps; isn't that right?

2   A.  Yes, sir.

3   Q.  Okay.  And up to the present date -- you're aware that we're

4   now here in federal court -- the charges in state court, that is

5   by the commonwealth attorney of Jefferson, in Jefferson Circuit

6   Court, those charges have all been dismissed.  You're aware of

7   that?

8   A.  Right.

9   Q.  Okay.  And as a matter of fact, in 2017, the excessive

10  window charge --

11          MS. MCKENZIE:  Your Honor, may we approach?

12          THE COURT:  Yes.

13      (Bench conference on the record outside the hearing of the

14  jury.)

15          MS. MCKENZIE:  I know that we have litigated prior to

16  trial the issue of the case being taken to federal court from

17  state court and the motivations behind that.  That is something

18  the court ruled on.  I don't know exactly where Mr. Mejia is

19  going with this, but I am afraid that we are retreading that

20  ground to the jury and I --

21          MR. MEJIA:  I'm not going into that, that the gun and

22  drug charges were dismissed and brought here.  I'm not going

23  into that.  After the case was brought here, those charges were

24  dismissed, that is the gun and the drugs on both days.  The

25  excessive window charge, however, went on.  It wasn't dismissed

```
 1   until quite recently.  Your Honor's aware --

 2           THE COURT:  The excessive --

 3           MR. MEJIA:  The excessive window tint car charge was

 4   voluntarily dismissed by the prosecution, and it has nothing to

 5   do with federal charges.  That's still carried over in state

 6   court.  They've voluntarily dismissed it so there's never been a

 7   conviction of excessive window tint, and that's all I was going

 8   to ask him.

 9           THE COURT:  I think he can make that point.  I

10   think --

11           MR. MEJIA:  I'm not going into anything of the

12   prosecution or selective prosecution.  I'm not doing any of

13   that.

14           MS. MCKENZIE:  Okay.

15           THE COURT:  You can redirect on that issue, if you

16   choose to.

17           MS. MCKENZIE:  Sure.

18           THE COURT:  Obviously, there's no federal law for

19   excessive window tinting.  I mean, you can only go so far.

20           MR. MEJIA:  Of course.

21           THE COURT:  That's fine.  Thank you.

22       (End of bench conference.)

23   BY MR. MEJIA:

24   Q.  You are aware that the excessive window tint charge was

25   initially brought in the Jefferson District or Jefferson Circuit
```

```
 1    Court as a violation of the law in Jefferson County, that is
 2    after November 11 of 2015, you're aware of that?
 3    A.  Yes.
 4    Q.  Okay.  And you're the officer on that charge, you and
 5    Officer Holly Hogan; right?
 6    A.  Yes, sir.
 7    Q.  Okay.  Now, despite the matter being now here in federal
 8    court, following at all times November 11th of 2015, that
 9    excessive window case continued and went on and was pending in
10    the Jefferson County court for a period of time or years, was it
11    not?
12    A.  I'm not sure, sir.
13    Q.  Well, on May 31st of 2017, according to the records of the
14    Jefferson Circuit and District Courts, that charge was
15    voluntarily dismissed by the commonwealth attorney of Jefferson
16    County.  You're aware of that, aren't you?
17    A.  I'm not.
18    Q.  Okay.
19    A.  I haven't looked into that, no, sir.
20    Q.  So be that as it may, Mr. Brewer has never been convicted of
21    excessive window tint in relation to the stop that was made and
22    the actions that you took on November 11th; isn't that correct?
23    A.  I'm not sure, sir.
24    Q.  Okay.  Well, are you -- you would be aware of that, as the
25    officer in the case, whether somebody is convicted or not,
```

Holland - Cross

1    wouldn't you?

2    A.   If I was the lead officer I would, yes, sir.

3    Q.   Okay.  Well, you and Officer or Detective Hogan are still

4    officers with the Louisville Metro Police, are you not?

5    A.   Yes.

6    Q.   Okay.  So you have told us of the events that -- as they

7    occurred.  You took the initial step to stop that car because

8    you had seen it driving -- by your intuition, your judgment,

9    your experience, you had seen it driving at an excessive rate of

10   speed over the speed limit, which violates the law.  That's what

11   you saw?

12   A.   Right.

13   Q.   And that's why you pulled that car over, isn't it?

14   A.   It's not why I pulled the car over.

15   Q.   Well --

16   A.   What initially drew my attention to the car was the car was

17   moving at a high rate of speed.  The reason I stopped the car

18   was excessive window tint.

19   Q.   Right.  Well, you've told us that you were not the lead

20   officer in the case.

21   A.   Right, not the lead officer, yes, sir.

22   Q.   Okay.  And certainly by the time Officer Hogan, as the lead

23   officer on the case, wrote up the citation, she said it was

24   stopped for two reasons, excessive rate of speed and -- excuse

25   me -- excessive driving at a high rate of speed and tinted

1    windows.  That was the two reasons why that car was stopped.  Is

2    that accurate?

3    A.  That's -- you're saying that's what she said in her

4    citation?

5    Q.  Yes, yes.

6    A.  Okay.  Yes, sir.

7    Q.  And you agree with that?  You agree with that's why the car

8    was pulled over.

9    A.  The reason for the stop was not -- was not that it was

10   traveling at a high rate of speed.  I don't have a radar to

11   actually confirm that for sure, but, again, that's what

12   initially drew my attention.

13   Q.  Right.  And so would it be correct to say that driving at

14   excessive rate of speed violates the laws of the Commonwealth of

15   Kentucky?

16   A.  Yes, if that officer can deem it and tell and know for sure

17   how fast you're traveling, yes.

18   Q.  Okay.  And from that time to the present, you still can't

19   say to this jury, because you've admitted it here -- you didn't

20   have a radar gun -- you can't say how fast in excess of the

21   speed limit it was going, can you?

22   A.  I cannot.

23   Q.  All right.  What was the speed limit there at that location?

24   Could you tell us that?

25   A.  I can't say for sure.

1   Q.   Okay.  So you can't tell us whether it was five miles over

2   the limit?  Seven miles?  Fifteen?  Give us your best estimate.

3   With all the experience you've got, how far over the speed limit

4   was it going?

5   A.   I can't tell for sure.

6   Q.   All right.  So there is so much uncertainty to that that

7   even to this day we can't say whether he violated the law of

8   speeding, can we?

9   A.   Well, again, that has no weight on why I stopped the car.

10  Q.   Okay.

11  A.   I stopped the car for excessive window tint.

12  Q.   And to this date, we can't ever say that he ever violated

13  the law of excessive window tint because that's never been shown

14  in a court of law, has it?

15  A.   That's why we're here today.  We're showing that he had

16  excessive window tint.

17  Q.   Right.  Well, there's no federal charge of excessive window

18  tint.  You're aware of that, aren't you?

19  A.   Right, yes, there's no federal charge for excessive window

20  tint.

21  Q.   In fact, you know we're here today on the charges that there

22  are, Counts 2, 3, and 4, possession of marijuana and possession

23  of a firearm in furtherance of a drug trafficking offense.

24  That's what you're aware of, aren't you?

25  A.   The possession of marijuana, I'm not for sure.  I thought it

Holland - Cross

1    was called something else, but with the firearm charge, the

2    second charge you stated, yes, sir.

3    Q.   All right.  So as of the time that you approached the

4    vehicle, Mr. Brewer rolled his window down just part way.  He

5    cracked the window for you.  Right?

6    A.   Yes, sir.

7    Q.   And he handed you his driver's license and registration or

8    whatever you had requested?

9    A.   Again, I can't remember our conversation.

10   Q.   Okay.

11   A.   I'm sure he did.

12   Q.   He didn't --

13   A.   And that's one of the typical things that I will ask for is

14   a driver's license.

15   Q.   Okay.  That would be routine and that would be routine for

16   somebody to give it to you?

17   A.   Yes, sir.

18   Q.   Okay.  And it doesn't stick out in your mind that he ever

19   did or said anything to disobey any command by a police officer,

20   did he?

21   A.   No.

22   Q.   All right.  In fact, you asked him to get out of the

23   vehicle; right?

24   A.   Yes, sir.

25   Q.   That was because you saw a towel on his dashboard?

Holland - Cross

1   A.   A multitude of things.  So the towel on the dashboard --

2   Q.   And you saw the carotid artery, as you've described it here?

3   A.   Yes, sir, more than the carotid artery, but just the carotid

4   artery was pulsating very quickly.

5   Q.   Okay.  So let me understand this.  The car was so dark that

6   you couldn't see into it, but you could see his carotid artery?

7   A.   With the help of my flashlight, yes, sir, the same way I saw

8   the towel.

9   Q.   All right.  So having seen -- and, of course, now, you had

10  never seen him before to see his carotid artery, to see and

11  observe it ever.  Of course, that -- because you had never seen

12  him before; correct?

13  A.   Right.

14  Q.   All right.  And you wouldn't know how many times he had been

15  stopped for tinted windows by Louisville Metro Police Department

16  as of November 11, 2015?  You didn't know how many times he had

17  been stopped for excessive --

18  A.   No, sir.

19  Q.   -- excessive windows, but you know today, don't you --

20  A.   Not exactly, no.  I know he was stopped before for excessive

21  window tint, but as far as --

22  Q.   Right.  In fact, you know it because you are the named

23  defendant in a civil rights suit, Cherosco Brewer versus Robert

24  Holland and about eight other Louisville Metro police officers.

25  You know that, don't you?

Holland - Cross

1    A.   Yes, sir.

2    Q.   And you also know that you had and have counsel appointed to

3    represent you in a federal proceeding for violation of his civil

4    rights -- his rights under the Civil Rights Act.  You're aware

5    of that?

6    A.   Yes, sir.

7    Q.   And you know that to violate the civil rights of a citizen

8    is something that is -- that violates your duty and your oath as

9    a law enforcement officer.  You know that, don't you?

10   A.   Yes, sir.

11   Q.   Okay.  Now, you placed handcuffs on a man who you cannot say

12   how excessive of the speed limit he was driving, nor how

13   excessive the windows were tinted, but in your mind, that was

14   reason to handcuff him because you felt funny.  Is that

15   accurate?

16   A.   Not at all.

17   Q.   Okay.

18   A.   So the reason I handcuffed him, again, if you want me to

19   proceed, the towel on the dashboard, his carotid artery

20   pulsating very quickly.  And, again, remember when I told you I

21   have made traffic stops now for eight years as a law enforcement

22   officer.  Everybody that I've ever given loud commands to roll

23   down their windows, they roll them down and he did not.  He

24   cracked his window.  Again, that's in my mind not good.  As I'm

25   talking to him, the carotid artery and then noticing the towel

Holland - Cross

```
 1    up in the dashboard covering all the lights, which I've never
 2    seen before.
 3    Q.  Would it be accurate to say that handcuffing a citizen
 4    deprives them of their freedom of movement and their freedom
 5    to --
 6            MS. MCKENZIE:  Your Honor, may we approach?
 7            THE COURT:  You may.
 8        (Bench conference on the record outside the hearing of the
 9    jury.)
10            MS. MCKENZIE:  Again, I know this is something that we
11    litigated on briefs and the court has ruled upon.  My
12    understanding of the court's ruling is that Mr. Mejia is
13    entitled to cross-examine as to the fact that Mr. Brewer has a
14    pending civil suit against these officers.  The court's order
15    specifically said that Mr. Brewer would not be entitled to
16    litigate the merits of those claims in this trial, and I think
17    that's where we're going.
18            THE COURT:  That is in my December 6th order, footnote
19    1.  I did indicate that while I would allow you latitude to
20    cross-examine the relevant Government witnesses regarding the
21    existence of the civil rights suit, we're not going to get into
22    the merits of the civil suit.
23            MR. MEJIA:  I think that's --
24            THE COURT:  It's fair for you to point it out, that it
25    exists.  I think it's fair for you to probe as to whether there
```

1   is a bias as a result of the existence of a suit, but we are not

2   going to get into the merits of that.  I'm not going to have a

3   suit within a suit.

4         MR. MEJIA:  No, I'm -- I didn't know that's what I was

5   doing.  I'm just simply -- I was trying to get to the point that

6   he handcuffed a man who's compliant with him in every way and

7   who was nowhere near any kind of a weapon.

8         THE COURT:  And I think that's a fair area of

9   cross-examination.

10        MR. MEJIA:  That's all I was doing.

11        MS. MCKENZIE:  Well, but it was framed as "you do

12   understand that it is a civil rights violation."

13        THE COURT:  Well --

14        MR. MEJIA:  No, no, I didn't -- I don't think I asked

15   that.

16        THE COURT:  I think it's a fair area of inquiry to ask

17   about why he chose -- why the arresting officer chose to place

18   the defendant in handcuffs.  I think that's a fair area of

19   inquiry, but I will caution with respect to my prior ruling.

20   Thank you.

21      (End of bench conference.)

22   BY MR. MEJIA:

23   Q.  Having never seen the man before and after he complied with

24   every order that you gave him, you found it necessary to

25   handcuff him for your safety.  Is that accurate?

1    A.   Yes.

2    Q.   Okay.  Now, at this time, how many other officers are there

3    at the location with you as you handcuff him at the rear of the

4    vehicle?

5    A.   I'm not sure.

6    Q.   Well, there were --

7    A.   I know there were other officers there, but I'm not sure an

8    exact number.

9    Q.   There were multiple -- there were multiple police cars

10   there, weren't there?

11   A.   I'm not sure.

12   Q.   Okay.  There was --

13   A.   My sole attention is on Mr. Brewer.

14   Q.   Right.

15   A.   I'm not looking around or anything like that.

16   Q.   And your sole attention -- and, of course, we're in a

17   courtroom and this is a record.  We're not being videoed here.

18   You're a white or Caucasian officer and you're in the presence

19   of an African-American man.

20          MS. MCKENZIE:  Your Honor, may we approach?

21          THE COURT:  Yes.

22      (Bench conference on the record outside the hearing of the

23   jury.)

24          MR. MEJIA:  I have to put this on the record, that

25   he's black and he is white.  I have to do that in terms of the

Holland - Cross

```
 1    reasonableness of his conduct.  Judge, he's handcuffing a man

 2    who's not violated any direction or violated any law, and

 3    this --

 4              THE COURT:  You pointed that out.  You've pointed that

 5    out.

 6              MR. MEJIA:  I've got to point it out on the record

 7    that my client is black.

 8              THE COURT:  That's already in the record.  What does

 9    the witness's race have to do with his actions as --

10              MR. MEJIA:  The unreasonableness of his conduct, and

11    the credibility of his police steps that he's taken, and all of

12    the things that are done here.

13       My client is nowhere near that gun, and he's nowhere near

14    any danger, and he's nowhere near -- and it goes to the

15    reasonableness and the believability and credibility of this

16    officer.

17              THE COURT:  All of those issues that you just said,

18    nowhere near the gun, not a threat, those are all fair questions

19    to ask.

20              MR. MEJIA:  And I said --

21              THE COURT:  I'm not sure you've asked all of them, but

22    those are all fair questions to ask.

23              MR. MEJIA:  Judge, with all due respect, if you're

24    going to say I can't say that the client -- that my client is

25    black and he's white --
```

Holland - Cross

```
 1              THE COURT:  Let's have a rule of thumb here.  Do not
 2    preface anything to me with all due respect, because we all know
 3    that when anyone says "with all due respect," that is not what
 4    they mean.
 5              MR. MEJIA:  I apologize, Judge.
 6              THE COURT:  Okay.  What I am saying --
 7              MR. MEJIA:  I accept your ruling.
 8              THE COURT:  -- is we are not going to litigate his
 9    civil rights lawsuit here.  You've made the point.  The jury is
10    aware of its existence.  It is fair for you to ask him and
11    cross-examine him soundly on issues with respect to the nature
12    of the arrest and his reasons for it.  You have done that, but
13    with respect to a racial motivation, I think we need to be
14    very -- I think we need to tread very carefully.
15       I also trust you can fix whatever issues you think you need
16    to fix with respect to this witness's conduct on redirect.
17              MS. MCKENZIE:  Sure.  I just didn't want this to go
18    further.
19              THE COURT:  But your cross-examination is, in my
20    estimation, Mr. Mejia, effective, but I am not interested in
21    having a lawsuit within this lawsuit.
22              MR. MEJIA:  Yes, sir.
23              THE COURT:  Thank you.
24       (End of bench conference.)
25    BY MR. MEJIA:
```

1    Q.  You also saw, I think you said, that when he got out of his

2    vehicle, Mr. Brewer was actually filming you?

3    A.  Yes.

4    Q.  And, of course, that's not illegal, is it?

5    A.  No, no.

6    Q.  Once you handcuffed him, however, was that handcuffing him

7    behind his back?

8    A.  Yes.

9    Q.  And after that happened, of course, he couldn't film you

10   anymore, could he?

11   A.  Right.

12   Q.  Now, you have said to us that you had a body recorder on

13   you, and that's something that is part of your equipment --

14   A.  Yes.

15   Q.  -- in the unit that you were assigned at that time?

16   A.  Yes.

17   Q.  And it is the regulations for you to follow that that body

18   cam is to go on when you get out of your vehicle, isn't it?

19   A.  Yes.

20   Q.  And you didn't do that, did you?

21   A.  Right, I did not.

22   Q.  And The reason for the body cam on a police officer is to

23   record what the officer does so that one can see and observe in

24   realtime the steps and actions that the officer has taken;

25   right?

1   A.   Yes, yes.

2   Q.   That is for the protection of the officer, as well as for

3   protection of the citizen, isn't it?

4   A.   Right.

5   Q.   And the reason for that is so that later it's not maybe one

6   person's word against the other as to what happened.   We

7   actually see an objective film and audio and recordation of all

8   the events that occur; right?

9   A.   Right.

10  Q.   So as of this time, we don't have any film to back up,

11  corroborate, or to show what you've said is this carotid artery,

12  as you describe it; right?

13  A.   Those parts, no.

14  Q.   Okay.

15  A.   No.

16  Q.   We don't have any film or recordation of this towel on the

17  dashboard, do we?

18  A.   Yes, but not from my body camera.

19  Q.   Not from you?

20  A.   Right.

21  Q.   Okay.   That's because other officers different from you

22  actually turned on their body cams as required by regulations?

23  A.   Yes, Detective Holly Hogan had -- Detective Holly Hogan had

24  hers on the entire encounter.

25  Q.   And, of course, it isn't a violation of any state law to

1   have a towel on your dashboard, is it?

2   A.  No, not that I know of.

3   Q.  Okay.  And can you tell me whether or not that vehicle was a

4   two-door or four-door as best you can remember, that Dodge?

5   A.  I cannot.

6   Q.  Okay.  But, however, after you removed him from the vehicle

7   and handcuffed him, did he remain there at the back of that car?

8   A.  So as soon as I removed him from the car, I didn't

9   immediately handcuff him.

10  Q.  Okay.  And can you tell me --

11  A.  But when he was handcuffed, he was to remain to the back of

12  the car, yes, sir.

13  Q.  All right.  And, of course, this would mean at the back of

14  the car and at -- and handcuffed as he was, he would have been

15  some distance of the vehicle and, of course, would have zero

16  access to anything in that vehicle; correct?

17  A.  Right.

18  Q.  Okay.  And, now, you've told us here that as the events

19  followed, a K-9 unit arrived.

20  A.  Yes.

21  Q.  Can you tell the jury how long after the initial stop for

22  the excessive driving, or the tinted windows, or both, how long

23  did it take for the K-9 unit or those officers to arrive?

24  A.  I'm not sure.  It was a quick amount of time.  So the K-9

25  dog is actually tasked with our unit, so he's kind of like our

Holland - Cross

1    unit's own personal dog.  And he was actually in the same area

2    that we were, so it was relatively quick.

3    Q.  Did you yourself with your own eyes see the K-9 alert to the

4    car?

5    A.  No, I heard the dog bark.

6    Q.  You heard the dog bark?

7    A.  Which is usually after the dog sits, he'll bark, and you'll

8    hear more about that with the dog handler.

9    Q.  Okay.  Can you tell the jury how long it -- how much time

10   elapsed before the dog barked or alerted, as you understand it?

11   A.  I'm not sure.  It was relatively quick.

12   Q.  Okay.  Can you tell us how long it was for the -- that it

13   came to your attention that there was a firearm, a Glock in the

14   vehicle?

15   A.  How long before it was found?

16   Q.  Yeah.

17   A.  I'm not sure, sir.

18   Q.  Okay.  Now, of course, you don't know as an investigator in

19   this case where that Dodge had come from.  In other words, what

20   was the starting point that evening, at least where it had come

21   from or where it was before you stopped it?

22   A.  Right.

23   Q.  Okay.

24   A.  Yeah, I had no idea.

25   Q.  You didn't know where it was going?

Holland - Cross

1    A.   No.

2    Q.   And you had never seen that vehicle before?

3    A.   No, not to my knowledge, no.

4    Q.   And as a law enforcement officer with all the investigative

5    -- investigations that you've had in this case, you can't, of

6    course, tell this jury how long in time that marijuana was in

7    that car?

8    A.   No, I cannot.

9    Q.   You can't tell this jury how long that Glock, that firearm

10   was in that car?

11   A.   No.

12   Q.   You can't tell the jury who put it there, the marijuana or

13   the Glock?

14   A.   No.

15   Q.   And you can't tell the jury where that vehicle was going?

16   A.   No.

17   Q.   I think you were asked about what happens to physical

18   evidence here, the things of focus in this case, the marijuana

19   and the Glock.  That is placed in what's called inventory.

20   A.   Property room, yes, sir.

21   Q.   Property room, okay.  And can you tell us, in your

22   experience, whether you have ever inventoried suspect controlled

23   substances?

24   A.   Yes.

25   Q.   And firearms; right?

1    A.   Have I ever done that before, is that what you're asking?

2    Q.   Yes.

3    A.   Yes, I have.

4    Q.   And, of course, in your experience as a police officer, a

5    part of your job, a part of your duties, if called later, you

6    will go to a court of law and testify as to the events of the

7    investigation, just as you have here?

8    A.   Yes.

9    Q.   And it's a part of that investigative tool of the police

10   that suspect controlled substances are analyzed --

11   A.   Yes.

12   Q.   -- by people with forensic knowledge, chemists and things of

13   that nature?

14   A.   Yes.

15   Q.   And also firearms are examined to see that they're

16   functioning and they work?

17   A.   Yes.

18   Q.   Okay.  Can you tell me -- and I'm just only going to ask

19   you --

20   A.   Sure.

21   Q.   -- about the marijuana, whether that was ever weighed in

22   terms of determining its quantity by weight, if you know.

23   A.   I don't know the exact weight, but I know that it was

24   weighed.  That's a typical procedure for our property room

25   technicians.  They weigh the narcotics.

Holland - Cross

1   Q.  Okay.  Now, in your experience, are there instances where

2   you have as a law enforcement officer pulled a vehicle over and

3   smelled the scent of marijuana having been smoked in a car?

4   A.  Yes.

5   Q.  You made no observation here of having smelled marijuana in

6   that car, did you?

7   A.  No.  Just to kind of go back a little bit, if you don't

8   mind.

9   Q.  Sure.

10  A.  So the smell of marijuana being smoked is a completely

11  different smell than marijuana that has not been used yet.  So

12  fresh marijuana and smoked marijuana have completely two

13  different smells.

14  Q.  Okay.  Thanks.  Now, did you --

15  A.  Yes, sir.

16  Q.  Did you actually take that marijuana and smell it yourself,

17  that suspect controlled substance you saw?

18  A.  No, sir.

19  Q.  Are you aware of the term counterfeit --

20  A.  Yes.

21  Q.  -- controlled substances?

22  A.  As far as controlled substance, no, just when it comes to

23  money.

24  Q.  Money counterfeit?

25  A.  Yes, sir.

1    Q.   Now, are you aware of the term paraphernalia?

2    A.   Yes, sir.

3    Q.   Tell the jury what paraphernalia is.

4    A.   Paraphernalia can be deemed as tools or objects used to

5    smoke or ingest narcotics.

6    Q.   And, also, is there paraphernalia in connection with the

7    tools and objects to distribute or traffic in narcotics?

8    A.   Yes.

9    Q.   Things like scales?

10   A.   Yes, sir.

11   Q.   Things like rubber bands?  Things like plastic bags; right?

12   A.   Yes, sir.

13   Q.   Also, money in proximity to controlled substances, there's

14   also some significance or connection to that?

15   A.   Yes, sir, large amounts of money, yes, sir.

16   Q.   Yeah.  Now, did you -- in this case are you aware of having

17   in that vehicle any law enforcement officer recovering any

18   scales or any baggies --

19   A.   No, sir.

20   Q.   -- or any weight -- any things, objects to use to traffic in

21   controlled substances?

22   A.   No, sir, no.

23   Q.   And are you aware of cash being found with the controlled

24   substances, as sometimes occurs in police investigations?

25   A.   I am not.  I'd have to see the inventory sheet.

Holland - Redirect

```
1          MR. MEJIA:  Okay.  Thank you.  Nothing more.
2          THE COURT:  Redirect?
3          MS. MCKENZIE:  Yes, briefly.
4                    REDIRECT EXAMINATION
5    BY MS. MCKENZIE:
6    Q.  If you saw the evidence inventory sheet, would it refresh
7    your recollection about whether there was cash recovered?
8    A.  Yes, ma'am.
9          MS. MCKENZIE:  Your Honor, permission to refresh.
10   A.  Yes, there was $920 cash --
11   Q.  Okay.
12   A.  -- that was seized.
13   Q.  Thank you.  You were asked about the fact that you placed
14   Mr. Brewer in handcuffs, and you did that once the dog alerted.
15   A.  Right.
16   Q.  Is that something that is common in your --
17   A.  For me personally, yes, and there's a lot of reasons.  I've
18   sustained a lot of injuries on the job from people running and
19   fighting.  So when I see indicators, like the carotid artery,
20   somebody's really nervous and then I have a reason to detain
21   someone when the dog indicates on the vehicle, along with the
22   totality of the circumstances -- he's covering up his dashboard,
23   covering up the dashboard lights and things like that -- I go
24   ahead and prevent anything from happening.  So for my safety and
25   his, that's why I put him in cuffs, just to prevent anything
```

1  from happening.

