```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:17-CR-00037-DJH
 4                                  )
              Plaintiff,            )
 5                                  )
     v.                             )
 6                                  )
     CHEROSCO BREWER,               )
 7                                  )    January 9, 2019
              Defendant.           )    Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                             VOLUME 3
                       TRANSCRIPT OF JURY TRIAL
11               BEFORE HONORABLE DAVID J. HALE
                   UNITED STATES DISTRICT JUDGE
12
                            *  *  *  *  *
13
     APPEARANCES:
14
     For United States:      Corinne E. Keel
15                           Erin G. McKenzie
                             U.S. Attorney's Office
16                           717 West Broadway
                             Louisville, KY 40202
17
     For Defendant:          David S. Mejia
18                           310 East Broadway, Suite 201
                             Louisville, KY 40202
19
     [Defendant present.]
20

21
                        Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                           232 U.S. Courthouse
23                       Louisville, KY 40202
                            (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1      (Begin proceedings in open court at 9:00 a.m.  Jury out.)

2           THE COURT:  Good morning.  We are back on the record

3    in U.S. v. Brewer.  The jury is not present in the courtroom.

4      This is the time we set aside for our initial instructions

5    conference.  I understand that you-all have talked, that there

6    are some objections and agreed upon changes to be made to the

7    draft instructions that we gave you yesterday, so let's just

8    take those up now.  Is it you, Ms. Keel, that will be handling

9    these discussions for the U.S.?

10          MS. KEEL:  Yes, Your Honor.

11          THE COURT:  Ms. McKenzie seems to be lost in a box

12   back there, so I just wanted to make sure.

13          MS. MCKENZIE:  I'm sorry.  I'm listening.

14          THE COURT:  All right.  So with respect to the first

15   few pages, which are standard instructions, the first question I

16   have is on page 1.  There is the bracketed portion there in the

17   middle of page 1 that signals to the jury that I will explain

18   the defendant's position.  That's largely dependent upon --

19   Mr. Mejia, upon your viewpoint.  I can include that and then

20   there is another reference in the body of the instructions or I

21   can exclude it.  What's your view?

22          MR. MEJIA:  I know there's just -- I don't have the

23   number, but there's the one clause "and the defendant's

24   position."

25          THE COURT:  This is on page 1, the preview, if you

 1   will, that the instructions will include.  And I can't recall

 2   off the top of my head where, but there is a -- within the

 3   substantive instructions there is another optional reference to

 4   the defendant's position with respect to -- I think it's on page

 5   28.  There's another reference there.

 6       And then is there -- Megan, is there another reference in

 7   the body of the instructions?

 8             LAW CLERK:  That may be the only one.

 9             MR. MEJIA:  I believe I did see that on page 28, and I

10   have no objection to those words being included.  And I have no

11   objection to the reference on the first page.

12       The law is the law for both sides and, obviously, both sides

13   rely upon the law as you give it in arguing the facts.  So I

14   think the inclusion of the reference to the defendant's position

15   is, of course, that we want the jury to follow the law as given.

16             THE COURT:  That's fine.  We'll leave those there

17   then.

18       Anything we need to talk about with respect to Instructions

19   1 through -- let's see here -- they're numbered 1 through 7, and

20   then we've removed the numbering -- or haven't yet added the

21   numbering to the subsequent instructions, in case we need to

22   move things around, but that would be pages 1 through 8,

23   Instructions Numbers 1 through 7.  I haven't been advised of any

24   request to changes or objections.  Is that right?

25             MR. MEJIA:  That's correct, no objections.

1          MS. KEEL:  Correct.

2          THE COURT:  And then let's see.  I don't think --

3    Instruction Number -- what would be Number 8 on page 9 and

4    Instruction Number 9 on page 10, I don't think there's anything

5    there.  Correct?

6          MR. MEJIA:  That's correct.

7          MS. KEEL:  Correct.

8          THE COURT:  And then Instruction Number 10 on page 11,

9    nothing there?

10          MR. MEJIA:  Correct.

11          MS. KEEL:  Correct.

12          THE COURT:  Okay.  That takes us then to page 12, what

13    would be Instruction Number 11, and I understand, Mr. Mejia,

14    that --

15          MR. MEJIA:  At the third line --

16          THE COURT:  -- you have an issue here that we need to

17    talk about.

18          MR. MEJIA:  Yes, sir.

19          THE COURT:  Okay.  What is that?

20          MR. MEJIA:  Certainly separate consideration is the

21    correct statement of law, but the third line saying "return a

22    separate verdict as to each one" commands them to do so.  If the

23    jury finds guilty of the lesser possession of marijuana or not

24    guilty to possession with intent to traffic and possession, then

25    they cannot go to Count 3.  They can go no further.

1          In Kentucky, there is a -- if you find -- and we agree as to

2     the wording in the verdict form, and the verdict form should

3     say -- and I'll let Corinne address that, but we have an

4     agreement as to what that should say.  And I would ask to strike

5     and return a separate verdict for each one.  It commands them to

6     do so, and if they find not guilty of the marijuana, they cannot

7     convict on the gun.

8          MS. KEEL:  Your Honor, the United States' position is

9     just that giving a little more information on the verdict form,

10    as Your Honor has already done with respect to explaining the

11    significance of the lesser included possession counts, that that

12    would actually be sufficient to have it in the verdict form and

13    we don't need to repeat it here on page 12, basically.

14         MS. MCKENZIE:  But could I add -- I'm sorry.

15         MS. KEEL:  Go ahead.

16         MS. MCKENZIE:  I don't think that language should

17    order the jury that if they find not guilty on Instruction 2,

18    they are to skip Instruction 3, because there has to be --

19         THE COURT:  Instruction 2 or Count 2?

20         MS. MCKENZIE:  Count 2.  There has to be a verdict on

21    the firearm charge.  They can't just not address it.

22         THE COURT:  Your position is, if they find not guilty

23    on both the primary charge and the lesser included offense as to

24    Count 2 --

25         MR. MEJIA:  They can go no further.

1            THE COURT:  -- that they cannot address Count 3?

2            MR. MEJIA:  That is the law.

3            THE COURT:  The law where?

4            MR. MEJIA:  The law is -- the law is that possession

5   of the marijuana with intent to distribute is the predicate for

6   possession of the firearm in furtherance of a drug trafficking

7   crime.  Possession is not a drug trafficking crime.

8        If the jury were to return a verdict of guilt -- certainly

9   they can say not guilty.  I'll be happy to hear them say that,

10  but you can't direct a verdict of not guilty if they -- if they

11  either acquit of marijuana trafficking or find straight

12  possession of marijuana.  There can be no conviction of

13  possession of a firearm in furtherance of a drug trafficking

14  crime.  It cannot happen.

15       And I think the direction to the jury would be, if you find

16  guilty of the lesser offense of possession or not guilty, go no

17  further as to Count 3.  I mean, they really have to stop there.

18            THE COURT:  Right.

19            MR. MEJIA:  There's no deliberating there.

20            THE COURT:  Tell me how that's inconsistent with the

21  standard pattern instruction that's on page 12 that tells them

22  to separately consider the evidence that relates to each charge.

23  If the verdict form tells them -- if you-all are going to

24  suggest a change to the verdict form that indicates that not

25  guilty on Count 2 forecloses their consideration of Count 3 or

1    something along those lines --

2           MR. MEJIA:  Okay.  If that instruction is given, I

3    will not object then to the third line, because obviously

4    separate consideration must be given.  I was just concerned

5    about this being contradictory or confusing.

6           THE COURT:  Yes.  I'll take a look at that.  You say

7    the law.  Do you have something that you can give us with

8    respect to Count 3 being obviated by not guilties on Count 2?

9    That's logical to me but --

10          MR. MEJIA:  No, I think it's axiomatic that the

11   elements of Count 3 rest upon guilt of trafficking in a narcotic

12   offense or possession with intent to traffic in a narcotic

13   offense.  One cannot be convicted of possession of a firearm

14   as -- in connection with possession.

15          THE COURT:  Merely possession?

16          MR. MEJIA:  That's correct.

17          THE COURT:  Does the Government agree with that?

18          MS. MCKENZIE:  Your Honor, I'm sorry.  I'd like to

19   rescind -- I did not understand what we were talking about

20   earlier, and I know that we still have some proof to put on.

21   Would it be possible for us to table this instruction and let me

22   see if I could find some legal authority that addresses this

23   situation?  I just -- I don't want to --

24          THE COURT:  I don't intend for us to resolve

25   everything here.  We're going to have to use the lunch hour to

 1    finalize things, but this is the 11th hour.  You-all have had

 2    instructions on the table for quite some time with the pretrial

 3    order, as well as our discussions at the outset of the trial, so

 4    I'm not a big fan of last-minute legal research.  It is

 5    sometimes necessary, but if we need to do it to get things

 6    right, we're certainly going to do it.  But it does seem to me

 7    that if you're not guilty on possession with intent to

 8    distribute or possession, then you cannot be guilty of the

 9    affiliated gun crime.  That would not foreclose a separate felon

10    in possession consideration.

11              MR. MEJIA:  Of course.

12              THE COURT:  That's the flip side of that coin.

13              MR. MEJIA:  Of course.

14              THE COURT:  Did you-all talk about this before we

15    started this morning?

16              MR. MEJIA:  We had an agreement as to just what I've

17    said and obviously --

18              THE COURT:  As to --

19              MR. MEJIA:  -- Ms. McKenzie now doesn't agree.

20              THE COURT:  As to modification of the verdict form?

21              MR. MEJIA:  Yes.

22              THE COURT:  On Count 3?

23              MR. MEJIA:  Yes.

24              THE COURT:  All right.  Well, we'll make a note of

25    that, and I don't know when you-all are going to do it.  I

```
 1    presume you're going to need to engage colleagues to assist, but
 2    we'll have to circle back to this issue at lunch.  So that
 3    instruction on page 12 we'll have to circle back to, and the
 4    related impact it would have on the verdict form --
 5              MS. KEEL:  And Your Honor --
 6              THE COURT:  -- we'll have to circle back to that.
 7              MS. KEEL:  -- excuse me -- the United States'
 8    position, even if there is a change to the verdict form, is that
 9    there's no need to make any changes to page 12.  To be redundant
10    in that way would just confuse the jury.
11              THE COURT:  Well, I think Mr. Mejia agrees that if the
12    verdict form properly instructs the jury as to the impact a not
13    guilty on both portions of Count 2 would have with respect to
14    Count 3, I think you're okay --
15              MR. MEJIA:  That's correct.
16              THE COURT:  -- with the language --
17              MR. MEJIA:  Right.
18              THE COURT:  -- because it simply instructs them to
19    follow the verdict form.
20              MR. MEJIA:  Right.  With that correction, that would
21    trump page 12, Instruction 11, and I would then have no
22    objection to separate consideration.
23              THE COURT:  So the instructions on -- let's see --
24    pages 13 through 16, there are no objections; is that correct?
25              MR. MEJIA:  Correct.
```

1          THE COURT:  And then we get to instruction -- or the

2    instruction on page 17, which is the pattern instruction on

3    possession of a firearm in furtherance of a drug trafficking

4    crime.

5          MR. MEJIA:  And we have an agreement as to the last

6    line of page 17.

7          THE COURT:  Okay.  Before we get to that, the

8    highlighted section under subpart (c) that references the

9    stipulation, the parties' proposed stipulation on the firearm,

10   is that language acceptable to both sides?

11         MS. KEEL:  Yes, Your Honor.  And so now, actually, our

12   agreed change based on the new instruction would be on page 18

13   of the new instruction.

14         THE COURT:  Oh, I forgot.  Yeah, we gave you a new

15   one.

16         MS. KEEL:  And that is simply to strike item four from

17   that list of considerations that the jury can look at for

18   questioning whether the possession of the firearm was in

19   furtherance because, frankly, number four, the jury doesn't

20   understand or know that this is illegal possession.

21         THE COURT:  It's inconsistent with Count 1.  That's

22   fine.  And that's an agreed upon change, Mr. Mejia?

23         MR. MEJIA:  Yes, sir, it is.

24         THE COURT:  So we'll strike through number four and

25   we'll re-number numbers five and six as four and five, and we

1   will leave in as it exists now the highlighted section.  We'll

2   add the exhibit number.  Do you-all know off the top of your

3   heads or by easy reference there what exhibit number the firearm

4   is?

5            MS. KEEL:  Number 4.

6            THE COURT:  So we'll refer to it as Government's

7   Exhibit 4.

8       Then the instruction regarding possession of cocaine with

9   intent to distribute begins on page 19.  There are no objections

10   to that.

11            MR. MEJIA:  Right.

12            MS. KEEL:  Correct.

13            THE COURT:  The next instruction, which begins on page

14   21, the lesser included offense of cocaine, there are no

15   objections to that.

16            MR. MEJIA:  Right.

17            MS. KEEL:  Correct.

18            THE COURT:  And then we get to the pattern instruction

19   on page 22 regarding the on or about language in the indictment.

20   And I understand, Mr. Mejia, that you have an objection to that

21   instruction.

22            MR. MEJIA:  I do.  I object to the instruction as a

23   whole.  While the indictment says on or about, the facts and

24   proof and everything in this case has pointed to two dates and

25   two dates only.  The on or about is surplusage now in the

1    indictment and I think it's unnecessary.

2        This jury is called upon to decide did he possess on that

3    date or not.  Did he possess on the second date or not?  On or

4    about is, obviously, a construction of the courts and law where

5    there is some openness as to dates.  It just doesn't apply to

6    this case.

7            MS. MCKENZIE:  Your Honor, I don't think I've ever had

8    a trial where this was not language included in the

9    instructions.  And, for instance, if the jury finds that the

10   drugs were Mr. Brewer's in the vehicle but that he wasn't

11   necessarily distributing them or intending to distribute them on

12   the night of November 11th, but he had plans to drop off his

13   passenger and continue on with his business, I just -- I don't

14   think that there is any reason to take this language out because

15   it is the law.

16           THE COURT:  I'll look at it again, Mr. Mejia, and give

17   you my ruling during the lunch break.  I will say there is ample

18   law with respect to the conjunctive and disjunctive language

19   used in indictments and verdict forms and instructions.

20       The on or about, I think, is pretty well settled, so I think

21   it will likely be included, if for no other reason than -- I

22   don't know that the evidence has been particularly precise with

23   respect to before and after midnight on either of these dates,

24   and I would not want the jury confused into believing that if,

25   in fact, something happened at 12:01 on the 12th, then because

1    it refers to the 11th, that's somehow out of bounds.  So I will

2    take another look at it, but I think it's likely going to remain

3    in.

4        So then the next one is page 23.  That's the defendant's

5    state of mind.  There's no objection to that one.  Correct?

6            MS. KEEL:  Correct.

7            MR. MEJIA:  Correct.

8            THE COURT:  The next instruction on page 24 regarding

9    proving a defendant's knowledge, I understand, Mr. Mejia, you

10   have an objection to this pattern instruction as well.

11           MR. MEJIA:  I do.  In the Seventh Circuit, we call

12   this the ostrich instruction, and I think it may fit a category

13   of cases involving financial crimes and involving narcotics or

14   stolen goods and things like that.  I just don't think it

15   applies here.

16       This wasn't something in front of his eyes that he ignored.

17   This isn't something that was obvious to any person who wasn't

18   deaf, dumb, and blind, and it's not our defense that it was

19   there but he just didn't see it.  I mean, obviously, he couldn't

20   see it.  No one could see it.  It took a dog to find these

21   things, and so the ostrich instruction just doesn't apply here

22   in my view.

23           MS. MCKENZIE:  Your Honor, I don't agree with that.  I

24   think the facts are that Mr. Brewer is driving on two different

25   dates vehicles that are not registered to him, one of which is a

1    rental vehicle.  However, it's a rental vehicle that he rented

2    in his own name many months prior.

3        I don't know what additional testimony there will be from

4    the defense, but I can -- I mean, I can envision a number of

5    arguments that could be made regarding other individuals

6    connected to Mr. Brewer, or close to Mr. Brewer, or related to

7    Mr. Brewer who may be involved in narcotics activity.  And, I

8    mean, I don't think that this instruction is out of bounds when

9    knowledge is an element.

10            THE COURT:  Well, I think this is a slightly closer

11   call than the on or about instruction.  I'll take a look at it.

12       I think that -- I think the proof has come in in such a way

13   as to suggest that the defense strategy is to point out to the

14   jury that there is no connection between the defendant and the

15   drugs located in either of the cars.  And so that fairly then, I

16   believe, implicates the question of whether he ignored knowledge

17   of the contraband.  Ignored or avoided, I think, is a more

18   precise description, avoided knowledge of the contraband.

19       That may be something the jury would have a question about,

20   and this instruction would give them guidance with respect to

21   that question raised by the defense, so that's why it's here to

22   begin with, but I'll take another look at it.

23            MR. MEJIA:  Okay.

24            THE COURT:  Let's see.  The instruction on page 25

25   here is the pattern instruction explaining possession.  There

1    are no objections to that.

2            MR. MEJIA:  No objection.

3            THE COURT:  The next one on page 26 is the follow-on

4    pattern instruction regarding possession and whether two or more

5    people can together share possession.  And I don't believe

6    there's an objection to that either; is that correct?

7            MR. MEJIA:  Correct.

8            THE COURT:  Then on page 27, that is the conjunctive/

9    disjunctive issue.  The instruction reads:  "Although the

10   indictment charges that the statute was violated by acts that

11   are connected by the word 'and,' it is sufficient if the

12   evidence establishes a violation of the statute by any one of

13   the acts charged."  Oh, I misread the list.  We don't have an

14   objection to this one either; correct?

15           MR. MEJIA:  Correct.

16           MS. KEEL:  Correct.

17           THE COURT:  Okay.  So then we get to the instruction

18   on page 28.  This is the -- basically, just a transitional

19   instruction which tells the jury that we are now done talking

20   about the elements of the crime.  And we agreed that we would

21   leave in "and the defendant's position there."

22           MR. MEJIA:  Yes, sir.

23           THE COURT:  So that gets us to page 29.  And the two

24   instructions -- we will have to pick one, depending upon how the

25   trial goes -- regarding the defendant's absolute right not to

1    testify.

2        So I have a note, Mr. Mejia, that -- well, not that you have

3    an objection, but that you -- obviously, you want to talk about

4    this one.

5            MR. MEJIA:  Right.

6            THE COURT:  And so my practice is to simply present

7    both options and not ask you to pick one at this point.  One

8    option is, should Mr. Brewer decide not to testify, we will so

9    instruct the jury of his right not to:  And one is, if he

10   chooses to testify, then we will instruct the jury with respect

11   to his having testified.

12           MR. MEJIA:  One of the most sacred rights a person has

13   is to testify or not and that moment will come.

14           THE COURT:  Right, that's right.  So is it -- is there

15   any discussion to be had here regarding the language -- in the

16   alternative language presented on page 29 here?

17           MR. MEJIA:  No objection.

18           MS. KEEL:  No, Your Honor.

19           THE COURT:  So we will just select based upon how the

20   trial goes.

21       That gets us to page 30.  This is the opinion witness

22   instruction with respect to the anticipated testimony of

23   Detective McKinney, and I don't believe there is an objection

24   here.  Is that correct?

25           MR. MEJIA:  That's correct.

```
 1            MS. KEEL:  Correct.

 2            THE COURT:  The next one is on page 31 and this is

 3    also a fact and opinion instruction, a pattern instruction, and

 4    I understand you-all have talked about this.  Is that correct?

 5            MR. MEJIA:  Yes, to include the name James Stewart or

 6    Detective Stewart.

 7            MS. KEEL:  Chad Stewart.

 8            MR. MEJIA:  I'm sorry.  Chad.

 9            MS. KEEL:  And we don't object to using this

10    instruction for Detective Stewart.

11            MR. MEJIA:  Is it Chad James?  James Chad?

12            MS. KEEL:  Chad Stewart.

13            THE COURT:  Ched Jennings is a lawyer.

14            MR. MEJIA:  Oh.

15            THE COURT:  Chad Stewart.  So we'll make that change.

16        Then page 32 contains an instruction regarding -- now I

17    can't remember why we included this one.  I think it had to do

18    with some cross-examination regarding prior testimony perhaps at

19    the suppression hearing from one of the detectives.

