1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF KENTUCKY

2                      LOUISVILLE DIVISION

3

  UNITED STATES OF AMERICA,     )    Case No. 3:17-CR-00037-DJH

4                       )

       Plaintiff,      )

5                       )

  v.                     )

6                       )

  CHEROSCO BREWER,         )

7                     )    January 10, 2019

       Defendant.      )    Louisville, Kentucky

8

9                   * * * * *

10                   VOLUME 4
             TRANSCRIPT OF JURY TRIAL

11         BEFORE HONORABLE DAVID J. HALE
          UNITED STATES DISTRICT JUDGE

12

13                 * * * * *

APPEARANCES:

14

For United States:     Corinne E. Keel

15                 Erin G. McKenzie
                 U.S. Attorney's Office

16                 717 West Broadway
                 Louisville, KY 40202

17

For Defendant:        David S. Mejia

18                 310 East Broadway, Suite 201
                 Louisville, KY 40202

19

  [Defendant present.]

20

21

               Dena Legg, RDR, CRR, CCR-KY

22             Official Court Reporter
             232 U.S. Courthouse

23             Louisville, KY 40202
             (502) 625-3778

24

  Proceedings recorded by mechanical stenography, transcript

25  produced by computer.

1      (Begin proceedings in open court at 9:03 a.m.  Jury out.)

2          THE COURT:  I am informed that we are still waiting on

3   two or three members of our jury, who have been stuck behind an

4   accident, so we obviously will not be able to start until they

5   make it.

6      We should follow up then on our discussion about the scope

7   of cross-examination of the witness.  Yesterday we talked about

8   Rule 609, and I believe that the Government identified a

9   conviction that is approximately five years old, a misdemeanor

10  conviction of Kentucky Revised Statute Section 523.110.  Is that

11  correct?

12         MS. MCKENZIE:  Yes, Your Honor.

13         THE COURT:  And so I've reviewed that statute, which

14  makes it a crime to give a police officer false identifying

15  information.  I've also looked at a couple of recent Sixth

16  Circuit cases addressing evidence Rule 609, particularly

17  609(a)(2).  One of them is *United States v. Jones*, 554 F.App'x

18  460, and that case essentially says that false -- well, it says

19  a number of things, but false personation is generally

20  considered a type of fraud, according to that decision.

21      And, also, *U.S. v. Collins*, a 2015 Sixth Circuit case, 799

22  F.3d 554, and that case comes out of Kentucky and involves this

23  same statute.  Without going through all of the discussion,

24  which is substantial in *U.S. v. Jones* and *U.S. v. Collins*, it's

25  clear from a reading of those cases, as well as the statute and

1    Rule 609, that given the age of this misdemeanor, only five

2    years, given the nature of the misdemeanor, one that involves an

3    element of a dishonest act, that it is admissible and it's a

4    proper topic for impeachment on cross-examination, so I will

5    permit the examination on that.

6        As I said yesterday, I don't see -- I don't see that there

7    is justification for extensive cross-examination on this.  I

8    don't see any reason to belabor the topic.  Any questions about

9    that?

10               MR. MEJIA:  No, sir.

11               MS. MCKENZIE:  No, Your Honor.

12               THE COURT:  How are we, Chris?

13               COURT SECURITY OFFICER:  We're good, sir.  Everybody's

14   here.

15               THE COURT:  Great.  So the jury is now assembled and

16   we'll bring them in.

17        Is the witness ready to re-take the stand?

18               MR. MEJIA:  I'll retrieve her, Your Honor.

19        They just arrived.  She's removing her coat.

20               THE COURT:  Good morning, ma'am.

21               THE WITNESS:  Good morning.

22               THE COURT:  I just need to remind you that you remain

23   under oath from yesterday.

24               THE WITNESS:  Yes, sir.

25        (Jury in 9:11 a.m.)

1      THE COURT:  Good morning, members of the jury.  I

2  understand some of you faced some traffic difficulties this

3  morning, and that is par for the course around here.  We are now

4  ready to continue with the testimony that began yesterday

5  afternoon.

6     Your witness.

7        MS. MCKENZIE:  Thank you, Your Honor.

8     (STEPHANIE SEARS, called by the defense, previously sworn.)

9                    CROSS-EXAMINATION

10  BY MS. MCKENZIE:

11  Q.  Good morning, Ms. Sears.

12  A.  Good morning.

13  Q.  My name is Erin and I'm one of the prosecutors on this case.

14  Have you -- did you talk to anyone about your testimony or about

15  this case since you testified yesterday?

16  A.  No, ma'am.

17  Q.  Okay.  And if I recall your testimony from yesterday

18  correctly, you stated you have no connection to Cherosco Brewer?

19  A.  None at all.

20  Q.  None at all?

21  A.  Uh-uh.

22  Q.  Do you know Cherosco Brewer?

23  A.  I know him, but I have no connection to him.

24  Q.  How do you know him?

25  A.  Reading about something that he -- my cousin and him was

1    locked up together.

2    Q.   I'm sorry?

3    A.   They was in the same penitentiary, that's all, not just --

4    not saying, "Hi.  How are you doing?"  You know, carrying on a

5    conversation, I don't know him like that.

6    Q.   Okay.  You don't hang out with him?

7    A.   No.

8    Q.   Okay.  And how did you get to court today?

9    A.   I drove.

10   Q.   Okay.  Now, Ms. Sears, have you ever been convicted of

11   making a false statement to the police?

12   A.   I was not convicted of false of my name.  My name is

13   Stephanie Sears Yancy Henderson.  And I gave them one of my

14   married names, and they said I gave them the wrong name.  No, I

15   was not convicted of that.

16   Q.   You were not convicted of that?

17   A.   No, ma'am, I was not.

18   Q.   You did not plead guilty?

19   A.   It was amended down, because it was a gun charge on there

20   too.

21   Q.   Okay.  You did not plead guilty to giving an officer a false

22   name or address?

23   A.   No, ma'am.  I've been in my house for 53 years.  I wouldn't

24   give a false address.  And as I told you, I've been married

25   twice and I have three last names.

1  Q.  Okay.  So if there's a court record that says that you

2  entered a guilty plea to that --

3  A.  I don't remember.

4  Q.  -- in April of 2013 --

5  A.  I don't remember that.

6  Q.  -- that would be wrong?

7  A.  I don't remember.

8  Q.  Okay.  That's fair.  Who is Yvette Allen to you?

9  A.  A friend.

10  Q.  A friend?

11  A.  Uh-huh.

12  Q.  Friend or a relative?

13  A.  A friend.

14  Q.  Okay.  Describe your friendship with her.

15  A.  Going places, eating, talking on the telephone.

16  Q.  Okay.  What do you talk about?

17  A.  My husband.  We've been in New York -- when I go to New

18  York -- I live there sometimes.  I have a husband that lives

19  there.

20  Q.  Uh-huh.  And you just talk about each other's lives?

21  A.  Uh-huh.

22  Q.  Okay.  Like friends do?

23  A.  Uh-huh.

24  Q.  Does she talk about what's going on in her life?

25  A.  No.  She's so private.

1    Q.   Really?

2    A.   Yes.

3    Q.   Okay.  And do you go by Stephanie?  Is that -- like do your

4    friends call you Stephanie?

5    A.   Uh-uh.

6    Q.   What do they call you?

7    A.   "Avon Lady."

8    Q.   I'm sorry?

9    A.   "Avon Lady."

10   Q.   Okay.  How do you spell Stephanie?

11   A.   S-T-E-P-H-A-N-I-E.

12   Q.   Okay.  And you definitely don't hang out with Cherosco

13   Brewer?

14   A.   No, ma'am.

15   Q.   Okay.

16   A.   I'm 53 years old.  I don't know how old he is.  I have a

17   husband.  I don't hang out with him.

18   Q.   Okay.  Do you hang out with Yvette?

19   A.   No.  I told you we just talk on the phone sometimes.

20   Q.   Okay.  Who is Karen Tobin Sears?

21   A.   My uncle's wife.

22   Q.   Okay.  That's -- so a relative by marriage?

23        (Witness nodded head.)

24   Q.   Who is Devondra Shoulders?

25   A.   A cousin.

1           MS. MCKENZIE:  Okay.  May I have the Elmo.

2    Q.  Ma'am, can you see -- let me zoom out here.  This is a

3    screenshot of a Facebook post.

4    A.  Uh-huh, uh-huh.

5    Q.  Do you recognize that?

6    A.  Yes.

7    Q.  Okay.  And you're tagged in that photo.

8    A.  Uh-huh.

9    Q.  Is that correct?

10   A.  I tagged the photo.  I'm not in that photo.

11   Q.  Okay.

12   A.  Do you see me in there?

13   Q.  Well --

14   A.  I'm not in that photo.

15   Q.  You're tagged in that photo.

16   A.  Ma'am, that's the guy over there, that's Yvette, a young guy

17   named Jody, Shoulders, and another lady in the back.  I'm not in

18   that photo.

19   Q.  Okay.  And --

20   A.  It's three women in there.  You can see them real clearly.

21   They do not look like me.  I have glasses on.

22   Q.  Uh-huh.

23   A.  Uh-huh.

24   Q.  Why do you suppose you were tagged in this photo?

25   A.  I don't understand why I was tagged.  I copied the photo as

1    one of my pictures, but I'm not in there.

2    Q.   Okay.  You don't know the people in the photo?

3    A.   I know Yvette.

4    Q.   Okay.

5    A.   But there's three women in there -- excuse me?

6    Q.   Do you know the gentleman that Yvette is with?

7    A.   Now I do, seeing here and there, right there, yeah.

8    Q.   Okay.

9    A.   This is Yvette, but there's three women in there and I have

10   glasses.  I can't see without them.

11   Q.   Okay.  Sure.  You testified yesterday that you have used

12   cocaine and marijuana, and I am not sure that I heard -- I want

13   to make sure I didn't confuse what you said about the length of

14   time that you have used those things.  When you used cocaine,

15   when was that?  Was that 30 years ago or over a period of years?

16   A.   Over a period of years.

17   Q.   Okay.  And your testimony was that you would use on a fairly

18   regular basis; is that correct?

19   A.   Yes.

20   Q.   Okay.  And if you were by yourself, I think you said you

21   might use a couple of grams a day.  Is that --

22   A.   Right.

23   Q.   Does that sound right or am I --

24   A.   Right, right.

25   Q.   Okay.  And is that every day?

1    A.   No.

2    Q.   How often?

3    A.   Weekends.

4    Q.   Okay.  Every weekend?

5    A.   No.

6    Q.   Help me out.  How often?

7    A.   Just the weekend.  I mean --

8    Q.   Okay.  But not every weekend?

9    A.   No, ma'am.

10   Q.   Special weekends?

11   A.   Yeah.

12   Q.   Okay.  What might be a special occasion where you might use

13   it?

14   A.   Going out, somebody's birthday, or just -- you know,

15   holiday, something like that.

16   Q.   Okay.  And so how much would it cost you?

17   A.   Depends on what I want to spend, 100, 200.

18   Q.   Dollars?

19   A.   Yes, ma'am.

20   Q.   Okay.  And that is for what you would use in one weekend?

21   A.   Uh-huh.

22   Q.   Okay.  And then is it -- am I understanding correctly that

23   it may be a couple weeks or maybe even more time that passes

24   before you would use it again?

25   A.   Yes.

1    Q.   Okay.  And then how much would you spend the next time?

2    A.   Maybe the same or maybe less.

3    Q.   Okay.  So 100 to $200 every how many weeks?  You think --

4    would you say once a month on a weekend or --

5    A.   I'll say twice.

6    Q.   Okay.  Twice a month?

7    A.   Uh-huh, and I wouldn't be spending all the money.  It'd be a

8    group of us putting in together.

9    Q.   Okay.  So you guys would kind of pool your money?

10   A.   Together.

11   Q.   Get an amount?

12   A.   Uh-huh.

13   Q.   And you would share --

14   A.   Uh-huh.

15   Q.   -- in it?  Okay.  So you're not putting all $200 out of your

16   own pocket.  How much might you contribute?

17   A.   I'm putting the whole 200 out of my pocket.

18   Q.   And then maybe your friends are reimbursing you?

19   A.   No, they probably putting the same too.

20   Q.   Okay.  I'm sorry.  So everybody's going to throw down about

21   that much?

22   A.   We partying.

23   Q.   Okay.  I understand, I understand.  And that's maybe a

24   couple times a month?

25   A.   Once or two.

1    Q.  Once or two, okay.  And for how long?  You said over a

2    period of years.

3    A.  Maybe six months.

4    Q.  Okay, okay.  Fair enough.  So a couple hundred dollars is

5    not a small amount of money.  Would you agree with that?  You

6    would not agree with that?

7    A.  I don't -- money -- I don't know.  Two hundred is nothing.

8    Q.  $200 is nothing to you?

9    A.  Uh-uh.

10   Q.  Ma'am?

11   A.  No, it's nothing.  The boots I got on cost 300.

12   Q.  Okay.

13   A.  Uh-huh.

14   Q.  Those boots that cost $300, those are fancy boots.

15   A.  Uh-huh.

16   Q.  I mean, my shoes don't cost $300.

17   A.  Uh-huh.

18   Q.  When you get home after court, or after you go to work, or

19   whatever else you have to do in your day, you take those boots

20   off.  Where do you put them?

21   A.  In a box in the closet.

22   Q.  Because they're fancy boots; right?

23   A.  Uh-huh.

24   Q.  Try to take care of them; right?

25   A.  Take care of them.

1    Q.   Now, the marijuana, help me understand.  You smoked that

2    over a period of years; is that correct?

3    A.   That's correct.

4    Q.   Okay.  And was that a daily thing?

5    A.   No, ma'am.

6    Q.   Okay.  Was that similar to the cocaine --

7    A.   Yes, ma'am.

8    Q.   -- a once-in-a-while weekend thing?

9    A.   Uh-huh.

10   Q.   And how much money would you throw down for the marijuana?

11   A.   $50.

12   Q.   $50.  And would that last you a whole weekend?

13   A.   Yes.

14   Q.   Would it last you more than a weekend?

15   A.   A weekend.

16   Q.   A weekend, okay.  And about how much weed does $50 buy?

17   A.   A gram.

18   Q.   A gram.  How many times can you smoke off a gram?

19   A.   Well, it depends on the way you roll it.  So I say I smoke

20   about six times off of it.

21   Q.   Okay.  And is that like six times all in that weekend?

22   A.   Uh-huh.

23   Q.   Okay.  Do you still use the drugs?

24   A.   No, ma'am.

25   Q.   When's the last time you used?

Sears - Cross

1    A.   Five years ago.  You surprised?

2    Q.   When is the last time you used cocaine?

3    A.   Five years ago.  Are you surprised?  The way you looked --

4    Q.   Does anybody in your house use cocaine?

5    A.   No, they don't.

6    Q.   Has there been cocaine in your house?

7    A.   Yes, it has.

8    Q.   Recently?

9    A.   No.

10   Q.   What about 2017?

11   A.   Right, it wasn't being used.  My son had it selling it.

12   Q.   Okay.

13   A.   He no longer --

14   Q.   Is that a yes to my question?  Okay.  Have you ever stayed

15   at Yvette's house?

16   A.   Yes.

17   Q.   Do you know the address?

18   A.   No.  Should I?

19   Q.   Well, you gave it to the police.  Does 3510 Shadyside

20   Drive --

21   A.   Why would I give it to them when they looked at my ID and

22   see I live at 709 East Kentucky?

23   Q.   Okay.

24   A.   I was using Yvette's car and got pulled over.  She had a gun

25   in it.

1    Q.   Okay.

2    A.   So we share -- I mean, if I needed to use her car, yeah.

3    Q.   Okay.  And is that when you gave her name and address to the

4    police?

5    A.   Right, because her gun was in there.

6    Q.   Okay.  And you told them that your name was Yvette.

7    A.   No, ma'am.  We don't look nothing alike.  He asked for my

8    ID.  I gave it to him.  Well, he didn't ask for it.  He went in

9    my purse and got it out.

10   Q.   So she doesn't talk about her life with you, but you drive

11   her cars?

12   A.   If I need to, yes.

13   Q.   And you didn't know Mr. Brewer until you saw him over there?

14   A.   Right.

15   Q.   Okay.

16   A.   Not at her house.

17   Q.   Okay.  What does marijuana smell like?  Can you describe

18   what it smells like?

19   A.   No, ma'am.

20   Q.   Really?

21   A.   Uh-uh.  It smells good to me.  I don't know -- I can't --

22   no.

23   Q.   Okay.  I've heard people describe it as smelling sort of

24   like a skunk or like a skunk's behind.

25   A.   Sometimes.

Sears - Cross

1    Q.   Would you say that's --

2    A.   Uh-huh.

3    Q.   -- somewhere in the ballpark?

4    A.   Yes, it's all kind of brands and they'll call it "skunk."

5    Q.   Okay.

6    A.   They'll call it "gasoline, fire."

7    Q.   And do you ever do any cooking?

8    A.   Yes.

9    Q.   Do you like to cook?

10   A.   No.

11   Q.   Okay.  But you cook?

12   A.   Uh-huh.

13   Q.   Do you know what oregano smells like?

14   A.   Yes.

15   Q.   Okay.  It doesn't smell like marijuana, does it?

16   A.   Uh-uh.

17   Q.   Parsley doesn't smell like marijuana, does it?  Basil?

18   A.   Uh-uh.

19              MS. MCKENZIE:  Thank you, Your Honor.  I don't have

20   any further questions for this witness.

21              THE COURT:  Mr. Mejia, any redirect?

22              MR. MEJIA:  No, sir.

23              THE COURT:  Thank you, ma'am.  You may step down.

24              THE WITNESS:  Thank you.

25              THE COURT:  You may call your next witness.

```
 1              MR. MEJIA:  The defense will call Yvette Allen.

 2         (YVETTE CHRISTY ALLEN, called by the defense, sworn.)

 3                        DIRECT EXAMINATION

 4    BY MR. MEJIA:

 5    Q.  Good morning.  Would you please tell us your full name and

 6    spell your last name for us.

 7    A.  Yvette Christy Allen, A-L-L-E-N.

 8    Q.  And where do you live?

 9    A.  3510 Shadyside Drive, Louisville, Kentucky, 40211.

10    Q.  Thank you.  And what is your business, profession, or

11    occupation?

12    A.  A paralegal.

13    Q.  Tell us where you are a paralegal and for how long.

14    A.  Darryl T. Owens, attorney-at-law, for 21 years.

15    Q.  All right.  And your duties as a paralegal are to assist the

16    lawyer --

17    A.  Yes.

18    Q.  -- in whatever his or her practice is?

19    A.  Yes.

20    Q.  Now, do you know Cherosco Brewer?

21    A.  Yes.

22    Q.  Do you see him here in the courtroom or can you point to

23    him?

24    A.  Yes, here.

25              MR. MEJIA:  Okay.  The record should reflect she's
```

1    identified Mr. Brewer.

2    Q.   And for how long have you known him?

3    A.   Since 2001.

4    Q.   And what is your relationship to him?

5    A.   It's my fiancé.

6    Q.   All right.  And as his fiancée, do you and he refer to each

7    other sometimes as husband and wife?

8    A.   Yes.

9    Q.   Now, over the time period of 2001 to the present -- we're

10   here at 2017 -- particularly, let's focus on up to the time of

11   November of 2015.  Okay?

12   A.   Uh-huh.

13   Q.   '01 to November of 2015.  What was the extent and degree of

14   your contact with him by maybe how frequent you and he saw each

15   other?

16   A.   Daily.

17   Q.   Daily?

18   A.   Uh-huh.

19   Q.   And can you tell me whether or not you and he shared the

20   same residence or frequented each other's residence?

21   A.   Every day.

22   Q.   Okay.  And do you and he or did you and he have children

23   together?

