```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:17-CR-00037-DJH
 4                                  )
            Plaintiff,              )
 5                                  )
     v.                             )
 6                                  )
     CHEROSCO BREWER,               )
 7                                  )    April 20, 2017
            Defendant.             )    Louisville, Kentucky
 8

 9                          * * * * *

10              TRANSCRIPT OF DETENTION HEARING
                BEFORE HONORABLE DAVE WHALIN
11              UNITED STATES MAGISTRATE JUDGE

12                          * * * * *

13   APPEARANCES:

14   For United States:       Erin G. McKenzie
                              U.S. Attorney's Office
15                            717 West Broadway
                              Louisville, KY 40202
16
     For Defendant:           Keith E. Kamenish
17                            600 West Main Street, Suite 300
                              Louisville, KY 40202
18
                              Scott James Barton
19                            600 West Main Street, Suite 300
                              Louisville, KY 40202
20
     Transcriber:             Dena Legg, RDR, CRR, CCR-KY
21                            Official Court Reporter
                              232 U. S. Courthouse
22                            Louisville, KY 40202

23

24   Proceedings recorded by digital recording.  Transcript produced
     by computer from audio recording that the Court provided to
25   transcriber.
```

1      (Begin proceedings in open court at 3:07 p.m.)

2           DEPUTY CLERK:  3:17-CR-37, United States of America

3      versus Cherosco Brewer.  We're here for a detention hearing.

4           MS. MCKENZIE:  Good afternoon, Your Honor.  Erin

5      McKenzie for the United States.

6           THE COURT:  Ms. McKenzie.

7           MR. KAMENISH:  Keith Kamenish and Scott Barton for

8      Mr. Brewer.  Good afternoon.

9           THE COURT:  All right.  Good afternoon.  Are we here

10     for arraignment as well?

11          DEPUTY CLERK:  No.  We did the arraignment Monday.

12          MR. KAMENISH:  We did it Monday.

13          THE COURT:  I see.  All right.

14          MR. KAMENISH:  Yes, sir.

15          THE COURT:  It's been a long week already.

16     All right.  Mr. Kamenish, are you prepared for the detention

17     hearing today?

18          MR. KAMENISH:  Yes, sir.

19          THE COURT:  All right.  Does this indictment charge

20     possession in the furtherance of a drug offense?

21          MS. MCKENZIE:  Yes, Your Honor.

22          THE COURT:  Doesn't that make it --

23          MS. MCKENZIE:  A presumption?

24          THE COURT:  -- a presumption?

25          MS. MCKENZIE:  Yes.

1          MR. KAMENISH:  That's debatable, but it's also charged

2   with possession with intent to distribute cocaine in a separate

3   count, which would --

4          THE COURT:  Okay.

5          MR. KAMENISH:  -- so -- but whatever combination you

6   want, it survives that test.

7          THE COURT:  All right, sir.  So, Mr. Kamenish, let me

8   hear from you as to what credible evidence you wish to present

9   that Mr. Brewer's not a danger to the community or a risk of

10   flight, please.

11          MR. KAMENISH:  You can always tell when it's Thunder

12   time.

13          THE COURT:  Yeah, really.

14          MR. KAMENISH:  I'm going to speak up pretty loudly.

15      Judge, on a presumption case, as the court well knows,

16   because we've done several of these hearings together, once it's

17   a presumption case, then the burden switches to the defense to

18   show some evidence that he's not a flight risk or a danger to

19   the community but, ultimately, the burden will rest with the

20   United States once we present some evidence that those two

21   factors don't exist.

22      I think the first one and the easiest one would be --

23          THE COURT:  You said you were going to bring the big

24   guns today.  I should never doubt you.

25          MR. KAMENISH:  -- would be that -- is that he's not a

1   flight risk.  When the court looks through his criminal record

2   on any serious charge, he has made every single court

3   appearance.

4       The only thing that the Government can point to is back in

5   2014, he was cited twice for not wearing his seat belt.  On one

6   he did not appear at the arraignment, but it was quickly

7   re-docketed and he paid the $25 fine.

8       On the second one, Your Honor, he was in the wrong

9   courtroom, so the case was called.  When he got into the

10  courtroom, they recalled it.  He paid a $25 fine.  So the FTA

11  was actually issued and rescinded on the very same day.

