```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:17-CR-00037-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
     v.                             )
 6                                  )
     CHEROSCO BREWER,               )
 7                                  )    July 30, 2020
             Defendant.             )    Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                  TRANSCRIPT OF SENTENCING HEARING
                    BEFORE HONORABLE DAVID J. HALE
11                   UNITED STATES DISTRICT JUDGE

12                          *  *  *  *  *

13   APPEARANCES:

14   For United States:      Corinne E. Keel
                             U.S. Attorney's Office
15                           717 West Broadway
                             Louisville, KY 40202
16
     For Defendant:          Larry D. Simon
17                           239 South First Street, Suite 1700
                             Louisville KY 40202
18

19   [Defendant present.]

20

21
                         Dena Legg, RDR, CRR, CCR-KY
22                         Official Court Reporter
                           232 U.S. Courthouse
23                         Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1     (Begin proceedings in open court at 11:42 a.m.)

2         DEPUTY CLERK:  3:17-CR-37, United States of America

3     versus Brewer.

4         MR. SIMON:  Good morning, Your Honor.  Larry Simon.

5     I'm appointed and I'm present.  Mr. Brewer is present as well.

6         MS. KEEL:  Your Honor, Corinne Keel for the United

7     States.

8         THE COURT:  Let's see.  As we start here, Mr. Simon,

9     let me address the circumstances.  Of course, we still find

10    ourselves here dealing with the effects of the COVID-19

11    pandemic.

12    Everyone in the courtroom is subject to the court's rule

13    requiring the wearing of face coverings.  The courtroom has been

14    outfitted, as all can see, with Plexiglass shields, and we have

15    a hand sanitizing rule as well.  All of these are efforts to

16    mitigate the risk to the public who attend these hearings, to

17    the litigants, and to the court staff.

18    And so as a matter of course, I have been addressing these

19    circumstances with counsel at the outset of hearings in order to

20    clarify that the court procedure and tradition that would have

21    counsel stand and address the court from the podium may be

22    dispensed with under these circumstances.  I have been leaving

23    that up to counsel.

24    So if you would prefer, Mr. Simon, to remain seated at the

25    table behind the shield, that's fine.  On the other hand, you

1    are, obviously, wearing your mask.  You're also welcome to stand

2    there at the podium as well.  I'll leave that up to you.

3        Ms. Keel, I presume your preference is to remain seated at

4    counsel table; is that correct?

5            MS. KEEL:  Yes, Your Honor.

6            THE COURT:  Very well.

7            MR. SIMON:  Thank you, Your Honor.  Yes, my

8    preference -- if I might, I'm right here.  I'll remain standing

9    at the podium, and I'll maintain with my mask.

10            THE COURT:  That's fine.  Then let's proceed.  We are

11   here for sentencing.  And let me begin and ask you, Mr. Simon,

12   to confirm that you and Mr. Brewer have received and reviewed

13   the presentence investigation report.

14            MR. SIMON:  Yes, sir.  Once it was received, I

15   forwarded that in the mail to Mr. Brewer.  I've discussed that,

16   the contents of the report, and specifically the calculation of

17   his guideline sentence and also the imposition of mandatory

18   minimums that have been indicated in the report for various

19   reasons based upon his prior criminal record.

20            THE COURT:  And, Mr. Brewer, is it correct that you

21   have received -- you would have received the first version of

22   the PSR way back in February of last year and then, again, a

23   slightly revised version earlier this month; is that correct?

24            THE DEFENDANT:  Correct.

25            THE COURT:  And you went over that, as Mr. Simon says,

1    with him and the contents of the PSR?

2         THE REPORTER:  Excuse me.  Can you pull the microphone

3    closer, please.

4         THE DEFENDANT:  He just talked to me about it

5    downstairs in the chambers.  I looked over it myself.  A lot of

6    it I didn't understand, but I looked at it.

7         THE COURT:  And back in February of last year, you

8    received the first version of the PSR; is that correct?

9         THE DEFENDANT:  That's correct.

10        THE COURT:  And you would have had time since

11   February -- it's about 18 months -- to go through the PSR and

12   talk with your various lawyers along the way about the contents

13   of the PSR; is that correct?

14        THE DEFENDANT:  I didn't really talk to the last

15   lawyer that gave me that.

16        THE COURT:  Mr. Meier?

17        THE DEFENDANT:  Yes.  No, sir, I didn't talk to him

18   none about it.

19        THE COURT:  Did you talk to Mr. Mejia about it?

20        THE DEFENDANT:  No, sir.

21        THE COURT:  So you're telling me that the only lawyer

22   you've spoken to about the PSR is Mr. Simon?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  Very well.  We'll go with that then.

25        MR. SIMON:  If I might, Your Honor.  I'm sorry to

1    interrupt.

2            THE COURT:  That's okay.

3            MR. SIMON:  There's an indication on the first

4    objection that was filed in the record by Mr. Mejia to the

5    presentence report.  This is before I was appointed.  There's, I

6    believe, an email communication from Mr. Mejia's legal assistant

7    that indicated that, if I remember correctly, Mr. Brewer

8    insisted or wanted the assertion of a certain objection that was

9    contained in that email.

10       There were -- it's part of the record.  There were some

11   handwritten maybe seven pages that was apparently sent in as an

12   addendum.  I never did receive that addendum until I got the

13   final version or the version of the report that I filed

14   objections to.  So I don't know where they came from, but I have

15   not asserted any of the points that were set out in the

16   handwritten -- the handwritten addendum to the first report.

17           THE COURT:  Now, when you say "the handwritten

18   addendum," you're talking about the handwritten objections that

19   were filed by Mr. Brewer's prior counsel?

20           MR. SIMON:  I don't know -- I really don't know the

21   origin.  This is in the order of --

22           THE COURT:  Well, the record makes the origin quite

23   clear.  I guess I'm surprised to hear now that you're unfamiliar

24   with the origin.  We're talking about, at Docket Number 163-1, a

25   number of objections that were filed presumably in the

1    handwriting of Mr. Mejia's assistant.  And I believe that your

2    sentencing memorandum, Mr. Simon, addresses the arguments made

3    there, does it not?

4            MR. SIMON:  I think I may have referred to it as the

5    Document Number 232-1 that was part of the presentence report,

6    the revised version on July 15th of 2020.  I think that version

7    was contained -- it may have been contained in the first set of

8    objections.

9            THE COURT:  Yes.

10           MR. SIMON:  Okay.  Well, all I'm saying is I hadn't

11   seen those until I got the -- you know, the presentence report

12   that was recently disclosed that I filed my objections to.  I

13   just made reference to an email.  I didn't know if those were --

14   the email was connected to the handwritten objections or not.

15           THE COURT:  Well, just so that it's clear -- I think

16   there's an unnecessary amount of confusion about the import of

17   those handwritten objections, particularly given that page one

18   of your objections to the PSR states, quote, "Undersigned

19   counsel will not assert at sentencing any of the arguments

20   contained in those documents."  Is that correct?

21           MR. SIMON:  That is accurate.  All I'm saying today,

22   Your Honor -- and I apologize for kind of confusing things.  All

23   I'm saying today is that if Mr. Brewer says he hadn't spoken --

24   he had not spoken to Mr. Mejia about the report, then the email

25   would seem to indicate that they did, because those -- if those

1    were the written objections that accompanied the email, or

2    separately, or whatever, it would indicate that he was familiar

3    with the report and had discussed it with Mr. Mejia.  That's the

4    only point.

5            THE COURT:  Right.  And Mr. Brewer could be forgiven

6    for not remembering, given the length of time that has passed.

7    Those objections were originally filed by his trial counsel in

8    March of last year.  Again, we're now some 16, 17 months past

9    that point as a result of the posttrial motion practice, as well

10   as a few delays related to resolving the motion as a result of

11   the limitations imposed by the pandemic.