2  Q.  The towel across the dash, you were asked is it a violation

3  of the law.

4  A.  Right.

5  Q.  Certainly it's not.  Is it something that you have seen with

6  any frequency?

7  A.  Never seen it before, never.

8  Q.  Do you drive your personal vehicle with a towel across the

9  dash?

10  A.  No.

11  Q.  Now, you were asked about the number of times Mr. Brewer's

12  been stopped before and whether he's been stopped before for

13  tinted windows.  Is it fair to say that you have no knowledge of

14  any previous encounters Mr. Brewer has had with police other

15  than you and your immediate working partners?

16  A.  Right, yes.

17  Q.  Did you testify in a suppression hearing on the defendant's

18  motion to suppress the evidence in this case?

19  A.  Yes.

20  Q.  And were you asked in that hearing to explain your grounds

21  for stopping the car?

22  A.  Yes.

23  Q.  And for removing Mr. Brewer from the car?

24  A.  Yes.

25  Q.  Okay.  And did the court rule on that motion?

1    A.  Yes.

2              MR. MEJIA:  Objection.

3              THE COURT:  Please approach.

4         (Bench conference on the record outside the hearing of the

5    jury.)

6              MR. MEJIA:  Are we going to be allowed to relitigate

7    the Fourth Amendment issue?

8              THE COURT:  No.

9              MR. MEJIA:  I object.

10             MS. MCKENZIE:  I'm just trying to clean up what's

11   already been injected.

12             THE COURT:  Well, I think you can do that without

13   respect to informing the jury through his testimony of what my

14   prior rulings were.  Those are not relevant here.

15             MS. MCKENZIE:  Okay.

16             THE COURT:  So you can refer to the pretrial hearing,

17   if you wish, prior testimony.  You referred to his prior

18   testimony; is that right?

19             MR. MEJIA:  Yes, and the proper way to say is prior

20   hearing, prior testimony, prior evidence.  I ask that the court

21   admonish the jury to disregard --

22             THE COURT:  Do you really want that emphasis on this?

23             MR. MEJIA:  -- disregard anything about suppression.

24             THE COURT:  Do you really want that emphasis on it?

25             MR. MEJIA:  What can I do, Judge?  What in the world

```
 1   can I do?  I don't know what to do.  I don't know why she said
 2   what she said.
 3           THE COURT:  Well, she did not elicit --
 4           MR. MEJIA:  The defendant trying to suppress
 5   evidence --
 6           THE COURT:  Hold on.  Let me finish, Mr. Mejia.  She
 7   did not elicit a final response from the witness before you
 8   objected.  Now, I can admonish them, but that further
 9   emphasizes --
10           MR. MEJIA:  I know it.  I know it.
11           THE COURT:  I think --
12           MR. MEJIA:  Would you tell her not to say that again?
13           THE COURT:  I just did.
14           MR. MEJIA:  Okay.
15           THE COURT:  I think it's cleaner to simply have her
16   back up and say at a prior -- in a pretrial hearing you
17   testified and approach it that way.
18           MR. MEJIA:  Yes.  That's why I waited as I have,
19   because I didn't want to highlight it.
20           THE COURT:  It was an appropriate objection and it's
21   sustained.  Go ahead.
22       (End of bench conference.)
23   BY MS. MCKENZIE:
24   Q.  Did you give testimony in a pretrial hearing about your
25   grounds for stopping the car and for removing Mr. Brewer from
```

1    the car?

2    A.  Yes.

3    Q.  And there was some reference to the fact that Mr. Brewer has

4    filed a civil suit against you and various other police

5    officers.  At any time on scene that night did Mr. Brewer accuse

6    you of violating his rights?

7    A.  Yes.

8    Q.  When?

9    A.  During the pat-down.  So as I was checking to make sure he

10   didn't have any weapons on him, I was patting down the outside

11   of his clothes.  My thumb either went in -- he's saying that my

12   thumb went into his pocket.  And immediately when it did that,

13   he said that I violated his rights, which that was not my

14   intention to go into his pockets.  I know that I cannot go into

15   his pockets without his permission, and I've never done that to

16   anybody before without their permission or having probable cause

17   to do so.

18   Q.  When did you become aware that Mr. Brewer had filed a

19   lawsuit against you and various other police officers?

20   A.  I don't have an exact date for you.  It was, I would say, a

21   long time after this stop, but an exact date, I'm not sure.

22              MS. MCKENZIE:  I don't have think I have any further

23   questions.

24              THE COURT:  Mr. Mejia, do you have any recross?

25                        RECROSS-EXAMINATION

Holland - Recross

1   BY MR. MEJIA:

2   Q.  Do you have the inventory sheet in front of you that was

3   shown?

4   A.  Yes, sir.

5           MR. MEJIA:  May I approach the witness?

6           THE COURT:  Yes.

7   BY MR. MEJIA:

8   Q.  Did you yourself see this $910?

9   A.  Not that I can recall.  I'm sure that I did on scene.  I

10  remember seeing all of the property, but, again, I can't say for

11  sure if I saw that exact amount.

12  Q.  Do you recall or if at all that money was actually in his

13  pocket?

14  A.  I don't recall.

15  Q.  Okay.  And, now, you're saying that you had -- you

16  accidentally put your thumb in his pocket or you don't remember

17  that you did, and if so, it was inadvertent?

18  A.  It was some -- I'm saying that Mr. Brewer said that I did

19  and I don't recall doing that, but it is very possible that my

20  thumb went into his pocket.  But purposefully trying to go into

21  his pocket without his permission is something that I would not

22  do.

23  Q.  If I showed you one of the court papers on -- you were asked

24  about the dates of the civil rights action against you and other

25  officers.  If I showed you just the cover page and the court

Holland - Recross

```
 1   stamp, would that help you recall the date that you were aware
 2   of the action?
 3   A.  No, I -- no.  I was notified through an email.  So, like,
 4   even you showing me that date, it wouldn't click that, yeah,
 5   that was the day, if that makes any sense.
 6   Q.  Okay.  But it was after November 11th of '15, either that
 7   year or the next year you were notified, look, you're a
 8   defendant in a civil rights suit?
 9   A.  Right.  It was definitely after the stop.  Now, if it was
10   the same year or the next year, I'm not sure.
11   Q.  Now, that suit is still pending and you know that, don't
12   you?
13   A.  Yes.
14   Q.  And as you -- in your position not as an LMPD officer, but
15   in your position as a defendant in that civil suit, you are
16   subject potentially to a judgment against you declaring that you
17   did what is alleged?
18   A.  Right.
19   Q.  You are subject to money damages against you or the
20   department?
21   A.  Yes.
22   Q.  And you are subject to discipline potentially if those
23   allegations are shown to be true in a court of law?
24   A.  Yes.
25         MR. MEJIA:  Thank you very much.
```

Holland - Recross

1          THE COURT:  Ms. McKenzie, may the witness be excused?

2          MS. MCKENZIE:  Yes.  I do not have any further

3    questions.

4       There was a second page to this.

5          THE COURT:  You may step down.

6          MS. MCKENZIE:  Mr. Mejia --

7          THE COURT:  You-all can figure that out in just one

8    minute.

9       Members of the jury, we're going to take our morning break

10   now, so we will break for about 15 minutes and then we'll resume

11   testimony when you return.

12      (Jury out 10:40 a.m.)

13         THE COURT:  You-all may be seated.  The jury is

14   outside the courtroom.  If I could see the lawyers at the bench,

15   please.

16      (Bench conference on the record.)

17         THE COURT:  We plan to have a draft set -- a draft set

18   of instructions to you later today, and so I'm just giving you a

19   heads-up as to how we'll work through that.  What I would like

20   for you-all to do, depending on when we get them to you -- you

21   might begin that discussion on a break -- but I think probably

22   most likely what we will do is -- depending on how far we get

23   today is we'll schedule a conference in the morning, probably

24   about 8:30 and work through the instructions then.

25      What I like to do is direct counsel to confer so that we can

1   narrow the scope of our discussion to those matters that are in

2   dispute.  And so to the extent that you-all can agree -- and, of

3   course, you -- I'm sure you will on most of the standard

4   instructions.

5       Now, let me put you-all on notice.  One of your proposed

6   instructions -- I can't recall now off the top of my head which

7   one -- came with some blanks, so I can't really fill in the

8   blanks for you.

9               MS. MCKENZIE:  Okay.

10              THE COURT:  I'm going to ask you to go back and look

11  at that.

12              MS. MCKENZIE:  Okay.

13              THE COURT:  And if you want to fill in the blanks and

14  resubmit it, I'll consider it and -- but I won't be able to do

15  that given the blanks that are left.

16      Anything we need to talk about?  I'll let you-all take about

17  a ten-minute break and then have your next witness ready.  This

18  is a shorter witness?

19              MS. MCKENZIE:  Yes.

20              MR. MEJIA:  I would just inquire of the court, on the

21  subject of instructions, I saw in the record that

22  Messrs. Kamenish and Barton had submitted jury instructions.

23  You've got those as part of the defense package?

24              THE COURT:  Well, they were filed in the record, yeah.

25              MR. MEJIA:  Okay.  That's it.

Caye - Direct

1          THE COURT:  Yeah.

2      (End of bench conference.)

3      (Recess at 10:43 a.m. until 10:58 a.m.  Jury in.)

4          THE COURT:  You ready to call your next witness?

5          MS. MCKENZIE:  Yes, Your Honor.  United States calls

6   Derek Caye.

7      (DEREK CAYE, called by the Government, sworn.)

8                     DIRECT EXAMINATION

9   BY MS. MCKENZIE:

10  Q.  Good morning.  Could you please introduce yourself to the

11  jury.

12  A.  Yes, my name is Derek Caye.  I currently work for the post

13  office.  At the time I was working for Enterprise Rent-A-Car as

14  a manager.

15  Q.  And when you say at the time, do you mean in November of

16  2015?

17  A.  Yes, ma'am.

18  Q.  How long did you work for Enterprise?

19  A.  A little over four years.

20  Q.  And what was your job there?

21  A.  I started as a management trainee and was promoted to

22  assistant manager and then manager of the Dixie Highway branch

23  after two years, and then I transferred down to Eighth Street

24  and was the manager down there as well.

25  Q.  Okay.  And I want to ask you about a car, a 2013 Dodge

1    Charger that was rented from Enterprise with the registration

2    199TJV.  Do you recall that car?

3    A.  Not the particular VIN number, but I do recall a Dodge

4    Charger, yes, ma'am.

5    Q.  Okay.  Do you know the defendant, Mr. Brewer?

6    A.  Yes, ma'am.

7    Q.  Okay.  Do you know him through your work at Enterprise?

8    A.  Yes, ma'am.

9    Q.  Okay.  I'd like to show you what I've premarked for

10   identification purposes as Government's Exhibit 9, and I'd like

11   for you to take a look and tell me if you recognize what it is.

12   A.  Okay.  Yes, this is a summary of charges, basically, for the

13   rental contract of the vehicle that he had rented.

14   Q.  Okay.  And is this something -- this information, is this

15   something that is recorded at Enterprise in the normal course of

16   business?

17   A.  Yes, ma'am.  Yes, everyone who rents a vehicle, they will

18   get a contract that they sign.  Everything's inputted into the

19   system, and this is the receipt that -- when the rental is over

20   that we give the customer.

21   Q.  Okay.  And the Dodge Charger with the license number 199TJV,

22   do you see a receipt for that rental there?

23   A.  Yes, ma'am.

24   Q.  Okay.  Who rented that vehicle?

25   A.  Cherosco Brewer.

Caye - Direct

1   Q.   Okay.  And what was the date that that car was rented out?

2   A.   It looks like 7-21 through 11-10.

3   Q.   Okay.  Of what year?

4   A.   2015, I believe.

5   Q.   Okay.  And that vehicle -- did Enterprise rent vehicles with

6   aftermarket window tint on them?

7   A.   No, ma'am.

8   Q.   Are you aware of this vehicle having window tint applied to

9   it?

10  A.   When the vehicle was first rented, no, there was no tint on

11  it.

12  Q.   Okay.  Do you know, when the vehicle was returned to

13  Enterprise, did it have tint on it?

14  A.   Yes, ma'am, yes, it did.

15  Q.   Okay.  And did you -- what happens when a customer rents a

16  car?  Is there a certain amount of money down or a deposit that

17  they have to pay?

18  A.   Sure, sure.  Each rental there's a $150 deposit on top of

19  the cost of the rental for the length of however long they

20  wanted to keep it.  With tint, if a car were to come back with

21  tinted windows, we usually will take that deposit and take

22  whatever it cost towards getting the tint taken off the windows

23  and use that deposit.

24  Q.   Okay.  So had you rented other cars to Mr. Brewer?

25  A.   Yes, ma'am.

Caye - Direct

1    Q.  And are you aware of any of those cars having aftermarket
2    tint when they were rented out from Enterprise?
3    A.  No.
4    Q.  Okay.  Are you aware of those cars having aftermarket tint
5    applied?
6    A.  Yes, ma'am.
7    Q.  Okay.  And what happens then?  Would Mr. Brewer --
8    A.  In this particular instance, yes, Mr. Brewer was very
9    responsible with taking the tint off the window before he was to
10   return the vehicle or to switch out into a different vehicle.
11   The tint was always removed, except for this one instance.
12   Q.  Okay.  And are you referring to the Dodge Charger?
13   A.  Yes, ma'am.
14   Q.  Okay.  How did the tint -- you said the vehicle was returned
15   to Enterprise with the tint on it.  How did it come to be taken
16   off?
17   A.  I believe the vehicle was impounded.  So in that instance,
18   when a vehicle is impounded, we -- it's on us to get the vehicle
19   out of impound and bring it back to our lot.  So we get it towed
20   back to our lot.  At that time I did observe the vehicle having
21   tint on the window.
22   Q.  Okay.  Do you know how it came to be removed?
23   A.  Yes, ma'am.
24   Q.  How was that?
25   A.  Mr. Brewer came and removed it the next day so he wasn't

Caye - Direct

1   charged any additional fees.

2   Q.   Okay.  And what was the -- on this receipt for the rental,

3   what was the -- was there another vehicle rented on this

4   receipt?

5   A.   Yes.  On this particular one, it looks like there was a 2015

6   Chevy Silverado.

7   Q.   Okay.  And on the receipt, it indicates miles driven.  Is

8   that -- how does that number get calculated?

9   A.   Whenever we have them sign the contract when they're leaving

10  with the vehicle, we do record what the mileage is from the

11  odometer and place it on the contract.  Then when they come

12  back, after we do our walk around to make sure there's nothing

13  wrong with the vehicle, we also grab the mileage off of the

14  odometer as well.

15  Q.   Okay.  And so the miles driven on the Charger, when it says

16  1,813, that's just the difference in the odometer reading?

17  A.   Yes, ma'am.

18  Q.   How many miles were driven on the pickup?

19  A.   903.

20  Q.   Okay.  And what was the total amount paid for those rentals?

21  A.   For both the vehicles was $3,334.40.

22  Q.   Okay.  Do you have other vehicle rentals, other receipts

23  there?

24  A.   Yes, ma'am.

25  Q.   Do you recognize all of these documents as being records

1    that Enterprise normally keeps in the course of its business?

2    A.  Yes, ma'am.  This would be any receipt that any customer

3    would get once they return a vehicle.

4            MS. MCKENZIE:  Your Honor, I would move to admit

5    Exhibit 9 and publish a portion of it to the jury.

6            MR. MEJIA:  No objection.

7            THE COURT:  It will be admitted.

8            (Government Exhibit 9 admitted in evidence.)

9    BY MS. MCKENZIE:

10   Q.  And so on this receipt, the Dodge Charger, is that the one

11   listed as a Vehicle Number 2?

12   A.  Yes, ma'am.

13   Q.  Okay.  And that is -- over here, these specific items under

14   the billing statement, is that $200 a week?

15   A.  Yes, ma'am.

16   Q.  Is it possible to rent-a-car on a weekly basis?

17   A.  Of course.

18   Q.  Okay.  And is that how this vehicle was rented?

19   A.  Correct.

20           MS. MCKENZIE:  Okay.  Thank you, Mr. Caye.  I don't

21   believe I have any further questions for you at this time.

22   Mr. Mejia might and I'd ask you to please answer those.

23                         CROSS-EXAMINATION

24   BY MR. MEJIA:

25   Q.  Good morning.  What is your name again?

Caye - Cross

1    A.  Derek Caye.

2    Q.  Caye?

3    A.  Yes, sir.

4    Q.  How do you spell that?

5    A.  C-A-Y-E.

6    Q.  So Exhibit Number 9 is the records of Enterprise?

7    A.  Yes, sir.

8    Q.  Made at the time of the business activity?  The record is

9    made at the time that the --

10   A.  Yes, yes.

11   Q.  -- the activity is done?  And it is the regular activity of

12   Enterprise to rent cars?

13   A.  Yes, sir.

14   Q.  And the record is made by a person with knowledge of such

15   activity at the time?

16   A.  Yes, sir.

17   Q.  And it is the regular business of Enterprise to keep and

18   maintain such records?

19   A.  Yes, sir.

20   Q.  Okay.  Now, the records before you are for a customer named

21   Cherosco Brewer.

22   A.  Yes, sir.

23   Q.  Do you see him here in the courtroom today and recognize

24   him?

25   A.  Yes, sir.

Caye - Cross

1    Q.  And he was a customer of yours, and you kept records of all

2    of the times that he rented a vehicle, and we have those here in

3    a court of law.

4    A.  Yes, sir.

5    Q.  And when he rented cars, his name was on those records so

6    that anybody could see and know he's the person renting that

7    vehicle.

8    A.  Yes, sir.

9    Q.  And the license plate is recorded so that anybody seeing

10   that license plate, with a little bit of leg work and a call to

11   you, could quickly see that's an Enterprise car driven by

12   Cherosco Brewer.

13   A.  Yes, sir.

14   Q.  Okay.  And when he rented the vehicle, you also keep a

15   record of how much he paid, and you've talked about that here

16   with us.

17   A.  Yes, sir.

18   Q.  Yes.  And you've said the amount here was some $3,000?

19   A.  Correct.

20   Q.  And how did he pay?

21   A.  He used -- it says check.  I believe it was a money order.

22   Q.  Okay.  So in the business of Enterprise, a money order or

23   check would be the same thing.  It would be a document given to

24   you which is equal to currency.  It's a payment.  And his name

25   is on that money order too, isn't it?

Caye - Cross

1    A.  Yes, sir.

2    Q.  And, of course, that too is a regular business of Enterprise

3    to keep and maintain a record of that payment by check or money

4    order.

5    A.  Yes, sir.

6    Q.  Now, there is a -- you've told us that aftermarket tinting

7    isn't put on the rentals there.

8    A.  Correct.

9    Q.  But you have a policy or a practice there at Enterprise, if

10   someone puts tinting on windows, that's okay, but they'll pay

11   extra if it comes back with the tint on it?

12   A.  Yes, sir.

13   Q.  And it's not a violation of the rental agreement to put tint

14   on windows, is it, if you know?

15   A.  I do not know off the top of my head.  This was more of a

16   situation where I knew Mr. Brewer and I knew he would take care

17   of it.

18   Q.  Okay.

19   A.  So --

20   Q.  And he did?

21   A.  Yes, sir.

22   Q.  He would remove the tint from the window when he returned

23   the cars to save that extra cost increment that would be charged

24   to him.

25   A.  Correct.

```
 1   Q.  And in all other respects then, the cars came back in good
 2   shape?
 3   A.  Yes, sir.
 4   Q.  And on the -- the rental of the Dodge was to the 10th, but
 5   actually you got it back on the 11th.
 6   A.  Correct.
 7   Q.  You got it back from the police?
 8   A.  Yes, sir.
 9   Q.  And so it would be obvious then that Mr. Cherosco Brewer
10   didn't have the opportunity then to remove the tint, because if
11   he could have, he would have?
12   A.  Sure.
13            MR. MEJIA:  Nothing more.  Thank you.
14            THE COURT:  Anything further for this witness?
15            MS. MCKENZIE:  No, Your Honor.
16            THE COURT:  May he be excused?
17            MS. MCKENZIE:  Yes, Your Honor.
18            THE COURT:  You may step down.  Thank you.
19       The Government may call its next witness.
20            MS. MCKENZIE:  United States would call Chad Stewart.
21       (DETECTIVE CHAD STEWART, called by the Government, sworn.)
22                      DIRECT EXAMINATION
23   BY MS. MCKENZIE:
24   Q.  Good morning.
25   A.  Good morning.
```

Stewart - Direct

1   Q.  Can you please introduce yourself to the jury and tell them

2   where you work.

3   A.  Detective Chad Stewart, Louisville Metro Police Department.

4   Q.  Detective Stewart, how long have you been a police officer?

5   A.  Since 2008.

6   Q.  So roughly ten years?

7   A.  Yes, ma'am.

8   Q.  What is your current assignment with LMPD?

9   A.  My current assignment is a fugitive detective.  We go after

10  the most violent fugitives in this city.

11  Q.  Okay.  What was your -- what other assignments have you had

12  in the police department?

13  A.  In the police department, I started as a patrol officer in

14  the West end in the Portland neighborhood.  I was there for

15  about three years.  I then transferred to the VIPER Unit, which

16  was the violent crime unit/gang unit.  The VIPER Unit was then

17  renamed to the Ninth Mobile, which we are now.  I've worked on

18  the street side of that, as far as doing enforcement on the

19  street side.  And then I went to a major case detective where we

20  did violent crimes and gang enforcement, and now I'm a fugitive

21  detective.

22  Q.  Okay.  In November of 2015, where were you assigned?

23  A.  I was assigned to the street side of the Ninth Mobile

24  Division.

25  Q.  Okay.  Do you recall making a traffic stop in the area of

1    24th and Broadway on November 12th of 2015?

2    A.   Yes, ma'am, I do.

3    Q.   And do you recall what kind of car you stopped?

4    A.   It was a silver Ford Taurus.

5    Q.   Do you remember approximately what time of day?

6    A.   It was nighttime.  I want to say between 11:00 and 12:00 at

7    night.

8    Q.   Okay.  Who was driving the vehicle?

9    A.   Cherosco Brewer.

10   Q.   Okay.  And do you see that person in the courtroom?

11   A.   Yes, ma'am.  He's sitting at the defense table on the right.

12   Q.   Okay.  Tell the jury, why did you stop this car?

13   A.   The Ninth Mobile Division, we patrol the city's hot spots,

14   so where there's a spike in violent crime or drug activity,

15   things of that nature.  We were on patrol in that area of the

16   West end that night.

17        I was doing what I call patrol speed.  I'm driving

18   excessively kind of under the speed limit.  I was doing about 10

19   to 15 miles an hour in the right-hand lane --

20   Q.   On Broadway?

21   A.   Yes, ma'am, traveling eastbound on Broadway from the 2600

22   block.

23        I noticed that there was a car in the left-hand lane that

24   wasn't passing me.  And one of the reasons I drive at a patrol

25   speed or drive that slow is, one, if something happens, I want

1  to have time to see it, analyze it, and react to it, if I need

2  to.  And if you're driving too fast, you -- you'll be past it

3  before you even realize what's going on.

4      So I'm driving very slow and normally cars just go right by

5  me.  There was a car in the left-hand lane that wouldn't pass

6  me, which was odd, number one.  I'm looking in my mirror at this

7  car.  It has excessive window tint.  The tint is very dark.  The

8  front windshield is tinted all the way down.  I can't even see

9  anybody in the car.  Normally, in my experience --

10 Q.  I'm sorry.  Why does that dark, dark tint -- why is that

11 something you notice?

12 A.  One, it's illegal to have the windows tinted like that, but

13 normally the only time somebody tints their vehicle that dark

14 is -- in my experience is to conceal something.  And so it

15 automatically -- the car won't pass me.  That's a red flag.  The

16 tint's really dark.  That's another red flag for me.

17     So in order to kind of see what's going on with the car, I

18 literally just stopped in the middle of Broadway, the 2600 block

19 of Broadway.  I just stopped.  The car next to me in the other

20 lane had an open lane, had no reason to stop, but they stopped.

21 Again, that's another red flag.  Why doesn't this vehicle want

22 to pass me?