20            MR. MEJIA:  I don't believe --

21            THE COURT:  Did that not come in?

22            MS. KEEL:  Your Honor, I think that there were some

23    questions on cross about prior testimony, and we -- and I

24    believe Mr. Mejia agrees with us -- didn't hear direct

25    impeachment from prior testimony.  I think we're in agreement
```

1    that at this time that instruction is not -- should not be

2    included.  However, we have more testimony today.  So, of

3    course, there are other opportunities for impeachment.  If it

4    comes up, we would want to discuss whether or not the

5    instruction was appropriate to that witness.

6              MR. MEJIA:  Right.  So far it's not needed.

7              THE COURT:  Fair enough.  We will then remove it by

8    agreement.

9         So let's see.

10             MR. MEJIA:  Although it may be included back in,

11   depending on today.

12             THE COURT:  We'll revisit it at the close.  If either

13   of the remaining Government witnesses are impeached by their

14   prior testimony, we can simply add it back.

15        Let's see.  We took out -- Megan, we took out the

16   instruction on page 33 regarding the stipulated facts --

17   right -- because we incorporated those?

18             LAW CLERK:  Yes.

19             THE COURT:  So that gets us to page 34.  This is

20   the -- again, a transitional type instruction concluding that

21   section.  And even though this is a pattern instruction, I

22   understand you-all have found a way to improve it.

23             MS. KEEL:  Your Honor, it's really just a tiny

24   logistical change.  As it turns out, we have available of the

25   firearms, drugs, and currency photos of --

1          THE COURT:  We're talking about the fourth paragraph.

2          MS. KEEL:  Yes, yes.

3          THE COURT:  Fourth unnumbered paragraph here.  For the

4    record, let me just say it currently reads:  "All of the

5    evidence will be sent back with you, except for the firearm,

6    drugs, and currency.  Photos of those items have been admitted

7    and will be provided."  That's fairly standard language, but in

8    this case I think you have some photos but not all.

9          MS. KEEL:  That's correct, Your Honor, and we weren't

10   actually planning on taking photos --

11         THE COURT:  You didn't make your case agent photograph

12   everything; right?

13         MS. KEEL:  That's right.  And the jury has had the

14   chance to see the cocaine held up in front of them, but, you

15   know, they won't be able to take that back.  At this time we

16   don't have a photo.

17      So we would propose a change of just saying that you have

18   seen photos of some of those items that have been admitted and

19   will be provided, and if you want to see any of those exhibits

20   for which only a photograph has been provided or which you have

21   only seen in the courtroom, you may send me a message and those

22   exhibits will be provided to you.

23         THE COURT:  Why don't you tell me again -- I think we

24   would need to modify both of those sentences.

25      Now, the first sentence:  "All of the evidence will be sent

1    back with you, except for the firearm, drugs, and currency."  Is

2    that sentence acceptable to both sides?

3              MS. KEEL:  Yes, no change there.

4              MR. MEJIA:  Yes.

5              THE COURT:  Then the next sentence reads:  "Photos of

6    those items have been admitted and will be provided."  So that

7    needs to be altered how?

8              MS. KEEL:  Just to add after "photos of," the two

9    words "some of."  So "photos of some of those items."

10             THE COURT:  Can we be specific?  Can we say what we

11   have photos of?  Photos of the firearm and currency or --

12             MS. KEEL:  Photos of the firearm -- I mean, we could.

13   I mean, essentially, what we're talking about here is that we've

14   got cocaine that they don't have a picture of and --

15             MS. MCKENZIE:  And the currency on the second stop

16   there's no photo.  There was just testimony.

17             MS. KEEL:  On the second stop.

18             THE COURT:  I see.  Is it cleaner to take the line out

19   altogether?

20             MS. MCKENZIE:  Yes.

21             MS. KEEL:  That would probably be perfect, yes.

22             THE COURT:  Mr. Mejia.

23             MR. MEJIA:  I'll agree.

24             THE COURT:  So we'll take out the sentence that reads:

25   "Photos of those items have been admitted and will be provided."

1    So then the next sentence is:  "If you want to see any of

2   those exhibits for which only a photograph has been provided,

3   you may send me a message and those exhibits will be provided to

4   you."  So should we also then take out the phrase "for which

5   only a photograph has been provided"?

6         MS. KEEL:  Yes, I think that would be clearer than

7   what I originally suggested.  Thank you.

8         MR. MEJIA:  Agreed.

9         THE COURT:  So that paragraph will now read:  "All of

10   the evidence will be sent back with you, except for the firearm,

11   drugs, and currency.  If you want to see any of those exhibits,

12   you may send me a message and those exhibits will be provided to

13   you."

14         MS. KEEL:  Yes.

15         MR. MEJIA:  You would provide the firearm, drugs, and

16   currency or --

17         THE COURT:  Well, that's something we're going to have

18   to talk about.  I have made them available to prior juries.

19         MR. MEJIA:  Okay.

20         THE COURT:  Now, we don't interfere -- I don't allow

21   anyone in when a jury is deliberating, but juries can be

22   assembled for purposes of observation.  So probably what we

23   would do is we would have to reach some agreement between the

24   parties as to putting those items on display, allowing the jury

25   to come back into the courtroom with a court security officer

1    only, see the items without deliberation and leave.  I think it

2    would need to be in a situation like that where the jury is

3    comfortable and where we have a qualified court security officer

4    who can assure us that the firearm is properly disabled, et

5    cetera, et cetera.

6              MR. MEJIA:  And the --

7              THE COURT:  Well, they won't -- we won't have them

8    handle anything.

9              MR. MEJIA:  Okay.

10             THE COURT:  Now, of course, back in the old days --

11             MR. MEJIA:  That's right.  That's why I'm smiling,

12    because --

13             THE COURT:  When I was an AUSA a long, long time ago,

14    the firearm would sit right out on the table with a plastic band

15    on it through the whole trial and it went back with the jury.

16    That's how it was done back then, but we have progressed since

17    then and -- but, nevertheless, they are exhibits that have been

18    properly admitted or will be properly admitted.  And so if we

19    have members of the jury who want to eyeball those exhibits, I

20    don't know that we can deny them that right.

21             MR. MEJIA:  Envision the jury saying to one another,

22    "Let's see that marijuana.  There's only one way to know if it's

23    marijuana."

24             THE COURT:  Yeah, well, we're not going to allow

25    testing.  So they will have been properly instructed that they

1   can't do any outside testing.  They can only decide the case

2   based on the evidence.

3         MR. MEJIA:  We'll withhold the lighter.

4         THE COURT:  Yeah.  I can change this last line to say

5   "may be provided to you," if we don't think we have an agreement

6   now on how we would properly do that.

7         MR. MEJIA:  I follow all Your Honor's suggestions.

8   Obviously, we'll do what is -- if they really want to see them,

9   then they can see them, but they can't touch them.

10        THE COURT:  My recent experience suggests that juries

11  don't need to see things twice.  If they see it during the

12  course of the trial, that's enough.  They will also have the

13  video evidence.  So my guess is we're talking about a

14  contingency that is unlikely to be realized, but I do want to be

15  as precise as circumstances permit, and I want to have the

16  procedure as palatable to both sides as we can get it under the

17  law.

18     So if you-all are okay with this, that's the way we'll send

19  it back.  If not, I'll change -- in the fourth line of the

20  fourth paragraph there, I'll change "will" to "may."

21        MS. KEEL:  We're fine with the way it is with the

22  modifications you just made.

23        THE COURT:  Mr. Mejia, you're okay leaving "will" in

24  there.

25        MR. MEJIA:  Yes, sir.

1          THE COURT:  If we do get a message and they do want to

2    see anything, obviously, I will talk with you-all first before

3    we respond.

4       I don't have anything else on the list that's been provided

5    to me of any other objections you have to the instructions, so

6    that would mean the instructions on page 35 through 44 are

7    acceptable.

8          MR. MEJIA:  Only with regard to 40, I think 40 is fine

9    if we make the modifications to the verdict forms.  Otherwise,

10   we have the same situation.

11         THE COURT:  Okay.  Well, let's then confirm for me

12   that pages 35, 36, 37, 38, and 39, those are all standard

13   pattern instructions regarding how the jury is to do their work.

14   Those are all without objection?

15         MS. KEEL:  Yes.

16         THE COURT:  Just so the record is clear, the

17   instruction on 35 is a reminder to the jury about their duties

18   to base their decision on the evidence heard in court, not to

19   communicate or do any independent research.  The instruction on

20   page 36 is as to the requirement of unanimity.  And then the

21   instruction on page 37 is transitional, simply telling them that

22   they will now hear closing arguments.

23      Now, we've talked about this before.  Mr. Mejia, I know

24   you've tried cases in my court.  I can't recall off the top of

25   my head.  I will give the instructions through page 37 prior to

1    your closing.  I like to reserve the final instructions for

2    after closing.  I think it makes it a little less onerous on the

3    jury.  I think it also makes more sense for the jury to hear

4    instructions regarding their process after closing before they

5    go back.

6        So where it says on page 37 "break," that's for you-all and

7    this discussion.  That will not be in the instructions that go

8    with the jury.  So this transitional instruction will be given,

9    and then the closing arguments will be given.  And then after

10   closing arguments, I will pick up with the instructions on page

11   38, which begins "Now that all the evidence is in and the

12   arguments are completed, you are free to talk about the case in

13   the jury room."  And so there's no objection to that

14   instruction; correct?

15              MR. MEJIA:  That's correct.

16              MS. KEEL:  Correct.

17              THE COURT:  The next one on page 39 is the instruction

18   informing the jury that they need not concern themselves with an

19   appropriate punishment, and there's no objection to that.

20              MR. MEJIA:  No objection.

21              MS. KEEL:  No objection.

22              THE COURT:  And then that gets us to page 40, the

23   instruction that refers to the verdict form.  So that has us

24   circle back then to our earlier discussion.  Mr. Mejia, you

25   would have us change this how?

1          MR. MEJIA:  I will -- it doesn't need to be changed if

2     we correct the verdict form as we had agreed earlier today.

3          THE COURT:  I see.

4          MR. MEJIA:  Otherwise, it stands in the same place as

5     page 12, a separate consideration and how they go about signing

6     verdicts.  I have no objection, just so long as we do correct

7     the verdict form as earlier suggested.

8          MS. MCKENZIE:  Your Honor, I do have some more

9     information on that issue.

10         THE COURT:  Let's finish everything but the verdict

11    form and then we'll do that.

12       So page 41 is an instruction regarding the marijuana charge

13    that -- that's the instruction regarding how to go about the

14    lesser included offense, and there's no objection to that

15    instruction; correct?

16         MR. MEJIA:  Correct.

17         MS. KEEL:  Yes, Your Honor.

18         THE COURT:  And then the instruction on page 42 is

19    just the reminder instruction, the pattern instruction to the

20    jury that the defendant is on trial only for the crimes charged

21    in the indictment and the lesser included and they're not to

22    consider anything else.  There's no objection to that.

23         MR. MEJIA:  Right.

24         MS. KEEL:  Correct.

25         THE COURT:  Forty-three is the first of the two

1    concluding instructions that tells the jury not to worry about

2    anything that I said or did during the trial.  There's no

3    objection to that.

4              MR. MEJIA:  No objection.

5              MS. KEEL:  No objection.

6              THE COURT:  And then the instruction on 44 -- this is

7    the last one -- this is the pattern instruction regarding notes.

8    Well, I keep referring to these as pattern.  They're standard

9    instructions, I guess, regarding how they use their notes as

10   memory aids, and there's no objection to that.

11             MR. MEJIA:  No, sir.

12             MS. KEEL:  Correct.

13             THE COURT:  So that leaves the verdict form.  And do

14   you-all have an agreed upon modification to the verdict form?

15             MS. MCKENZIE:  No.  I have some clarification and some

16   law to offer in support of my objection to modifying that

17   verdict form, as well as modifying Instruction Number 12.

18        And I'm reading from federal firearms manual, which cites

19   law from various circuits.  I don't see any Sixth Circuit cases,

20   but in the Fourth, Eighth, Fifth, Tenth, and the D.C. Circuit,

21   the law is that even an acquittal on the predicate offense, when

22   charged as a separate count, does not foreclose a conviction

23   under 924(c), that an appellate court will not reverse that

24   conviction based upon on inconsistent verdict.  "It is

25   unnecessary that the defendant be convicted of or even charged

1    with the underlying federal offense."

2        Like I said, this does not cite to a Sixth Circuit case, but

3    the Fourth, Eighth, Fifth, Tenth, and D.C. Circuits all are in

4    agreement that the jury can find not guilty or find only

5    possession and still convict on the 924(c).

6        THE COURT:  Well, I'm not completely surprised by

7    that, because the -- I think the case law in the Sixth Circuit

8    with respect to the issue that we need to talk about next, after

9    we get past the instructions for Counts 2, 3, and 4 and talk

10   about the transition to the second trial, if you will, on Count

11   1, the law in the Sixth Circuit would suggest that irrespective

12   of the jury's finding with respect to Count 3, which is

13   possession of the firearm in relation to a drug crime, the jury

14   will still be -- will still need to make a finding with respect

15   to Count 1.

16       In other words, you-all may stipulate as to the gun elements

17   of that, and they may reach a finding in Count 3 as to the

18   possession of that same firearm.  Nevertheless, they still have

19   to take a look at and would be permitted to make an inconsistent

20   verdict with respect to Count 1 and Count 3.  That's the law of

21   the circuit as I understand it.  So for that reason, I'm not at

22   all surprised that other circuits would apply that same logic

23   here to the predicate offense versus the 924(c) count.

24       I understand your objection, Mr. Mejia, and we'll take a

25   look at it.  I'm not going to rule on it now, and we'll work

1    through it during the lunch break or, if necessary, we'll take

2    another break after the proof is in.

3            MR. MEJIA:  I'd request that the court have the --

4    Ms. McKenzie provide me with whatever authority she's relying

5    on.  I'm unaware of that --

6            MS. MCKENZIE:  Sure.

7            MR. MEJIA:  -- and certainly would welcome a chance to

8    look at it so that I can make a better record, if needed.

9    However, I do believe that in light of the indictment we have

10   here, all of it's going to be moot, depending on what happens.

11           THE COURT:  I'm not sure I follow that last part.

12           MR. MEJIA:  Well, with considering Count 1, if he

13   is --

14           THE COURT:  Oh, you're talking about Count 1?

15           MR. MEJIA:  Yes.

16           THE COURT:  Well, that's what I'm saying, it would --

17   one would think it would be moot.  If the jury reaches a verdict

18   on Count 3, one would think that that would be dispositive --

19           MR. MEJIA:  Right.

20           THE COURT:  -- of the finding as to Count 1, because

21   it's the same firearm, and the only issue left would be the

22   felony status of the defendant --

23           MR. MEJIA:  Right.

24           THE COURT:  -- but you-all have stipulated to that for

25   various reasons.

1          MR. MEJIA:  Right.

2          THE COURT:  Nevertheless, I think the law in this

3     circuit directs that we send it back to the jury.  Despite their

4     prior finding, we send it back with the stipulation and they

5     have to go through the process again.  It may not take them very

6     long --

7          MR. MEJIA:  Right.

8          THE COURT:  -- given that they're undertaking that

9     task immediately after having returned verdicts on Counts 2, 3,

10    and 4 with the same evidence at issue, but I do believe they get

11    a fresh look at the issue.

12         MR. MEJIA:  Right.  I mean, I haven't -- I'm not

13    acquainted with the Fifth, Fourth Circuit, and Tenth Circuit

14    cases, but what I'm assuming those cases have found is that

15    where there's evidence that the defendant did not possess on a

16    certain day, that doesn't mean the jury can't convict him of

17    having a firearm in connection with a drug trafficking offense,

18    let's say in a conspiracy, let's say as an accessory, let's say

19    in a complex case.  This is not that.

20         THE COURT:  Yeah.  Well, I think we're speculating as

21    to what those cases say --

22         MR. MEJIA:  Right.

23         THE COURT:  -- without having read them, so that's not

24    a useful exercise at this point.

25       Ms. McKenzie, what I'll ask you to do is email to Natalie

1    and to Mr. Mejia the case cites on which you're relying, and

2    then we'll pull those -- we'll look at them, to the extent you

3    can do so during a break, Mr. Mejia, or what might even be

4    better is for you to have a meaningful discussion about those

5    issues during a break.  That will be helpful.

6        We're now five minutes past when I told the jury that I

7    would like to have them in the box beginning with the next

8    witness, so let me simply preview for you how I think that this

9    will best work.  And what I would like to do is avoid sort of

10   clumsiness in the transition from a verdict on Counts 2, 3, and

11   4 to the jury's being asked to turn around and take up Count 1.

12       What I propose to do -- and I'll show you the language

13   during the lunch hour or another break.  What I propose to do

14   is, presuming that the jury does in fact return a verdict on

15   Counts 2, 3, and 4, after we receive that verdict, following the

16   normal course in every case, I will simply inform the jury that

17   normally we would dismiss them and thank them for their service,

18   but that in this case they have one more task to perform, and I

19   will explain to them that there is another count for them to

20   take up.

21       I do not intend to re-read all of the instructions.  So if

22   either side thinks that the better course is to re-read all of

23   the instructions, I will ask you to make that case to me during

24   our lunchtime discussion.  It does not seem to me to be an

25   appropriate thing to do.  They will have just heard those

1    instructions earlier in the day.

2        What I will do, however, is I will give them an instruction

3    on the counts.  I will remind them that I read all of the

4    instructions, that all of those instructions apply, and we will

5    send back with them the same instructions, removing the

6    instructions on the Counts 2, 3, and 4, replacing those with the

7    instruction I give them for Count 1.

8        Any questions about that?  Does that make sense?  I'm not --

9    I think I explained that adequately.  There will also,

10   obviously, be a new verdict form.  So what they would get is

11   they would get a transitional instruction as to their new

12   obligation.  They would get a substantive instruction as to

13   Count 1, the elements.  They would get a reminder that all of

14   the instructions given apply.  And they would also be given the

15   same instructions with Counts 2, 3, and 4 removed, Count 1

16   inserted, and a different verdict form.

17       I think that would make perfect sense to them.  It would be

18   less burdensome than re-reading all of the instructions, but I

19   give you that preview so that you can think about it.  We can

20   talk more about it on a subsequent break.

21           MR. MEJIA:  I won't be objecting to that procedure.  I

22   think it's streamlined and I think it's clearly enough.

23           MS. KEEL:  We would agree.

24           THE COURT:  As I said, I'll show you the transitional

25   instruction, as well as the substantive instruction.  That's a

 1    pattern instruction on felon in possession that's used in every

 2    case.

 3         Are you-all ready with your next witness?

 4              MS. MCKENZIE:  Yes.

 5              THE COURT:  I'm going to give you five minutes.

 6         If you'll tell the jury that we expect to have them in at

 7    10:00.  Thank you.

 8         (Recess at 9:54 a.m. until 10:01 a.m.  Jury in.)

 9              THE COURT:  Good morning, members of the jury.  I

10    trust you had a restful evening.  We are starting a few minutes

11    behind our targeted schedule this morning, but I can tell you

12    that the lawyers and I used this time productively, and I

13    believe we will make up this little bit of lost time as a result

14    later in the day.

15         We're ready to proceed.  Is the Government ready to call its

16    next witness?

17              MS. MCKENZIE:  We are, Your Honor.  United States

18    calls Detective Holly Hogan.

19         (DETECTIVE HOLLY HOGAN, called by the Government, sworn.)

20                        DIRECT EXAMINATION

21    BY MS. MCKENZIE:

22    Q.  Good morning.

23    A.  Good morning.

24    Q.  Can you please introduce yourself to the jury and tell them

25    where you work.

1  A.  Yes.  My name is Detective Holly Hogan.  I work for the

2  Louisville Metro Police Department.

3  Q.  And what's your assignment in the police department?

4  A.  Currently my assignment is to the Louisville Metro Police

5  Department's Homicide Unit.

6  Q.  What other divisions within the department have you worked

7  for?

8  A.  I was first assigned to the Patrol Division, which I was

9  assigned to the Fourth Division, which is like the Taylor

10  Boulevard area; and then I was assigned to the Ninth Mobile

11  Division, which you've heard in length about; and then I'm --

12  for the past two-and-a-half years have been assigned to

13  Homicide.

14  Q.  And can you just explain, is your job as a homicide

15  investigator -- how is that different from what you would have

16  been doing in the Ninth Mobile?

17  A.  So as a homicide detective, we are more of a reactive unit.

18  We respond -- excuse me.  We respond to events after they've

19  already occurred.  We take shootings, fatal and nonfatal, and

20  obviously homicides, any unnatural death, overdoses, suicide,

21  things like that.  So we're more of a reactive unit.  We show up

22  after everything -- you know, the violence has already occurred.

23      In the Ninth Mobile Division, it was more of a proactive

24  unit.  We were there to saturate areas to deter crime.

25  Q.  In both capacities in the Ninth Mobile and as a homicide

1    detective, have you had very many cases where you are collecting

2    evidence -- physical evidence, such as a gun or guns or other

3    physical items?

4    A.   Yes, ma'am.  I've collected a lot of evidence, probably

5    hundreds of guns.

6    Q.   And you are the lead detective on this case; is that

7    correct?

8    A.   Yes, I am.

9    Q.   What does it mean to be a lead detective?

10   A.   To be the lead, you are just making, I guess, most of the

11   decisions on scene.  You are doing most of the work, I guess, is

12   the best way to put it, organizing what needs to be done.  And

13   it's a little different than, say, you're the lead on a

14   homicide.  That's like the grand scale of investigations.

15       In the Ninth Mobile, it's more of a street-level

16   investigation, like a traffic stop and then retrieval of

17   evidence, like a gun and narcotics.  When you're the lead on

18   something like that, you're still organizing and you're still

19   doing things, but you're the one who writes the citation and

20   everything is from your perspective, what you observed and how

21   you got from point A from the traffic stop to where you are now.

22   And it's everything from your perspective, so that's how you

23   become the lead.

24       And in Ninth Mobile, we rode so many detectives to a car, so

25   you would kind of take turns on who was the lead.  Just because

Hogan - Direct

```
 1    Detective Holland was driving doesn't mean he's the lead.  He
 2    may have taken the case, you know, the traffic stop before, so
 3    then it was my turn to be the lead on the next stop so -- if
 4    that makes any sense.
 5    Q.  So it's not uncommon to have a number of officers present on
 6    a stop, but there's one of you that's going to be responsible
 7    for getting that case through court and any follow-up that's
 8    needed?
 9    A.  Yes, ma'am.  So the lead is responsible for all of that.
10    People might assist.  They may help out.  "Hey, what do you
11    need?  I can help."  But, really, the lead is responsible in
12    court proceedings and taking the case and seeing it all the way
13    through.
14    Q.  And when I refer to this case, I'm going to ask you
15    specifically about the night of November 11th, 2015.  You were
16    in the Ninth Mobile at that time?
17    A.  Yes, ma'am.
18    Q.  Is that correct?
19    A.  Uh-huh.
20    Q.  And did you regularly ride with Detective Holland?
21    A.  Yes, ma'am, I did.  We were -- like I said, I was in the
22    Fourth Division previously, and we were beat partners in the
23    Fourth Division.  And then he went to the Ninth Mobile a couple
24    of months before I did and then I went to the Ninth Mobile
25    there, and we became partners there too.  We were just very
```

Hogan - Direct

1   familiar with each other, so it was just natural to be partners

2   there as well.

3   Q.  So the traffic stop of Mr. Brewer at the intersection of

4   Wilson Avenue and Olive Street, can you tell the jury from your

5   perspective what you remember about that vehicle, particularly

6   when you first noticed it.

7   A.  Yes, ma'am.  Detective Holland told you the directions we

8   were going.  I'm terrible with directions.  I know we passed the

9   vehicle in the opposite direction.  I noticed the car was like a

10  gray color, and the windows I immediately noticed looked black.

11  And I was comparing it in contrast to the vehicle.  So the

12  windows looked completely black in contrast to the car.

13      And on 18th Street, we were passing under several of the --

14  both of us were passing under several street lamps.  And as it

15  was coming to us, the lights looked -- or the windows looked

16  black.

17      And in legal tinted vehicles, you should be able to see

18  silhouettes.  At nighttime, it's unrealistic to be able to see

19  faces and things like that, but you should see silhouettes of

20  people.  In this particular vehicle, you couldn't see anything

21  inside at all, so that's what drew my attention immediately.

22  The windows looked black, couldn't see in any window as it was

23  passing us, so we decided to turn around and follow the car.

24      Upon turning around, our headlights were obviously shining

25  on the car, so we could see it better.  And then at that point,

1    we determined that you still could not see in the car.

2    Q.  And you were the -- as the lead, you were the officer who

3    actually wrote the citation and decided what charges to place on

4    Mr. Brewer; is that correct?

5    A.  Yes, ma'am.

6    Q.  Did you charge Mr. Brewer with speeding?

7    A.  No, ma'am.

8    Q.  And do you remember noticing his speed?

9    A.  I didn't.

10   Q.  So you get the car stopped.  What do you do relative to

11   Mr. Brewer's vehicle once the traffic stop begins?

12   A.  I was seated in the passenger's seat of our car.  Detective

13   Holland was the driver and, as the driver, he's going to start

14   making verbal commands or initiate the stop to the driver.

15       With the tint being that dark, you don't really want to

16   approach the car if it's completely unknown.  So he started to

17   ask the driver to roll the windows down.  That's not uncommon.

18   We do that all the time.  And I think -- I don't want to beat a

19   dead horse, but Detective Holland told you-all that usually

20   people roll the windows down.  It's not an issue.  We approach

21   the car.  You know, people know their tint is dark, so they

22   know, hey, we'll just roll them down.  The police will approach

23   and it's not an issue usually.

24       In this instance, the windows didn't come down.  So

25   Detective Holland and I waited back at our car until we felt

1    safe to approach, which the windows never came down.  So

2    Detective Holland ended up approaching the driver's side of the

3    car.  I waited back until I could hear or wait for a signal to

4    approach the passenger's side so --

5    Q.  Were you wearing a body camera on that night?

6    A.  Yes, ma'am, uh-huh.

7    Q.  Did you activate your body camera?

8    A.  Yes, ma'am, I did.

9    Q.  Did you have an opportunity to review that footage prior to

10   your testimony today?

11   A.  Yes, ma'am.

12   Q.  And is that a true and accurate recording of the events --

13   A.  Uh-huh.

14   Q.  -- of that night?

15           MS. MCKENZIE:  Your Honor, at this time, with the

16   court's permission, I'd move to admit and publish our first

17   portion of the body camera video.  That would be Exhibit 8C.

18           THE COURT:  I'm sorry.  8C?

19           MS. MCKENZIE:  Uh-huh.

20           MR. MEJIA:  No objection.

21           THE COURT:  It will be admitted.

22           (Government Exhibit 8C admitted in evidence.)

23       (Government playing video.)

24   BY MS. MCKENZIE:

25   Q.  Detective, I want to ask you a few questions about what we

1    just watched.  The passenger in the car, what was her name?

2    A.   Regina Northington.

3    Q.   Okay.  Did you charge her with anything?

4    A.   No, ma'am.

5    Q.   Okay.  There was a conversation between the two of you, and

6    it sounded like you were asking her if she thought she had any

7    warrants.  Can you explain to the jury what was going on there.

8    A.   Okay.  So we obviously as police have discretion, and we are

9    equipped with a computer in the Ninth Mobile and also in patrol.

10   In Ninth Mobile, we have unmarked vehicles, so they don't have a

11   mount for the computers.  So sometimes we can turn those on

12   and -- but the computer would just like fly around the car so --

13   and you saw in Detective Stewart's, he ran people on the

14   computer, which is a way to do it.

15       If I had a traffic warrant and you look me up on the

16   computer and saw I had a warrant, then you may not have to take

17   me to jail, because it's not documented over the air.  But if

18   you looked me up over radio and you dispatched me in, that's

19   documented, date, time stamped, everything.  It's recorded so

20   radio knows you have that person, so there's not really

21   discretion there.  You pretty much have to take that person to

22   jail.

23       So Detective Holland and I -- I usually always ran people

24   over the radio, but I always like to give them that disclaimer

25   at the beginning.  "Hey, if you have a traffic warrant or

1    something like that, let me know, because I'm probably not going

2    to take you to jail for a traffic warrant.  I will just let you

3    re-docket it.  So if you do, let me know.  I will look you up on

4    the computer, and then you can go down and re-docket that."

5    Q.   Can I interrupt.  I'm sorry.

6    A.   Yeah.

7    Q.   For those that don't live in Jefferson County, what does

8    that mean, re-docket it?

9    A.   Okay.  So you can go down to the courthouse, and if you just

10   missed a court date because you couldn't get off work or

11   something like that, then you can go down to the courthouse and

12   get a new date for your traffic warrant, or no insurance

13   warrant, or something like that.

14   Q.   Without a bench warrant?

15   A.   Without -- yes, without a bench warrant.

16   Q.   Or without being arrested on that warrant?

17   A.   Without me having to take you to jail.

18   Q.   Okay.  And checking the occupants of vehicles for any

19   outstanding warrants, is that something that you do any time you

20   have a car pulled over?

21   A.   Yes.  So we pull a car over, check the people -- you know,

22   check the occupants for warrants and check the vehicle for

23   stolen.

24   Q.   Okay.  Let me ask you this:  When you check a vehicle to see

25   if it's stolen, what procedure -- specifically what are you

1    doing?  What information are you looking up or calling in?

2    A.  So I would get on the radio on our service channel and then

3    I would run the license plate number.  And I want to know who

4    it's registered to and then, obviously, if it's stolen, if the

5    tag comes back to that car.  Sometimes they'll switch tags or

6    something like that.  So you can also run the VIN of the

7    vehicle.

8    Q.  And so if you wanted to run a vehicle -- and I don't know

9    that I asked you this earlier -- do you remember about what time

10   of night this traffic stop was?

11   A.  I believe my citation says 1:00 a.m.  So sometimes that's

12   maybe the time that I was writing the citation and I look down

13   and it said 1:00 a.m. or if I do remember what time we actually

14   stopped them was 1:00 a.m.  I can't really remember, but it's

15   about 1:00 a.m.

16   Q.  Okay.  So if you had a vehicle stopped and you called in a

17   tag and found that, while it wasn't stolen, it was not actually

18   registered to a person.  It was, say, registered to a rental

19   company.

20   A.  So in this particular instance, when I ran this vehicle,

21   radio came back to me and said it's registered to EAN Holdings.

22   Well, in my experience --

23   Q.  What do you know that to be?

24   A.  In my experience, that means it's registered to a rental

25   company, which is Enterprise, so --

1    Q.  How --

2    A.  All I know at that point is it's a rental vehicle.  I don't

3    know who it's registered to.  I don't know -- or who it's rented

4    to.  I'm sorry.  I don't know any of that information.

5    Q.  You later -- am I correct, did you later find out?

6    A.  Yes, ma'am, during business hours.

7    Q.  Okay.  So we've seen video of the dog doing his job on

8    scene.  Did you call for the dog?

9    A.  No, ma'am, I didn't.

10   Q.  Were you present when he was doing his work?

11   A.  Yes, I was.

12   Q.  Okay.  And have you worked with that dog before?

13   A.  Uh-huh.

14         MS. MCKENZIE:  I want to play another portion of your

15   video for you, if I could.

16      Your Honor, I would move to admit and publish United States

17   Exhibit 8B at this time.

18         MR. MEJIA:  No objection.

19         THE COURT:  It will be admitted.

20         (Government Exhibit 8B admitted in evidence.)

21      (Government playing video.)

22   BY MS. MCKENZIE:

23   Q.  A few questions about what we just saw, Detective.  The

24   firearm, can you explain the positioning of that gun and --

25   relative to the marijuana that we just saw.

1   A.  So the firearm -- so you saw that black cloth.  When you

2   look down in under the steering wheel column, how the steering

3   wheel's adjustable for like shorter people, like myself, and

4   then taller people, it was like in that dead space.

5       If you looked back in there, the cloth was kind of covering

6   it.  When I first stuck my hand in there, I could feel something

7   hard.  And I was not experienced with finding firearms in that

8   area, so I was afraid to put my hand back in there, because I

9   did not want to put my finger in like the trigger well.  That's

10  why I had my sergeant come.  And I knew that he had found things

11  in there before, so that's why I had him really help me retrieve

12  it but -- so that's where that was located with the cloth kind

13  of wrapped around it, but the marijuana would have been right

14  next to it.

15      So you could have actually probably retrieved the marijuana

16  going in under there and then just to the left, if we would have

17  like hooked our hand that way.  Diesel was hitting on both

18  areas, so you probably could have just retrieved it that way,

19  but because he was actually hitting on that little -- we have

20  photographs.

21  Q.  Yes.

22  A.  So it might be easier for me to explain if they actually saw

23  it.  But because he's hitting on that little panel to the left,

24  that is why they removed that, and then the marijuana was just

25  sitting right there.

Hogan - Direct

1          So, essentially, if you would have removed that whole dash

2     area, they would have essentially been right next to each other,

3     if that makes any sense.  I think the pictures may be better

4     but --

5     Q.  Let me show you what has been premarked for identification

6     purposes as United States' collective Exhibits 10 and 11.  Take

7     a look at those and let me know if you recognize what you're

8     looking at.

9     A.  Yes, ma'am.

10    Q.  Okay.  Do those appear to be -- are those the pictures that

11    you took, that we saw you taking on the video?

12    A.  Yes, ma'am.

13    Q.  Okay.  And are they true and accurate representations of

14    those items --

15    A.  Yes, ma'am.

16    Q.  -- as they appeared?

17             MS. MCKENZIE:  Your Honor, I'd move to admit and

18    publish Exhibits 10 and 11.

19             MR. MEJIA:  No objection.

20             THE COURT:  They will be admitted.

21             (Government Exhibits 10 and 11 admitted in evidence.)

22    BY MS. MCKENZIE:

23    Q.  Okay.  And, Detective, if you'd like, I could put those on

24    the Elmo.

25    A.  Sure.  So the ones that I was -- the panel that I'm

1    referring to and under the column -- if you kind of want to show

2    them these two.

3        So the steering wheel column would be like right here and

4    then the panel is there, but that's the proximity, if that is

5    easier for them maybe.

6    Q.  Okay.  So the area that Diesel was hitting on after the gun

7    was removed from the car, was that this panel that is loose

8    here?

9    A.  Uh-huh.

10   Q.  Okay.  This would be 11B.  11A --

11   A.  It was like that whole area but -- yes, and then his -- and

12   the gun is like right underneath that steering column, yes, and

13   then that's where the marijuana is.  So it's right next to each

14   other.

15   Q.  Okay.  You may actually be able to tap that screen and --

16   A.  Okay.  So, yeah, that arrow, is it on your screen?

17       Okay.  That's where the gun is and then marijuana is right

18   there.

19   Q.  Okay.  I also want to show you -- there's a photo of the

20   marijuana.  This is 10A.  And can you help orient us -- try to

21   not make anyone dizzy here.  I think if you tap up in the

22   corner, it might make those go way.  Great.

23       What are we looking at here?

24   A.  Okay.  I believe that's when I removed -- or when I took the

25   camera and I -- when you heard me being really bossy and I was

1    like, "Don't remove it.  Wait, let me go get the camera."  And I

2    came over my sergeant's back and I started taking pictures

3    before he took anything out of the steering wheel column.

4        So I believe this is -- that right there is the leather of

5    like the steering wheel, like how it moves up and down in that

6    dead space, and then this is the cloth that we referred to, and

7    then this is going to be like the handle of the firearm, I

8    believe.

9    Q.  Okay.  And that -- the gun was positioned that way when you

10   found it?

11   A.  I believe so.  My sergeant actually removed it.  If you saw,

12   he's the one that actually pulled it out.

13   Q.  Okay.  But if this is the handle, then --

14   A.  Yes.  So it would have been like --

15       [Witness indicating.]

16   Q.  So you were seated facing that steering column --

17   A.  Yes.

18   Q.  -- you wouldn't needed -- you would have just --

19   A.  Right, pulled the handle out, uh-huh.

20   Q.  -- pulled it out --

21   A.  Right.

22   Q.  -- with the natural grip?

23   A.  Right.

24   Q.  Okay.  Do you know the serial number on that gun?  And

25   that's not a trick question.  If you needed to look at your

1    report --

2    A.   If you wouldn't mind, that would be great.

3    Q.   -- to refresh your recollection --

4    A.   I've seen the serial number.  I just don't have it

5    memorized, and I wouldn't want to mistake the serial number.

6    Q.   Excuse me.  Too much going on here.  Take a look at your

7    citation, see if that refreshes your recollection.

8    A.   Yes, ma'am.

9    Q.   Okay.

10   A.   Would you like for me to read it?

11   Q.   Yeah.  What is the serial number?

12   A.   Yes, ma'am.  It's H as in Henry, V as in Victor, P as in

13   Paul 3-3-7.

14   Q.   What kind of gun is this?

15   A.   It's a Glock 22, .40 caliber.

16   Q.   Did you continue searching the car after the gun and the

17   drugs were --

18   A.   Yes, ma'am.

19   Q.   -- retrieved?  And I'd like to show you one more video clip.

20          MS. MCKENZIE:  Your Honor, I'd move to admit and

21   publish Exhibit 8D.

22          MR. MEJIA:  No objection.

23          THE COURT:  It will be admitted.

24          (Government Exhibit 8D admitted in evidence.)

25       (Government playing video.)

1    BY MS. MCKENZIE:

2    Q.  We saw you taking a couple of photos during that clip,

3    Detective.  What were you photographing?

4    A.  I was photographing some mail matter in the back of the

5    vehicle.  The reason I was doing that is I didn't know who the

6    vehicle was registered to or rented to.  I'm sorry.  All I knew

7    is it was a rental car and all I knew was that Mr. Brewer was

8    the one driving it.  So when I found mail matter that was his, I

9    took pictures of it, and that is usually what I would do to show

10   that, obviously, this person had some control over the vehicle

11   from some time because they had mail in the car.

12   Q.  I'd like to show you what I've premarked for identification

13   purposes as United States' proposed Exhibits 12 and 13.  Can you

14   look at those and tell me if you recognize them?

15   A.  Yes, ma'am I do.

16   Q.  What are they?

17   A.  It's a picture of the mail matter that we just spoke about,

18   and then a picture of a screwdriver that was found inside the

19   driver door frame.

20          MS. MCKENZIE:  Okay.  I would move to admit and

21   publish.

22          MR. MEJIA:  No objection.

23          THE COURT:  They will be admitted.

24          (Government Exhibits 12 and 13 admitted in evidence.)

25   BY MS. MCKENZIE:

Hogan - Direct

1   Q.   That is 12.   Thirteen is the screwdriver.

2   A.   The reason I took that picture is because of the -- that

3   side panel that was -- that was -- that we had to pop off to get

4   the marijuana out.   Clearly -- I don't know if we even -- I

5   don't know if we used that to pop it off, actually, but the

6   tooling marks that they talked about yesterday, that was just

7   indicative of that may be something that he used to get that off

8   and get the marijuana in and out.

9   Q.   In the video with the gun, there is a brief moment where you

10  can see your sergeant taking the gun and placing it into the bag

11  and taking the magazine and placing it into the bag.   Is it

12  common, when you find a gun on the street or on a scene, for you

13  to remove the ammunition from the gun?

14  A.   Yes.   So --

15  Q.   Can you explain that.

16  A.   Yes.   So on scenes like that, you wouldn't want to transport

17  the gun live, as we would call it.   You wouldn't want to

18  transport a loaded gun.   We photographed it and then noted that

19  it, you know, had a magazine in it, and then we would make it

20  safe.   So you would take the magazine out and then put the

21  magazine with the gun and then transport it.

22      And the reason I hesitated when she asked that is because as

23  a homicide detective now, that's not something we would ever,

24  ever do.   But when you're working on street crime, street crime

25  unit, yes, that's what you would do.   So it's just -- I had to

Hogan - Direct

1    operate two brains at the same time when she asked me that

2    question.  So that's the only reason I hesitated so --

3    Q.   Was that gun loaded --

4    A.   Yes, ma'am.

5    Q.   -- when you-all found it?

6    A.   Uh-huh, it was.

7    Q.   I'm going to show you packages -- these are premarked for

8    identification.  We've got proposed 1 and 2, proposed 7, and

9    proposed 3.  Let's start with 1, 2, and 3.  Can you -- hold on.

10   I'd ask you to look at the outside of those packages.

11   A.   Okay.

12   Q.   Tell me if you recognize the packaging.  Please open the

13   package, look inside, tell me if you recognize what's inside.

14   A.   Yes, I recognize this packaging.  Yes, I recognize this

15   packaging.  Yes, I recognize this packaging.

16   Q.   Let's start with proposed 1 and 2, if you could open those.

17   A.   Okay.

18   Q.   Okay.  Do you recognize what's inside?

19   A.   Yes, ma'am.

20   Q.   What is it?

21   A.   It is the marijuana that was recovered from the door frame

22   and the marijuana that was recovered from the dash compartment.

23          MS. MCKENZIE:  I'd move to admit 1 and 2 and publish

24   for the jury.

25          MR. MEJIA:  No objection.