24   A.   We lost a set of twins.

25   Q.   You did.  Very sorry about that.  Now, I want to focus your

1    attention on the time period prior to November 14 -- excuse

2    me -- November 12 of 2015.  Did you -- were you the owner of a

3    Ford Taurus?

4    A.  Yes.

5    Q.  Are you still the owner of that Ford Taurus today?

6    A.  Yes.

7    Q.  Where is that vehicle, if you could tell the jury?

8    A.  It's in the impound.

9    Q.  And has it been there since --

10   A.  Yes.

11   Q.  -- the date of November 12th?

12   A.  Yes.

13   Q.  Have you made efforts to seek its return to you?

14   A.  Yes.

15   Q.  Now, prior to November 12th, that day, can you tell me the

16   frequency -- well, let me ask it this way:  At that time that

17   I've just said, did you own any other vehicles in your name?

18   A.  Yes.

19   Q.  What did you own?  Describe the car, year, model.

20   A.  A '97 Monte Carlo Super Sport.

21   Q.  All right.  Did it come to your attention on November 12

22   that Cherosco had been arrested by police --

23   A.  Yes.

24   Q.  -- and that your car had been taken?

25   A.  Uh-huh.

Allen - Direct

1   Q.  How did you learn that?

2   A.  He actually called me and said he was being arrested.  They

3   were impounding my car.  I got up and came to where the scene

4   was.  And I told them I was the owner of the car, and they said

5   they were still impounding it.

6   Q.  Okay.  Now, prior to November 12th, that day, with what

7   frequency did Cherosco drive that car?

8   A.  He did not.

9   Q.  Okay.  Was there ever any times that he would just drive it

10  once or twice prior to November 12th?

11  A.  No.

12  Q.  Do you know why it was that on that day that he was driving

13  the Ford Taurus of yours?

14  A.  Yes, the day before he was arrested and they impounded his

15  car.

16  Q.  And were you familiar enough to tell the jury what kind of

17  car that was?  Dodge, if you remember?

18  A.  Yes, it was a Dodge.

19  Q.  Did you have the awareness that that Dodge had been rented

20  from Enterprise?

21  A.  Yes.

22  Q.  Now, do you recall at that time, November of 2015, for how

23  long he had been renting that Dodge?

24  A.  Approximately a week.

25  Q.  From what you remember, approximately a week?

Allen - Direct

1    A.  Uh-huh.

2    Q.  Could it have been longer?

3    A.  I don't think so.

4    Q.  Okay.  Well, we have records here of longer, but you're

5    not --

6    A.  No.

7    Q.  Now, can you -- I'm going to ask you about Cherosco's

8    customs, habits, and practice as a fellow.  Okay?  Can you tell

9    me, if you know from your observation, with what frequency he

10   would let other people drive his car?

11   A.  All the time.

12   Q.  Okay.  How many other people -- either in your experience or

13   your observations, how many other people would he let drive his

14   car?

15   A.  I would say about four or five.

16   Q.  All right.  Do you know who -- if I asked you the names of

17   those people, could you say them?

18   A.  I wouldn't know their last names.

19   Q.  Okay.

20   A.  But I probably would know their first names.

21   Q.  All right.  Now, with regard to you, your custom, habit, and

22   practice with regard to loaning other people your Ford Taurus --

23   A.  Yes.

24   Q.  -- what was your custom, habit, or practice of letting

25   people drive your car?

1   A.  It would mainly be my sister, my daughter, my nephew.  About

2   four or five people, I would let them use it, if they really

3   needed to get somewhere or something to do, something important.

4   Q.  Okay.  Now, you know that, of course, I'm Mr. Mejia and I'm

5   Cherosco's attorney.

6   A.  Yes.

7   Q.  And during the pendency of this case, did I ask for your

8   assistance in helping me find somebody who could assist me in

9   describing the use of marijuana and the use of cocaine?

10  A.  Yes.

11  Q.  And did you provide me the name of the person who just left

12  the courtroom here?

13  A.  Yes.

14  Q.  And as a result of that, you're aware that someone from my

15  office contacted her and she agreed to be a witness in this

16  case --

17  A.  Yes.

18  Q.  -- to assist us?  Okay.  Now, that Ford Taurus, how long did

19  you have it prior to November of two thousand --

20  A.  Approximately six months, five or six months.

21  Q.  Okay.  If I show you a document, do you think that might

22  help you remember how long you'd owned that car?

23  A.  Yes.

24      (Counsel conferring off the record.)

25          MR. MEJIA:  May I approach the witness?

1          THE COURT:  Yes.

2    BY MR. MEJIA:

3    Q.  You see there where I have my thumb, just read that to

4    yourself, right here.

5    A.  Yes.

6    Q.  Okay.  Now, do you recognize what the document is that I

7    just showed you?

8    A.  I do.

9    Q.  Is that the certificate of title for that vehicle?

10   A.  It is.

11   Q.  In your name?

12   A.  Yes.

13   Q.  At your address?

14   A.  Yes.

15   Q.  And did you -- do you now remember how long you'd had that

16   title issued to you?  If you want to see it again --

17   A.  Yes, I need to see that again.

18       Okay.  Thank you.

19   Q.  Okay.  Now, how long had you had that car issued to you,

20   ma'am?

21   A.  For about ten to 12 months.

22   Q.  Do you see the date of 2014 there?

23   A.  Yes.

24   Q.  Okay.  What's the date on the document?

25   A.  May.

1    Q.   Of 2014?

2    A.   Uh-huh.

3    Q.   Okay.

4    A.   So about 15 months.

5    Q.   Okay.  And where did you buy that vehicle?

6    A.   I purchased it from a guy -- my uncle works at a car lot.

7    The guy was selling the car and I purchased it from him.

8    Q.   All right.  And can you tell me whether in the time that you

9    had it, from 2014 to November of 2015, whether you ever had any

10   maintenance performed?  Particularly I want to focus on the

11   interior of that vehicle.

12   A.   I did.  When I first purchased the car, the actuator, which

13   is something to do with the airflow in and out of the -- when

14   you turn the heater on, it was clicking.  And I took it to Ford,

15   to a dealership, and they took the dashboard out, fixed the

16   actuator.  And then I also had Sirus XM put in my car.  They had

17   to take the dashboard out to put the antenna behind there.

18   Q.   Can you tell the jury, as best you can recall, during the

19   time period from 2014 to late 2015, when that was that they had

20   to take the dashboard out the first time and when they had to

21   take out the dashboard the second time.

22   A.   The first time would have been in July of '14.

23   Q.   Okay.

24   A.   It would have been around that July.  And then the second

25   time, it would have been about February or March, because it was

1    after tax time, so I got a new stereo put in my car of '15.

2    Q.  All right.  And can you tell the jury, if you recall -- I'm

3    trying to take you back now to -- prior to November 12 of

4    2014 -- whether you recall there were any scratch marks or

5    markings on the left side of the steering wheel because of the

6    maintenance performed by those two times?

7    A.  I do not recall.

8    Q.  Okay.  You don't remember that there were scratch marks

9    there to the left of the steering wheel, but you can tell this

10   jury that that dashboard had been removed twice as far as you

11   know by maintenance?

12   A.  Yes.

13          MR. MEJIA:  Okay.  Thank you.  Nothing more.

14                     CROSS-EXAMINATION

15   BY MS. MCKENZIE:

16   Q.  Good morning, Ms. Allen.

17   A.  Good morning.

18   Q.  My name is Erin.  I'm one of the prosecutors on this case.

19   A.  Uh-huh.

20   Q.  So was November 12th the first time Mr. Brewer had ever

21   driven that Ford Taurus?

22   A.  Yes.

23   Q.  He'd driven your other car quite a bit though, hadn't he?

24   A.  My other car, yes.  We would drive it together.  We would go

25   out, outings together in it a lot.

1   Q.  Are you aware of other cars that Mr. Brewer has driven?

2   A.  Such -- a rental car or in my car?

3   Q.  Any cars.  I mean, you knew about the Dodge Charger.

4   A.  Uh-huh.

5   Q.  Can you name some other cars that he has driven?

6   A.  A Jetta, which was my car -- no, he didn't drive it because

7   he was locked up, so, no, he didn't drive that.  I'm going to

8   take that back.  No.

9   Q.  Okay.  Did you ever drive the Dodge Charger?

10  A.  No.

11  Q.  Okay.  Now, how do you know Stephanie Sears?

12  A.  Relative.

13  Q.  Can you tell me how you're related?

14  A.  Uh-huh, that's my sister.

15          MR. MEJIA:  Excuse me, Judge.  May we approach just

16  for a moment?

17      (Bench conference on the record outside the hearing of the

18  jury.)

19          MR. MEJIA:  I don't intend to recall her, but

20  Ms. Sears has just entered the courtroom.

21          THE COURT:  Her testimony's over.  She's free to --

22          MR. MEJIA:  Okay.  I just wanted to let Your Honor

23  know.  Obviously, I don't intend to recall her so --

24          MS. MCKENZIE:  I don't either.

25          MR. MEJIA:  -- that's fine.

1          (End of bench conference.)

2     BY MS. MCKENZIE:

3     Q.   She's your sister?

4     A.   Uh-huh.

5     Q.   And so that means you have the same mom and dad?

6     A.   No, we have the same dad.

7     Q.   Same dad.  Different moms?

8     A.   Yes.

9     Q.   Okay.  And are you the older sister or the younger sister?

10    A.   Younger.

11    Q.   Okay.  Does she know Mr. Brewer?

12    A.   Yes.

13    Q.   Okay.  And you work in -- you've had a 21-year career as a

14    paralegal.  Have you spent that whole time working for

15    Mr. Owens' law office?

16    A.   Yes.

17    Q.   Okay.  What kind of law does he practice?

18    A.   Family.

19    Q.   Okay.  Like divorce, child custody, that kind of thing?

20    A.   Uh-huh, and probate.

21    Q.   I'm sorry?

22    A.   And probate.

23    Q.   And probate, okay.  So as a paralegal, what are some of the

24    things that you do to assist Mr. Owens in his practice?

25    A.   Filing documents, going to court, typing up documents.  I do

```
 1    all the payroll.  I do all the -- paying all the bills.  I pay
 2    all the office bills.  I'm the only employee.
 3    Q.  Do you ever draft pleadings?
 4    A.  Do I draft pleadings?
 5    Q.  Uh-huh.
 6    A.  With his assistance, yes.
 7    Q.  Okay.  And if you're anything like my paralegal and the
 8    other paralegals in my office, you probably know about as much
 9    about the law as the lawyer that you work for.  Would you say
10    that's --
11    A.  No.
12    Q.  You certainly get to know the area of the law that your
13    lawyer practices though; correct?
14    A.  Somewhat, yes.
15    Q.  And you get to know your way around the courthouse; correct?
16    A.  Correct.
17    Q.  You get to know how to file documents, what certain
18    documents might be called, how to file motions, that kind of
19    thing.
20    A.  Yes.
21    Q.  Have you ever drafted any pleadings or filed any motions for
22    Mr. Brewer in his lawsuit or lawsuits against the police?
23    A.  No.
24    Q.  That's a no?
25    A.  No.
```

1    Q.   Okay.  So if you had been seen by the county attorney

2    defending that case delivering pleadings on that case, she must

3    be mistaken?

4    A.   If I delivered something, that doesn't mean I drafted it.

5    Q.   Okay.  So when Mr. Brewer files documents -- and do you

6    know, does he have an attorney representing him in that lawsuit?

7    A.   Not sure.

8    Q.   You're not sure?  Okay.  Well, you tried to join that

9    lawsuit, didn't you?

10   A.   Okay, yes.

11   Q.   You did?

12   A.   Yes.

13   Q.   Okay.  So let me ask you again, do you know --

14   A.   Which lawsuit are you talking about?

15   Q.   -- that he has an attorney representing --

16   A.   Which lawsuit are you talking about?

17   Q.   Well, that's a good question.  I'm talking about the one

18   that Mr. Brewer has filed against Tyler Holland, Detective

19   Hogan, and the other officers in this case, as well as some

20   officers that weren't involved in this case, and it looks like

21   it was filed in January of 2016, so the lawsuit that he has

22   pending right now.

23   A.   Okay.  Yes.

24   Q.   You tried to join that lawsuit with him?

25   A.   Yes.

1    Q.   Okay.  And you actually signed a document right underneath

2    Mr. Brewer's signature --

3    A.   Uh-huh.

4    Q.   -- and you both signed as pro se litigants; correct?

5    A.   Yes.

6    Q.   Okay.  And this is the substance of that document, and you

7    did not prepare this document?

8    A.   No.

9    Q.   Okay.  Did Mr. Brewer prepare it?

10   A.   No.

11   Q.   You don't know who prepared it?

12   A.   I don't know who prepared it.

13   Q.   Who asked you to sign it?

14   A.   Myself.

15   Q.   Well, you didn't prepare the document though.  So someone

16   had to prepare the document and present it to you for your

17   signature; correct?

18   A.   It was -- I don't know who prepared it though, and I'm not

19   for sure if he has obtained an attorney or not.

20   Q.   Okay.  Sure.

21   A.   For myself, I would be pro se.

22   Q.   But that is your signature; correct?

23   A.   It is.

24   Q.   Okay.  How did your signature come to be on this document?

25   A.   I signed it.

Allen - Cross

1   Q.   Okay.  How did you come to sign this document, if you --

2   A.   It was mailed to me and I signed it.

3   Q.   Okay.  Mailed from where?

4   A.   Kentucky.  I didn't look at the postmark on it.  Kentucky.

5   Q.   You routinely sign documents without paying attention to --

6   A.   The postmark?

7   Q.   -- who's sending them to you?

8   A.   I read over the document and I signed it.

9   Q.   Okay.  You filed your own suit against Detective Holland,

10  didn't you?

11  A.   Yes.

12  Q.   Okay.  Who else have you sued?

13  A.   Another officer.

14  Q.   Okay.  Related to these events?

15  A.   No.

16  Q.   Related to other events?

17  A.   Yes.

18  Q.   Okay.  Prior to this?

19  A.   Prior to this.

20  Q.   Okay.  So a separate lawsuit?

21  A.   Yes.

22  Q.   Okay.  Have you filed any other lawsuits seeking money?

23  A.   No, I don't think so.

24  Q.   You don't think so or no?

25  A.   Yes, it would have been when I fell and then I have a

Allen - Cross

1    permanent disability in my arm at Outback Steakhouse.

2    Q.   So you sued Outback Steakhouse --

3    A.   Uh-huh.

4    Q.   -- because you have a permanent injury to your arm from a

5    fall.  Which arm?

6    A.   Right.

7    Q.   Okay.  Does that affect your ability to type, and write, and

8    prepare documents?

9    A.   I have no control over it, so sometimes it hurts.

10   Q.   It comes and goes?

11   A.   Well, it always hurts, but sometimes it hurts worse.

12   Q.   Okay.  So Texas -- Outback Steakhouse, you said, not Texas

13   Roadhouse.  Do you remember when that was?

14   A.   It would have been 2014, because I fell on December the

15   20th, 2013.

16   Q.   Okay.  Did you get any money in that lawsuit?

17   A.   No.

18   Q.   Okay.  Who else have you sued for money?

19   A.   I think that's it.

20   Q.   Okay.  What about Drs. Hilgaford, Morgan, and Haney, PLLC?

21   You sued them, didn't you?

22   A.   Hilgaford, Morgan, and Haney?  No.

23   Q.   In 2013?

24   A.   No.

25   Q.   Yvette Allen versus Drs. Hilgaford, Morgan, and Haney, PLLC.

Allen - Redirect

1    You're saying that's not you?

2    A.   I don't recall filing that.

3    Q.   Okay.  Do you know who Regina Northington is?

4    A.   Not right offhand.

5    Q.   You don't know Ms. Northington?

6    A.   No.

7    Q.   And when did you and Mr. Brewer get engaged?

8    A.   It would have been Valentine's day of 2012.

9    Q.   Okay.  And you're still in a relationship --

10   A.   Yes.

11   Q.   -- as of right now?

12   A.   Yes.

13         MS. MCKENZIE:  Okay.  Thank you.  I don't have any

14   further questions.

15                      REDIRECT EXAMINATION

16   BY MR. MEJIA:

17   Q.   When you received that pro se lawsuit that you signed, you

18   received that at your home?

19   A.   Yes.

20   Q.   And at that time that you had that mailed to you, do you

21   recall at least at that time period Cherosco Brewer was then

22   incarcerated?

23   A.   Yes.

24   Q.   And did you -- have you come to learn or do you know who

25   assisted him in preparing that, there where he was, to have it

1    mailed to you?

2    A.   I don't know who it was.

3    Q.   Okay.  Now, while we're not going to go into the merits of

4    any of that, did that have anything to do with the police taking

5    your car on November 12th?

6    A.   Yes.

7    Q.   And have you consistently tried to have that vehicle

8    returned to you?

9    A.   Yes.

10   Q.   Now, are you aware also -- counsel asked you about other

11   lawsuits.  You sued some medical doctors for malpractice or you

12   made some suit because of an injury to you of some kind?

13   A.   I don't recall it.

14   Q.   Okay.  But the question is this:  Did the lawsuit for your

15   injuries, or the lawsuit against doctors, or what have you, does

16   it -- did that have anything to do with Cherosco Brewer at all?

17   A.   No.

18   Q.   Okay.  And, of course, as a paralegal, working for a lawyer

19   who's a civil attorney, you of course know your rights to sue

20   somebody when you've been injured or damaged by them?

21   A.   Yes.

22   Q.   And that is your right as a citizen, isn't it?

23   A.   It is.

24   Q.   And let me ask you whether you're aware, so that we're not

25   confused about what lawsuits -- are you aware that Cherosco

Allen - Redirect

```
 1    Brewer filed multiple lawsuits against police for violation of

 2    his civil rights?

 3    A.   Yes.

 4    Q.   And are you aware, prior to November -- excuse me -- to the

 5    present time whether he's won awards, that is money judgments

 6    out of those lawsuits?

 7              MS. MCKENZIE:  Your Honor --

 8    A.   Yes.

 9              MS. MCKENZIE:  Withdrawn.

10    BY MR. MEJIA:

11    Q.   And let me ask you whether, during the time period of

12    November 11 and 12, by that time whether he had received money

13    judgments for which he had filed civil rights cases against

14    police?

15    A.   Yes, sir.

16    Q.   And in that time period, prior to November 11 and 12, what

17    was his habit and practice with regard to purchasing lotto

18    tickets?

19    A.   Every day.

20    Q.   Is there a means --

21    A.   Twice a day.

22    Q.   And did you observe his habit and practice of doing that and

23    with what regularity he may win up to 600 in cash?  How

24    regularly he won?

25    A.   Oh, sometimes two or three times a week.
```

Allen - Redirect

1    Q.  In case any of the jury doesn't understand, explain how it

2    is that one cashes a lotto ticket and how one is paid.

3    A.  Okay.  When you play the lottery -- say you play midday, if

4    you play midday -- say you play the triple 4's and they come out

5    triple 4, it comes out triple 4's, and you played it for a

6    dollar straight, you -- the ticket is worth $600.

7        Up to $600, you can go to the store and you cash it at

8    the -- the store cashes it out to you.  Anything over that, you

9    have to go to the lottery headquarters and then they do it, but

10   a lot of people -- to avoid that, a lot of people will play

11   multiple tickets.  They may play the triples on five separate

12   tickets and so 600 five times, but then they'll -- they won't

13   cash it all at the same store.  They may cash them at different

14   stores or they may cash them at the same store, if the store has

15   the cash to cash it out.

16   Q.  And is that something -- is that the kind of method that

17   Cherosco employed?

18   A.  Yes.

19   Q.  Can you tell me whether, in the time period prior to

20   November 12th, he had some employment for which he made cash

21   money?

22   A.  Yes, he did.

23   Q.  Tell the jury what that was and whether you know how much

24   money he made cash.

25   A.  I do know he worked at a auto body shop, and he was paid

1   cash and I think he made about $600 a week.

2   Q.   To your knowledge had he -- you and he ever gone to the

3   casino boat or to Churchill Downs?