12          THE COURT:  Okay.

13          MR. KAMENISH:  And those are two very, very minor

14  cases and only carries a $25 fine.  You don't even pay court

15  costs on it.  But on every major case in here, there's not one

16  time he has failed to appear.

17      Next, Your Honor, the indictment before you concerns two

18  consecutive dates, November the 11th, 2015 and November 12th,

19  2015.  The United States alleges that on November the 11th,

20  2015, Mr. Brewer was stopped and his car was searched.  They

21  found a gun and less than eight ounces of marijuana, probably at

22  least upon what we know, somewhere around seven or eight grams.

23      The very next day he was stopped again in a vehicle and they

24  found a quantity of cocaine, but the only thing I can tell you

25  is that amount was so small that there's no mandatory minimum on

1    it.  There was no gun found on that case.

2        The cases proceeded through Jefferson District Court and

3    were eventually indicted.  We were actually defending him on

4    these when this federal indictment came down.  So the cases were

5    14, 15, 16 months old at the time of the federal indictment.

6    The federal indictment arises from the same facts as the state

7    prosecution on the two dates that we're talking about.  During

8    that period we had multiple court appearances, and he made every

9    single one of them.

10       We were in the stages of putting together a motion to

11   suppress and then the federal government sought the indictment.

12   I guess they had some conversation with the prosecutor there --

13   I can only assume -- and there was a decision to bring it down

14   here.  I think the indictment was obtained sometime in March,

15   but it was under seal.  And then he was arrested on April the

16   17th and was brought before the court for an arraignment, but

17   it's the same facts, same cases.  He never missed a court

18   appearance.

19       The court will see that there was a fugitive warrant in a

20   17-F case.  It's on the very last line.  And I think you

21   probably remember from your practice over there, but when

22   someone's picked up on a fugitive warrant out of any

23   jurisdiction or out of a federal bench warrant, arrest warrant,

24   it's -- and they're lodged in the Jefferson County jail, there's

25   a number assigned to that, so they can hold them until the other

1   jurisdiction decides to pick them up, and then that case is

2   dismissed once the custody is transferred.

3       That's what happened here.  That wasn't a new case.  That

4   was an arrest on your warrant issued out of the Western District

5   that generated a state number that was later dismissed once

6   custody was transferred.  So I didn't want you to think that

7   that was some sort of new thing, a warrant out of some other

8   jurisdiction for a failure to appear because it wasn't.

9           THE COURT:  That was the hold imposed by the federal

10  warrant you're saying?

11          MR. KAMENISH:  Right.

12          THE COURT:  Okay.

13          MR. KAMENISH:  And then you'll see it's dismissed

14  because they set it up for a review date.  Once the court gets

15  knowledge that custody has been transferred, the matter is

16  dismissed.

17      Your Honor, he's lived here in Jefferson County his entire

18  life.  He has family here.  He has his fiancée, his grandmother,

19  cousins here.  He's lived down in the West end practically his

20  entire life.  He's working at a job for the last two years, and

21  he has substantial ties here.

22      I think the only realistic argument that the Government can

23  present here is that he's looking at federal time, therefore,

24  looking at a plea, but his history doesn't show you that.  And I

25  think for the Government to make that argument sincerely with

1   the court now, in light of everything I've told you, I think it

2   just lacks merit.

3       Everything that -- in the last -- in his history of his life

4   and in the last two years indicate he will show up to court and

5   he has substantial ties.

6       I think the Government's primary emphasis ought to be danger

7   to the community, and they're going to pound on you about his

8   prior criminal record.  That's going to be their angle here.

9       Now, danger to the community always represents an issue

10  that's difficult for the defense to give you 100 percent

11  assurance on because there's so many factors that go into that.

12  One of the factors that the court uses is what's his prior

13  criminal history?

14      And then his prior criminal history, you'll see a number of

15  felony convictions, but those dates, some of them are from

16  offenses 23 years ago, 22 years ago, 13 years ago.  And then

17  there's this huge thing where there's no conviction.  Yes, he

18  had those convictions.  They're old convictions.  They may be

19  relevant in this case as far as what sentencing could be, but

20  there's a large gap in there in which there's no felony

21  convictions.

22      The Government can sit here and say, well, he had some

23  offenses, but they were dismissed.  And I understand the law

24  says that you can consider those, but I don't think you can when

25  you know nothing about them and you just see the word dismissed.

1      I think the Government really wants to argue he had some

2  intermittent trafficking arrests that were dismissed.  They

3  ought to tell you what the case was about and what evidence was

4  there or not or you really can't consider it.  I think it's just

5  conjecture at that point.