12       So, again, let's just make sure we're all on the same page

13   here.  Mr. Brewer has received and reviewed with you, Mr. Simon,

14   the presentence investigation report; correct?

15           MR. SIMON:  Yes.

16           THE COURT:  And your objections we will take up here

17   shortly do not include the objections previously made by trial

18   counsel; is that correct?

19           MR. SIMON:  That's accurate.

20           THE COURT:  Let's then proceed to take up the

21   objections that have been filed.  I will state now for purposes

22   of our discussion and for the record that I have carefully

23   considered all of the materials going back to the originally

24   filed materials, but certainly with respect to our current

25   sentencing hearing, I have carefully considered the respective

1    memoranda filed by the parties, the written objections,

2    Mr. Simon, that you have filed, and the letters of support that

3    you filed in Mr. Brewer's behalf.  I have carefully reviewed all

4    of that material.

5        So let's begin by stating for the record our starting point,

6    which is the guideline calculations, and then we will proceed,

7    Mr. Simon, to take up your objections.

8        The offense level computation from the presentence

9    investigation report begins on page six with paragraph 17.

10       Now, paragraph 18 notes that Counts 1, 2, and 4 are grouped

11   for guideline calculation purposes because, as it states there,

12   one of the counts embodies conduct that is treated as a specific

13   offense characteristic in or other adjustment to a guideline

14   applicable to another of the counts.

15       So the guideline utilized here ultimately is 2K2.1 because

16   it follows from a higher total offense level.  Then that results

17   in a base offense level under 2K2.1 of a 24.

18       Then we move down to paragraph 26, which outlines the

19   significant increases as a result of the Chapter 4 enhancements.

20   Paragraph 26 notes that Mr. Brewer has at least two prior felony

21   convictions of either a crime of violence or controlled

22   substance events and lists those case numbers.  Those case

23   numbers in paragraph 26 correspond with later paragraphs in

24   Mr. Brewer's criminal history outlined in the PSR, paragraphs

25   36, 40, and 41.

1      The sum total of the three convictions listed there is that

2   Mr. Brewer qualifies under the guidelines as a career offender.

3      The conviction with respect to Count 3 is a conviction

4   pursuant to 18 U.S.C. 924(c).

5      And then let's move to paragraph 28.  The PSR notes here

6   that under Guideline 4B1.1(c)(2)(A), the mandatory minimum

7   consecutive penalty required for that 924(c) conviction is 60

8   months.  That is consecutive to any sentence imposed for the

9   other count.  The statutory minimum sentence as to Count 1 is 15

10  years, meaning the guideline term of imprisonment there is 180

11  months.

12     Now, paragraph 29 states that the otherwise applicable

13  guideline range is compared to the chart that is set out in

14  Guideline 4B1.1(c)(3).  In this instance, that results in a

15  guideline sentence range of 360 months to life, and there is no

16  reduction here for acceptance of responsibility following the

17  trial conviction.  Therefore, the adjusted offense level is 37.

18     That Chapter 4 enhancement is further discussed in paragraph

19  30, and it's important here to note that the three prior

20  convictions that we've talked about also qualify under the

21  statute as an armed career criminal, and that's in Title 18,

22  U.S. Code, Section 924(e).

23     The guidelines then assign that the greater level of

24  4B1.4(b)(1), (b)(2), or (b)(3), and it results in an offense

25  level there of 37.  That is our total offense level here against

1    a criminal history category of VI.

2        Now, therefore, the guideline range applicable is a custody

3    range of 360 months to life, a supervised release range of two

4    to five years for Counts 1 and 3.  Those are the longest terms.

5    It notes that Mr. Brewer is ineligible for probation under the

6    guideline here.  A fine range is 40,000 to $1 million.

7        Now, it's a little more complicated than the typical case,

8    given the applications of both the career offender guideline and

9    the armed career criminal statute, which has been addressed by

10   the guideline reference.

11       But, first, let me begin with you, Ms. Keel.  Have I stated

12   the guidelines correctly as they are set out in the revised

13   presentence investigation report?

14            MS. KEEL:  Yes, Your Honor.

15            THE COURT:  Mr. Simon, same question to you.

16            MR. SIMON:  Yes, I believe that the report does

17   accurately construct the guideline range and asserts the

18   mandatory minimum sentence under the Armed Career Criminal Act,

19   so the calculations -- the manner in which they calculated the

20   sentence appears to be correct.

21            THE COURT:  Now, you have filed a number of objections

22   and let's just take those one at a time.

23            MR. SIMON:  All right.  Yes, Your Honor.  The main

24   objection that I filed was objecting to the applicability of the

25   Armed Career Criminal Act and the 15-year mandatory minimum, as

1   well as the enhancement that makes him at a level 37.

2       I apologize by virtue of the fact -- I apologize that the

3   objections that I filed were pretty darn general -- okay? --

4   I'll admit that under the cases that I cited, *Apprendi*.  I

5   understand *Apprendi* allows the court to make fact-finding,

6   essentially, for prior convictions, so a defendant's criminal

7   history is subject to being determined by the court at

8   sentencing.

9       The cases that came down after *Apprendi* are generally in the

10  category -- when they talk about the Armed Career Criminal Act

11  and whether or not somebody has qualifying serious drug

12  offenses -- we're not talking about violent offenses, because

13  they're not applicable to my client's case -- but serious drug

14  offenses, the fact-finding that the defendant has objected to is

15  the fact that they happen on different occasions, that the court

16  is making a finding that the three felony convictions that

17  qualify Mr. Brewer as an armed career criminal occurred on

18  separate occasions.

19      And notwithstanding the fact -- and I would say this,

20  notwithstanding the fact that these -- that it's plain that

21  these indictment dates that the court is allowed to -- under

22  cases that came after Apprendi and in determining whether or not

23  the court can make fact-finding as to prior felonies and when

24  they occurred, notwithstanding that I am stating an objection

25  for the record that the court is -- would apparently have to

1    make those findings that they -- those offenses happened on

2    different occasions.  So that's the basis of my objection.

3         THE COURT:  Let me just state with respect first to --

4    first, as to his status under the Armed Career Criminal Act, as

5    I outlined just a minute ago, as is set out in the PSR, I do

6    find that the necessary predicate offenses are set out in

7    paragraphs 36, 40, and 41 of the presentence report.

8         To the extent that Mr. Brewer objects to the application of

9    the resulting 15-year mandatory minimum under 18 U.S.C. Section

10   924(e) on the ground that the jury did not make any findings

11   regarding his prior convictions -- and I understand what you're

12   saying now, Mr. Simon, but to the extent that that objection has

13   been made, I want to make sure the record is clear.  I will

14   overrule it.

15        The Supreme Court has held that facts that increase the

16   prescribed range of penalties to which a criminal defendant is

17   exposed are elements of the crime that must be found by a jury

18   beyond a reasonable doubt, but the Supreme Court expressly

19   carved out the -- and I'll quote here now -- "the fact of a

20   prior conviction," end quote, from that rule, and the Sixth

21   Circuit has recognized that exception in several cases.  One

22   example is *U.S. v. Washington*, which is a 2018 Sixth Circuit

23   case.  I will then overrule the objection to the extent that it

24   is based upon that argument.

25        Now, with respect to the convictions that are set out in

1    paragraphs 36, 40, and 41, it's my understanding from a reading

2    of the -- of those paragraphs in the presentence investigation

3    report that the records which are summarized in those paragraphs

4    establish that the offenses occurred on dates different from the

5    other with an intervening arrest.  Is that correct?

6           PROBATION OFFICER:  That's correct, Your Honor.

7           THE COURT:  And so I will overrule the objection there

8    as well.

9       Anything further with that -- with respect to that discrete

10   issue, Mr. Simon?

11          MR. SIMON:  No, sir.

12          THE COURT:  Did you have a separate objection with

13   respect to the career offender finding?