23     I'm not driving a marked police car with 911 all over it.

24 I'm driving a silver Nissan Armada.  And we did at that time

25 make a lot of stops, so my car, if you were involved in certain

Stewart - Direct

```
 1   negative activity, you wanted to know what the unmarked cars
 2   were.  So I didn't know if it's somebody that knew my car was a
 3   police car.  So I stopped in the lane and we kind of played the
 4   waiting game.  I'm not moving until you move.  Eventually, I
 5   guess, they got the point.  They had to pass me.  The vehicle
 6   had to pass me.
 7       That vehicle then proceeds past me, gets over in the lane in
 8   front of me and then pulls over -- a lot of times we'll find
 9   that if the police are behind you and you don't want to get
10   pulled over, people will just pull over like they're parking
11   somewhere and then it's like, oh, the police got to go by.
12       The vehicle pulled over.  However, when they did, they were
13   blocking a parking lot entrance, blocking a huge entrance to a
14   parking lot.  So I stopped right behind -- right in my lane,
15   knowing that they were going to have to pull back out because
16   he's blocking a parking lot.  He can't park there.
17       The vehicle then pulls down.  At that point I've had enough.
18   I need to figure out is this an impaired driver?  Is there a
19   problem?  What's going on with this vehicle?  I have all these
20   red flags.  I'm going to at least investigate it.
21       I initiate my emergency equipment.  I pull the vehicle over
22   and close to the intersection of 24th Street and West Broadway.
23   Q.  Okay.  Now, you described the tint on the window as
24   excessive.
25   A.  Yes, ma'am.
```

Stewart - Direct

1   Q.  And noted that at some point the tint could be too dark --

2   A.  Yes, ma'am.

3   Q.  -- to be legal.  How can you tell as a police officer

4   patrolling in your car what tint is legal or not legal or when

5   it's too dark?

6   A.  There are -- okay.  There are three main types of tint that

7   people will put on a vehicle.  You have 35 percent, which is

8   legal for your front windows, your front diver's side and

9   passenger's doors.

10      At 35 percent, I can -- even at nighttime, especially in a

11  well-lit area, as the 2600 block of West Broadway, I can look

12  over and I can see your silhouette, and if you have a red shirt

13  on, I can tell if you have a red shirt on, you know, something

14  to that nature.

15      The next -- the next level of tint that people put on their

16  cars is 20 percent.  Twenty percent is what's legal for your

17  back windows and your back windshield.  Twenty percent, I can

18  look over and I'll be able to see your silhouette, be able to

19  see other lights through the car, something of that nature.

20  I'll be able to see that somebody -- you know, how many people

21  are in the car, something of that nature.

22      The next level that normally is used is 5 percent, which

23  people call limo tint.  And the reason it's called limo tint is

24  you can't see in it.  If you look at the back of a limo, you

25  can't see it in.  It's 5 percent tint.  When you look over, you

1    can't see anything.  It, basically, looks like somebody has a

2    curtain or something over the window.

3        Now, with this particular car, there was extremely dark tint

4    on the side windows, front driver's and passenger's door, rear

5    driver's and passenger's door, and the back window, but the

6    driver's side window -- or the driver's windshield was actually

7    tinted all the way down.

8        Now, legally, you're allowed to have a six-inch strip, but

9    you're not allowed to have tint all the way down the window.

10   And, again, from my experience, you only do that when you're

11   trying to conceal something, from my experience.

12   Q.   When you're referring to tint levels as percentages --

13   A.   Yes, ma'am.

14   Q.   -- is that a percentage of like how much light --

15   A.   Yes.  So the percentage of a vehicle's tint, basically the

16   percentage level means how much light does that allow into your

17   vehicle or in through that shield that's there?  So at 35

18   percent, it's allowing 35 percent of the outside light past

19   that.  Twenty percent, it's allowing 20 percent of the light.

20   Five percent, obviously, it's very dark.  You're only getting 5

21   percent of the outside light through that surface.

22   Q.   Detective Stewart, were you equipped with a body camera at

23   the time of this stop?

24   A.   Yes, I was.

25   Q.   And was your -- did you activate your body camera?

Stewart - Direct

1    A.   Yes, ma'am.

2    Q.   Have you had the opportunity to review that footage prior to

3    your testimony?

4    A.   Yes, ma'am.

5    Q.   Is it an accurate recording?

6    A.   Yes, ma'am.

7            MS. MCKENZIE:  Your Honor, I would move to admit and

8    publish portion of Detective Stewart's body camera.

9            MR. MEJIA:  No objection.

10           THE COURT:  It will be admitted.

11           THE REPORTER:  What number is that?

12           MS. MCKENZIE:  It should be 18A.

13           (Government Exhibit 18A admitted in evidence.)

14           THE COURT:  Dena, did you say the jurors do have --

15           THE REPORTER:  Yes, Your Honor.

16           THE COURT:  Members of the jury, you have before you

17   headsets, if you would like to utilize those.

18       (Government playing audio.)

19           MS. CRACKNELL:  The audio is not playing.

20       (Off-the-record discussion.)

21           THE COURT:  Can I see counsel briefly, please.

22       (Bench conference on the record outside the hearing of the

23   jury.)

24           THE COURT:  I think -- can you ask other questions and

25   go on and while we get IT up here or do we need to just break?

1        MS. MCKENZIE:  I can ask some other questions.

2        THE COURT:  All right.  I'm going to ask Dena to --

3   actually, Natalie to get -- call IT, and while they're on their

4   way, then why don't you go on with some other questions.

5      (End of bench conference.)

6        THE COURT:  I think I mentioned, members of the jury,

7   that this is an old courtroom and so sometimes, despite the

8   addition of new technology, we will have glitches, but our crack

9   IT staff will get it fixed.

10     You want to go on, Ms. McKenzie, while our IT folks are on

11  their way.

12       MS. MCKENZIE:  Yes.

13  BY MS. MCKENZIE:

14  Q.  Detective Stewart, we'll come back to your body camera

15  video.  Once you decided to -- once you pulled the car over,

16  what happened?

17  A.  As I start to approach the car, I do stop short because of

18  the fact, as you'll see on the video, I can't see anything in

19  the car.  I don't know how many people are in the car.  I don't

20  know what's going on in the car.  I don't know who's in the car.

21     I don't approach at that time until I can see in the car.

22  So I stop at the back of the car, and I basically yell for the

23  driver to roll the window down, roll the back windows down so I

24  can see in the car.

25     At that time, Mr. Brewer cracked the window a couple of

```
 1    inches.  It was enough to at least let me see his head, and I

 2    could scan enough to see that there wasn't anybody else in the

 3    car, so I went ahead and approached the driver's side at that

 4    time.

 5        I asked Mr. Brewer for his identification.  He hands it to

 6    me.  I get him out of the car.  I go back to my vehicle and

 7    start to run his information to check for wants and warrants,

 8    driver status, things of that nature.  There's -- then one of

 9    our K-9 officers, who was on a stop across the street, came

10    over, ran his dog around the car.  The dog indicated on the

11    vehicle the presence of narcotics.  We then searched the

12    vehicle, recovered a large amount of cocaine and placed

13    Mr. Brewer into custody.

14    Q.  Now, when you say a large amount, what do you --

15    A.  I believe it was --

16    Q.  What's a large amount to you?

17    A.  I believe it was 13 grams, which is half an ounce.

18    Q.  Okay.

19    A.  And there was some other drug, I believe, mixed in there.

20    Q.  Okay.

21    A.  I believe it was 13 grams though all bagged up in

22    individually packaged baggies.

23    Q.  Okay.  You said there were other drugs --

24              MR. MEJIA:  Judge, may we approach for one moment,

25    please?
```

Stewart - Direct

1    THE COURT:  Yes.

2    (Bench conference on the record outside the hearing of the

3    jury.)

4    MR. MEJIA:  He has said 13 grams twice.  We have

5    stipulated to 8.1 grams.  I'd like that corrected.

6    MS. MCKENZIE:  I can clear it up.  Thirteen grams is

7    the weight at the property room.  They weigh it with the

8    packaging.  We can clear that up.

9    THE COURT:  Well, then so in a subsequent question you

10   can disaggregate between the packaging and the actual weight and

11   get to the stipulated --

12   MS. MCKENZIE:  Yes.

13   THE COURT:  That's fine.

14   MR. MEJIA:  Say gross and net as in 8.1 grams.  That's

15   the stipulation.

16   MS. MCKENZIE:  Yes.

17   MR. MEJIA:  Okay.  Thank you.

18   (End of bench conference.)

19   BY MS. MCKENZIE:

20   Q.  Are those drugs weighed when you take them to the property

21   room?

22   A.  Yes, they are.

23   Q.  Okay.  And when the property room does the initial weight,

24   do they weigh it as it's received?

25   A.  Yes, the property room will weigh it bag and all, however we

1    bring it to them.  Obviously, we're not going to take it out

2    and, you know, measure it out as far as take the drugs out of

3    the packaging that they're in.  That's not safe for us to do.

4    So we will weigh it in whatever baggie it comes in.  And,

5    obviously, when you take into account the weight, you have to

6    take into account the bag as well.

7    Q.  Okay.  You said the drugs were in individual baggies?

8    A.  Yes, ma'am.

9    Q.  Individual packages?

10   A.  Yes, ma'am, I believe so, yes, ma'am.

11   Q.  And that there was another type of drug.

12   A.  Yes, ma'am.

13   Q.  Is that something that you recognize by observation?  How do

14   you -- how do you know what you're looking at when you find it

15   on the street?

16        MR. MEJIA:  Judge, may we be heard on this again?  I'm

17   sorry to interrupt.

18        THE COURT:  Yes.

19     (Bench conference on the record outside the hearing of the

20   jury.)

21        MR. MEJIA:  I note that there's a suspect other

22   quantity, but it's never tested and she's trying to -- I just

23   object to any other controlled substance.

24        THE COURT:  Is this subject of the charge?

25        MS. MCKENZIE:  No.

Stewart - Direct

```
 1              THE COURT:  I think we can move past this then pretty
 2   quickly; right?  What does it go to?
 3              MS. MCKENZIE:  It's just res gestae.  I think it's
 4   uncharged --
 5              THE COURT:  It's not charged conduct, so let's just
 6   move past it.
 7              MS. MCKENZIE:  Okay.
 8         (End of bench conference.)
 9   BY MS. MCKENZIE:
10   Q.  The individual baggies of cocaine -- have you encountered
11   cocaine on the street before?
12   A.  Yes, ma'am.
13   Q.  Okay.  Have you encountered it in individual packages like
14   that before?
15   A.  Yes, I have.
16   Q.  Have you encountered it in a form where it's not in
17   individual packages?
18   A.  Yes, I have.
19   Q.  Okay.  Where was that -- if you said it, I missed it.  Where
20   were the drugs specifically inside the car?
21   A.  The dog indicated on the lower part of the dashboard,
22   underneath the steering wheel, kind of to the left of the
23   steering wheel.  We actually had to remove or pull off part of
24   the dashboard, and it was concealed behind the dashboard.
25   Q.  Okay.  So within the structure of the car's interior itself?
```

1    A.   Yes, ma'am.

2    Q.   Did you collect any other items of evidence during the

3    search of this car?

4    A.   I believe we collected -- and I don't remember exactly where

5    they were found.  We collected three cell phones and then a

6    large amount of U.S. currency that was in his pocket in various

7    denominations, which is consistent with narcotics trafficking.

8    Q.   What is a large amount to you?

9    A.   It was 800 and -- I believe it was $885.

10   Q.   Okay.  And these items, when you collect them at a scene,

11   what happens to them after you're done at the scene?

12   A.   We have to -- we'll put everything in a bag, label it.  We

13   will -- as far as money is concerned, we'll put it in a separate

14   baggie.  We'll do a forfeiture form for it, if I believe --

15   since I believe it's involved in narcotics trafficking.

16       It then -- I'll put it in the back of my vehicle in a secure

17   spot.  I'll then transport -- I then transported Mr. Brewer to

18   the jail.  We'll then go to the property room, enter that

19   evidence, weigh the narcotics, put the money in, put the

20   drugs -- or put the phones in, and all of that goes straight

21   into evidence at that time.

22   Q.   Okay.  And then those items, do they get logged under a

23   particular name or number?

24   A.   We will receive a case number from our dispatch.  It will

25   then be -- everything involving that case will then associate

1     with that number.  And that number, you can pull it up and then

2     find Mr. Brewer's name or find my name, but everything will go

3     from that number as far as the report number.

4         If I want to search it, I'll go into our I/LEAD system, type

5     in that number and it will pull up everything associated with

6     that number, the narcotics, the arrest slip, all of that stuff.

7     Q.  I'd like to show you some premarked for identification

8     purposes exhibits, and I'd like to ask you if you recognize the

9     outer packaging.

10        (Counsel conferring off the record.)

11    Q.  And can you start, Detective, by telling me if you recognize

12    the manner in which these items are packaged.

13    A.  Once we take our narcotics, or whatever we've recovered from

14    the scene, once we take it to the property room, our property

15    room clerks will then put it into one of these envelopes, put a

16    sticker on the outside of it of what it is.  They will then put

17    a tamper proof seal on the outside of it.  They have to sign it.

18    We'll sign it and then we take it and put it into part of

19    what's -- our drug vault for the drug unit detectives to come

20    get it.

21    Q.  Okay.  And what do they do with it?

22    A.  The drug vault detectives will be the ones that send it off

23    to the lab, get it tested, you know, pull it out of there.  Once

24    I put it in here, usually until we have a trial or something

25    like that, I don't see it again.

1    Q.   Okay.  So let's start with -- do you have an item marked 16?

2    A.   Sixteen is right here, yes, ma'am.

3    Q.   Okay.  Can you look inside that package and tell me if the

4    contents are consistent with the labeling.  Does it appear to be

5    what it claims to be --

6    A.   Yes, ma'am.

7    Q.   -- on the label?  Okay.

8    A.   It does.

9    Q.   And is that the -- does that appear to be the cocaine that

10   you recovered from Mr. Brewer's car?

11   A.   This appears to be the narcotics that we recovered, correct.

12   Q.   Okay.  Is there an item marked 17?

13   A.   Yes, ma'am.

14   Q.   And can you look inside the package and tell me if you

15   recognize the contents.  Do they appear to be what they're

16   supposed to be?

17   A.   Yes, ma'am.

18   Q.   Okay.  And what is it?

19   A.   It is a -- it's a black rag or bag that the -- was tied up

20   behind the vent or the light behind the dashboard.  This is

21   actually what the narcotics were in and it's black.  It makes it

22   harder for us -- if I have a flashlight or something and I'm

23   just looking under the dashboard to try and see if there's

24   something there, the black obviously conceals it more than,

25   obviously, a white baggie of drugs sitting there.

1    Q.   Gotcha.  Do you have an exhibit marked with the Number 19?

2    A.   Yes, ma'am, I do.

3    Q.   Can you do the same with that package for me, please.

4    A.   It is a -- appears to be three cell phones.

5    Q.   Okay.  And are those the cell phones that you collected from

6    Mr. Brewer --

7    A.   Yes, yes, ma'am.

8    Q.   -- that night?  Okay.  Now, the cash, the $885 cash, does

9    that get packaged up like the other evidence?

10   A.   The cash gets put into a different bag and then it will

11   end -- instead of our department storing large amounts of U.S.

12   currency in our property room, it gets sent to a bank and

13   counted.

14   Q.   Okay.

15   A.   And we don't count it on scene.  We'll take it out of their

16   pocket, and we don't count it right there.  I take it out, put

17   it in a bag, give it to the property room.  The property room

18   then takes it, gives that bag to the bank.  The bank counts it.

19   That's where we get our official count from.

20   Q.   Okay.  And then there's a record kept of that money and how

21   much, but the physical currency --

22   A.   The physical currency itself is kept in a vault at a bank.

23         MS. MCKENZIE:  Okay.  Your Honor, I would move to

24   admit Exhibits 16, 17, and 19.

25         MR. MEJIA:  No objection.

Stewart - Direct

1           THE COURT:  They will be admitted.

2           (Government Exhibits 16, 17, and 19 admitted in

3    evidence.)

4    BY MS. MCKENZIE:

5    Q.  When you searched this vehicle, did you find any

6    paraphernalia for smoking cocaine?

7    A.  No, we didn't.

8    Q.  Pipes?

9    A.  No, ma'am.

10   Q.  Bowls?

11   A.  No, ma'am.

12   Q.  Brillo?

13   A.  No, ma'am.

14           MS. MCKENZIE:  Your Honor, may we approach?

15       (Bench conference on the record outside the hearing of the

16   jury.)

17           MS. MCKENZIE:  I think we have reached the point in

18   the testimony where I can't go any further without the video.

19           THE COURT:  Okay.  I am informed that IT is on their

20   way.  That's about all I know at this point, so I guess we'll

21   just break early for lunch at this point.

22           MS. MCKENZIE:  Okay.

23           MR. MEJIA:  Is it --

24           THE COURT:  Not yet, not yet.  It's a fair question,

25   but not yet.  You may step back.

1          (End of bench conference.)

2              THE COURT:  Members of the jury, we're going to break

3      just a little earlier than anticipated for our lunch.  And

4      during that time, our folks from the IT department will be

5      working to correct the glitch.  And when we come back in about

6      45 minutes -- we'll say 12:40, so 50 minutes from now, we will

7      pick up with further testimony from this witness.  Remember my

8      admonition.  Please do not discuss the case amongst yourselves

9      or with anyone else.  Enjoy your lunch break and we will see you

10     in about 50 minutes.

11         (Jury out 11:51 a.m.)

12             THE COURT:  You-all may be seated.  The jury has left

13     the courtroom.

14         Detective, you may step down.  Remember that you remain

15     under oath.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  And your consultation with your witness

18     should be appropriately limited during the break, given that he

19     remains under oath and will return to the stand.

20         Do we need to talk about anything at this point, Counsel,

21     before we take our lunch break?

22             MR. MEJIA:  Well, no, I don't think there's anything.

23     Obviously, I'm going to bring up the same matters that I did

24     with the other officer, without being cumulative.  I'm just --

25     counsel is aware that there is a previous stop by this officer

1   of Mr. Brewer on November 4th.  I'm going to bring that out.

2          THE COURT:  The Government have any position on that

3   that requires any preliminary ruling on my part?

4          MS. MCKENZIE:  Not at this time.  Mr. Mejia stated an

5   intention to go into a prior stop.  There were prior stops

6   referenced in the previous cross.  I don't have any need for a

7   ruling at this point.

8          MR. MEJIA:  I'm not going to re -- I'm not going to

9   litigate the civil rights matter, but there was a previous stop

10  that is the subject of the civil rights suit.  I'll go no

11  further.

12         THE COURT:  That's fine.  The instruction that I

13  referenced earlier that the Government submitted with the

14  blanks, that was a deliberate ignorance instruction.  That's the

15  one that -- really, the holes there need to be filled in before

16  I can properly consider it.

17     So I would ask you-all to come back around 12:30, and we

18  will let you know if there is any further difficulty with the

19  technology issue.  So we'll be in lunch break until then.

20     (Recess at 11:54 a.m. until 12:51 p.m.  Jury out.)

21         THE COURT:  Are we ready?

22         MS. MCKENZIE:  I believe we are.

23         THE COURT:  I understand the issue has been corrected.

24  We'll have the jury in and you can ask the witness to return to

25  the stand.

```
 1          (Jury in 12:55 p.m.)

 2              THE COURT:  Ms. McKenzie, you may continue.

 3              MS. MCKENZIE:  Thank you.

 4     BY MS. MCKENZIE:

 5     Q.  Detective Stewart, I think we're going to try again with

 6     your body camera, if we could play that clip.

 7          (Government playing video.)

 8     Q.  Detective Stewart, do you know, who is the car registered

 9     to?  Whose car was it?

10     A.  I believe it was Yvette Allen.

11     Q.  Okay.

12     A.  When I asked Mr. Brewer on the stop, he said it was his

13     wife's car.

14     Q.  Okay.  The drugs appeared to be up in the -- were they in

15     the vent, under the vent?

16     A.  It appeared to be tied under the vent.  You could see, when

17     I pulled the bag out -- again, when I showed you the bag and I

18     told you, if I look up in there with a flashlight and it's

19     covered by a black bag, it's harder to see.

20          And then you can see, once we pull it out, it's actually

21     tied to something behind there.  I don't know if it was tied to,

22     you know, the light switches or to the vent itself.  It was tied

23     up in there.

24     Q.  Okay.  And was that you saying that on the video, that that

25     vent was closed and all the others were open?
```

1   A.  That was not me saying that.  That was another detective

2   saying that.

3   Q.  And why did you get Mr. Brewer out of the car upon the

4   initial -- after the initial exchange?

5   A.  It was the totality of the circumstances.  I couldn't see in

6   the car at all.  I had dealt with Mr. Brewer previously, and it

7   was more -- I didn't want to go back to my car.  I knew he had

8   been stopped the night before with a firearm.  I didn't know if

9   there was another firearm in the car.  I couldn't see in the

10  car.  He wasn't rolling the windows down enough for me to be

11  able to clearly see in the car.  So it's -- for my safety, I

12  just got him out.

13  Q.  Excuse me.  Did you know, when you stopped that vehicle or

14  when you noticed it on Broadway, that it was Cherosco Brewer?

15  A.  No, I didn't -- obviously, you can see you can't see in that

16  car, and I don't know who the car belongs to.  It doesn't come

17  back to Mr. Brewer.  Actually, I hadn't had enough time with him

18  to even recognize his face right away.  When he handed me his ID

19  and I read his name is when you hear me say, "Oh, how you doing,

20  Mr. Brewer?"

21       MS. MCKENZIE:  Okay.  Detective Stewart, those are all

22  the questions I have for you at this time.  Mr. Mejia may have

23  some questions for you, and then I may have some follow-up.

24       THE WITNESS:  Yes, ma'am.

25              CROSS-EXAMINATION

Stewart - Cross

1    BY MR. MEJIA:

2    Q.  You began by telling us your assignment in November of 2015,

3    and you've told us about the events of November 12th of that

4    month.  Were you in a plain, unmarked car as you were driving on

5    Broadway that night?

6    A.  As I explained earlier, I was in a Nissan Armada, not a

7    marked 911 Crown Victoria or Ford Taurus.

8    Q.  And you've told us about tinted windows and described those

9    to some extent to us today.  Were the windows of your vehicle

10   tinted?

11   A.  The windows of our vehicles are tinted as well.  They are

12   tinted to, again, what we call the legal level to where you can

13   still see somewhat in and out of there.  It doesn't necessarily

14   preclude us from seeing out when it comes to seeing other

15   vehicles or the tint on other vehicles when they're in a well

16   lit area such as that.

17   Q.  Okay.  I'll try to make the questions very simple so that we

18   can maybe get a yes or no.  Think we could do that?

19   A.  If I can answer just yes or no without having to explain,

20   yes.

21   Q.  Now, someone driving down Broadway at night could see into

22   your vehicle by looking at you and recognize you as the driver;

23   right?

24   A.  I don't know if they could recognize me as the driver.

25   Again, the front windshield of my vehicle is not tinted.  You

1   could see in my car, yes.

2   Q.  Okay.  Well, you've described the ability to which your

3   sight was impaired by the tinting of the other car.  Was a

4   driver in any vehicle that night, could they see you in your

5   vehicle?  I mean, your features?  Your face?  You're a man with

6   a baldpate, that you wear no glasses, no facial hair.  Could

7   they see that about you as they looked at you that night at that

8   place and at that time with that lighting?

9   A.  Would you be able to see in my vehicle?  Yes, you would be

10  able to see in my vehicle, as you can see -- on the lights, you

11  can see inside the front windshield.  You can see my steering

12  wheel.  You can see my dashboard, yes.

13  Q.  Okay.  But, conversely, you could not see into the vehicle

14  that you eventually stopped that night because of the tint as

15  you've described it; right?

16  A.  Correct.

17  Q.  And you were on Broadway and 23rd eventually.  That's where

18  the stop happened?

19  A.  No, sir.

20  Q.  Broadway and what is where the stop happened?

21  A.  It was actually west of the intersection of 24th and West

22  Broadway, which would be the 2400 block of West Broadway.

23  Q.  Okay.  The 2400 block of West Broadway is where this stop

24  occurred?

25  A.  Correct.

1    Q.   All right.   Now, what is the speed limit on Broadway?

2    A.   I believe it's 35 miles an hour.

3    Q.   Okay.   So in your capacity there, you're driving that

4    vehicle.   Let me ask you, had you been driving that same vehicle

5    for the whole month of November?

6    A.   Yes.

7    Q.   And that night you were also with a partner, an Officer

8    Casse or no?

9    A.   No, I believe I was by myself at this particular time.

10   Detective Casse had shown up at some point.

11   Q.   Okay.   He joined you at a point in the course of the events

12   that occurred after the vehicle stop?

13   A.   Yes.   He wasn't in the car with me, if that's what you're

14   asking.

15   Q.   Okay.   And you described your actions there.   You were

16   driving slowly.   You said 15 miles under the speed limit?

17   A.   I was either driving 10 to 15 miles an hour, yes.

18   Q.   So you're driving 10 to 15 miles an hour in a 35 mile zone?

19   A.   Yes, sir.

20   Q.   And would you call that erratic or crazy?

21   A.   No, sir.

22   Q.   All right.   Is it -- we know there's such a law as excessive

23   driving in excess of the speed limit.   Is there such a thing as

24   too low below the speed limit which would be a violation of the

25   motor vehicle code?

1   A.  There are indicators, yes, as far -- and that's one

2   indicator of possibly impaired driving or things like that, if

3   there's not a valid reason to be doing that.

4   Q.  Okay.  Were you driving in a way that was excessively below

5   the speed limit?

6   A.  I was driving 10 to 15 miles an hour.

7   Q.  Okay.  So you're driving 10 to 15 miles an hour, and a car

8   that eventually we learn is Mr. Brewer is on your left side

9   going in the same direction as you?

10  A.  Correct.

11  Q.  And this car and you are both driving -- let me ask you, at

12  a point are you reducing your speed limit below 10 to 15 miles

13  an hour?