```
 1              THE COURT:  They will be admitted.
 2              (Government Exhibits 1 and 2 admitted in evidence.)
 3              THE WITNESS:  Would you like for me to remove them?
 4              MS. MCKENZIE:  Yes.
 5              THE WITNESS:  Okay.
 6   BY MS. MCKENZIE:
 7   Q.  Could you?  And could you hold up --
 8   A.  This is like what was in the door frame that Diesel
 9   initially hit on.  It's a candy thing and then that was inside.
10       And then this is the canister, rubber band around it.  Would
11   you like for me to open this completely?  This is like a --
12   Q.  Yes.
13   A.  -- sandwich bag.
14   Q.  As much as we can get a visual of how it is inside.
15   A.  Okay.  We can.
16   Q.  How many individual little packages are there?
17   A.  One, two, three, four, five, six, seven, eight, nine.
18   Q.  Thank you.  Go ahead with proposed 3 -- or if you want to
19   put those back -- if you want to put that kind of back in the
20   canister before you do that, that's fine.
21   A.  Okay.  Secure it all back in?
22   Q.  Yeah, so we don't lose any of it.
23   A.  You said 3?
24   Q.  Uh-huh.
25   A.  There's another bag inside of here.
```

Hogan - Direct                                                Volume 3, Page 53

1    Q.  Okay.  You can look in that bag.

2    A.  I have to take it out to look in it.

3    Q.  That's fine.

4    A.  Okay.  Yes, I recognize this.

5    Q.  Do you recognize it?  What is it?

6    A.  It's the black cloth napkin that was around the firearm

7    inside the --

8            MS. MCKENZIE:  I would move to admit and publish

9    Exhibit 3.

10           MR. MEJIA:  No objection.

11           THE COURT:  It will be admitted.

12           (Government Exhibit 3 admitted in evidence.)

13   BY MS. MCKENZIE:

14   Q.  Can you just hold that up, please.

15       [Witness complying.]

16   Q.  And that -- is that what was wrapped sort of around the

17   gun --

18   A.  Yes, ma'am.

19   Q.  -- down in the steering column?

20       Okay.  A couple more.

21       Okay.  Show you what is premarked for identification as

22   proposed United States Exhibit 4, 5, and 6.

23           THE COURT:  Could I see counsel at the bench for a sec

24   please before you proceed.

25       (Bench conference on the record outside the hearing of the

1    jury.)

2              THE COURT:  It's my preference that whenever we're

3    displaying a handgun in court, that the first questions be to

4    assure everyone here that the firearm is disabled.

5              MS. MCKENZIE:  Unloaded, yes.

6              THE COURT:  And is not currently functional.

7              MS. MCKENZIE:  Sure.

8              THE COURT:  So that -- it does make some people

9    uneasy, and I think we need to allay any of that at the outset.

10   So you don't need to belabor the point, but simply make it clear

11   through the detective that the firearm is not operable in its

12   current state and it could not become easily operable in its

13   current state.

14             MR. MEJIA:  Were we going to take a break this

15   morning?

16             THE COURT:  We are, yeah.

17             MR. MEJIA:  Bathroom.

18             THE COURT:  Yeah.  We've only -- we've only had the

19   jury in here an hour.

20             MR. MEJIA:  I know.

21        (End of bench conference.)

22   BY MS. MCKENZIE:

23   Q.  Detective, first thing could you do for me with proposed 4

24   and 5, can you look at that and tell me, is that gun in its

25   current state able to be fired?

1    A.   Would you like me to touch it or just look at it?

2    Q.   You can touch it.  I just want to confirm that it's not --

3    A.   No, ma'am, there is a zip tie in the trigger well and

4    there's also a zip tie in the slide.  As I pull it back, I know

5    that there's no round in the chamber.  Also, there's no magazine

6    lodge, so it's clearly dis --

7    Q.   Thank you.  Now, can you take a look at that weapon and --

8    A.   Yes, ma'am.

9    Q.   -- tell me if that is the gun you retrieved from

10   Mr. Brewer's car?

11   A.   I'll check the serial number just to be sure.  Yes, ma'am.

12           MS. MCKENZIE:  Okay.  And I would move to admit

13   Exhibits 4 and 5.

14           MR. MEJIA:  No objection.

15           THE COURT:  They will be admitted.

16           (Government Exhibits 4 and 5 admitted in evidence.)

17   BY MS. MCKENZIE:

18   Q.   Okay.  Now, with the gun, there is a separate item kind of

19   tagged to it.  What is that?

20   A.   Okay.  So this?

21   Q.   Yes.

22   A.   So Exhibit 5?

23   Q.   Yes.

24   A.   The magazine.  So this is -- can I make reference to this?

25   Q.   Uh-huh.

1    A.  So this is a box of ammunition, the rounds, the bullets, and

2    then this is your magazine, which is where you put the bullets.

3    And then once the magazine is loaded, then you put it in the

4    gun.

5        And then when you chamber a round, which means that you take

6    the slide and you push it back charging the gun, and then it

7    shoots a round forward, and that means your gun is ready to go.

8        And this, just for reference for your pictures, because I'm

9    more of a visual person, what you were seeing in that picture,

10   like those little bumps and I said was the back of the gun, like

11   the handle, that's what you were seeing in the picture is this

12   right here.  And that's the back of the gun, so it was like

13   wrapped in a towel and it was facing like the -- in between, if

14   you can imagine the steering wheel in between your legs and this

15   is what was facing you.  So that's --

16   Q.  The barrel is pointed away from the driver?

17   A.  Right, like with the handle pointing at you with those bumps

18   like that, so just for reference.

19   Q.  How many rounds -- can you tell by looking at that magazine

20   how many rounds it can hold?

21   A.  Yes, ma'am.  So it can hold 15 and it's actually numbered.

22   And then if you charge a round, which means -- you can charge a

23   round forward and then you can actually fit one more, so it

24   could hold 16.

25   Q.  Okay.

1   A.  But this magazine holds 15 and that's how many were in it

2   that night.

3   Q.  Okay.  And that -- my next question is to take a look at

4   proposed 6.  If you wouldn't mind, open that little box.

5   A.  Sure.

6   Q.  Confirm for me that it is what it is supposed to be.

7   A.  I'll count them separately.  Do you want me -- it looks to

8   be what it's supposed to be, but I'll count them, just to make

9   sure.

10  Q.  Sure.

11  A.  Yes.

12  Q.  So 15 rounds of -- what type of ammunition?

13  A.  Smith & Wesson, .40 caliber.

14          MS. MCKENZIE:  Okay.  And if you could -- I would move

15  to admit 6 and publish.

16          MR. MEJIA:  No objection.

17          THE COURT:  It is admitted.

18          (Government Exhibit 6 admitted in evidence.)

19  BY MS. MCKENZIE:

20  Q.  If you could just hold up one of those rounds so that the

21  jury can see.

22      [Witness complying.]

23  Q.  Detective, do you carry a duty weapon --

24  A.  Yes, ma'am.

25  Q.  -- when you're working?

1    A.  Uh-huh.

2    Q.  Do you use a particular type of gun?

3    A.  The same type actually, a Glock 22, .40 caliber.

4    Q.  Okay.  So the exact same make and model as this gun?

5    A.  Yes, ma'am.

6    Q.  Okay.  And when you -- strike that.

7        I want to ask you about other evidence that you found in

8    that car.  Is there a package up there, proposed Exhibit 7?

9    A.  Yes, ma'am.

10   Q.  Okay.  Can you open that, take a look inside.

11   A.  Yes, ma'am.  Yes, ma'am, I recognize these items.

12   Q.  What's inside?

13   A.  Cell phones.

14   Q.  Okay.  Where did those cell phones come from?

15   A.  The vehicle.

16          MS. MCKENZIE:  Okay.  I'd move to admit 7 and show

17   them to the jury.

18          MR. MEJIA:  No objection.

19          THE COURT:  Seven will be admitted.

20          (Government Exhibit 7 admitted in evidence.)

21   BY MS. MCKENZIE:

22   Q.  Can you just take those out.

23   A.  So some of these are like the cell phone covers, which we

24   had to remove to get the serial numbers off the phones.

25   Q.  When you found the phones were they intact?

1   A.   Yes, ma'am, they were intact, but to lodge them into

2   evidence, you have to have the serial numbers so --

3   Q.   How many phones are there?

4   A.   There's -- I'll count them just to be sure.  One, two,

5   three, four, five, six, seven.  Do you want me to unbindle them?

6   Q.   No, that's okay.

7   A.   Yes, ma'am, there's seven and there's various types.

8   They're not all the same type.

9   Q.   Okay.  Did you seize any money that night?

10  A.   Yes, ma'am.

11  Q.   Okay.  Do you remember how much?

12  A.   Approximately 900, $920, something like that.

13  Q.   Okay.  Where was that money?

14  A.   It was located on Mr. Brewer.

15  Q.   Okay.  In his pocket?

16  A.   Yes, ma'am.

17  Q.   Okay.  Did you photograph that money?

18  A.   Yes, ma'am, I did.

19  Q.   Okay.  I'd like to show you premarked proposed United States

20  Exhibit 14.  Can you take a look at those photos, tell me if you

21  recognize them.

22  A.   Yes, ma'am, I do.

23  Q.   Okay.  Did you take those photos?

24  A.   Yes, ma'am, I did.

25  Q.   And what are they?

1   A.   One is a photograph of Mr. Brewer's Kentucky driver's

2   license.   One is a photograph of his driver's license, along

3   with some of the currency, and then the other photograph is more

4   currency spread out.

5             MS. MCKENZIE:   Move to admit 14 and publish.

6             THE COURT:   Mr. Mejia.

7             MR. MEJIA:   No objection.

8             THE COURT:   It will be admitted.

9             (Government Exhibit 14 admitted in evidence.)

10  BY MS. MCKENZIE:

11  Q.   And the money -- when you seize currency like that, did you

12  take it to the property room?

13  A.   Yes, ma'am.   So Detective Stewart briefly went over our

14  policy and procedure over seizing money.   We do not do a count

15  on scene.   The official count is at the bank.   It's just

16  something that our department says that we're supposed to do.

17       However, if we seize money and we seize it in front of the

18  person who we're seizing it from, and we place it into a bag,

19  like he told you, and then we rip off this piece of the bag that

20  he alluded to.   They sign it so that there's no confusion on

21  what money we take from someone.

22       The bag that he was talking about is that right there.   And

23  then the piece that we rip off or whatever is like that little

24  top right there, and then they sign it and then they keep that.

25  And then I usually just lay out the different denominations of

1   the cash.  So it would be like spread it out there, and then

2   baggie it altogether in front of them, and then seal the bag,

3   and then I take that straight to the property room.  And then

4   the official count is at the bank and then that's where it's

5   kept.

6   Q.  Did you find -- did anyone find in the search of that

7   vehicle any pipes?

8   A.  No, ma'am.

9   Q.  Bowls?  Bongs?  Papers?  Any paraphernalia for smoking

10  marijuana?

11  A.  No, ma'am.

12  Q.  Did you -- the evidence, you know, the packaging we've

13  identified -- we've talked about the property room.  After you

14  deposit all the evidence at the property room, did you request

15  anything else be done with any of it?  Let's say the gun.  Did

16  you request anything be done to the gun?

17  A.  So everything was taken to the property room and then the

18  gun was taken to CSU, which is our Crime Scene Unit.  You heard

19  from Technician Kimmer.  And I requested that the gun be

20  photographed, which Ms. McKenzie has copies of those photos

21  you'll see, better photographs than what I had on seen, because

22  as you can tell, those photographs are not great.

23      I think in my body camera you saw me try to take a picture

24  of that mail matter like five times before I could get a decent

25  photo, so better photos of the gun, functionality of the gun,

1   fingerprints, and then swabs of DNA.  So I did request that they

2   take swabs so -- and I'll explain further in just a second or do

3   you want me to go ahead and explain that?

4   Q.  Well, did you request that the gun be -- that there be DNA

5   testing?

6   A.  So I requested swabs be taken at that moment, because at

7   that time the gun had not been test fired.  At that time I did

8   not know if the gun was going to link to a homicide.  I did not

9   know -- so the guns are test fired and then casings of the gun

10  that are test fired are compared into a system that the ATF

11  owned, which is called NIBIN, and that compares casings from

12  this gun that are unique to casings that are entered from

13  casings that are collected from homicide scenes or shooting

14  scenes.

15      If this gun would have come back to a murder or something

16  like that across, you know, the country, then this gun would

17  have been a good candidate to be tested for DNA.  At the time

18  that I logged it in, I don't know -- you know, the gun had not

19  been test fired.  So I did request for swabs be taken, because

20  at that moment -- once you get the swabs, then you have them, so

21  there's nothing wrong with going ahead and requesting them.  So

22  they did go ahead and swab them.

23      Now, after we figure out what we have, then if you send it

24  off for comparison and analysis is another story, if it's a good

25  candidate for that.  So I do request it, you know, initially.

1    Q.  And is it -- those swabs that they take, is that something

2    that they have to do before they do any other testing on that

3    gun?

4    A.  Yes.

5    Q.  Okay.  So if you had not requested those swabs up front, and

6    then they had tested it for fingerprints, and then the next day

7    it matches to a homicide, would you have lost the ability --

8    A.  Uh-huh.

9    Q.  -- to possibly look for DNA related to the murder?

10   A.  Yes.  So the way they test for fingerprints is like a powder

11   oftentimes.  I'm not sure exactly how -- I've watched them on my

12   scenes and things like that do their job, so I know that the DNA

13   could be compromised by other steps of evidence collection, of

14   fingerprints and things like that.  So DNA is one of the things

15   that they would go ahead and try to exact if they are going to

16   process for DNA.

17   Q.  Up front?

18   A.  Up front.  So that's one of the things they would do first,

19   if that makes sense.

20   Q.  We talked about processing that gun for prints with negative

21   results.  In your time in patrol, or in the Ninth Mobile, or

22   maybe even in Homicide -- I don't know -- the guns that you have

23   collected in your cases, how often have you gotten a positive

24   result when attempting to get a lift -- a print off of a gun?

25   A.  I have seized and had processed -- requested hundreds of

1    guns be processed.  I have had zero fingerprints lifted off of

2    any guns.

3    Q.   Okay.

4    A.   Just because there were no identifiable prints lifted off of

5    this gun --

6    Q.   That means nothing they could read?

7    A.   Nothing they could ID is what that means.

8    Q.   Did you do any other follow-up investigation on this case?

9    A.   Yes, ma'am.  So on scene you saw me taking pictures.  The

10   next day I reviewed my pictures, and I was trying to capture

11   pictures of the dark tint on the car.  And I was looking at --

12   through my pictures and I was not happy with the pictures that I

13   got of the car, because those cameras they issue us are just --

14   I was just not happy.

15       So I knew I towed the car, so I went to our impound lot and

16   I was going to try to get better pictures during the day.  And

17   when I went down there, the car had already been towed back to

18   Enterprise.  So I figured it wasn't a big deal.  I would just go

19   to Enterprise and take a picture of the car there.  So I went to

20   Enterprise and met with their manager, which was -- you heard

21   from him yesterday, Mr. Caye.

22   Q.   Caye?

23   A.   However he pronounced his name.  And I asked him if I could

24   photograph the car, and that's when I learned that the vehicle

25   had already -- the tint had already been removed from the

```
 1    vehicle, so I was not going to be able to take pictures of the
 2    dark tint, which is what I was wanting.
 3        At that time I conducted an interview with him regarding
 4    that, what you heard from yesterday, and then I obtained the
 5    records of the rental agreement.  And that's -- that is when I
 6    learned that Mr. Brewer --
 7              MR. MEJIA:  Objection.  Hearsay.
 8              THE COURT:  Overruled.
 9    BY MS. MCKENZIE:
10    Q.  You can continue.
11    A.  Okay.  That is when I learned that it had been rented to
12    Mr. Brewer, but that's the only time that I had learned that.
13    Q.  Okay.  I have -- I think we're done opening those packages,
14    if you --
15    A.  Would you like for me to secure everything?
16    Q.  I have three photos to show you premarked for identification
17    as Government's Exhibit 15.  Do you recognize those?
18    A.  Yes, yes, ma'am, I do.
19    Q.  Okay.  What are they?
20    A.  The pictures that I did photograph -- or photographs that I
21    did take that night on scene, one of the license plate and then
22    the very blurry pictures of the car that I took.
23              MS. MCKENZIE:  Okay.  I'd move to admit and publish
24    Exhibits 15.
25              THE COURT:  The three photos are collectively
```

 1    Exhibit 15?

 2              MS. MCKENZIE:  15A, B, and C.

 3              MR. MEJIA:  No objection.

 4              THE COURT:  I see.  They will be admitted.

 5              (Government Exhibits 15A, 15B, and 15C admitted in

 6    evidence.)

 7              THE COURT:  And if I could see counsel again, please.

 8         (Bench conference on the record outside the hearing of the

 9    jury.)

10              THE COURT:  How much longer do you have on direct?

11              MS. MCKENZIE:  I don't think very much longer.  I'm

12    almost at the end of my outline.

13              THE COURT:  Like five minutes or --

14              MS. MCKENZIE:  Ten maybe, ten or less.

15              THE COURT:  Let's take a break.  They've been at it

16    for an hour and 20 minutes, and I want to try and finish with

17    this witness before the lunch break.

18              MS. MCKENZIE:  Okay.  Thank you

19         (End of bench conference.)

20              THE COURT:  Members of the jury, we're going to take a

21    morning break now, and I'm going to give you around ten minutes

22    or so.  And when you come back, we will continue with this

23    witness, and that should take us probably to the lunch break.

24    Remember not to discuss the case during the break.

25              (Jury out 11:22 a.m.)

1          THE COURT:  You may be seated.  The jury is now

2     outside of the courtroom.

3        We'll take a ten-minute or so break.  Is there anything we

4     need to discuss at this point?

5          MS. MCKENZIE:  I don't think so.

6          MR. MEJIA:  No.

7          THE COURT:  Any ballpark prediction on how long your

8     cross-examination will take?

9          MR. MEJIA:  Fifteen, 20 minutes.

10         THE COURT:  That will be fine.  I think that will get

11    us then to the lunch break.  I don't think we'll start with the

12    next witness before we let them go to lunch.  How long is

13    Detective McKinney expected to take on direct?

14         MS. MCKENZIE:  I would think 45 minutes maybe,

15    possibly an hour.

16         THE COURT:  And that is your -- he will be your last

17    witness?

18         MS. MCKENZIE:  Last witness.

19         THE COURT:  All right.  I think probably what we'll do

20    then is we'll take a -- not a brief -- I want to give the jury

21    time to eat something.  It will not be an extended lunch break

22    because we will need to break again to finalize instructions and

23    the procedure for the second portion after the close of

24    evidence, so they'll get two breaks.  So we won't go too long on

25    the lunch break.  I'll see you back in about ten minutes.

```
 1          (Recess at 11:24 a.m. until 11:45 a.m.  Jury in.)

 2              THE COURT:  Please proceed.

 3   BY MS. MCKENZIE:

 4   Q.  Detective --

 5              MS. MCKENZIE:  Actually, Your Honor --

 6   Q.  Oh, in the video clip where we saw the marijuana being

 7   unpackaged and you came in to take a photograph of it, you were

 8   handling the marijuana.  Did Diesel ever indicate on you at the

 9   scene?

10   A.  No, ma'am.

11   Q.  Okay.  Did he ever indicate on Detective Settle --

12   A.  No, ma'am.

13   Q.  -- who is in the seat?

14              MS. MCKENZIE:  Your Honor, I actually think those are

15   all the questions I have for the detective at this time.

16                          CROSS-EXAMINATION

17   BY MR. MEJIA:

18   Q.  Good morning, Detective Hogan.

19   A.  Good morning, sir.

20   Q.  When you -- of course, you've told us up to the time that

21   you saw the person at Enterprise and saw the documents that are

22   now here in evidence, up to that point you didn't know who had

23   rented that vehicle until confirmed by Enterprise the next day.

24   Would that be kind of accurate?

25   A.  Yes, sir.
```

Hogan - Cross

1  Q.  And when you first observed the vehicle coming in the

2  opposite direction of you, you weren't on a call to stop that

3  vehicle or that vehicle had not been alerted to you as a law

4  enforcement official?  In other words, you didn't have a radio

5  call "stop that car"?

6  A.  No, sir.

7  Q.  So it's correct to say that Mr. Brewer wasn't under

8  investigation prior to the moment that you first made the

9  observation that you did when it passed you in the street and

10 then the events that followed; correct?

11 A.  That's correct.

12 Q.  And when Detective Holland first saw the vehicle, as you've

13 seen here and as you've seen in prior proceedings, the first

14 thing he noticed was that it was driving an excessive rate of

15 speed.  He turned -- he was driving and you were the passenger.

16 He observed the vehicle was driving at an excessive rate of

17 speed; is that right?

18 A.  I can't testify to what he observed.

19 Q.  Right.  But he's testified to that here and he's -- you're

20 the case agent here.  You know he's testified to that today or

21 this week.  He testified to that in earlier proceedings.

22 A.  He may have observed that.

23 Q.  Okay.

24 A.  But we observed the vehicle at the same time.

25 Q.  Right.

Hogan - Cross

1   A.   But two different people observe things --

2   Q.   Of course.

3   A.   -- two different ways.

4   Q.   Of course.  And I don't mean to put you at odds with him.

5   A.   No, right.

6   Q.   But you've never testified here, nor have you testified

7   previously, nor have you ever cited Mr. Brewer for driving

8   excessive -- in excess of the speed limit?

9   A.   Correct, and it's not in my citation, you know, that he was

10  traveling at a high rate of speed.

11  Q.   And, of course, as things developed, you saw -- and we've

12  seen the exhibit here -- he did have a proper, valid driver's

13  license that night?

14  A.   Yes, sir.

15  Q.   And he also had a properly, I guess, rented, registered

16  vehicle, as you've taken a photo of the license plate and now

17  seen that it was rented by Enterprise?

18  A.   Yes, sir.

19  Q.   Okay.  And when you were there at the car, you were on the

20  right side of the vehicle and your partner, Detective Holland

21  was on the left side of the vehicle; correct?

22  A.   So I was on the passenger's side of our car initially.  I

23  didn't know there was a passenger in the vehicle, in the --

24  Mr. Brewer's rented vehicle.  So initially you see in my body

25  camera in the very beginning, I'm kind of on his side of the

Hogan - Cross

1   car.  I'm trying to ascertain what -- you know, what is going

2   on, because all the windows never came down.  So I'm trying to

3   figure out do I need to go ahead and get on the passenger's side

4   or what's going on?

5   Q.   Okay.  I think you told us that he approached the driver's

6   side --

7   A.   He did, uh-huh.

8   Q.   -- and you were on the passenger's side.  I guess I should

9   have just asked that specifically.

10  A.   Yeah, I was trying to orient the jury with --

11  Q.   Of course.

12  A.   -- what they saw in the video, because initially they see me

13  kind of behind Detective Holland, and then see me kind of go to

14  the passenger's side, so I was just trying to orient them a

15  little better.

16  Q.   And he then proceeded at some point to ask the driver to

17  roll down the window?

18  A.   Yes, sir.

19  Q.   And at that time where are you?

20  A.   When he asked Mr. Brewer to roll down the window, I am at

21  the front, I believe, of our car.

22  Q.   All right.  And at some point did you see him approach or

23  interact with the driver of the vehicle?

24  A.   Yes, sir.

25  Q.   At what point then was it that you went to the right side of

Hogan - Cross

1   the vehicle or the passenger's side and then approached then the

2   right front passenger?  At what point did you do that?

3   A.  At some point when I heard that there was dialogue going on

4   and either maybe mention of a passenger or -- I'm not exactly

5   sure --

6   Q.  Okay.

7   A.  -- what point.  I don't remember but --

8   Q.  Okay.  But at some moment in time in the sequence of

9   events --

10   A.  Right.

11   Q.  -- as they were occurring --

12   A.  Yeah.

13   Q.  -- you're at the right passenger door?

14   A.  Yes, sir.

15   Q.  And did you then open the door or did you have -- request

16   somebody to open the door?  How did that happen that the door

17   became opened at the right passenger's side, if you can tell us?

18   A.  I don't remember.  I know, first, I had -- I knocked -- if

19   you saw me, I knocked on the passenger window and had them roll

20   it down.

21   Q.  Okay.

22   A.  And that's when I began the dialogue with the passenger.

23   Q.  Okay.  You observed then that there was a right front

24   passenger?

25   A.  Yes, yes, sir.

Hogan - Cross

1    Q.   And you observed that it was a woman?

2    A.   Uh-huh.

3    Q.   And you've since learned her name is?

4    A.   Ms. Northington.

5    Q.   Ms. Northington?

6    A.   Uh-huh.

7    Q.   Okay.  And you -- by some means you made it clear you're a

8    law enforcement officer, asked her to get out of the vehicle?

9    A.   I obtained her information first.

10   Q.   Okay.  And at this time you don't know who owns the vehicle.

11   You only know who -- she's a passenger, the other fellow is a

12   driver?

13   A.   Right.

14   Q.   You don't know that it's a rented vehicle at all, not yet?

15   A.   Not yet.

16   Q.   And you don't -- and what you -- all you know up to this

17   point is that it's got very, very dark tinted windows.

18   A.   Yes, sir.

19   Q.   Okay.  Now, by what we hear there in the tape, there is an

20   exchange of words between you and she.  And you say to her, "All

21   we're -- we're trying to get guns off the street.  That's all

22   we're doing."  You say those words to her.

23   A.   And I'll place that in context for you.

24   Q.   Well, just did you say those words?  Yes or no?  And then

25   we'll put them in context.

Hogan - Cross

1    A.   Yes, I did.

2    Q.   You said those words.  Did you say to her "I stopped the car

3    for tinted windows"?  Did you say that to her?

4    A.   I don't believe I said that to her.

5    Q.   You didn't say that to her, did you?

6    A.   Uh-uh.

7    Q.   No.  And you aren't aware of the other officers, so you

8    couldn't say anything about excessive driving, because as you've

9    just told the jury, you didn't know whether it was driving in

10   excess of the speed limit or not.  That you don't know?

11   A.   No, I don't know that.

12   Q.   Okay.  So that being the case and with the tinted windows,

13   you asked her to exit the vehicle.  Right?

14   A.   Yes.

15   Q.   And you conduct a pat-down of her for weapons?

16   A.   I do.

17   Q.   Yes.  And as the sequence of events go on, prior to the

18   recovery of the firearm or of marijuana, Mr. Brewer is

19   handcuffed behind his back.  Prior to the recovery of the

20   marijuana and the gun, Mr. Brewer is handcuffed behind his back;

21   right?

22   A.   Upon a K-9 alert of the vehicle, Mr. Brewer is detained by

23   being handcuffed.

24   Q.   Okay.

25   A.   Yes.

Hogan - Cross

1   Q.  That is before the recovery of any gun or any marijuana;

2   correct?

3   A.  Yes, you can be detained, yes.

4   Q.  Okay.  So --

5   A.  Being detained and being under arrest are two different

6   things.

7   Q.  Ma'am, I'm not arguing with you.  He was handcuffed?  That's

8   the question.

9   A.  Okay.

10  Q.  Right?

11  A.  I was just making sure the jury knows the difference.

12  Q.  Well, I'll ask the question.  You'll answer the question.

13  The jury will ask questions if they have any.  Okay?

14  A.  I just didn't want to mislead the jury.

15  Q.  Ma'am, you saw -- after the dog barked, I guess we saw on

16  the video one of the officers is at the front door.  The car

17  door is open and the officer appears either to be on his knees

18  or crouched down in the manner that I am now.  Did you see --

19  the photo or the video is true and accurate, is it not?

20  A.  The video is very accurate, yes, sir.

21  Q.  Yes.  And the officer then, after the dog barks or as we

22  said K-9 Diesel alerts, an officer is in a crouched or kneed/

23  kneeled position at the location to the left of the steering

24  wheel; right?

25  A.  If it's on the video, sir, yes, then he is.

1   Q.  Well, we're just -- I'm just trying to see if the video is

2   that -- that is -- we see that in the video.  Before the

3   marijuana or the gun is seen or removed, the officer -- I'm just

4   trying to put it in context here.

5   A.  Okay.

6   Q.  He is on his knees or crouched under with his shoulders at

7   the level below the steering wheel?  That's what I'm just trying

8   to ascertain, the conduct of the officer.

9   A.  Okay.  Upon the alert of the K-9?

10  Q.  Yes.

11  A.  Okay.

12  Q.  And we see that through your body cam or through the body

13  cam of another officer.  That's your body cam -- tell me if I'm

14  wrong here.  Is that your body cam recording that?

15  A.  It could have been.  I'm just trying to figure out what --

16  in the sequence of what events?  You know what I'm saying?

17  Q.  In the sequence of before the firearm or the marijuana is

18  recovered, do we see an officer on his knees or crouched to the

19  left of the steering wheel with his elbows or arms forward

20  searching for where the dog has alerted?  That's my question.

21  A.  Did we see it on the clips?  You can play that for me and I

22  would be glad to --

23  Q.  Well, let's put it this way:  Did you see that?  Did you see

24  it or did you not?

25  A.  At some point there is an officer -- when Diesel alerts and

Hogan - Cross