4   A.   Casino boat.

5   Q.   Okay.  And when you make money at the casino boat or

6   Churchill Downs, how is that money given to you?

7   A.   Cash.

8           MR. MEJIA:  Thank you.  Nothing more.

9                     RECROSS-EXAMINATION

10  BY MS. MCKENZIE:

11  Q.   Did you and Mr. Brewer go to the casino boat in between him

12  getting locked up on November 11th and getting re-arrested on

13  November 12th?

14  A.   No.

15  Q.   Okay.  So that almost $900 in his pocket wouldn't have been

16  from the casino boat, would it?

17  A.   No, it would have been from the lotto.

18  Q.   From the lotto?

19  A.   Uh-huh, and then whatever he had from work.

20  Q.   From work?

21  A.   Uh-huh.

22  Q.   Have you ever seen this before?

23  A.   I can't see that far --

24          MS. MCKENZIE:  May I approach?

25          THE COURT:  Yes.

1    A.   -- without my glasses.

2    BY MS. MCKENZIE:

3    Q.   It's -- I can give you a glove, if you want to open --

4            THE COURT:  Can you identify the exhibit for the

5    record.

6            MS. MCKENZIE:  This is previously admitted into

7    evidence in this case as Government's Exhibit 16.  There's been

8    witness testimony about this item.

9    BY MS. MCKENZIE:

10   Q.   Have you ever seen --

11   A.   No.

12   Q.   Okay.  And there's been testimony that this is actually

13   cocaine.  This is cocaine that was recovered from your Ford

14   Taurus, and all of these little pieces of plastic here are the

15   15 separate packages that this cocaine was found in.  Now, were

16   those your 15 packages of cocaine?

17   A.   No.

18           MS. MCKENZIE:  I don't have anything further.

19           THE COURT:  May the witness be excused?

20           MR. MEJIA:  Yes, sir.  Thank you very much.

21           THE COURT:  Thank you.  You may step down.

22           THE WITNESS:  Thank you.

23           THE COURT:  You may call your next witness.

24           MR. MEJIA:  Your Honor, the defense --

25           THE COURT:  Yes, you're finished.  Thank you.

1        MR. MEJIA:  Thank you very much, Your Honor.  The

2   defense rests.

3        THE COURT:  Thank you, Mr. Mejia.

4      Does the Government have any rebuttal?

5        MS. MCKENZIE:  We don't, Your Honor.

6        THE COURT:  Members of the jury, the testimony portion

7   of the trial has now concluded, so we will move on to the next

8   phases of the case.

9      Let me tell you what we will be doing.  I'm going to give

10  you-all a brief break, and the lawyers and I will use that to

11  organize.  When you come back, I will have instructions for you.

12  The lawyers' closing arguments will follow those instructions.

13  Then I will have final procedural instructions for you.

14     Once those are complete, we will then randomly select one of

15  you-all to be the alternate, and the remaining 12 of you will

16  then retire to deliberate and the case will be yours to decide.

17  That is the sequence we will be following here in just a few

18  minutes.

19     So for now, I'm going to let you take a brief break.

20  Remember not to discuss the case.  The case will soon be yours,

21  and you will be directed to discuss the case, but not quite yet.

22     (Jury out 10:05 a.m.)

23        THE COURT:  You may be seated.  The jury is out of the

24  courtroom.  We will bring the completed instructions in to you

25  shortly.  There is one minor addition to the instructions from

1    when we last spoke that was occasioned by the testimony of the

2    defense's first witness.  It is the pattern instruction that

3    deals with impeachment by a conviction of a witness other than

4    the defendant.  I'm sure it will be a familiar instruction to

5    you.  We have inserted that into the instructions.

6        I'm going to return to chambers.  We'll pick those up and

7    you-all can eyeball that addition.  And then, otherwise, we'll

8    be ready to go.  What I would like to do is go straight through

9    without any breaks through instructions, closing arguments,

10   final instructions, random selection of our alternate, and

11   allowing the jurors to then retire to deliberate.

12       Anything we need to talk about at this time, Mr. Mejia?

13           MR. MEJIA:  I need to make a motion for judgment of

14   acquittal at the close of all evidence pursuant to Rule 29 of

15   the Federal Rules of Criminal Procedure, and I make no argument

16   beyond that.

17           THE COURT:  You're essentially renewing the motion you

18   made at the close of the Government's --

19           MR. MEJIA:  Yes, sir.

20           THE COURT:  -- case?  Do you have any response at this

21   point?

22           MS. MCKENZIE:  Yes, Your Honor.  I think, in the light

23   most favorable to the United States, there is sufficient

24   evidence on which a jury could find the defendant guilty of the

25   charges.  I can elaborate.

1          THE COURT:  I'm going to reserve my decision.  The

2     rule permits me to reserve until even after the jury reaches its

3     conclusion, so I intend to do that here.

4        I'm going to give you-all a few minutes to get organized.  I

5     believe you said yesterday you were predicting somewhere in the

6     neighborhood of 30 minutes total?  Twenty and 10?

7          MS. MCKENZIE:  Oh, I'm sorry.  Thirty and 15.

8          THE COURT:  All right.

9          MS. MCKENZIE:  Probably won't need that much but --

10         THE COURT:  Probably won't.

11         MR. MEJIA:  I've been so lousy at this.  I said 30

12    yesterday.  I'm going to say 30 to 40 today.

13         THE COURT:  I often wonder why I even bother to ask.

14         MR. MEJIA:  I know.

15         THE COURT:  Lawyers are great at many, many things,

16    predicting their own time frames not so much.

17         MR. MEJIA:  Time gets weird, it does.

18         THE COURT:  I do think it isn't necessary for me to

19    remind you of this.  We all know this now, but we live in an age

20    where attention spans are short, and so there is a law of

21    diminishing returns that applies with respect to oral

22    presentations to captive audiences, and I think that applies to

23    lawyers arguing to juries.  So I would just ask for you-all to

24    keep that in mind, not in the interest of time so much as in the

25    interest of being most effective at your tasks.

1        So take a few minutes.  I'll send in the completed

2   instructions.  I'll identify for you the new number for the

3   additional instruction.  As I said, I think this is a pattern

4   instruction that's necessary because of the nature of the cross-

5   examination we heard this morning.  Other than that, the

6   instructions track exactly along the lines of the final rulings

7   and modifications we made by agreement yesterday.  Thank you.

8        (Recess at 10:09 a.m. until 10:31 a.m.  Jury out.)

9            THE COURT:  May I see the lawyers at the bench,

10  please.

11       (Bench conference on the record.)

12           THE COURT:  Anything with respect to the new

13  Instruction Number 28 which was added?

14           MS. MCKENZIE:  No.

15           MR. MEJIA:  Your Honor, we're moving fast and furious

16  here, and I listened carefully --

17           THE COURT:  How are we moving fast and furious?  I

18  would suggest we are doing anything but that.

19           MR. MEJIA:  Okay.  Well, to me.  I don't know that

20  Ms. Sears admitted to the prior conviction.  I know she

21  responded.  She explained what happened, but I don't know that

22  counsel elicited an admission or denial.  Clearly --

23           THE COURT:  The instruction does not say she admitted

24  to it.

25           MR. MEJIA:  Okay.

1           THE COURT:  Only that they have heard that she was
2   convicted of a crime.
3           MR. MEJIA:  Right, right.
4           THE COURT:  The jury clearly heard that --
5           MR. MEJIA:  Yes.
6           THE COURT:  -- from Ms. McKenzie.
7           MR. MEJIA:  Right.  I'd ask Ms. McKenzie for whatever
8   she has by way of court paper or something to satisfy that she
9   has in fact been convicted.  I trust her word on it, but I
10  haven't seen it yet.
11          THE COURT:  That's fine.
12          MR. MEJIA:  Okay.
13          THE COURT:  I don't care whether she gives -- that's
14  perfectly fine.  What I am concerned about now is the proper
15  instruction to the jury.
16          MR. MEJIA:  Right.
17          THE COURT:  That was obviously heard in court, and so
18  I want the instructions to address that issue, unless you both
19  surprise me and agree that it isn't appropriate to give the
20  instruction, but it seems to me --
21          MR. MEJIA:  Yes, it is an appropriate instruction.  It
22  was just a matter of proof.  It wasn't clear to me that she
23  admitted it.  And in the face of equivocal, does a proponent
24  then have to offer the conviction or at least present something
25  to the court to satisfy us?  I haven't seen it yet, Judge.

 1    That's all I'm saying.

 2              THE COURT:  No, I think it's fine if you want to show

 3    him your -- is it a CourtNet document you have?

 4              MS. MCKENZIE:  Yeah.

 5              THE COURT:  That's fine.  Why don't you go retrieve

 6    that.

 7              MR. MEJIA:  That's fine.  I just want to make sure I'm

 8    competent here.

 9              THE COURT:  No, I don't think there's any question

10    about that.  It's just I don't think it necessarily was proved

11    that she was convicted.  It's a collateral issue.  We're not

12    going to going down that trail.

13              MR. MEJIA:  Right, right.

14              THE COURT:  But it was -- it was certainly presented

15    to the jury as such.

16              MR. MEJIA:  Right.

17              THE COURT:  And so, therefore, I want to make sure

18    they don't do anything more with it than what they should.

19              MR. MEJIA:  Thank you.

20              MS. MCKENZIE:  It's on the second page.

21              MR. MEJIA:  Thank you.  Thank you very much.

22              THE COURT:  So as I told you yesterday, after

23    instruction what is now numbered 32 -- it was Instruction 31 --

24    Instruction 32 now says:  "Now you will now hear closing

25    argument from the lawyers."  That's where I will break, you-all

1    will give your closing arguments, and then I will pick up with

2    Instruction Number 33 and go through Instruction 39.

3        I will also refer to the verdict form, which is attached to

4    the instructions that will be provided to the jury, along with,

5    obviously, the instructions.

6        So you'll go first, you'll go second, you'll go last, and

7    then I'll finish the instructions.  The clerk will have the 13

8    juror numbers in the wheel, and she will then randomly select

9    one.  What I typically do is ask that person to stay seated.  We

10   excuse the jury, tell them they may begin deliberations.

11   They're escorted out and then I generally address the one left

12   behind, thank them for their service.  And we also typically get

13   their cell number so that if they leave, a juror becomes sick,

14   we can replace them.  I don't generally want folks talking to

15   them, so we'll leave them alone.

16       Okay.  Any questions about that process and procedure?

17            MR. MEJIA:  No, sir.

18            THE COURT:  Well, then we'll bring the jury in.  We'll

19   get started with instructions forthwith.

20            MR. MEJIA:  I just wanted to see that -- I'm combing

21   through them here -- the instruction that needed to be -- the

22   second paragraph struck because the defendant did not testify.

23   I'll look at them again.

24            THE COURT:  Well, let's just do that while we're here.

25            MR. MEJIA:  Make sure that's there.  I'm just trying

1    to make sure that that's been corrected, and I don't remember

2    the number right offhand.

3          THE COURT:  I don't either.  I believe it's 25.  Yes,

4    Instruction Number 25, and it's written in such a way as to

5    reflect the fact that Mr. Brewer did not testify.

6          MR. MEJIA:  Thank you very much, sir.  That's good.

7    Thank you.

8       (End of bench conference.)

9          THE COURT:  We're ready for the jury now.

10      (Jury in 10:40 a.m.)

11         THE COURT:  It is now time, members of the jury, for

12   me to instruct you about the law you must follow in deciding

13   this case.  I will start by explaining your duties and the

14   general rules that apply in every criminal case.  Then I will

15   explain the elements or parts of the crime that the defendant is

16   accused of committing.  Then I will explain some rules that you

17   must use in evaluating particular testimony and evidence.  And

18   last I will explain the rules that you must follow during your

19   deliberations in the jury room and the possible verdicts that

20   you may return.

21      Please listen carefully to everything that I say and keep in

22   mind that you will have a copy of these instructions in the jury

23   room.

24      Instruction Number 2.  You have two main duties as jurors.

25   The first one is to decide what the facts are from the evidence

1    that you saw and heard here in court.  Deciding what the facts

2    are is your job, not mine, and nothing that I have said or done

3    during this trial was meant to influence your decision about the

4    facts in any way.

5         Your second duty is to take the law that I give you, apply

6    it to those facts, and decide if the Government has proved the

7    defendant guilty beyond a reasonable doubt.

8         It is my job to instruct you about the law, and you are

9    bound by the oath that you took at the beginning of the trial to

10   follow the instructions that I give you, even if you personally

11   disagree with them.  This includes the instructions that I gave

12   you before and during the trial and these instructions.  All the

13   instructions are important, and you should consider them

14   together as a whole.

15        The lawyers have talked about the law during their

16   arguments, but if what they said is different from what I say,

17   you must follow what I say.  What I say about the law controls.

18        Perform these duties fairly.  Do not let any bias, sympathy,

19   or prejudice that you may feel toward one side or the other

20   influence your decision in any way.

21        Instruction Number 3.  As you know, the defendant has

22   pleaded not guilty to the crimes charged in the indictment.  The

23   indictment is not any evidence at all of guilt.  It is just the

24   formal way that the Government tells the defendant what crime he

25   is accused of committing.  It does not even raise any suspicion

1    of guilt.

2        Instead, the defendant starts the trial with a clean slate,

3    with no evidence at all against him, and the law presumes that

4    he is innocent.  This presumption of innocence stays with him

5    unless the Government presents evidence here in court that

6    overcomes the presumption and convinces you beyond a reasonable

7    doubt that he is guilty.

8        This means that the defendant has no obligation to present

9    any evidence at all or to prove to you in any way that he is

10   innocent.  It is up to the Government to prove that he is

11   guilty, and this burden stays on the Government from start to

12   finish.  You must find the defendant not guilty unless the

13   Government convinces you beyond a reasonable doubt that he is

14   guilty.

15       The Government must prove every element of the crime charged

16   beyond a reasonable doubt.  Proof beyond a reasonable doubt does

17   not mean proof beyond all possible doubt.  Possible doubts or

18   doubts based purely on speculation are not reasonable doubts.  A

19   reasonable doubt is a doubt based on reason and common sense.

20   It may arise from the evidence, the lack of evidence, or the

21   nature of the evidence.

22       Proof beyond a reasonable doubt means proof which is so

23   convincing that you would not hesitate to rely and act on it in

24   making the most important decisions in your own lives.  If you

25   are you convinced that the Government has proved the defendant

1   guilty beyond a reasonable doubt, say so by returning a guilty

2   verdict.  If you are not convinced, say so by returning a not

3   guilty verdict.

4      Instruction Number 4.  You must make your decision based

5   only on the evidence that you saw and heard here in court.  Do

6   not let rumors, suspicions, or anything else that you may have

7   seen or heard outside of court influence your decision in any

8   way.

9      The evidence in this case includes only what the witnesses

10  said while they were testifying under oath, the exhibits that I

11  allowed into evidence, and the stipulations that the lawyers

12  agreed to.

13     Nothing else is evidence.  The lawyers' statements and

14  arguments are not evidence.  Their questions and objections are

15  not evidence.  My legal rulings are not evidence, and my

16  comments and questions are not evidence.

17     During the trial I did not let you hear the answers to some

18  of the questions that the lawyers asked.  I also ruled that you

19  could not see some of the exhibits that the lawyers wanted you

20  to see, and sometimes I ordered you to disregard things that you

21  saw or heard, or I struck things from the record.  You must

22  completely ignore all of these things.  Do not even think about

23  them.  Do not speculate about what a witness might have said or

24  what an exhibit might have shown.  These things are not evidence

25  and you are bound by your oath not to let them influence your

1    decision in any way.  Make your decision based only on the

2    evidence as I have defined it here and nothing else.

3        Instruction Number 5.  You should use your common sense in

4    weighing the evidence.  Consider it in light of your everyday

5    experience with people and events and give it whatever weight

6    you believe it deserves.  If your experience tells you that

7    certain evidence reasonably leads to a conclusion, you are free

8    to reach that conclusion.

9        Instruction Number 6.  Now, some of you may have heard the

10   terms "direct evidence" and "circumstantial evidence."  Direct

11   evidence is simply evidence like the testimony of an eyewitness,

12   which if you believe it, directly proves a fact.  If a witness

13   testified that he saw it raining outside and you believed him,

14   that would be direct evidence that it was raining.

15       Circumstantial evidence is simply a chain of circumstances

16   that indirectly proves a fact.  If someone walked into the

17   courtroom wearing a raincoat covered with drops of water and

18   carrying a wet umbrella, that would be circumstantial evidence

19   from which you could conclude that it was raining.

20       It is your job to decide how much weight to give the direct

21   and circumstantial evidence.  The law makes no distinction

22   between the weight that you should give to either one or say

23   that one is any better evidence than the other.  You should

24   consider all the evidence, both direct and circumstantial, and

25   give it whatever weight you believe it deserves.

1        Instruction Number 7.  Another part of your job -- excuse

2    me -- as jurors is to decide how credible or believable each

3    witness was.  This is your job, not mine.  It is up to you to

4    decide if a witness's testimony was believable and how much

5    weight you think it deserves.  You are free to believe

6    everything that a witness said, or only part of it, or none of

7    it at all, but you should act reasonably and carefully in making

8    these decisions.

9        Let me subject -- I'm sorry -- let me suggest some things

10   for you to consider in evaluating each witness's testimony:

11       (A) Ask yourself if the witness was able to clearly see or

12   hear the events.  Sometimes even an honest witness may not have

13   been able to see or hear what was happening and may make a

14   mistake.

15       (B) Ask yourself how good the witness's memory seemed to be.

16   Did the witness seem able to accurately remember what happened?

17       (C) Ask yourself if there was anything else that may have

18   interfered with the witness's ability to perceive or remember

19   the events.

20       (D) Ask yourself how the witness acted while testifying.

21   Did the witness appear honest or did the witness appear to be

22   lying?

23       (E) Ask yourself if the witness had any relationship to the

24   Government or the defendant, or anything to gain or lose from

25   the case, that might influence the witness's testimony.  Ask

1    yourself if the witness had any bias, or prejudice, or reason

2    for testifying that might cause the witness to lie or to slant

3    the testimony in favor of one side or the other.

4        (F) Ask yourself if the witness testified inconsistently

5    while on the witness stand, or if the witness said or did

6    something -- or failed to say or do something -- at any other

7    time that is inconsistent with what the witness said while

8    testifying.

9        If you believe that the witness was inconsistent, ask

10   yourself if this makes the witness's testimony less believable.

11   Sometimes it may.  Other times it may not.  Consider whether the

12   inconsistency was about something important or about some

13   unimportant detail.  Ask yourself if it seemed like an innocent

14   mistake or if it seemed deliberate.

15       (G) And ask yourself how believable the witness's testimony

16   was in light of all the other evidence.  Was the witness's

17   testimony supported or contradicted by other evidence that you

18   found believable?

19       If you believe that a witness's testimony was contradicted

20   by other evidence, remember that people sometimes forget things,

21   and even two honest people who witness the same event may not

22   describe it exactly the same way.

23       These are only some of the things that you may consider in

24   deciding how believable each witness was.  You may also consider

25   other things that you think shed some light on the witness's

1    believability.  Use your common sense and your everyday

2    experience in dealing with other people, and then decide what

3    testimony you believe and how much weight you think it deserves.

4        Instruction Number 8.  One more point about the witnesses.

5    Sometimes jurors wonder if the number of witnesses who testified

6    makes any difference.  Do not make any decisions based only on

7    the number of witnesses who testified.  What is more important

8    is how believable the witnesses were and how much weight you

9    think their testimony deserves.  Concentrate on that, not on the

10   numbers.

11       Number 9.  There is one more general subject that I want to

12   talk to you about before I begin explaining the elements of the

13   crimes charged.  The lawyers for both sides objected to some of

14   the things that were said or done during the trial.  Do not hold

15   that against either side.  The lawyers have a duty to object

16   whenever they think that something is not permitted by the rules

17   of evidence.  Those rules are designed to make sure that both

18   side receive a fair trial.