6      Another thing that the defense can use under the issue of

7  dangerousness is the testimony from other people.  That is when

8  they place bonds up.  The case law says that is a testament to

9  his character and a testament that he's not a violent, dangerous

10  person.

11      In our case, Your Honor, we'll have two residents that we

12  can post.  One is from a family friend, Debra Eids [phonetic].

13  It's at 3602 Bank Street and its value is $33,000 unencumbered.

14      The second home and this is what's really important is going

15  to be Sarah Garner.  That's his grandmother.  She's here in the

16  audience here.  She's willing to post her home at 65 -- 658 or

17  -- 658 South 40th street.  That's valued at $35,000.  That's

18  been her residence forever and it's unencumbered.  So they're

19  willing to come forward and say, Judge, we have enough faith in

20  him to abide by your court orders that we're going to post our

21  home, and I think that's extremely important.

22      One of the angles that the United States uses in these cases

23  where there are drugs is, Judge, it's really hard or it's really

24  difficult to stop anyone from dealing drugs when they're out of

25  custody.  I think you've probably heard that three times a week

1  every week since you've been the magistrate judge.  That's the

2  one they always use.  Well, they're right.  There's no 100

3  percent way to -- or 100 percent condition to stop someone from

4  committing drugs when they're released into the community.

5      I know what you say, because you've got [inaudible].  You

6  say, "Well, I know one way, Keith, put them in jail," but that's

7  not what we're talking about.  What we're saying here, it's

8  almost impossible to give you any condition for someone released

9  in the community not to be dealing drugs.

10      Now, fortunately, that's not the test.  The court will look

11  at what condition or combination of conditions can reasonably

12  assure the community -- the safety of the community in this case

13  not to deal in drugs.  So it's not a 100 percent test for you.

14  It's a reasonableness test.  And that's what allows defense

15  attorneys to be able to argue in drug cases that their clients

16  should be released and to overcome that common thread that the

17  United States always gives, "Oh, he's dealing drugs.  He'll do

18  it again."

19      What conditions can we put on here to reasonably assure he

20  will not deal drugs?  Well, first, Your Honor, he can live with

21  his fiancée at 3510 Shady Side Drive.  That's her residence.

22  She lives there with her 17-year-old son.  She has, other than

23  traffic cases, no criminal record.

24      Importantly enough, the allegations in this case never

25  alleged that he was dealing drugs from his residence where he

was living.  And these are two instances of being in vehicles
away from the home.  And what Scott and I were able to determine
from our time in state court is that there's no allegations that
he was leaving his home or going to his home at the time of the
event.

You've used this on me before:  "Mr. Kamenish, he's going
back to the very same home they found the drugs in?"  That's
always been a very good point, but in this case I'm going put it
back on you.  There is no evidence that he was dealing out of
his house, so the residence is important.  And I could
understand that, if he was going back to the very residence that
the drugs were found in, the court would definitely have some
reservations about it, but this is the opposite situation.

She's present, Judge, and would act as a third party
custodian.  She's open to any questions that you have.  Now, she
works.  She works three days a week from 8:30 to 1:00 in the
afternoon, 8:30 in the morning to 1:00 in the afternoon.  But
other than those four or five hours three times a week, she'll
be there around him at all times.

When I spoke with her about being a third party custodian, I
let her know what that entails.  That means, if he acts up, she
informs the court.  She understands that duty and she will
comply with that.

Now, the court can take a look at, "Okay.  Mr. Kamenish, I
understand that he was stopped and there was a drug and gun

1   found on him one day and drugs on the next away from a

2   residence, but can't he just go out there and do that again?"

3   Well, the answer is going to be no because we're going to be

4   asking for electronic monitoring.  That is he stays at home and

5   comes to see us so that we can go over the discovery and do the

6   things that we need.

7        And I can tell you as an officer of the court, in my 24

8   years as a defense attorney, when someone comes to my office, I

9   sign a sheet what time they come.  When they leave my office, I

10   sign a sheet on what time they leave.  I've never once violated

11   it.  And I can tell you, I've had several clients, "Keith, can

12   you give me just an extra half hour?"  I say, "No, no, I'm not

13   going to blow this for every other client that's on electronic

14   monitoring.  No, I'm not going to do that.  Get your butt home."