14          MR. SIMON:  No.  I believe he would qualify.  If he

15   has two prior felonies in the category of a serious drug

16   offense, it would appear that the court would have the ability

17   to make a finding as to that, and he's over 18.  He was

18   convicted of a similar type offense in the proceeding in this

19   court.  So from that standpoint and the way the guidelines were

20   built out utilizing those provisions, it would appear that he is

21   subject to that guideline.  And if I could make a valid

22   objection, I would.  I would state it.

23          THE COURT:  And I know that you would.  I'll just

24   state for the record that Mr. Brewer -- I will find

25   alternatively that Mr. Brewer qualifies as a career offender

1      under Section 4B1.1 of the guidelines.  He has three separate

2      prior convictions for trafficking in a controlled substance

3      under Kentucky state law.  The probation office did not count

4      conspiracy or complicity offenses as predicate offenses pursuant

5      to its 4B1.1 calculations.  Only substantive trafficking

6      offenses under Kentucky law were counted.  So to the extent that

7      there had been an objection to that calculation, it would be

8      overruled as well.

9           Any other objections to the PSR that we need to take up,

10     Mr. Simon?

11               MR. SIMON:  No, I don't believe so, Your Honor.

12               THE COURT:  From the United States, any objections to

13     take up to the PSR?

14               MS. KEEL:  No, Your Honor.

15               THE COURT:  Let's then move to consideration of any

16     motions.  As we do so, I will simply state that I will adopt the

17     report as prepared.  It will be filed in the record under seal.

18     In the event an appeal, the parties, court, and counsel will

19     have access to the PSR.

20          Any motions to take up at this time, Mr. Simon?

21               MR. SIMON:  Yes.  Without belaboring the point, as the

22     court is aware and has issued an order earlier today -- and

23     that's Document Number 239 -- court and counsel for the United

24     States is aware that yesterday -- and I tried to set out in some

25     detail the reason for the timing of that in that I wanted to

1   confirm with Mr. Brewer that that was, in fact, you know, his

2   statement.  And I had previously advised Mr. Brewer, you know,

3   he has the right of allocution at the time of sentencing and

4   that, you know, the court would allow him to address the court.

5   So I took that as, essentially, his allocution.

6        Mr. Brewer, in talking to him today, may have, you know,

7   other things that he wants to say, but I said I will submit that

8   in the record as an addendum.  And then, obviously, when I read

9   it, it presented to me a dilemma for me to go forward.

10       So the motion that I filed yesterday asking the court to

11  determine whether or not it'd be proper for my appointment as

12  CJA counsel to continue, I mean, that's based upon what I saw in

13  writing.

14       So, you know, I understand the court's ruling and I

15  understand that the court has, you know, looked at that and

16  said, "Well, Mr. Brewer's obviously dissatisfied with his

17  attorney's unsuccessful arguments," including mine, but I think

18  the court can understand it puts me in a position where if I've

19  asserted IAC claims on behalf of Mr. Brewer to, you know,

20  preceding counsel, he has stated that in writing and, you know,

21  has not excluded me from that.

22       So it creates what in my mind is a real conflict.  Maybe we

23  deal with that on another occasion because, otherwise, you know,

24  I'm appointed until the end of this case on appeal and

25  otherwise, but I think it's a matter that would have to be

1   addressed.

2      So I think the court understands where I'm coming from and

3   the position that I feel compelled to put that in the record --

4           THE COURT:  I do.

5           MR. SIMON:  -- and notify the court.

6           THE COURT:  I do understand the basis for your filing.

7   I don't think it's necessary for me to expand on my ruling,

8   which is a written ruling that I made sure that you were

9   provided a copy of prior to the hearing, so that you could

10  actually show it to Mr. Brewer.

11     I will say a couple of things.  First, I did review the

12  materials that you submitted in Mr. Brewer's behalf, and I

13  addressed that a bit further in my order.  But to the extent

14  that you wish to bring that to my attention, I have reviewed it.

15  And in deciding not to relieve you of your representation

16  obligations, I am in no way suggesting that your motion itself

17  was improper.

18     I do understand the situation that prompted your filing of

19  the motion.  My take on it, as is expressed in the order, is

20  that it is not necessary for you to be relieved, that there is

21  no reason to further delay this sentencing hearing.

22     We actually began this sentencing hearing the first time on

23  May 15th of last year.  So about 14 months ago, we first

24  gathered for a sentencing hearing, and there have been two

25  changes of counsel since that time, and as I mentioned earlier

1   in our discussion, a fairly substantial amount of motion

2   practice regarding the trial and regarding arguments made and

3   not made, both pretrial and during the trial.  Those issues have

4   been resolved in a prior opinion.  I don't need to revisit that

5   at this point, but just in order to give some context here to

6   where we are.

7       If there's anything else that needs to be discussed, now

8   would be the time to do it, but I think you have adequately set

9   out the issue and my written order addresses it, to the extent

10  that it needs to be addressed at this point.

11      Does anyone have anything to add on these issues?

12          MS. KEEL:  No, Your Honor.  The United States would

13  have objected to withdrawal at this point to delay the

14  sentencing any further, and I believe Your Honor's written order

15  addresses the points that the United States would have made and

16  we agree.

17          MR. SIMON:  Your Honor, I did -- I had spoken to

18  Mr. Brewer, and I had read to him or paraphrased your order that

19  was issued this morning, said that he may, if the court allows,

20  have an opportunity to address that aspect of the motion to

21  withdraw that I filed.  Mr. Brewer indicated he did want to

22  address the court as to that.  And then he'd have the right to,

23  you know, allocution later, but he did mention to me he did want

24  to address the court as to the motion.

25          THE COURT:  That's fine.  We'll get to that --

1          MR. SIMON:  Okay.

2          THE COURT:  -- during his -- I will consider that as

3     part of his allocution.

4          MR. SIMON:  Thank you.

5          THE COURT:  Staying now in the category of any motions

6     for departure or variance that need to be addressed, is there

7     anything along those lines that you would like to raise at this

8     point?

9          MR. SIMON:  Yes, Your Honor.  As I stated in my

10    sentencing memorandum, I think the court or I believe the court

11    is entitled to look at Section 3553(a) factors in determining a

12    sentence that's reasonable under the circumstances and

13    accomplishes the goals of sentencing which, basically, we all

14    know what they are.

15         And as it pertains to Mr. Brewer's situation, I would say

16    this:  Mr. Brewer's 46 years old.  And by the way, his

17    grandmother, Ms. Garner, is here.  Ms. Brasher, a friend of

18    Mr. Brewer's, is present as well.  And they have -- those two

19    individuals, as well as others, have written letters of support

20    for Mr. Brewer.

21         So it is one thing to have someone that's classified under

22    the code as an armed career criminal and a career criminal and

23    all that, but it does signify, you know, Mr. Brewer is a human

24    being.  He's a resident of this community.  He has people that

25    care about him and love him and that he has relationships with.

1   So I'm not adding anything new, but I would like to point that
2   out.
3       So Mr. Brewer's 46 years old.  He's not in the best of
4   health.  Paragraph 63 of the report indicates he had been
5   treated by his primary care physician, Dr. Gray, who has an
6   office on Eastern Parkway.  So he has conditions that put him in
7   what would be a high risk category under the current conditions
8   that exist in this state and also in this country.  I'd ask the
9   court to take that into consideration as well.
10      The difficulty with that and a lot of things now is -- I
11  gave up predicting things that might happen in the future in mid
12  March, and I have -- I don't think nobody knows what's going to
13  happen even next week, or next month, or next year, but as much
14  as we know about the virus and how it affects people with at-
15  risk conditions, I think the court can take that into
16  consideration in fashioning a proper sentence.
17      I'd ask the court to look at -- and the court is aware of
18  the personal circumstances in the family, I'd say, educational
19  history -- but sort of noneducational history of my client
20  that's set out in paragraphs 55 through 58 of the report.