14  A.  No, I pretty much stayed -- I try to stay level at that,

15  because, again, if there's cars that stack up behind me or

16  something like that and I have to speed up, then I will.  Again,

17  there were cars in that lane that were passing me.  Mr. Brewer

18  had caught up with me and then didn't pass me.

19  Q.  Okay.  So here we have these two vehicles going down the

20  street, and you're both driving 10 to 15 miles an hour?

21  A.  Yes, sir.

22  Q.  And this goes on for how long?  A block?  Two blocks?  Block

23  and a half?  How long?

24  A.  I would say -- I started in the 2800 block or I started

25  between 26th and 28th.  Okay?  And there's kind of really

Stewart - Cross

| 1 | nowhere to turn off.  There's a big Kroger right there, so it's |
| 2 | kind of a two-block stretch.  And I noticed Mr. Brewer next to |
| 3 | me or behind me, just probably still the -- what would be the |
| 4 | 2700 block in there, but there's nowhere to -- you know, other |
| 5 | than turning left, there's nowhere to turn off right there. |
| 6 | It's a big Kroger parking lot.  So it would have been about a |
| 7 | block and a half before we got to 26th Street, and then he went |
| 8 | ahead and got in front of me. |
| 9 | Q.  So two cars are driving 10 to 15 miles an hour in a 35 mile |
| 10 | zone for a block and a half? |
| 11 | A.  Yes, sir. |
| 12 | Q.  And you get a sense of something here in your intuition that |
| 13 | this person may have recognized you? |
| 14 | A.  I don't know why he won't pass me.  I don't know what it is. |
| 15 | Q.  Now that you sit here today and we think about all the |
| 16 | events that happened and you process them in your mind, clearly |
| 17 | as you've told the jury, he could see you.  You could not see |
| 18 | him? |
| 19 | A.  Correct. |
| 20 | Q.  And as a matter of fact, he could easily recognize you |
| 21 | because you had actually stopped him the week before on |
| 22 | November 4, same month, same year? |
| 23 | A.  It was in a different vehicle, but we had stopped -- I had |
| 24 | stopped him, yes, or I was involved in a stop with him. |
| 25 | Q.  You're in the same vehicle.  He's not? |

Stewart - Cross

1    A.   No, sir, I was in a different vehicle on that stop.   I was

2    riding with a different detective in a gray Ford Explorer.

3    Q.   Okay.   So I thought I had asked you earlier whether you were

4    in the same vehicle for the month and you said yes.   And now

5    you're saying no, it was a different vehicle on the 4th?

6    A.   I understood the question as was I in the -- have I operated

7    the same vehicle for a month?   Absolutely, I had operated the

8    same vehicle.

9    Q.   Okay.

10   A.   I was not operating the vehicle on the first time that we

11   had stopped him.   I was riding as a passenger.   So, yes, I still

12   had that car.   It was parked at our division and I was riding

13   with a different detective.

14   Q.   But clearly on the basis of all we know and understand now,

15   he saw you on the 11th and recognized you because you had

16   stopped him and --

17            MS. MCKENZIE:   Objection.   Speculation.

18            THE COURT:   Overruled.   You can ask it.

19   BY MR. MEJIA:

20   Q.   You've said that the vehicle for a block and a half stayed

21   at your speed and that you had an intuition that the vehicle

22   wasn't passing you as normal vehicles would; right?

23   A.   Again, as I explained, as we went 10 to 15 miles an hour

24   down Broadway and he had stayed behind me -- and I told you we

25   played the waiting game, because at one point I literally

Stewart - Cross

1  stopped in the traffic lane and didn't go and that vehicle

2  stopped as well.  I can't say what he saw.  I don't know what he

3  saw.  I couldn't see in his car.  I didn't know if he was even

4  looking at me.  I don't know what he saw.

5  Q.  Once you pulled him over, you saw his driver's license and

6  recognized him from November 4th, didn't you?

7  A.  I saw his driver's license, saw his name.  I didn't

8  recognize him by face, as you can see.  And then when I see his

9  name on his driver's license, I realize who he is.

10  Q.  Have you had experiences in life where people recognize you

11  and remember you as a police officer but you don't remember

12  them?  Has that ever happened to you?

13  A.  That's happened.

14  Q.  Okay.  And is it your experience as a police officer that

15  people pretty much remember a police officer who stops/arrests

16  them a week before?  That'd be pretty common for a citizen to

17  know and realize that, wouldn't it?

18  A.  I think he -- if you said if I stop and arrest him, I would

19  think, but I didn't arrest him.

20  Q.  Right.

21  A.  I don't even -- he got a ticket, but he didn't get arrested.

22  Q.  Right.

23  A.  And that wasn't my stop.  Well, I was there as a backup

24  officer with Detective Joel Casse.  Detective Casse is the one

25  that wrote the citation.

Stewart - Cross

1    Q.   On November 4th, you and Detective Casse pulled him over for

2    tinted windows?

3    A.   Correct.

4    Q.   And you also went to court.  He was charged with tinted

5    windows at some time after November 4th of 2015?

6    A.   He was charged on November 4th, given the citation by

7    Detective Casse that day.  I never went to court on that.  That

8    would have been Detective Casse going to court on that --

9    Q.   Right.

10   A.   -- if someone had been subpoenaed.

11   Q.   And you have since learned that on 8-21 of this year, 2018,

12   that charge of excessive tinted windows was dismissed in

13   Jefferson Circuit or Jefferson County court?

14   A.   It was dismissed.

15   Q.   He has never been convicted then of the reason for that

16   stop, that is excessive windows, has he?

17   A.   That's slightly misleading, if I can explain it.

18   Q.   Well, has he been found guilty by guilty plea, or trial, or

19   verdict, or judgment of any kind of the crime of excessive

20   window tint on November 4th of 2015?  Yes or no?

21   A.   That charge was dismissed because he was in federal custody.

22   Q.   Sir, do you have some difficulty answering my question?

23   A.   I did answer your question, sir.

24   Q.   He has never been found guilty, has he, for whatever reason?

25   A.   That charge was dismissed.

Stewart - Cross

1    Q.  Right.  Now, also, you are fully aware that following

2    November 2015, you, Officer Casse, and at least nine to ten

3    other officers have been sued in this courthouse, the U. S.

4    District Court for the Western District of Kentucky, for

5    violation of Cherosco Brewer's civil rights?

6    A.  Yes.

7    Q.  And as you sit here and testify today, you are a defendant

8    in that litigation?

9    A.  Yes.

10   Q.  It alleges that you, in your capacity as a law enforcement

11   officer, violated his rights.  And if judgment is entered

12   against you, there are consequences on the basis of a civil

13   judgment against you, aren't there?

14   A.  Not -- there are not consequences to me.

15   Q.  You understand that as a Louisville Metro police officer,

16   you are subject to damages for money for violating people's

17   civil rights?  You don't know that?

18   A.  No, sir, I am not -- I do not pay anything.

19   Q.  You have a lawyer defending you in that litigation pending

20   in this court, don't you?

21   A.  There is a lawyer that represents the city that represents

22   us.

23   Q.  And you don't understand that as a Louisville Metro police

24   officer, if there's a judgment or finding against you for

25   violation of his civil rights, that there's any employment

1  consequence, any money consequence, or any other collateral

2  consequence to you for violating a citizen's rights?  You don't

3  know that?

4  A.  I do know that if I committed a crime, then, yes, I would

5  have to have my own attorney, not the city's attorney, that

6  would have to represent me and I could be liable, yes.

7  Q.  And you are also subject to summons, you're subject to being

8  called in for deposition, and you're subject to being called in

9  at trial, if the case goes to trial on the merits.  You

10  understand that as well, don't you?

11  A.  The merits have been reviewed and none of that has happened,

12  but, yes, we are subject to that, if it is --

13  Q.  Now, up to the point of you pulling the car over, that is on

14  November 12th, Mr. Brewer has driven 15 miles an hour or lower

15  for a block and a half, and you observe windows that you believe

16  are excessive window tint.  Is that it?

17  A.  They are excessively tinted.

18  Q.  And he's also pulled over to the side of the street, and

19  those things in combination prompted you to take action to

20  investigate, have him -- remove him from the vehicle and take

21  further steps as you've described here?

22  A.  Not exactly.  The totality of it all, you know, him not

23  wanting to pass me, him stopping in traffic with me, the

24  excessive tint on the car, him pulling over blocking a --

25  blocking an entrance to a parking lot, which is -- obviously,

Stewart - Cross

 1    anybody that drives knows you can't do that -- so then he would

 2    have to come out.  So it was the totality of it all, yes.

 3    Q.  You are presently in a unit -- your capacity is arresting

 4    fugitive -- people who are fugitive with warrants?

 5    A.  Correct, currently.

 6    Q.  I think you described that as violent offenders.

 7    A.  Yes, sir.

 8    Q.  You've been a policeman for how many years now?

 9    A.  Ten years.

10    Q.  And based upon all the steps that have been taken here, you

11    had him get out of his vehicle, as you've described them here in

12    detail to this jury?

13    A.  It was the totality of it all.  The previous stop when we

14    had stopped Mr. Brewer, he said -- and you'll have to excuse my

15    language -- "You don't know who the fuck I am.  You better

16    fucking look me up."

17        And so when he said that, I look him up.  Now, granted, I

18    can't see anything other than his criminal history is all I can

19    see.

20    Q.  Were you aware that he had made complaints to the Louisville

21    Metro Police Department against officers for violation of his

22    rights?

23    A.  No.

24    Q.  Were you aware of that?

25    A.  No.

Stewart - Cross

1  Q.  Did you know that what he meant by "look me up," you'll find

2  my name as a person who will make complaints when police violate

3  my rights?

4  A.  Again, the only thing he said to me was, "You don't know who

5  I am.  You better fucking look me up."  So when -- the only way

6  that I can look you up is to look up your criminal history.  I

7  can't look up anything that has to do with whether you've

8  complained on police officers, whether you've sued police

9  officers.  I don't know anything about that.  I don't have

10  access to that.

11  Q.  Well, you are aware as you sit here now that as the result

12  of somewhere near 12 to 14 vehicle stops for tinted windows, he

13  has an action not only against you but eight or nine other

14  officers with the Louisville Metro Police Department.  You're

15  aware of that, aren't you?

16  A.  Can you say that one more time?

17  Q.  You are aware today that if you look up his name in court

18  records and yours, you will see that he has been stopped in

19  excess of 12 to 14 times for excessive window tint in this city?

20  A.  Mr. Brewer's been stopped by me twice.  When I look him up,

21  yes, he's been stopped multiple times for excessive window tint.

22     What that also shows me is whether it was merged with

23  another charge, whether it was dismissed because it was

24  corrected, whether it was dismissed because it was dismissed and

25  a felony was taken higher.  Things of that nature, it will tell

1    me that.  That's what I know is, yes, he has been stopped for

2    excessive window tint.

3    Q.  And the record will also show that as many as 12 to 14

4    excessive window tint stops/charges separately have all been

5    dismissed in Jefferson Circuit Court.  Are you aware of that if

6    you look it up, sir?

7    A.  Again, they were dismissed, but it wasn't dismissed because

8    it didn't happen.  It was dismissed because it was corrected,

9    merged with something else.  I can't say why they dismissed it,

10   you know, without the printout in front of me.  I know my

11   particular case, it was dismissed because it was federal

12   custody.

13   Q.  Now, we saw the clip here, and it appeared that there was a

14   time meter on it and the clip began at zero and it ended to

15   somewhere near about 7 minutes, 15 seconds.  I'm not asking you

16   to recall that, but did you see -- that sounds about right about

17   the time?

18   A.  There should be some type of time mark on it.

19   Q.  Can you tell me whether or not you turned your body camera

20   on or off or did it run continuously from start to finish, if

21   you under my question?

22   A.  From the video that I saw, it ran continuously.  I didn't

23   turn it off on the part that I saw.

24   Q.  Okay.  And you've described to me the windows, how they were

25   dark.  We also see from the clip that the door is open, driver's

Stewart - Cross

1    side door front is opened and officers are looking in there or

2    we see the interior of the vehicle; right?

3    A.   Yes.

4    Q.   And we also see that somewhere near the end of the clip, we

5    see that to left-hand side of the steering wheel a panel has

6    been removed or pulled down.  That accurately describes where

7    the panel was removed or pulled down from the vehicle; right?

8    A.   I pulled down the panel -- as you can see on the video, I

9    pull it down and it comes down fairly easily, which if it -- if

10   it's removed off and on quite a bit, you know, as in your

11   vehicle, your panels are fairly snug.  If it's removed off and

12   on quite a bit, it will become loose and it's easier to pull

13   off.

14   Q.   And we hear the words "got it" after the panel is removed?

15   Did you hear that?

16   A.   They could have been on there.  I wasn't paying attention

17   about it.

18   Q.   Did you hear the word "cocaine" after the --

19   A.   I believe somebody asked me what it was and I said cocaine.

20   Q.   Okay.  And now, in addition to the panel, in addition to

21   what you've described here, I believe you've also said there was

22   a rag.  You've described that, that there was a rag somehow also

23   behind that panel location.

24   A.   There's a black bag and all of this stuff was in the black

25   bag.  And as I pulled it out, I didn't stretch everything out,

1    and there's a -- I don't know what you call it, if it's a do-rag

2    type, if it's a -- it's a rag of some type.

3    Q.  So the sequence is that the panel is pulled off, you reached

4    in, pulled out a bag, unrolled a bag, and then found the

5    quantity of suspect controlled substance, cocaine?

6    A.  Inside the bag, yes, sir.

7    Q.  Okay.  Now, apart from that, that particular bag, was there

8    any -- well, I'll strike that.

9        You were shown, I think -- I don't know if you were -- an

10   inventory, but let me -- you've said that you believe it was

11   13.1 grams and later you explained that was gross weight, which

12   was packaging?

13   A.  Yes, sir.

14   Q.  You have since seen or do you know that it actually was

15   tested for net weight at 8.1 grams of positive for cocaine?

16   A.  When we initially put it in, as I said, I put it in bags and

17   all, and that would have been the 13 point something grams.  I

18   haven't seen the paper that you have.  I do know, when the KSP

19   lab tests it, they will dump all of the product out.

20   Q.  Let me -- if I show that to you, would that help you recall

21   that?

22   A.  Yes, please.  The KSP lab tested a chunky, off-white

23   material weighing 8.16 grams.

24   Q.  You can't read it.  That's just for you to read yourself.

25   A.  Okay.  Yes, sir, 8.1 grams.

Stewart - Cross

1    Q.  Thank you.  We just have to follow the rules here.

2        Now, to help the jury, I have some things here, and you've

3    said that to you it was a lot.  To assist the jury, I'm going to

4    show you something that is manufactured labeled 1 gram, and tell

5    me whether or not this looks to you in your experience -- you

6    can see the front and back -- whether that appears to you to be

7    a gram quantity.

8    A.  Are you asking me a question?

9    Q.  Is that a gram quantity there in your hand?

10   A.  This may be a gram quantity of whatever this is.  Each

11   material weighs different things.  Sugar may be heavier than

12   cocaine.  It may be more.  It may be less when it comes to a

13   package of this size.

14   Q.  Let me show you a package that has been manufactured labeled

15   7 grams.  If you could look at that.  Does that look -- can you

16   -- in your hand does that appear to be 7 grams as indicated by

17   the manufacturer's label?

18   A.  Well, the manufacturer's label says 7 grams.  Again, 7 grams

19   of this is 7 grams different than cocaine, or marijuana, or

20   something like that.  Seven grams of marijuana is going to be

21   bigger than 7 grams of cocaine.

22   Q.  Right.  But when we're just talking about weight, not size

23   and not thickness, just weight.

24   A.  I just don't want to mislead the jury --

25   Q.  Of course.

1    A.   -- on what you're handing me.

2    Q.   No one wants to mislead this jury, sir.  We have 3.96 on

3    each one of these, total just under 8 grams by fractions of

4    hundredths of grams by manufacturer's label.  Would you agree

5    with me that that in your hand is the weight of just a fraction

6    under 8 grams by weight?

7    A.   I can't argue with the manufacturer's label.  I don't -- I

8    don't know.

9    Q.   Okay.  Now, so the jury can understand, we start with a

10   common known weight of a pound.  A pound is 16 ounces.  You'd

11   agree with that?

12   A.   Yes, sir.

13   Q.   And you understand that an ounce is one-sixteenth of a

14   pound.  Sixteen ounces to a pound?

15   A.   An ounce is 28 grams, 28 point --

16   Q.   And in grams, 28 grams makes an ounce?

17   A.   Correct.

18   Q.   So a half of an ounce would be 14 grams?

19   A.   In there, yes, sir.

20   Q.   A fourth of an ounce would be 7 grams.

21   A.   You get a quarter ounce, yes.

22   Q.   So what you recovered then was just almost on the spot a

23   fourth of an ounce of cocaine.

24   A.   Yes, sir.

25   Q.   Now, do you have experience enough in narcotics

Stewart - Cross

1  investigations to know that some controlled substances are pure

2  and some controlled substances have mixture of noncontrolled

3  substance with them?

4  A.  Yes, yes, sir.

5  Q.  In this case, can you tell the jury whether or not the

6  cocaine recovered here was pure cocaine or whether it was

7  cocaine mixed with a noncontrolled substance?  Yes or no?

8  A.  I can't tell you whether it was mixed or whether it wasn't,

9  no.

10  Q.  And do you also -- can you tell the jury from any knowledge

11  or experience you have in law enforcement whether or not sellers

12  of cocaine, that is cocaine traffickers, mix it with

13  noncontrolled substances to increase its weight, or to increase

14  its volume, or to increase its -- it for purposes of selling or

15  distributing, if you know?

16  A.  We don't have a purity test on this substance.  It did come

17  back positive for cocaine, so I can't tell you if it was mixed

18  with something or not.

19  Q.  So you can't tell whether or not it has been, as they say in

20  the street, cut with a noncontrolled substance that is suitable

21  for distribution?  That you don't know and that you can't tell

22  this jury?

23  A.  I don't know if it was cut.  There was no cut found in the

24  vehicle.  Sometimes we will find other things, baking soda or

25  something, vitamins or something like that that it will be cut

Stewart - Cross

1    with in a vehicle.  I didn't find anything like that.

2    Q.  And there are other articles or objects that indicate drug

3    trafficking, such as scales.  You didn't find any scales in this

4    case, did you?

5    A.  There are multiple things, large amounts of currency in U.S.

6    -- in different denominations, multiple cell phones.

7    Q.  Sir, sir, scales.  We'll hit the rest of them, but let's go

8    one at a time.

9    A.  No, we didn't find a scale in the car.

10   Q.  There were no scales in the car?

11   A.  As I said, it was in individually packaged baggies already,

12   as if it had already been weighed out.

13   Q.  How many bags?

14   A.  Fifteen, I believe, is what it says on the paper.

15   Q.  Okay.  Now, can you tell me or tell the jury how long that

16   cocaine had been at that location --

17   A.  I don't know.

18   Q.  -- in the car?

19   A.  I don't know.

20   Q.  Can you tell me how many people had driven that car that

21   day, if you know?

22   A.  I don't know.

23   Q.  Good.  Did you ever take steps to investigate or to look up

24   his wife to find out information about who else may have been

25   driving that car?

Stewart - Cross

1   A.   The only thing I know is that he said it was his wife's car.

2   She showed up at the scene.   She wasn't driving it.   That's the

3   only thing I really know about her.

4   Q.   So he is -- he is driving someone else's car during this

5   event and that, obviously, is something that you verified from

6   him.   Have you verified that from records as well?

7   A.   We talked about narcotics trafficking.   It is common for

8   narcotics traffickers to drive cars that come back to other

9   people, or rental cars, or things of that nature to make sure,

10  if I run a tag or if I get something out of the car, it doesn't

11  come back to them.

12  Q.   Is it common for people involved in this to pay cash for

13  rental cars?   Is that common?

14  A.   It's common for them to pay however they want to pay.

15  Sometimes they'll pay with cash.   Sometimes they'll pay with a

16  card.   Sometimes they'll have you go in and you rent the car for

17  them.

18  Q.   Right.

19  A.   You know, it's all --

20  Q.   And sometimes they will place their drugs in somebody else's

21  car and somebody else might be stopped with their drugs.

22  A.   That's kind of a hard thing to believe when the aspect if

23  that's your money maker, I'm not going to leave that much drugs

24  for just somebody else to find.   If it's my money, I'm going to

25  keep it with me.

1  Q.  Do you -- have you in your experience as a law

2  enforcement -- well, first of all, in your life experience, have

3  you ever, let's say, cohabitated with a drug user?

4  A.  No.

5  Q.  A narcotic addict?

6  A.  No.

7  Q.  Have you ever been near or around on a daily basis with

8  somebody who's a drug dealer or --

9  A.  No.  And in my experience, mainly what I find is, if there

10  are narcotics from a user left in a car, it will be narcotics --

11  it will be user levels, small levels, points of a gram, maybe a

12  gram, if they're lucky.  That's not usually left anywhere.

13     If anything is left, there'll be a used needle, you know,

14  things of that that's been left in a car, some kind of

15  paraphernalia, a crack pipe, or a straw, or something like that

16  that might be left in.  A user doesn't leave their drugs behind.

17  That's their lifeline as far as a user goes.

18     Now, that -- users normally have, in my experience, very

19  small amounts, user amounts, points of a gram.  So we're

20  talking, you know, a quarter ounce, which is eight grams.  A

21  point of a gram is one-tenth of that.  So user amounts are very

22  small.

23  Q.  Sir, did you examine at any time the quantities that were in

24  these individual packages?

25  A.  No, sir.  It was all weighed together.

Stewart - Cross

```
 1   Q.  All right.  So you don't know whether or not this is cocaine
 2   of a user or cocaine of a dealer from your own knowledge, do
 3   you?
 4   A.  What I can explain to you is, again, when I talk about user
 5   amounts --
 6   Q.  Sir, sir, of your own --
 7   A.  I'm trying to answer your question, sir.
 8   Q.  No, no.  Of your own knowledge, you don't know whether this
 9   is cocaine of a user or cocaine of a seller of your knowledge?
10   A.  My knowledge, it is cocaine of a seller, from my experience.
11   Q.  Right.  And it's important for you to say that as a
12   defendant in the civil rights suit in order to justify your
13   conduct both on the 4th, as well as on the 12th, isn't that so?
14   A.  No, sir.
15   Q.  Well, we know that you stopped him on the 4th, and we know
16   that you've been sued as a result of that.
17   A.  Yes, he is suing the police department.
18   Q.  Now, you did not find any scales.  You've said that; right?
19   A.  Correct.  I told you it was already bagged up as if it had
20   already been weighed.
21   Q.  And you said that you found cash on him as well?
22   A.  Correct.
23   Q.  And you've described what you have -- what you did with the
24   cash.  You put it in inventory.
25   A.  Yes, sir.
```

1    Q.  Now, did you report or make any record of the denominations

2    of the currency that he had on November 12th?

3    A.  No, I did not.  Again, I did report it as various

4    denominations, meaning more than one, two.

5    Q.  Can you tell the jury how many hundreds it was?

6    A.  I cannot.  I don't know.

7    Q.  How many 20s it was?

8    A.  I don't know.

9    Q.  Are you aware of the sale price of drugs on the street as

10   being five to $10 to $20 per bag, as you've described them here?

11   A.  It depends on what drug we're talking about.

12   Q.  Here.

13   A.  It depends on what drug we're talking about, sir.

14   Q.  Cocaine in gram quantities, although we don't have --

15   A.  You cannot buy a gram of cocaine for $5, no.

16   Q.  Gram of cocaine, in your experience or knowledge, goes for

17   how much?

18   A.  It can range anywhere -- normally when we're buying grams,

19   we're talking 20s to anywhere to $100.

20   Q.  Now --

21   A.  Again, it all depends on what drug we're talking about.

22   Q.  Let me show you and see if you recognize this.

23       (Counsel conferring off the record.)

24   Q.  Have you ever experienced in your time as a law enforcement

25   officer where an officer will photograph money obtained or taken

Stewart - Cross

1   from a person who's been arrested?

2   A.   I've seen people photograph it.  More we photograph it when

3   it comes -- my unit at the time would photograph it if we're

4   going to do a controlled buy, something of that nature.  So when

5   we stop that person to take the money off of them, we can

6   compare the serial numbers to the same thing we have.

7        As I told you, to keep from any misunderstanding about money

8   period, our department, now we will take it -- or myself, I

9   don't want any misunderstanding of the money of how much I took

10  off of you.  I will take it out of your pocket, and I will put

11  it in a bag in front of you, and I won't photograph it or

12  anything like that.  It will go right in a bag in front of you.

13  I don't count it.

14  Q.   Sir, in this case you've already told the jury that

15  Mr. Brewer was arrested the night before on November 11th.

16  A.   He was, yes.

17  Q.   And I'm going to show you a photograph of the money that was

18  inventoried on the day before, November 11th.  Do you see the

19  date mark, November 11th of 2015?

20  A.   Yes, sir, I do.

21  Q.   And do you see the denominations there spread upon the table

22  in front of you?

23  A.   I do.

24  Q.   That wasn't done on the date of your investigation,

25  November 12th, was it?

Stewart - Cross

1    A.   No, it wasn't.  I don't know where they found that money, if

2    it was on him, if it was in the car.  I don't know.  If it's in

3    the car, it's more likely to be photographed than if maybe it's

4    on him.  I don't know, but I'm telling you my practice, to keep

5    from any misconstruing of anything, take it out of your pocket

6    in front of you, put it in a bag in front of you, seal the bag

7    in front of you, give you a receipt for the bag right in front

8    of you.  That's what I do.