```
 1    then Diesel is backed away from the car, then an officer does
 2    get down to see where he alerted to see what we need to be
 3    looking for.  So I'm not sure that the position of the officer
 4    is what you're looking for.  I'm trying to understand what
 5    you're saying.
 6    Q.  I'm asking did we see that?  And I don't want to bicker with
 7    you, ma'am.
 8    A.  Sir, I'm not trying to bicker.  I'm just trying to be very
 9    accurate.  If you want to play the video for me, I will
10    identify.
11    Q.  No, this isn't a trick.  I'm just trying to get at what the
12    facts are here.  Okay?
13    A.  So am I.
14    Q.  The officer -- who is the officer who recovers the firearm
15    and who -- and the marijuana, which officer?
16    A.  So Sergeant Adams -- that's my sergeant that was on scene --
17    he is the one that stuck his hand in like the steering wheel
18    column area where the firearm was located.  He is the one who
19    actually retrieved it.
20    Q.  Okay.  Did you with your own eyes see him remove the firearm
21    from the place where it was behind the dashboard or under the
22    steering wheel?  Did you see that with your eyes?
23    A.  Yes, I was standing right behind him.
24    Q.  Okay.  Did you see it?  Did you see him remove the cloth and
25    the firearm from under the dashboard or behind the dashboard?
```

Hogan - Cross

1    Did you see that with your eyes?

2    A.  Yes, sir, I was standing right there.

3    Q.  Okay.  Did you photograph it?  Because we haven't seen one

4    here today.  Did you photograph him removing the firearm wrapped

5    in the cloth from behind the steering wheel?  Did you photograph

6    that?

7    A.  I did photograph that.

8    Q.  Okay.  Because what we see in Exhibit 10 -- may we go to

9    Exhibit 10, please.

10         MS. MCKENZIE:  Who are you speaking to?

11         MR. MEJIA:  Brandi?  Should I use this?  I'm sorry.

12   BY MR. MEJIA:

13   Q.  I think it's placed this way.  You've explained this.  This

14   is what -- this is a photograph of what?

15   A.  Of the firearm inside the steering wheel column.

16   Q.  Okay.  And you took the photograph?

17   A.  Yes, sir.

18   Q.  Okay.  And it says here 1:06?

19   A.  Yes, sir.

20   Q.  It says 11-11, 1:06?

21   A.  Uh-huh.

22   Q.  And then we see the gloved hand and the firearm?

23   A.  Uh-huh.

24   Q.  That's at 1:07?

25   A.  Okay.

Hogan - Cross

1   Q.   Would that be accurate as to the time that was taken?

2   A.   If it's time stamped, yes, sir.

3   Q.   Okay.  And then we see the other photograph at 1:07.

4   A.   Okay.

5   Q.   Is that correct?  And was that the time, if timing is

6   accurate, when the firearm was recovered, at 1:07 a.m.?

7   A.   If the time on the camera was set, you know, just -- at an

8   accurate time, yes, sir.

9   Q.   Okay.  And according to your citation, the time of the

10  arrest is 1:00 a.m. on that date, November 11th of 2015.

11  A.   Okay.

12  Q.   Is that accurate?

13  A.   Like I said, the time could have been when the dog alerted.

14  It could have been the time that we made the stop.

15  Q.   Let me just --

16  A.   I mean, I know what it says.  I know it says 0100, but --

17  Q.   What you see there is an official document of the Louisville

18  Metro Police Department.  That's the citation, isn't it?

19  A.   Yes, sir.

20  Q.   And that's written by you?

21  A.   Yes, sir.

22  Q.   And it says the date.  What's the date?

23  A.   November 11th of 2015.

24  Q.   And it says time of arrest.

25  A.   It says 0100.

Hogan - Cross

1    Q.   0100.  Now, so according to that record, Mr. Brewer is

2    arrested at 1:00?

3    A.   That's what it says.

4    Q.   Okay.  And according to the photograph, the firearm is taken

5    from the dashboard seven minutes later at 1:07, at least

6    according to what we see here in the evidence.

7    A.   Okay.

8    Q.   Not okay.  Is that correct?

9    A.   Yes, sir.

10   Q.   Okay.  Now, can you tell the jury how long it was after the

11   initial stop that the K-9 unit, Diesel and the gentleman,

12   arrived in minutes, as best you can say?

13   A.   Within minutes.  I don't know exactly how long it was, but

14   it was within a few minutes.  We get the occupants out and then

15   we start to run them.  Like I explained earlier, we start to

16   check them for warrants and check the car, the car's

17   registration for stolen, things like that, and I was still doing

18   that when K-9 Diesel showed up.

19   Q.   And we see -- this is Exhibit 11.  Do you see that?  And

20   it's -- the time is nine minutes after 1:00?

21   A.   Yes, sir.

22   Q.   Okay.  So would it be accurate to say that the marijuana was

23   recovered two minutes after the gun was recovered?

24   A.   That's accurate.

25   Q.   Okay.  And, in fact, the way these timings work, it actually

Hogan - Cross

1    would be correctly 1:09.  And then for 60 seconds it's 1:09

2    until 61 seconds.  After that it's 1:10.  That's the way those

3    timers work; right?

4    A.  Yes.

5    Q.  Is that the way your timer works?

6    A.  Yes, sir.

7    Q.  Sixty seconds in a minute.  I'm just trying to use simple

8    math here.

9    A.  Yes.

10   Q.  So two to three minutes, two minutes or more after.

11       Now, can you tell me if -- by the way, here is the -- well,

12   you've already seen the other pictures of the marijuana.  Can

13   you tell me what the distance was or tell the jury, as best you

14   can, what was the distance in -- either by use of hands or what

15   have you between the location of the marijuana and the location

16   of the firearm in the black rag?

17   A.  I think it was just within arm's reach of both of them.

18   Q.  The length of my arm here?

19   A.  Within hand's reach.

20   Q.  Within the distance of my hand?

21   A.  Sure.

22   Q.  Six to eight inches, something like that?

23   A.  Sure.

24   Q.  Okay.  And can you tell me what depth of distance under the

25   dashboard, if you know, further in or to the left or right of

1    the firearm was the location of the marijuana, if you know?

2    A.  So the gun would have been straight in and then the

3    marijuana would have been to the left.

4    Q.  Okay.  Somewhere -- a hand's length, something like that?

5    A.  Yes, sir, uh-huh.

6    Q.  Okay.  Now, can you tell me how long it took for the officer

7    to remove either the plate -- it looks to be a plate removed, or

8    something, or a portion of the dashboard -- how long it took the

9    officer to have that removed from the plate or from the -- that

10   metal from the dashboard?

11   A.  Well --

12   Q.  How long did it take him to do that?

13   A.  Not very long, according to the time stamp that you just

14   showed me.

15   Q.  Okay.

16   A.  But I -- I can't tell you how long, but --

17   Q.  Would it have been minutes?

18   A.  Well, it couldn't have been, based on what you just told me.

19   Q.  Right.

20   A.  So --

21   Q.  It could have been up to five to seven minutes to finally

22   remove it and to retrieve the objects that we've -- in evidence

23   here?

24   A.  Well, it couldn't have been, because you showed me the

25   picture of the gun being photographed and then within two

Hogan - Cross

1   minutes the picture of the marijuana so --

2   Q.  Right.

3   A.  -- that couldn't have been possible.

4   Q.  Right -- well, right.  That took two minutes --

5   A.  So two minutes.

6   Q.  -- or more.  How long did he -- did it take for him to

7   actually -- from beginning -- from the alert by Diesel to the

8   retrieval of the firearm, how long did that take in minutes, as

9   best you can say?

10  A.  Just a few minutes as well.

11  Q.  Okay.  A few minutes.  Now, one -- well, the vehicle is very

12  dark.  You've already told us that.  It's also very dark within

13  the vehicle; correct?

14  A.  Uh-huh, yes, sir.

15  Q.  And a person -- well, a person sitting in the front seat

16  would not have the visual acuity to see that firearm where it

17  was located because there was metal, and dashboard, and steering

18  wheel between eyes and the location of that gun; right?

19  A.  I don't agree with that.

20  Q.  One could not see that gun from the front seat.  One in the

21  front seat of that car could not see that gun before it was

22  removed from where it had been placed?

23      Okay.  Let's put it this way:  As one is sitting in the

24  front seat of that car, before the gun is removed, you see

25  steering wheel.  You see dashboard.  You see instrument panel.

Hogan - Cross

1  You don't see a gun.  Is that true?

2  A.  True.

3  Q.  Same with the marijuana; right?

4  A.  True.

5  Q.  And I've asked it of several witnesses here.  Nothing in the

6  investigation revealed how long that gun was at that location.

7  Right?

8  A.  We do not know how long that was there.

9  Q.  Nothing in this investigation reveals how long that

10 marijuana was there.

11 A.  No, it does not.

12 Q.  Now, we heard the testimony of the K-9 handler yesterday.

13 What was his name again, the gentleman who testified here?

14 A.  Detective James.

15 Q.  Detective James.  He testified about tooling marks that he

16 observed on the Ford Taurus on November 12th.  Do you recall

17 that?

18 A.  Yes, sir, I do.

19 Q.  Okay.  Now, he was also there on the night of November 11th

20 with Diesel; right?

21 A.  Yes, sir.

22 Q.  Okay.  Now, the item of evidence here that you have

23 identified at Exhibit 13, that was photographed.

24 A.  Yes, sir.

25 Q.  At least what I could see of the video as we were following

Hogan - Cross

1    it, it appeared that that was retrieved from the glove box of

2    the Dodge.

3    A.   No, it was retrieved from the door -- the driver door

4    handle or the --

5    Q.   The driver's door handle?

6    A.   Not the handle, the pocket.

7    Q.   Okay.  And was that item, was that object, was that

8    inventoried by you or anybody else in this case?

9    A.   No, I just photographed it and simply made note of it.

10   Q.   Okay.  And can you tell me what you did with it after it was

11   photographed or -- well, first, let's start it this way:  Whose

12   hand is holding the photograph, if you remember?

13   A.   I don't remember.  Maybe Detective Settle.  I don't

14   remember.

15   Q.   It was a police officer though; right?

16   A.   Yes, sir.

17   Q.   So the last time we see it in this case, it is in the hands

18   of a police officer photographed by you?

19   A.   Yes, sir.

20   Q.   And what happened to that screwdriver or -- it looks to be

21   what we carpenters call an awl.  What happened to that?

22   A.   We left it in the vehicle, and then it was towed back to

23   Enterprise and the contents released back to Mr. Brewer, from

24   what I know.

25   Q.   Okay.  So it was towed on the night of November 11 and taken

1    to the Enterprise or taken to a police impound?

2    A.   Yes, sir.  So it was towed to impound, our impound lot, and

3    then Enterprise has their own tow company they contract out to

4    come get their vehicles.

5    Q.   Okay.  And can you tell me how long later, if you know from

6    all the information in the investigation, when Enterprise

7    retrieved the vehicle?

8    A.   That next morning.

9    Q.   Okay.  And that awl, screwdriver, or object, that wasn't

10   located in the Ford Taurus on November 12th, was it?

11   A.   I have -- I cannot speak to that stop.

12   Q.   Right, that's right, but you're the case agent.  Can you

13   tell us if it was seen, located, or inventoried?  You'd know

14   that, if it had been obtained on November 12th, wouldn't you?

15   A.   I'm the case agent for November 11th stop so --

16   Q.   Excuse me.  I thought you were the case agent on the whole

17   case.  You're not the case agent here?

18   A.   I was present -- I am the case agent for November 11th,

19   2015.

20   Q.   Okay.  So at this point then, we don't know -- we have no

21   evidence that this object -- where it was on November 12th?  We

22   just have no idea?

23   A.   I'm not sure if it was there or not.

24   Q.   Okay.

25   A.   You crossed that witness yesterday so --

Hogan - Cross

1    Q.   Okay.  Do you have the exhibit which is the marijuana,

2    Exhibits 1 and 2?

3    A.   Yes, sir, I do.

4    Q.   Do you have those?  And you showed those to the jury as

5    well?

6    A.   I'm sorry.  What did you say, sir?

7    Q.   You held those -- did you show that to the jury?

8    A.   Yes, sir, I did.

9    Q.   All right.  Now, I think you were also asked how many

10   individual packages there were and you said nine?

11   A.   Yes, sir, I counted them.

12   Q.   Okay.  Can you tell me whether in this investigation any

13   steps were taken to weigh any of those nine individual packages?

14   A.   I'm not sure if they were weighed at the property room, or

15   if they just weighed them as it came in as one, or if they

16   weighed them individually.  I'm not sure.

17   Q.   Okay.  Can you tell me whether the marijuana itself was ever

18   weighed for --

19   A.   I'm sure it was.

20   Q.   -- that weight?

21   A.   I'm not sure.  Do you want me to tell you what this says?

22   Q.   Well, just say yes or no, whether it was ever weighed, and

23   then we'll go from there.

24   A.   Okay.  There appears to be a weight on here.

25   Q.   Okay.

Hogan - Cross

1   A.  So it appears, yes.

2          MR. MEJIA:  May I approach the witness?

3          THE COURT:  Yes.

4   BY MR. MEJIA:

5   Q.  May I see that?

6   A.  Yes.  I'm looking at this, so I don't know if that's like

7   everything or -- I don't know how that is.

8   Q.  Are you aware of any lab report where anyone with training,

9   knowledge, or experience weighed the actual substance itself,

10  the suspect marijuana?

11  A.  I'm not.

12  Q.  Okay.  Now, can you see that -- did you observe that night

13  or do you observe today that these nine separate packs or

14  portions of marijuana -- why don't you, if you can, if you have

15  the gloves to show those again to us.

16  A.  Sure.

17  Q.  So we can see the nine separate --

18  A.  Can you get me some gloves, please?  I don't have any more.

19          MR. MEJIA:  Of course.

20          THE WITNESS:  Thank you.

21  A.  Sir, would you like for me to pull out all the baggies

22  again, sir?

23  Q.  Yes, just so that the jury can get a look at the -- just how

24  much marijuana it is.

25  A.  Sure.

Hogan - Cross

1   Q.  And the individual -- one individual pack, if you can get it

2   out.

3   A.  Sure.  So this was -- this one was by itself.

4   Q.  Okay.

5   A.  It was found in a different location so --

6   Q.  Yes.  You have the black container and that black container

7   has nine individual packs?

8   A.  Yes.

9   Q.  Let's see that.  And then that -- nine individual packs in

10  there?

11  A.  Yes, sir.  So it's actually in like two sandwich baggies.

12  So this is the first -- like one sandwich baggie.  This is the

13  second one.  And then do you want me to just lay them out?

14  Q.  Just one.

15  A.  Oh, just one, okay.

16          THE COURT:  Make sure when you're asking her to hold

17  it up that everyone on the jury is able to see.

18  Q.  Yes, I'd like for you to hold it up so that all the jury can

19  see.

20      I'm wondering could she walk in front of the jury and show

21  it to them?

22          THE COURT:  Any objection?

23          MS. KEEL:  We don't object.

24          MR. MEJIA:  I just want -- if they all --

25          THE COURT:  That's fine.

Hogan - Cross

1          MR. MEJIA:  Can you-all see it?

2          THE COURT:  The witness may step down in order to hold

3  up the evidence.

4          MR. MEJIA:  Okay.

5      [Witness exited witness stand.]

6          THE COURT:  That's fine right there.

7          MR. MEJIA:  Thank you very much.  Thank you.

8          THE WITNESS:  Go back?

9          MR. MEJIA:  Yes, please.

10  BY MR. MEJIA:

11  Q.  Would the amount -- if you know from your training,

12  experience, or knowledge as a police officer, can you tell us

13  whether the amount that you held in your hand there, that

14  individual pack, would be an amount that would be consistent

15  with putting in a bowl to smoke, if you have any knowledge of

16  that?

17  A.  I have no idea.

18  Q.  Do you know what the word blunt is?

19  A.  I know what the word blunt is.

20  Q.  Isn't that where somebody takes a cigar, empties it out and

21  puts marijuana in it and --

22  A.  Sure.

23  Q.  -- reseals it?  Would that be an amount consistent with a

24  blunt, if you know?

25  A.  I don't know.

 1   Q.  I don't mean to put you on the spot.  Do you know whether

 2   each of those is an amount for individual use, if you know that?

 3   A.  I don't know.

 4   Q.  Don't know that either?  Okay.  I think you were asked

 5   earlier whether or not -- well, let me ask you this, if you're

 6   aware of it -- whether the amount that you've shown is an amount

 7   that would be -- have a lighter or match lit to it and it would

 8   be inhaled like a cigarette?  Would that be an amount that you

 9   have in front of you for -- and for inhaling, smoking and having

10   marijuana, if you know, the amount to which you showed, the

11   individual -- one of the nine packs?  Would that be an amount

12   that would be smoked, if you know?

13   A.  I'm sure it's --

14   Q.  Okay.  I'll withdraw the question.  You were asked whether

15   or not there were any other objects found there.  Was there any

16   cigars found?

17   A.  No, sir.

18   Q.  Was there any pipes, or bowls, or things like that found?

19   A.  No, sir.

20   Q.  Okay.  You've testified -- you can put those down now.

21   Thank you very much.

22       You were asked about the cell phones, and you said that

23   there were cell phones that were recovered, seven of them?

24   A.  Yes, sir.

25   Q.  And at a later time, you took further steps with the cell

1   phones to seek permission to search those cell phones?

2   A.   Uh-huh, I did.

3   Q.   And of the seven cell phones, actually two of them were in

4   operation, five were not.  Isn't that correct?

5   A.   I would have to review the downloads.  I'm not sure exactly.

6   I know there were some that were not operable, but I'm not

7   exactly sure how many.

8   Q.   Right.  But there weren't -- there were not seven operating

9   cell phones?

10   A.   That would probably be fair to say.

11   Q.   Okay.  And the application that you made to search the cell

12   phones was directed at two of them that were operating, and had

13   phone numbers on them, and had calls to and from them, and you

14   sought permission to search those cell phones, two of them?

15   A.   I don't know how many, sir.

16   Q.   Nevertheless, you did conduct a search of those cell phones?

17   A.   That's correct.

18   Q.   Okay.  The money was photographed.  You see it there?

19   A.   Yes, sir.

20   Q.   With the driver's license in the first photo.

21   A.   Uh-huh.

22   Q.   And then the money was spread and it appears to be what we

23   have in front of us there; correct?

24   A.   Yes, sir.

25   Q.   Okay.  I'm going to -- I don't know how clear this is for

Hogan - Cross

1   the jury.  I think I'll ask to approach you and we'll do this.

2        I think we have a clearer picture here, but the $100 bills

3   are here and the $20 bills are there; correct?  Do you see that

4   there's one, two, three, four, five, six, seven, eight, nine --

5   I'm sorry.

6   A.  No.

7   Q.  Let me go the other direction.

8   A.  I think there's only four 100's, I thought.

9   Q.  Yes, let's look at the 100's.  Yes, tell the jury if that's

10  correct.

11  A.  That's not correct.

12  Q.  Is there four 100 bills?

13  A.  Those are tens.

14  Q.  How many $100 bills are there?

15  A.  Can I refer to the other?

16  Q.  Sure, of course, yes.

17  A.  So there's only four $100 bills.

18  Q.  Right.  And do you see the picture of Benjamin Franklin on

19  that?

20  A.  Yes.

21  Q.  Okay.  And do you see that they appear to have a fold in

22  them as if they were folded together, those 100 dollar bills?

23  And do you see that those are $100 bills that have that banker's

24  -- the treasury stripe across them?  Do you see that as well?

25  A.  Yes.

Hogan - Cross

1    Q.  Can you look closely enough -- because I tried to and I did

2    see that I could actually make out the numbers and that those

3    are in banking sequence, at least three of them.  Do you see

4    that, if you look at the end numbers on them?

5    A.  I can't tell from this copy.

6    Q.  Let me read them to -- and let me see -- to you and see if

7    you agree with me.

8    A.  Okay.

9    Q.  The last three numbers in sequence are 9960, 9970, and then

10   the third one is not seen, and then the fourth one is 1500.  So

11   let me see if you agree with 9960 and 9970?  Do you see those?

12   A.  Yes, I see those.

13   Q.  And in your experience when money is in sequence like that,

14   that's the way it's received from a bank.  Is that your

15   experience?  Tell me if you recall -- now, the time that this

16   money is photographed is November of 2015.  Do you remember that

17   it was 2014, the year before, that these new $100 bills came

18   into circulation with the treasury stripes and the enlarged

19   picture of Benjamin Franklin?

20   A.  I don't remember that.

21   Q.  And then through '15 -- through '14 into '15, we have two

22   different kind of $100 bills.  These are all the new ones, but

23   they're in sequence, at least as far as we can see here?

24   A.  I don't remember.  I don't carry 100's.

25   Q.  You're not aware of that?

Hogan - Cross

1   A.  No.

2   Q.  Now, I've asked this to the other officer and I'll ask you

3   as well.  You also are a named defendant in the civil rights

4   suit filed by Mr. Brewer.

5   A.  I am.

6   Q.  And that case is pending in the U. S. District Court, this

7   courthouse?

8   A.  It is, sir.

9   Q.  And in addition to November 11th, you -- November 11th of

10  2015, you had a second interaction with Mr. Brewer on April 21

11  of 2016?

12  A.  I was a backup officer on a stop.

13  Q.  Let me --

14  A.  If that's what you're referencing.

15  Q.  Yes, I am.  Do you see --

16          THE COURT:  Is there an objection?

17          MS. MCKENZIE:  I just -- I haven't seen what he's

18  showing the witness.

19  A.  This is not me.

20  Q.  Of course.

21  A.  This is not me.  My name was never on a citation when I was

22  a backup officer and that citation is not me.

23          MR. MEJIA:  One moment.

24      (Counsel conferring off the record.)

25  BY MR. MEJIA:

Hogan - Cross

1    Q.   Excuse me.  I think I'm showing you the wrong document.

2    Excuse me.

3    A.   At least I don't remember my name being on a citation when I

4    was a backup officer.

5            MR. MEJIA:  I'm sorry.  I withdraw that, Judge.  I

6    think I showed her the wrong document.  I apologize for that and

7    I withdraw that, Judge.  I'm sorry.

8    Q.   April 21 of 2016, let me see --

9            MS. MCKENZIE:  May I see that document?

10           MR. MEJIA:  Of course.

11   BY MR. MEJIA:

12   Q.   Does your name appear on that April 21, 2016 citation?

13   A.   It does.

14   Q.   And I'll ask you some questions on that now.

15   A.   Okay.

16   Q.   Thank you.  You were with another officer.  What was the

17   officer's name on this citation?

18   A.   Detective Mosley.

19   Q.   And Detective Mosley's name is before yours.

20   A.   Uh-huh.

21   Q.   So he's the case agent and you're the officer with him on

22   this matter?

23   A.   Yes, sir, I was the backup officer.

24   Q.   And that was at 27 minutes after midnight on April 21, 2016,

25   you had interaction with Mr. Brewer.

```
1    A.   Limited interaction but, yes, I was there.

2    Q.   And he was charged with excessive window tint on that day?

3    A.   If that's what it says.  I really don't remember too much of

4    that stop.  I mean, I saw the citation.

5    Q.   Was he charged with excessive --

6    A.   I mean, he was but --

7    Q.   Thank you very much.

8    A.   -- don't remember too much of it.

9    Q.   And you're also aware that that charge was dismissed by --

10   on the date of April 21, 2018?  You're aware of that?

11   A.   Because he was in federal custody.

12   Q.   And that too is included in the lawsuit against you and the

13   other officers?

14   A.   Uh-huh.

15   Q.   Right?

16   A.   Yes, sir.

17        MR. MEJIA:  Thank you very much.

18        MS. MCKENZIE:  Mr. Mejia, what was the court case

19   number for that?

20      (Counsel conferring off the record.)

21        THE COURT:  Do we need to take a break?

22        MS. MCKENZIE:  No.

23      (Counsel conferring off the record.)