19       And do not interpret my rulings on their objections as any

20   indication of how I think the case should be decided.  My

21   rulings were based on the rules of evidence, not on how I feel

22   about the case.  Remember that your decision must be based only

23   on the evidence that you saw and heard here in court.

24       Instruction Number 10.  That concludes the part of my

25   instructions explaining your duties and the general rules that

1    apply in every criminal case.  In a moment, I will explain the

2    elements of the crimes that the defendant is accused of

3    committing.

4        But before I do that, I want to emphasize that the defendant

5    is only on trial for the particular crimes charged in the

6    indictment and the lesser charges that I will explain to you.

7    Your job is limited to deciding whether the Government has

8    proved the crimes charged or one of those lesser charges.

9        Number 11.  The defendant has been charged with several

10   crimes.  The number of charges is no evidence of guilt and this

11   should not influence your decision in any way.  It is your duty

12   to separately consider the evidence that relates to each charge

13   and to return a separate verdict for each one.  For each charge,

14   you must decide whether the Government has presented proof

15   beyond a reasonable doubt that the defendant is guilty of that

16   particular charge.  Your decision on one charge, whether it is

17   guilty or not guilty, should not influence your decision on any

18   of the other charges.

19       Number 12.  The defendant was charged in a four-count

20   indictment.  Only three of those charges are now before you.  Do

21   not speculate about why the remaining charge is not part of this

22   trial.

23       The defendant is on trial only for Counts 2, 3, and 4 of the

24   indictment.  You may consider the evidence presented only as it

25   relates to those counts.

1          Instruction Number 13, possession of marijuana with intent

2     to distribute.  The defendant is charged with the crime of

3     possessing marijuana with intent to distribute.  Marijuana is a

4     controlled substance.  For you to find the defendant guilty of

5     this crime, you must find that the Government has proved each

6     and every one of the following elements beyond a reasonable

7     doubt:

8          (A) First, the defendant knowingly or intentionally

9     possessed marijuana.

10         (B) Second, the defendant intended to distribute marijuana.

11         Now I will give you more detailed instructions on some of

12    these terms.

13         To have "knowingly" possessed the marijuana, the defendant

14    did not have to know that the substance was marijuana.  It is

15    enough that the defendant knew that it was some kind of

16    controlled substance.

17         Further, the defendant did not have to know how much

18    marijuana he possessed.  It is enough that the defendant knew

19    that he possessed some quantity of marijuana.

20         The phrase "intended to distribute" means the defendant

21    intended to deliver or transfer a controlled substance sometime

22    in the future.  The term "distribute" includes the actual,

23    constructive, or attempted transfer of a controlled substance.

24    To distribute a controlled substance, there need not be an

25    exchange of money.

1    In determining whether the defendant had the intent to

2  distribute, you may consider all the facts and circumstances

3  shown by the evidence, including the defendant's words and

4  actions.  Intent to distribute can be inferred from the

5  possession of a large quantity of drugs, too large for personal

6  use alone.  You may also consider the estimated street value of

7  the drugs, the purity of the drugs, the manner in which the

8  drugs were packaged, the presence or absence of a large amount

9  of cash, the presence or absence of weapons, and the presence or

10  absence of equipment used for the sale of drugs.  The law does

11  not require you to draw such an inference, but you may draw it.

12    If you are convinced that the Government has proved all of

13  these elements, say so by returning a guilty verdict on this

14  charge.  If you have a reasonable doubt about any one of these

15  elements, then you must find the defendant not guilty of this

16  charge.

17    Number 14, lesser included offense, possession of marijuana.

18  If you find the defendant not guilty of possession of marijuana

19  with intent to distribute, or if after making every reasonable

20  effort to reach a unanimous verdict on that charge, you find

21  that you cannot agree, then you must go on to consider whether

22  the Government has proved the lesser charge of possession of

23  marijuana.

24    The difference between these two crimes is that to convict

25  the defendant of the lesser charge of possession of marijuana,

1    the Government does not have to prove that he intended to

2    distribute the marijuana.  This is an element of the greater

3    charge, but not the lesser charge.

4        For you to find the defendant guilty of possession of

5    marijuana, the Government must prove each and every one of the

6    elements beyond a reasonable doubt:

7        (A) First, that the defendant possessed marijuana.

8        (B) Second, that he did so knowingly or intentionally.

9        To have "knowingly" possessed the marijuana, the defendant

10   did not have to know that the substance was marijuana.  It is

11   enough that the defendant knew it was some kind of controlled

12   substance.  Further, the defendant did not have to know how much

13   marijuana he possessed.  It is enough that the defendant knew

14   that he possessed some quantity of marijuana.

15       If you are convinced that the Government has proved all of

16   these elements, say so by returning a guilty verdict on this

17   charge.  If you have a reasonable doubt about any one of these

18   elements, then you must find the defendant not guilty of this

19   charge.

20       Number 15, possession of a firearm in furtherance of a drug

21   trafficking crime.  The defendant is charged with violating

22   federal law by possessing a firearm in furtherance of a drug

23   trafficking crime.

24       For you to find the defendant guilty of this crime, you must

25   find that the Government has proved each and every one of the

1  following elements beyond a reasonable doubt:

2      (A) First, that the defendant committed the crime of

3  possession of marijuana with intent to distribute.  Possession

4  of marijuana with intent to distribute is a drug trafficking

5  crime which may be prosecuted in a court of the United States.

6      (B) Second, that the defendant knowingly possessed a

7  firearm.

8      (C) Third, that the possession of the firearm was in

9  furtherance of the crime of possession of marijuana with intent

10  to distribute.

11      Now I'll give you more detailed instructions on some of

12  these terms.

13      The term "firearm" means any weapon which will or is

14  designed to or may readily be converted to expel a projectile by

15  the action of an explosive.  The firearm need not be loaded.

16      The Government and the defendant have agreed that the Glock

17  22, .40 caliber, semiautomatic pistol, serial number HVP337,

18  introduced as Government's Exhibit 4, is a firearm for purposes

19  of this element in that it expels a projectile by the action of

20  an explosive.  You must therefore accept this fact as proved.

21      The term "knowingly" means voluntarily and intentionally and

22  not because of mistake or accident.

23      The term "in furtherance of" means that the firearm was

24  possessed to advance or promote the crime of possession of

25  marijuana with intent to distribute.

1       In deciding whether the firearm was possessed to advance or

2   promote that crime, you may consider these factors:

3       (1) Whether the firearm was strategically located so that it

4   was quickly and easily available for use;

5       (2) Whether the firearm was loaded;

6       (3) The type of weapon;

7       (4) The type of drug trafficking crime; and

8       (5) The time and circumstances under which the firearm was

9   found.  This list is not exhaustive.

10      If you are convinced that the Government has proved all of

11  these elements, say so by returning a guilty verdict on this

12  charge.  If you have a reasonable doubt about any of these

13  elements, then you must find the defendant not guilty of this

14  charge.

15      Number 16, possession of cocaine with intent to distribute.

16  The defendant is charged with the crime of possession of cocaine

17  with intent to distribute.  Cocaine is a controlled substance.

18  For you to find the defendant guilty of this crime, you must

19  find that the Government has proved each and every one of the

20  following elements beyond a reasonable doubt:

21      (A) First, the defendant knowingly or intentionally

22  possessed cocaine.

23      (B) Second, the defendant intended to distribute cocaine.

24      Now I will give you more detailed instructions on some of

25  these terms.  To have "knowingly" possessed the cocaine, the

1    defendant did not have to know that the substance was cocaine.

2    It is enough that the defendant knew that it was some kind of

3    controlled substance.  Further, the defendant does not have to

4    know how much cocaine he possessed.  It is enough that the

5    defendant knew that he possessed some quantity of cocaine.

6        The phrase "intended to distribute" means the defendant

7    intended to deliver or transfer a controlled substance sometime

8    in the future.  The term "distribute" includes the actual,

9    constructive, or attempted transfer of a controlled substance.

10   To distribute a controlled substance, there need not be an

11   exchange of money.

12       In determining whether the defendant had the intent to

13   distribute, you may consider all the facts and circumstances

14   shown by the evidence, including the defendant's words and

15   actions.  Intent to distribute can be inferred from the

16   possession of a large quantity of drugs too large for personal

17   use alone.

18       You may also consider the estimated street value of the

19   drugs, the purity of the drugs, the manner in which the drugs

20   were packaged, the presence or absence of a large amount of

21   cash, the presence or absence of weapons, and the presence or

22   absence of equipment used for the sale of drugs.  The law does

23   not require you to draw such an inference, but you may draw it.

24       If you are convinced that the Government has proved all of

25   these elements, say so by returning a guilty verdict on this

1    charge.  If you have a reasonable doubt about any one of these

2    elements, then you must find the defendant not guilty of this

3    charge.

4        Number 17, lesser included offense - possession of cocaine.

5    If you find the defendant not guilty of possession of cocaine

6    with intent to distribute, or if after making every reasonable

7    effort to reach a unanimous verdict on that charge, you find

8    that you cannot agree, then you must go on to consider whether

9    the Government has proved the lesser charge of possession of

10   cocaine.

11       The difference between these two crimes is that to convict

12   the defendant of the lesser charge of possession of cocaine, the

13   Government does not have to prove intent to distribute.  This is

14   an element of the greater charge but not the lesser charge.

15       For you to find the defendant guilty of the lesser charge,

16   you must find that the Government has proved each and every one

17   of the following elements beyond a reasonable doubt:

18       First, the defendant possessed cocaine.

19       Second, the defendant did so knowingly or intentionally.

20       To have knowingly possessed the cocaine, the defendant did

21   not have to know that the substance was cocaine.  It is enough

22   that the defendant knew that it was some kind of controlled

23   substance.  Further, the defendant did not have to know how much

24   cocaine he possessed.  It is enough that the defendant knew he

25   possessed some quantity of cocaine.

1    If you are convinced that the Government has proved all of

2    these elements, say so by returning a guilty verdict on this

3    charge.  If you have a reasonable doubt about any one of these

4    elements, then you must find the defendant not guilty of this

5    charge.

6    If you are convinced that the Government has proved all of

7    these elements, say so by returning a guilty verdict on this

8    charge.  If you have a reasonable doubt about any one of these

9    elements, then you must find the defendant not guilty of this

10   charge.

11   Number 18.  Next I want to say a word about the dates

12   mentioned in the indictment.  The indictment charges that the

13   crimes happened on or about November 11 and 12, 2015.  The

14   Government does not have to prove that the crimes happened on

15   those exact dates, but the Government must prove that the crimes

16   happened reasonably close to those dates.

17   Number 19.  Next, I want to explain something about proving

18   a defendant's state of mind.  Ordinarily, there is no way that a

19   defendant's state of mind can be proved directly, because no one

20   can read another person's mind and tell what that person is

21   thinking.

22   But a defendant's state of mind can be proved indirectly

23   from the surrounding circumstances.  This includes things like

24   what the defendant said, what the defendant did, how the

25   defendant acted, and any other facts or circumstances in

1    evidence that show what was in the defendant's mind.

2        You may also consider the natural and probable results of

3    any acts that the defendant knowingly did and whether it is

4    reasonable to conclude that the defendant intended those

5    results.  This, of course, is all for you to decide.

6        Number 20.  Next I want to explain something about proving a

7    defendant's knowledge.  No one can avoid responsibility for a

8    crime by deliberately ignoring the obvious.  If you are

9    convinced that the defendant deliberately ignored a high

10   probability that there was contraband inside the vehicle, then

11   you may find that he knew he possessed the drugs.

12       But to find this, you must be convinced beyond a reasonable

13   doubt that the defendant was aware of a high probability that

14   there was contraband inside the vehicle and that the defendant

15   deliberately closed his eyes to what was obvious.  Carelessness,

16   or negligence, or foolishness on his part is not the same as

17   knowledge and is not enough to convict.  This, of course, is all

18   for you to decide.

19       Instruction Number 21.  Next I want to explain something

20   about possession.  The Government does not necessarily have to

21   prove that the defendant physically possessed the controlled

22   substance or firearm for you to find him guilty of the crimes I

23   just described.  The law recognizes two kinds of possession:

24   Actual possession and constructive possession.  Either one of

25   these, if proved by the Government, is enough to convict.

1        To establish actual possession, the Government must prove

2   that the defendant had direct, physical control over the

3   controlled substance or firearm and knew that he had control of

4   it.

5        To establish constructive possession, the Government must

6   prove that the defendant had the right to exercise physical

7   control over the controlled substance or firearm, and knew that

8   he had this right, and that he had intended to exercise physical

9   control over the controlled substance or firearm at some time,

10  either directly or through other persons.

11       For example, if you left something with a friend intending

12  to come back later and pick it up, or intending to send someone

13  else to pick it up for you, you would have constructive

14  possession of it while it was in the actual possession of your

15  friend.

16       But understand that just being present where something is

17  located does not equal possession.  The Government must prove

18  that the defendant had actual or constructive possession of the

19  controlled substance or firearm and knew that he did for you to

20  find him guilty of the crime.  This, of course, is all for you

21  to decide.

22       Number 22.  One more thing about possession.  The Government

23  does not have to prove that the defendant was the only one who

24  had possession of the controlled substance or firearm.  Two or

25  more people can together share actual or constructive possession

1   over property, and if they do, both are considered to have

2   possession as far as the law is concerned.

3      But remember that just being present with others who had

4   possession is not enough to convict.  The Government must prove

5   that the defendant had either actual or constructive possession

6   of the controlled substance or firearm and knew that he did for

7   you to find him guilty of the crime.  This, again, is all for

8   you to decide.

9      Number 23.  Although the indictment charges that the statute

10  was violated by acts that are connected by the word "and," it is

11  sufficient if the evidence establishes a violation of the

12  statute by any one of the acts charged.  Of course, this must be

13  proved beyond a reasonable doubt.

14     Number 24.  That concludes the part of my instructions

15  explaining the elements of the crimes.  Next I will explain some

16  rules that you must use in considering some of the testimony and

17  evidence.

18     Number 25.  A defendant has an absolute right not to

19  testify.  The fact that he did not testify cannot be considered

20  by you in any way.  Do not even discuss it in your

21  deliberations.

22     Remember that it is up to the Government to prove the

23  defendant guilty beyond a reasonable doubt.  It is not up to the

24  defendant to prove that he is innocent.

25     Number 26.  You have heard the testimony of LMPD Detective

1    Kevin McKinney, who testified as an opinion witness.

2        You do not have to accept Detective McKinney's opinion.  In

3    deciding how much weight to give it, you should consider the

4    witness's qualifications and how he reached his conclusions.

5    Also consider the other factors discussed in these instructions

6    for weighing the credibility of witnesses.  Remember that you

7    alone decide how much of a witness's testimony to believe and

8    how much weight it deserves.

9        Number 27.  You have heard the testimony of LMPD Detective

10   Chad Stewart, who testified to both facts and opinions.  Each of

11   these types of testimony should be given the proper weight.

12       As to the testimony on facts, consider the factors discussed

13   earlier in these instructions for weighing the credibility of

14   witnesses.

15       As to the testimony on opinions, you do not have to accept

16   Detective Stewart's opinion.  In deciding how much weight to

17   give it, you should consider the witness's qualifications and

18   how reached his conclusions, along with the other factors

19   discussed in these instructions for weighing the credibility of

20   witnesses.

21       Remember that you alone decide how much of a witness's

22   testimony to believe and how much weight it deserves.

23       Instruction Number 28.  You have heard the testimony of

24   Stephanie Sears.  You have also heard that before this trial she

25   was convicted of a crime.  This earlier conviction was brought

1   to your attention only as one way of helping you decide how

2   believable her testimony was.  Do not use it for any other

3   purpose.  It is not evidence of anything else.

4        Number 29.  That concludes the part of my instructions

5   explaining the rules for considering some of the testimony and

6   evidence.  Now let me finish up by explaining some things about

7   your deliberations in the jury room and your possible verdicts.

8        The first thing that you should do in the jury room is

9   choose someone to be your foreperson.  This person will help to

10  guide your discussions and will speak for you here in court.

11       Once you start deliberating, do not talk to the jury

12  officer, or to me, or to anyone else, except each other about

13  the case.

14       If you have any questions or messages, you must write them

15  down on a piece of paper, sign them, and then give them to the

16  jury officer.  The officer will give them to me, and I will

17  respond as soon as I can.  I may have to talk to the lawyers

18  about what you have asked, so it may take me some time to get

19  back to you.  Any questions or messages normally should be sent

20  to me through your foreperson.

21       All of the evidence will be sent back with you except for

22  the firearm, drugs, and currency.  If you want to see any of

23  those exhibits, you may send me a message, and those exhibits

24  will be provided to you.

25       One more thing about messages.  Do not ever write down or

1    tell anyone, including me, how you stand on your votes.  For

2    example, do not write down or tell anyone that you are split

3    6-6, or 8-4, or whatever your vote happens to be.  That should

4    stay secret until you are finished.

5        Number 30.  Remember that you must make your decision based

6    only on the evidence that you saw and heard here in court.

7    During your deliberations, you must not communicate with or

8    provide any information to anyone by any means about this case.

9        You may not use any electronic device or media, such as a

10   telephone, cell phone, smartphone, or tablet, computer, the

11   Internet, any Internet service, or any text or instance

12   messaging service, any Internet chat room, blog, or website,

13   such as Facebook, Instagram, MySpace, LinkedIn, YouTube, or

14   Twitter to communicate to anyone any information about this case

15   or to conduct any research about this case until I accept your

16   verdict.

17       In other words, you cannot talk to anyone on the phone,

18   correspond with anyone, or electronically communicate with

19   anyone about this case.  You can only discuss the case in the

20   jury room with your fellow jurors during deliberations.  I

21   expect you will inform me immediately if you become aware of

22   another juror's violation of these instructions.

23       You may not use these electronic means to investigate or

24   communicate about the case because it is important that you

25   decide this case based solely on the evidence presented in this

1   courtroom.  Information on the Internet or available through

2   social media might be wrong, incomplete, or inaccurate.

3       You are only permitted to discuss the case with your fellow

4   jurors during deliberations because they have seen and heard the

5   same evidence you have.  In our judicial system, it is important

6   that you are not influenced by anything or anyone outside of

7   this courtroom.  Otherwise, your decision may be based on

8   information known only by you and not your fellow jurors or the

9   parties in the case.  This would unfairly and adversely impact

10  the judicial process.  A juror who violates these

11  instructions -- or I'm sorry -- these restrictions jeopardizes

12  the fairness of these proceedings and a mistrial could result,

13  which would require the entire process -- trial process to start

14  over.

15      Number 31.  Your verdict, whether it is guilty or not

16  guilty, must be unanimous as to each count.  To find the

17  defendant guilty of a particular count, every one of you must

18  agree that the Government has overcome the presumption of

19  innocence with evidence that proves his guilt beyond a

20  reasonable doubt.  To find him not guilty of a particular count,

21  every one of you must agree that the Government has failed to

22  convince you beyond a reasonable doubt.  Either way, guilty or

23  not guilty, your verdict must be unanimous as to each count.

24      Instruction Number 32.  Now you will hear closing arguments

25  from the lawyers.  Then I will have some final instructions

1    regarding the procedures that you will follow in your

2    deliberations.

3                MS. MCKENZIE:  May it please the Court.

4                THE COURT:  Mr. Mejia.

5                MR. MEJIA:  Counsel.

6                MS. MCKENZIE:  Members of the jury:  This is all what

7    it appears to be.  Your common sense doesn't lie and it doesn't

8    leave you when you walk through those doors.  And the law, the

9    law that you've been given, the law that operates in this

10   historic building, it depends on that common sense.

11       I want to highlight a few things about the judge's

12   instructions, and I want to start with -- may I have the Elmo?

13   -- I want to start with your common sense.  It's written into

14   the instructions.