15        Judge, this is a serious set of circumstances.  Mr. Brewer's

16   looking at -- or could be looking at a serious sentence here.

17   He's presumed to be innocent and the court can take into

18   consideration the presumption of innocence too.  Just like when

19   you look at the presumption that I'm now presenting evidence to

20   rebut, the court can also consider the presumption of innocence.

21        And the court also can take note that a defendant's best

22   equipped to defend himself when he's out of custody and he has a

23   close, steady relationship with his attorneys.  Some of the

24   facilities that the court -- not the court but the marshals send

25   him to are difficult to maintain that relationship.  Driving to

 1    Grayson County two or three times, Hart County, wherever, any

 2    defense attorney would proudly tell you it makes our job a lot

 3    harder to defend someone.

 4        There's confidentiality that's often breached.  Anything we

 5    send Mr. Brewer is very difficult for the rest of the cellmates

 6    to not look at it, not to go through it.  It's very difficult.

 7    We have to watch what we say to him when we mail stuff to him.

 8    We get a jail phone call, it's being recorded, though there are

 9    some things you can do.

10        My last case I had for the videoconference, it took three

11    tries.  The first time we couldn't see him and he couldn't see

12    us.  The second time we could see each other, but we couldn't

13    talk to each other.  It took three times on three different

14    dates to get an hour conference.

15        Now, these things happen in the computer generation, I

16    understand that, but I just want to give you an idea of how much

17    more important it is for a defendant to be able to defend

18    himself out of custody than to have to go through all of the

19    security procedures -- all right -- to be able to talk to his

20    attorney.  And then you throw in the distance requirements, it

21    just fuels trouble.

22        And that's what -- when we look at this and we're looking at

23    everything that's in this package, I think the conditions that

24    would reasonably assure his appearance, which I don't think you

25    really worry about based upon what I told you, and the safety of

1   the community is to live with his fiancée at 3510 Shady Lane,

2   make her the third party custodian, take property that we

3   suggested that you take, because these are people that are very

4   close to him, put him on electronic monitoring, require him to

5   report to probation.  If you don't want to do that, allow them

6   to come to his house and search it.  These are the things I

7   think that will reasonably assure the community that he's not a

8   danger.  Thank you.

9         THE COURT:  All right.

10    Ms. McKenzie.

11        MS. MCKENZIE:  Your Honor, I appreciate the arguments

12   of counsel.  Under the statute there is a presumption.  It is

13   subject to rebuttal by the defendant.  It's for the court to

14   determine whether Mr. Kamenish's arguments have effectively

15   rebutted this presumption.  I submit that they do not.

16    Looking at the factors in the statute that the court

17   considers, the first one being the nature and circumstances of

18   the offense -- and I want to say at the outset that this is a

19   gun offense.  And because Mr. Brewer has three prior first

20   degree trafficking convictions, he is eligible to be an armed

21   career criminal under the Gun Control Act.  I think that

22   elevates the gravity of the offenses as they appear on paper.

23    I think it's also significant that within this indictment

24   there are actually two separate offenses that are separated by

25   an intervening arrest, and that is -- if you look at

1   Mr. Brewer's history from the probation report, that's a theme

2   that repeats itself.  He has a pattern of committing offenses

3   while he has cases pending, while he is on pretrial release.

4           THE COURT:  Are you saying that there was an arrest on

5   November the 11th or November the 12th?

6           MS. MCKENZIE:  He was arrested on November the 11th.

7   And after his release from custody, he was pulled over again and

8   arrested a second time.

9           THE COURT:  All right.  Go ahead.

10          MS. MCKENZIE:  The history that the court takes into

11  account, the history and characteristics include his prior

12  criminal history, his record concerning appearances in court.

13  And, again, I think this is a factor that weighs very heavily

14  against him.

15      I count -- Mr. Kamenish addressed a couple of the failures

16  to appear, but I counted a total of four in this probation

17  report.  And two of those were on felony cases, felony

18  indictments in Jefferson Circuit Court.

19          THE COURT:  Can you point to those.

20          MS. MCKENZIE:  Yes.  The first one is on page three of

21  the report.  It's the very first case listed.

22      The second one --

23          THE COURT:  Oh, I see.

24          MS. MCKENZIE:  The FTA.

25          THE COURT:  Failure to appear for arraignment.  Okay.

1          MS. MCKENZIE:   The second one appears on page five

2     under the Case Number 04-CR-2140.   There is a failure to appear

3     for a pretrial.   Those are in addition to the failures to appear

4     that Mr. Kamenish discussed.