21      Obviously, Mr. Brewer did not have the same advantages that
22  I had growing up as a two-parent household.  No issues of mental
23  illness.  No issues of substance abuse.  No economic problems at
24  all.  That put Mr. Brewer, obviously, in a big hole.  And I
25  think it -- I think it's understood by all of us in the room the

1    disadvantage that a person would be in in that position.

2        I'm not saying that as an excuse.  Obviously, Mr. Brewer's

3    record is what it is.  He has been a small-time, street-level

4    drug dealer, primarily in marijuana and cocaine and, if it

5    matters because the court is looking at a guideline range, which

6    is the starting point of determining a person's sentence of

7    between 30 years and life imprisonment.  And the seriousness and

8    the imposition of such a long sentence for -- I'm not saying --

9    the imposition of potentially such a long sentence, obviously,

10   bears on Mr. Brewer and it bears on his counsel, whatever

11   Mr. Brewer may have written about me before.  That's a big

12   responsibility.

13       I would ask the court to take into consideration those --

14   whatever you want to call them -- socioeconomic factors, those

15   things -- the conditions that Mr. Brewer grew up with and dealt

16   with in his life maybe put him on that track.

17       If there's any basis for comparing his previous criminal

18   conduct in determining a proper sentence -- we have the range

19   and it's, you know, an enormous range.  And it starts at a floor

20   that actually by the mandatory minimum is 240 months.  So with

21   the court -- the court's findings of the way that his sentence

22   is being calculated, 240 months would be the absolute minimum,

23   even if the court was -- even if the court was going to consider

24   departing from the minimum guideline range of 360.  I think I'm

25   correct on that.

1    I'm asking the court to consider doing that and giving

2    Mr. Brewer a lower sentence primarily because, as I said, he's

3    going to turn 47 years of age in a couple of months.  A 30-year

4    sentence would put him into -- even with the different types of

5    releases that are currently available, maybe in the future

6    available, aside from coronavirus considerations, Mr. Brewer's

7    going to be well into his late 60s before he qualifies for any

8    type of release under a 360-month sentence.

9    I would submit to the court the combination of factors would

10   argue -- would put me in a position of arguing for a much lower

11   sentence than 360 months, within the court's discretion to make

12   that departure.

13   I don't know whether it's apples or oranges.  The court and

14   the United States are well familiar with organized groups of

15   individuals that bring in, you know, kilos and kilos of

16   methamphetamine and -- I mean, fentanyl, which is resulting in

17   deaths all -- you know, in this community and everywhere else.

18   Mr. Brewer doesn't -- isn't that type of drug dealer.  Okay?

19   It's not a defense because it would be a really rotten defense

20   to say, "Oh, he's not a bad guy.  He's just a small-time drug

21   dealer."  But in comparison, I would ask the court to make and

22   consider that comparison in terms of the significance of his

23   conduct.

24   But utilizing those factors, knowing that Mr. Brewer does

25   have people in the community that do care about him, are willing

1   to help him when he is able to gain his release -- in one way or

2   another, he's going to be a lot older than he is now when he's

3   able to be released by almost any sentence that the court would

4   consider, because we've got an absolute floor of 240 months.

5   I'd ask the court to consider a downward departure from the

6   guideline minimum of 360 and fashion a sentence that is

7   reasonable under these circumstances.

8          THE COURT:  Ms. Keel, your response.

9          MS. KEEL:  Yes, Your Honor.  The United States would

10   ask the court to impose a guideline sentence in this case, and

11   I'll just address a few of the 3553 factors that I think are

12   particularly pertinent here.

13       Looking at the history and characteristics of the defendant,

14   as the PSR shows, as the United States highlighted in our

15   sentencing memorandum, the defendant has a long history of

16   repeating similar offenses to the ones that are before the court

17   for sentencing today.

18       And while I will grant you, as the defense points out, that

19   Mr. Brewer may not be a large, high-volume drug distributor,

20   what's particularly concerning about his conduct and part of the

21   reason that his prescribed sentence is so high is that he was in

22   the process in the first of the two arrests at issue in this

23   indictment of dealing drugs with a firearm in furtherance of

24   that activity, and that -- the use of firearms is also something

25   that has come up previously in his criminal record, including

1   being a felon in possession of a firearm.

2       And I think that his persistence in carrying out that kind

3   of criminal activity is particularly poignant here when you look

4   at the fact that we are looking at arrests that occurred in this

5   case on almost successive nights where the defendant was

6   arrested.  The firearm he had was seized, and when he was

7   released from jail, without hesitation, he went out with a

8   different vehicle, because the first one had been taken, and

9   carried on in the same modus operandi of dealing drugs that he'd

10  been engaged in just a couple of nights before.

11      And I will just point out that along with that criminal

12  history, the defendant was not particularly -- I mean, the

13  events that are charged in the indictment happened almost five

14  years ago now, but he was not a particularly young man at the

15  time without, you know, this history, without having had prior

16  consequences.  He had had those and did not change his behavior.

17  And I think that that persistence, looking at the record, is

18  really kind of striking with this defendant's criminal history

19  in particular.

20      And I think that, you know, the fact here that we are

21  looking at someone who has not responded to deterrence in the

22  past and who has shown this propensity that, if he is released,

23  if he were out in the public again, I don't think that there's

24  anything to suggest that he would not engage in similar conduct.

25      And so under the second -- (2)(C), under those 3553

1    factors -- pardon me -- protecting the public from further

2    crimes of the defendant is one of those and something that I

3    think that the court should consider.

4         And then, also, just the need to avoid unwarranted sentence

5    disparities among defendants, again, the higher guideline

6    sentence here is prescribed because of the nature and

7    circumstances of this offense and because of the defendant's

8    persistent criminal conduct over decades, really.

9         And as, you know, pointed out in the PSR and by the defense,

10   we went to trial here.  There's no acceptance of responsibility

11   factored into the guidelines here.  And, you know, I think

12   because of that the consistency is important.

13        Again, the guidelines are what they are for a reason and

14   prescribe those enhancements based on criminal history so that

15   other defendants who have similar criminal history to

16   Mr. Brewer, whether they're -- some differences in quality and

17   specifics, of course, but we look at the number and type of

18   convictions.  And the guidelines, you know, properly reflect

19   that and should be applied here to Mr. Brewer consistently as

20   they would have been with similarly situated defendants.  That's

21   all I have.

22             THE COURT:  Thank you.

23        Anything further, Mr. Simon?

24             MR. SIMON:  No, Your Honor.

25             THE COURT:  Anything else from either side with

1  respect to 3553(a) issues that either side would like to bring

2  to the court's attention at this point?

3            MR. SIMON:  No, sir.

4            MS. KEEL:  No, Your Honor.

5            MS. GARNER:  Your Honor, can I say something?

6            THE COURT:  Mr. Simon, it appears that someone in the

7  gallery may wish to speak in Mr. Brewer's behalf.

8            MR. SIMON:  Ms. Garner is my client's grandmother.

9  She indicated she wanted to address the court, if that would be

10 allowed.

11            THE COURT:  That would be fine, ma'am.  You'll need to

12 keep your mask on, please.

13            MR. SIMON:  You want her to come around to the podium?

14            THE COURT:  Why don't you come up to this podium here.

15            MS. GARNER:  I'm Cherosco's grandmother.

16            THE COURT:  Yes, ma'am.  If you would, tell us your

17 name.

18            MS. GARNER:  My name is Sarah --

19            THE COURT:  Just so that we have your name in the

20 record correctly.

21            THE WITNESS:  Yes, my name is Sarah Garner.  I'm the

22 mother of five boys.  I had five boys and two girls.  It hadn't

23 been easy, you know.  And me as a child, it wasn't easy for me

24 as a child coming up because segregation is something that has

25 been raising in our lives, all our lives.  No one has -- y'all

1   haven't walked in our shoes.