9    Q.   Now, you are aware of the standards applicable for

10   investigation of tinted windows or charges of tinted windows in

11   Kentucky, the standards for investigating tinted windows?

12   A.   I don't understand what you're asking.

13   Q.   Tinted window --

14   A.   Do I know how to tell if a window is illegal or not?

15   Q.   Yes.

16   A.   Yes.

17   Q.   Isn't there a device or a method that's used to determine

18   whether windows are tinted in excess of that required by law?

19   A.   There is a device called a tint meter that if you don't

20   know, you can put it on the window to see if it's legal or

21   illegal.

22        Also, when you use that device, you have to be trained with

23   that device.  And during that training, it also goes through how

24   to recognize visibly whether I can see you or whether I can't,

25   you know, different shades of the window.  And at the end of

1    that certification, you have to take a test, not using the

2    device, but just seeing a picture of a window and what's behind

3    it with certain amounts of tint as far as what the window

4    tintage -- what the window percentage is, and you have to pass

5    that test before you're even authorized to carry it.

6    Q.   Right.  And none of that was done in his case, was it?

7    A.   I have taken that test.

8    Q.   No, no, no.

9    A.   I do not have a window tint meter that I carry with me, no.

10   Q.   None of that was done on November 4th, none of that was done

11   on November 12th?

12   A.   No.  When it comes to 5 percent window tint, there's no

13   question on whether it's legal or not.  You can't see in it,

14   it's illegal.

15   Q.   Right.  Of course, tinted windows and this crazy driving

16   down the street was the reason he was stopped.

17   A.   That was the totality of the circumstances, as I have

18   explained.

19   Q.   Two things for which he was never charged or convicted?

20   A.   I didn't stack charges on him, no.  Once I had the felony

21   of -- and I don't remember.  I don't have my citation on me.  I

22   don't remember if I charged him for window tint or whether I

23   didn't.  I did charge him with the felony drug trafficking.

24            MR. MEJIA:  Nothing more.

25            THE COURT:  Any redirect?

Stewart - Redirect

1          MS. MCKENZIE:  Yes.

2                    REDIRECT EXAMINATION

3    BY MS. MCKENZIE:

4    Q.  Detective, you were asked about this idea that -- well, let

5    me back up.  Are you familiar with the process in Jefferson

6    County District Court?

7    A.  Yes, ma'am.

8    Q.  Okay.  And for members of our jury who may be from out of

9    county, what happens in Jefferson District Court?  What kinds of

10   charges go through Jefferson District Court?

11   A.  Initially, Jefferson District Court is for misdemeanors,

12   violations, things of that nature.  Now, you will get felonies

13   down there.  And then they are usually either going to the grand

14   jury or waived up to the grand jury, and they'll be taken to

15   circuit court, if it's a felony.  Misdemeanors and violations

16   stay in district court.

17   Q.  Okay.  And is that -- do you go to district court on a

18   regular basis as part of your job?

19   A.  Early in my career when I'm on the street, I went quite a

20   bit to district court.  I don't go to district court very much

21   anymore.  Most of my cases are felonies that are taken up in

22   circuit court or federal cases.

23   Q.  But as a patrol officer, as a street squad member --

24   A.  Right.

25   Q.  -- have you taken cases through district court --

Stewart - Redirect

1   A.   Yes.

2   Q.   -- enough to be familiar with --

3   A.   Quite a bit, yes.

4   Q.   -- the process?

5   A.   Yes, ma'am.

6   Q.   Okay.  So when a charge gets dismissed --

7   A.   Yes, ma'am.

8   Q.   -- in district or circuit court for that matter, does that

9   always mean the same thing?

10  A.   No, ma'am.

11  Q.   Okay.  Why might there -- why might some -- I can't speak

12  today.  What are some reasons why a case might be -- not a

13  case -- a charge --

14  A.   Yes, ma'am.

15  Q.   -- a charge might be dismissed?

16  A.   There's multiple, multiple reasons why.  Sometimes, as I

17  look at Mr. Brewer, you know, and if -- or not even Mr. Brewer.

18  If I look at a case -- if I charge you with excessive window

19  tint and then you bring in a piece of paper from a tint shop or

20  somebody else that says -- you know, a receipt that says tint

21  removal and you show that to the attorney, to the district court

22  attorney, they will charge it as corrected, and they will

23  dismiss the charge for you because you took care of the problem.

24       There's also things -- if someone is charged with a felony

25  and there's a misdemeanor in district court, sometimes that will

Stewart - Redirect

1  either be merged, dismissed/merged as the same charge or it will

2  just be dismissed and the felony will go forward.  As in this

3  case, the tint's dismissed.  We're in federal court dealing with

4  felonies.  The violation is not going to tie up -- it's not

5  going to bog -- they're not going to bog down the court system

6  with the violation and keep it going and going and going when

7  the defendant can't show up because he's in federal custody, so

8  they'll dismiss that charge.  There's a myriad of reasons why

9  they might be dismissed.

10  Q.  Okay.  And you were asked about whether or not Mr. Brewer

11  had ever been convicted of having excessive tint.  And without

12  going into every single case, are you aware of whether he has at

13  some point been convicted?

14  A.  Yes, he has.

15  Q.  Okay.  Are you aware of whether some of those other charges

16  were dismissed in exchange for a resolution on another charge?

17  A.  I believe --

18  Q.  Without being specific.

19  A.  I believe I've seen dismissed/merged as far as they've been

20  put together as one charge or the more serious charge.

21  Q.  And are you aware of whether there were any other similar

22  charges that -- like the tint charge in your case ultimately

23  were dismissed because the federal case took Mr. Brewer away

24  from district court?

25  A.  Any of the charges that are involved in that, like my

Stewart - Redirect

```
 1  narcotics trafficking charge, my felony that's in circuit court
 2  would be dismissed because it's -- he's not going to be charged
 3  for the felony trafficking narcotics in circuit court and
 4  charged with the felony narcotics trafficking in federal court,
 5  so they'll dismiss the lower court's standings.
 6  Q.  Detective, you are being sued by Mr. Brewer.
 7  A.  Yes, ma'am.
 8  Q.  The attorney representing you, where does that -- is that an
 9  attorney that you went out and hired?
10  A.  No, ma'am.  I don't even know who it is.
11  Q.  Okay.  Is it someone who works for Jefferson County?
12  A.  It would be someone that works for the city or the state
13  representing the Government.
14  Q.  Do you attend court dates on that case?
15  A.  No, ma'am, I've never even been subpoenaed on it.  The only
16  thing I ever got was a letter saying I was being sued.
17  Q.  Okay.  And when did -- when did you become aware of the
18  lawsuit?
19  A.  Years ago.  I don't --
20  Q.  Okay.
21  A.  I don't remember.
22  Q.  Is it fair to say it was after November 12th of --
23  A.  Oh, absolutely.
24  Q.  -- 2015?
25  A.  It was after I had contact with him, yes.
```

1    Q.  Okay.

2    A.  Prior to the November 4th stop, I didn't even know who

3    Mr. Brewer was.

4    Q.  Okay.  And is it fair to say it was after the lawsuit was

5    filed on January 7th of 2016?

6    A.  Yes.

7    Q.  Okay.  Do you know an Officer Beckett?

8    A.  Bickett, yes, ma'am.

9    Q.  Okay.  Do you work with him?

10   A.  No, I don't.

11   Q.  Okay.  Do you know him in any capacity related to Cherosco

12   Brewer?

13   A.  No.

14   Q.  Okay.  Did you conspire with him to violate Mr. Brewer's

15   rights?

16   A.  No.

17   Q.  Okay.  And Mr. Mejia asked you about employment consequences

18   should there be a negative result in the civil case.

19   A.  Uh-huh.

20   Q.  Is there an entity in the police department that

21   investigates complaints against officers?

22   A.  Yes, ma'am.

23   Q.  Okay.  What's it called?

24   A.  We have the Professional Standards Unit, or PSU, or you have

25   the Public Integrity Unit, which is PIU.

Stewart - Redirect

1    Q.   Okay.  Can you explain for the jury's understanding, what do

2    those terms mean?  What --

3    A.   The Professional Standards Unit investigates violations of

4    police policy.  If we had done something wrong, such as not

5    turned our camera on or something like that, then PSU is the one

6    that investigates it.

7         PIU, the Public Integrity Unit investigates officers that

8    violated the law.  If there was a -- if I had violated a law in

9    any way, shape, or form and a complaint was lodged with PIU,

10   they would be the ones to investigate it.

11   Q.   Okay.  At any time have you been notified of a PSU or a PIU

12   investigation --

13   A.   No, ma'am.

14   Q.   -- of which you are a target --

15   A.   No, ma'am.

16   Q.   -- related to Mr. Brewer?

17   A.   No, ma'am.

18   Q.   Okay.  Are you aware of whether Mr. Brewer filed any

19   complaints with PSU against you?

20   A.   I would be notified if they had and no.

21   Q.   Have you received any notification?

22   A.   No, ma'am.

23   Q.   Okay.  Detective Stewart, in the November 12th stop, and

24   since it's been raised, in the November 4th encounter with

25   Mr. Brewer, did you follow your normal procedures, your normal

1  routine on traffic stops of that nature?

2  A.  Yes, ma'am.

3  Q.  Okay.  I'm just curious.  Have you ever been in trouble with

4  PSU before?

5  A.  No, ma'am.

6  Q.  Have you ever had -- been disciplined by the department?

7  A.  I think I got a letter of reprimand for bumping a fire

8  hydrant.

9  Q.  With your police vehicle?

10  A.  Yes, ma'am.

11  Q.  Okay.

12  A.  At about two miles an hour.

13       MS. MCKENZIE:  Thank you, Detective.  I don't have any

14  further questions at this time.

15       THE COURT:  Mr. Mejia.

16            RECROSS-EXAMINATION

17  BY MR. MEJIA:

18  Q.  You were with Officer Casse on the November 4th stop of

19  Mr. Brewer?

20  A.  Yes, sir, I was with Detective Casse.

21  Q.  You made reference to your citation or to the citation that

22  you don't recall what it shows.

23  A.  No, I don't remember a citation from three years ago, no,

24  sir.

25  Q.  Let me show you --

1          (Counsel conferring off the record.)

2    Q.  Without reading it aloud, would you read it to yourself,

3    look to the bottom to see if you recognize your name there?

4    A.  Yes, sir, my name's on it.

5    Q.  Okay.  What does that record indicate insofar as who the

6    arresting officers are or who the officers are on the citation?

7    A.  Okay.  The officers on the citation are Joel Casse first and

8    my name second.  The reason we do that as detectives is if there

9    is a case that comes up and I may not remember something or I

10   may not be the primary officer that had involvement in

11   something, it basically is telling me who else was there with

12   me.  So the two arresting officers -- or citing officers, Joel

13   Casse is first as the primary.  I am the second.

14   Q.  Whether primary or second, you are the officer on that stop

15   and on that charge, are you not?

16   A.  Again, I'm the secondary officer and I am listed on the

17   citation.

18   Q.  And you have seen -- let me show you what is the clerk's

19   record of that particular case for that November 4th stop and

20   charges placed against Mr. Brewer.  You recognize what that is

21   in your hand?

22   A.  It's -- you printed out CourtNet is that what it is?

23   Q.  Yes, sir.

24   A.  Okay.

25          MS. MCKENZIE:  I'm sorry.  Can we approach or can I

Stewart - Recross

1   see what you're showing the witness?

2        MR. MEJIA:  Yes.  I'm sorry.

3      (Counsel conferring off the record.)

4   BY MR. MEJIA:

5   Q.  Do you see that as a certified copy of the court record of

6   the November 4th citation?

7   A.  Correct.  It's not the citation.  It's the court printout.

8   Q.  The court record?

9   A.  Yes, sir.

10  Q.  And, now, do you see the charges there that stem from the

11  November 4, 2015 stop?

12  A.  Yes.

13  Q.  And do you see there are three charges?

14  A.  Yes, sir.

15  Q.  What are those?

16  A.  Excessive windshield or window tinting, failure or improper

17  to signal, and failure to wear seat belts.

18  Q.  Now, it is -- you've had experiences in the court enough to

19  know that when they come before the district court, there's

20  what's called arraignment.  That's where the individual with or

21  without counsel appears before the court, enters a plea of not

22  guilty.

23  A.  Correct, sir.

24  Q.  Is that what appears to have occurred there by the sequence

25  of events that followed, the case is continued from time to time

Stewart - Recross

1    for further proceedings?

2    A.  It's continued a lot.

3    Q.  Yes.

4    A.  Yeah.

5    Q.  Do you see that it's continued through the balance of '15,

6    all of '16, all of '17?  Do you see that?

7    A.  I see where the arraignment is.  I don't see what his plea

8    was on this, but I do see where the arraignment date was, yes.

9    Q.  Right.  And do you see all of the progress reports of the

10   numbers of times it came before the court?

11   A.  A motion to continue by defendant, pretrial conferences,

12   yes.

13   Q.  Right.  You don't see anything indicating a plea of guilty

14   to any charge there, do you?

15   A.  No.  Again, I'm not seeing the pleas of anything on here,

16   but, no, I don't see a plea of guilty.

17   Q.  Your experience would tell you, however, that it is a plea

18   of not guilty if the case is continued from time to time to time

19   over the course of two years?

20   A.  It's back here.

21   Q.  Look to the second page and third page, sir.

22   A.  Yeah, I found it.

23   Q.  Yes.

24   A.  Okay.  It doesn't say -- oh, it does say dismissed, yes,

25   "charge disposed, dismissed, cannot OPA from federal custody,"

1    yes.

2    Q.  Okay.  And what is the date of the dismissal of all three

3    charges?

4    A.  8-21 of 2018.

5        (Counsel conferring off the record.)

6    Q.  You were asked about records of Louisville Metro Police

7    Department with regard to you.  Without reading it out aloud, do

8    you recognize what that is?  First of all, do you recognize it

9    as a document of the Louisville Metro Police Department?

10   A.  Yes, that's a copied document, yes.

11   Q.  And does it relate to an individual making a request to the

12   police department?

13   A.  It does.

14   Q.  Who is that from?

15   A.  "Requester's name:  Cherosco Brewer."

16   Q.  And does it refer to officers there with regard to that

17   request?

18   A.  I don't normally read it in this order, so let me see.  You

19   mean specific officers or just officers?

20   Q.  Does it refer to a date?  Let's start that way.

21   A.  The date of the request is 11-9 of 2015.

22   Q.  Does it refer to a request for a specific item, that is a

23   video or body cam recording of a stop or arrest?

24   A.  It just says -- okay.  There's badge numbers up top, no

25   names, and it says -- and this is actually not my badge

Stewart - Further Redirect

1    number --

2    Q.   Okay.

3    A.   -- but it says he wants video from a stop.

4    Q.   Right.   From the police department with respect to a request

5    by Cherosco Brewer; right?

6    A.   Yeah, but that's not my badge number.

7              MR. MEJIA:   Nothing more.   Thank you.

8                     FURTHER REDIRECT EXAMINATION

9    BY MS. MCKENZIE:

10   Q.   Have you ever seen that document before today?

11   A.   No, ma'am.

12             THE COURT:   May the witness be excused?

13             MS. MCKENZIE:   Yes.

14             THE COURT:   You may step down.   Thank you.

15             THE WITNESS:   Thank you.

16             THE COURT:   Let's see.   Members of the jury, we will

17   take a very brief ten-minute break now, and when we return, we

18   will pick up with more testimony.   Remember not to discuss the

19   case.

20       (Jury out 2:02 p.m.)

21             THE COURT:   You may be seated.   The jury is now out of

22   the courtroom.   I'll see you back here in about ten minutes.

23       (Recess at 2:02 p.m. until 2:17 p.m.  Jury out.)

24             THE COURT:   We ready for the jury?

25             MS. MCKENZIE:   Yes.   Your Honor, I wanted to make

 1    sure -- I couldn't remember if I formally moved to admit

 2    Exhibit 18A, which is the video clip that we played on the last

 3    witness.

 4              THE COURT:  I don't recall either.

 5              THE REPORTER:  It is, Your Honor.

 6              THE COURT:  It is admitted?

 7              MS. MCKENZIE:  Okay.

 8        (Jury in 2:20 p.m.)

 9              THE COURT:  The Government may call its next witness.

10              MS. KEEL:  Thank you, Your Honor.  We'll call LMPD

11    Detective Anthony James.

12        (DETECTIVE ANTHONY JAMES, called by the Government, sworn.)

13                        DIRECT EXAMINATION

14    BY MS. KEEL:

15    Q.  Good afternoon, Detective James.

16    A.  Good afternoon.

17    Q.  Would you please introduce yourself to the jury, telling

18    them your name and occupation.

19    A.  Sure.  I am Anthony James.  I work and am employed by

20    Louisville Metro Police Department.  I am currently assigned to

21    the Narcotics Unit.

22    Q.  And how long have you been with the LMPD?

23    A.  I was hired in 2000, so a little over 18 years.

24    Q.  What role were you in during the month of November 2015?

25    A.  I was assigned to the Mobile Ninth Unit, was actually their

1    K-9 handler.

2    Q.  And how long did you serve altogether in that role as a K-9

3    officer?

4    A.  Well, I got the dog when I was in narcotics, about 2011, and

5    I think soon after that I was transferred over there to VIPER

6    and then Mobile Ninth.  And then I just left back in April, I

7    think, is when I got transferred.

8    Q.  Okay.  So the total time that you were working as a K-9

9    handler would have been from around 2011 to 2018?

10   A.  Yes, ma'am, I believe so.

11   Q.  About seven years?

12   A.  Uh-huh.

13   Q.  Okay.  Now, can you please describe for the jury what it is

14   that you did as a K-9 officer.

15   A.  Sure.  What my job description was is I had a single purpose

16   narcotics detection K-9, and that dog was trained to alert on

17   narcotic odors, such as like marijuana, cocaine, heroin, or

18   methamphetamine, and, like, derivatives of that, things that

19   would contain those same products, like crack cocaine would

20   contain cocaine, so he would hit on crack cocaine too.

21       And, basically, I was assigned to -- like with the VIPER

22   Unit and the Mobile Ninth, I was assigned to a platoon.  And,

23   basically, I would kind of shadow them and follow them around in

24   the areas that they were assigned to work, various areas of

25   town, and I would be close by, either, you know, to assist for

1    safety reasons or to assist with the K-9.

2    Q.  And to do that job, did you have to go through specialized

3    training and certification?

4    A.  Yes, I did.  The basic training that I started out with with

5    the K-9 was about 280 hours, I believe.  That was just the basic

6    handler training with me and the dog.  And at that time, then

7    you actually have to pass like a practical, where you and the

8    dog have to go out and both perform and pass that qualification.

9    And then there's ongoing training and then after that every year

10   you have to re-certify with that dog.

11   Q.  So there's an annual re-certification and then can you sort

12   of describe what the ongoing training process is like.

13   A.  Like on Wednesday nights is a big training night, and what

14   they'll do is they'll have different venues.  One night we might

15   be doing vehicles.  The next week we might be doing hotel rooms,

16   and then there could be a combination of them thrown in there.

17   And we do different venues, just to have different odors,

18   different distractions, different things for the dogs to

19   actually work through.

20   Q.  And can you tell us about the K-9 that you were working with

21   in November 2015?

22   A.  Sure.  That was K-9 Diesel.

23   Q.  And so Diesel also went through the certification process

24   and the ongoing training that you described?

25   A.  Yes, yes, he did.

1   Q.   Okay.  And you said that you were working with Diesel, who

2   is a single-purpose dog sniffing out narcotics.  Now, are there

3   ever reasons that a dog trained like Diesel was -- might alert

4   on other articles other than the narcotic substance themselves?

5   A.   Yes.

6   Q.   And can you explain why that might be.

7   A.   In the dog world, with what I'm trained with with single-

8   purpose narcotics, there's actually dogs that will track.

9   There's actually dogs that will do articles, and then there is

10  patrol dogs that will actually -- the dogs that can, you know,

11  track down people, and if they need -- you know, if they don't

12  comply, can be bitten.

13      My dog was just a single-purpose dog.  He was only -- we

14  were only certified to do narcotics, but on occasion we could

15  find different things.  Like if somebody ran on foot and they

16  believed that narcotics might have been dropped, I would run

17  that area.  And it was common that we would find guns or, you

18  know, contraband, drugs and guns or whatever in those areas.

19  Q.   And why would a drug-sniffing dog be able to find those

20  articles?

21  A.   Because they contain an odor of -- narcotic odor is why he's

22  alerting on it.

23  Q.   And so those odors, they come from residues from the

24  substances?

25  A.   Yes.

1    Q.  Now, as part of your work with the Mobile Ninth Unit, did

2    you respond to traffic stops on November 11th and November 12th

3    in 2015 that involved the defendant, Cherosco Brewer?

4    A.  Yes, ma'am, I did.

5    Q.  And can you explain, what is the process for executing a K-9

6    sniff when you're called to a scene like that?

7    A.  Typically when I would arrive at the scene, I would be, you

8    know, most of the time minutes behind them or right with them.

9    You know, if they -- if they see fit that they wanted an open

10   air sniff around the vehicle, I would get the dog out and deploy

11   the dog around the vehicle for an open air sniff.

12   Q.  And we've actually heard a couple of officers from earlier

13   testimony talk about Diesel alerting.  What is it -- what does

14   it mean when a trained K-9 like Diesel alerts?

15   A.  Well, Diesel's alert was to sit.  He would sit where that

16   was a function of his alert.  Basically, he would sit down and

17   that showed me that there was an alert, there was a presence of

18   narcotics that he's trained on.

19   Q.  And are there any other sort of indicators when Diesel would

20   alert, any other behaviors he would exhibit?

21   A.  Not -- I mean, he would sometimes stare at me, you know,

22   which is -- you know, he would stare sometimes, but he would --

23   you know, always sit and it could come with a stare sometime,

24   like if I wasn't moving fast enough or he would give me a stare

25   like, you know, I'm doing my job so --

1   Q.  Now, speaking of doing his job, did Diesel receive any kind

2   of award or payment for doing that job?

3   A.  He did.

4   Q.  And can you describe that.

5   A.  Yes.  He was trained on just a regular tennis ball, just a

6   yellow tennis ball, usually tethered with a string, and that was

7   his payment.  He would -- when he would alert on something and

8   we could verify that, you know, the alert was positive, that

9   there was narcotics present, then he would be paid with a tennis

10  ball.

11  Q.  And I think you just described this, but just to clarify,

12  after the alert Diesel didn't automatically get paid; right?

13  A.  No.

14  Q.  Only after there was something actually found?

15  A.  Yes.

16  Q.  Now, on those dates, on November 11th and November 12th of

17  2015, were you wearing a body camera?

18  A.  I was.

19  Q.  And you activated that body camera?

20  A.  Yes, ma'am, I did.

21          MS. KEEL:  Your Honor, at this time I would like to

22  move to admit and publish to the jury clips of body camera

23  footage.  The first one, I believe, has been labeled 8A.

24          THE COURT:  Without objection, it will be admitted.

25          MR. MEJIA:  No objection.

1           MS. KEEL:  Thank you.

2           (Government Exhibit 8A admitted in evidence.)

3      (Government playing video.)

4   BY MS. KEEL:

5   Q.  Okay.  I'm going to go back and just ask you a few questions

6   about what we just looked at.

7   A.  Yes, ma'am.

8   Q.  So at the beginning of the video, you sent Diesel to do an

9   open air sniff, the way you described before.

10  A.  Yes, ma'am.

11  Q.  Just for the jury's benefit, because it might be a little

12  confusing, it sounds like you're speaking another language to

13  Diesel.  Is that right?

14  A.  It's Dutch.

15  Q.  Okay.

16  A.  Or kind of Dutch.

17  Q.  Okay.  So those words that you're using, those are commands

18  to the dog?

19  A.  Correct.

20  Q.  And then after you sort of have Diesel start doing his work,

21  then what happened next?

22  A.  If you'll notice in the video, he starts -- I usually start

23  pretty much at that corner of -- some handlers do things

24  different.  I always usually start at the driver's side

25  headlight.  I start there.  He starts his sniff.  His sniff goes

James - Direct

```
 1    down and he stops at the door, pretty much at that seam of the
 2    door in the door handle area.  And then he's smelling up on the
 3    window because he's getting odor out of that window area there.
 4    At that time, he sits down and has a positive alert on that
 5    door.
 6    Q.  And then at that time when you get that alert on the outside
 7    of the car, you open the car door?
 8    A.  Yes, ma'am.
 9    Q.  Okay.  And then what happened after you opened the door?
10    A.  He goes back into his sniff and that's when, if you'll
11    notice, he goes in and -- on his own and goes up to the door
12    handle and alerts on the door handle pretty rapidly and then
13    sits.
14    Q.  And then the item that you found there that looked like
15    marijuana you said, that was in -- in the driver's side door;
16    correct?
17    A.  Yeah, it was just like a nugget of marijuana, like in a --
18    when I picked it up, I could feel it.  It felt like a nugget to
19    me.
20    Q.  And that was in an open space in the door; right?
21    A.  Yeah, just right by the door window actually, like I guess
22    for your hand, the handle to shut the door.
23    Q.  And then you -- next, it looks like you gave Diesel his
24    reward.
25    A.  Correct.
```

1  Q.  And that's the tennis ball we talked about before?

2  A.  Correct.

3  Q.  And you put him back into a patrol car --

4  A.  Yes.

5  Q.  -- for a second.

6  A.  Yeah.

7  Q.  And you mentioned -- I heard you say on the tape that you're

8  going to re-run Diesel.  What does that mean?