24                  REDIRECT EXAMINATION

25   BY MS. MCKENZIE:
```

Hogan - Redirect

1    Q.   Detective Hogan, do you know why that 2016 tint charge was

2    dismissed?

3    A.   The 2016 tint charge?

4    Q.   Yes, the one from the May 21st, 2016 stop that Mr. Mejia

5    just asked you about.

6    A.   Not sure about that one.

7    Q.   I'm sorry.  April 21st, 2016.  He just asked you about a

8    charge.

9    A.   I'm not sure exactly on that one, if it was rolled and it

10   kept being rolled because he was in federal custody.

11   Q.   Okay.

12   A.   I know that's why many of them were.

13   Q.   If you looked at the docket sheet, would it refresh your

14   recollection about why it was dismissed?

15   A.   Yes, ma'am.

16   Q.   Does that refresh your recollection?

17   A.   Yes, ma'am.

18   Q.   Why was it dismissed?

19   A.   Because he was in federal custody.

20   Q.   Okay.  Thank you.  I want to rewind.  Mr. Mejia asked you

21   about a statement you made to Ms. Northington, the passenger of

22   that vehicle, when you get her out of the car.

23   A.   Yes.

24   Q.   You did not say you have excessive tint on your windows.

25   A.   Right.

Hogan - Redirect

1    Q.  You said something about getting guns off the street, and

2    you attempted to put that into context.  Can you now put that

3    into context?

4    A.  Sure.  The reason I was telling her that is because I was

5    trying to kind of calm her down, because I knew as I was getting

6    her out -- as you-all saw in the video, there was tons of

7    officers back there, so I was trying to let her know, basically,

8    this is what our unit does.  We get guns off the street and

9    trying to prep her for you're about to see a bunch of officers,

10   basically.  So this is what we're doing.  This is what our unit

11   does.  We respond to violence and we get guns off the street, so

12   to kind of calm her down so she knows, hey, I don't have a gun

13   on me or I'm not out here doing a bunch of violence.  I have

14   nothing to worry about.

15       I used that as a deescalation technique when I was in that

16   unit all the time.  So it just kind of calmed people down and

17   put them at ease.

18       So when she got out of the car, she was just like, well, I

19   know I'm not toting guns or committing violence, so she just

20   kind of calmed down.  And I would want to be treated that way,

21   so I tried to treat other people that way, so that's what I --

22   that's my point for saying that to her.

23       It wasn't a justification for the stop.  It wasn't the

24   reason we stopped them.  It was just, basically, hey, you're

25   about to see a bunch of police back here.  I want to just calm

1    you down and just let you know this is what we're out doing.

2    This is the purpose for our unit, jut put her at ease a little

3    bit.  So that was my purpose for saying that.

4    Q.  Okay.  I want to rewind to the discussion about the time

5    stamps on the photos compared to the time that is listed on your

6    arrest citation.  Was Mr. Brewer placed under arrest before or

7    after the gun and the drugs were found?

8    A.  He was detained upon the alert of the dog, but he was not

9    under arrest.

10   Q.  Okay.  Let's assume a different scenario.  If the dog had

11   alerted on the car and you had not found a gun and drugs in that

12   car -- you had found no contraband, nothing dangerous -- would

13   Mr. Brewer have then been released --

14   A.  Yes.

15   Q.  -- from those handcuffs and sent on his way?

16   A.  Absolutely.

17   Q.  Okay.  At the Louisville Metro Police Department, are you

18   subject to any sort of regular or ongoing training?

19   A.  Yes.

20   Q.  Okay.  Does the police department train you on new

21   developments or the current state of Fourth Amendment law?

22   A.  Uh-huh.

23   Q.  When you can search, seize, detain?

24           MR. MEJIA:  Object.  May we be heard?

25           THE COURT:  Please.

Hogan - Redirect

1      (Bench conference on the record outside the hearing of the

2   jury.)

3           MR. MEJIA:  I'll be happy to litigate the Fourth

4   Amendment issue, if she wants to do that, but what does this

5   have to do with my cross-examination?

6           MS. MCKENZIE:  Well, I think this was probed quite a

7   bit on cross-examination, and Mr. Mejia seemed to be suggesting

8   that Mr. Brewer was arrested because of the time on the citation

9   after the contraband was found.  And I'm trying to establish

10  that this officer --

11          THE COURT:  You mean before?

12          MS. MCKENZIE:  -- or before the contraband was found.

13  I'm just trying to establish that the officer knows that that is

14  bad, that that is something that they're trained on, so that the

15  jury doesn't walk away with the impression that these are --

16          THE COURT:  I think she testified that he was

17  detained.  And she made a point of pushing back on Mr. Mejia's

18  question on the difference between arrest and detention, and she

19  testified, if memory serves, that he was detained upon the K-9

20  alerting on the car.  That's before the contraband was located

21  but after reasonable suspicion was demonstrated; correct?  Is

22  that not how she testified?

23          MS. MCKENZIE:  Uh-huh.

24          THE COURT:  Well, then why do we need to go over that

25  again?

Hogan - Redirect

```
 1              MS. MCKENZIE:  I'll move on.
 2              THE COURT:  All right.  While you are up here, your
 3    20-minute prediction was a little off.
 4              MR. MEJIA:  I know it was.  I'm sorry.
 5              THE COURT:  How much longer?  I need to get the jury
 6    to lunch.
 7              MS. MCKENZIE:  Ten minutes or less.
 8              THE COURT:  My preference is to finish with the
 9    witness, rather than --
10              MS. MCKENZIE:  Yeah.
11              THE COURT:  Okay.
12         (End of bench conference.)
13    BY MS. MCKENZIE:
14    Q.  Has Mr. Brewer filed a complaint, to your knowledge, against
15    you either with the Professional Standards Unit or the Public
16    Integrity Unit for anything related to this stop?
17    A.  No, ma'am.
18    Q.  For anything related to the April 2016 stop?
19    A.  No, ma'am.
20    Q.  When you're in the Ninth Mobile, was your nightly routine to
21    be out patrolling, looking for violations, conducting traffic
22    stops similar to what we've seen and heard about?
23    A.  Yes, ma'am.
24    Q.  Okay.  In the course of all those traffic stops, did you
25    ever stop a car for a traffic violation and Diesel was not
```

Hogan - Redirect

1    available or working another scene?

2    A.  Yes.

3    Q.  Okay.  Was there ever a situation where you had stopped a

4    car and you couldn't get a dog there reasonably quickly, so you

5    had to just write a traffic violation and send somebody on their

6    way?

7    A.  Yes.  If the dog can't get there in a reasonable amount of

8    time for you to complete your investigation, then you cannot

9    hold those people until the dog can get there.  That is

10   unreasonable and they cannot be held, and that's a violation of

11   their rights, so you cannot do that.

12        So, yes, there's many times where Diesel was tied up or

13   another K-9 was unavailable, so you have to let the person go.

14   You cannot just hold them there for -- just to wait for a dog.

15   You have to complete your investigation and then, if the dog's

16   not there, then you have to let them go.

17   Q.  So did you write a fair number of traffic tickets as a Ninth

18   Mobile detective?

19   A.  Yeah.

20   Q.  When did you first learn of Mr. Brewer's lawsuit against

21   you?

22   A.  Sometime in January, beginning of 2016.

23   Q.  Okay.  After the arrest?

24   A.  Uh-huh.  Well, obviously, yeah.  Well, after the arrest.

25   Q.  When did you learn of Mr. Brewer's other contact with the

1    police and other lawsuits?

2    A.  It wasn't until after I learned that we were being sued that

3    he had had other prior contact, civil contact with police.

4    Q.  Okay.

5    A.  I have no way of knowing that.

6         MS. MCKENZIE:  Detective Hogan, I thank you.  I don't

7    have any further questions for you at this time.

8                         RECROSS-EXAMINATION

9    BY MR. MEJIA:

10   Q.  When you said to the passenger, "We're out here trying to

11   get guns off the street," you've explained why you said it.

12   A.  Uh-huh.

13   Q.  It was the truth.  You were trying to get guns off the

14   street.  That was the truth, wasn't it?

15   A.  Absolutely.

16        MR. MEJIA:  Nothing more.

17        THE COURT:  You may step down.

18        THE WITNESS:  Thank you.

19        THE COURT:  Members of the jury, we're going to take

20   our lunch break now.  I'm going to give you-all until 1:30.

21   That's about 47 minutes and we will -- the lawyers and I will be

22   eating quickly and doing some work during the lunch break, and

23   so we expect to start back at about 1:30.  Remember not to

24   discuss the case with each other or with anyone else.

25        (Jury out 12:44 p.m.)

1    THE COURT:  The jury has now left the courtroom.  I'm

2  going to give you-all about 20 minutes or so to grab a bite and

3  get organized, and then we will have our follow-up discussion on

4  the instructions.

5    I had hoped we would be done with the Government's case by

6  now, but, obviously, we have one more witness.  That witness may

7  or may not change a couple of things with respect to the draft

8  instructions, but we will send out to you another updated near

9  final draft that incorporates the changes we discussed this

10  morning.  There may be one or two more items for us to discuss,

11  and then I'll come out in 20 minutes, 25 minutes or so, and I'll

12  give you-all some rulings on the objections that are

13  outstanding.

14    I'll probably also have for you at that time a couple of

15  redacted indictments to send back with the jury at the close of

16  the case.  Any questions?  Anything else we need to be prepared

17  to discuss?

18        MS. MCKENZIE:  I don't believe so, Your Honor.

19        THE COURT:  So you'll finish with Detective McKinney.

20    And, Mr. Mejia, do you anticipate needing a break after the

21  Government closes its case?  I know you'll want to make your

22  motion.

23        MR. MEJIA:  Yes, sir.

24        THE COURT:  But will you need a break to make your

25  decision on your next step at that point?

1          MR. MEJIA:  I'd like ten, 12 minutes, if I can have

2     it.

3          THE COURT:  That'd be fine, that'd be fine.  Thank

4     you.  I'll see you in a few minutes.

5          (Recess at 12:46 p.m. until 1:39 p.m.  Jury out.)

6          THE COURT:  We're back on the record and the jury is

7     not in the courtroom.  This work on the instructions took just a

8     few minutes longer than we anticipated, but I think we are now

9     in a position to get to a near final version of the

10    instructions.  You-all received the updated instruction

11    packages, did you not?

12         MR. MEJIA:  Yes, sir, I have them.

13         MS. KEEL:  Yes.

14         THE COURT:  So, first, let me ask you about the

15    redacted indictments.  We did the best we could to remove the

16    references to Count 1 from the indictment that will go back with

17    the jury at the close of proof.  Does this version meet with

18    your approval?

19         MR. MEJIA:  Yes, sir.

20         MS. KEEL:  Yes, Your Honor.

21         THE COURT:  And then we can talk more about it later.

22    I'm not going to spend a lot of time now talking -- I'm not

23    going to spend any time now talking about Count 1, but we did

24    the same thing with it.

25         So let's take up the outstanding issues with respect to the

1    jury instructions.  First of all, with respect to the phrase in

2    Count 1 and the reference -- the related reference -- I'm

3    sorry -- Instruction 1 and the related reference in Instruction

4    24 with respect to the defendant's position, that has been

5    removed from the current jury instructions and it was not

6    objected to.  But after reviewing the pattern jury instructions

7    and looking at, in particular, the use note to Instruction 1,

8    that reference is generally only to be included when the

9    defendant has raised a defense that requires some explanation,

10   like an alibi, entrapment, insanity, or self-defense type

11   defense, and so we don't have that scenario here, Mr. Mejia.

12        So what I'm concerned about is not just technical precision.

13   What I'm concerned about is having that reference and then

14   having the jury say, "There was no explanation.  The judge's

15   instruction said that there would be, but there isn't."  So let

16   me get your thoughts on that.

17             MR. MEJIA:  Judge, that -- I'm not familiar with that

18   line of case law, but it would make sense, where the defendant

19   interposes an affirmative defense of compulsion, self-defense,

20   you name it, that it would be a defense theory, so to speak,

21   and --

22             THE COURT:  With an attendant instruction.

23             MR. MEJIA:  Yes.

24             THE COURT:  And I think that's what's contemplated

25   here.

1          MR. MEJIA:  Yes, sir.

2          THE COURT:  Nothing I have said is to suggest that

3    there is no defense to be made to the charges.  It's simply that

4    there is no recognized defense requiring an attendant

5    instruction that I am aware of at this point.

6        Now, obviously, that could change during the balance of the

7    trial, but that's my concern is that we are creating an

8    expectation that will not be met, and therefore, it may be

9    better to follow the advice of the use note and leave it out.

10         MR. MEJIA:  I agree.

11         THE COURT:  Then we will -- let's see -- move on to

12   the next issue.  Let's look at Instruction Number 18.  That's on

13   page 22 of the current draft.  That's the on or about

14   instruction that, Mr. Mejia, you had objected to during our

15   conference this morning.

16       I've looked at that and, of course, since our morning

17   conference we've heard more testimony.  My conclusion is that

18   the instruction is appropriate based upon the testimony we've

19   heard thus far in the case.

20       The incidents in question occurred at night, and I -- absent

21   this instruction, I would be concerned that there might be some

22   confusion by the jury as to the -- whether the stop occurred on

23   either side of midnight.  And so I think this instruction, which

24   is routinely given and consistent with the law, is appropriate,

25   and so I'm going to overrule the objection and give Instruction

 1    Number 18.

 2        That takes us then to a question that I have for you-all

 3    regarding Instruction Number 19, which is on the very next page.

 4    In the last paragraph there is a phrase we did not talk about

 5    this morning, but it reads:  "You may also consider the natural

 6    and probable results of any acts that the defendant knowingly

 7    did," and then bracketed is the following phrase:  "Or did not

 8    do."  And so my question for you-all is, what is each side's

 9    position with respect to the bracketed optional language?

10        The commentary would suggest that in the absence of evidence

11    probative of a failure to act on the part of the defendant, the

12    language is not included.  So unless the Government -- I think

13    it would be incumbent upon you to tell me where there is

14    evidence probative of a failure to act.  I don't think this is

15    that type of case.  And so in the absence of that evidence

16    produced at trial thus far, I don't see this language staying in

17    there.

18            MS. MCKENZIE:  I don't have an issue with that.

19            THE COURT:  So then without objection, Mr. Mejia,

20    unless you see some reason to leave it in there --

21            MR. MEJIA:  I do not.

22            THE COURT:  -- we will take the bracketed language "or

23    did not do" out of the second line of the fourth paragraph in

24    Instruction Number 19.

25        That takes us to the very next page, Instruction Number 20.

```
 1    This is the deliberate ignorance instruction to which,

 2    Mr. Mejia, you objected.  I have looked carefully at this.  I've

 3    looked at the use note to the pattern instruction, and I

 4    conclude, basically, from the testimony that we've heard through

 5    the trial up until now, my conclusion is that the instruction is

 6    appropriate.

 7        I think the testimony elicited, particularly on

 8    cross-examination is to the effect that -- is to underscore the

 9    lack of connection between the defendant and the contraband.

10    And so I think that implicates this instruction, so I'm going to

11    overrule the objection and give Instruction Number 20.

12        That takes us back to the issue that we spoke about at

13    length this morning with the verdict form, the 924(c) issue.  I

14    think we gave you both this morning a copy of the Sixth Circuit

15    case U.S. v. Smith, which is a 2000 Sixth Circuit case, 182 F.3d

16    452.  The opinion happens to be drafted by our neighbor, Judge

17    Boggs, across the hall here, and it provides -- it is cited in

18    the relevant section of the commentary to the Sixth Circuit

19    Pattern Instruction 12.03, and I believe it's dispositive of the

20    issue that we have here.

21        In essence, an inconsistent verdict is tolerated by the

22    courts.  And so should the jury here choose not to convict

23    Mr. Brewer of either of the substantive marijuana counts, they

24    may still choose to convict him of the 924(c) count.  And that

25    is permitted by the teaching of this opinion, which relies upon
```

1   the Supreme Court case of *U.S. v. Powell*, which -- and in the

2   *Smith* case, Judge Boggs says specifically:  "A jury verdict will

3   not be overturned simply because it is inconsistent or because

4   the jury acquitted a defendant of a predicate offense" and cites

5   *U.S. v. Powell* from the Supreme Court, and states affirmatively

6   that we also hold that Section 924(c) does not require a

7   conviction for the predicate offense.

8       So I understand how that might appear at first blush to be

9   inconsistent, but that's the clear holding.  I believe I

10  understand it and so from that I can only conclude that the

11  verdict form is properly is prepared now, and the related

12  instructions that explain to the jury how they are to go through

13  each count are consistent with that holding.

14      So is there anything else to be discussed there?

15          MS. KEEL:  No, Your Honor.

16          MR. MEJIA:  Just so that I'm not committing either

17  ineffective assistance of counsel or waiver, what I'll do is

18  supply to Your Honor what I would submit would be the

19  appropriate verdict form, which would be, if you find not guilty

20  as to Count 2 or guilt of the lesser included, go no further and

21  -- on Count 3 and proceed to Count 4 so that that would

22  effectively be a defense tendered instruction.

23      Robin's here with me and I don't have a typist at hand --

24          THE COURT:  I don't think it's necessary for you to

25  actually submit a form.  I think you have now made your

1   objection.

2             MR. MEJIA:  Thank you, sir.

3             THE COURT:  I think the record is clear that your

4   preference would be that the verdict form, essentially, say that

5   if the jury acquits on counts -- on Count 2 and on the lesser

6   included offense there, that they are to skip Count 3,

7   essentially.

8             MR. MEJIA:  Yes, that's right.

9             THE COURT:  So I think my ruling is consistent with

10  the prevailing authority, and so I think the record is made

11  here.

12      Anything else we need to discuss with respect to the

13  instructions to be given at the close of the case with respect

14  to Counts 2, 3, and 4?

15            MR. MEJIA:  No, sir, not here.

16            MS. KEEL:  Nothing for the United States.

17            THE COURT:  As I said earlier, once we get done, I

18  will have a draft, a near final, since it's pretty standard on

19  the felon in possession count.

20      We will also pass along a draft, again, what I would refer

21  to as a transitional instruction that I will give the jury

22  explaining that while they have now reached a verdict on Counts

23  2, 3, and 4, there remains work to be done with respect to Count

24  1, and I'll go over all of that with you.  I suspect we'll have

25  adequate time once the jury retires to deliberate on Counts 2,

1    3, and 4.

2        We'll also take some time, once the Government closes its

3    case -- I think you had asked, Mr. Mejia, for a few minutes at

4    that point, so we'll take another break.  Anything else at this

5    point before we bring the jury in?

6            MR. MEJIA:  I do have a request.  It's come to my

7    attention that there is a Kevin McKinney who has been subject to

8    some discipline for unprofessional conduct.  I'd ask, if the

9    Government is aware of any impeaching material, or any evidence,

10   or any material that bears upon his credibility, that I be --

11   that it be identified and disclosed to me.

12           THE COURT:  Ms. McKenzie, I trust that's what you're

13   looking for.

14           MS. MCKENZIE:  I am, Your Honor.  And the United

15   States had previously reviewed records related to this issue for

16   each of the testifying officers and did not determine that there

17   was anything provided in those records from the agencies that

18   would qualify as Giglio material.  However, if -- since the

19   issue has been raised, I have the department's response related

20   to Detective McKinney.  I would be happy to provide that for the

21   court to review.

22           THE COURT:  Let me have it.

23           MS. MCKENZIE:  And for the court to determine whether

24   Your Honor believes it's subject to disclosure.

25           THE COURT:  So what's the Government's position with

1    respect to these matters?

2         MS. MCKENZIE:  The Government's position is that there

3    is no -- there is no Giglio material to disclose.  There is

4    nothing that I have that bears on Detective McKinney's character

5    for truthfulness.  There is nothing that I have that could be

6    used to impeach Detective McKinney's testimony in this case, and

7    there's nothing that I have that would qualify as Brady material

8    that would negate an element of the offense or mitigate

9    punishment.

10        THE COURT:  Yeah, I agree there's -- from this single

11   page you've given me, which is an LMPD Professional Standards

12   Unit form listing Complaint and Disciplinary History, there's

13   nothing here that could qualify as Brady material.

14     In terms of Giglio, it doesn't appear anything significant,

15   but there -- why don't I see counsel at the bench.

16     (Bench conference on the record.)

17        MS. MCKENZIE:  If it would help, Your Honor --

18        THE COURT:  Does the Government object to me

19   describing the one finding in here for Mr. Mejia?

20        MS. MCKENZIE:  Sure, that's fine.

21        THE COURT:  Mr. Mejia, on this form, there appears to

22   be only one section that has something to do with court

23   attendance, which would be a rather minor and typical

24   infraction.  Nothing else in here results in any findings.

25     So what I would like to know is what difference it makes if

```
 1    Mr. Mejia knows -- he now basically knows -- but knows about
 2    that one issue?  Is it your position that that is not Giglio?
 3          MS. MCKENZIE:  It is, Your Honor.  He does know now
 4    and I would ask that the court -- I would move in limine to
 5    exclude any questioning of Detective McKinney on any of that,
 6    because I don't think that it fits within the evidentiary rules
 7    on character for truthfulness or any of the other rules
 8    regarding impeaching a witness.
 9          THE COURT:  You're probably right.
10       What's your position there, Mr. Mejia?
11          MR. MEJIA:  Well, when an expert testifies to matters
12    beyond the ken of the jury because of education, training,
13    experience, if they have been shown in some manner to be
14    deficient or lacking in gaining that professional experience,
15    knowledge, training, then I think we're in the ballpark.
16       If he's late for court and he's disciplined because he
17    doesn't show up -- you know, maybe he's got a sleeping problem,
18    but I agree with counsel.  That's not impeaching and that's not
19    Giglio.  I wouldn't go into the fact that the guy's late for
20    court.  That hardly matters.  I'll trust what Your Honor has
21    described.
22          THE COURT:  I see nothing else here but that and it
23    did not result in -- it did not result in discipline.  It
24    resulted in counselling by a superior officer, and it appears
25    that it was ten years ago.
```

1          MR. MEJIA:  Okay.  No, because what I have is

2    apparently a 2012 matter.  It may be a different officer.  This

3    is *Settles v. McKinney* on claims that are excessive force

4    against McKinney and an Officer Wright, failure to intervene on

5    McKinney, false arrest on McKinney in his individual capacity,

6    but, again, this has just come to my attention.

7          THE COURT:  And me.  I'm looking here what is

8    essentially an in camera review of this, as I described it, LMPD

9    PSU disciplinary history form, and the only finding that

10   sustained a complaint is the one I described.

11      Now, that does not mean and I am not telling you nothing

12   else was ever raised, but there is no other finding resulting in

13   discipline other than the court attendance resulting in

14   counselling, which I would not describe -- typically describe

15   that based on my understanding as discipline.  So there is no

16   other disposition noted of any kind.

17      We can take 15 minutes.  I can go back to chambers and do a

18   quick follow-up.  It's been a few months since I've looked at

19   Giglio.  I'm happy to go do that.  It keeps our jury waiting.  I

20   can't say that I'm thrilled that we're doing this now, but I

21   will if either side sees a reason to do so.

22          MR. MEJIA:  I have to trust my opponent on this.

23          THE COURT:  Giglio compliance is an important issue.

24   I don't take it lightly and I don't suggest that we should do so

25   here but --

1          MR. MEJIA:  He's testifying as a professional with

2     experience gained through, you know, his work as a detective.

3     If his work as a detective has not shown any impairment or any,

4     you know, disability in that way, or if he hasn't been demoted,

5     or he hasn't in some way been impaired, you know --

6          THE COURT:  No.  As I said, from the information I

7     have just provided by the United States, the only disposition of

8     any complaint is counselling on a court attendance issue.

9          MR. MEJIA:  Okay.  Ten years?

10         THE COURT:  And you know as well as any of us here

11     know, having been around a long time, there's no police officer

12     in a major city anywhere that hasn't on occasion been deficient

13     in their court attendance.

14         MR. MEJIA:  Okay.

15         THE COURT:  Now, that's not to minimize it, but it is

16     what it is.  So I understand your position, so I'm going to put

17     the ball in your court, Mr. Mejia.  Do you want me to go and

18     double-check and make sure that the mere allegations that --

19     allegations that do not result in findings, dispositions, or

20     discipline are subject to Giglio review?  And I don't think they

21     are, but I can double-check that.

22         MR. MEJIA:  I'd ask that you do so and I feel terrible

23     about the time as well, but I can't be remiss in my duty.

24         THE COURT:  No, I --

25         MR. MEJIA:  I can't do it.

1      THE COURT:  -- I understand you are in a difficult

2   position.

3      Is there anything else that I need to take into

4   consideration besides this particular form?

5      MS. MCKENZIE:  I was just going to ask if -- and maybe

6   just for purposes of the record, if Your Honor also would like

7   to see a copy of the request that we sent to the department.

8      THE COURT:  That'd be fine.

9      MS. MCKENZIE:  The specific things we asked.

10     THE COURT:  Unless this has changed within the last

11  four years, I'm pretty familiar with this type of Giglio request

12  and understand that files are routinely kept on these types

13  of -- particularly with respect to the Brady and Giglio matters.

14     Okay.  I'll take these in for a very brief in camera review.

15  Where's Chris?  There he is.

16     (End of bench conference.)

17     THE COURT:  We're going to take a short recess, so you

18  can advise the jury they can just stand down.

19     COURT SECURITY OFFICER:  Yes, sir.

20     (Recess at 2:06 p.m. until 2:46 p.m.  Jury out.)

21     THE COURT:  If I could see counsel at the bench,

22  please.

23     (Bench conference on the record.)

24     THE COURT:  I completed my in camera review of the

25  material that the Government provided.  Also, I failed to return

 1   to the bench with that form, but I'll give that back to you on

 2   another break.

 3       I'm going to deny the request.  Nothing contained in the

 4   report suggests facts giving rise to the issuance of that minor

 5   disciplinary action there on the officer's reputation or

 6   character for truthfulness.  That means that the defendant is

 7   not entitled to pretrial production of the material.  It also

 8   means you can't inquire into the facts giving rise to that minor

 9   disciplinary finding during the cross-examination.

10       Now, in reaching that conclusion, I am aided by an opinion

11   or an order issued out of Eastern District of Michigan, *U.S. v.*

12   *Tutt,* and -- let's see, I can give you a Lexis cite.  2013 Lexis

13   157329.  It deals with matters that are, frankly, more involved

14   than we have here.

15       In looking at this, this is, as I said, an issue merely of a

16   court attendance.  It is not clear from the document provided

17   that the police officer was even disciplined, merely -- the

18   disposition call merely indicates counselling, and so I could

19   not conclude from that that he was even disciplined.

20       So that suggests to me that the -- it is not a serious level

21   of misconduct.  It certainly does not rise to the level of a

22   finding or a suggestion of dishonesty, and there's nothing here

23   to suggest that the context of that minor infraction was of a

24   fact pattern that's relevant to ours here, which is what you

25   typically find when you look at cases involving the application

1  of Giglio to police misconduct.  It's most egregious.  It's most

2  concerning when the fact pattern of the officer's misconduct

3  touches upon the fact pattern at issue in the case-in-chief.

4      We don't have that here, and so for those reasons, I

5  conclude that if -- and I think that's a significant question

6  that is unanswered by the report.  It appears to me that we're

7  not even talking about discipline.  We're simply talking about

8  an officer ten years ago being counseled by a superior officer

9  to show up on time in court and nothing more than that.  I mean,

10  so that doesn't touch on an issue of honesty and it doesn't

11  touch on the fact pattern applicable here, so I will sustain the

12  Government's motion and not permit you to get into that on

13  cross-examination.

14          MR. MEJIA:  Thank you for your attention to the

15  matter.

16          THE COURT:  Well, one of the best parts of this job is

17  you learn something just about every day, and I have been

18  through all of the Brady/Giglio training that I ever care to go

19  through, but it helps on occasion to refresh that.  And this is

20  an area that -- I don't guess I've looked at a court attendance

21  issue in the Giglio context before, but it's worth doing.  So

22  perhaps the next time it comes up, it won't take me 30 minutes

23  to figure it out.

24      So we'll get the jury in and you'll be ready to go.  I trust

25  you will not waste much time on your direct or redirect with

McKinney - Direct

1    this witness.

2              MS. MCKENZIE:  Yes.

3              MR. MEJIA:  Yes.

4        (End of bench conference.)

5              THE COURT:  We're ready.

6        (Jury in 2:52 p.m.)

7              THE COURT:  Members of the jury, we apologize for the

8    extra time we kept you waiting.  We were not twiddling our

9    thumbs.  We were doing some work and we are now ready to

10   proceed.

11             MS. MCKENZIE:  United States calls Detective Kevin

12   McKinney.

13       (DETECTIVE KEVIN MCKINNEY, called by the Government, sworn.)

14                         DIRECT EXAMINATION

15   BY MS. MCKENZIE:

16   Q.  Good afternoon.  Can you introduce yourself to the jury and

17   tell them where you work.

18   A.  My name is Detective Kevin McKinney.  I'm employed with the

19   Louisville Metro Police Department.

20   Q.  Detective McKinney, what is your current assignment in the

21   police department?

22   A.  I'm currently assigned to Metro Narcotics Major Case Unit.

23   Q.  How long have you been a narcotics detective?

24   A.  I've been in Narcotics since May of 2005.

25   Q.  How long have you been a police officer?

McKinney - Direct

1    A.   Since May of 2002.

2    Q.   Okay.  Can you describe -- do you have any particular -- in

3    addition to the police academy and your ordinary training to

4    become a police officer, do you have any specialized training

5    that prepares you to investigate narcotics?

6    A.   Yes, ma'am, I have several, probably in the thousands of

7    hours of actual classroom classes that I've taken for narcotics

8    reaching back all the way back to basic narcotics to more

9    advanced certifications.  I am certified by the FBI as a

10   certified federal undercover detective as well.  I've received

11   certifications in clandestine laboratories, as well as marijuana

12   grows, and other certifications in narcotics as well.

13   Q.   Can you tell the jury, do you have experience interviewing

14   or debriefing drug users?

15   A.   Yes, I have.

16   Q.   Okay.  Do you sometimes refer to those as confidential

17   informants?

18   A.   Yes, depending on the status of where their involvement is,

19   we have in the past referred to them as confidential informants.

20   And I've also interviewed drug users and dealers that were not

21   confidential informants as well.

22   Q.   Okay.  And that was my next question.  Do you likewise have

23   experience debriefing drug dealers?

24   A.   Yes, ma'am.

25   Q.   What about -- and when we refer to drug dealers or drug

McKinney - Direct

1   traffickers, can you clarify, is there a certain scale or amount

2   of drugs that you investigate?  Do you understand my question?

3   A.  Yes, ma'am.  Me personally, I -- where I'm at currently, I

4   investigate larger traffickers.  However, drug traffickers come

5   in all ranges, starting from very low level of traffickers up to

6   multi -- what I would consider multikilo traffickers.  So they

7   come in all gamuts, but I've -- in my experience, I've

8   investigated very, very small quantities all the way up to

9   multikilo, multistate investigations.

10  Q.  Okay.  And when you say low level traffickers, are those

11  what you may sometimes refer to as, like, street level dealers?

12  A.  Yes, ma'am, or street level dealers where they're more apt

13  to be selling to just a user, an everyday user.

14  Q.  What other particular experience do you have in this field

15  that you have -- have you investigated or participated in

16  controlled buys?

17  A.  Yes, I have.

18  Q.  What about undercover buys?

19  A.  Yes, I have.

20  Q.  Have you personally bought drugs undercover?

21  A.  Yes, ma'am.

22  Q.  What kinds of drugs?

23  A.  All types.  I've bought methamphetamine, heroin, cocaine,

24  marijuana.

25  Q.  Have you bought user amounts of those drugs?

McKinney - Direct

1  A.  Yes, I have.

2  Q.  Large quantities?

3  A.  Yes, I have.

4  Q.  Do you have experience with highway interdiction?

5  A.  Yes, I have been a part of some of the highway interdiction,

6  yes.

7  Q.  Traffic stops?

8  A.  Several, yes, ma'am.

9  Q.  What about something that, I guess, in ordinary terms we

10  might refer to as wiretaps or that may be how jurors have seen

11  it on TV.  Are you familiar with those?

12  A.  Yes, ma'am, I am.

13  Q.  Okay.  Have you had the opportunity in your career to listen

14  to those and listen to members of the drug trafficking community

15  talk to one another --

16  A.  Yes.

17  Q.  -- in their, you know, natural element?

18  A.  Yes, ma'am, several hours of it.

19  Q.  Would you say that you're familiar with the ways in which

20  drug traffickers buy, sell, package, store their drugs?

21  A.  Yes, I am.

22  Q.  Transport, conceal their drugs?

23  A.  Yes, ma'am.

24  Q.  And is all of this knowledge based on your own training and

25  personal experience investigating these cases or doing

1  undercover operations?

2  A.  Yes, ma'am, the culmination of all of that.

3  Q.  Okay.  So you stated that you have investigated smaller

4  level or street level dealers.  Can you explain to the jury in

5  that world what kinds of amounts of drugs might we be talking

6  about?

7      And let me give you a better question.  With regard to a

8  substance like crack cocaine, is there a standard amount that a

9  drug dealer would sell or a standard amount that a user would

10  use?

11  A.  It's all going to depend -- as far as what a user is going

12  to use is what their tolerance level is for that particular

13  narcotic.  It's going to vary between person to person.

14      So to say that a person's going to -- every person -- one

15  dosage is this, it's going to be very hard for me to say.

16  However, a common dosage is something that a user would use and

17  might frequently go back to that seller in a day to get more of

18  that narcotic.  They may not get it all at one time, if that

19  helps maybe to clarify that.

20      But as far as a certain amount, it's pretty common for a

21  drug trafficker to maybe have it ready in a certain amount for a

22  user and then that user would buy that, just depending on how

23  that that individual narcotics trafficker sells that product.

24  Q.  So how much crack cocaine would it take to get high?

25  A.  On average, I would say maybe a quarter to half gram,

McKinney - Direct

1    probably closer to a half gram.

2    Q.   Okay.

3    A.   It's a base narcotic, so it's something that's smoked.  So

4    the quantity of it, as far as the physical weight of it to

5    smoke, it's going to go back down because it's a base.

6    Q.   Okay.

7    A.   So it may be a little bit -- you know, as far as the actual

8    weight, maybe about half a gram.

9    Q.   And how much on -- are you familiar from your experience

10   with drug prices here locally in Louisville?

11   A.   Yes, ma'am.

12   Q.   How much would it cost me to go out on Seventh Street and

13   buy a half gram of crack right now?

14   A.   A half gram in today's market or -- I would say --

15   Q.   Well, actually, let's go back to 2015.

16   A.   Okay.

17   Q.   I don't know if the inflation has changed drug prices in the

18   last few years, but --

19   A.   Yes, ma'am, it varies with -- prices of drugs will vary with

20   what, in lack of better terms, is hot on the street.  Drugs kind

21   of go in a cycle.  So sometimes the more expensive narcotic

22   could be one day and the next, you know -- or not the next day,

23   but maybe a year later could go down.  2015, to put a number on

24   it -- and I'd have to put a little bit of a gauge on it -- but I

25   would say for maybe a gram would be anywhere from 60 to $80,

1   $85, maybe somewhere around there.

2   Q.  Okay.  And that might get me high two times, maybe more than

3   that if I have a low tolerance?

4   A.  Correct.

5   Q.  Now, if we stick with this hypothetical, am I --

6         THE COURT:  Can I see counsel at the bench, please.

7      (Bench conference on the record outside the hearing of the

8   jury.)

9         THE COURT:  Correct me if I'm wrong, crack is not an

10  issue here.  Is that right?  This is cocaine powder.  I don't

11  want to mislead this jury with testifying about crack and crack

12  alone.  We have powder cocaine here, unless I'm wrong.

13        MS. KEEL:  It was reported as a chunky, white

14  substance, which is what was reported yesterday by Tom Frisby,

15  and it was ground into a powder per -- to be more homogenous for

16  testing, but it was reported as a chunky, white substance.

17        THE COURT:  Does that make it crack?

18        MS. MCKENZIE:  Possibly.

19        THE COURT:  No, I don't think it does, unless we have

20  testimony that's going to tell us that.

21        MS. MCKENZIE:  Okay.

22        THE COURT:  Right?  Am I wrong?

23        MS. MCKENZIE:  I thought the lab said found to contain

24  cocaine.

25        MR. MEJIA:  Right, that's what was said.  It was a

McKinney - Direct

1    white --

2            THE COURT:  But that's the way it's always charged,

3    substance containing cocaine.  It does not say cocaine base.

4            MR. MEJIA:  It actually isn't crack cocaine in this

5    case, Judge.  This is not crack cocaine, no.

6            MS. MCKENZIE:  Okay.  I can speak specifically to --

7            MR. MEJIA:  The other thing is -- I don't mean to step

8    on your words.  I'm sorry -- but we don't have any testimony as

9    to its concentration.  We don't have any testimony as to the

10   individual packages and whether or not they were cocaine base or

11   powder cocaine.  I'm --

12           THE COURT:  Well, I'm not sure I would go that far.

13   The indictment refers simply to cocaine.  It does not refer to

14   cocaine base.  So irrespective of whether it was chunky, I'm not

15   sure that we need to veer into that area.

16           MS. MCKENZIE:  Okay.

17           THE COURT:  I think you need to stick with --

18           MS. MCKENZIE:  The facts of this case.

19           THE COURT:  There is evidence as to how it was

20   packaged.  The jury saw that.  The KSP person testified about

21   how it was packaged.  And so I think my preference would be that

22   in order to be consistent with Rule 702, that his expertise to

23   be useful to this jury needs to be about the thing that is

24   applicable here, which is cocaine, not cocaine --

25           MS. MCKENZIE:  Understood.

1       THE COURT:  -- base.  And so I don't believe that his

2    reference to crack up till now is unfairly prejudicial, no

3    different than it would be if you were to ask him what was the

4    price of a hit of heroin in 2015.  That just demonstrates his

5    knowledge of the subject matter, but I don't want the testimony

6    being left with the jury as if he was called up here to talk

7    about crack, if crack is not the drug at issue here.

8       MS. MCKENZIE:  Sure.

9       THE COURT:  I did not mean to make your objection for

10   you, but I am concerned about -- I have a role as a gatekeeper.

11   He is a 702 witness and so I just want to make sure we're all on

12   the same page there.  As I said, I don't think this is

13   irredeemable.  I think we just need to move on, and he does not

14   need to be dealing with hypotheticals.

15      MS. MCKENZIE:  Okay.

16      THE COURT:  So he just needs to give his --

17      MS. MCKENZIE:  Opinion?

18      THE COURT:  -- his expert opinion.  I also presume you

19   have no objections to his qualifications as 702.

20      MR. MEJIA:  I don't.

21      THE COURT:  I think had you, we would have had a

22   Daubert issue teed up.  I see none.  This is a fairly typical

23   law enforcement expert.

24      His preliminary testimony, it seems to me, established the

25   appropriate framework for his 702 --

McKinney - Direct