15       I used to practice in state court in Kentucky.  I can tell

16   you that as federal jurors, you're lucky because you actually

17   get a definition of reasonable doubt.  A state juror, they

18   don't -- they don't get any definition for this term, but Judge

19   Hale's instructions really break this down and it's not magic.

20       Proof beyond a reasonable doubt is not beyond all possible

21   doubt.  It is not based on speculation.  It is based on reason

22   and common sense.

23       And I used to say, trying to help jurors understand this in

24   state court, that if it's not reasonable, then it cannot form

25   the basis for reasonable doubt.  And I think that that really

1   just gets to this whole idea of you come here with the ability

2   to solve this problem, and the law depends on you using your own

3   reason and common sense and everyday experience.

4       Here's another instruction, again, that makes reference to

5   this:  "Use your common sense.  Consider it -- consider the

6   evidence in light of your everyday experience with people and

7   events.  Give it whatever weight you believe it deserves.  If

8   your experience tells you that certain evidence reasonably leads

9   to a conclusion, you are free to reach that conclusion."

10      "Circumstantial evidence:  Similarly, this is a chain of

11  circumstances that indirectly prove a fact."  I highlight this

12  for this particular case because among the elements of the

13  offenses that you're considering is you have to find beyond a

14  reasonable doubt that Mr. Brewer intended -- that he knowingly

15  possessed drugs and then intended to distribute those drugs.

16      Short of having statements by Mr. Brewer where he says, "I'm

17  on my way to sell these drugs," there's not going to be a lot of

18  direct evidence in that category.  But indirect evidence,

19  circumstantial evidence, logical conclusions that you draw from

20  the facts, from the testimony, from the things in front of your

21  eyes, these instructions not only permit that, they depend on

22  it.

23      Instruction Number 7 is another pretty important one.  This

24  is your roadmap to evaluating the credibility of the witnesses

25  that you heard testify.  It's a long instruction.  I'm not going

1   to re-read it to you, but, again, I think a lot of the things

2   that are baked into this instruction are really just echos of

3   what you already do in your everyday lives.  If you have

4   children or with people that you deal with in your job on a

5   daily basis, you're doing these things.  You're evaluating the

6   credibility of things people tell you.  And, again, it isn't

7   magic.  It's something that ordinary people are best situated to

8   do.

9       I'm going to come back to Instruction Number 10.  We're

10  going to save that one.

11      Let me skip forward to some more instructions about

12  credibility.  There were some witness specific instructions.

13  For instance, an instruction regarding Detective McKinney and

14  the opinions that you heard.  You are able to judge his

15  qualifications, weigh what you heard, and decide whether it

16  passes muster to you.  Likewise with Detective Stewart.

17      I did not elicit any opinions from Detective Stewart, but I

18  believe there were some that came out on cross-examination.

19  And, similarly, you can evaluate those opinions based on what

20  you observed about Detective Stewart, what you heard about his

21  own experience, and how he might be qualified or not to opine,

22  and you determine what you believe, how much you believe, and

23  how much weight you give it.

24      And, finally, the same concept goes for Ms. Sears and any

25  other witness, but there's a specific instruction here regarding

1    Ms. Sears.  And that's simply to let you know that the -- what

2    you heard about her prior conviction for lying to the police is

3    only to be used in terms of evaluating whether or not you find

4    her believable, and you don't use it for anything else.

5        So I want to go to the instructions on the specific

6    offenses.  This is Instruction 13.  So Mr. Mejia talked in his

7    opening statement about how there are three big things you have

8    to decide in this case, and I think that's probably a fair way

9    to characterize your job.  There are three separate charges.

10   They have different elements, but there are three big concepts

11   here that you have to wrestle with, and those get you to a

12   verdict ultimately.

13       The first one is knowing possession and whether you believe

14   evidence shows beyond a reasonable doubt that Mr. Brewer had

15   knowing possession on November 11th, knowing possession of both

16   the marijuana and the firearm -- because both of those

17   instructions include that element -- and on November 12th,

18   knowing possession of the cocaine.  I think if you start there

19   and decide that before you move on, maybe that helps inform your

20   later decisions that you have to make.

21       So how do you know that the evidence does establish knowing

22   possession beyond a reasonable doubt?  Well, the first way you

23   know it is you have these video clips.  I'm not going to replay

24   them right now, but they are available to you and you can watch

25   them as you deliberate.  You can watch and re-watch them, but

1    the video clips, first of all, they show you some of the

2    behavior, some of the circumstances that were described by the

3    witnesses in their testimony.  For instance, there was a lot of

4    cross-examination about the window tint and whether it was or

5    whether it wasn't, whether there have been other instances, how

6    many other instances.

7        There was a lot of discussion about the fact that those

8    window tint charges ultimately were dismissed by the state

9    court.  I think you heard from multiple witnesses that that was

10   because the felony charges ended up in federal court.  But if

11   the point of all of that was to suggest that the windows were

12   not really tinted and that that is somehow something these

13   officers made up, watch the video.  You can see clearly on both

14   of these videos how dark those cars are.

15       In Detective Stewart's video, you even see him stop at the

16   rear of the car, and he doesn't move until he sees that window

17   come down.  And that's because you can't see -- you can't see

18   what's in that car.  You can't see how many people are in that

19   car.  It could be Big Bird driving the car and you can't see it.

20       And the reason it matters -- I mean, it doesn't really

21   matter.  It's not in the instructions that you have to find that

22   these windows were excessively tinted, but it matters for two

23   reasons:  One, I think Mr. Mejia attempted to develop it as some

24   sort of credibility issue for these police officers.  And if

25   it's a credibility for the police officers, it's one that goes

1    in their favor.  And you see that when you watch these videos.

2         The other reason it matters is because why do you do that?

3    Why do you put illegal limo tint on your rental car?  You have

4    to pay to have it applied and then you have to take it off or

5    you lose money.  And we'll revisit that in a minute, but I

6    submit to you that that goes under the column of establishing

7    that he knew what was in the car.

8         The other way you know this is knowing possession are the

9    similarities between November 11th and November 12th.  And, I

10   mean, you just got to ask yourself, is this a coincidence or a

11   pattern?

12        Is this happenstance or a mode of operations?  The first car

13   is a rental.  Fair enough.  I'm sure these rental agencies don't

14   dig under the steering wheel every time somebody comes in to

15   turn in a car just to make sure they didn't leave a Glock in

16   there, but it's not just the rental car.  It's the rental car

17   and then the next day it's his wife's car.  And it's the same

18   general method of hiding, same general area.  It is a black

19   fabric wrapped around the drugs, hidden up inside each time, and

20   the canister, the black canister was then in a black bag.

21        The closeness in time here, how quickly?  If this is

22   coincidence, it is lightning striking, lightning striking twice.

23   He has just bonded out of jail and he's already got three cell

24   phones and $1,000.

25        And you heard Ms. Allen testify that in his job at the auto

1    body shop he made about $600 a week, I believe, was the

2    testimony.  So the next day he bonds out of jail, and he's got

3    almost two weeks of income from his day job in his pocket and

4    three cell phones.

5        His behavior is another thing that you can put under the

6    column of knowing possession, the tint, the towel.  Do you

7    remember what Detective James said about the towel?  "Yeah, I've

8    seen that before.  I've used that before when I'm out solo doing

9    surveillance because it keeps the lights on the dash from

10   illuminating my face so I can sit in a parked car and not be

11   recognized, not have anybody notice me."

12       Well, Cherosco Brewer is not a police officer.  He's not out

13   there doing surveillance.  Why do you do that?  If you are the

14   unluckiest man in the world on whom lightning has stricken twice

15   in two days, and you're driving around in a rental car that you

16   rented months ago that I guess somebody drove and left their

17   stuff in and didn't tell you about it, why do you do that with

18   the towel?  What is that?  That is trying to conceal.  What is

19   he trying to conceal if he doesn't know what's in the car?

20       His refusal to pass Detective Stewart's car on Broadway.

21   Why do you stop dead on Broadway to avoid passing a car that

22   you've recognized is being driven by a police officer?  Well,

23   you might do it if you know the car you're driving has cocaine

24   in it and you know this police officer.  You know the unit that

25   he's assigned to.  You know that if he pulls you over, within a

1   couple of minutes there's going to be others, and there's going

2   to be that guy with the dog, and that damn dog is going to sniff

3   around the car and here we go again.  That's why you stop your

4   car in the middle of Broadway.

5       It's November.  It's cold outside.  Both of these cars are

6   pretty late model vehicles that appear to be in good working

7   order.  What do you do when you get in your car in the middle of

8   winter?  Well, I turn on the heat.  And when it's real cold,

9   when it's so cold that I can see my breath outside at night, I

10  turn the heat on full blast.  Now, if somebody left nine bindles

11  of weed in my vent, I'm going to smell it.  I'm going to smell

12  it when I crank that heat up.

13      Okay.  Here is another thing that you file under knowing

14  possession:  Recall the testimony of Stephanie Sears.  She would

15  not agree with me that $200, which is what she says she would

16  spend at a time on drugs, is a lot of money, but she said, "My

17  boots cost $300."

18      And I said, "What do you do with those boots when you get

19  home at the end of the day?"

20      "Well, I take them off and I put them in a box," because

21  they're $300 boots.  That's what you do with $300 boots.

22      What do you do with $200 worth of drugs or in this case 750,

23  $800 worth of drugs?  400, $500 worth of drugs?  A really nice

24  handgun, what do you do with it?  You don't leave it in somebody

25  else's car.  Especially if you're spending that kind of money on

1    cocaine, you don't forget where that stuff is.

2        The second big decision you've got to make after knowing

3    possession is -- with respect to Counts 2 and 4, the drug

4    charges, is intent to distribute.  And I have some things that

5    you can file under that heading too.  For starters, the cell

6    phones.  Why does a person -- now, I have old cell phones that

7    I'm not currently using because I've upgraded.  I don't drive

8    around with them all in my car.  I don't drive around with seven

9    cell phones.

10       The gun, the gun is how you -- one of the reasons you know

11   this was intent to distribute, as opposed to mere possession.

12       The rental cars, the rental cars -- you know, there's

13   probably not a person in this courtroom that hasn't at some time

14   rented a car -- when you're traveling, when something is wrong

15   with your car, if you're lucky, maybe your insurance company

16   pays for that -- but there's a lot of car renting going on and

17   there's a lot of money.  $200 a week just for this one receipt

18   alone.  $200 a week is an $800 a month car payment.  That's a

19   fancy car.  If that's a car payment for a car you own, that's a

20   fancy car.

21       And I'm not saying that this is, you know, fancy in the

22   sense that, you know, it means he's a drug dealer, but it means

23   he is spending a significant amount of money to drive different

24   cars, cars that when she runs the tag at 1:00 in the morning,

25   all it tells her is it's registered to EAN Holdings.

1       The packaging, the packaging is -- this is a big -- this is

2  a big deal.  These are very nice little packages.  You heard

3  testimony, I think, from both prosecution and the defense

4  witnesses about, you know, each of these little packages is a

5  couple of servings.  Each of these 15 little bindles would have

6  been about half a gram, a couple of servings.

7       You heard from Detective McKinney and your memory -- you go

8  on what your memory is or what your notes, you know, and your

9  memory tell you, not mine, but I think I also heard Detective

10 Stewart say he's not seen drug users who purchase their personal

11 use narcotics packaged like this.  The packaging tells you what

12 the intent was.

13      Another way that you know what the intent was -- I don't

14 know if anyone during the trial asked themselves, "Huh, why is

15 that little package of weed down in that candy box?  And why did

16 that guy have his weed out in the open in that door handle like

17 that?"

18      Well, if I'm supposed to meet you somewhere to sell you some

19 weed, we're going to try to do that as low-key as possible so

20 that nobody who might be around, certainly no police who might

21 be around, recognized what's happening as a drug transaction.

22 So I'm going to pull up.  I'm going to have it ready to go, roll

23 my window down, and I'm going to pass you this little box of

24 candy.  This doesn't look illegal, does it?  This in the door

25 handle tells you what his intent was with all of these.

1     Now, the amounts of drugs, there's plenty of testimony about

2     it, plenty of questioning from both sides about it.  One thing

3     you will not find in here is a requirement that there have to be

4     a certain quantity of drugs in order for it to be possession

5     with intent.  Whether the quantity is too much for personal use

6     alone is a factor to consider, but it's a factor to consider

7     among other things.  And I would ask you, again, to use your

8     common sense as you evaluate whether, because of the quantity

9     here that necessarily means it couldn't have been for sale.

10     Detective McKinney explained that in the world of drug

11    trafficking -- I mean, there are -- there's a spectrum.  There

12    are economies of scale and he spoke mostly of street-level

13    dealing, which is what we have in this case.  I'm not trying to

14    convince you that he's Pablo Escobar, but he's a drug dealer,

15    and there's not going to be anything in that instruction that

16    requires you to find a certain amount.  It's not going to

17    require you to find that there was a certain level of purity of

18    the cocaine.

19     The third category relates only to the gun.  The third

20    category is on the gun charge.  If you find knowing possession,

21    is the gun possessed in furtherance of a drug trafficking

22    offense?  How do you know that?

23     Well, guns are a tool of the trade.  That was Detective

24    McKinney's testimony.  How else do you know it?  Its proximity

25    to the drugs.  It was loaded.  It had a full magazine and you

1    know because of its accessibility.

2         This textured thing you're looking at is this right here.

3    So if I'm driving around serving people up some weed, this gun

4    down in that steering wheel, the barrel is facing away from me.

5    It's accessible if I need it.  It's tucked away so that if I get

6    stopped, it's not immediately visible, but it's accessible if I

7    need it.  Detective McKinney testified that a drug dealer can't

8    call the police if they get robbed.  This is a necessary tool of

9    the trade.

10        And, just briefly, I want to address a couple of additional

11   things because they're out there.  It's not in the instructions,

12   but it's something that's been put out there, and I know that

13   it's in your mind and you're probably wondering, "What do I do

14   with this?"

15        So the burden of proof here is mine.  Mr. Brewer is not

16   required to put on a defense.  He is not required to call a

17   single witness.  However, if they do, you have to evaluate what

18   they put forward just the same as you evaluate all the other

19   witnesses.  And that credibility instruction and your common

20   sense will guide you in that, but let's start with Stephanie

21   Sears.

22        She testified about drug use either to make you think that,

23   well, maybe this stuff could be hers because -- I don't know --

24   because she said that sometimes she hides her drugs, or maybe

25   she testified to make you think that someone who uses this kind

1    of stuff would buy it for personal use in many single servings

2    and then leave it behind.

3        Let me tackle that -- okay -- the single servings.  I don't

4    know how many drug users out there treat their drugs like Weight

5    Watchers meals, but the testimony of the men who have spent

6    years investigating narcotics, investigating the sale of

7    narcotics users and their behavior certainly suggest that that's

8    not how drug users buy their drugs.  That's not how they do it.

9        I mean, maybe if you're trying not to use too much, you're

10   going to order it up like this, but I submit to you that that is

11   not credible.  It is also not credible to believe that this --

12   this is a valuable substance to anybody who uses it, to anybody

13   who sells it.  This is close to $800.  I don't know about you,

14   but I have never lost or just carelessly left behind $800.  If I

15   lost $800, I'd be racking my brain trying to find it.

16       Also, this is a nice gun.  This is the same gun that the

17   police officers use.  Detective Hogan carries the same gun as

18   her duty weapon.  I don't know how much a Glock costs, but it's

19   not cheap, and it's something else that it is just incredible to

20   believe that you wouldn't know where that is.

21       The other witness that the defense put forth was Yvette

22   Allen.  You know, just a couple of things here.  She loves him.

23   They've been engaged for a long time.  They've been through

24   tragedy together.  They have a partnership, but she doesn't know

25   what he's out doing late at night.

1    I didn't ask her about Regina Northington to embarrass her.

2    I asked her because if she doesn't know the woman that Cherosco

3    is out with at 1:00 in the morning, then she probably also

4    doesn't know what he's doing with this, or this, or where the

5    cocaine in her car came from.  That's not her fault.  She loves

6    him and she's trying to help him.

7    You have to ask yourself if this is -- if this is

8    coincidence that twice in two days, in two different cars,

9    Mr. Brewer gets pulled over with something that could send him

10   to jail, hidden in pretty much the same place, hidden in a place

11   that somebody who has a job that involves working on cars might

12   be familiar with how to pop something out and stick something

13   in.

14   It's not coincidence.  It's proof beyond a reasonable doubt

15   that he's guilty as charged of possession of marijuana with

16   intent to distribute, of possession of a firearm in furtherance

17   of a drug trafficking crime, and possession of cocaine with

18   intent to distribute.

19         MR. MEJIA:  May it please the Court, members of the

20   prosecution, Mr. Brewer.

21   Members of the jury, we stand for you when you come into the

22   room.  That's a pretty significant thing, when you think about

23   it, in your lives how many times that happens.  Certainly a

24   gentleman will stand when a woman enters the room for an

25   introduction, but for a court staff, lawyers, all the attendants

1    in the room to stand for you when you come in the room is a

2    symbol of something just so extremely important.  It's you and

3    why you're here, and what we're doing here, and what this is

4    about.

5        We stand for you because what you do as jurors is probably,

6    next to service of our country in time of war, the most precious

7    obligation that a citizen can have, service on an American jury.

8        And in that capacity, it is you and you alone who determine

9    guilt or innocence, and that may change some notions that you

10   may have had in everyday life.  For instance, what you've heard

11   here, judges don't decide guilt or innocence.  You do.  I've

12   said this earlier and, obviously, from the instructions that

13   you've been given and no doubt will heed very closely, you and

14   you alone will determine the facts of this case following and

15   applying the law to it.

16       In assessing the credibility of, let's say, an opinion

17   witness, such as Detective McKinney or Officer Chad Stewart,

18   they were giving you their opinions of what this evidence means.

19   You are free in your wisdom, and in your judgment, and in your

20   common sense to accept or reject what they say.  Why?  Because

21   if it were a case where police determine guilt, then they just

22   simply decide it, a person's guilty and the case is done.

23       An indictment is not evidence.  It's not even a hint of

24   evidence, because if that was the case, one would be indicted.

25   They'd come to court.  They'd be convicted.

1      No, members of the jury, what we have are rock-bottom rules

2  of law that I must remind you of.

3      Now, in everyday life, going about your morning coffee or

4  your commute to work, you may hear on the radio, or see in the

5  news at night, or read in the Internet:  Someone's been

6  indicted.  Someone's under investigation.  Somebody is on trial

7  for a criminal cause.  You may conclude guilt.  Of course you

8  can.  That's your freedom of judgment, but here in this place,

9  in this room, in this precious courthouse, we can't do that,

10  none of us.

11      We all agree, all of us -- and you accept it as the rule of

12  law -- Cherosco Brewer is not guilty.  He is presumed innocent,

13  because if we didn't have the presumption of innocence, we'd

14  simply have folks, like Detective McKinney and Detective

15  Stewart, saying "all that means, he's a drug trafficker," a

16  prosecutor saying, "He's a drug trafficker.  He's guilty, case

17  done."  It doesn't work that way, members of the jury.

18      Your verdict is not a vote for or against drug laws.  We

19  accept the laws.  Your verdict is not a vote for or against the

20  Government.  It's not a vote for or against police.  You're not

21  vouching for and honoring police by saying guilty or not guilty.

22  This is not a popularity contest.

23      If anything I've done or said in this trial somehow would

24  indicate that we have or I have some disrespect for police,

25  please don't think that.  We honor police.  We honor our system

1   of laws.  We believe in our laws, but your verdict in this case

2   is not a vote for or against cocaine.  It's not a vote for or

3   against marijuana.  It's not a vote for or against the charges

4   here.  It is a determination of whether the Government has met

5   its burden of proof beyond a reasonable doubt.

6       If it would help in applying common sense, let's think of it

7   this way:  A man is stopped by law enforcement.  Let's even say

8   he's stopped for tinted windows.  The trunk is popped and there

9   under a carpet is a case of Jim Beam whiskey, and the law

10  enforcement team is a team of whiskey inspectors.  "Are you

11  distributing?  Are you selling whiskey without a liquor permit?"