5          Also, I think it's highly significant, if you start -- if

6     you look at the bottom of page five of the probation report, he

7     was charged on October 7th of 2004 with conspiring to traffic in

8     controlled substances, first degree, and trafficking in

9     controlled substances, first degree, cocaine.   That offense

10    date, October 7th, 2004, that's while he had two other felony

11    cases pending.   The case right above it, 04-F-10410, that case

12    was pending.   So was the case at the top of the page,

13    04-CR-2140.

14         So while he has two indictments in Jefferson Circuit Court

15    and he's released on those indictments, he goes out and he picks

16    up another drug trafficking charge.   And I note that 04-F, that

17    case, that was a pending trafficking case.

18         If you flip to page six, the very next felony indictment,

19    05-CR-0611, the offense date is 2-22 of '05.   Well, that was

20    while 04-CR-2823 was pending.

21         So under the last factor, danger -- nature and seriousness

22    of the danger he presents to the community, under that factor,

23    that danger includes the risk of re-offending if he's released.

24    He has a clear pattern of re-offending while on release.   He

25    re-offended while on release in this case.   That's how he's got

1     two possession with intent to distribute counts in the

2     indictment.

3          So I think, even if you ignore his prior failures to appear,

4     even if you say that he's not a flight risk, there's no

5     combination of conditions that can keep him from re-offending.

6     There's not now and apparently there never has been.

7          Mr. Kamenish referenced a large span of time in which he had

8     no arrests.  When I look at this criminal history, I see that he

9     pled guilty and was sentenced in January of '07 to two separate

10    circuit court trafficking cases and took five years consecutive

11    to five years.  So I think he spent quite a bit of time in

12    prison as a time-out.  And I think the research is clear that

13    taking somebody out of the environment in which they can deal

14    drugs -- putting them in custody is one of the only proven

15    effective ways at stopping them from dealing drugs.  I don't

16    know, but I would guess that's why this is a presumption case.

17         So I think that when the court considers whether -- for

18    instance, the proposed conditions would reasonably assure the

19    safety of the community and his reappearance, I think you have

20    to take into consideration his prior conduct.

21         And if we're talking about an individual who will be under

22    indictment and facing significant prison time for trafficking,

23    be released and still go out and continue to traffic drugs and

24    subjecting himself to double whatever potential penalties there

25    are, I feel like it's a stretch to expect that the potential

1    forfeiture of someone else's house is something that will

2    reasonably assure good behavior.

3        So I think the court has ample evidence, and I don't know

4    that there's been evidence presented that rebuts the presumption

5    that we started out with.  I submit to the court that Mr. Brewer

6    is both a flight risk and a danger to the community, and I would

7    ask you to detain him.

8            THE COURT:  All right.  Mr. Kamenish.

9            MR. KAMENISH:  Just real quickly.  Judge, on this

10   thing from 1994, again, I'll try to bring you back into the

11   state court for a little bit and bring some stuff up to you for

12   it.

13       When someone's directly indicted without an arrest, a

14   warrant's issued and it's put on the next Monday.  And if the

15   person doesn't know, it will go to -- it will say FTA and then

16   they're arrested and that's what happened here.  This was a

17   direct submission that was issued by -- and then a warrant

18   issued by the grand jury, Judge.  So his failure to appears was

19   he didn't have knowledge of it.  It was the result of a direct

20   submission, and you can see the difference in the dates.

21       On the other one, Judge, he quit -- that was quickly

22   re-docketed.  I mean, he quickly re-docketed the thing.  And I

23   think the charges were eventually -- if I'm not mistaken, were

24   dismissed, if that's what I read.  Yeah, dismissed by the

25   prosecutor on January 30th, 2006.

1    Here's one thing that I hope the court will take into

2    account:  The two events that she talks about, the one on

3    November the 11th and November the 12th, 2015, they're 16 months

4    old.  If he's the danger to the community that they're leading

5    you to believe, why did it take 16 months to indict him?  Why

6    did they wait 16 months and let's go through state court

7    appearance after appearance after appearance, released on bond

8    if he was that threat, if there weren't conditions or a

9    combination of conditions that could reasonably assure the

10   community?

11   This is a man that went to state court eight, nine, 10 times

12   to defend the very same facts that the prosecutor's now

13   suggesting to you.  And it's only now, in March of 2017, that

14   he's deemed this great danger.