2       I remember as a child coming up, we had to ride streetcars

3   that ran through the air connected to electricity.  And it was

4   like 10 cents to ride on the streetcars, but we was so poor, we

5   didn't even have 10 cents.  And when we did have 10 cents to get

6   on the bus, on the streetcar, if someone -- a white person got

7   on there, we had to get up.  If they come and stood beside you,

8   you had to get up and give them your seat.

9       So my grandmother, she raised us growing vegetables

10  alongside the house.  We went to church.  We didn't have no

11  lights, all those things we went through.  We had to walk to the

12  Haymarket.  Everywhere we went, we walked.  That's why I'm 83

13  years old.  I've had two knee operations because we walked.  We

14  passed up I don't know how many schools to get to the school we

15  were supposed to go to.

16      In our lives, it's been a struggle all my life.  I have two

17  sons that's deceased.  They end up on drugs.  Black people don't

18  have no ships and planes to bring no drugs into the United

19  States.  How did it get here in the beginning?  It was sent --

20  brought to the neighborhoods.  My sons, they died from drugs.  I

21  don't know how many of their friends have died from drugs.  Our

22  graveyards are full of 16, 17-year-old boys that have killed one

23  another.

24      Drugs.  I live in the West end.  Nighttime, you can't go

25  out.  They're full of drugs.  They're on this stuff.  I don't

know what it is.  They land in the street.  They're doing all kind of things.

People -- older people that's got those carts you ride in, they can't ride in them.  Because why?  They run up and grab their groceries and stuff and they're in this cart.  That's the only transportation.  I can't hardly walk.  I don't go out at night.  It's not safe.

Polices don't come into our neighborhood to rescue us.  You can pick up the phone and turn it and say, "Oh, they're selling drugs."  Do they come and arrest them?  No.  It's been a struggle.

My five boys -- I've got 18 grandchildren.  Cherosco is the third grandchild that I -- I had him ever since he was two or three years old.  He wasn't that old.  He was some months.  And his mother give him to my son, which is his daddy, so he was there in my household.  I sent him to school.  I clothed him.  I loved him.  Not only him, I had two other grandsons.

When I went on vacation from GE, I picked them up, all three of them, and I would keep them on vacation time all through the weeks.

Everything went on at my house because God blessed me with a good job.  Some kind of way he allowed me with myself and kids to be able to support and to try to take care of the others.  Everything went off at my house.  I was a single parent, but God was always there making a way.  It's been hard.

1        Cherosco, he end up getting a job, working, had a little

2    car.  Every time you'd turn around, they was pulling him over,

3    talking about his windows was too tinted, followed him

4    everywhere he go, coming through the neighborhood, slowing down

5    by the house, stopping him down in the next block.  Everywhere

6    he turned around, here come the police.  Here come the police.

7        They come to court.  I've been here every court date.  They

8    sat right here and lied and said, "We didn't even know who he

9    was."  That's a lie.  They followed him all -- everywhere he

10    went, they followed him.

11        Well, I'm not trying to make no excuses.  You don't know

12    what it's like to wake up or whatever it is and go out the door.

13    You can't do this.  You can't do that because you black.  I

14    didn't ask to be born black.  God made me black, but I learned

15    how to live and love everybody.  I don't hate.

16        This boy here, he ain't never murdered nobody.  He ain't

17    never broke in -- there ain't no record where he broke in

18    nobody's house, stole nothing.  He ain't killed nobody.  Some of

19    the blame -- he's not the only black child in the West end

20    that's had drugs.  It was brought to our neighborhoods, placed

21    in their hands.  That has to be taken into consideration of how

22    we have to live.

23        We have -- in the West end, they don't even clean the

24    streets.  When the water -- the debris come from the trees and

25    stuff, it goes down in the gutters and stuff.  It backs back up

1    in our house.  Because why?  They don't even clean the streets.

2       I worked all my life.  Name it, I've done it.  I've washed

3    dishes.  I cleaned white people's houses.  I did everything to

4    raise my kids and my grandkids.

5       It's just horrible.  You know, you just sit here talking

6    about taking -- sending somebody to prison for 30 years.  The

7    president let out murderers, men that have killed and murdered

8    somebody, and he let them go free.

9       It's time now.  We're tired.  We're sick of being tired.

10   We're tired.  We're sick of being tired.  All we want to do is

11   just live and be free and not have to worry about all these

12   things that's going on in the world today.

13      God created everything in this world.  We didn't create

14   nothing.  He created everything.  A lot of people don't believe

15   there's a God, but I know there's a God.  I know it's a God.  He

16   created everything in this world and everything that has rough

17   God made it.

18      And just don't treat people like they ain't nothing, like

19   they dirt.  He's not a murderer.  He's not a thief.  I ain't

20   trying to say he ain't never did nothing.  Everybody in here

21   done done something at one time or another, but is it worth it

22   to send somebody to take their life away?  He got one child.

23   That one sitting right there is the only child he got.

24      I'll be 84 in September.  I'm going to continue.  I got all

25   the little-bitty ones now that's coming along.  You can't give

1   up.  You got to keep on going.

2       We're all humans.  You cut me, I'll bleed, just like you

3   bleed.  We're all -- this corona, it touches the whole world.

4   It's just not here.  It's everywhere.  And I don't care what

5   nobody said, God is in charge of everything and everybody.  I

6   believe it and I will die -- I'm going to my grave because I

7   know there is a God.  He will take care of it all when he gets

8   ready.  He'll straighten it all out.

9       All we have to do is wear our mask, practice social

10  distance, love one another.  That's what -- Jesus died on the

11  cross because he loved everybody.  I don't hate nobody.  All I

12  want to do is just live my life until I die.  Let him live his

13  until he die.  That's not no big thing to ask of.  Cut out all

14  this silly people and locking them up.  That's wrong.  That's

15  all I have to say.

16          THE COURT:  Thank you, ma'am.

17          THE WITNESS:  Thank you.

18          THE COURT:  Mr. Simon, anything further?

19          MR. SIMON:  I have nothing further.  Mr. Brewer may

20  want to address the court.

21          THE COURT:  Mr. Brewer, you have the right to

22  allocution, the right to address the court.  Now would be your

23  opportunity.

24          THE DEFENDANT:  Yes.  Right here?

25          THE COURT:  Yes, you can just stay right there.

1          THE DEFENDANT:  Well, as you know, Judge Hale, I've

2    been coming in your court for the last four years.  You very

3    familiar with the trials and tribulations I've been through

4    coming into court, and I know -- I've learned that it's the

5    court's job to be neutral in the situation with the Government

6    and me.

7          I have repeatedly, over and over and over told the counsels,

8    either my granny and my family hired or the ones that are

9    appointed to me, I told them, "All you have to do is supplement

10   what I filed in Judge Simpson's court and everything's going to

11   work itself out.  You have to investigate what I'm saying to

12   raise my claims."  I know nobody's perfect, but this court has

13   seen every counsel come in here and raise my claims how they

14   want to.

15         Judge Hale, they got me looking like a monster in here.  I

16   might not even make it to tomorrow.  There's guys in the dorm,

17   they got corona.  As you see, I can't help -- I might die

18   tomorrow.  That's going to kill my granny.

19         But at the same time, you seen nobody raise my claims.

20   Right?  I read all your opinions and "no authority, no merits,

21   lack of time."  Nobody listen to me.  I been -- I don't know a

22   lot of stuff about the federal court, but I understand it.

23         My reading might be bad.  I might not be able to type it up,

24   but I can tell somebody to tell somebody to get it done.  And I

25   ain't -- I ain't trying to prolong my sentence.  I'm trying to

 1   save my life.  All they talk about is "Judge Hale don't like

 2   you.  He's not going to go for that.  My opinion, that he's

 3   going to keep denying you if you" -- I said -- I asked -- I

 4   begged the lawyers, even when my granny and them paid them.

 5   "That's not right, man.  Y'all not listening to me."  You seen

 6   me fire them lawyers.  Mr. Larry even asked to get off my case.