9  A.  Well, if you'll look in there, when he was sniffing, he only

10 sniffed the door pretty much.  He didn't get to go in and do the

11 whole vehicle.  In my training and experience, it's often common

12 that there will be other narcotics in other spots of the vehicle

13 possibly.  I've gotten one type of narcotic over here or even

14 the same, and then redeployed him in the vehicle and found some

15 in the back, or in the headliner, or a million places anywhere

16 in a vehicle, basically.  So to be thorough and make sure, I

17 just -- I knew that he hadn't made his rounds through the whole

18 vehicle sniffing, so I was going to redeploy him.

19 Q.  Now, from your body camera footage, it looked like when you

20 were standing near the driver's side door, when it was open,

21 that there was a white towel draped across the dash.  Did you

22 notice that?

23 A.  Yes, ma'am, I did.

24 Q.  And is that something that you'd had before in your work as

25 a police officer?

1  A.  I've utilized that technique myself when I'm static and I'm

2  doing surveillance somewhere, because you want to darken the

3  interior of that vehicle.  And even when your car is turned off,

4  those lights, especially the newer vehicles, they're pretty

5  bright.  So you use a towel or something to cover up the cluster

6  there and even the radio, because -- or the GPS, because it puts

7  out some, like, ambient light, especially if you look down the

8  street and all the cars look the same, except you're going to be

9  backlit, so we typically cover that area so we can stay hidden.

10  Q.  So in your experience using a towel to cover the dash, the

11  purpose behind that would be to conceal what's going on in the

12  car?

13  A.  To make it darker inside that vehicle, harder to see inside

14  that vehicle, yes, ma'am.

15  Q.  Okay.  Going back, at the very beginning of the video it's

16  silent for a little bit.  Can you explain why that is?

17  A.  When you turn the cameras on, the audio takes a minute to

18  catch up to it, so it takes a few minutes for the audio to kick

19  in.

20  Q.  So when you were getting out of the car and there was that

21  quiet space, that's because you just turned on the camera?

22  A.  Yes, ma'am.

23  Q.  All right.  So let's talk about what happened when you then

24  reran or redeployed Diesel back to the vehicle.  Can you

25  describe what happened next.

1   A.  He went back to sniffing the interior of the vehicle, and at

2   that time you can see where he goes underneath the steering

3   column.  And underneath in that particular model, there's a --

4   there's a dead space in between like the bottom of the dash and

5   the steering column where you can adjust it.  And I believe on

6   that model, a lot of them have like a piece of, like, vinyl or

7   leather in there, and he was sticking his nose directly in there

8   and then showing me another alert, that there was something in

9   there that he was alerting to.

10      And that's -- at that time I asked for help and I actually

11  asked for, I think, Sergeant Adams to come up and tell him --

12  show him where the alert is, which is a common thing that I do.

13  While I've got hold of the dog, I don't typically dig around in

14  there, if I can -- if I have help.

15  Q.  And so after the alert, you sort of step away from the

16  vehicle and let other officers conduct the actual search of that

17  area?

18  A.  Yes, ma'am.

19  Q.  Okay.  And are you aware of what was recovered from that

20  area where Diesel alerted for the second time?

21  A.  Yes, ma'am, I believe a handgun.

22  Q.  Anything else?

23  A.  I believe after the handgun, I think they kept searching and

24  they actually found like a jar, like a black jar and it

25  contained marijuana.

James - Direct

1  Q.  All right.  And you mention on the video that maybe you were

2  familiar with things being hidden in a spot like that on a car.

3  Is that something you've seen before in your experience as a

4  police officer?

5  A.  Yes, ma'am.  Yeah, there's trends -- I've been to several

6  highway interdiction schools where people transport narcotics

7  inside vehicles, and we're trained to locate them and find them.

8  There's actually websites that we stay up on our training with,

9  and that was a spot that had become popular in that make and

10  model of cars, that a lot of people were getting them and that

11  we had already gotten some in Louisville that the guns were

12  being placed in there.

13  Q.  All right.  Before we move on to the 12th, are there any

14  other observations you wanted to mention from your video?

15  A.  I don't believe so.

16       MS. KEEL:  Okay.  Then next I'm going to move to admit

17  and publish to the jury another video clip, this one from

18  November 12th, 2015, from Detective James' body camera, and it

19  has been marked as Exhibit 8B.

20       THE COURT:  Mr. Mejia.

21       MR. MEJIA:  No objection.  Was it 8E?

22       MS. KEEL:  8B.

23       MR. MEJIA:  8B.  Thank you.

24       MS. MCKENZIE:  18B.

25       MS. KEEL:  I'm sorry.  That's 18B.

James - Direct

```
 1              MR. MEJIA:  No objection.

 2              THE COURT:  It will be admitted.

 3              (Government Exhibit 18B admitted in evidence.)

 4         (Government playing video.)

 5    BY MS. KEEL:

 6    Q.  Okay.  Can you kind of talk us through what we just saw on

 7    the video.  Obviously, Diesel went out again and sniffed around

 8    a vehicle; right?

 9    A.  Correct.

10    Q.  And what did he do after?

11    A.  He had a positive alert on open air, again, on the door, at

12    which time he was deployed.  And if you'll look, he goes in and

13    he gets in odor up by that dash area.  He's alerting by the -- I

14    think it's the switch, the light switch and the vent, because

15    the vent and all that, it's kind of plastic all in there, and

16    I'm sure the odor is probably coming out of that whole area

17    right there.  So he has a positive alert right there, and I tell

18    them where it's at.

19         Detective Stewart gets in there and gets it, but he doesn't

20    get it all the way.  He can't see.  I think he thought I was --

21    when I was showing my light, I think he thought it was lower.

22    And then once I got in there and Diesel went right back to the

23    light switch again, then I was -- I think either I popped it out

24    or somebody popped it out and you could see baggies in there.

25    Q.  And are you aware what was recovered from that space?
```

1   A.  I know, I believe, cocaine, but I don't know what else.

2   Q.  And I heard you say on the tape, "Can I pay my dog now?"

3   Basically, that's because you can't reward until there's

4   something actually found?

5   A.  Right, that's the whole thing.

6   Q.  I want to go back to something that was present on the

7   November 11th and November 12th tapes.  Did you take special

8   notice of the window tinting on those vehicles?

9   A.  Yeah, I did.

10  Q.  And from your training and experience as a police officer,

11  what did you observe about that?

12  A.  They were very -- they were extremely dark tint to me.

13  Q.  And did that make it so it was difficult to see inside with

14  the windows up?

15  A.  It's a safety concern for us, you know, because we can't

16  really see who's in there or how many people are in there, or,

17  you know, what's going on in the vehicle during a traffic stop.

18  Q.  And, again, I think similar to November 11th, this space

19  where the bag was removed on November 12th, that's not an

20  ordinary compartment of the vehicle, is it --

21  A.  No.

22  Q.  -- for storage?

23  A.  No.  It had some -- did you hear me mention about there's

24  scratches on the dash?  In the world that I come from, in the

25  interdiction world, that's known as tooling.  And tooling is

James - Direct

1   where you take a tool and you use a tool or an item to pop out

2   something or manipulate something.  And if you do it enough or

3   even if you do it even once, you can have scratches, or marks,

4   or, you know, where it's messed up.  It's gouged in.

5        And so I could see tooling on that area right there, so I

6   figured, you know, because of the -- with the totality of a K-9

7   alert, the dog's, and then I saw some tooling there -- and, you

8   know, that looked like a fairly new car, so I wouldn't think it

9   would have to be worked on on that, you know.  It wasn't like an

10  older car.

11  Q.  And those kind of tooling marks are something that you've

12  seen commonly in your work doing drug interdiction?

13  A.  Yes, ma'am.

14          MS. KEEL:  Give me just one moment, please.

15  Q.  Now, you mentioned the tooling marks.  Is that something

16  that could be left by an item like a screwdriver, something like

17  that?

18  A.  Yes.

19  Q.  Is that, in your experience, something that someone might

20  use to --

21  A.  I've recovered screwdrivers from inside vehicles and -- many

22  times.

23  Q.  And, again, similar to the day before, was that -- finding

24  contraband in a compartment like that, is that something that

25  you've seen commonly when working with K-9 and with narcotics?

1    A.   Yes, ma'am.

2           MS. KEEL:   I believe that's all I have for right now,

3    but I'm sure Mr. Mejia has some questions for you.

4           THE WITNESS:   Okay.

5                         CROSS-EXAMINATION

6    BY MR. MEJIA:

7    Q.   The K-9 trained -- as you've described it here today, is

8    trained to alert to just certain things, and I think you gave us

9    a list here:   Cocaine, heroin, marijuana, meth, and crack.

10   A.   And marijuana.  Did you say marijuana?

11   Q.   I did.

12   A.   Okay.

13   Q.   And so I take it, so the jury understands, some K-9s are

14   trained to alert to things like explosive devices.

15   A.   Yes, sir.

16   Q.   Some are trained, as dismaying and sad as it is, sometimes

17   to find bodies.

18   A.   Yes, sir, you're right.

19   Q.   And whatever the interest of law enforcement may be to

20   search and find things, those K-9s can be specifically trained

21   to look for those items, and yours here, Diesel -- by the way, a

22   nice name for a dog.

23   A.   Thank you.

24   Q.   -- was trained in the ones that you've described here?

25   A.   Yes, sir.

1    Q.  And you've also said that Diesel will alert to something

2    like an object that has some proximity to the other objects of

3    which is the focus, marijuana, cocaine, heroin, meth?

4    A.  No, they typically need to have an odor on them.

5    Q.  Okay.

6    A.  There's certain dogs that are article trained.

7    Q.  Okay.

8    A.  And those dogs can truly find articles of any kind, keys,

9    gun, magazine for a gun.  Those are article search dogs

10   typically.

11   Q.  Right.  Is that because the other article has the odor of

12   marijuana, cocaine, heroin on it?

13   A.  Yes, that's -- that's how I perceived it when Diesel would

14   hit on a gun, for instance.

15   Q.  So a person then who would be handling marijuana, handling

16   in their fingers cocaine and these other listed items and then

17   touches money, that odor as far as -- I mean, the dog is very --

18   is very keen.  The dog then would detect that odor on things

19   like money?

20   A.  It can, yes.

21   Q.  And it can things like a gun?

22   A.  Yes.

23   Q.  And here it appears that the dog first, like on the 11th --

24   let's go to that one first --

25   A.  Yes, sir.

James - Cross

1   Q.  -- the dog alerted to the car door itself from the exterior.

2   A.  Yes, sir.

3   Q.  It would -- and the K-9's sense of smell is so keen, so good

4   that by opening the door, the dog then more directly then

5   alerted to some compartment in the driver's side door.

6   A.  Yes, sir.

7   Q.  And the dog was right, because there was some marijuana

8   there.

9   A.  Yeah, a little nugget of marijuana, yes, sir.

10  Q.  Okay.  We sometimes see K-9s at airports.

11  A.  Uh-huh.

12  Q.  Can K-9s actually alert to people who have the residue or

13  odor of this substance on their hands?

14  A.  It depends.  There's all variations of it.  It depends on

15  the time length probably.

16  Q.  Okay.

17  A.  It depends on how much that person might have been handling.

18  Q.  Okay.  Or perhaps a container that did have marijuana, or

19  cocaine, or meth in it, it would alert to that container because

20  there's some residue or smell left there?

21  A.  If there was some residue there or the time frame.  You know

22  what I mean?  Like, if it had been there -- if it had been a

23  large amount, a small amount and the time.  It's all --

24  Q.  Can you tell me what that time frame would be?

25  A.  Not really.

James - Cross

1    Q.  Dogs can't speak, I guess.

2    A.  Yeah, it's all a variable of how long and how much, you

3    know.

4    Q.  Okay.  Now, here at least we see your body recorded in the

5    first one.  The sound comes in after the vision is there, but we

6    see the dog running in front of you.  I think we even see some

7    shadowing.  Obviously, you behind the dog holding the leash.

8    A.  Yes, sir.

9    Q.  Are you -- tell us so that I understand.  Are you directing

10   the dog to that vehicle?

11   A.  No, no, no.

12   Q.  Or is the dog, basically, taking you to the vehicle?

13   A.  Well, the dog -- it can be both.  I mean, I'm directing him

14   to the area that we're going to do the sniff on.  You know, I'm

15   holding on to him.  And when I get to the vehicle that he is

16   going to sniff, do an open air sniff on, I'm holding on to him

17   because they just chase their nose, you know.

18   Q.  Okay.  And do you recall that on the 11th, the gentleman

19   here in court with us, Mr. Cherosco Brewer, do you recall that

20   he was at the rear of the vehicle?

21   A.  Yes, sir.

22   Q.  Okay.  Now, if there was cocaine, or methamphetamine, or

23   heroin, or marijuana on him, would the dog have simply gone to

24   him?

25   A.  It can but not always.

1    Q.  Okay.

2    A.  There's -- once again, it's variables.  You're dealing with

3    wind, humidity.  There's a lot of variables when you get out in

4    the open like that.

5    Q.  Have you had experiences, in your years of work with Diesel

6    or other K-9s, that they will actually go to a person who's in

7    possession of narcotics?

8    A.  Oh, absolutely, yes.

9    Q.  Okay.  Or go to a person who's just very recently had

10   narcotics on their hand or on their person?

11   A.  Possibly, yeah.  You know, I can't -- you know, not always

12   confirm it.  Sometimes people go, yeah, he's hitting on me

13   because I just smoked a joint.

14   Q.  And I understand that that currency, U.S. currency -- now,

15   this is just some anecdote I've heard.  Tell me if it's correct

16   or not in your experience -- that currency in the U.S. -- a

17   great majority of currency in the U.S. has residue of narcotics

18   on them?

19   A.  It can, yes, sir, it can.

20   Q.  Therefore, a person who is innocent of any such thing could

21   actually have currency that came from a place that had -- was in

22   proximity to drugs.

23   A.  I'm assuming, yeah.  That makes logical sense.

24   Q.  Have you had false alerts where the K-9 will alert to

25   something because either drugs were there in close proximity in

James - Cross

```
 1  time and are now gone or would mistakenly alert but it's not
 2  there?
 3  A.  Well, I wouldn't -- I wouldn't quantify them as false
 4  alerts.  I would probably rephrase them as unproductive results
 5  or alerts.  There's all the variables.
 6      You know, you can stop a car and, you know, maybe the guy
 7  just dropped off dope and he's alerting on the car.  You know,
 8  it's just like if somebody came in the back room and had a cup
 9  of coffee for two minutes, and you leave and then ask somebody,
10  "Well, what do you smell?  I smell coffee."  And you would
11  probably believe that there's still coffee in the room, but to
12  us, we still smell it.  And I believe to them, that's how a K-9
13  sort of works.  They still smell it, even though we might not be
14  able to physically see it or find it.
15  Q.  Right.  And I think that's a good comparison, because we can
16  smell coffee in a room or cigarettes is another one.
17  A.  There you go.
18  Q.  So anyway, in this investigation, on the 11th, at no time
19  did this K-9 alert to Mr. Brewer himself?
20  A.  No.
21  Q.  And on the 12th, at no time did the K-9 Diesel alert to
22  Mr. Brewer?
23  A.  No.
24  Q.  Now, we know, at least from the evidence so far, that
25  Mr. Brewer was driving the car that Diesel alerted on on the
```

James - Cross

1    11th.

2    A.  Yes, sir.

3    Q.  Okay.  Now, that would mean that Mr. Brewer's hands were on

4    the steering wheel; right?

5    A.  I would assume so.

6    Q.  That would mean that with regard to that towel that was

7    there, that Mr. Brewer would have put that towel there and his

8    hands would have been on that towel.

9    A.  I would presume.

10   Q.  Now, at no time did Diesel alert to that towel.  He did not?

11   A.  No, he alerted to the dash area.

12   Q.  Right.  And he didn't alert to the steering wheel?

13   A.  Well, he alerted to underneath the steering column.

14   Q.  No, I mean the steering wheel itself.

15   A.  No, I didn't see him do that, no.

16   Q.  Okay.  And so at least by everything that we know here from

17   Diesel, if Diesel could talk, there's nothing indicating that

18   Mr. Brewer ever had this marijuana in his hand, at least not by

19   what Diesel tells us?

20   A.  Well, I never really ran his hands.

21   Q.  Right.  But Diesel is -- I can see he's moving along and

22   he's pulling you.

23   A.  Oh, he loves his job, yes.

24   Q.  Right.  And, of course, if that were so, Diesel would have

25   gone to Mr. Brewer had he had marijuana on his hands, on his

1    person or cocaine on that second night?

2    A.  Well, not necessarily, because like I said, there's

3    variables.  You know, he's out in the open, wind blowing,

4    temperature.  I mean, there's a lot of things that go into play

5    with that, you know.

6    Q.  You can't --

7    A.  And then I had to move him from, you know, that area too, I

8    believe.

9    Q.  And so I'm -- I don't mean to confuse you or confuse the

10   issue.

11   A.  No.

12   Q.  But all we know is that marijuana was in that door.

13   A.  Yes, sir.

14   Q.  And we don't know, nor can Diesel tell us how long it was

15   there.

16   A.  Correct, sir.

17   Q.  We know that there was a firearm at a location behind or

18   under the steering wheel.

19   A.  Yes, sir, underneath it, yeah.

20   Q.  And there's nothing from Diesel or your experience that can

21   tell us how long it was there.

22   A.  No.

23   Q.  We have no indication in this case that Mr. Brewer ever

24   touched either of those two items.

25   A.  I don't.

1  Q.  Okay.  And with regard to that the -- what was it on the

2  second day, the 12th, that you refer to these scratch marks or

3  tooling marks?

4  A.  Yes, sir.

5  Q.  "Tooling marks" is actually a term of art meaning that we

6  can see from our eyes that either a surface, an object has been

7  marked by screwdriver, or by knife, or some --

8  A.  Some tool, yes, sir.

9  Q.  Okay.  Can you tell the jury whether or not any such tool or

10  sharp object was ever found on Mr. Brewer, if you know?

11  A.  I don't know, honestly, sir.  I can't testify to that.

12  Q.  I'll help you.  In this case none was ever found.

13  A.  Okay.

14  Q.  Now, can you tell us whether or not in the vehicle Diesel

15  ever alerted to a sharp object, such as a screwdriver, or a

16  knife, or something that would have made those tooling marks

17  there at that location?

18  A.  I don't believe that he did, no.

19  Q.  All right.  Of course, if you had found such a tooling

20  object, that would have been a matter of important evidence to

21  inventory and to bring to court?

22  A.  Well, it would have been, but I didn't -- if you'll notice,

23  I didn't really completely search the vehicle, I don't

24  believe --

25  Q.  Of course.

1  A.  -- on either time, other than I was holding on to him.  I

2  can't remember.  I don't know if I went back after putting him

3  up, but I don't think that I did but I can't remember.

4  Q.  And I don't mean to put that on you either, sir.

5  A.  Oh, no, you're fine.

6  Q.  You've explained to us that once Diesel alerts, you step

7  back and let the other officers --

8  A.  I try to as much as possible.

9  Q.  And I saw that at least in the second day, on November 12th,

10  we saw that the car door was opened and the officer seemed to be

11  down on his knees and leaned over, and he was exerting some

12  force to get this plate or to get this vent cover off.

13  A.  After the alert, yes.

14  Q.  Did you see that he was pulling or did you see there was

15  some effort involved to do that, at least -- I could see in the

16  film --

17  A.  Well, I think he was pulling on the wrong part.

18  Q.  Excuse me?

19  A.  I think he was pulling on the wrong part down there.  I

20  think he was -- the odor was coming up high.  That's why I

21  redeployed Diesel and the odor was coming higher than he was

22  pulling.

23  Q.  Right.  So eventually he did find the right place --

24  A.  Yes.

25  Q.  -- were the tool marks were and off it came?

1   A.   Yes, sir.

2   Q.   Okay.  So would it be -- and, of course, we don't know.  No

3   one was there, but we don't know whether somebody was on their

4   knees to take that vent off to put that object in there, but at

5   least that's the way we got it out, someone on their knees, door

6   open to pull it out of that place.

7   A.   Well, I don't know how it was placed in there.

8   Q.   Okay.  These are unfair questions to you, but that's at

9   least what we see on how that vent was taken down --

10  A.   For us to remove it, yes.

11  Q.   -- and the evidence was obtained.  Okay.  You work -- in

12  your capacity as the dog trainer, you work in conjunction with

13  other officers who are this -- what is the name of the unit that

14  they're on?

15  A.   Well, I'm not a dog trainer.  I'm a dog handler but --

16  Q.   I'm sorry.  I --

17  A.   You're okay.  I worked with the Mobile Ninth, the Mobile

18  Ninth.

19  Q.   The Mobile Ninth.  And the Mobile Ninth is a unit that's not

20  confined to one specific area of the city.  They go wherever

21  they're directed in terms of places where it's likely to find

22  the things for which they search, guns, drugs, things of that

23  nature?

24  A.   Well, they're directed by statistical information that's

25  gathered up downtown in conjunction with, like, shots fired

1   runs, violent crime, drugs, you know, drug dealing and stuff

2   like that.

3   Q.  Some locations of the city have higher incidence of those

4   things and that's where --

5   A.  Wherever they decide that -- with this analysis that they

6   do, then I believe that's conveyed to the commanders and then

7   they send us into different areas, correct.

8   Q.  And notwithstanding their directive, and notwithstanding

9   their initiative, and notwithstanding the statistics as you've

10  said to them, a law enforcement officer, a policeman, can't

11  simply stop a car just because they want to.  There has to be a

12  reason to stop a car.

13  A.  There has to be a violation or something, yes, sir.

14  Q.  There has to be some violation of law.  And in both these

15  cases, the violation of law, at least from the initiation of the

16  vehicle stops both days was tinted windows?

17  A.  And here's the deal:  I'm not present during that stop, so I

18  can't really testify to 100 percent what it was.

19  Q.  Right.  And I don't mean to put that on you.

20  A.  No, you're fine.  I just wanted to clarify that for the

21  court.

22  Q.  You're not the officer who would tell us that there were

23  tinted windows or not, because they're initiated by other

24  officers who do it.

25  A.  Correct.

James - Cross

1    Q.  And you are aware that -- and I don't mean to embarrass you

2    one bit here, but I need to ask these questions.

3    A.  That's okay.

4    Q.  You are aware that Mr. Brewer has been stopped multiple

5    times, more than a dozen times for tinted windows, which is now

6    the subject of a lawsuit filed in this courthouse?

7    A.  Yes, I do know -- I didn't know the -- all the basis of it,

8    but I know that there's a lawsuit.

9    Q.  Right.  And we're not going to go into the basis of any of

10   them, sir.

11   A.  Okay.

12   Q.  But due to multiple stops for window tinting, excessive

13   window tint, he has initiated a lawsuit under the Civil Rights

14   Act, and you are actually one of the named officers.

15   A.  Yes, I am.

16   Q.  And the other officers, of course, are the ones that

17   initiated the stop, not you.  You simply did your duty with the

18   Diesel --

19   A.  Yes, sir.

20   Q.  -- or with Diesel.

21   A.  With Diesel.  I'm Diesel's driver.

22   Q.  And, of course, you can't speak to whether or not there

23   was -- or if you know or if you have any awareness that all of

24   the charges for excessive window tint were eventually --

25            MS. MCKENZIE:  Your Honor, may we approach?

1          MR. MEJIA:  I'll withdraw the question.

2          MS. MCKENZIE:  May we approach?

3          THE COURT:  Yes.

4      (Bench conference on the record outside the hearing of the

5   jury.)

6          MR. MEJIA:  I'll withdraw the question.

7          MS. MCKENZIE:  Well, this question has been asked

8   multiple times and it is factually inaccurate.

9          THE COURT:  How so?

10          MS. MCKENZIE:  Mr. Brewer has been convicted more than

11   once for excessive window tint, so it's not accurate to say to

12   this jury that all of Mr. Brewer's charges from prior stops have

13   been dismissed.

14          THE COURT:  Okay.  This was -- this is a perfect

15   illustration of getting sidetracked by a collateral issue.  I

16   think you can correct the discrepancy by asking just that, if he

17   is aware.  If he is, fine, it ends there.  If he's not, fine, it

18   ends there.  The point is still made.  On a break you-all need

19   to compare notes on this issue, because you do seem to have

20   differing opinions on the record.  I have no idea one way or the

21   other whether --

22          MR. MEJIA:  I've got certified copies and I'll share

23   them with counsel.

24          THE COURT:  If you can't reach an agreement on that,

25   then it might be the subject of some argument, but we're not

```
 1   going to bring in witnesses on that collateral issue.  I think
 2   it ends there.
 3      Your point has been, I think, adequately made.  And to the
 4   extent that it matters, I think that you have also made that
 5   point with your prior witness and you can follow up with this
 6   witness.
 7            MS. MCKENZIE:  Your Honor, and I -- it is difficult
 8   because I have specifically instructed witnesses that they are
 9   not to mention any prior convictions that Mr. Brewer has.
10            THE COURT:  Right.
11            MS. MCKENZIE:  And this line of questioning --
12            THE COURT:  It does get close and I understand what
13   you're saying.  I do not think a door has yet been opened, but I
14   think it does get perilously close to calling for an examination
15   of his record, which we need to avoid here, frankly.
16            MR. MEJIA:  I've withdrawn the question because I
17   don't know that he knows the answer and I think it's unfair to
18   the witness.  That's why I've withdrawn the question.
19            THE COURT:  I think you can address it in a single
20   question on cross.  Again, if he says I don't know, then I think
21   it needs to end there.  We're not going to show him any court
22   records.  I think you've already made that point.  The record is
23   clear.  It's certainly adequate enough.  For example, in closing
24   argument, you will be able to say "that is not an undisputed
25   fact.  It is not proven at this point."
```

1      All right.  Let's see if we can finish up with this witness.

2           MR. MEJIA:  I'll ask one last question and be done.

3           THE COURT:  Okay.

4      (End of bench conference.)