```
 1              MR. MEJIA:  Right.
 2              THE COURT:  -- testimony, but I -- that concerned me,
 3    so I wanted to make sure.
 4              MS. MCKENZIE:  I'll get us --
 5              MR. MEJIA:  And just anticipating something else, I
 6    have their notice as to who he is and what he's going to say.
 7    I'm assuming he's not going to delve into having examined the
 8    physical evidence in this case.
 9              MS. MCKENZIE:  No, I'm going to show it to him in
10    court.
11              MR. MEJIA:  Okay.
12              THE COURT:  I don't think that's a problem.
13              MR. MEJIA:  No, no, it's not.  I just didn't know
14    whether that was where he was going.  I mean, if we were, let's
15    get to it, but that's fine when they do.
16              THE COURT:  That's fine.  Thank you.
17         (End of bench conference.)
18    BY MS. MCKENZIE:
19    Q.  Detective McKinney, are you familiar with the way drugs are
20    packaged for sale at the street level?
21    A.  Yes, ma'am.
22    Q.  Can you describe some of the most common methods of
23    packaging for sale.
24    A.  The most common way that we see it is, basically, a sandwich
25    baggie, the corner of the sandwich baggie, so just a small
```

1    amount rolled -- or tied up in the corner of a baggie.

2    Q.   So whatever the unit of sale might be for whatever the drug

3    is would come in those little corner --

4    A.   In a corner.

5    Q.   -- pieces of a baggie?

6    A.   Yes, ma'am.

7    Q.   I'd like to show you some evidence in this case that has

8    already been admitted.  This is United States Exhibit 16 and

9    there has been testimony already that the white material in this

10   bag is cocaine.  Do you see, in addition to the white material,

11   something inside that baggie?

12   A.   Well, this -- I see the several corner -- where knotted off

13   corners have been cut off.  Is that what you're --

14   Q.   Yes.

15   A.   Basically what it is, it's just several corner baggies that

16   have been opened up and apparently been probably introduced into

17   this bigger bag for probably testing.

18   Q.   Okay.  Are you familiar with markings of the Kentucky State

19   Police lab?

20   A.   Yes, ma'am.

21   Q.   Okay.  Is that what that bag with powder appears to be?

22   A.   Yes, ma'am, and the evidence tape that's located on it as

23   well.

24   Q.   Okay.  And are these the little baggie corners that you

25   referred to a minute ago?

McKinney - Direct

1   A.   Yes, ma'am.

2   Q.   Okay.  And what about -- there should be an exhibit down

3   maybe over your -- yeah, to your left.

4   A.   There's three down here.

5   Q.   Okay.  Is there one marked Number 1 and 2?

6   A.   Yes, 1 and 2.

7   Q.   Okay.  Before you open that, have you personally been

8   trained on identifying marijuana?

9   A.   Yes, ma'am.

10  Q.   Okay.  Have you done that in the field?

11  A.   Yes.

12  Q.   Have you done that in a controlled setting?

13  A.   Yes, ma'am.

14  Q.   Okay.  Are you, by your training and experience, able to

15  identify marijuana by sight, smell, personal inspection?

16  A.   Yes, ma'am.

17  Q.   Okay.  And I mean not burnt marijuana, but the green stuff?

18  A.   Correct, yes.

19  Q.   You know what it smells like?

20  A.   Yes, ma'am.

21  Q.   Know what it looks like?

22  A.   Yes, ma'am.

23  Q.   If you could open the package labeled 1 and 2.  That has

24  already been admitted into evidence.  And there are gloves, if

25  you need them.

1    A.  Yes, I'll get those.  Do you want me to go ahead and inspect

2    them or --

3    Q.  Yes.

4    A.  Okay.  Uh-huh, it's marijuana.

5    Q.  Okay.

6    A.  Apparently -- or what appears to me, it looks like in this

7    smaller box container, it looks like one bag with, you know, a

8    decent amount of marijuana.  And then in the black container, it

9    appears to be numerous, again, corner baggies of marijuana as

10   well.

11   Q.  Okay.

12   A.  So individual baggies.

13   Q.  Okay.  And do those appear to be packaged for sale?

14   A.  Yes.

15   Q.  I want to ask you, based on your experience with drug users

16   and purchasing drugs like this on the street, when you have gone

17   either yourself or had CIs going at your direction to purchase

18   marijuana for personal use on the street, how much would you buy

19   at a time?

20   A.  It would vary on the user, but just small amounts.  I mean,

21   it could go anywhere from a $5 bag of marijuana to a pound of

22   marijuana, just -- it would depend on what the user would want

23   at that particular time.

24   Q.  And how far would a $5 bag go?  How many smokes is that?

25   A.  So with that, just to make a clarification, there's

McKinney - Direct

 1    different grades of marijuana.  There's a very low grade of

 2    marijuana that's more of a compressed type marijuana, and then

 3    there's what we would call a high grade, a hydroponics grown

 4    marijuana where the THC content is much higher, higher in that

 5    type of marijuana.

 6        With being that marijuana of use, with the THC content

 7    higher, you obviously wouldn't need as much marijuana.  A baggie

 8    like that's in this container here would maybe roll what --

 9    maybe one blunt or a joint.  It could also be used in some type

10    of bong, but of that, you could probably use it in a bong maybe

11    twice and then maybe one blunt out of it.

12    Q.  Okay.  And if a user of marijuana wanted to buy

13    substantially more than that, enough to do a week's worth of

14    blunts or bongs, would you purchase -- how would that come

15    packaged?

16    A.  It wouldn't -- if, say, I wanted to buy two ounces of

17    marijuana, it wouldn't come -- it would probably -- it would

18    come in one bag with two ounces in it.

19    Q.  And are there common measurements in the drug world or on

20    the street in terms of like what size bag you might be able to

21    buy?

22    A.  Yes.

23    Q.  Okay.

24    A.  So a user would buy -- if they're going to buy an ounce,

25    basically, it's just maybe an inch to maybe an inch and a

1  quarter sandwich baggie, the bottom of it and then rolled up.

2      Most commonly, if a drug trafficker knows that, say, I'm

3  going to buy two ounces of marijuana, he's going to have two

4  ounces in that bag rolled up, instead of having two individual

5  baggies, if he knows he's coming to me and that's what he's

6  wanting to sell to me or that's what I've ordered.

7  Q.  What about cocaine?  How much -- first of all, in terms of

8  getting high on cocaine, does the amount you need change based

9  on the way you ingest it?

10  A.  Yes.

11  Q.  Okay.

12  A.  And there's several different ways of ingesting cocaine.

13      MR. MEJIA:  Judge, may we be heard, please?

14      (Bench conference on the record outside the hearing of the

15  jury.)

16      MR. MEJIA:  In line with your earlier ruling, I object

17  to his discussing various ways in which cocaine is ingested.

18  This is powder cocaine.  I have no objection to his testifying

19  as an expert with experience, training, and knowledge on powder

20  cocaine, but to go off on the other matters, I agree with Your

21  Honor.  It is an objection and we shouldn't get into crack

22  cocaine in this case.

23      THE COURT:  Well, to the extent that she's trying to

24  elicit testimony to demonstrate his knowledge and expertise, I

25  don't think it's objectionable, but as I said earlier, I don't

McKinney - Direct

1   want there to be any confusion with respect to his testimony on

2   whether we're talking in this case about powder cocaine versus

3   cocaine base.  So my preference would be that you use some other

4   example so as to avoid any confusion or that you just move on.

5           MS. MCKENZIE:  Okay.

6           THE COURT:  I do think that your obligations under --

7   I believe it's Rule 702 are met.  I think he's demonstrated

8   through the length of time he's worked that he has the

9   specialized knowledge, and I would rather easily conclude that

10  his specialized knowledge would aid the jury in their -- in

11  their inquiry because the area of the specialized knowledge or

12  indicia of drug dealing, drug packaging, those types of things,

13  dosages, is beyond the realm of the average person, the average

14  juror, but I do want to avoid any confusion.

15          MS. MCKENZIE:  Okay.

16      (End of bench conference.)

17  BY MS. MCKENZIE:

18  Q.  Specifically concerning powder cocaine -- and let me give

19  you a better question.  If I told you that the testimony has

20  been that there were 15 of these individual baggies prior to the

21  contents being combined and that the net weight of the powder

22  was just a hair over eight grams, assuming that the packages

23  were roughly the same size, how far would a half a gram of

24  powder cocaine get me?

25  A.  If you're using it as far as snorting?

McKinney - Direct

1    Q.   Yes.

2    A.   This is snorting?  You could probably -- it'd be probably

3    one or two lines, depending -- it would be probably two, maybe

4    two hits or two different occasions you would use it --

5    Q.   Okay.

6    A.   -- at the most.

7    Q.   So similar -- although completely different substances,

8    similar in terms of the number of doses to the individual

9    baggies of marijuana?

10   A.   Yes, ma'am.

11   Q.   Okay.  And how much would that -- would one of these cost on

12   the street?  And let's use 2015 dollars.

13   A.   A half gram -- I mean, a gram, around there, was like I

14   said, probably around 80 -- I mean 60 to 80.  It wouldn't be

15   half that because it would be a little bit -- probably around

16   $50, 40 to $50, somewhere around there.

17   Q.   And are you familiar with -- when we're talking about the

18   sale of drugs in amounts like this, are you familiar with common

19   methods used by drug traffickers to transport their product?

20   A.   Yes, ma'am.

21   Q.   Okay.  Can you elaborate on that?

22   A.   With smaller narcotics -- with the size of this maybe being,

23   you know, eight grams, it's sometimes difficult for us because

24   there's a lot of places that could be hidden.  On a person it

25   could be hidden in certain areas of clothing.  Even on their

1    body, we've found, you know, with the size of amount that.  When

2    you start introducing more things, such as cars and houses, it

3    becomes a little bit more difficult to us as far as locations,

4    but drug traffickers are constantly trying to put it in

5    locations where we may not look.

6        So the more discrete location that they can get, the more

7    comfortable they feel carrying that, whether it be on their

8    person or on their vehicle.  It all depends on the trafficker

9    and how elaborate they would get with the way that they would

10   hide their narcotics.

11   Q.  Okay.  I'd like to show you what's been previously admitted

12   as United States Exhibit 11A and 11B.  And can you tell me if

13   that is something that you recognize or have encountered before?

14   A.  Yes, ma'am.  And the 11B was the black container that we

15   just reviewed.  And then in the background, it shows -- the

16   bottom of it looks like the bottom of like a dash next to the

17   light switch where you would turn your headlights on is pulled

18   down, which is located below the steering wheel.

19       And then in 11A, it's a close-up photo of the same where it

20   looked like the contents were hidden behind the plastic

21   upholstery of the -- below the steering wheel.

22   Q.  Okay.  And is that a method of concealment that you've seen

23   before?

24   A.  Yes, I have.

25   Q.  Would you say that's common or uncommon?

1    A.   This is one of -- one of the more common areas in a vehicle

2    because of the accessibility to it.

3    Q.   Okay.  I'd like to -- continuing with concealment, are there

4    other methods that you commonly encounter that someone selling

5    narcotics would use to conceal their product, conceal their

6    identity, their behavior, basically avoiding detection by law

7    enforcement?

8    A.   Yes, ma'am.  So there's -- just as we're changing, as law

9    enforcement changes in our tactics to try to catch the

10   traffickers, they're doing the same thing as far as their

11   tactics on trying to stay under our radar, I would say.

12       So they're constantly doing things that would avoid

13   detection by us.  With that being said, whereas, if -- just

14   starting with their person, the way that they hide it, the

15   locations that they hide it.

16       Moving on to a vehicle, they may not have a vehicle that's

17   in their name.  Rental vehicles are common.  We're seeing where

18   they're switching out vehicles.  So if we see them today, we may

19   not see them in that vehicle tomorrow.  And the same thing with

20   houses and apartments.  They're getting people to put their

21   houses and apartments in different names and trying to deter us

22   on trying to locate them.

23   Q.   And what about -- you mentioned vehicles.  There's

24   vehicle -- a couple of vehicles involved in this case.  Have you

25   encountered attempts to further conceal your identity within the

McKinney - Direct

1  vehicle -- modifications to the vehicle, I guess?

2  A.  Yes, we're seeing -- and it doesn't -- we're seeing where

3  people are getting cars rented to them or they're having a car

4  rented by another person to a not -- for us to not be able to

5  determine that that person rented the vehicle.

6     We're also seeing rental cars that are getting their windows

7  tinted, which in and of itself, a rental car and getting the

8  windows tinted is bizarre in and of itself, because you don't

9  own the vehicle and you're probably going to be turning it in in

10  a couple of days.  So that's something that if we conduct a

11  traffic stop for a traffic violation and find out that the car

12  is rented and the windows are tinted, that's kind of a red flag

13  to us.  So that's one of the biggest things that would stick out

14  on that.

15  Q.  What about the role of money in all of this?  Are you

16  looking for money in certain denominations?  Is there a certain

17  amount of money that would throw up red flags to you?

18  A.  Yes, ma'am.  So in reference to this case and this quantity

19  of narcotics, we would be looking for more of the five, ten, 20

20  type range as far as denominations, just because of what's being

21  purchased.  We wouldn't see a lot of -- you know, a lot of big

22  bills, but we'd see different denominations, not pretty

23  consistent -- you know, pretty consistent variation of different

24  bills.

25  Q.  Would you necessarily think, if someone did not have a

1    certain amount of cash on them, that they must not be dealing

2    drugs?

3    A.   No, ma'am.

4    Q.   Okay.

5    A.   For one, people aren't going to bring their proceeds with

6    them when they're traveling for the sake of us taking it from

7    them, so it may be at a different location.  Most of the time

8    it's not in the same location.

9    Q.   Are you familiar with the role of firearms in the world of

10   drug trafficking?

11   A.   Yes, ma'am.

12   Q.   What is the relationship there?  Why is there a relationship

13   there?

14   A.   The easiest way that I can try to explain it is drug

15   traffickers can't -- if they get robbed or they get something

16   stolen from them, they can't call the police.  So it's not like,

17   say, Best Buy, they get something stolen from them or robbed,

18   they call the police to take care of them.  They have to have a

19   way of securing their product, making sure that they don't get

20   robbed.  Also, it's a form of intimidation.

21       Sometimes drug traffickers may what we call "front" out the

22   narcotics, basically give the narcotics to a user in hopes that

23   in a few days they'll get that money returned to them.

24       So with having a firearm around, it may intimidate the user

25   to pay that person back.  It also is, again, a deterrent so that

McKinney - Direct

```
 1    user doesn't decide they want to rob that particular drug dealer
 2    for that product.
 3         So, basically, the firearm is their police.  It's their way
 4    of protecting their product, protecting themselves, and then
 5    used for intimidation as well.
 6    Q.  Would you say that a firearm is a tool of the trade?
 7    A.  Yes, it goes hand-in-hand.  I mean, without it, they may not
 8    be able to keep the product.
 9    Q.  Even if we're talking about a street-level dealer who is
10    not -- you know, we're not talking about Pablo Escobar, but a
11    guy on the street dealing out, you know, a couple servings at a
12    time, would you --
13    A.  In my experience in undercover roles, the more dangerous
14    situations I've been in have been in the street-level field of
15    it.  You're not -- it becomes more common at that area.  So with
16    the firearm being used, it's from all gamuts of it, but I would
17    feel, in my experience, that firearms are more used and more
18    shown and displayed in smaller trafficking situations.
19    Q.  Without stating the obvious, in a world where product is
20    essentially money, are you familiar with common methods of
21    storing the product either for transport or -- you know, I
22    assume it is not like a McDonald's drive-through where the
23    customers stack up in a line and you're handing the orders
24    out --
25    A.  Correct.
```

1  Q.  -- one at a time, you know, all in a row.

2  A.  Correct.

3  Q.  Are you familiar with common ways of keeping the drugs when

4  you're not necessarily dealing with the customer?

5  A.  Yes, ma'am.  So I hope this -- maybe this will explain.  So

6  if a drug trafficker gets a quantity of narcotics from his

7  supplier, he may not travel with that quantity on him all the

8  time.  He may break that down into smaller quantities, take what

9  he thinks he's going to sell, store it somewhere.  And as he

10  gets a phone call saying that what he needs is X, Y, Z, he

11  may -- what he would do is get that particular size narcotic out

12  and available for that person.

13      What he's wanting to do is limit his time of transaction

14  when he's meeting with somebody.  So if he has it ready and,

15  say, someone pulls up next to him -- and I'm only referencing in

16  a vehicle -- that the transaction would go quick.  The less time

17  that he has with that person and the less attention he brings to

18  himself, the less he might get caught by the police.  So what he

19  would have is probably available to the person he's going to

20  sell it to at that time.

21  Q.  Okay.  Would you expect -- strike that.  I have a couple

22  more exhibits to show you.  There should be a package to your

23  left with Number 7 on it.

24  A.  Yes.

25  Q.  And, also, I'm going to show you United States Exhibit 19.

1    A.   Okay.

2    Q.   There's been some disassembly there.

3    A.   Yes.

4    Q.   But do you generally recognize what you're looking at?

5    A.   Yes, ma'am.  This is several cell phones in there.  I'm

6    going to keep this separate.  And then this one is -- appears to

7    be numerous, numerous cell phones.

8    Q.   Okay.  Why might someone who is selling narcotics have a

9    number of cell phones at any given time?

10   A.   Again, it refers back to staying under the radar from us and

11   referenced -- Title III or wiretaps is what we talked to

12   earlier.  Narcotics traffickers think that if -- they feel like

13   if they switch their cell phones and switch their phone numbers,

14   they're staying under the radar of us, to where if we do have

15   their phone tapped, they switch their phones and they feel like

16   that that alleviated that problem.

17        Another instance could be where there -- have maybe one or

18   two users that only uses that cell phone.  The reason being for

19   this is they know, basically, what that user wants when they

20   call, for one.  For two, if there's some type of report or

21   search warrant that we've done on a phone, or if we're using a

22   confidential informant and they gave us the phone number, that

23   particular drug trafficker would know immediately who gave them

24   up.  So they would be able to determine who was the person that

25   was the leak in their organization.  So that's a couple of

1    different reasons why they might have it.

2    Q.  Now, referencing your prior experience actually listening to

3    drug dealers talking on phones, do they often or commonly

4    overtly discuss narcotics?

5    A.  No.  You'll have some that will, but for the most part they

6    won't.  They'll use code words, names for different things.

7    After they've been familiar with this user, they may just say,

8    "Hey, I'll" --

9              MR. MEJIA:  Excuse me, Judge.  May we be heard,

10   please?

11      (Bench conference on the record outside the hearing of the

12   jury.)

13             MR. MEJIA:  I don't see the material or relevance of

14   any of this.

15             MS. MCKENZIE:  Well --

16             MR. MEJIA:  I object on relevance.

17             MS. MCKENZIE:  -- I think, because we have introduced

18   the phones, we have discussed that only a couple of them were

19   active.  We have not produced any evidence of overt drug talk on

20   text messages.  To the extent that this is a modern jury and

21   they may be wondering where that evidence is, I'm offering an

22   explanation for that.

23             THE COURT:  I'm not sure I follow.  Events of what?

24             MS. MCKENZIE:  There has been evidence introduced that

25   we've collected a number of cell phones off of Mr. Brewer.

McKinney - Direct

 1          THE COURT:  Right, right.

 2          MS. MCKENZIE:  We have not offered evidence of text

 3   messages referencing drugs.

 4          THE COURT:  Right.

 5          MS. MCKENZIE:  And the point I'm simply trying to make

 6   to the jury is that that is not --

 7          THE COURT:  Typical.

 8          MS. MCKENZIE:  -- typical.

 9          THE COURT:  I see.  I think if Mr. Mejia were to make

10   the point on cross that none of the cell phones produced any

11   texts saying "I'm offering drugs for sale.  Are you interested?"

12   that you would be able to follow up on redirect and address

13   that, but I think he's already testified as to why multiple cell

14   phones are indicia of drug dealing and so --

15          MS. MCKENZIE:  He's a good lawyer.  I'm simply

16   anticipating his argument.

17          MR. MEJIA:  I take it as a high compliment.

18          THE COURT:  I get that.  It's just 20 minutes before

19   4:00, and I think you can move along.

20          MS. MCKENZIE:  Sure.

21          MR. MEJIA:  Just so we don't close the subject, I do

22   intend to cross-examine him on the methods by which evidence is

23   gathered when cell phones are seized.  There's nothing here in

24   this case of that, and I do intend to go there so --

25          THE COURT:  That's fine.  You can hit any topic that

McKinney - Direct

```
 1    is relevant and appropriate.  If you ask him that question, she
 2    is going to come back and say, "Drug dealers aren't typically
 3    explicit, are they?"  And he's going to say no.
 4            MR. MEJIA:  That's fine.  I just -- there is no
 5    interceptions here, and there are no text messages, and there
 6    are no communications, and there is no evidence of any of
 7    that --
 8            THE COURT:  Right, right.
 9            MR. MEJIA:  -- in this case.  And then the lack of it,
10    of course, is probative for me, but I think her evidence with
11    regard to they do that or they don't do that is not material
12    here.
13            THE COURT:  To the extent she has explained that it is
14    anticipatory, that's understandable, so I think we can move
15    along for now.
16         (End of bench conference.)
17    BY MS. MCKENZIE:
18    Q.  Detective McKinney, I just have one last or maybe a double
19    last question for you.  If you on the street encountered all in
20    the same immediate area a loaded firearm, a baggie containing
21    several individual packages of marijuana of about yea size,
22    another individual package of marijuana in the handle of the
23    driver's door of a vehicle, seven cell phones, and a little over
24    $800 -- $900 in cash on the driver's person, would that send up
25    signals to you of possible drug trafficking?
```

1    A.  Without a doubt, yes.

2           MS. MCKENZIE:  Okay.  I don't have any further

3    questions for you.

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  Mr. Mejia.

6           MR. MEJIA:  Yes, sir.

7                        CROSS-EXAMINATION

8    BY MR. MEJIA:

9    Q.  Good afternoon, Detective.

10   A.  Good afternoon, sir.

11   Q.  Sir, when were you contacted to give input as a witness in

12   this case?

13   A.  The first contact was, I think, when the first -- I think

14   there was a trial date set a while back, and I think that that

15   was my first contact.  I can't --

16   Q.  I don't mean to put you on the spot and test your memory,

17   but somewhere within the past year?

18   A.  Yes, sir, it was, yes.

19   Q.  Okay.  And I take it you were not a part of the

20   investigative team, those who have been named here and some of

21   whom have testified, with respect to the investigations of

22   November 11 and November 12 of 2015?

23   A.  No, sir, I wasn't a part of that.

24   Q.  Okay.  And being contacted last year sometime -- probably

25   within 2018 sometime you were contacted -- could you give input,

McKinney - Cross

```
 1    provide your expertise, your knowledge, your training as a

 2    witness in this case?

 3    A.  Yes, sir.

 4    Q.  You were shown a couple of exhibits here today.  Did you see

 5    and examine the exhibits before today?

 6    A.  AUSA McKenzie did show me, I think, the pictures, yes, prior

 7    to this.

 8    Q.  For instance, the marijuana, you said that you conclude this

 9    is marijuana.  Have you seen that before today?

10    A.  That particular marijuana?

11    Q.  Yes.

12    A.  No, sir, just a picture, I think maybe a picture of it.

13    Q.  All right.  And you were asked about your training, your

14    knowledge in identifying marijuana on the street.