12  And the person, exercising his rights, says, "I deny that.  I'm

13  not possessing whiskey," and that's what you have.

14      And you ask yourself:  Okay.  How does the Government go

15  about proving beyond a reasonable doubt that this person is

16  distributing whiskey without a license?  Because that's what

17  must be proven.  Well, where did he come from?  Well, we don't

18  know.  How long has the whiskey been in that trunk?  That we

19  don't know.  Who put it there?  That we don't know.  Well,

20  certainly, he must know what's in his trunk.  Really?  What if

21  his wife put it there?  What if a co-worker put it there?

22      Say, well, let's find out a little bit more about this

23  person.  Turns out, guess what?  He works at the tavern.  He

24  works at the tavern.  And in the tavern, behind him, there's an

25  entire -- three rows high of all categories of liquors, wine,

1    booze, gin, rum, tequila, and bourbon.  Certainly you would

2    conclude this person is selling this whiskey, this case of Jim

3    Beam from the trunk.  Of course you'd conclude that, wouldn't

4    you?  Can you?  Maybe not.

5        Is he taking the whiskey home because he has an employee

6    discount, and he's going to make use of it and drink it over the

7    year?  In such a case, he's possessing whiskey.  He's not

8    selling it.  Is it a gift from his wife, who gave it to him to

9    enjoy?  That's left unanswered.  You see, members of the jury,

10   circumstantial evidence is just that.  It can lead to one

11   conclusion or it may lead to another.

12       Now, we've had some -- both sides, we disagree here about

13   the separate quantities of these things.  We have marijuana in

14   nine different little packs.  We have cocaine, which by the

15   circumstantial evidence here, was in 15 different portions.  And

16   I suppose if a seller, manufacturer, or a person 20 years in the

17   whiskey business took the witness stand and said, "In my view or

18   opinion, anybody with a case of Jim Beam is selling it," that

19   would be their opinion, and it would be their honest opinion,

20   and they would think that.  But you, members of the jury, are

21   free to reject that, if in the light of all the other evidence

22   there is a reasonable doubt of proof of that, because all we

23   have is this person's opinion and this person's been in that all

24   of his life.

25       And we can think of other examples.  Someone has a case of

1    Coca-Cola.  Now, we know that they can have a 2 liter bottle or

2    two or three liter bottles of Coca-Cola, and we know there's a

3    price difference between those.  Now, because someone has a

4    12-pack of Coca-Cola, could the retail or wholesaler of soft

5    drinks come in and say, "Anybody who's got a 12-pack of

6    Coca-Cola means there's 12 people who are going to have these

7    Coca-Cola, have one for each person," and I suppose that's true,

8    if you want to speculate.

9        Are they taking it to the church for Sunday to -- for 12

10   people?  That would be distribution of Coca-Cola.  Are they

11   taking it home to have it over the week for their own self for

12   the family?  That's not distribution of Coca-Cola.

13       How about a ten-pack of gum?  Is each one of those for ten

14   different people because, members of the jury, that's what this

15   is all about, determining whether or not this was possession of

16   something to distribute or possession of something for personal

17   use.  That's the decision here, and that's what you're called

18   upon to decide, and that's the reason why you're here.  And this

19   isn't trickery.  This isn't slight of hand.  This isn't a lot of

20   technical stuff.

21       As a lawyer in a court of law, I'm simply trying to assist

22   or aid you in making that determination, applying the rules of

23   law, as given to you by the court, by His Honor, Judge Hale,

24   that you and you alone determine the facts, that you apply your

25   common sense, that the defendant is presumed innocent, that it's

 1    the burden of the Government to prove his guilt beyond a

 2    reasonable doubt, that he is not required to explain, to

 3    testify, or to defend.

 4        Now, many people in my many years of experience in the

 5    courts have thought, "Gee, someone's been charged with a crime.

 6    Gee, is the Government or the judge going to put him on the

 7    witness stand and explain himself?"  You now know from the law

 8    that Mr. Brewer, as all criminal accused, has an absolute right

 9    not to testify, and the fact that he doesn't can't even be

10    mentioned.  It can't even be said.  It can't be held against him

11    and you can create no inference from it whatsoever.  Why?

12    Because the Government has the burden of proof beyond a

13    reasonable doubt.

14        Now, in this case, members of the jury, what we begin with

15    is, I submit, a test of honesty and credibility.  In thinking

16    about these tinted windows, in thinking about the words of

17    Detective Hogan to Regina Worthington as she stood there beside

18    the door, as she testified earlier and as she's testified here:

19    "We're out here trying to get guns off the street.  That's all

20    we're doing here," and that's what she said.

21        And I thought about that and, you know, it reminded me, you

22    know, of the experience of, I guess, walking into the Wal-Mart

23    and it says:  "*Courier-Journal* free."  You're thinking, "Of

24    course, free *Courier-Journal*s.  Free *Courier-Journal*

25    subscription and it says that.  And the *Courier-Journal* salesmen

1    is there and says, "Have the *Courier-Journal* subscription free."

2    You're thinking, "Isn't this great?  I get the *Courier-Journal*

3    for nothing."

4         They say, "Well, no, we want your name, your address, your

5    credit card, because to get this free for a month or free for a

6    week, you have to subscribe for a year."  What are they doing?

7    Are they giving the *Courier-Journal* away free, as they say?  And

8    if the salesman was Hogan, "This is free.  You get it free for a

9    month."  That's the truth.  The tinted windows is the truth, but

10   we know better.  We know better.  It's not free.

11        Amazon does the same thing on the Internet.  "Sign up for

12   Amazon Extra or Amazon Plus, free shipping.  Thirty days, first

13   goods free.  $200 free."  But, no, they want your name, they

14   want your credit card, and they want you on the hook for a year

15   of paying them over and over each month.

16        Now, what is true?  We also know from Detective Holland,

17   "The reason we turned around, the reason what I saw was he was

18   driving an excessive rate of speed."

19        I say this to you, members of the jury, because in assessing

20   the evidence and testimony of the police in this case -- and

21   believe me, I honor and respect law enforcement, as all good

22   citizens do -- but in this case, in this proceeding, in a

23   criminal proceeding as an American juror, you assess the

24   testimony of a law enforcement officer the way you would any

25   other person, and you take into account who they are, and where

1   they're from, and what they do, and whether or not they all do

2   the same thing again, and again, and again.

3       And in listening to particularly Officer Chad Stewart, I

4   thought of the old saying "To a man with a hammer, everything

5   looks like a nail."  And isn't it true?  Every person who's got

6   tinted windows is a drug trafficker.  Every person who has a

7   quantity of marijuana that could be used for personal use is a

8   drug trafficker.  Every person who has cocaine, enough for use

9   over a couple or three weekends, is a drug trafficker.

10      Do you believe that?  Do you have a doubt of that?  Well, do

11  we have any evidence that Cherosco Brewer was under

12  investigation or that their attention was drawn to him because

13  he was trafficking?  No, no.

14      What we have here is attention brought to him because he's

15  got tinted windows and because I think he was driving at an

16  excessive rate of speed.  And they do their job and the K-9 unit

17  comes and it alerts and all that happens, but up to that point,

18  are they investigating him?  Do they have a confidential

19  informant that says that's what he's doing after the fact?

20      And I think this is significant because it is the burden of

21  the prosecution to prove its case beyond a reasonable doubt that

22  they knew this.  They have methods of investigation.  They have

23  methods of finding things out.  They have methods of obtaining

24  evidence.  And what does the evidence here show?

25      Well, in determining whether or not there's a doubt of

1    guilt, imagine this, imagine this:  If you took any one cell

2    phone -- and remember asking Officer McKinney about this -- if

3    someone were to take David Mejia's cell phone right now -- and

4    let's say it's a police officer and he seizes it from me.  And

5    even if he gets court permission to go through my cell phone and

6    see its history, well, they would see that I called my wife two

7    or three times after court yesterday to get ahold of her to say

8    I'm on my way home.  They'd see that I called a couple of

9    clients to respond to their questions.  They would see that I

10   called on the way to court to see where I was going, and they

11   would see the contacts that I made with clerks, and they would

12   see the contacts I had made with court administration, and

13   they'd see the contacts I made with other colleagues in the

14   profession, and they would have all of this.  And they could go

15   to them, any of them and say, "Who's David Mejia?  Where was he

16   going?  What was he doing?" and they'd see that all.

17       The same thing is true here.  In any garden variety of

18   arrest for suspect narcotic trafficking, that phone would say

19   where Cherosco Brewer was and where he was going.  They have

20   said it to you today.  He was on his way to distribute marijuana

21   out of the side of that car.  That's what he was doing.  Oh, was

22   he?  How about some proof of that.  That's your burden.  That's

23   your responsibility.  This is a court of law.  Prove it.  Say it

24   and back it up with evidence and proof.

25       In this case we have Detective McKinney, who has said to us,

1    well, in his experience, in his training, and in all of his

2    courses and work as a narcotic traffic -- trafficker

3    investigator, he sees that narcotic traffickers rent cars.  We

4    have a rental car.  Therefore, he's a narcotic trafficker.

5        Well, not so fast.  Narcotic traffickers, when they rent

6    cars, rent them for a day and keep different cars every day.

7    Did he do that?  No.  He rented this for three months.

8        Well, narcotic traffickers spend cash for their rental cars

9    to conceal their names or put them in somebody else's names.

10   Rent a car, somebody else's name, use cash, never come back to

11   you.

12       This man is driving in a car where the documents and records

13   of Enterprise Car Rental have his name on them.  They show that

14   he paid with money order or check.  The license would clearly go

15   straight back to Enterprise and it did.  The police were there

16   the next day, and, obviously, they identified him to that car.

17   So Detective McKinney's evidence and his testimony that rental

18   cars are used for concealment doesn't work here.

19       And they're still holding onto, "Well, the tinted windows,

20   the tinted windows."  Well, we now know what the tinted windows

21   are.  The tinted windows are like the *Courier-Journal* salesman

22   there at the Wal-Mart.  That's what the tinted windows are.

23       And, members of the jury, that's what the lawsuits are

24   about.  And we don't go into the merits of those, but in

25   assessing the credibility of the law enforcement officers here,

1    whether they would slant their testimony, or whether they would

2    give you opinions or conclusions, or whether they would give you

3    what they believe as law enforcement officers what that means to

4    them -- and it's trafficking in controlled substances,

5    trafficking, distributing, selling.  Would they slant that a bit

6    to affect the outcome of this case and perhaps in the same way

7    affect or have some kind of positive impact to them in terms of

8    money judgments, damages, discipline to them in connection with

9    that civil rights case?  That was the only purpose of that, to

10   assess their credibility.

11       Do they have some interest?  Do they have some agenda?  Do

12   they have some other thing that would make them testify in a way

13   more favorable to the prosecution?

14       It isn't unimportant to bring out the absence of evidence,

15   because the lack of evidence, the absence of evidence and proof

16   is significant to you.  We are in a federal courthouse.  This is

17   the United States federal government.  This isn't the

18   Commonwealth of Kentucky.  This is a case brought from the state

19   court to the federal government for prosecution, and they have

20   the wherewithal to, with the swabs, conduct a DNA examination of

21   that firearm to see that he touched it.  That ain't hard.  Very

22   simple.

23       DNA is on any surface that we touch from the sweat from our

24   hands, from the glands, from saliva, from the swab very easy.

25   Did he touch the firearm?  Simple question.  Mr. Mejia asked it:

1    "Is there evidence of DNA?  Is there fingerprint evidence?"

2        "Yeah, well, that never works."

3        "Okay.  How about DNA?"  That works.  It works with utter

4    clarity, with utter 100 percent reliability to link someone to

5    something.  If it's your burden of proving it, prove it.

6        They say that the -- that firearms or guns are the tool of

7    the trade of drug traffickers.  And, of course, it is quite

8    apparent that if somebody is meeting with somebody else -- and

9    we see the common lesson in life.  Law enforcement officers,

10   policemen, they have the gun revealed there on the hip.  Why?

11   I'm a policeman and I'm here to serve and protect.  Anybody

12   should know that I have the -- I have the firearm here.  I have

13   the baton here.  I have the taser here.  I have the badge here.

14   The gun works in the same way.  A firearm works in the same way.

15       Members of the jury, it don't work, and it doesn't send a

16   message, and it's not used if it's crammed under a steering

17   wheel behind a dashboard, and we saw here and I asked a fair

18   question.

19       I'll let you look at the videos.  You may recall the videos.

20   In order to retrieve that weapon or to get at it, the police

21   officers -- the police officer was -- or officers were on their

22   knees, under the dashboard, elbow up underneath, reaching, and

23   shaking, and moving, and it took something like seven to ten

24   minutes to retrieve it from there.  It's a firearm that's seven

25   to ten minutes away, separated by the metal and glass of the

1    dashboard.  Is that accessible for use, use in a narcotics

2    trafficking offense that never happened?

3        Well, you could guess and speculate that maybe sometime on

4    November 18th, it may have been available to him, but that's not

5    why we're here and that would be silly to conclude that.  That

6    would be, obviously, not what we're talking about here.

7        And you can take into account -- you know, I played amateur

8    baseball for ten years.  I kept my baseball stuff in my trunk

9    all the time.  Could I use it if it was closed up in my trunk?

10   Nope.  I could only use the baseball mitt, the bat, the glove,

11   the cap, the uniform if it's on me and it's there.  That is

12   possessing and using in furtherance of a narcotic trafficking

13   offense.

14       The way the charges are set forth, members of the jury, you

15   may consider the offense of possession of marijuana.  If you

16   determine in your collective judgment that this marijuana was an

17   amount for personal use and not for distribution, applying your

18   common sense, your common sense tells you:  Okay.  Mr. Mejia, I

19   think that a 12-pack of Coke, Coca-Cola, or a carton of

20   cigarettes with ten packs and 20 cigarettes in each, I think

21   that's for distribution, then that's your judgment and that's

22   your decision.

23       I submit to you, however, that common sense equally tells us

24   that a carton of cigarettes with ten packs and 20 cigarettes in

25   each pack is a lot of separate cigarettes.  It's a lot of blunts

1    of marijuana here, but that's still for personal use.  And if

2    you determine that, members of the jury, you should render a

3    verdict of possession of marijuana.  And if you do that,

4    according to the law and the instructions given to you, in view

5    of all of the essential elements necessary to establish guilt of

6    Count 3, possession of a firearm in furtherance of a narcotic

7    trafficking offense, I submit to you, you must find Mr. Brewer

8    not guilty.  Why?  Because it is the possession of the firearm

9    in furtherance of trafficking, distributing, selling.

10   Possession of a firearm while possessing, if that were your

11   conclusion, would be insufficient under the elements before you.

12       There's history behind this.  Some years ago when these laws

13   were being discussed in Congress -- and this helps us understand

14   them -- we had some wise southern senators with the northern

15   senators, who in discussing these provisions said, "Well, I've

16   got a little bit of a question about these laws.  What if a

17   couple of my boys were going down to Alabama, and they were

18   going to do some hunting, and they had all their firearms with

19   them?  They had their rifles, and they had their guns, and they

20   had those with them, and they took a little detour to Knoxville,

21   stopped and got some cocaine, and they continued on?  They

22   wouldn't be guilty of that, would they?"

23       The laws, just as has been given to you, have been carved

24   out to say, no, a person who is possessing cocaine or possessing

25   marijuana for their own personal use can't be guilty because,

1    like those boys down in Alabama, they were going down there to

2    go hunting and shooting, not possessing of those firearms in

3    connection with a narcotic trafficking offense.  And I hope that

4    helps you understand it, because if you determine guilt of

5    possession of marijuana, then Mr. Brewer is not guilty of

6    possession of that firearm in connection with a narcotic

7    trafficking offense.

8        And, of course, the cocaine has nothing to do with the

9    firearm, because the cocaine was -- relates to Count 4, and that

10   too -- if you determine that that cocaine is possessed as a

11   lesser offense -- if you determine, okay, the instructions, and

12   the law, and all the evidence as I see it give me reasonable

13   doubt that he intended to possess with the intent to distribute,

14   then I will find guilty of possession of cocaine.

15       That, members of the jury, is a decision you can make if you

16   determine, as I believe the good evidence shows, the reliable

17   evidence shows, the reasonable evidence shows that the

18   Government has failed to prove an intent to distribute.  Why?

19   The cocaine is the same thing.  This amount of cocaine could be

20   used and possessed by one person for themselves over a period of

21   time because of its sheer quantity.

22       We're not in a court of law now with kilos of cocaine, or

23   pounds of cocaine, or multiple ounces of cocaine.  We have eight

24   grams of cocaine.  And like I say, if it would assist you in

25   some way to think about this in terms of packs of gum, or

1    bottles of Coca-Cola, or Jim Beam, then you should, because the

2    reason I say that is not to dissuade you from what the actual

3    evidence is, because we've agreed to it.  That's what they are.

4    We stipulate to it.  That's what it is.

5        But in terms of applying common sense, you know, we're not a

6    room full of individuals or people here who have that kind of

7    contact, and we do as a collective group as citizens, sure, we

8    support narcotics laws.  Of course we do.  We must because of

9    what they do.

10       But in order to overcome that bias, then we apply common

11   sense to the common things of life.  Of course, we both agree to

12   that and that's why, when thinking about that case of Jim Beam

13   in the back of the car, you know, it's really a matter of common

14   sense, and it's a matter of applying the rules of the court, the

15   laws given to you in making that determination.

16       Because in such a case of that man with a case of Jim Beam

17   in the back of the car, absent his coming forward -- and he

18   doesn't have to and nothing can compel him to -- then it's the

19   obligation of the liquor commission to prove it, you know, to

20   prove beyond a reasonable doubt that he intended to distribute.

21       And in this case, I asked fairly straightforward questions.

22   Don't people who engage in narcotic trafficking have the tools

23   of narcotic trafficking, like scales, like all of the other

24   things necessary and useful for narcotic trafficking?  The

25   answer is yes.  Did you find any here?  And the answer was no.

1          Sure, it does make common sense that if someone is driving

2     around in a car, that they're going to conceal the presence of

3     those.  The question is do you have evidence before you that

4     proves Cherosco Brewer knew those were here and so intended to

5     distribute them?

6          We lawyers, of course, and the court, we take great care and

7     we spend a great deal of our time making sure that the

8     instructions are given to you, and that they are right, and

9     they're correct, and they apply to this case.  And we talk about

10    instructions a lot and we both refer to them, but I think you

11    may hear more of that today.

12         Let me tell you something about those instructions.  That

13    whole pile of some 28 or 30 or more instructions that you'll

14    have, and will read, and will guide you, no matter how hard you

15    read them and no matter how closely you read them, there isn't a

16    word in any of them that tells you what your verdict must be or

17    what your verdict shall be.  The verdict is yours to render in

18    your wisdom, the 12 of you.

19         And when you're done, when you render that verdict -- and

20    this is part of the we stand for you stuff -- afterwards no one

21    can question why you rendered that verdict.  No one can ask you

22    to justify your verdict, and you are free not to talk to anybody

23    about that verdict, if you so choose.

24         If you want to talk with people about it, of course, you

25    can.  You probably certainly will to family and friends, and

1    maybe with each other, and maybe through the years you'll talk

2    about that verdict, but you don't have to, because under our

3    system of law, after your verdict is in, nobody from the

4    Government, nobody from the court, nobody in society can ever

5    challenge you, or question you, or ask you to justify that

6    verdict, because it is so precious and it's yours and it's so

7    powerful.  It's more powerful than any governor, any president,

8    any judge, any lawyer.  It is yours.  That's the power you have

9    and that's why we stand for you.

10        And this experience, the thing that brought the 12 of you

11    together, to me, it's -- I think it's a marvel, and I am just so

12    lucky and so honored to be a lawyer in this courtroom with this

13    judge appointed by the president of the United States.