15   I understand sometimes that people are a target of long-term

16   investigation and you kind of wait to a certain point to

17   indictment them, but that's not this case.  And I think it kind

18   of takes away from their argument that he's a danger when we

19   know that he has been arrest free for the last 15 months on the

20   same exact circumstances.

21   We're asking you to increase the conditions that he was out

22   on in state court.  We're asking you to increase it by home

23   detention with limited releases.  We're asking you to do that.

24   We're asking you to accept additional property.  We're asking

25   you to put a third party custodian to accomplish what we all

1    want to accomplish, no arrest while this is pending, even though

2    in state court where he was released on bond, free to go

3    anywhere, work, go and come as he chooses, live where he wants,

4    with those minimum conditions he didn't re-offend.  We're asking

5    you to increase them.  If that's not a reasonable assurance, I

6    don't know what else I can give you.

7         I think the history is important.  I understand

8    Ms. McKenzie, she gives you the history and she tries to use

9    that history in a way to persuade you to do something, but

10   there's other history too.  And I think what's happened in the

11   last 15 months, with the conditions placed on him by the state

12   court, which are less than I'm asking the court to do, it's

13   working.  Thank you.

14        THE COURT:  All right.  Well, Mr. Kamenish, you're

15   right.  The focus is not on failure to appear.  I think that you

16   have presented information that would indicate that he would

17   appear, and there are explanations for the prior warrants for

18   failing to appear.

19        The focus here really is on danger to the community and

20   you're right, the history does tell a story.  And the concern is

21   that there is a history -- pardon me -- of felony drug

22   trafficking with three felony drug trafficking convictions, '98,

23   '04, and '05, which would make him eligible for the Armed Career

24   Criminal Act, and there's a misdemeanor trafficking conviction

25   in 2010, which not a felony, it does indicate an ongoing pattern

1    of behavior.  And then you have the 2015 incidents alleged in

2    this indictment.

3        There's also a history of gun activity and violent crime:

4    In '94, the wanton endangerment convictions; in '04, the felon

5    in possession; and then the instant offense where the weapon

6    possessions are there and alleged to have been used in the

7    furtherance of drug trafficking.  So there does seem to be a

8    pattern of behavior and with criminal activity committed while

9    under court supervision, whether it be under some sort of

10   supervised release or other supervision following convictions or

11   in the current case.  If he was bonded out from the first one

12   and then was arrested the same or next day for similar conduct,

13   none of that gives me much confidence that he's going to be

14   impressed by or comply with the limits that I would place.

15       I believe as to the danger to the community, Mr. Brewer's

16   not overcome the presumption and you're right, the Government

17   does bear the burden.  And if you look to the factors, I think

18   that they've met it.  And if I look at the nature and

19   circumstances of the offense charged, whether drug and weapons

20   crimes, the weight of the evidence against him is not to the

21   guilt of the defendant as to the instant offenses but the

22   weight.

23       As to the danger to the community, I think I've gone over

24   that.  History and characteristics, the first one, whether at

25   the time of the current offense he was on probation, parole, or

1    other release pending trial, well, he would have been as to the

2    second arrest.  And I don't know -- I didn't go back to look to

3    see if there was active or inactive supervision in place in

4    November of 2015 from these other --

5              MR. KAMENISH:  There wasn't, Your Honor.

6              THE COURT:  -- charges or convictions.

7              MR. KAMENISH:  There wasn't.

8              THE COURT:  There were not?

9              MR. KAMENISH:  No, sir.

10             THE COURT:  Okay.  So I think, based on his criminal

11   history and particularly the violent history and drug

12   trafficking pattern and weapons offenses, I find that the

13   Government's met its burden to show danger to the community in

14   that there are no conditions or set of conditions I could set

15   that would reasonably abate that danger.  I'm going to order

16   that he be detained and remand him to the custody of the

17   marshal's service pending further order of the court.

18        (Proceedings concluded at 3:41 p.m.)

1          C E R T I F I C A T E

2       I am an official court reporter for the U.S. District Court

3   for the Western District of Kentucky and certify that the

4   foregoing is a true and correct transcript, to the best of my

5   ability, of the above pages, of the digital audio recording

6   provided to me by the Court of the proceedings taken on the date

7   and time previously stated in the above matter.

8
          s/ Dena Legg                    October 16, 2020
9   Official Court Reporter               Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25