 7   I didn't try to delay it.  I told the truth.  Even when I told

 8   the truth, it wasn't enough.

 9       I showed where I got the information from.  Them guys

10   argued -- these lawyers argued, but they didn't show no law, no

11   authority nowhere, Judge Hale, and you seen that.  I watched and

12   read every one of your opinions on any of these motions they

13   filed.  They didn't have no law.

14       How can I find the stuff and they can't find it?  They've

15   been 30 years, 40 years lawyers.  None of them, five lawyers.

16   One lawyer, Mr. Mejia, stood up and said, "I ain't helping

17   Mr. Brewer do nothing."  I had said it, "Y'all trying kill me."

18       Come on, Judge Hale.  You done watched these people do this

19   to me.  And I know it's your job to be impartial, but somewhere

20   it got to be some give and take.  I've showed over and over what

21   they didn't do.

22       I'm fighting the United States, 50 states.  It's one of me.

23   And the family that I got won't come to court because they

24   scared of the federal court.  I got way more family than that.

25   They done ran all my family off.  My granny may not even make it

1   a day if you give me 30, 18, 15 years.

2        This man supposed to be with me.  I asked him to file the

3   motion for the corona so you consider letting me go home while I

4   go through my appeal.  It's never even been done.  He was not

5   even properly prepared today.  You see how he was stuttering?

6        You know, that's my son.  That's my granny.  That's my

7   woman.  That's my cousin.  He said friends.  Judge Hale, he

8   don't even know what's going on.

9             THE COURT:  Well, Mr. Brewer, you're starting to get

10  upset.

11            THE DEFENDANT:  No, I ain't getting upset.  I'm

12  just --

13            THE COURT:  Hold on.  When the judge talks, we pause.

14  Okay?

15       I'm going to let you finish.  I'm not cutting you off.  I

16  just want to interject here that to the extent that you have the

17  perception that Mr. Simon is not prepared or doesn't know what

18  he's doing, I want you to understand that that's not the case.

19  Mr. Simon is prepared.  He filed quality objections and a

20  sentencing memorandum in your behalf, and he argued based on the

21  law.

22       That's what I have to follow.  I can't make stuff up.  I

23  can't -- I can't take law from a different jurisdiction that

24  isn't applicable and try and wedge it into this case.  I can't

25  do any of that.  Mr. Simon knows that.  He's an experienced

1   lawyer and he has -- he has made appropriate, proper arguments

2   in your behalf.

3      Now, I realize you're frustrated about the arguments that

4   you wanted presented earlier and those have been made.

5   Mr. Simon made those in the form of a posttrial motion, and he

6   presented to me just yesterday the arguments that you asked him

7   to present; so I have considered all of that.

8      And I tell you that because -- he doesn't need me to defend

9   him and that's not my point here.  I just want you to understand

10   that I have received everything that you asked that be presented

11   in the form of that posttrial motion.  And then, again, prior to

12   this hearing, those arguments that you asked be made, the ones

13   that were made in your civil lawsuit you asked to be filed here,

14   Mr. Simon did that and I read it.  So I want you to know that.

15   All right?  Now, I'm going to let you finish.

16        THE DEFENDANT:  Judge Hale, over the years, I trusted

17   my attorneys.  I trusted them because I had history with them.

18   You know, they've been my friend's and cousin's lawyer, so I

19   took in consideration.  Just like in my suppression hearing, if

20   I'd known that I could have just standed up and talked directly

21   to you and said, "Hey, I want to fire them," I would have never

22   went that far.

23      Once you told me that I can't file my own motions or I can't

24   talk directly to you -- I didn't know anything about the federal

25   system.  I just had common sense.  And once I started reading

1    and getting more understanding, I'm like, "Everybody is talking

2    about something different than what I'm talking about."

3        Now, you just said it about Mr. Simon, but I told him, when

4    y'all appointed him to me, "Hey, you need to go over my civil

5    situation because it could be supplemented.  All you got to do

6    is supplement and apply the law."

7        "Okay.  I got you, Mr. Brewer."

8        But when you read -- when you read the interpretation of the

9    law, it's similarly situated people have been arrested for the

10   same thing that I'm arrested for, Judge Hale, and they got

11   released.  And it's a Supreme Court case.  So for it not to be

12   binding on the court, I was trying to understand.  I was like,

13   "Well, the federal court adopted that as well."

14       I pointed all these out.  This is 2016 cases.  This is -- I

15   was still on the street.  I wasn't even locked up.  So the

16   state -- when the case was in the state, it should have never

17   made it to the feds, because the case that -- the *Davis* case

18   repeatedly explained why I should have never been arrested for

19   this.  It should have been throwed out in the state.  Then it

20   wind up in the feds.

21       The case came out in '18, the *Mosley* case, the *Smith* case,

22   the *Gibson*, all of them came out, and they're Supreme Court

23   cases.  And I've been -- not Mr. Larry.  I told all the rest of

24   them that.  "The 2016 case, nobody never uses it."

25       And then once I said, "Well, okay, they gave me Mr. Simon.

1    He's off the panel.  I know I'm going to -- I got a chance."  If

2    I found them, how is it that five lawyers couldn't find it,

3    Judge Hale, five lawyers?  I've got a high school education.  My

4    granny raised us.  She know more about the law than I do.

5        I had to reference her and -- Grandma, you done heard about

6    this before.  She check it out.  I got another uncle that go

7    look up the case.  Nobody cited none of those cases, not

8    Mr. Larry, not none of those lawyers.  How is it that my -- I'm

9    the layman to the law.  They don't got no books with no cases at

10   Grayson County.  They ain't gone you no help.

11       I got a pinched nerve in my back, a groin pull.  My teeth,

12   if I don't hold them in with glue right now, they'll fall out of

13   my mouth.  I've been asking Mr. Larry to get me to the doctor

14   who did them.  I ain't went yet.

15       And then you said to my family you're going to give me 30

16   years to life.  I ain't did nothing that nobody else had did.  I

17   ain't saying I'm guilty, and I ain't saying I'm innocent, but if

18   somebody in a similar situation, my situation, I should be

19   released just like they did.

20       There's no way we can be right here, Judge Hale.  I'm going

21   on all this time and you know this.  You've seen the lawyers

22   come in here and not do their job.  You clocked out -- you went

23   off on Keith and Scott told them, "What are y'all talking

24   about?"

25       First day my granny said, "Fire them," but my other one had

1    already gave them money.  I didn't have -- just leave because of

2    it.  Got me looking like a monster.  All I do is take care of my

3    family.

4              THE COURT:  Mr. Brewer, I don't view you as a monster.

5    Let me -- I understand your distress.  I understand you're under

6    a tremendous amount of pressure here.  This is a very difficult

7    day for you, but I want -- I feel it's necessary for me to

8    interject here and tell you I do not now and at no point during

9    the course of these proceedings over these last few years view

10   you as a monster.  I do not.  In fact, I have spent a lot of

11   time studying your background, and I will have some things to

12   say about that in a few minutes.

13       I do not view you as a monster.  I don't want to belabor the

14   point about the case law that you keep referring to, but I do

15   want you to understand that all of the applicable case law that

16   is important here to your case was submitted by your lawyers.

17   And Mr. Simon has approached the sentencing hearing in a manner

18   that is prescribed under the law.

19       This is not -- this is not a situation where I am being

20   misled as the judge here, as the neutral.  You used that word

21   and that is exactly what a judge is is a neutral.  I'm not being

22   misled here by the absence of binding precedent; so I want you

23   to understand that.

24       Those are difficult concepts even sometimes for lawyers.

25   And so I get that they can be confusing, but I don't want you to

1   leave here today -- as difficult as this situation is for you

2   and your family, I don't want you leaving here today believing

3   either that I see you as a monster, because I don't, or that I

4   have been somehow misled on the law that applies to your case.