5  BY MR. MEJIA:

6  Q.  I take it, Officer James, that you are not aware of the

7  outcome of any of those tinted window citations?

8  A.  No, I'm not.

9           MR. MEJIA:  Okay.  Thank you very much.

10           THE WITNESS:  Thank you.

11           THE COURT:  Any redirect, Ms. McKenzie?

12                     REDIRECT EXAMINATION

13  BY MS. KEEL:

14  Q.  All right.  Detective James, I have a few more questions for

15  you.  First, Mr. Mejia asked you about the civil case in which

16  you were a defendant.  Did you know who Mr. Brewer was prior to

17  November 11th, 2015?

18  A.  As a person or a target, no, I did not know him.  I think

19  one other time he was stopped, and I was there and did an open

20  air sniff around the vehicle for him, but I don't remember him.

21  Q.  But at the time that you made contact or saw Mr. Brewer, you

22  didn't recognize him or know him --

23  A.  No.

24  Q.  -- on the 11th?  Okay.  And did you know anything about his

25  record of police complaints or earlier lawsuits, if there was

1    any?

2    A.  Not really, no.

3    Q.  Is it part of your normal practice or was it when you were

4    working with Diesel to approach targets, human targets in the

5    course of an investigation with Diesel and have him sniff that

6    person?

7    A.  If we had probable cause or, you know, reasonable suspicion

8    to believe.  Typically, we'd have to find something else,

9    product in the vehicle and, you know, other kind of narcotic

10   contraband in the vehicle, but, yes, I would do an open air

11   around somebody after we found that.

12   Q.  Afterwards, okay.

13   A.  Yeah.

14   Q.  So in this case, when you started with an open air sniff

15   around the vehicle, that's -- that was your normal practice on a

16   traffic stop?

17   A.  Yes, ma'am.

18   Q.  And unless there was more, you wouldn't approach the

19   defendant or target at that moment?

20   A.  Pretty much, no.

21   Q.  In fact, I think I recall hearing you say on the second

22   video -- and perhaps you can sort of explain what the procedure

23   is there -- that you actually asked specifically to have the

24   target moved away from the vehicle before you started the sniff.

25   A.  On the first stop.

James - Redirect

1    Q.   I'm sorry.

2    A.   I think they were at the back of the vehicle when I asked

3    them to be removed from that area.

4    Q.   And did you collect the evidence or do searches of either of

5    these vehicles on either stops?

6    A.   I can't remember.  I didn't collect it and put it in the

7    property room, I don't believe.  I don't think I did it on

8    either of those cases, no.  I can't recollect that.

9    Q.   At any point during either stop, did Diesel alert on any of

10   the other police detectives who were standing around?

11   A.   I don't believe so.

12   Q.   Okay.  Mr. Mejia asked you about prior citations of

13   Mr. Brewer that might have been dismissed.  He didn't ask you

14   about ones that weren't dismissed or convictions that he had; is

15   that correct?

16   A.   Correct.

17   Q.   And you are not an expert in Mr. Brewer's prior record; is

18   that correct?

19   A.   No.

20   Q.   So that's something you just don't have knowledge of?

21   A.   I have no knowledge of that at all.

22         MS. KEEL:  Just give me one moment.

23      All right.  Detective James, that's all I've got right now.

24   Thank you.

25         MR. MEJIA:  Nothing more.  Thank you, sir.

1              THE WITNESS:  Thank you, Mr. Mejia.

2              THE COURT:  You may step down.

3              THE WITNESS:  Thank you, Your Honor.

4              THE COURT:  You ready to call your next witness?

5              MS. MCKENZIE:  United States calls Rebecca Kimmer.

6              MR. MEJIA:  May we approach just one moment?

7              THE COURT:  Yes.

8         (Bench conference on the record outside the hearing of the

9    jury.)

10             MR. MEJIA:  I just don't readily see her name on any

11   material I have.  Is there any paper on her?

12             MS. MCKENZIE:  There's a CSU report with her name on

13   it.

14             MR. MEJIA:  CSU report?

15             MS. MCKENZIE:  Uh-huh.  She works for the Crime Scene

16   Unit.  They received some of the evidence.

17             MR. MEJIA:  Okay.  That's all I wanted to know.

18   Thanks, thanks.

19        (End of bench conference.)

20        (REBECCA KIMMER, called by the Government, sworn.)

21                          DIRECT EXAMINATION

22   BY MS. MCKENZIE:

23   Q.  Good afternoon.  Can you introduce yourself to the jury,

24   please.

25   A.  My name is Rebecca Kimmer.  I work for Louisville Metro

Kimmer - Direct

1    Police Department in their Crime Scene Unit.

2    Q.  Does that mean you are a police officer?

3    A.  I'm not sworn.

4    Q.  So you're a civilian?

5    A.  I'm a civilian.

6    Q.  Okay.  And how long have you been employed by the Crime

7    Scene Unit?

8    A.  Approximately five-and-a-half years.

9    Q.  Can you explain to the jury what the Crime Scene Unit is.

10   A.  We assist the officers and detectives with their scenes.  So

11   once we are called out or they bring evidence to us, we process

12   it at their discretion.  We take direction from them.

13   Q.  Okay.  So sometimes you go out onto a scene, other times you

14   have detectives bring evidence to you and make requests?

15   A.  That's correct.

16   Q.  Okay.  And can you explain what your job entails?

17   A.  Our job entails processing the scene in terms of

18   photographing, videoing, if need be.  We then collect the

19   evidence, bring the evidence back to the unit, where we do

20   another series of photographs within a controlled environment.

21   We get detailed descriptions of the evidence.  We then process

22   the evidence, whether that be fingerprinting or collecting/

23   obtaining swabs, and then we also package the evidence, and then

24   transport the evidence to the property room.

25   Q.  Is that on any kind of case or only specific types of cases?

Kimmer - Direct

1  A.  That's on all of our cases.

2  Q.  Okay.  So did you assist with any evidence in this case?

3  A.  I transported this evidence to the property room for

4  Technician Butts.

5  Q.  What evidence was received at CSU?

6  A.  May I refer to my report or her report?

7  Q.  Yes.

8          THE COURT:  She'll direct you.

9  A.  Technician Butts collected a napkin, a Glock 22, a magazine

10  that came from the Glock, 15 live rounds that were removed from

11  the magazine.  She also collected two sets of swabs from the

12  grip and the back slide of Exhibit 2, and she collected swabs

13  from the base of Exhibit 3.  She also collected a controlled

14  swab, and all of that evidence was transported to the property

15  room by myself.

16  Q.  Okay.  So what are the normal CSU protocols for a case like

17  this, for evidence like this?

18  A.  So when we take in guns from the officers or detectives, we

19  process those items.  We photograph them, get a detailed

20  description of those items.  We do swabs on the items.  And then

21  if they've asked for printing, we then go ahead and print the

22  item, and then it's packaged and transported to the property

23  room.

24  Q.  When you say print the item, what do -- you mean --

25  A.  We process -- we are processing the evidence for

1    fingerprints.

2    Q.   Okay.  Do you often get fingerprints off of guns?

3    A.   It's not very common.

4    Q.   Why is that?

5    A.   They are handled quite often and there's not a good

6    printable surface, whether it be the texture or the grip.  And

7    the surfaces that would be easily printable, they are often --

8    we often have overlap prints or smudging from where they've

9    racked them back or just handled them too often.

10   Q.   What is the purpose of the swab?

11   A.   The swabs are used to determine if a specific person has

12   handled that firearm.

13   Q.   Okay.

14   A.   It's for DNA transfer is what we're looking for.

15   Q.   Now, a crime scene tech would collect those swabs.  Are you

16   also the people that would test them?

17   A.   We do not test them.  We send them off to KSP for testing.

18   Q.   Okay.  And is that also part of your job, dealing with the

19   lab?

20   A.   We deal with the lab, yes.

21   Q.   And how is that -- in a particular case, if there is

22   evidence that needs to go to the lab, are you the one making

23   that request?

24   A.   We make that request, but we make that request per the

25   detective or the officers.  We help them often write up the lab

1    request, and at that point, we get the evidence ready and have

2    it sent off to KSP for testing.

3    Q.  Do you ever have, just in general, a lab request that you

4    send off and the lab refuses to test that evidence or --

5    A.  Yes, that happens.

6    Q.  -- refuses to test certain evidence for certain things?

7    A.  That happens, yes.

8    Q.  Would you say that's common or uncommon?

9    A.  It's common in certain cases.

10   Q.  Okay.  Do you ever have the lab ask you the particular facts

11   or circumstances of a case before they will agree to test

12   certain items?

13   A.  When we ran our lab request, we put all of the case

14   information in that lab request for them, but they have been

15   known to call us to get more details.

16   Q.  Okay.  And do the -- well, let me ask you this:  Have you

17   ever had the lab refuse to test a swab from a firearm for DNA?

18   A.  Yes.

19   Q.  Would you say that's common or uncommon?

20   A.  That's common.

21   Q.  Okay.  On the flip side of that, have you been able at times

22   to convince the lab to do such testing?

23   A.  Yes, there are circumstances in which they will go ahead and

24   test that firearm for us.

25   Q.  Such as?

1   A.   Such as if that firearm is linked possibly to a homicide,

2   then that's a situation that they would go ahead and test those

3   swabs for us.

4   Q.   When you say linked, do you mean --

5   A.   Possibly used in a homicide.

6   Q.   Is that through the NIBEN system?

7   A.   Yes.

8   Q.   So if there is some other forensic evidence from shell

9   casings at a crime scene and you've identified that it'd go to

10  that gun, you've been successful in getting the lab to test that

11  gun --

12  A.   That's correct.

13  Q.   -- for DNA?

14  A.   Correct.

15  Q.   There are some packages on the witness stand up there.  Do

16  you recognize just generally the manner of packaging there?

17  A.   I do, yes.

18  Q.   And is that --

19  A.   But these --

20  Q.   -- consistent --

21  A.   -- appear to be packages that were taken to the property

22  room, not to CSU.

23  Q.   Okay.  Is that consistent with how evidence is typically

24  packaged --

25  A.   Yes.

Kimmer - Cross

1    Q.  -- for storage at LMPD?

2    A.  Yes.

3         MS. MCKENZIE:  Technician Kimmer, I don't believe I

4    have any further questions for you at this time.

5         THE WITNESS:  Okay.

6         MS. MCKENZIE:  Mr. Mejia might.

7                        CROSS-EXAMINATION

8    BY MR. MEJIA:

9    Q.  You mentioned the list of things that are there on the

10   sheets in front of you, napkin, a Glock, magazine, 15 rounds, et

11   cetera.

12   A.  Yes.

13   Q.  Okay.  Now, it is true, is it not, with regard to

14   fingerprinting that we can have what are called latent

15   fingerprints?

16   A.  Those are latent prints, yes.

17   Q.  Tell the jury what a latent fingerprint is.

18   A.  Our latent fingerprints are the prints that we are able to

19   see with our powder.  We're able to -- once we get a latent

20   print, we then take a small sticky -- it's hard for me to

21   describe it --

22   Q.  Tape?

23   A.  -- tape sort of and it will lift that print off.  That's our

24   latent print.  At that point, we place it on a white piece of

25   paper that we then transport to our fingerprint analyst, and at

Kimmer - Cross

1    that time, they can put that through their system and identify

2    that print for us.

3    Q.  And once that is obtained, one can actually make a national

4    search for all known fingerprints that somehow by way of

5    computer, by some technology can actually match a print to

6    somebody in Utah, somebody in California, somebody in the other

7    side of the world, if they're in that base.

8    A.  That's correct.

9    Q.  Is that accurate?

10   A.  Yep, that's correct.

11   Q.  Now, here we have a Glock handgun, a firearm, that has

12   smooth, metal surfaces on its side, on its barrel; right?

13   A.  It does, yeah, that's correct.

14   Q.  And can you tell me whether at all -- and I don't want --

15   I'm not putting the responsibility on you -- whether anybody in

16   this case ever took the steps to seek and try to obtain latent

17   fingerprints on this Glock pistol?

18   A.  Yes, Technician Butts actually did apply Ultra Blue 2000 to

19   the Exhibit 2, which is the handgun, and Exhibit 3, also

20   Exhibit 3A, which were the live rounds, and she was not able to

21   obtain any prints off of those items.

22   Q.  Okay.  And so at least by way of an investigative technique,

23   there's no -- there is no fingerprint match that would link the

24   defendant here, Cherosco Brewer, to this Glock pistol?

25   A.  No lifts were printed or no lifts were obtained.  I'm sorry.

1   Q.  And so there's no identification by way of fingerprint

2   comparison in this case.  Let's go on to DNA now.  DNA is

3   something that is in every human being.  Correct?

4   A.  Yes.

5   Q.  As fantastic as it may be, it's in something as fine as a

6   hair particle.  It is in the very oil and sweat from our

7   fingers.

8   A.  That's correct.

9   Q.  Right?  It is on skin surfaces and it's in all tissues and

10  all fluids of the body.

11  A.  Yes.

12  Q.  Every human being has a unique DNA as to them; isn't that

13  accurate?

14  A.  That's correct.

15  Q.  And it is the case that even as I stand here now and I touch

16  this smooth surface, my DNA actually could be taken from that

17  surface to establish by comparison that I touched this podium by

18  way of absolute positive match.

19  A.  Most certainly.

20  Q.  And no other human being has my DNA --

21  A.  That's correct.

22  Q.  -- in the entire world.  And there is such a thing as taking

23  DNA from a surface, such as a Glock.  That can be done.

24  A.  That's correct.

25  Q.  And do you know whether in this case swabs were taken of

1  Mr. Brewer, the defendant here?

2  A.  Do I know if his buccal swabs were taken?

3  Q.  Yes.

4  A.  I'm not aware.

5  Q.  Tell the jury what a buccal swab is.

6  A.  A buccal swab is when we take two swabs and we will actually

7  rub them on the interior of each side of your cheek obtaining

8  your DNA.

9  Q.  And if then DNA were lifted, obtained, or somehow identified

10  from a smooth surface, that comparison could be made by a

11  laboratory of somebody with that unique knowledge, skill,

12  training, and education.  Is that accurate?

13  A.  Most certainly, yes.

14  Q.  Okay.  Now, you've said here that these are not -- these are

15  commonly either refused upon request or a requirement is made

16  for further demand --

17  A.  Yes, sir.

18  Q.  -- that it be done in a case; right?

19  A.  Yes, sir.

20  Q.  And, of course, nothing would be more important in an

21  investigation than a homicide investigation, for instance, a

22  murder case.

23  A.  That's correct.

24  Q.  In those cases then, I guess the requirement is reduced and

25  the explanations are reduced.  Those are more important cases

1   than others?

2   A.  High priority cases.

3   Q.  High priority cases.

4   A.  Yes, sir.

5   Q.  And so at least insofar as this case is concerned, the

6   investigation, the inventory, the property, no DNA comparison

7   exists to match Cherosco Brewer to this firearm, this Glock;

8   correct?

9   A.  Not that I'm aware of.

10  Q.  All right.  And with regard to plastic surfaces, such as

11  baggies or other such plastic bags that contain objects --

12  A.  Yes.

13  Q.  -- those too can be examined for latent fingerprints as well

14  as DNA?

15  A.  Absolutely.

16  Q.  And in that case, we have no -- we have no investigation

17  that shows that was done in this case to match any of the

18  objects obtained, items that were inventoried to Cherosco Brewer

19  in this case, do we?

20  A.  I don't have any paper baggies on here.

21  Q.  Okay.  So to sum up then, we have neither fingerprints, nor

22  DNA that would match to show that he came in contact with,

23  touched, or ever handled these objects?

24  A.  Not to my knowledge.

25  Q.  You said that these are sometimes -- I think you said part

Kimmer - Cross

1   of the process would be a detective request.  Do you know if

2   there was a detective request here for either of these two

3   investigative methods or means of identification?

4   A.  I'm not able to answer that.  I don't know.

5   Q.  You don't know?

6   A.  Not to my knowledge.

7   Q.  Okay.  If there was such a detective request, would that be

8   a part of the material?

9   A.  It would not be on this report here.  And I'm not the lead

10  on this case, so I can't answer as to whether or not there was

11  communication about that.

12  Q.  Is there a way for you to make such a search to tell us?  I

13  mean, not right now, but is there such a thing you could do to

14  seek and find if there exists a detective request?

15  A.  We would have to ask the lead detective on the case.

16           MR. MEJIA:  Okay.  All right.  Nothing more.  Thank

17  you very much, ma'am.

18           MS. MCKENZIE:  No redirect.

19           THE COURT:  You may step down.  Thank you.

20           THE WITNESS:  Thank you.

21           THE COURT:  Members of the jury, we will now take our

22  last afternoon break for about 10 minutes.  We should be on

23  track -- although I'm going to use the break to talk with the

24  lawyers a bit about our scheduling for the end of today and

25  tomorrow morning, we should be on track to end, again, today

Kimmer - Cross

1    around 4:30.  Remember not to discuss the case.

2         (Jury out 3:37 p.m.)

3         THE COURT:  You may be seated.  The jury has left the

4    courtroom.  I'm going to step out for a couple of minutes and

5    check on our draft instructions.  We will get those to you

6    either at the end of this break or when we break for the day.

7       You have another witness that you can put on here or two

8    this afternoon?

9         MS. MCKENZIE:  We have at least one more.  I'm not

10   sure beyond that.  I think the remaining -- I think we should

11   have maybe two witnesses after that, and they're both long

12   witness -- I say long, but they're -- I don't think that we

13   could get two on today.

14        THE COURT:  How many more total do you anticipate?

15        MS. MCKENZIE:  After the next witness, I think

16   probably two, depending on what --

17        THE COURT:  In your direct or your case-in-chief?

18        MS. MCKENZIE:  Yes.

19        THE COURT:  Two more after the next, so you have three

20   total witnesses left?

21        MS. MCKENZIE:  Yes.

22        THE COURT:  All right.  Okay.  I'm going to -- as I

23   said, I'm going to go check on our instructions.  And if you've

24   only got one -- is the next one on your list, is it Major Baker?

25        MS. MCKENZIE:  No.  We have him on standby, but I

1   think we'll be able to dispense with him and with Persails by

2   virtue of the firearm stipulation.

3            THE COURT:  Very well.  So your next one --

4            MS. MCKENZIE:  Frisby.

5            THE COURT:  -- is Frisby?

6            MS. MCKENZIE:  Yes.

7            THE COURT:  Well, we'll just see how far we can go, if

8   we can get that witness completed, and then we will -- once

9   you're done for the day with witness testimony, we'll plan to

10  talk for a few minutes about scheduling tomorrow and the

11  bifurcation issue, as well as instructions.  So I'll be back in

12  just a few minutes.

13       (Recess at 3:39 p.m. until 3:54 p.m.  Jury out.)

14           THE COURT:  We are back on the record.  The jury is

15  not yet in the courtroom.  We've just provided each side with a

16  draft of the instructions.  I think what I'd like to do now,

17  Ms. McKenzie, is begin with your next witness.  I believe you

18  said it was Frisby; is that correct?

19           MS. MCKENZIE:  Yes, Your Honor.

20           THE COURT:  And then we'll see if we can finish -- my

21  preference would be to finish with Mr. Frisby before the day,

22  rather than bring him back.  Is it a correct presumption that,

23  if he works for the KSP lab, that's in Frankfort?

24           MS. MCKENZIE:  Yes.

25           THE COURT:  So rather than force him to return

1    tomorrow, we will try and finish with him today, if that is

2    possible.

3         And then we'll talk a bit about the draft instructions at

4    the end of today, but we'll hold our substantive conference in

5    the morning.  We will probably delay the start of the trial by

6    about half an hour in the morning to accommodate that.

7                   MR. MEJIA:  Are you thinking we'll start that at 9:30?

8                   THE COURT:  Probably, unless we don't finish with

9    Mr. Frisby, and then we'll start first thing to finish with him.

10        (Jury in 3:58 p.m.)

11                  THE COURT:  You may call your next witness.

12                  MS. KEEL:  Tom Frisby.

13        (NATHAN THOMAS FRISBY, called by the Government, sworn.)

14                           DIRECT EXAMINATION

15   BY MS. KEEL:

16   Q.  Good afternoon, Mr. Frisby.  Can you start by introducing

17   yourself to the jury by your name and occupation, please.

18   A.  My name is Nathan Thomas Frisby.  I go by Tom and I'm a

19   forensic chemist for the Kentucky State Police.

20   Q.  And can you also describe your background and training that

21   qualifies you for that position.

22   A.  I have a Bachelor's Degree in Chemistry from Bellarmine

23   College.  I've completed all the in-house training given by

24   Kentucky State Police, attended numerous seminars given by the

25   DEA and several other agencies over the years, and I've been

Frisby - Direct

1   working as a drug chemist since 2003.

2   Q.  There's some evidence that's already sitting there at the

3   witness box.  Could you please take a look at items that's been

4   marked as Exhibit 16.

5   A.  Yes.

6   Q.  And, now, are you familiar with this kind of evidence

7   packaging?

8   A.  Yes, this is a typical evidence envelope from Metro police.

9   Q.  And when you analyze evidence, what is it that you do to

10  sort of mark that you have examined that evidence?

11  A.  Okay.  There's two things here that I can see that identify

12  it.  One, this evidence -- this yellow evidence label is from

13  our laboratory.  It gives -- this is the identifying number that

14  we use in-house for it.  And, also, this evidence tape here has

15  my initials on it.

16  Q.  So before even looking inside, just by examining the outside

17  of that package, can you identify this as an item that you have

18  analyzed?

19  A.  Yes.

20  Q.  And in doing your analysis and testing, do you routinely

21  take notes as you --

22  A.  Yes.

23  Q.  And do you have those bench notes with you?

24  A.  I do.

25  Q.  Would it help you to recall the procedures that you went

Frisby - Direct

1    through to test that material by referring to your bench notes?

2    A.   Yes.

3    Q.   So I'm going to ask you, first -- well, actually, can you

4    open that item -- and it's labeled 16 -- and see what's inside.

5    Oh, oh, and I have gloves for you to use.  Sorry.

6    A.   Thank you.

7    Q.   If you could just -- and I think I'm only going to be asking

8    you questions about the white powder substance inside.

9    A.   Okay.

10   Q.   And could you hold that up for the jury to see.

11        (Witness complying.)

12   Q.   All right.  Now, first, is that -- that item packaged the

13   way it was when it originally came to the lab?

14   A.   With the addition of a small plastic bag inside that I used

15   from our laboratory, yes.

16   Q.   Okay.  Now, was it all together or were there individual

17   packages?

18   A.   Whenever I received it, I have that it was 15 knotted pieces

19   of plastic containing chunky, off-white material.

20   Q.   And did you remove it from the packaging to conduct your

21   tests on this --

22   A.   I did.

23   Q.   And why did you do that?

24   A.   I have that the -- there was cross-contamination present,

25   meaning one or more of the pieces of plastic was leaking, so I

Frisby - Direct

1    removed all of them from the plastic and combined them.

2    Q.   And that process of combining a cross-contaminated substance

3    like that, is that part of your normal procedures in the lab?

4    A.   Yes.

5    Q.   And then once that substance was combined, can you explain

6    what techniques you used in the lab to identify the substance.

7    A.   I used two instrumental techniques, a gas chromatography and

8    gas chromatography/mass spectometry.

9    Q.   And without going into too much technical detail for the

10   jury, what do those tests tell you?

11   A.   The gas chromatography is -- sorry -- the gas

12   chromatography/mass spectometry is a specific identifying test,

13   and the gas chromatography is a confirmatory test.

14   Q.   And in this case you performed both of those tests on that

15   substance?

16   A.   Yes.

17   Q.   And what were the results of that?

18   A.   Both tests were positive for cocaine.

19   Q.   And those testing methods, are those scientifically accepted

20   methods for testing substances?

21   A.   They are.

22   Q.   And referring to your notes, are you able to tell the jury

23   what the net weight of that substance was once it was combined?

24   A.   Yes, I have that the net weight was 8.106 grams, plus or

25   minus .003 grams.

1   Q.  And that weight is a net weight, so that's without any

2   packaging; correct?

3   A.  Yes.

4   Q.  One moment, please.

5       Okay.  I just want to go briefly back over the packaging of

6   the material.  So you testified that initially when you received

7   the substance, it was packaged in 15 separate knotted pieces of

8   plastic; correct?

9   A.  Correct.

10  Q.  And that those were combined together?

11  A.  Yes.

12  Q.  And did you make any other observations about the appearance

13  of those -- of the substance?

14  A.  I made a note that some of the material was slightly lighter

15  in color than some of the others, nothing major or unusual

16  though.

17  Q.  Okay.  And then when you combined the substance, did you do

18  anything else to it prior to doing the testing?

19  A.  Yes, I ground it up into a fine powder.

20  Q.  And what is the purpose behind doing that?

21  A.  That's to make the sample homogeneous, you know, throughout,

22  so that everything is the same throughout.

23  Q.  And after you took the substance out of the knotted pieces

24  of plastic, what did you do with the plastic pieces?