15    A.  That's correct.

16    Q.  How do you do that?

17    A.  There's several different ways.  I have certifications in

18    the marijuana grow, so I'm familiar with marijuana from a

19    seedling to all the way to a plant to harvested marijuana.  So

20    I'm familiar with the smell, the look, the texture of marijuana

21    itself.

22    Q.  Okay.  And this -- these exhibits here had the look of

23    marijuana to you?

24    A.  That is correct.

25    Q.  And there are -- there are people with training, knowledge,
```

1   and experience in the lab who are technicians who both weigh,

2   examine, and who give laboratory results on THC or

3   tetrahydrocannabinol?

4   A.  As far as -- I'm not sure what our lab -- how they test it.

5   I know the lab, the state lab and the federal labs are

6   different.  I'm not sure if our labs test for THC or not.

7   Q.  Have you seen in your career as a law enforcement officer

8   laboratory reports testing, weighing, examining marijuana?

9   A.  Oh, yes, sir.

10  Q.  Okay.  And have you seen testimony in a court of law

11  individuals -- like earlier we had one here, Mr. Frisby.  Have

12  you seen witnesses identify marijuana as having been examined,

13  tested, and weighed in the lab?

14  A.  Yes, sir.

15  Q.  Okay.  Are you aware that in this case that this particular

16  marijuana was not examined, tested, or weighed in the

17  laboratory?

18  A.  I'm not aware of that.

19  Q.  Okay.  Now, there is such a thing as people on the street

20  buying substances that they believe to be marijuana but aren't.

21  That happens, doesn't it?

22  A.  As far as -- it's very rare if -- I've never heard of it, of

23  somebody selling fake marijuana.

24  Q.  Let me ask you though, have you ever seen any case in your

25  time in law enforcement where marijuana has been sent to the

1    lab, the KSR or the federal lab, and it's come back negative for

2    marijuana?  Have you ever seen that?

3    A.   No, I haven't.

4    Q.   But, nevertheless, as we sit here now, this particular

5    marijuana has not been examined by a technician with education,

6    knowledge, and qualifications to describe it by marijuana, by

7    amount, and by concentration?

8    A.   I couldn't answer that, sir.

9    Q.   Okay.  Have you -- do you -- can you tell the jury --

10   apparently the marijuana here and evidence is already in that

11   there's a canister of marijuana, and that apparently contained

12   nine different corner packages in count, nine total.  Now, I

13   think you looked at them and saw one of them and discussed that.

14   A.   No, sir, I saw there was one in a -- I think a Lemonheads

15   container.

16   Q.   Yes.

17   A.   And then there was individual baggies in a black container

18   inside of a larger bag.

19   Q.   Did you look at one of the individual baggies in the larger

20   bag?  That's my question to you.

21   A.   Yes, I examined it.  I looked at it.

22   Q.   Okay.  And did you see that to be an individual, let's say,

23   amount to which one would put in a blunt you said?

24   A.   Yes.

25   Q.   And tell the jury what a blunt is and don't belabor it, but

1   describe what a blunt is.

2   A.   A blunt on the street is, basically, a marijuana cigarette.

3   It's used from a cigar wrapping.  The tobacco is taken out and

4   marijuana is introduced and is rolled back up to make a

5   marijuana cigarette with a cigar-type wrapping.

6   Q.   Okay.  And you have talked to, in your time as a law

7   enforcement officer, debriefing individuals who are cooperating,

8   interviewing people who are cooperating with law enforcement, as

9   well as individuals who work as informants, so you understand

10  and know individuals who are regular users of marijuana?

11  A.   Yes, of all drugs.

12  Q.   Okay.  And, of course, there are people who use it more and

13  some people who use it even more than more.

14  A.   Yeah, that's a correct statement.

15  Q.   You've met people who smoke marijuana multiple times a day

16  from the time they wake up until they go to sleep?

17  A.   I don't know that they've told me exactly how much they've

18  smoked it, but I'm sure that they -- they've done their fair

19  share.

20  Q.   Does your experience and training -- have you either seen,

21  observed, or come into contact with individuals who smoke

22  marijuana all day long?  If you haven't, I understand, but if

23  you have, let us know.

24  A.   I couldn't tell you exactly their patterns and when they use

25  it.

McKinney - Cross

1    Q.   Okay.  But you have met individuals who smoke marijuana

2    multiple times per day?

3    A.   Yes.

4    Q.   And what we have here is, essentially, nine quantities of

5    marijuana.  If one were to smoke three blunts a day, that would

6    be three days of marijuana?

7    A.   Yeah, with the math, yes.

8    Q.   Okay.  And you've seen individuals who have actually

9    purchased an amount of marijuana for their own use to last a

10   week?

11   A.   Uh-huh, yes.

12   Q.   Two weeks?

13   A.   It just depends on how much they use it, I guess.

14   Q.   Right.  Or I guess if they're in a frat house -- and I don't

15   mean to dump on college boys -- but if they're in a frat house,

16   they might buy an amount for three weeks because it only lasts a

17   week because of all the frat boys?

18   A.   Anything's possible, yes.

19   Q.   Right.  I mean, there are marijuana users who live together

20   and share it with each other -- that's my point -- so that a

21   person could buy marijuana for their own use and they're not a

22   drug trafficker.  That's my question.

23   A.   I see what you're saying now and to maybe -- you're

24   confusing me for a minute, because I know -- let me try to

25   clarify that.

1    Q.  Sure.

2    A.  If I was going to go buy marijuana, just like if I was going

3    to go -- if I'm going to buy two ounces -- let's just use it for

4    simplicity reasons -- two ounces of marijuana, it would be

5    cheaper for me on the street to go buy it in a two ounce

6    quantity.

7    Q.  Of course.

8    A.  If I go to -- and it's the same thing if I go to, say,

9    Thorntons and buy a coke.  I buy one 20 ounce Coke, it's $2.  I

10   go to Costco and buy 30 of them, it's $12.  I mean, it's cost

11   effective for me to buy it in a bigger quantity.

12       With that being said, if someone is going to purchase enough

13   and know that they're going to use it enough for, say, a

14   quantity of three days, it would be more cost effective for them

15   to purchase in one, say, two-ounce bag instead of individual

16   baggies.

17   Q.  Right.  I mean, there are people who call ahead and say,

18   "I'd like to hook up with you" --

19   A.  Yes.

20   Q.  -- using street language, see you, which means see you for

21   you to sell and me to buy; right?

22   A.  Correct.

23   Q.  And in that instance, somebody would find out, "Could I

24   have" -- if we say an ounce, which would be in their mind a

25   week's worth, this is what I want.  The person would package it,

McKinney - Cross

1    meet them, money for marijuana, and off they go?

2    A.   Could be correct, yes.

3    Q.   Okay.  However, if somebody were to meet somebody who's a

4    marijuana salesman and say this is what they want, but the

5    person says, "Well, I've got nine packages here but it equals

6    what you want," that would be another way to buy it, but that

7    doesn't meant the person is a drug trafficker.  It just means

8    they've bought nine quantities of marijuana; right?

9    A.   It depends but, I mean, if say the drug trafficker in this

10   instance had the nine quantities and he didn't know exactly what

11   he wanted, the person wanted to come, he may buy a couple of

12   them off of him but --

13   Q.   Right.

14   A.   -- yes.

15   Q.   Maybe one person could buy half of them and then another

16   person buy the other half; right?

17   A.   Yes.

18   Q.   But, nevertheless, in this case we have -- we have nine

19   separate bags or corners, and we don't know what the total

20   quantity is still.  I mean, you can't tell us what the quantity

21   is here, can you?

22   A.   No, sir, I cannot tell the quantity.

23   Q.   And you can't tell us -- well, I guess from what you've

24   told, this would be nine blunts, or nine bowls, or nine joints,

25   or something like that?

McKinney - Cross

1    A.  Roughly, yes, sir.

2    Q.  All right.  It is in the way that it's presented -- and then

3    I'll go on to something else -- it is in the way that it's

4    presented here ready to ingest?

5    A.  Yeah, after you take it out of the packaging, yes.

6    Q.  I mean, it's ready --

7    A.  Yes, you would take it out of the packaging and then,

8    depending on how you were going to smoke it then, yes, it's

9    ready to ingest.

10   Q.  Okay.  Now, let me ask you about cocaine.  We have in this

11   case, as you've already been presented, just slightly more than

12   eight grams of cocaine.  It was in separate bags but appear to

13   be half gram quantities, 15 of them, and the bags at least were

14   -- first arrived at the lab at 15 little corner bags.

15   A.  Correct.

16   Q.  Okay.  The bags have been described when they arrived at the

17   lab as having different coloration to them.  What does that mean

18   in your training or experience, different coloration of those

19   bags of powder cocaine?

20   A.  It would depend on the type of cocaine.  There's a lot of

21   different factors on the color of the cocaine.  It could be how

22   the cocaine was shipped.  We've seen where there's been large

23   quantities of cocaine that had contamination from how it was

24   smuggled and how it got to this location, whether it be from

25   contamination from diesel fuel where it was inside a diesel

1    tank, contamination from some type of axle grease that they use

2    to deter a K-9 that it was wrapped in, a couple different

3    factors on that.  The second thing that it could be is --

4    Q.  Excuse me, sir.  I don't mean to cut you off --

5    A.  Yes, sir.

6    Q.  -- but maybe to help you with the facts.  These are 15

7    little corner bags in one plastic bag, and they were recovered

8    in a vehicle behind the dashboard.

9    A.  Correct.

10   Q.  And they arrived from the unit to inventory to lab and they

11   were different colorations, and apparently they were what's

12   called cross-contamination.

13   A.  Okay.

14   Q.  Does that help you in terms of explaining why they would be

15   of different coloration?

16   A.  That was my second thing I was going to get.

17   Q.  Okay.

18   A.  So, basically, depending on how the trafficker -- what they

19   would do is they would purchase a quantity of cocaine.  And then

20   to further extend their cocaine, they may mix it with something

21   to make the quantity bigger, so when they cut it down, they'll

22   have more quantity for less product that they physically have in

23   it.  So maybe -- depending on what they cut it with may be a

24   reason why there was discoloration.

25       Again, this is back to why that individual package may have

McKinney - Cross

1    a different color in them.  We're not dealing with licensed

2    chemists, so they're not putting in a certain amount with a

3    certain amount of cocaine and then mixing that and making it all

4    proportionate.  So it may be a little bit more cut.  What we

5    call "cut" is what they would add to it in a certain baggie that

6    may not be in another one.

7    Q.  And to clarify, "cut" is a substance, baking powder or some

8    other white substance, that isn't a controlled substance that's

9    mixed with the cocaine?

10   A.  Correct, to make it more quantity.

11   Q.  To make a little bit more quantity.  And in this case, what

12   we know is that it arrived at the lab and it was because of this

13   cross-contamination all put to one quantity.  It was mashed up,

14   mixed, and found to contain cocaine.

15   A.  Okay.

16   Q.  From what we know here, we don't know the concentration of

17   cocaine, whether it was 5 percent or 90 percent.  We have no

18   idea.  We also don't know what the individual 15 bags weighed,

19   although we can -- doing math and extrapolation, probably half a

20   gram each.  Okay?

21       Now, when one uses cocaine, you said a gram would be, you

22   say, one to two lines or did you say two to four lines?

23   A.  I think we were talking about the half gram.

24   Q.  A half a gram would be how many lines?

25   A.  Depending on the person, probably maybe two or three lines

1  maybe.

2  Q.  Okay.

3  A.  Maybe.  In a -- for reference, a gram is about a sugar

4  packet.

5  Q.  And can you tell the jury, from your experience, knowledge,

6  and training dealing with cocaine users, the -- what you've seen

7  in terms of how much a person -- let's say a person who is

8  heavily addicted to cocaine, how much they'd use per day?

9  A.  And, again, it's going to depend on how much -- we refer

10  back to the cut -- how much cocaine, actual quantity is in the

11  cocaine.  I've been in an undercover capacity where I've seen a

12  person do several lines and he didn't act any different.  And

13  I'm not a doctor to see if he was under the influence.

14  Q.  By "several" you mean -- I don't mean to cut you off -- but

15  by "several," you mean four to five lines?

16  A.  Probably.  And then I've seen them on different occasions do

17  one and was definitely under the influence.  So it's really

18  going to depend on the -- how much quantity of cocaine and how

19  strong the cocaine is.

20  Q.  So an individual could buy as much as two to three grams of

21  cocaine for personal use?

22  A.  I mean, it could be possible, yes.

23  Q.  Right.  And so here we have three days.  If a person were a

24  heavy drug addict, this is three days' worth of cocaine as it's

25  now been given to us all in one amount, 8.1 grams; right?

1   A.   Correct, but users wouldn't buy it all three days together.

2   Q.   How about a user who's going to a party and has a real

3   pretty girlfriend?

4   A.   I couldn't answer.  I mean -- I mean, we can make a

5   situation for every --

6   Q.   Right.

7   A.   -- example.

8   Q.   But I'm just trying to arrive, for the jury's sake, as

9   whether or not this is absolutely not personal use cocaine.

10  That's my question and that was the purpose of the question.  An

11  individual could use -- could purchase and have half of that

12  amount for themselves?

13  A.   Like I said, anything's possible, but if you take the

14  culmination of all the facts that I've been given --

15  Q.   Right.

16  A.   -- I wouldn't put that.  I would put --

17  Q.   Right.  But the facts as you've given them are where one

18  person sets up a meeting to see somebody else for a specific

19  quantity and that person's given a particular price; right?

20  A.   No, sir, that's not the facts.  The facts that I've been

21  given in the case are the pictures that I've received and the

22  evidence.  So from what I've seen from the pictures, the

23  evidence that was given, that doesn't lead me to a user.

24  Q.   Okay.  Let me ask you this:  You say -- you told us about

25  rental cars.

McKinney - Cross

1    A.   Excuse me?

2    Q.   Rental cars.

3    A.   Yes, sir.

4    Q.   Drug traffickers often use rental cars and don't put them in

5    their name?

6    A.   That's correct.

7    Q.   They get rental cars and they pay cash?

8    A.   Yes, they could.

9    Q.   And they also drive vehicles that aren't in their name, in

10   the name of somebody else?

11   A.   Yes, they could do that as well.

12   Q.   Would it be typical, in an effort to conceal, that a man

13   would drive his wife's car?

14   A.   I mean, yes, it's possible, yes.

15   Q.   Okay.  In firearms -- in your line of answers with regard to

16   firearms, a man has said, you know, a firearm isn't any good

17   unless somebody sees it.  Do you agree with that?

18   A.   Not necessarily.

19   Q.   Okay.  Well, we know officers, police officers commonly in

20   uniform have a firearm that is displayed for all the public to

21   see.

22   A.   That's correct.

23   Q.   We know a policeman has a firearm.

24   A.   That is correct.

25   Q.   And there's a purpose for that for our service and for our

1    protection; right?

2    A.   Correct.

3    Q.   And you said here that it is important between buyer and

4    seller for the person who is handing over the money, or seeing

5    somebody who may have money, to see a weapon in order to know,

6    look, don't mess with me; right?

7    A.   Yes.

8    Q.   I mean, if two people are going to meet in a narcotic

9    transaction, it is your understanding of the practice that the

10   person with a firearm or -- with either or both with a firearm

11   are going to let the other one know, "I've got a firearm, don't

12   try to take my money," or "I've got a firearm, don't try to take

13   my dope."  Right?

14   A.   That's correct.

15   Q.   I think the word you used here is "to display."  Right?

16   A.   Yes, they could.

17   Q.   You also, I think, described a typical narcotic transaction,

18   because it's illegal, is something that is quick and something

19   that happens with the element of speed.

20   A.   Correct.

21   Q.   That'd be pretty common, wouldn't it?

22   A.   For the most part, yes.

23   Q.   And two people who aren't going to spend much time together?

24   In fact, momentarily, as quick as the moment can be, meet,

25   exchange, and go their separate ways.  Would that be true?

1    A.   Yes.

2    Q.   Okay.  And that would mean then, if two people are going to

3    meet quickly, make the exchange of money for drugs, that it is

4    going to be -- I think the terminology in the street is hand to

5    hand; right?

6    A.   Correct, yes.

7    Q.   Hand to hand?

8    A.   Yes.

9    Q.   In law enforcement you use that term?  It looked to me to be

10   a hand-to-hand?

11   A.   Yes.

12   Q.   And hand to hand means two hands meet with money and drugs

13   and it's quick, it's swift, and it's momentarily.

14   A.   That is correct.

15   Q.   Okay.  That would mean then, for two people to meet and

16   transact narcotics or illegal drugs, it would take the person

17   having it ready in the hand and the gun ready to display for the

18   quick meet, start --

19   A.   Okay.

20   Q.   -- to finish?

21   A.   Yes, sir.  Maybe I'm -- this particular instance was a

22   traffic stop.  It wasn't a hand-to-hand stop.  Am I correct?

23   Q.   No, no, no.  I don't mean -- we had no hand to hand in this

24   case at all.

25   A.   I was just making sure.

1    Q.  Now, have you seen what's called negative lab with regard to

2    cocaine examinations, testing, weighing --

3    A.  I have.

4    Q.  -- reports?

5    A.  Yes, I have seen negative lab.

6    Q.  Tell the jury what negative lab is.

7    A.  Basically, it's when someone tries to sell something that's

8    simulated as cocaine, whether it just be 100 percent cut with no

9    cocaine in it, try to pass it off as cocaine, and that

10   particular product comes back as to found no cocaine that it

11   would contain.

12   Q.  And, of course, the way we achieve a result of negative lab

13   is for the substance to be examined by a technician with

14   knowledge, training, and experience?

15   A.  That is correct.

16   Q.  Okay.  In this case, we have 15 separate bags that weren't

17   examined.  We have 15 separate bags that were all put together,

18   mixed and mashed up and tested, so that we don't know whether

19   three of the 15, five of the 15, or seven of the 15 contained

20   cocaine.  Would you be able to tell us whether -- absent an

21   examination of each of those 15, whether all 15 contained

22   cocaine?

23   A.  No, sir, I don't conduct laboratory testing.

24   Q.  Okay.  Now, here there were seven cell phones that were

25   recovered.  I believe -- correct me if I'm wrong -- in a bag in

McKinney - Cross

1    a car and two of them were -- two of them were operating.

2    A.   Fair enough.  I don't know.

3    Q.   Okay.  Now, it is your experience, so that I understand it

4    here, that law enforcement, when there is a drug arrest, it is

5    either as the result of surveillance, or it would be the result

6    of a citizen tip, or a report of drug activity at a location, or

7    a tip or a confidential informant that a transaction is going to

8    talk place at a date, time, or location?

9    A.   Are you saying that's the only time that we do?

10   Q.   No, no, no, but it's common that I've described to you and

11   you've agreed how drug transactions take place.  Quick,

12   momentarily, exchange of money for drugs.

13   A.   Correct.

14   Q.   Whether it's a kilo or whether it's a half a gram.  I mean,

15   that's --

16   A.   Correct.

17   Q.   Because it's illegal; right?

18   A.   Correct.

19   Q.   And the way drug interdiction works, the way law enforcement

20   works is we want to be there when it happens someway, somehow,

21   someplace so that we can catch the drug trafficker and catch the

22   person who's buying drugs, because he too may be a drug

23   trafficker; right?

24   A.   Very difficult to get both those in the same place but --

25   Q.   Right, right.  But when you have an informant, it can be

1 done.

2 A.   Yes, sir.

3 Q.   Because the informant works as the buyer to take you to the

4 seller.  And, of course, at that point the seller doesn't know

5 you're going to be there, and you arrest the seller as he's

6 making a delivery; right?

7 A.   Yes, that -- yes.

8 Q.   And same thing with a buyer.  You have a cooperating

9 informant who is a seller and he locates a buyer.  You are there

10 at the location and there you have the buyer taking the quantity

11 and the arrest is made with the assistance of an informant?

12 A.   Yes, we use informants.

13 Q.   Okay.  And in the the investigations that we have in this

14 case, we have a report -- or excuse me -- an observation by a

15 law enforcement officer of a tinted window.  The tinted window

16 then leads to other investigative observations that lead the

17 officers to conduct a K-9 search.  From there, then there is a

18 recovery of a gun, and marijuana, and then cocaine.  You're

19 aware of that generally in this case?

20 A.   Yes, sir, yes, sir.

21 Q.   Now, in a case such as this -- I mean, this does happen with

22 some frequency, not great frequency, but this is one of the

23 investigative tools of law enforcement.  And I'm not questioning

24 the legality or the propriety of it, but this is one of the

25 investigative tools of law enforcement, isn't it, what I've

1   described to you?  A traffic stop --

2   A.  Yes.

3   Q.  -- leading to a K-9, leading to the recovery of drugs?

4   A.  Yes, that's just doing good police work.

5   Q.  And in this investigative method, the individual doesn't

6   know -- in fact, the policeman doesn't even know that there's

7   going to be a K-9 alert and that there's going to be recovery of

8   a controlled substance and other contraband.

9   A.  I wasn't there, but that's usually how it works.  Usually

10  the K-9 will indicate and then we would find it, yes.

11  Q.  Right.  But based upon what we have here, the police

12  officers have said they didn't know Mr. Brewer before and they

13  weren't called to the location.  This was a traffic stop which

14  led to a K-9 alert that led to a recovery.  Follow that so far?

15  A.  Yes.

16  Q.  And it also led to the recovery of cell phones.

17  A.  Correct.

18  Q.  You're aware of that?

19  A.  Yes, sir.

20  Q.  Now, in this scenario, as well as in the other scenarios

21  I've described using confidential informants, wouldn't the

22  recovery of the cell phone be an important item of evidence

23  potentially in an investigation?

24  A.  It could be, yes.

25  Q.  Yes.  Because wouldn't the cell phone have a screen on it

 1    that would show incoming phone calls or outgoing phone calls?

 2    A.   I mean, yes.

 3    Q.   It could?

 4    A.   It could, yes.

 5    Q.   Yes.  And can you tell me whether you're aware of the fact

 6    that there was an application for the search of the content of

 7    these two cell phones, whether you know that or not?

 8    A.   I have no idea.

 9    Q.   Okay.  Well, there are investigative methods, as I've

10    described, which do lead to evidence of other narcotic

11    traffickers, or buyers, or sellers of controlled substances by

12    use of a cell phone.  Does that happen?

13    A.   Yes, it could happen, yes.

14    Q.   Yes.  Have you done that in your -- in your law enforcement

15    work?  Made an arrest, seized a cell phone, found numbers on it

16    which led to other suspects or other narcotic -- or other people

17    involved in narcotic trafficking?

18    A.   Yes, we have done that.

19    Q.   Do you know that wasn't done here in this case?

20    A.   I wasn't aware of that, no.

21            MR. MEJIA:  Okay.  Thank you.  Nothing more.

22            MS. MCKENZIE:  I have no redirect.

23            THE COURT:  You may step down.  Thank you.

24            THE WITNESS:  Thank you, Your Honor.

25            THE COURT:  Let me see counsel at the bench, please.

1      (Bench conference on the record outside the hearing of the

2    jury.)

3              THE COURT:  I presume you have no more witnesses;

4    correct?

5              MS. MCKENZIE:  That concludes our case.

6              THE COURT:  Before I ask you to state that in open

7    court, is now the occasion for me to read your stipulations?

8              MS. MCKENZIE:  Yes, Your Honor.

9              THE COURT:  Now, I don't plan on giving these

10   stipulations as they've been drafted here to the jury.  To the

11   extent that there are references to them in the instructions,

12   that's where they would see the written version of them.  Do you

13   want to sign them and have them entered in the docket?  How do

14   you want to handle this?

15             MS. MCKENZIE:  Yes.

16             THE COURT:  Do you want me to give these to you now

17   and have them signed or do you want me to simply read them and

18   then you can sign them and enter them later?

19             MS. MCKENZIE:  Yeah, that's fine, you can read them

20   now and we can execute the documents later.

21             THE COURT:  Okay.  All I'm going to do is tell the

22   jury -- actually, I'm going to ask you when you go back if the

23   United States has any more testimony to present.  You can say no

24   and I will then say the parties have stipulated to certain

25   facts, and I am now going to read those two stipulations.  I'll

 1    read them exactly as they are said here.  I need you to tell me

 2    the exhibit numbers for the cocaine and the firearm, and I

 3    presume I can use today's date of January 9th.  Is that

 4    acceptable?

 5            MS. MCKENZIE:  Yes.  The firearm is Exhibit Number 4.

 6            THE COURT:  Exhibit number what?

 7            MS. MCKENZIE:  Four.

 8            THE COURT:  Okay.  And the cocaine is exhibit number?

 9            MS. MCKENZIE:  Sixteen.

10            THE COURT:  I'm sorry?  Sixteen?

11            MS. MCKENZIE:  Uh-huh.

12            THE COURT:  Do you-all need to look at these before I

13    read them?

14        Mr. Mejia, these are set up for your client to sign them.

15    Do you want to have him sign them before I read?

16            MR. MEJIA:  We probably should, yes.

17            THE COURT:  Why don't you go do that and I'll tell the

18    jury we just need a minute.

19        (End of bench conference.)

20            THE COURT:  Members of the jury, we just need a

21    minute, if you'll just relax in place.  If anybody needs to

22    stand up, that's fine.

23        (Mr. Mejia conferring with defendant off the record.)

24        (Bench conference on the record outside the hearing of the

25    jury.)

1          THE COURT:  Why don't you go ahead and sign it, and

2     then I'll give it to Natalie to be placed in the docket.  Thank

3     you.

4          (End of bench conference.)

5          THE COURT:  Ms. McKenzie, does the United States have

6     any further witness testimony to present?

7          MS. MCKENZIE:  No, Your Honor.  That concludes the

8     testimony from the United States.

9          THE COURT:  And the parties wish for me to now read

10     their stipulations; is that correct?

11          MR. MEJIA:  Yes, sir.

12          MS. MCKENZIE:  Yes, Your Honor.

13          THE COURT:  Members of the jury, I have for you two

14     stipulations or agreements as to certain facts.  I referenced

15     this possibility in the preliminary instructions that I read to

16     you at the outset of the case.  I will now read to you the two

17     stipulations.

18        The first one is as follows:  Defendant, Cherosco Brewer,

19     and the United States of America stipulate and agree to the

20     following:

21        One, that the Glock 22, .40 caliber, semiautomatic pistol,

22     serial number HVP337, introduced as Government's Exhibit 4 is a

23     firearm as defined by 18 U.S.C. Section 921(a)(3) in that it

24     expels a projectile by the action of an explosive.

25        Two, that the Glock 22, .40 caliber, semiautomatic pistol,

 1    serial number HVP337, introduced as Government's Exhibit 4 did

 2    cross state lines prior to November 11, 2015, in that it was

 3    manufactured outside the Commonwealth of Kentucky.

 4        In making this stipulation, the defendant makes no admission

 5    that he was ever in possession of the above listed firearm, and

 6    that is agreed to as of this date.

 7        The second stipulation reads as follows:  Defendant,

 8    Cherosco Brewer, and the United States of America stipulate and

 9    agree to the following:

10        One, that the white powder in court today and introduced as

11    Government's Exhibit 16 is the same as that seized from the

12    silver Taurus near the intersection of West Broadway and South

13    24th Street on April 3, 2015, and tested by forensic chemist Tom

14    Frisby of the Kentucky State Police Lab in Frankfort, Kentucky,

15    that the test conducted by the KSP lab concluded the substance

16    contained cocaine and had a total weight of 8.106 grams.  The

17    parties do not dispute these facts.

18        Let me see counsel.

19        (Bench conference on the record outside the hearing of the

20    jury.)

21            THE COURT:  This is not the right date, is it?

22            MS. MCKENZIE:  No, that is the previous version.

23    Natalie corrected this date.

24            THE COURT:  Well, that's the only one I had.

25            MS. MCKENZIE:  Okay.

1           MR. MEJIA:  Frisby's date of examination?

2           MS. MCKENZIE:  No, no, no.

3           THE COURT:  I don't know.  I don't know where that

4    date came from.

5           MS. MCKENZIE:  That was the typo.

6           THE COURT:  This should be what?

7           MS. MCKENZIE:  November 12th.

8           MR. MEJIA:  We all missed it.  Thanks, Judge.

9    Somebody's awake over here.

10          MS. MCKENZIE:  Yeah, I --

11          THE COURT:  Okay.  Let me get two lawyers and one

12   defendant's initials on that correction, and I'll re-read it to

13   the jury --

14          MS. MCKENZIE:  I apologize.

15          THE COURT:  -- with apologies.  You can take it over

16   to Mr. Brewer and explain the error.

17      (Mr. Mejia conferring with defendant off the record.)

18          THE COURT:  Thank you, sir.  Unless there's an

19   objection to it, I intend to simply inform the jury that I read

20   to them a version of the stipulation that contained a

21   typographical error, and I'm going to re-read it with the

22   correction to the date.

23          MR. MEJIA:  Yes.

24          MS. MCKENZIE:  Thank you, Your Honor

25      (End of bench conference.)

1          THE COURT:  Members of the jury, the second

2     stipulation of facts that I just read to you contained a

3     typographical error and the date was misstated, so I'm going to

4     re-read the second stipulation of facts to you with the date

5     having been corrected.

6        Defendant, Cherosco Brewer, and the United States of America

7     stipulate and agree to the following:

8        One, that the white powder in court today and introduced as

9     Government's Exhibit 16 is the same as that seized from the

10    silver Taurus near the intersection of West Broadway and South

11    24th Street on November 12, 2015, and tested by forensic chemist

12    Tom Frisby of the Kentucky State Police Lab in Frankfort,

13    Kentucky.

14       Two, that the test conducted by the KSP lab concluded the

15    substance contained cocaine and had a total weight of 8.106

16    grams.  The parties do not dispute these facts, and that is

17    agreed to with today's date.

18       Does the United States have any further evidence to present?

19          MS. MCKENZIE:  No, Your Honor.  That's the close of

20    the case for the United States.

21          THE COURT:  Members of the jury, the United States has

22    now closed its case.  Before I ask Mr. Mejia any questions with

23    respect to what he plans to do, I want to take a brief break

24    that will allow you-all time to catch your breath, get a drink

25    of water while we determine next steps.

1    Before we do that, I want to talk to you a bit about

2    scheduling.  It is now 4:20.  It is late in the afternoon.  I do

3    not know as I sit here whether we can finish today, but what I

4    would like to ask of you is whether any of you have a problem

5    staying later today than our normal 4:30 or 5:00?  If you do,

6    that's perfectly fine.  I told you at the outset I would not

7    impose any burdens upon you if I could avoid it.

8    My preference would be to try and conclude the case today,

9    if at all possible, but I don't know whether we can do that.  So

10   by show of hands, is there anyone who cannot stay past 4:30

11   today?  No hands.

12   Is there anyone in the jury pool who -- I'm sorry -- on the

13   jury who cannot stay past 5:00?  Yes, ma'am.  Thank you.

14   Then we will go no later than 5:00 today.  It may be that

15   that's unavoidable in any instance, because I do not know how

16   much more work or evidence there is to be presented to you in

17   any event, but when you come back from this break, I'll have a

18   bit more information for you.  Thank you very much.  Remember

19   not to discuss the case.

20   (Jury out 4:22 p.m.)

21   THE COURT:  The jury is now out of the courtroom.

22   Mr. Mejia, do you wish to make a motion at this time?

23   MR. MEJIA:  Yes, Your Honor.  Under appropriate rules

24   of the rules of criminal procedure in the federal courts, I move

25   for judgment of acquittal at the close of the prosecution's

1    case-in-chief.  I have no argument beyond resting on the

2    evidence that's been presented to this point.

3              THE COURT:  Well, under Rule 29(b), I'm going to

4    reserve my decision on that motion.

5         Now, before I ask you what's next, keep in mind we have one

6    juror who cannot stay past 5:00, so I think we're going to be

7    coming back tomorrow in any event.

8         I do not believe we can get through instructions and closing

9    arguments in 35 minutes, no matter what you do, Mr. Mejia, even

10   if you choose not to present any testimony or evidence, so I

11   think we'll be back in the morning no matter what.  What do you

12   plan to do at this point?

13             MR. MEJIA:  I have two short witnesses, and if you'll

14   give me five minutes, I'll coordinate them and I'll be ready to

15   begin.

16             THE COURT:  That will be fine.  I'll give you that and

17   perhaps a few minutes more.

18             MR. MEJIA:  Thank you very much.

19        (Recess at 4:24 p.m. until on 4:36 p.m.  Jury out.)

20             THE COURT:  Let me see counsel at the bench before we

21   bring the jury back, please.

22        (Bench conference on the record outside.)

23             THE COURT:  Here are the materials I looked at in

24   camera.  Do you have any -- not that your predictions are

25   particularly reliable, mind you, but do you have any predictions

1   as to the length of your testimony you anticipate?

2            MR. MEJIA:  I expect the direct examination of this

3   first witness is going to be ten to 12 minutes.

4            THE COURT:  Each?

5            MR. MEJIA:  Each.

6            THE COURT:  Just two?

7            MR. MEJIA:  Yeah.  Should we just do one?

8            THE COURT:  No, if we could -- well, we'll just see

9   how it goes.  I'm going to end at 5:00, because I don't want to

10  put that one juror in a bad spot, so I'm going to end at 5:00.

11  And the fact that we have to come back tomorrow, whether you

12  have a ten-minute witness in the morning or get them through

13  tonight, it won't really matter that much.

14           MR. MEJIA:  Okay.

15           THE COURT:  It won't alter the schedule that much.

16           MR. MEJIA:  I need access to Exhibits 1, 2, and 16.

17           MS. MCKENZIE:  I don't --

18           THE COURT:  One, 2, and 16?

19           MS. MCKENZIE:  Are you going to handle them?

20           MR. MEJIA:  I'm going to put gloves on, and I'm going

21  to show them to the witness.

22           MS. MCKENZIE:  Okay.  The witness cannot handle them.

23           MR. MEJIA:  I'm going to show them to the witness.  I

24  do believe I'm being told what to do.

25       (End of bench conference.)