14        And sometime in the future, if you become friends with each

15    other, you may meet and talk about this.  I don't know.  Even if

16    that doesn't happen, someday in the future, maybe on some

17    morning when you wake up, you'll think about this case.  You'll

18    think about this experience, and you'll remember this judge, and

19    you'll remember the lawyers, and maybe even more, you'll

20    remember Cherosco Brewer.  And you may have a moment to think

21    about that and say, "Gee, you know, what?  I remember that case.

22    Cherosco Brewer, wherever he is, you know something, in my heart

23    I gave him justice," and for that I'll thank you very much.

24        MS. MCKENZIE:  Proactive policing works and I don't

25    know how you as members of the jury feel about it, but the

1   officers in this case did their jobs and they acted like

2   professionals.  They were courteous.  They obviously arrested

3   Mr. Brewer.  They detained him before they arrested him, but not

4   because they wanted to pick on him, not because they ride around

5   in, you know, pairs -- or in Chad Stewart's case, he was on his

6   own -- looking for people whose nights they want to ruin.

7        They did what their training -- and in Officer Holland's

8   case, I mean, he said he has been injured on traffic stops

9   before.  They acted professionally and what they did, there was

10  nothing wrong with it.

11       Now, we have tiptoed for four days around the fact that this

12  man is suing these police officers, and it has been suggested

13  over and over again and just now that that has something to do

14  with whether or not he's guilty of these charges.

15       Well, what these instructions tell you and what I think your

16  common sense will support is that the only possible relevance

17  that that has to this case is whether you believe that lawsuit

18  somehow gives her or Detective Holland, and Detective Stewart,

19  and Detective James some reason to come in here and lie to you,

20  or as Mr. Mejia said, slant their testimony.

21       Does it?  Because their testimony is supported by the

22  evidence.  It's supported by the videos that you watched and can

23  watch again.  It's supported by one another.  They've been

24  separated.  All the witnesses have been separated.  They have to

25  stay outside so they can't listen to what other witnesses say.

1        And here's the thing:  The facts as they were on November

2   11th and November 12th of 2015, that's crystallized.  The cake

3   is baked.  Okay?  The videos are what they are.  That lawsuit

4   gets filed in January.  They don't even get notified of it until

5   sometime after that.  They get letters from the county saying,

6   "You're being sued.  Here's the name of the county attorney

7   who's going to represent you.  Please contact this person."

8        So look at the evidence, watch the videos, recall the

9   testimony, look through your notes.  What's different between

10  November 11th and November 12th and what you heard in this

11  courtroom?  Is it different?  Because that's the only way this

12  civil rights suit matters.

13       Now, there's some other things that I think have been

14  implied, and I hesitate to even address them, but none of these

15  officers have been disciplined.  There's not even been an

16  administrative complaint filed with the department about

17  anything they did.  That is because pulling a car over for a

18  traffic violation for excessive tint, that's a valid way to have

19  contact with citizens.  And I'm not going to pretend that it

20  doesn't happen to some citizens more than it does others.

21  That's true.

22       I'm not going to pretend that there aren't bad cops out

23  there.  That's true.  It's not these cops and you know that

24  because you have these videos.  These are the people on the

25  front lines using valid methods to interact with citizens in the

1    parts of this city that are experiencing high numbers of

2    shootings and homicides.

3        And the question was asked of Detective Hogan on cross, as

4    though it's something for everybody in this courtroom to see as

5    a bad thing or something for her to shy away from or be ashamed

6    of, but the question was asked:  "You pulled that car over for

7    tint, but you told that passenger that you had a lot of murders

8    and you're just trying to get guns off the street.  Isn't that

9    true?  You told the truth, didn't you?"  Yes, she did because

10   that's what we want the police to do.  We don't want them to

11   violate people's rights.  And the injection of that into this

12   trial, it's smoke.  It's smoke.

13       You can evaluate the credibility of the law enforcement

14   officers.  You can evaluate whether you believe your own eyes

15   and the reasonable inferences to be drawn from this evidence.

16       And I'm sorry.  Let me say that we're not talking about a

17   case of Coca-Cola on the way to a church picnic or a case of Jim

18   Beam in the trunk of somebody's car.  We're not just talking

19   about even drugs in a car by itself.  What we're talking about

20   is the totality of everything.  And either Cherosco Brewer is

21   the unluckiest guy that ever was unlucky or this is what it

22   appears to be.

23       The suggestion that you should not convict somebody of drug

24   trafficking unless there is a complex investigation with

25   informants, and they should have taken these phones and tried to

```
 1    call up some of the customers or co-conspirators, that's more

 2    smoke.  Drug trafficking comes in a variety of forms, but we're

 3    not talking about going to Costco and buying a case of booze or

 4    getting a case of booze as an employee award or whatever the

 5    metaphor was.

 6        That's not what this is and you have evidence of his knowing

 7    possession.  You have evidence of an intent to distribute, and

 8    you have evidence that the firearm is not there as a matter of

 9    mere coincidence to the drugs.  And if you apply these

10    instructions to that evidence, you get to guilty.  If you filter

11    out the smoke, you get to guilty, and then you get to go home

12    and say, yes, Mr. Mejia, I did do justice.  Do justice.

13        THE COURT:  Members of the jury, that concludes our

14    closing arguments.  I now have just a few remaining, final

15    instructions for you.

16        Once I complete these instructions, we will randomly select

17    one of you to serve as the alternate.  The other 12 will then

18    retire to the jury deliberation room.

19        Instruction Number 33.  Now that all the evidence is in and

20    the arguments are completed, you are free to talk about the case

21    in the jury room.  In fact, it is now your duty to talk with

22    each other about the evidence and to make every reasonable

23    effort you can to reach unanimous agreement.

24        Talk with each other, listen carefully and respectfully to

25    each other's views, and keep an open mind as you listen to what
```

 1    your fellow jurors say.  Try your best to work out your

 2    differences.

 3        Do not hesitate to change your mind if you are convinced

 4    that other jurors are right and that your original position was

 5    wrong, but do not ever change your mind just because other

 6    jurors see things differently or just to get the case over with.

 7        In the end, your vote must be exactly that, your own vote.

 8    It is important for you to reach unanimous agreement, but only

 9    if you can do so honestly and in good conscience.

10        No one will be allowed to hear your discussions in the jury

11    room, and no record will be made of what you say, so you should

12    all feel free to speak your minds.

13        Listen carefully to what the other jurors have to say and

14    then decide for yourself if the Government has proved the

15    defendant guilty beyond a reasonable doubt.

16        Number 34.  If you decide that the Government has proved the

17    defendant guilty, then it will be my job to decide what the

18    appropriate punishment should be.  Deciding what the punishment

19    should be is my job, not yours.  It would violate your oaths as

20    jurors to even consider the possible punishment in deciding your

21    verdict.  Your job is to look at the evidence and decide if the

22    Government has proved the defendant guilty beyond a reasonable

23    doubt.

24        Number 35.  I have prepared a verdict form that you should

25    use to record your verdict.  It is the last page of these

1    instructions.  If you decide that the Government has proved the

2    charge against the defendant beyond a reasonable doubt, say so

3    by having your foreperson mark the appropriate place on the

4    form.  If you decide that the Government has not proved the

5    charge against him beyond a reasonable doubt, say so by having

6    your foreperson mark the appropriate place on the form.  Your

7    foreperson should then sign the form, put the date on it, and

8    return it to me.

9        Number 36.  As I explained to you earlier, the charge of

10   possession of marijuana with intent to distribute includes the

11   lesser charge of possession of marijuana, and the charge of

12   possession of cocaine with intent to distribute includes the

13   lesser charge of possession of cocaine.

14       If you find the defendant not guilty of the greater charge,

15   or if after making every reasonable effort to reach a unanimous

16   verdict on that charge you find that you cannot agree, then you

17   must go on to consider whether the Government has proved the

18   lesser charge.

19       If you decide that the Government has proved the lesser

20   charge beyond a reasonable doubt, say so by having your

21   foreperson mark the appropriate place on the verdict form.  If

22   you decide that the Government has not proved the lesser charge

23   beyond a reasonable doubt, say so by having your foreperson mark

24   the appropriate place on the form.  Your foreperson should then

25   sign the form, put the date on it, and return it to me.

1      Number 37.  Remember that the defendant is only on trial for

2    the particular crimes charged in the indictment and the lesser

3    charges, which I described.  Your job is deciding whether the

4    Government has proved the crimes charged or one of those lesser

5    charges.

6      Number 38.  Let me finish up by repeating something that I

7    said to you earlier.  Nothing that I have said or done during

8    this trial was meant to influence your decision in any way.  You

9    decide for yourselves if the Government has proved the defendant

10   guilty beyond a reasonable doubt.

11     Number 39.  Remember that if you elected to take notes

12   during the trial, your notes should be used only as memory aids.

13   You should not give your notes greater weight than your

14   independent recollection of the evidence.  You should rely upon

15   your own independent recollection of the evidence, or lack of

16   evidence, and you should not be unduly influenced by the notes

17   of other jurors.  Notes are not entitled to any more weight than

18   the memory or impression of each juror.

19     Whether you took notes or not, each of you must form and

20   express your own opinion as to the facts of the case.

21     Now, that concludes my instructions.  As I said, attached to

22   the copy of the instructions that will be sent back to the jury

23   deliberation room with you will be the verdict form.  It simply

24   reads:  We, the jury, find the defendant, as to Count 2,

25   guilty/not guilty.  As to Count 2, possession of marijuana,

1    ignore if Count 2 answer is guilty.  Guilty/not guilty.

2        As to Count 3, guilty/not guilty.  As to Count 4, guilty/not

3    guilty.  As to Count 4, possession of cocaine, ignore if Count 4

4    answer is guilty and a place for guilty/not guilty.

5        Now, we always have an alternate or two, depending upon the

6    length of the trial.  We have one alternate and the way we do it

7    is we do not identify that alternate at the time of outset, so

8    it will now be a matter of random selection.

9        All 13 of your juror numbers have been placed in the wheel,

10   and I will have the clerk of court now select by random draw the

11   number of the person who will serve as the alternate.

12       Once that number is selected, I will ask the other 12 to go

13   ahead and begin your deliberations, and the person whose number

14   is called, if you will just stay in your seat, I will have some

15   final instructions for you.

16           DEPUTY CLERK:  Number 89.

17           THE COURT:  So if the 12 of you whose number was not

18   called will please go with the jury officer and you can now

19   begin your deliberations.

20       And if Number 89 would stay behind, please.

21       (Jury out 12:54 p.m.)

22           THE COURT:  Thank you.  You may be seated.  The jury

23   has now left.

24       Juror Number 89, it is typically disappointing news to be

25   identified by random draw as the alternate.  First, let me thank

1    you for your patience and your participation.  Let me also tell

2    you that it is not necessarily over at this point.  An alternate

3    may be placed back into service, should a member of the jury

4    become ill, or incapacitated, or have some other problem.  And

5    at that point, the person removed would be replaced by you and

6    the deliberation would start anew from the beginning.

7        And so I would ask you to provide, if you don't mind, your

8    contact information to the clerk.  She'll take that from you

9    privately, and you're free to go, but we would ask you if you

10   could maybe give her an idea of how quickly you could return to

11   the courthouse, if, in fact, an issue arose that required your

12   further service.  Again, thank you very much.

13       Let me also tell you that you are now generally free to talk

14   about the case.  What I would ask you to do though is until --

15   and the clerk will call you and tell you when a verdict is

16   rendered.  Until you get that call, I would ask you, if you

17   would not mind, to refrain from talking about the case so that

18   you could then be returned to service, if necessary.

19       Once she calls you and tells you that the verdict has been

20   returned, then you would be free to discuss the case however you

21   would like.

22       I would also tell you that you do not have to talk about the

23   case, so that if at any point anyone asks you questions about

24   the case, you're not required to talk about it.  That's entirely

25   up to you.  But if you would not mind to keep it to yourself for

1    now, until you receive word from the clerk, that would be

2    appreciated.

3        We are now in recess as we await the jury's deliberations.

4        As to the other matter that we discussed, I will have some

5    materials for you shortly, but probably not before 1:30.

6    Actually, let me see the lawyers at the bench.

7        (Bench conference on the record.)

8            THE COURT:  I just didn't want to talk about it in

9    front of our alternate.  We have two instructions.  They will be

10   Numbered 40 and 41.  Forty is the transitional instruction I

11   talked about that will simply say, "In Instruction 12 you were

12   told to ignore the fact there's no Count 1 here.  Now you are to

13   take up Count 1."  And then Instruction 41 is the substantive

14   elements count.

15       So what we will do is I'll have one of the clerks bring you

16   those two instructions, and then we can talk about those in

17   about 45 minutes.  I have -- I have a rather full docket this

18   afternoon.  I have a couple of brief hearings and, I think, a

19   change of plea hearing, so I'm just going to -- to the extent I

20   can get those done while the jury is out, I'm going to do that.

21       Obviously, if we get notes or receive word of a verdict,

22   then I'll try and set those aside so that we can conclude the

23   trial.

24       But at some point, 1:45-ish, if you-all wouldn't mind then

25   to come back in, and we can talk about Instructions 40, 41 and

 1    how mechanically we'll do the transition to Count 1.  I don't

 2    really see a need for traditional opening statements, but I

 3    don't think there's any testimony to be heard; right?

 4       So I think -- I think what we would do is I would give them

 5    Instruction 40, which explains the transition.  It reminds them

 6    that they've been fully instructed, that I'm not going to

 7    re-read all of those instructions, and then you-all have

 8    a stipulation to be read.

 9       And then it might make more sense to the jury if each side

10    takes a few minutes -- because the one issue that they would

11    have to decide is possession, and so if you want to take 10

12    minutes to argue, summarize, I can tell the jury that opening

13    statements are not necessary and that we have a stipulation to

14    be read.  We have no further testimony to be heard and that each

15    side will have an opportunity to argue, unless you-all have a

16    better way of doing it.

17       I've sort of surveyed how this is done and there isn't a

18    great deal of variation.  Some courts like to re-read all the

19    instructions.  I would be inclined to do that only if a more

20    substantial period of time had passed, but they have just heard

21    me read those, and they'll have them in the jury room.  They

22    will have talked about them presumably, so I don't think it's

23    necessary to do that.

24            MR. MEJIA:  Judge, since this is a bifurcated trial --

25    and I've done them in the past, but this hasn't arisen, and I

 1   will confer with Mr. Brewer.  If the jury convicts on Count 3

 2   and we then proceed as Your Honor has directed, and Mr. Brewer

 3   says to me, "That wasn't my gun and I want to tell the jury

 4   that," that may be an option he can exercise on his Fifth

 5   Amendment rights.

 6       If he does so, I think it may be against my advice, but I

 7   think -- and I may tell Your Honor that, and he may then take

 8   the stand and say that to that jury.  If he does, I mean, it

 9   would be against my advice, but that's something that may

10   happen.  And I'm not saying that it will.  I hope it doesn't.

11           THE COURT:  I think that's his right --

12           MR. MEJIA:  Right.

13           THE COURT:  -- to testify in one part and not the

14   other, you know, so we'll just cross that bridge when we come to

15   it.

16           MR. MEJIA:  Right.  Just so you know that's something

17   that could be a contingency.

18           THE COURT:  And if you tell me he does plan to, then I

19   think what we would do is we would read the stipulation.

20   You-all would indicate that the Government has no further proof

21   on this issue.  I would turn to you and you would say, "I have a

22   witness."

23           MR. MEJIA:  Okay.

24           THE COURT:  And then I will -- and then once he

25   testifies, we would probably then need to give one additional

1    instruction besides the element instruction.

2            MR. MEJIA:  Which would be proof of conviction.

3            THE COURT:  Yeah.

4            MR. MEJIA:  Okay.

5            THE COURT:  We're going to fiddle with it a little bit

6    as well, because they probably need to be advised what the

7    charge is.  So I might add that to what we've got now in what is

8    draft Instruction 40.  I might add that Count 1 charges the

9    defendant with being a felon in possession of a firearm, the

10   same firearm that was at issue in Counts 2, 3, and 4 or Count 3.

11   So we might add -- we might add that reference, just to make it

12   a little more clear to the jury what we're doing.  And certainly

13   if he testifies, if he chooses to testify, we would then need to

14   take -- I believe it's Instruction 25, the alternate version,

15   out --

16           MR. MEJIA:  Right, of course.

17           THE COURT:  -- and instruct on that.  That would then

18   change and we would probably add to that standard language:

19   Earlier in Instruction 25, I said, you know, ignore the fact

20   that he didn't testify.  He's now -- and then add the language.

21           MR. MEJIA:  Okay.

22           THE COURT:  We'll have to be a little bit nimble with

23   all of that.

24      (End of bench conference.)

25           THE COURT:  As I said, I will send some papers back,

1    and I expect to come back around 1:45, if not earlier.

2         (Recess at 1:05 p.m. until 2:45.  Jury out.  Defendant not

3    present.)

4              THE COURT:  I need to see the lawyers.  We're back on

5    the record in U.S. v. Brewer.  The jury is not here and I need

6    to see the lawyers at the bench, please.

7         (Bench conference on the record.)

8              THE COURT:  We received a note from the jury that

9    reads as follows:  "Your Honor, I made a mistake on the form.

10   What would you like me to do?  I have scratched out mistake and

11   put my initials next to it.  Please advise."  And it's signed

12   with the number of, I presume, the foreperson.

13        So the question is do we respond and say, "That's fine.

14   Just initial your correction" or do we take the practical step

15   of supplying them with a clean copy of the verdict form so they

16   can fill it out correctly?

17             MR. MEJIA:  I think it's prudent just to have them

18   correct and send to us and we'll go from there.

19             THE COURT:  So you don't want me to send back a clean

20   verdict form?

21             MR. MEJIA:  No, no, I suggest you do that, yes.

22             THE COURT:  Okay.

23             MR. MEJIA:  Of course, yeah.  That's what I meant.

24   Sorry.

25             THE COURT:  I thought you meant just let them send us

1    the -- where he says, "I've scratched out mistake and put my

2    initials next to it."  Apparently he was worried enough about it

3    that he was afraid it would be misinterpreted or whatever.  I

4    think that's probably what he's asking for.

5              MS. MCKENZIE:  Yeah.

6              THE COURT:  Is a clean --

7              MR. MEJIA:  What's your intuition say was scratched

8    out and changed?

9              THE COURT:  I have no idea.

10             MR. MEJIA:  Neither do I.  I'm thinking, "What could

11   it be?  Wrong name?"

12             THE COURT:  No, and I don't want to ask him what it

13   is.  I mean, it could be -- it could be as simple as he put the

14   wrong number on it, Juror Number 78.  He could have scratched

15   that out, put a different number and --

16             MR. MEJIA:  Okay.

17             THE COURT:  -- is afraid to answer questions about who

18   the foreperson is.

19             MR. MEJIA:  It's amazing how scrupulously honest these

20   people become.  It's amazing.

21             THE COURT:  Well, you sit through three-and-a-half

22   days of trial, and have me bore them to death, and you-all

23   inspire them and, yeah, they're going to be -- they're going to

24   be --

25             MS. MCKENZIE:  Or vice versa.

1          THE COURT:  -- they're going to be scrupulous.  So

2    I'll just have the court security officer deliver to them a

3    clean version of the same exact verdict form.  All right.

4          MS. MCKENZIE:  Very good.

5          THE COURT:  We will have the instructions for the

6    transition to the Count 1 trial to you shortly.  We've been

7    tweaking it.  You know, it's not standardized.

8          MS. MCKENZIE:  Yes.

9          THE COURT:  So it isn't like you can simply pull out

10   the book and say, "Hear's what you say."  Every case where there

11   is a bifurcation is a little different.  So it's only two

12   instructions, but I don't want the jury -- I suspect they'll be

13   slightly annoyed that they have more work to do, understandable,

14   but I also don't want them to be confused any more than they

15   otherwise would be.

16      So I want to be able to tell them, "Look, in Instruction 12,

17   we told you to ignore the fact that there's a missing count

18   here.  Well, now that's what you're being asked to work on."

19   And I think --

20          MR. MEJIA:  That's fair.

21          THE COURT:  -- once they're told that, they'll

22   approach the task with the same approach that we see them doing

23   here.