5   I have not.

6       I have carefully considered the arguments that your counsel

7   has made, the arguments that the Government has made, and I have

8   reviewed the law that's applicable, whether it be the sentencing

9   guidelines, the statutes under which you were charged, and the

10  law which interprets those statutes.  I have done that work.

11      And so my rulings speak for themselves, the written rulings,

12  the rulings that I've made here on the record.  I'm not adding

13  to those or taking away from those.  I'm simply telling you in

14  as straightforward a manner as I can that I am a neutral, and I

15  have not been misled, and I don't view you as a monster.

16      So I say all of that so that you understand a bit better the

17  context in which I have this important decision to make here.

18  Now, do you have anything else that you want to talk about at

19  this point?

20          THE DEFENDANT:  I just ask -- I just ask that you have

21  mercy on my life, man, and give me an opportunity to get my

22  appeal in.  Like I said, they got this corona going around, and

23  I'm trying to file a motion in your court for you to release me.

24  I meet the requirements on the corona.  The 3582 and 3552, I

25  meet the standard of the -- for being released either pending

```
 1   sentence or pending appeal.  And all I ask you is you keep that
 2   in mind for when I file it, because we was supposed to file it,
 3   and that's what I'm -- that's all I'm hoping, man.
 4           THE COURT:  We'll look for those in due course.
 5       Anything else, Mr. Simon?
 6           MR. SIMON:  No, Your Honor.
 7           THE COURT:  Ms. Keel, anything further from the United
 8   States?
 9           MS. KEEL:  No, Your Honor.
10           THE COURT:  Let me begin by saying, first, with
11   respect to the arguments that Mr. Simon has made, both his
12   written submissions, as well as the oral argument received by
13   the court today, that I am persuaded by Mr. Simon's arguments,
14   which I construe as a request for a downward variance.
15       I have presided over this case through -- as we've now
16   discussed throughout this hearing, through substantial pretrial
17   and posttrial litigation, as well as the trial itself, of
18   course.  I'm well acquainted with the history and
19   characteristics of Mr. Brewer and the nature and circumstances
20   of the offenses here.
21       With that background and following careful review of the
22   presentence investigation report, the parties' sentencing
23   memoranda, my careful review of the Section 3553(a) factors, I
24   conclude, first of all, that a 360-month sentence, which is
25   called for in the guidelines here, is far greater than necessary
```

to comply with the purposes set forth in 18 U.S.C. Section

3553(a)(2).

Although Mr. Brewer has a substantial criminal record, that

record does not contain a substantial history of violence, and

the drug amounts at issue in this case are relatively small.

The evidence presented at trial does not show that he is

anything more than a street-level dealer, and that is a point

that the Government here today appears to agree with.

I've also considered Mr. Brewer's age, which the Sixth

Circuit has recognized as a relevant factor in sentencing most

recently in the case of *U.S. v. Payton*, which is a Sixth Circuit

case from 2014.

Given, as has been pointed out, Mr. Brewer's currently 46

years old, even a sentence at the low end of that guideline, 360

months, would extend well beyond the point at which recidivism

rates are known to significantly decline.

And, finally, as has also been discussed here, Mr. Brewer

does have documented health issues, including chronic kidney

disease, which I have also taken into account.

In sum, I find that a guideline sentence here, even a low

end guideline sentence, would be far greater than necessary to

comply with the purposes set forth in Section 3553(a)(2).

This is a mine-run case and yet the sentence called for by

the guidelines here fails properly to reflect the 3553(a)

considerations I have just discussed and would result, in my

 1   view, in a disproportionally harsh sanction.

 2        Now, having reached that conclusion, are the parties ready

 3   for me to state the sentence?

 4             MS. KEEL:  Yes, Your Honor.

 5             MR. SIMON:  Yes.  Sorry.

 6             THE COURT:  I stated previously the conclusion that

 7   the defendant qualifies as an armed career criminal under 18

 8   U.S.C. Section 924 and will sentencing accordingly.  I have also

 9   previously stated the conclusion that the defendant

10   alternatively qualifies as a career offender under Chapter 4 of

11   the guidelines.  The sentence imposed here follows from the

12   defendant's status as an armed career criminal.

13        Having considered the advisory sentencing guidelines, Title

14   18 of the U.S. Code, Sections 924 and 3553(a), I will impose the

15   following sentence:

16        It is the judgment of the court that the defendant, Cherosco

17   Brewer, is committed to the custody of the Bureau of Prisons for

18   a term of 60 months as to Count 2 and 180 months as to each of

19   Counts 1 and 4 in the indictment, to be served concurrently with

20   each other, and 60 months on Count 3, which shall be served

21   consecutively, as is required by the statute, to the terms

22   imposed on Counts 1, 2, and 4, for a total of 240 months'

23   imprisonment.

24        Upon release from imprisonment, the defendant shall be

25   placed on supervised release for a term of three years as to

1    Count 4 and five years as to each of Counts 1 through 3 to run

2    concurrently for a total of five years.

3        While on supervised release, Mr. Brewer will abide by the

4    standard conditions of supervision adopted by the court, as well

5    as a number of special conditions.  A copy of that list has been

6    provided to the defendant and counsel.  They include drug

7    testing and being subject to search.  The U.S. Probation Office

8    will answer any questions that Mr. Brewer might have regarding

9    the requirement of those conditions.

10       Title 18 of the U.S. Code requires that the defendant pay a

11   special penalty assessment fee of $100 as to each count of

12   conviction for a total here of $400.  This sanction shall be

13   paid in accordance with a schedule of payments page to be

14   included in the judgment.

15       Restitution is not an issue in this case.  I am going to

16   waive a fine, as well as the cost of investigation, prosecution,

17   incarceration, and supervision due to the defendant's inability

18   to pay.

19       As I have stated, I've carefully considered the history and

20   characteristics of Mr. Brewer.  As just discussed, he has a

21   significant criminal history, though as I mentioned, not one

22   with convictions for significant violent conduct or substantial

23   amounts of drugs.

24       I've also considered the nature and circumstances of the

25   offenses here.

1    Again, as I discussed just a minute ago, I conclude that

2   while the offenses committed by the defendant are serious, the

3   term of imprisonment suggested by the guidelines would result in

4   a sentence that is greater than necessary to achieve the goals

5   of 18 U.S.C. Section 3553(a).

6    As I outlined at the outset of this hearing, the advisory

7   sentencing guidelines produce a total offense level of 37

8   against a criminal history category of VI, resulting in a

9   recommended guideline range of 360 months to life, a fine range

10   of 40,000 to one million, and a range of two to five years of

11   supervised release.

12    As to the other relevant factors in Section 3553(a), I

13   conclude that this sentence properly reflects the seriousness of

14   the offenses for which Mr. Brewer was found guilty.

15    I conclude that this sentence, still quite substantial, will

16   promote respect for the laws which prohibit convicted felons

17   from possessing firearms and from dealing illicit narcotics.

18    It should be obvious to everyone familiar with the

19   circumstances of this case that a sentence of 240 months will

20   afford adequate deterrence to others who might be tempted to

21   commit similar crimes.

22    As for protecting the public, given Mr. Brewer's age and the

23   length of this sentence, even reduced as it is, it will result

24   in adequate protection from further crimes of the defendant.

25    Now, all of the arguments stated by the Government, while

1    well-taken, are adequately addressed by this substantial

2    sentence, albeit one that is reduced from the guideline

3    recommended sentence.

4        Accordingly, I conclude that a sentence of 240 months'

5    custody, followed by five years of supervised release, is

6    sufficient but not greater than necessary to comply with the

7    purposes set forth in Section 3553(a)(2).  It satisfies the

8    applicable statutory provisions, and as such, it represents just

9    punishment.

10       Ms. Keel, Mr. Simon, are there any objections to the

11   sentence that I have just announced, the special conditions

12   imposed which have not previously been raised?