25  A.  They're still here.

Frisby - Cross

1    Q.   Okay.  So in other words, you repackaged it.  You didn't

2    separate it back out, but you put that packaging into that?

3    A.   Yes, I put all the material itself into a bag from our

4    laboratory and the rest of the plastic is here.

5            MS. KEEL:  All right.  Thank you.

6            THE WITNESS:  You're welcome.

7            MS. KEEL:  See if Mr. Mejia has any questions for you.

8                        CROSS-EXAMINATION

9    BY MR. MEJIA:

10   Q.   Good afternoon, Mr. Frisby.

11   A.   Hello, sir.

12   Q.   I'm David Mejia.

13   A.   Nice to meet you.

14   Q.   Nice to meet you too.  So can you tell me when it was that

15   you performed the steps that you did, that is observed the

16   object or item of evidence, saw the 15 separate packages and

17   placed them or put them together into one?  When did you do

18   that?

19   A.   That was March 22nd of 2016.

20   Q.   Okay, 3-22 of '16.  So this was then some four months,

21   approximately, from the time that they were first placed in

22   evidence with the Louisville Metro Police Department?  I think

23   the source date is November 12th of 2015.

24   A.   Yes.

25   Q.   Okay.  Now, from November 12th to March 22nd, was that item

Frisby - Cross

1    of evidence, as far as you understand from the policy,

2    practices, methods, procedures kept in one place?

3    A.  I can only speak for it whenever we received it.  We didn't

4    receive it until November 23rd of 2015.  From that point

5    forward, I can testify that it was, you know, at our laboratory

6    sealed and, you know, in whatever condition that we received it

7    in.  Beforehand I can't make any assumptions.

8    Q.  Okay.  So you can vouch for its integrity between -- from

9    November 23rd to March 22nd?

10   A.  Yes.

11   Q.  Okay.  From November 12th to November 23rd, can you tell us

12   by whatever understanding you have where this object or item of

13   evidence was?

14   A.  I have no knowledge of it before it arrived at our

15   laboratory.

16   Q.  Can you tell me -- would you be able to tell -- I don't mean

17   to be redundant, but can you tell us how many places it was?

18   How many people touched it?  You know --

19   A.  No, sir, I can't.

20   Q.  -- how many hands went on it?  Okay.  Now, you said there

21   was -- well, let me ask you this:  Would that be a normal

22   expected time frame, November 12 to November 23rd for it to

23   arrive for your -- at your place of inventory?

24   A.  I would say that it's not unusual.

25   Q.  It's not unusual.

1    A.   Yes.

2    Q.   What is the normal procedure, or practice, or time frame

3    that they are received after having obtained them from an

4    investigation?

5    A.   I don't know that there really is an average time.

6    Q.   Okay.

7    A.   It's --

8    Q.   Fair enough.  So you said that the items, the 15 bags were

9    contaminated.

10   A.   That they were cross-contaminated.

11   Q.   Excuse me.  Cross-contaminated.  Tell the jury what those

12   words mean.

13   A.   What I mean by that is that the -- one or more of those

14   pieces of plastic appeared to be leaking.  So, therefore, they

15   have -- basically have contaminated one another.

16   Q.   Now, can you tell me whether or not one of the bags leaking

17   would be what the -- what the reason or what the explanation

18   would be for that occurring or is that so rare that you have no

19   idea?

20   A.   It's not -- it's not rare that it happens at all, but I have

21   no way of knowing, you know, what's -- what caused that.

22   Q.   Okay.  So you had -- you then, because of that -- because of

23   that, you actually just consolidated the 15 separate parts into

24   one single object or item for examination?

25   A.   Yes, sir.

1    Q.  And this is normal procedure?

2    A.  Yes, it is.

3    Q.  This would be expected of anybody with your qualifications,

4    training, knowledge?  That's the way you handle it --

5    A.  Yes.

6    Q.  -- at that point?  Okay.  So prior to your putting the 15

7    together, can you -- I take it you can't tell the jury how many

8    of the 15 contained cocaine.

9    A.  No, I cannot.

10   Q.  It could be that one out of the 15 were cocaine, or 14 out

11   of the 15 were cocaine, or all 15 were cocaine.  You just don't

12   know?

13   A.  That is possible, yes.

14   Q.  All right.  Now, you talked here about net weight, that is

15   the weight of an object without the packaging.

16   A.  Yes.

17   Q.  Okay.  Now, is there also a part of what you do in your

18   work, in addition to weighing something by net weight, to also

19   examine it for degree or concentration of cocaine, if you

20   understand my question?

21   A.  I do.  I think you're asking about purity.

22   Q.  Yes.

23   A.  Yes.  That's not a procedure that we do.

24   Q.  All right.  Can you tell me whether or not this was 5

25   percent cocaine?  Fifteen percent?  Half cocaine?  Ninety

Frisby - Cross

1   percent cocaine?  Could you tell us?

2   A.  No, I can't, sir.  I didn't -- I did not do any of that

3   testing.

4   Q.  Okay.  So is it a part of anything that you do to determine

5   whether it is part cocaine or all cocaine?

6   A.  We do not do that as a standard procedure, no.

7   Q.  Okay.  So, actually, before you put the 15 together, this

8   may have been -- well, if the total was 8.1 rounded off, 8.1

9   grams of cocaine, can you tell us how much or what any of the

10  individual 15 separate ones, how much each of those weighed by

11  net weight?

12  A.  No.

13  Q.  Could it be that, based on everything you saw and everything

14  you know, that this actually, before you mixed them all

15  together, which is a part of what you do, that it in actuality

16  was 3 grams of cocaine and 5 grams of benign substance?

17  A.  That is possible.

18  Q.  One gram of cocaine and 7 grams of benign substance?

19  A.  That is possible, yes.

20  Q.  And of course, under what we understand here, it is against

21  the law to possess a controlled substance or to possess with

22  intent to distribute a controlled substance.

23  A.  Yes, sir.

24  Q.  It is not against the law to possess noncontrolled

25  substances, that is benign substances, notwithstanding their

Frisby - Cross

1   proximity to controlled substances?

2   A.   Also correct.

3   Q.   Okay.  I don't mean to put you on the spot here, but I'll

4   try to see if we can get some help for the jury.  A gram is a

5   fraction of an ounce; correct?  Well, let's put it this way:  An

6   ounce is one-sixteenth of a pound?

7   A.   Yes.

8   Q.   A pound, of course, then is 16 ounces.  An ounce in terms of

9   gram measurement is 28 grams.

10  A.   Approximately.

11  Q.   Approximately.  There's some point zero zeros there, but 28

12  grams makes one ounce.

13  A.   Nearly, yes.

14  Q.   Okay.  Now, to help the jury understand gram quantities,

15  I've actually -- have some demonstrative things here.  Do you

16  see what is Defense Exhibit Number 1?  Do you see the other side

17  of it?

18  A.   Yes, it's a pack of Splenda.

19  Q.   It appears to be one gram of some kind of a sugar

20  substitute?

21  A.   I don't know what it weighs.  I don't see a weight printed

22  on it.  I don't have a scale.

23  Q.   You don't see the weight on it?

24  A.   No -- oh, here, 1, yes, gram of fiber per packet.

25  Q.   Okay.  Now, excluding the packet, excluding the packet,

Frisby - Cross

```
 1    would it -- as it's in your hand there, does that have the feel

 2    or weight of a gram?  Obviously, different substance, but does

 3    that have the feel or weight of a gram?

 4    A.  I don't know that I could tell you a gram by feel.

 5    Q.  Okay.  You'd need a fine instrument to do that?

 6    A.  Yeah.

 7    Q.  But the manufacturer says it's a gram, so that's what it

 8    says.  Do you see here this other, which is Defense Exhibit 2,

 9    do you see there -- I'll point to there.  See where it says 7G?

10    A.  Yes.

11    Q.  Excluding the packaging, does that have a feel to you in

12    your hand of 7 grams?

13    A.  I'd have to give the same answer.  Without a scale, I can't

14    make -- can't make that statement.

15    Q.  Look at the two little packages together.  They total just

16    about 8 grams by the manufacturer's label.  Does that have the

17    feel -- if that's an unfair question, I'll withdraw that too.

18    A.  Again, without a scale, I can't tell you what it necessarily

19    feels like.  You know, it appears to be an unaltered package.

20    Q.  Excuse me?

21    A.  I say it appears to be an unaltered package, so I assume

22    that their weight is at least reasonably correct.

23             MR. MEJIA:  Right.  All three are manufactured, sealed

24    packages that have a gram weight written upon them, just for --

25    just to assist the jury in terms of what we're dealing with.
```

Frisby - Redirect

1    Thank you very much, sir.  No further questions.

2             THE COURT:  Anything further?

3             MS. KEEL:  Yes, I have just a little bit of redirect.

4                         REDIRECT EXAMINATION

5    BY MS. KEEL:

6    Q.  Just a few clarifying questions, Mr. Frisby.

7    A.  That's fine.

8    Q.  Now, I've had an opportunity to see your bench notes too,

9    and can you please just sort of translate or tell us exactly how

10   the 15 knotted pieces were packaged.  Were they inside of

11   another package as you received them?

12   A.  Yes, they were in this plastic bag.

13   Q.  Okay.  And so that's the way you received them was in a --

14   with smaller --

15   A.  Yes.

16   Q.  -- plastic knotted?

17   A.  Yes, it was this bag and it contained the other knotted

18   pieces of plastic that I have repackaged in here.

19   Q.  Okay.  And you mentioned that some of the smaller bags were

20   leaking, causing cross-contamination.  So you further combined

21   the substance, but it was already combined to some extent?

22   A.  To some degree, yes, it was already contaminated with

23   itself.

24   Q.  Now, do you often receive substances that are packaged this

25   way with little baggies or little packets inside of a larger

Frisby - Redirect

1   baggie or packet?

2   A.   Yes.

3   Q.   And I think that you sort of touched on this with Mr. Mejia,

4   but just to clarify, is it fairly common for these substances to

5   have some cross-contamination and for you to have to combine

6   them the way you did in this case?

7   A.   Yeah, it's fairly frequent.

8   Q.   And once combined and tested, it's fair to say that what was

9   there was a substance containing cocaine; correct?

10  A.   Yes, that would be fair.

11  Q.   So you stated that you can't tell the purity, but it did

12  contain cocaine?

13  A.   Correct.

14  Q.   Okay.  Now, going back to the package that the -- the

15  envelope, the evidence envelope that you received at the lab.

16  A.   Uh-huh.

17  Q.   Do you receive those kinds of envelopes on a fairly regular

18  basis?

19  A.   Weekly almost.

20  Q.   Okay.  And those labels, and the packaging, and the use of

21  the evidence tapes on them, are those consistent with what you

22  ordinarily see from the LMPD property room?

23  A.   Yes.

24  Q.   Okay.  And do you have any reason, based on markings or the

25  condition that it arrived to you, that there had been any gaps

Frisby - Recross

1    in the chain of custody or tampering with the evidence when it

2    came to you?

3    A.   This does have evidence tape over top of my evidence tape.

4    Q.   Okay.

5    A.   So it has been -- it appears to have been opened and

6    resealed at some point.

7    Q.   So that would be -- that would show you that someone had

8    opened that package and looked at the evidence or something?

9    A.   Yes.

10   Q.   Since the time that you tested it?

11   A.   Yes.

12   Q.   But you don't recall or you don't have any notes or anything

13   like that to show that there was anything wrong with the

14   packaging as you received it?

15   A.   No.

16          MS. KEEL:   One moment, please.   No further questions.

17                      RECROSS-EXAMINATION

18   BY MR. MEJIA:

19   Q.   Sir, was there any indication that somebody had opened it

20   before you received it?

21   A.   No.

22   Q.   Tell the jury what the word "negative lab" means.

23   A.   I'm sorry?

24   Q.   Tell the jury what the word "negative lab" means.

25   A.   I'm not entirely --

Frisby - Recross

1  Q.  Do you use that term?  Is that a lawyer term?

2  A.  It sounds like a lawyer term.  It's not something that I

3  use.

4  Q.  Okay.  Do you oftentimes get bags, or packages, or objects

5  that look like that?  You examine them and test them and it's

6  not cocaine?

7  A.  Yes.

8  Q.  Okay.  Do you sometimes get them in separate bags like that,

9  in a larger bag and it's also not cocaine?

10  A.  Are you asking is it -- is it common for us to get things of

11  multiple bags where -- I'm sorry.  Could you rephrase the

12  question?

13  Q.  The question -- the question is actually a repetition of the

14  first one.  Do you sometimes get bags with suspect cocaine in

15  separate bags that are negative?

16  A.  Yes.

17  Q.  That is not cocaine?

18  A.  Yes.

19  Q.  This may be an unfair question, but is there any way in

20  science that you can tell us how long those substances were in

21  those plastic bags or plastic bag that you have prior to your

22  having received them?

23  A.  No, not that I know of.

24        MR. MEJIA:  Okay.  Thank you very much.

25        THE COURT:  Before the witness is excused, may I see

1    the lawyers at the bench, please.

2        (Bench conference on the record outside the hearing of the

3    jury.)

4            THE COURT:  Mr. Mejia, do you plan to seek admission

5    of the -- I'm not sure what they are because you haven't shown

6    them to me -- but the little demonstrative exhibits?

7            MR. MEJIA:  I do, just as an aid to the jury.

8            THE COURT:  Do you have a witness that you're going to

9    seek to have those admitted through?

10           MR. MEJIA:  I've only used them as demonstrative

11   because they're packaging.  They say what they say and just to

12   give the jury some sense of what a gram is.  I mean, I don't

13   know that Your Honor -- it's your practice that you're going to

14   send the cocaine back to the jury.  I don't think that's going

15   to happen.

16           THE COURT:  No, my practice is to send -- I presume

17   you have photographs of all of the contraband evidence; is that

18   correct?

19           MS. MCKENZIE:  Yes.  I don't have still photographs of

20   the cocaine.  I have the video where they're pulling it out of

21   the car, but they didn't take still photos.

22           THE COURT:  Typically my instructions will indicate to

23   the jury -- and we can talk about that tomorrow morning --

24   typically my instructions indicate to the jury that they will

25   not be receiving drugs, guns, and currency, that they will see

 1    photographs of those.  If they wish to inspect them, then they

 2    can message -- they never do, but on occasion when they do, we

 3    make arrangements to have them view that contraband evidence

 4    under more controlled conditions, but that's not why I'm asking

 5    the question.

 6        My question is I am concerned about those exhibits because

 7    there's very little guidance on demonstrative exhibits that are

 8    used to illustrate weights, but what there is is really sort of

 9    over my head in terms of how the comparison needs to be fair.

10        In other words, you need someone to say that two white

11    powdery substances have the same weight by volume because an

12    ounce of powdered sugar and an ounce of cocaine do not

13    necessarily look like the same thing.  Do you see what I'm

14    saying?

15            MR. MEJIA:  I agree with you -- I agree with you

16    completely, and I don't mean to tell this jury by demonstrative

17    evidence that these are the size of or they represent the bulk

18    or the quantity, but they do represent the weight, to assist the

19    jury in terms of how much it weighs.

20            THE COURT:  You think that's beyond sort of the

21    everyday knowledge of the typical juror?

22            MR. MEJIA:  I believe it is because to all of us the

23    concept of a gram is beyond our thinking because -- at least

24    before I was a lawyer, I would have never been able to conceive

25    of what is a gram.  That just doesn't make any sense to me.

1    What is a 28th of a gram?  What is a half an ounce?  What is a

2    quarter of an ounce?  And these have assisted me as a lawyer.

3    This tells me what something weighs.  Now, clearly, a pound of

4    lead is different than a pound of plastic.

5              THE COURT:  In terms of weight per volume.

6              MR. MEJIA:  In terms of weight per volume, but that's

7    not -- I certainly will not do anything other than to say, look

8    at what we have here in terms of how much it weighs to help

9    them.

10             THE COURT:  It's just difficult, I think -- this is

11   the conundrum:  I do not want the jury to be confused by any

12   suggestion that, for instance, a package of artificial sweetener

13   that may be listed as an ounce would be the same as an ounce of

14   similarly colored and textured cocaine.

15      And so what is the U.S. position there?  You-all haven't

16   elicited testimony from your witnesses as to how many dosages or

17   whatever slang word you use.

18             MS. MCKENZIE:  I have a witness coming up who will

19   give context to that.  I haven't objected --

20             THE COURT:  If you think you do, then perhaps during

21   -- perhaps that is the witness that we can then talk about

22   whether it would be appropriate or whether it would not be, but

23   I don't typically flag issues like this, as you-all know, but

24   this is one where you've used it a couple of times.  I am aware

25   of -- like I said, there's not a lot of guidance in this area,

1   but I am aware of some and it gives me a little bit of pause

2   because I do not want the jury to be confused by comparisons

3   between two very different substances, even though they might

4   have a similar physical appearance if they do not have -- and

5   I'm not qualified to say and I suspect none of you are either --

6   whether Splenda has the same weight per volume or a similar

7   weight per volume as granular cocaine.  I just don't know that.

8   So that's why I think we need to think a little bit more about

9   that.

10       If you've got another witness that is going to address those

11   types of issues, it may be that we can address that, but I would

12   imagine that this witness would not be prepared to make those

13   weight per volume comparisons.

14           MS. MCKENZIE:  Yeah.

15           THE COURT:  Is that right?

16           MS. MCKENZIE:  Well, I don't -- I don't know.  I mean,

17   he might be able to regarding certain narcotics that he

18   regularly tests.  What he can say comparing that to Splenda or

19   activated yeast, I don't -- I don't think any witness can

20   demonstrate familiarity with those and compare those to drugs

21   and, you know --

22           THE COURT:  Well, I'm sure that there are -- I'm sure

23   there are folks who are familiar with weights and measures and,

24   for instance, with -- there is a case where the DEA was able to

25   establish through expert testimony that a certain type of cake

1   mix had the same weight per volume as the substance in question

2   there, and so it -- in that case it was the Government, not the

3   defendant, that was seeking to use a demonstrative aid.  It was

4   permissible only after they were able to demonstrate that it is

5   similar in weight by volume and, thus, it would be helpful to

6   the jury.  That's how I'm coming at this.

7           MS. MCKENZIE:  And I --

8           MR. MEJIA:  I'm sorry, Erin.  I don't think --

9           MS. MCKENZIE:  But I'm going to anyway.

10          MR. MEJIA:  No, no, I'm just offering to the court to

11  answer the judge's question, I will contact a witness tonight

12  and --

13          THE COURT:  You will what?

14          MR. MEJIA:  I'll contact a witness tonight and I'll

15  seek to answer that concern that you have.

16          THE COURT:  We can talk about it in the morning then.

17  Do you have anything to add?

18          MS. MCKENZIE:  Not at this time.  You know,

19  demonstratives are one thing, but exhibits that go back with the

20  jury --

21          THE COURT:  Well, that's a whole different kettle of

22  fish.  We would have to address it from an admissibility

23  standpoint, but I'm just talking here about demonstrative aid.

24  And unless we get over that hump, we're not going to get to the

25  inquiry of whether it's actually admissible, but we can save

1   that for in the morning.

2       Now, with respect to scheduling, it's 4:30.  I'm going to

3   let the jury go.  How much time do you-all -- and I realize you

4   haven't had a chance to look at the draft that I've given you,

5   although you've lived with these instructions in prior

6   iterations for some time.  Is this a half-an-hour conference we

7   need or do we need an hour?

8           MR. MEJIA:  Half an hour.

9           THE COURT:  I think everything that we have in our

10  drafts are Sixth Circuit Pattern Instructions, so our starting

11  point is pretty standard.  I don't think there's a great deal of

12  creativity in them about which we need to argue, so I'm going to

13  have the jury show up to the courthouse at 9:30 and tell them

14  that we would expect to take the first witness in the morning at

15  9:45 and then we'll talk some more after.

16      (End of bench conference.)

17          THE COURT:  Thank you for your patience, members of

18  the jury.

19      Mr. Frisby, you may step down and you are excused.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Members of the jury, that concludes our

22  testimony for the day.  We are going to let you go home for the

23  evening.  As you do so, let me talk a little bit about

24  scheduling.  Our schedule tomorrow will vary a bit from today's

25  schedule.  I'm going to ask you to be here in the courthouse and

1     check in by 9:30, and we expect to get you here in the box to

2     take the next witness at about 9:45.  The lawyers and I have

3     some work to do, both this evening and in the morning, and we

4     expect that we will have that work done by about 9:30 and then

5     be ready to have you come in at 9:45.

6         At this stage, we think it's possible the case will finish

7     tomorrow, but we're not 100 percent certain of that, and so we

8     will know more by midday tomorrow as to whether we expect the

9     case to conclude tomorrow.

10        So for now enjoy your evening.  Remember not to discuss this

11    case with each other or with anyone else.  Thank you.

12        (Jury out 4:34 p.m.)

13        THE COURT:  You-all may be seated.  The jury is now

14    out of the courtroom.

15        We remain on the record.

16        As I mentioned at the bench, I think we will take some time

17    in the morning to talk about a couple of issues.  The first will

18    be the instructions that I've provided to you-all in draft form.

19    I will ask you to confer either this evening or in the morning

20    before we begin, and if you would, confer with an eye towards

21    finding those draft instructions about which you have a

22    disagreement.

23        What I would like to do is begin the instructions conference

24    by setting aside the noncontroversial instructions, if you will,

25    those on which both sides agree.  I would anticipate that would

1    be the housekeeping instructions and so forth.  And then we will

2    try and narrow our focus to the instructions for which either

3    side has an objection, and then we will move to any instructions

4    that are not included that either side wishes to revisit.

5         Any questions about that process?

6              MS. MCKENZIE:  No.  I'm sorry.  I missed what time

7    Your Honor --

8              THE COURT:  I haven't gotten to that yet.

9              MS. MCKENZIE:  Okay.

10             THE COURT:  So I'm going to ask you-all to be prepared

11   to begin that discussion with me at 8:45.  I appreciate your

12   30-minute estimation, but I'm going to give us just a little bit

13   more cushion.  I would like to begin the testimony at 9:45, if

14   we can do that.  We will -- I will have my chambers staff

15   working on the changes/modifications that result from our

16   conference so that those will be ready to go.

17        You have -- Ms. McKenzie, the Government has two more

18   witnesses in its case-in-chief; is that right?

19        And, Mr. Mejia, you can choose to tell me you're not yet

20   certain, but if you would like to share with us whether you

21   intend to present any testimony, that's always welcome.

22             MR. MEJIA:  I intend to call either one or two short

23   witnesses.  I expect no more than 30 to 40 minutes of direct

24   examination.

25             THE COURT:  That will be fine.

1          MR. MEJIA:  That's exaggerated, I think.

2          THE COURT:  So we will also talk tomorrow about the

3     issue of transition to the bifurcation issue.  I will have

4     some -- I will have an issue or two to discuss with you about

5     that, and we'll go over how we will handle that part of the

6     case.  Any questions about that?

7          MR. MEJIA:  None here.

8          MS. MCKENZIE:  No.

9          THE COURT:  Anything else we should talk about before

10    I leave you for the day?

11         MS. MCKENZIE:  I don't think so.

12         THE COURT:  Any anticipated issues with your witnesses

13    in the morning?

14         MS. MCKENZIE:  No, no.  There was a scheduling issue

15    with one of the witnesses, and I think it can be alleviated by

16    flipping the order of the last two, so I don't think it needs

17    the court's intervention.

18         THE COURT:  I'll see you at 8:45.  Thank you.

19     (Proceedings concluded at 4:38 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5

        _____s/Dena Legg_____          December 13, 2019
6   Certified Court Reporter No. 20042A157   Date
    Official Court Reporter
7

1                               INDEX

2      GOVERNMENT WITNESSES:

3      DETECTIVE ROBERT TYLER HOLLAND
            Direct Examination by Ms. McKenzie        12
4           Cross-Examination by Mr. Mejia            25
            Redirect Examination by Ms. McKenzie      50
5           Recross-Examination by Mr. Mejia          54

6      DEREK CAYE
            Direct Examination by Ms. McKenzie        59
7           Cross-Examination by Mr. Mejia            64

8      DETECTIVE CHAD STEWART
            Direct Examination by Ms. McKenzie        68
9           Cross-Examination by Mr. Mejia            89
            Redirect Examination by Ms. McKenzie      116
10          Recross-Examination by Mr. Mejia          122
            Further Redirect Examination by Ms. McKenzie  127
11
       DETECTIVE ANTHONY JAMES
12          Direct Examination by Ms. Keel            128
            Cross-Examination by Mr. Mejia            143
13          Redirect Examination by Ms. Keel          158

14     REBECCA KIMMER
            Direct Examination by Ms. MCKENZIE        161
15          Cross-Examination by Mr. Mejia            167

16     NATHAN THOMAS FRISBY
            Direct Examination by Ms. Keel            175
17          Cross-Examination by Mr. Mejia            180
            Redirect Examination by Ms. Keel          187
18          Recross-Examination by Mr. Mejia          189

19

20

21

22

23

24

25

```
 1                           EXHIBITS

 2      GOVERNMENT:
        Exhibit 8A - DVD                                    134
 3      Exhibit 9 - Enterprise records                      64
        Exhibit 16 - cocaine (retained by Government)       85
 4      Exhibit 17 - bag of rags (retained by Government)   85
        Exhibit 18A - DVD                                   75
 5      Exhibit 18B - DVD                                   140
        Exhibit 19 - cell phones (retained by Government)   85
 6

 7      DEFENDANT:
        No Exhibits
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```