```
 1          THE COURT:  Why don't you just keep them at the podium
 2   with you until you're ready to pull them out.
 3      Does Mr. Mejia need gloves?
 4          MS. MCKENZIE:  He has them.
 5          MR. MEJIA:  I have them.
 6          THE COURT:  Oh, they're up there.  I could not see
 7   them from my vantage point.
 8      We're ready for the jury.
 9      (Jury in 4:40 p.m.)
10          THE COURT:  Mr. Mejia.
11          MR. MEJIA:  May it please the court.  The defense will
12   call Stephanie Sears.
13      (STEPHANIE SEARS, called by the defense, sworn.)
14                      DIRECT EXAMINATION
15   BY MR. MEJIA:
16   Q.  Good afternoon, ma'am.
17   A.  Hi.
18   Q.  As you answer my questions, would you please address your
19   responses to the jury.
20   A.  Yes.
21   Q.  Please tell us your full name and spell your last name.
22   A.  My name is Stephanie Sears, S-E-A-R-S, like the store.
23   Q.  And where do you live?
24   A.  709 East Kentucky, Louisville, Kentucky, and I've been in my
25   house for 53 years.  I own it.
```

1    Q.  May I ask you -- I guess it's impolite.  Virtually your

2    whole life at that address?

3    A.  Whole life.

4    Q.  Okay.  Now, what's your business, profession, or occupation?

5    A.  I work for Amazon.  I do surveys for a living.

6    Q.  And what is your work there?  What do you do?

7    A.  I research.

8    Q.  All right.  And can you tell me a little bit about your

9    upbringing and education?  Where did you go to school and what

10   was your last either education or --

11   A.  I graduated from high school in 1983, and I went to

12   Atherton.

13   Q.  All right.  Now, did a representative of my office contact

14   you and request an interview of you this week?

15   A.  Yes, they did.

16   Q.  And did you consent to agree and meet and talk with me?

17   A.  Yes, I did.

18   Q.  Now, do you, ma'am, have any connection to my office, that

19   is the office of David Mejia in Louisville, Kentucky?

20   A.  No, I do not.

21   Q.  And do you have any connection to Cherosco Brewer?

22   A.  No.

23   Q.  Now, ma'am, I'm going to ask you some questions and not to

24   embarrass you, but because you may assist the jury.  Have you in

25   your life had experiences ingesting marijuana?

Sears - Direct

1   A.   Yes, I have.

2   Q.   Tell the jury how old you were approximately when you first

3   smoked marijuana.

4   A.   Nineteen.

5   Q.   And for how long a duration did you smoke marijuana, either

6   by months, years, or whatever you can tell us?

7   A.   Twenty years.

8   Q.   Did you have varying amounts that you would smoke, depending

9   upon either the season, year, or time?

10  A.   Yes.

11  Q.   Now, did you become familiar enough with marijuana to tell

12  us if you see it by looking at it?

13  A.   No, you can't tell unless you smoke it.

14  Q.   If I showed you, would you be able to tell me whether or not

15  you recognized something?  Okay?

16       How they got these on, I have no idea.  This may be the best

17  I do.

18       By looking at this, what's in front of you, ma'am, can you

19  tell me whether or not you can recognize this as having the look

20  of marijuana?

21  A.   Yes.

22  Q.   Now, looking at these different quantities, can you tell me

23  whether or not these appear to be quantities of marijuana of a

24  kind similar in size or in shape to which you have familiarity?

25  A.   Yes.

1   Q.  Can you tell me, as best you can, of these nine separate

2   quantities here what these appear to be, at least to you, based

3   upon your experience with marijuana for 20 years?  What amount

4   of marijuana is in each one of those nine separate portions?

5   A.  One blunt.

6   Q.  One blunt?

7   A.  Uh-huh.

8   Q.  Okay.  And over the period of time -- I'll take one out

9   individually, if I can, carefully.  Tell the jury what a blunt

10  is and how one ingests a blunt.

11  A.  Well, a blunt is rolled up into a sheet and smoked.

12  Q.  Okay.  And in your experience with marijuana, can you tell

13  me the quantity or amounts of marijuana that you would or could

14  ingest on a typical day as a marijuana user.

15  A.  No, I couldn't tell you because I would smoke it and

16  couldn't keep count of it.

17  Q.  Okay.

18  A.  It's like smoking a cigarette.  You don't keep count of how

19  many cigarettes you smoke.

20  Q.  We have -- could you tell -- be more specific to tell us

21  whether -- in a day how many blunts you would smoke.

22  A.  It would take about five or nine.  If I'm sharing it with

23  somebody, it would be about nine.

24  Q.  Nine a day?

25  A.  Uh-huh.

1    Q.  Can you tell me what would be a typical amount that you

2    would buy during the time period that you were smoking marijuana

3    regularly?

4    A.  Something like them bags right there.

5    Q.  Okay.  Do you recognize the nine bags as you see them here?

6    Do you recognize blunts --

7    A.  Yes.

8    Q.  -- being in nine separate bags?

9    A.  Yes.

10   Q.  Can you tell me whether in your experience, if you wanted,

11   let's say, nine blunts or ten blunts, that you would get them

12   all in one bag or they would be in separate bags as you would

13   purchase them?

14   A.  It's the way you order it, they'll give it to you.

15   Q.  Okay.  Can you ask that it all be in one bag and also ask

16   that it be in separate bags?

17   A.  Yes, sir.

18   Q.  Now, tell the jury how it is that as a marijuana user you

19   would actually recognize something to be marijuana or not be

20   marijuana.

21   A.  Only to smoke it.

22   Q.  Smoke it?

23   A.  Uh-huh.

24   Q.  Did you ever have experiences over the time period that you

25   smoked marijuana when you purchased it, inhaled it, and found it

Sears - Direct

1   not to be what it was represented to be to you?

2   A.   Yes.

3   Q.   And if not marijuana, could you maybe explain to the jury

4   what would be some kind of substitute for marijuana, be false

5   marijuana that you either would purchase or be delivered to you?

6   A.   Seasoning.

7   Q.   Seeds?

8   A.   Seasoning.

9   Q.   Seasoning?

10  A.   Uh-huh.

11  Q.   And was that something that was common or rare, or how would

12  you know, as you gave money for a purchase of marijuana, that it

13  was the real thing or not?

14  A.   Just take a chance.

15  Q.   Just take a chance.  Okay.  Now, can you tell me the kinds

16  of locations or places where -- or for one who has, let's say,

17  never had occasion to buy or purchase marijuana, in your

18  experience where one would find or locate marijuana?

19  A.   You can walk right outside the building and find it.

20  Q.   Right outside this building?

21  A.   Yes, sir, at this building.

22  Q.   In your experience, based upon either where you lived, or

23  where you worked, or where you inhabited, where would be a

24  normal or typical place for you to locate or buy marijuana?

25  A.   Anywhere.

1   Q.  All right.  Now, ma'am, I'm going to ask you about whether

2   you have ingested any other controlled substances other than

3   marijuana?

4   A.  Yes, I have.

5   Q.  Have you had experience ingesting cocaine?

6   A.  Yes.

7   Q.  Tell the jury when it was or how old you were when you first

8   ingested cocaine.

9   A.  Back in 1983.

10  Q.  So some 35 years ago?

11  A.  Thirty-five.

12  Q.  And what was the time period in which you ingested cocaine?

13  For how long?

14  A.  A year ago, a year ago.  How long have I been doing it?

15  Q.  You ingested cocaine up to a year ago?

16  A.  No.  How long have I been doing it?

17  Q.  Well --

18  A.  It was about a year.

19  Q.  Just so we're not confused, you first ingested cocaine in

20  1983.

21  A.  Right.

22  Q.  And how many years of your life did you --

23  A.  About 30.

24  Q.  Thirty years?

25  A.  Uh-huh.

1    Q.   So up until, like, about 2013?

2    A.   Right.

3    Q.   How frequently did you ingest cocaine, ma'am?

4    A.   Every other day.

5    Q.   Can you tell -- describe to the jury whether or not you ever

6    ingested powder cocaine.

7    A.   Yes.

8    Q.   So how would you -- or how did you ingest powder cocaine?

9    A.   I snorted it.

10   Q.   And is that how we see on TV and in the movies, where

11   someone has this straw type instrument and inhales it up their

12   nose?

13   A.   Yes, sir.

14   Q.   And can you tell the jury the quantity with which one would

15   ingest -- if it was, let's say, a line or two, what kind of

16   quantity that is by gram?

17   A.   Yeah, it depends on what you want, the quality, and you will

18   get it -- two or three grams.

19   Q.   Okay.  And how long would two or three grams last you, in

20   your experience?

21   A.   If I'm by myself, two days.

22   Q.   Okay.

23   A.   Usually I have company.  A day.

24   Q.   A day.  In this case we see that there is eight -- slightly

25   over eight grams of cocaine, and it was in 15 separate packages,

1    however, then all put together into one quantity of 8.1 grams of

2    cocaine.  Would you be familiar enough in your experience to see

3    cocaine in half gram quantities?

4    A.  Yes.

5    Q.  And would you -- have you -- had you ever purchased that

6    amount, a half a gram?

7    A.  Yes, yes.

8    Q.  And have you purchased multiple half grams for your own

9    personal use?

10   A.  Yes, I have.

11   Q.  What has been your experience there, an amount -- multiples

12   of half gram?

13   A.  As far as experience of what?  Getting it?

14   Q.  No, how many half grams?

15   A.  Have I bought?

16   Q.  If, let's say, in one purchase amount, could you -- in

17   multiple half grams of cocaine, how many would you purchase?

18   A.  Ten, 12.  It depends if I have company or not, if I'm by

19   myself.  Usually it's a party.

20   Q.  You could for your use purchase ten to 12 half gram

21   quantities?

22   A.  Yes, sir, yes, sir.

23   Q.  And when you did that, would they all be in separate half

24   gram bags?

25   A.  If that's the way I ordered, that's the way it came.

1   Q.  And would you order it sometimes that way?

2   A.  Yes, sir.

3   Q.  So at some point in your life, if one were to enter wherever

4   you were, a house, apartment, hotel, whatever, they could see

5   you with multiple half gram quantities of cocaine?

6   A.  Yes.

7   Q.  For your use?

8   A.  For my use only.

9   Q.  When you were using cocaine and marijuana, would you at

10  times hide it from being detected when you had it in your

11  possession?

12  A.  Yes.

13  Q.  Why would you hide it?

14  A.  So it wouldn't get stolen.

15  Q.  You also, of course, understood that having cocaine, having

16  marijuana is against the law.

17  A.  Yes, I do.

18  Q.  If traveling in a car, would you ever take steps to conceal

19  it?

20  A.  Yes.

21          MR. MEJIA:  Okay.  Nothing more.  Thank you.

22          THE COURT:  May I see counsel, please.

23      (Bench conference on the record outside the hearing of the

24  jury.)

25          MR. MEJIA:  How long did it take me?  The glove took

1   me two minutes.

2           THE COURT:  Do you anticipate having any cross?

3           MS. MCKENZIE:  Yes, Your Honor, and I have an issue to

4   bring to the court for your assistance for -- for a ruling, I

5   guess.

6           THE COURT:  With respect to this witness?

7           MS. MCKENZIE:  Impeachment of this witness.

8           THE COURT:  All right.  I'm going to let the jury go.

9   You'll have to have your witness return in the morning.

10          MR. MEJIA:  Okay.

11          THE COURT:  I will advise her that she will remain

12  under oath.  Also, the standard admonition I give to any witness

13  and counsel when there's an intervening time period that any

14  consultation should be limited and appropriate, given that they

15  remain under oath and their further testimony is anticipated.

16      All right.  We'll talk about it after I let the jury go.

17          MR. MEJIA:  I'm going to admonish her as to this

18  separation of witnesses order.

19          THE COURT:  That's fine.

20      (End of bench conference.)

21          THE COURT:  Members of the jury, we're going to break

22  now for the day, and so we will pick up in the morning at 9:00

23  a.m.  This witness will return to the stand for cross-

24  examination tomorrow morning, and that's where we'll pick up,

25  and then I will consult with you a bit further at that time

1    about the schedule.  I believe we can fairly anticipate

2    finishing the case tomorrow.  I'm sorry.  This sometimes gets in

3    my way and I push it away.  We will begin at 9:00 a.m. in the

4    morning.

5        Remember the admonition not to discuss the case amongst

6    yourselves or with anyone else.  Thank you very much.  We'll see

7    you -- please be here soon enough to be ready to start at 9:00.

8    Thank you.

9        (Jury out 4:57 p.m.)

10            THE COURT:  The jury has now left the courtroom.

11       Ma'am, you may step down now.

12            THE WITNESS:  Thank you.

13            THE COURT:  I will remind you that you will remain

14   under oath and that you will need to return in the morning in

15   order to resume your testimony at 9:00 a.m.  Thank you.

16            THE WITNESS:  Thank you.

17            THE COURT:  I'm going to ask counsel to plan to be

18   here at 8:30 in the morning.  We'll take up remaining

19   housekeeping issues at that time.

20       Now, why don't you-all return to the bench, and we can

21   discuss that issue that we need to take up.

22       (Bench conference on the record.)

23            MS. MCKENZIE:  So I wanted to alert the court to this

24   before questioning the witness about it.  My quick research on

25   my iPhone tells me that this witness has a 2013 conviction for

1   giving a police officer a false name or address.  Now, that is

2   not a felony, but I do believe it falls within the ambit of Rule

3   608(b), which says:  "Specific instances of conduct ordinarily

4   are not admissible proving specific instances, but the court may

5   on cross-examination allow them to be inquired into if they are

6   probative of the character for truthfulness or untruthfulness of

7   the witness."

8        So it's been a while since I have looked at the elements of

9   that crime, but I believe that that is a crime of

10  untruthfulness, and I would ask the court's permission to

11  cross-examine the witness about it.

12            THE COURT:  Do you have any response?

13            MR. MEJIA:  I object.  Specific instances of

14  untruthfulness aren't admissible, and I don't believe that this

15  particular instance falls within any exception to that.  We have

16  felonies and we have crimes of moral turpitude.  This particular

17  offense is actually a specific offense of untruthfulness, a

18  specific act of untruthfulness.

19            THE COURT:  So this is -- she was convicted; is that

20  right?

21            MS. MCKENZIE:  Uh-huh.

22            THE COURT:  It's a misdemeanor?

23            MS. MCKENZIE:  It is a misdemeanor.  Rule 608 concerns

24  a witness's character for truthfulness or untruthfulness.

25            THE COURT:  So is this, under Rule 609, impeachment by

 1    evidence of a criminal conviction?

 2              MS. MCKENZIE:  No -- well, yes, I guess it also falls

 3    under 609.

 4              THE COURT:  609(a)(2)?

 5              MS. MCKENZIE:  Yes.

 6              THE COURT:  "Any crime regardless of the punishment,

 7    the evidence must be admitted if the court can readily determine

 8    that establishing the elements of the crime require proving or

 9    the witness's admitting a dishonest act or false statement."  So

10    I would ask you, before we gather at 8:30 in the morning, to

11    look at Rule 609(a)(2), because that appears to be an

12    appropriate subject for even a misdemeanor conviction, if it

13    involves an element of a dishonest act or false statement.

14              MR. MEJIA:  Right.  If I concede the point, I'll

15    conclude my direct examination by fronting it.

16              THE COURT:  I thought you were done.

17              MR. MEJIA:  I was but now that I've just learned of

18    this -- I didn't know this, of this conviction.

19              THE COURT:  Well, you don't get to redirect her before

20    cross-examination.

21              MR. MEJIA:  No, no, no, conclude my direct

22    examination.

23              THE COURT:  I thought your direct was concluded.

24              MR. MEJIA:  It was until now.  I'm asking --

25              THE COURT:  No, it's concluded.

```
 1              MR. MEJIA:  Okay.  All right.

 2              THE COURT:  That's not fair.

 3              MR. MEJIA:  Okay.

 4              THE COURT:  I don't think you get to front an issue

 5    that a reasonable investigation could have uncovered.

 6              MR. MEJIA:  Okay.

 7              THE COURT:  I'm going to look at the case law with

 8    respect to 609(a)(2), because I think -- do you know the

 9    statute, state statute for this conviction?

10              MS. MCKENZIE:  I think this says -- it doesn't give

11    the KRS -- oh, yes, it does.  It is KRS 523.110 and it looks

12    like there are subsections and maybe Subsection (1).

13              THE COURT:  I will offer the unsolicited then in the

14    category for what it's worth observation that this is one of

15    the -- I don't know.  This is an exercise I don't look forward

16    to examining.

17        This woman's testimony, it seems to me, would suggest that

18    she is a long-term drug user and perhaps has overcome that.  I

19    hope she has, but it is a sad testimony presented, I'm sure, for

20    that purpose.  It's not going to shock anyone who heard her

21    testimony.  It's not going to shock anyone to hear that she has

22    a misdemeanor conviction.

23              MR. MEJIA:  Right.

24              THE COURT:  So I don't worry about -- I don't worry

25    about that aspect of it in any event.
```

1      Okay.  You need to look at 609 --

2           MR. MEJIA:  I'll do that.

3           THE COURT:  -- and be prepared to discuss anything

4  further, but it does appear that that rule applies here and that

5  the Government would be allowed to cross-examine her on that

6  conviction.

7      I don't think you're going to -- I'm not going to give you a

8  great deal of latitude to go very far with it.  I think the fact

9  that it's -- she's been convicted.  If she denies it, which I

10  would not expect her to, but if she were to deny it, we're not

11  going to call any other witnesses to prove it.

12          MS. MCKENZIE:  Sure.

13          MR. MEJIA:  And I expect that it would be just the

14  offense as described in the statute and that she's been

15  convicted of it.

16          THE COURT:  She may want to explain it.  I mean, I've

17  been in enough trials on that side of the bench and now this

18  side of the bench where folks have admitted to convictions and

19  then want to explain it.  If she wants to explain it, I'm not

20  going to prohibit her from offering some explanation.

21          MR. MEJIA:  Okay.

22          THE COURT:  But I don't see a whole lot of value in

23  delving into the details, absent her desire to do so.

24          MR. MEJIA:  Well, that was my purpose in saying may I

25  reopen or conclude my direct examination by asking her to admit

1    to it and that would be the end of it, but I accept your --

2            THE COURT:  I don't think you would have liked me

3    allowing the same for --

4            MR. MEJIA:  You're right.

5            THE COURT:  -- for the Government.

6            MR. MEJIA:  I admit it.  You're right.

7            THE COURT:  And then you anticipate having one more

8    witness after her?

9            MR. MEJIA:  Right, correct, same thing, 12 minutes.

10           THE COURT:  Right, ballpark 12, 25, somewhere in that

11   range.

12           MR. MEJIA:  Yeah.

13           THE COURT:  We'll talk at 8:30 in the morning.  We

14   will have the final instructions.  We'll have the redacted

15   indictment, all of that ready to go.  What I will plan to do,

16   once you are concluded -- do you at this point -- based on what

17   you've seen, I can't imagine you're going to have a rebuttal

18   witness.

19           MS. MCKENZIE:  No.

20           THE COURT:  So assuming no rebuttal witness is called

21   for based on your second witness -- you will rest after your

22   second witness?  Then I don't think -- unless we've been at it

23   and we just need a typical break, I don't think we'll break for

24   very long, because I think the instructions are done.

25       So at that point, I'm going to give the jury an outline.

1     I'm going to tell them that I have instructions for them.  They

2     will come in two parts.  And I'm going to go ahead and give them

3     the instructions, go to closing arguments, final instructions,

4     and then I will remind them that one of them will be randomly

5     selected as the alternate before the jury goes back to

6     deliberate.  And instructions probably are in the neighborhood

7     of 30 minutes to get through.  How long do you-all anticipate

8     you'll need for closing at this point?

9              MS. MCKENZIE:  I'd say 30 minutes, 15 for rebuttal.

10             MR. MEJIA:  Total 45?

11             MS. MCKENZIE:  Uh-huh.

12             MR. MEJIA:  Half an hour.  May I ask you, Judge -- I

13    don't recall whether you do this -- will you be admonishing him

14    and inquiring of him as to whether or not he chooses not to

15    testify?

16             THE COURT:  I typically do not, unless it's flagged by

17    one side or the other as necessary.

18             MR. MEJIA:  No, no, I don't think it is, but some

19    courts do, some don't.

20             THE COURT:  My view is that it's counsel's obligation

21    to inform their client of their rights and --

22             MR. MEJIA:  Okay.

23             THE COURT:  -- I trust that you have done that here,

24    and I trust that this defendant knows that he has the right to

25    testify, if he chooses to.  He has the right not to testify and

```
 1    no one can force him to testify.  I'm happy to say that to him.

 2    We can pull him up here right now and I can say it to him on the

 3    record, if you think it's necessary.

 4              MR. MEJIA:  No, that's all right.

 5              THE COURT:  But you're an experienced criminal defense

 6    lawyer, so I trust he has been well aware of those rights well

 7    in advance of trial.

 8         Okay.  Thirty to 45 minutes range and then final

 9    instructions.  We'll get it to the jury.  While they're out -- I

10    have hearings scheduled tomorrow, tomorrow afternoon, so if we

11    get to the lunch hour -- my hope would be that we could get this

12    to the jury by 11:30, and we'll probably order them lunch at

13    that point and then let them go.  My hearings are scheduled in

14    this courtroom.  I'll plan to keep those on the docket, unless

15    something comes up with the jury or with the trial.

16         I don't anticipate the turnaround between their return of

17    verdict and sending them back out on Count 1 to take very long.

18    Do you anticipate having any witnesses?

19              MS. MCKENZIE:  Not as long as the -- we still have a

20    stipulation.

21              THE COURT:  I'll double-check the date this time

22    before I read it.

23              MS. MCKENZIE:  I apologize, Your Honor.

24              THE COURT:  That's all right.

25              MS. MCKENZIE:  That's on me.  Yeah, I would expect it
```

1    to consist of reading the stipulation and instructing them

2    and --

3                THE COURT:  You've already stipulated to one aspect of

4    the gun --

5                MS. MCKENZIE:  Yeah.

6                THE COURT:  -- and then the other.  I will -- you-all

7    can talk about this.  I'll give you probably five, ten minutes

8    each to address the jury with respect to Count 1 in the form of

9    a closing argument.  I don't think an opening is necessary, if

10   there's not going to be testimony.  If all we're going to do is

11   read the second stipulation, I'll give you ten minutes to make

12   your -- or 15, whatever you need, to make your case.

13               MR. MEJIA:  Can't imagine what I'd say.

14               THE COURT:  Well, we know --

15               MR. MEJIA:  Been doing it a long time, Judge.

16               THE COURT:  I don't know either, unless they come back

17   and find him not guilty of Count 3.  Then you have something to

18   talk about.

19               MR. MEJIA:  There you go.

20               THE COURT:  And so we'll just see how that goes.  It's

21   an unusual set of circumstances --

22               MR. MEJIA:  Right, right.

23               THE COURT:  -- but understandable --

24               MR. MEJIA:  Yes, sir.

25               THE COURT:  -- how we got here.  It's just awkward.

1          MR. MEJIA:  Our path has led to that, Count 1.

2          THE COURT:  Yeah.  Okay.  I'll see you-all at 8:30 in

3     the morning.  Thank you.

4        (End of bench conference.)

5        (Proceedings concluded at 5:12 p.m.)

6                    C E R T I F I C A T E

7        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

8     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10

          _____s/Dena Legg_____          December 13, 2019
11     Certified Court Reporter No. 20042A157    Date
       Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2     GOVERNMENT WITNESSES:

3     DETECTIVE HOLLY HOGAN
           Direct Examination by Ms. McKenzie              33
4          Cross-Examination by Mr. Mejia                  68
           Redirect Examination by Ms. McKenzie            97
5          Recross-Examination by Mr. Mejia               104

6     DETECTIVE KEVIN MCKINNEY
           Direct Examination by Ms. McKenzie             121
7          Cross-Examination by Mr. Mejia                 148

8     DEFENSE WITNESS:

9     STEPHANIE SEARS
           Direct Examination by Mr. Mejia                178
10

11                                  EXHIBITS

12
      GOVERNMENT:
13    Exhibit 1 - marijuana (retained by Government)       52
      Exhibit 2 - marijuana (retained by Government)       51
14    Exhibit 3 - cloth napkin (retained by Government)    53
      Exhibit 4 - Glock (retained by Government)           55
15    Exhibit 5 - Glock magazine (retained by Government)  55
      Exhibit 6 - ammunition (retained by Government)      57
16    Exhibit 7 - cell phones (retained by Government)     58
      Exhibit 8B - DVD                                     43
17    Exhibit 8C - DVD                                     39
      Exhibit 8D - DVD                                     48
18    Exhibit 10 - photos                                  45
      Exhibit 11 - photos                                  45
19    Exhibit 12 - photo                                   49
      Exhibit 13 - photo                                   49
20    Exhibit 14 - photos                                  60
      Exhibit 15A - photo                                  66
21    Exhibit 15B - photo                                  65
      Exhibit 15C - photo                                  65

22

23    DEFENDANT:
      No exhibits

24

25