24      Okay.  So our response will be to simply send back a clean

25   form.

1      Now, I'm going to -- unless you-all have any other

2  suggestion, I'm going to have the court security officer tell

3  them to destroy the form with the mistake.  We don't want to see

4  that.

5           MS. MCKENZIE:  Yeah.

6           THE COURT:  Right?

7           MR. MEJIA:  If there's some reason on the new form to

8  alert us or -- to the court, or us, or the record, then I think

9  we'll rely upon you to do that.

10          THE COURT:  No, what I'm saying is I don't want

11  them -- I don't want to get two verdict forms back from them.  I

12  don't want to get the new one and the old one.

13          MS. MCKENZIE:  Right.

14          MR. MEJIA:  Okay.

15          THE COURT:  If what they've told us from this note is

16  they made a mistake on the first one, I want them to discard

17  that.

18          MR. MEJIA:  Exactly, yes, yes.

19          THE COURT:  Not tell us anything about it, which is

20  consistent with my instructions.

21          MR. MEJIA:  Yes.

22          THE COURT:  Not return it, only return the corrected.

23          MR. MEJIA:  Of course, yes.

24          THE COURT:  Okay.

25       (End of bench conference.)

1      (Recess at 2:54 p.m. until 4:13 p.m.  Jury out.)

2          THE COURT:  Let me see the lawyers at the bench,

3  please.

4      We're back on the record in U.S. v. Brewer.  The jury is not

5  present in the courtroom.

6      (Bench conference on the record.)

7          THE COURT:  We have a verdict from -- received a note

8  from Juror Number 78, the same one who sent the note earlier.

9  It simply says, "To Judge:  We've come to a decision."

10     So shortly we will call them in, begin that process of

11 receiving their decision on Counts 2, 3, and 4.  Have you-all

12 had a chance to look at the Instructions 40 through the verdict

13 form?

14         MS. MCKENZIE:  Yes.

15         THE COURT:  Forty-three and then the verdict form?

16 Any questions or objections?  Anything we need to talk about

17 here?

18         MR. MEJIA:  No.

19         THE COURT:  The gap or the blank line in 42 -- it's

20 now 4:15.  I believe we gave them instructions -- I think I was

21 reading them at the very end about -- I don't know -- 12:45, so

22 I'll probably say "approximately four hours ago."  Is that

23 right?  Or five?  No, four hours.

24         MR. MEJIA:  Noon to --

25         THE COURT:  Four hours is fine.  And then the

1    instruction about your client testifying, we'll just wait and

2    see.

3              MR. MEJIA:  Right, of course.

4              THE COURT:  If he testifies, we'll include it.  If he

5    does not testify, we'll withdraw it, because I won't read that

6    until the end.

7       I'm not going to want to sit on this.  So as soon as we

8    receive the jury's verdict and -- I will thank them for their

9    service, and then I will turn to Instruction Number 40.  That's

10   the one I'll give immediately and explain to them.  Then I'll

11   ask you-all to come back up.

12             MR. MEJIA:  Will you be asking the jury whether or not

13   they would prefer to continue today or come back tomorrow

14   morning?

15             THE COURT:  I'm going to try and get it done right

16   now.  Really, honestly, I don't think I'm even going to give

17   them an option.

18             MR. MEJIA:  Okay.

19             THE COURT:  Because we're now down to 12 and I would

20   prefer not to send them home.

21             MS. MCKENZIE:  Yeah.

22             THE COURT:  And if one of them raises their hand and

23   says, "I cannot stay past 5:00," I probably will ask them if

24   they can make arrangements to stay if I gave them a break and

25   work through it that way.  I think my preference would be to get

1    it done.

2              MR. MEJIA:  Okay.  Got it.

3              THE COURT:  Thank you.

4         (End of bench conference.)

5         (Jury in 4:19 p.m.)

6              THE COURT:  Members of the jury, who is your

7    foreperson?

8              THE FOREPERSON:  Me, Your Honor.

9              THE COURT:  You are Number 78; is that correct?

10             THE FOREPERSON:  That is correct.

11             THE COURT:  Have you received a verdict?

12             THE FOREPERSON:  We have, Your Honor.

13             THE COURT:  Is the verdict unanimous?

14             THE FOREPERSON:  It is, Your Honor.

15             THE COURT:  Please provide the verdict form to the

16   court security officer.

17        Members of the jury, your verdict will now be published.

18        This is the verdict form:

19        We, the jury, find the defendant, as to Count 2:  Guilty; as

20   to Count 3:  Guilty; as to Count 4:  Guilty.  It is signed by

21   the foreperson, Number 78.

22        Would either side like to inspect the verdict form?

23             MR. MEJIA:  No, sir.

24             MS. MCKENZIE:  No, Your Honor.

25             THE COURT:  Would either side like to poll the jury?

1          MS. MCKENZIE:  No, Your Honor.

2          MR. MEJIA:  No, sir.

3          THE COURT:  The clerk will file and record the jury's

4     verdict.

5          Now, let me move on to the next bit of business.  First, I

6     want to thank you for your service up until now.  I have another

7     instruction to give you.  This is Instruction Number 40:

8          Normally, your service would be complete at this point.  In

9     this case, however, there is one more task for you to complete.

10    Earlier, in Instruction 12, I directed you to ignore the fact

11    that Count 1 was not at issue.  For reasons that do not concern

12    you and about which you should not speculate, Count 1 of the

13    indictment was separated from Counts 2 through 4 for purposes of

14    trial.  However, now that you have reached a decision as to

15    Counts 2 through 4, you must now go on to consider Count 1.

16         Count 1 of the indictment charges the defendant with being a

17    convicted felon in possession of a firearm.  To prove that the

18    defendant possessed a firearm as a convicted felon, the United

19    States must prove beyond a reasonable doubt:

20         First, that he has been convicted of a crime punishable by

21    imprisonment for more than one year.

22         Second, that following his conviction, he knowingly

23    possessed the firearm specified in the indictment.

24         And, third, that this specified firearm crossed a state line

25    prior to the alleged possession.

```
 1        Now, members of the jury, we are going to proceed forthwith
 2   with the next phase.  Neither side expects this to take a great
 3   deal of time, so we are going to -- I'm going to have the
 4   lawyers come up to the bench for just a minute of discussion
 5   with me, and then we will proceed with the next steps.  I will
 6   advise you about the time frame, but as I said, neither side
 7   believes that addressing Count 1 will take a great deal of time.
 8        If I may see the lawyers, please.
 9        (Bench conference on the record outside the hearing of the
10   jury.)
11             THE COURT:  My suggestion is that I ask if the United
12   States wishes to present any testimony, and you simply respond
13   by saying the parties have a stipulation we would ask the court
14   to read.  And then after I read that, you would say the United
15   States rests, and then I'll turn to you.  And do you know what
16   your client is going to do?
17             MR. MEJIA:  He will not testify.
18             THE COURT:  He's not going to testify?
19             MR. MEJIA:  No.
20             THE COURT:  Then --
21             MR. MEJIA:  I will rest.
22             THE COURT:  -- then you will rest.  And then I will
23   tell the jury that I have three more instructions for them.  I
24   will read those all, taking out the one referencing the
25   testimony, and then I will give each side -- I mean, I can't
```

1    imagine you're going to need ten, 15 minutes.

2              MR. MEJIA:  I don't know that there's anything to say.

3              MS. MCKENZIE:  I won't even need that.

4              THE COURT:  Well, I think --

5              MR. MEJIA:  We'll --

6              THE COURT:  It's entirely up to you.

7              MR. MEJIA:  All we can do is ask for a verdict.

8    That's all we can do.  I mean, this case is done.

9              THE COURT:  I think that's true, but I think each side

10   deserves an opportunity to -- I think, if nothing else, it would

11   be helpful in explaining to the jury how this fits.

12             MR. MEJIA:  I can do that.  I mean, obviously, I can

13   thank them and say separate consideration, and we'll await your

14   verdict.

15             THE COURT:  Okay.

16             MR. MEJIA:  There's nothing more to say.

17             THE COURT:  Let me make sure I have the stipulation.

18   I want to make sure I have the -- that's it.

19             MS. MCKENZIE:  And that is the correct date, yes, sir.

20             THE COURT:  All right.  Why don't you-all take that

21   back and have Mr. Brewer sign it and you sign it.

22             MR. MEJIA:  I'll do that.

23             THE COURT:  We'll follow the same procedure.

24        (End of bench conference.)

25        (Mr. Mejia conferring with defendant off the record.)

 1          (Counsel conferring off the record.)

 2               THE COURT:  Ms. McKenzie, does the United States

 3     intend to produce any testimony with respect to Count 1?

 4               MS. MCKENZIE:  No, Your Honor, but the parties have a

 5     stipulation that we would like the court to read.

 6               THE COURT:  Very well.  Members of the jury, I'm going

 7     to now read to you, as I did earlier this week, a stipulation of

 8     facts:

 9          The defendant, Cherosco Brewer, and the United States of

10     America stipulate and agree to the following:

11          One, prior to November 11, 2015, the defendant, Cherosco

12     Brewer, had been convicted in a court of a crime punishable by

13     imprisonment for a term exceeding one year, that is, a felony

14     offense.  The parties do not dispute this fact and it is agreed

15     to today.

16          Anything further from the United States with respect to

17     Count 1?

18               MS. MCKENZIE:  No, Your Honor.

19               THE COURT:  The United States rests with respect to

20     Count 1?

21               MS. MCKENZIE:  Oh, yes.  I'm sorry.  We rest.

22               THE COURT:  Mr. Mejia?

23               MR. MEJIA:  The defense too rests.  Nothing further.

24               THE COURT:  Thank you.

25          Members of the jury, I think at this time the matter -- the

 1   proof with respect to Count 1 is concluded.  I'm going to give

 2   each side a few minutes to summarize any argument they want to

 3   make to you with respect to Count 1.  This should not take very

 4   long.

 5       Once they are finished, I will have a few concluding

 6   instructions for you.  I will then give you those new

 7   instructions, along with the instructions I gave you earlier

 8   today, and you will once again retire to deliberate with respect

 9   to Count 1.

10       Ms. McKenzie.

11           MS. MCKENZIE:  Count 1 simply requires you to find

12   beyond a reasonable doubt that Mr. Brewer knowingly possessed a

13   firearm, that the firearm had traveled in interstate commerce

14   prior to November 11th, and that Mr. Brewer, prior to November

15   11th, had been convicted of a felony offense.

16       At this point your work should be a lot simpler than it was

17   earlier.  You heard the stipulation.  We all agree that

18   Mr. Brewer has been previously convicted of a felony offense.

19   We all agree that this firearm is operable, not in its current

20   state, but it functions as designed and that it was manufactured

21   outside the Commonwealth of Kentucky.

22       The remaining elements, the only element that the parties do

23   not agree on is whether he knowingly possessed the firearm.  I

24   ask you to consider all of the evidence that you heard this

25   week, as well as the arguments you heard earlier today

1   concerning the issue of knowing possession.  You may again refer

2   to any of the evidence that's been admitted.  You may refer back

3   to your notes from the previous days of testimony, and I'd ask

4   you to find Mr. Brewer guilty on Count 1 of possession of a

5   firearm by a convicted felon.

6           MR. MEJIA:  May it please the Court.

7       Members of the jury, good afternoon.  While we have no

8   happiness from Mr. Brewer or his family --

9           THE REPORTER:  Mr. Mejia, would you pull the

10  microphone around, please.

11          MR. MEJIA:  Thank you.

12  -- we accept the verdict you've rendered on Counts 2, 3, and

13  4.  We ask for your consideration as to Count 1.

14      The law as given to you says that you must give separate

15  consideration to each count.  I will rely upon the facts that

16  have been presented to you, the evidence and testimony, all that

17  you have heard, and if you have a doubt that he knowingly

18  possessed this firearm as a convicted felon on November 11, then

19  you should render a verdict of not guilty.

20      To summarize or conclude again all that you've heard, that

21  is not needed.  The process that you've had here -- and we

22  welcome your patience and we welcome your attention.  The

23  process required and demanded that it be done this way.

24      You now know that he is a convicted felon, and it's now your

25  duty to determine whether or not as a separate charge, different

1    from the other three, whether he possessed it as a convicted

2    felon, and we will await your verdict.  Thank you.

3           THE COURT:  Thank you.  Members of the jury, these are

4    the remaining instructions.  And, again, these newer

5    instructions will be provided to you, along with the prior

6    instructions I gave you earlier.

7        Instruction Number 41, Possession of a Firearm by a

8    Convicted Felon.  Count 1 of the indictment charges the

9    defendant with being a convicted felon in possession of a

10   firearm.

11       For you to find the defendant guilty of this crime, you must

12   find that the Government has proved each and every one of the

13   following elements beyond a reasonable doubt:

14       First, that the defendant has been convicted of a crime

15   punishable by imprisonment for more than one year.  The

16   Government and the defendant have agreed that the defendant has

17   previously been convicted of a crime punishable by imprisonment

18   for more than one year.  Therefore, you must accept that fact as

19   proved.

20       Second, that the defendant, following his conviction,

21   knowingly possessed the firearm specified in the indictment.

22       Third, that the specified firearm crossed a state line prior

23   to the alleged possession.  It is sufficient for this element to

24   show that the firearm was manufactured in a state other than

25   Kentucky.  The Government and the defendant have agreed that the

1    Glock 22, .40 caliber, semiautomatic pistol, serial number

2    HVP337, introduced as Government's Exhibit 4, did cross state

3    lines prior to November 11, 2015, in that it was manufactured

4    outside the Commonwealth of Kentucky.  You must, therefore,

5    accept that fact as proved.

6        Now I will give you more detailed instructions on some of

7    these elements.

8        The term "firearm" means any weapon which will or is

9    designed to or may readily be converted to expel a projectile by

10   the action of an explosive.  The Government and the defendant

11   have agreed that the Glock 22, .40 caliber, semiautomatic

12   pistol, serial number HVP337, introduced as Government's

13   Exhibit 4, is a firearm for purposes of this element in that it

14   expels a projectile by the action of an explosive.  You must,

15   therefore, accept this fact as proved.

16       The term "knowingly" means voluntarily and intentionally and

17   not because of mistake or accident.  If you are convinced that

18   the Government has proved all of these elements, say so by

19   returning a guilty verdict on this charge.  If you have a

20   reasonable doubt about any one of these elements, then you must

21   find the defendant not guilty of this charge.

22       Instruction Number 42.  In considering Count 1, please

23   recall the evidence you have already seen and the instructions I

24   gave you approximately four hours ago before you deliberated as

25   to Counts 2, 3, and 4.  Those prior instructions apply to Count

1   1 as well.  Because I just read them to you, it is not necessary

2   to repeat them now.  You will receive a copy of the prior

3   instructions along with these new instructions.  You should

4   record your verdict as to Count 1 on the verdict form attached

5   at the end of these new instructions.  And the verdict form

6   simply permits you to find, we, the jury, find the defendant as

7   to Count 1 guilty or not guilty.

8       I will ask you-all now to retire again to the jury

9   deliberation room.  You already have a foreperson.  You do not

10  need to repeat that process.

11      And as I said, if any -- if you need to see any of the other

12  evidence, as we said in the prior instructions, you can ask to

13  see it.  Otherwise, we will send you back with the instructions

14  as I indicated.

15      (Jury out 4:38 p.m.)

16          THE COURT:  You may be seated.  The jury has left the

17  courtroom.

18      (Recess at 4:38 until 5:10 p.m.  Jury out.)

19          THE COURT:  If I may see the lawyers at the bench,

20  please.

21      (Bench conference on the record.)

22          THE COURT:  We have a decision as to Count 1.

23          MS. MCKENZIE:  Okay.

24          THE COURT:  Anything we need to talk about?  We'll

25  follow the same procedure.

1      (End of bench conference.)

2      (Jury in 5:13 p.m.)

3          THE COURT:  Mr. Foreperson, have you reached a verdict

4   as to Count 1?

5          THE FOREPERSON:  Your Honor, we have.

6          THE COURT:  And is that verdict unanimous?

7          THE FOREPERSON:  Your Honor, it is.

8          THE COURT:  Please pass it to the court security

9   officer.

10     Members of the jury, your verdict will now be published.

11     The verdict form reads as follows:  We, the jury, find the

12   defendant as to Count 1 guilty.  It is signed and dated by the

13   foreperson.

14     Would either side like to inspect the verdict form?

15         MS. MCKENZIE:  No, Your Honor.

16         MR. MEJIA:  No.  Thank you.

17         THE COURT:  And would either side like to poll the

18   jury?

19         MS. MCKENZIE:  No, Your Honor.

20         MR. MEJIA:  No.  Thank you.

21         THE COURT:  The clerk will file and record the jury's

22   verdict.

23     Members of the jury, your work is now complete.  Thank you

24   for your patience.  Thank you for your steady efforts in behalf

25   of all of the court staff, and counsel, the parties here.  We

 1    want to thank you for your efforts.

 2        As I said at the outset, the jury trial system is a bedrock

 3    of our system of criminal justice, and it is critically

 4    important to have dedicated, qualified individuals like

 5    yourselves participate and so we thank you.  You are now

 6    excused.

 7        (Jury out 5:16 p.m.)

 8            THE COURT:  You may be seated.  The jury has left the

 9    courtroom.

10        With respect to the Rule 29 motion, I'll conclude that at

11    the time the ruling was reserved, the U.S. had submitted

12    sufficient evidence from which a rational trier of fact could

13    find the elements of the crimes charged beyond a reasonable

14    doubt and will, therefore, overrule the Rule 29 motion.

15        We need to now set a date for sentencing.

16            DEPUTY CLERK:  April 17th at 1:30.

17            THE COURT:  That works for both counsel?

18            MR. MEJIA:  Yes.

19            MS. MCKENZIE:  That's fine.

20            THE COURT:  The defendant will be remanded to the

21    custody of the U.S. Marshal.  The verdict will be recorded in

22    the docket of the case.

23            MR. MEJIA:  Your Honor, I think the rules allow a

24    request, within the set time period for filing new trial or

25    posttrial motions, to enlarge that time.

1          THE COURT:  That's correct.

2          MR. MEJIA:  May I have 21 days to file new trial or

3    posttrial motions?

4          THE COURT:  I believe the rules set forth a specific

5    time frame, so consistent with the rule, you may have the amount

6    of time contemplated there.

7          MR. MEJIA:  Thank you very much.

8          THE COURT:  Anything further?

9          MR. MEJIA:  No more from here.  Thank you.

10         MS. MCKENZIE:  Nothing from the United States.

11         THE COURT:  We're adjourned.  Thank you.

12     (Proceedings concluded at 5:18 p.m.)

13              C E R T I F I C A T E

14     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

15   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

16

17

       _____s/Dena Legg_____          December 13, 2019
18   Certified Court Reporter No. 20042A157   Date
     Official Court Reporter
19

20

21

22

23

24

25

1                               INDEX

2    DEFENSE WITNESSES:

3    STEPHANIE SEARS
          Cross-Examination by Ms. McKenzie              4

4    YVETTE CHRISTY ALLEN
5         Direct Examination by Mr. Mejia              17
          Cross-Examination by Ms. McKenzie            25
6         Redirect Examination by Mr. Mejia            33
          Recross-Examination by Ms. McKenzie          37
7
     INSTRUCTIONS                                      39
8
     GOVERNMENT CLOSING                                70
9
     DEFENSE CLOSING                                   83
10
     GOVERNMENT REBUTTAL CLOSING                      101
11
     INSTRUCTIONS                                     105
12
     VERDICT                                          119
13
     INSTRUCTIONS                                     122
14
     GOVERNMENT CLOSING                               126
15
     DEFENSE CLOSING                                  127
16
     INSTRUCTIONS                                     128
17
     VERDICT                                          130
18

19                             EXHIBITS

20   GOVERNMENT:
     No exhibits
21

22   DEFENDANT:
     No exhibits
23

24

25