13            MS. KEEL:  None from the United States.

14            MR. SIMON:  No, Your Honor.

15            THE COURT:  Let's --

16            MR. SIMON:  I would say, I believe, that Mr. Brewer

17   will be instructing me or whoever's representing him to file an

18   appeal.  And there may be -- there may be grounds that he would

19   want to assert, but taking into consideration -- I will just say

20   there may be grounds that he may want to assert on that, but the

21   240 is the minimum as -- the minimum sentence that could be

22   imposed, I believe, under the findings of the court pursuant to

23   the ACCA and being a career criminal or having the firearm count

24   run consecutively.

25            THE COURT:  That's right.  And the question that I

1    just asked you is, of course, referred to as the Bostic

2    question.  It is simply to ensure that no objections were left

3    out that counsel intended to raise and to clarify here once the

4    sentence has been imposed.  If there are any remaining

5    outstanding objections to be made, we've clarified that

6    adequately.

7        Now, with respect to Mr. Brewer's appeal rights, Mr. Brewer,

8    you have the right to appeal your conviction following your

9    trial.  You have the right to appeal the sentence that I just

10   imposed if you believe it was illegally or incorrectly imposed.

11       Now, any notice of appeal, which starts the process, must be

12   filed within 14 days of the entry of judgment or within 14 days

13   of a notice of appeal should the Government choose to appeal.

14       If you need the assistance of the clerk's office in filing

15   that notice of appeal, they will assist you in filing a notice.

16   If you cannot afford the fee that is required to file an appeal,

17   you may ask that that fee be waived.

18       If you cannot afford to pay the cost of counsel on appeal,

19   you have the right to apply for leave to appeal in forma

20   pauperis, which means you can ask for not just the fee to be

21   waived, but also counsel to be appointed to represent you free

22   of charge on appeal.

23       Do you understand these appeal rights as I've outlined them

24   to you?

25              THE DEFENDANT:  Sir, you saying I got to get -- I got

1  to get another appeal lawyer, since Mr. Simon ain't going to

2  be -- he just said he ain't going to be my appeal lawyer.  So

3  does the court want to appoint me another appeal lawyer?

4          THE COURT:  Generally the Court of Appeals does that,

5  but your first step is your notice of appeal.  And as I said,

6  that's the first and most important step following today's

7  hearing.

8      You would need to file that notice of appeal within 14 days

9  of the entry of the judgment.  That is the paper that will state

10  for the record the sentence that I just announced, and that will

11  be in the record probably early next week.  Once that is in the

12  record, that begins that 14-day clock.

13      Now, whether Mr. Simon represents you on appeal or not, I

14  don't know.  He certainly could act in your behalf to file that

15  notice.  The notice is a very brief statement that indicates you

16  intend to appeal.  And he or another lawyer could do that for

17  you, but what I want to make sure you understand is that you

18  have 14 days from the entry of judgment.  And I want you to

19  understand that if you can't afford the fee or if you can't

20  afford to pay a lawyer, you can apply to have the fee waived,

21  and you can apply to have a lawyer appointed to represent you.

22  Do you understand that?

23          THE DEFENDANT:  Okay.  So you'll send me a paper in

24  the mail?  Is that what you're saying?

25          THE COURT:  No, I won't be sending you a paper in the

1    mail.  A judgment will be sent to you, but it will be 14 days

2    from its entry on the docket.

3        Mr. Simon will stay involved as your counsel long enough to

4    advise you about the entry of the judgment and the necessity of

5    filing that notice of appeal in a timely manner.

6            MR. SIMON:  That's correct.  And I would tell -- I'll

7    tell Mr. Brewer later.

8        Mr. Brewer, I'll make sure -- as long as I'm still counsel

9    of record, I'll make sure your appeal is filed in a timely

10   manner.  I'll prepare the documents that the judge has

11   referenced in terms of proceeding in forma pauperis and without

12   paying the costs of an appeal.

13       The document I gave you, we'll talk about it.  It repeats --

14   it paraphrases what Judge Hale has just said about your rights

15   to proceed.

16           THE COURT:  Any requests now, Mr. Simon, to be

17   included in the judgment?

18           MR. SIMON:  No, I don't -- I have nothing -- I know

19   that Mr. Brewer had indicated that because of his health

20   condition, if the facility in Lexington, Kentucky, which is a

21   medical facility, as I understand it, if there is available

22   space and if prisoners are being moved into the BOP or BOP

23   facilities -- and who knows what's going on with that either now

24   or in the near future -- Mr. Brewer asks that he would be

25   transferred to a medical facility that could deal with those

1    issues that he's currently having.

2        Would that be a fair statement, Mr. Brewer?

3            THE DEFENDANT:  Yes.

4            THE COURT:  The law does not give me the authority,

5    Mr. Brewer, to order the Bureau of Prisons to place you in any

6    specific facility.

7        Now, what I normally do in a situation like this -- because

8    as you can imagine, other folks that come through have physical

9    issues that need to be addressed.

10       I typically include and I will do so here in the judgment in

11   writing a request that the Bureau of Prisons evaluate your

12   health condition for appropriate placement.  It may be that they

13   decide that you need to be placed in a Federal Medical Center,

14   like Lexington, but that is beyond the authority granted me

15   under the law.  So I can't make that decision in their behalf,

16   but I will highlight it so that they can take it into -- they

17   normally would anyway, but I will highlight it for them to take

18   into consideration.

19       Anything further, Mr. Simon?

20           MR. SIMON:  No, Your Honor.  Thank you.

21           THE COURT:  Ms. Keel, anything further from the United

22   States?

23           MS. KEEL:  No, Your Honor.

24           THE COURT:  I'm not going to keep us here any longer

25   but, Mr. Brewer, your grandmother spoke to the court.  She was

1    most eloquent.  She spoke profound words that had an impact, I

2    am certain, on everyone in this courtroom and perhaps others who

3    will read the transcript of this hearing.  And so I want to take

4    an opportunity now here at the close of the hearing to thank her

5    for expressing herself in behalf of her family and you,

6    Mr. Brewer, so, again, eloquently and in such a profound manner.

7         Thank you, ma'am, for what you had to say.

8         This is a difficult day for you, Mr. Brewer.  I realize

9    that.  We've already talked about it.  It is a difficult day for

10   your family.  It will not get any easier going forward.  I

11   understand that, but I do want to highlight, again, what I said

12   earlier.  You were concerned that I might view you or that you

13   have been made out to be some sort of monster.  And, again, I

14   want to reassure you that is not the case.

15        I have studied that PSR.  I've gone back to that PSR

16   multiple times to read about you and your background.  My point

17   here in this little bit of time we have remaining is to tell you

18   that while this is a difficult day and you have a challenge

19   before you, I do see things in your background, Mr. Brewer, that

20   make me think that you will have an opportunity on the back end

21   of this process to do some of the things that you've said you

22   would like to do in terms of living your life.

23        You will have -- again, in part because of the arguments

24   made by your counsel, in part by the circumstances, the facts

25   here as I understand them, you will have a shorter sentence than

1     the guidelines -- substantially shorter sentence than the

2     guidelines would have suggested.  And that means that you will

3     have an opportunity on the other end of the service of your

4     sentence to again return to your family, return home.

5          And it's my hope for you that that will happen and that you

6     will put this ultimately -- it will take a while, but that you

7     will ultimately put this behind you and be able to live, again,

8     as a free person and put your entanglement with the criminal

9     justice system behind you.

10         I know those seem like hollow words now.  I'm sure they

11    would to me, but they are sincere.  And I believe that you have

12    the ability with the support of your family ultimately to do

13    that.  The sentence, while difficult, will give you that

14    opportunity some day, and that's my hope for you.  Thank you.

15         We'll be adjourned.

16         (Proceedings concluded at 1:10 p.m.)

17                    C E R T I F I C A T E

18         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

19    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20

21
          _____s/Dena Legg_____          October 16, 2020
22    Certified Court Reporter No. 20042A157   Date
      Official Court Reporter
23

24

25