IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

FILED (JS)
US DISTRICT COURT CLERK
WESTERN DISTRICT OF KY
21 FEB 25 PM 2:59

| | |
|---|---|
| **CHEROSCO BREWER,** | ) |
| **Petitioner** | ) |
| vs. | ) 3:17-cr-00037-DJH-1 |
| **UNITED STATES OF AMERICA,** | ) |
| **Respondent** | ) |

## PETITION FOR LEAVE TO FILE PETITION AND MEMORANDUM IN SUPPORT OF PETITION FOR RELIEF UNDER THE FIRST STEP ACT

COMES NOW, Cherosco Brewer, your Petitioner in the instant case, pro se, who respectfully files for leave to file this Petition and Memorandum in Support of said Petition for relief, pursuant to Section 404(b) of the First Step Act of 2018, and asking for the granting of Compassionate Release, reducing Petitioner's sentence instanter to time-served, with medical records to be provided by the federal Bureau of Prisons to be filed under seal, and in support thereof, states as follows:

## STATEMENT OF JURISDICTION

This United States District Court for the Western District of Kentucky at Louisville has jurisdiction over all offenses against the criminal laws of the United States which take place in that district, under 18 U.S.C. Section 3231, 21 U.S.C. Section 41(a)(1)(b)(1)(A), 21 U.S.C. Section 846, and 28 U.S.C. Section 2255.

1

## PROCEDURAL HISTORY

Petitioner was indicted in 2017 and charged with violations of 18 USC Section :922(g)(1), 924(a)(2), 924(e)(1) , Felon in Possession of a Firearm and Ammunition, (Count 1); 21 USC 841(a)(1) and (b)(1)(D) Possession With Intent To Distribute Marijuana (Count 2); 18 USC Section :924(c)(1)(A, Possession of a Firearm in Furtherance of Drug Trafficking Crime (Count 3): and 21 USC 841(a)(1) and (b)(1)(C), Possession With Intent To Distribute Cocaine (Count 4).

Petitioner was found guilty in 2019 after a jury trial, and he was sentenced on August 4 2020 to a total of 240 months, and five years of supervised release. Petitioner filed a direct appeal, which still pends, and now timely files this appeal for relief under the First Step Act of 2018, having already exhausted his administrative remedies.

## STATEMENT OF FACTS

Petitioner is currently confined at the Grayson County Detention Center. It is an older, overcrowded facility, and often acts as a transfer point for other prisoners It contains multiple security levels, and there is considerable turnover in its residents. It has also been recognized as a hotbed of COVID-19 by local health authorities. Grayson County, Kentucky has had a large number of COVID-19 cases. According to the New York Times, "Cases are extremely high and have stayed about the same over the past two weeks. The number of hospitalized Covid patients has risen in the Grayson County area." There have been numerous cases of COVID-19 at the Detention Center.

2

## ARGUMENTS

### I. THE CENTER FOR DISEASE CONTROL (CDC) STATES THAT INDIVIDUALS WITH CERTAIN HEALTH CONDITIONS ARE AT AN INCREASED RISK FOR SEVERE ILLNESS FROM COVID-19

It is undisputed that Petitioner suffers from a number of diseases, including high blood pressure, elevated heart rate, and hypertension,. He is in a fragile physical state.

The CDC notes in its COVID-19 advisory that

> COVID-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19. Based upon what we know at this time, people with the following conditions are at an increase risk might be at an increased risk for severe illness...hypertension, diabetes, obesity, diabetes....

CDC, July 8, 2020.

Petitioner contracted COVID-19 while at the jail, is also now suffering from a persistent cough, shortness of breath, chest pains, and requires constant medical monitoring, which is not available at his institution.

### II. PETITIONER IS AT GRAVE RISK DUE TO HIS PRE-EXISTING CONDITIONS NOW THAT SHE HAS CONTRACTED COVID-19

Various courts have made note of the fact that individuals who have contracted COVID-19 are still at grave risk, even if they technically "recover" from the initial exposure, due to pre-existing weakened immune response.

> Additionally, the Court finds that there is a chance that Defendant may contract COVID-19 again. Defendant argues that research shows that most patients who recover from COVID-19 have neutralizing antibodies, which indicates immunity for the affected individual. See Government's Response, d/e 332, p. 4. However, the CDC recognizes that it is possible for an individual who had COVID-19 to become infected again by the virus. As of July 20, 2020, the CDC provides the following advice:

3

> The immune response, including duration of immunity, to SARS-CoV-2 infection is not yet understood. Patients infected with other betacoronaviruses (MERS-CoV, HCoV-OC43), the genus to which SARS-CoV-2 belongs, are unlikely to be re-infected shortly (e.g., 3 months or more) after they recover. However, more information is needed to know whether similar immune protection will be observed for patients with COVID-19.

United States v. Davis, 2020 WL 4049980, at *1 (C.D. Ill. July 20, 2020).

Additionally, the Department of Justice now concedes that if the Petitioner's disease is on the CDC list of those that can prove fatal, such a person qualifies for compassionate release.

> United States v. Johnson, 2020 WL 4501513, at *3 (D.S.C. Aug. 5, 2020) "If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,7that condition potentially could satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (e., one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[ ] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19."

In May of 2020, in response to COVID-19 raging through the nation's prisons, DOJ issued an advisory that any individual asserting an underlying physical condition that made him vulnerable to death or serious disease from COVID-19 would be considered to have established the Extraordinary and Compelling Circumstances" required to establish a prima-facie case for Compassionate Release. See: Wise v. United States, Criminal No. ELH-18-72, 10 (D. Md. May. 20, 2020).

> "As applied to Wise, the COVID-19 virus presents "extraordinary and compelling reasons" that warrant a reduction of his sentence... "just last week, the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release. See ECF 185.

4

The same case found that the Sentencing Commission guidance that previously informed the basis for considering whether an individual qualified for the old BOP sponsored Compassionate Release process that prevailed prior to the passage of the First Step Act of 2018 was no longer applicable:

> The growing consensus among judges in this district and elsewhere is that § 1B1.13 is not a straightjacket. See United States v. Scott, ___ F. Supp. 3d ___, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020) (describing this as the "majority position"); see, e.g., United States v. Mel, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020); United States v. Haynes, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020); United States v. Decatur, ___ F. Supp. 3d ___, 2020 WL 1676219, at *2-3 (D. Md. Apr. 6, 2020); United States v. Redd, ___ F. Supp. 3d ___, 2020 WL 1248493, at *8 & n.18 (E.D. Va. Mar. 16, 2020); United States v. Lisi, ___ F. Supp. 3d ___, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020); see ECF 180 at 3-6 (collecting cases). Indeed, good reasons exist to doubt that the policy statement is binding.
>
> For starters, U.S.S.G. § 1B1.13 is outdated in light of the FSA. It presupposes that § 3582 review is available only upon motion by the BOP, which is no longer correct. See U.S.S.G. § 1B1.13 cmt. n.4. The commentary also delegates authority to the BOP to identify circumstances that warrant compassionate release. See id. cmt. n.1(D). Moreover, cabining the application of § 3582 to the scenarios set forth in the commentary accompanying U.S.S.G. § 1B1.13 is contrary to the FSA, which Congress enacted to remove the BOP as the gatekeeper of compassionate release. See 164 Cong. Rec. S7314-02 (Dec. 5, 2018) (statement by Sen. Cardin) (noting that the FSA was intended to "expand[] compassionate release"). But, where a federal statute and Guidelines commentary conflict, the former always prevails. See Stinson v. United States, 508 U.S. 36, 40-42 (1993); United States v. Allen, 909 F.3d 671, 675 (4th Cir. 2018) (Emphasis added.).
>
> Wise v. United States, Criminal No. ELH-18-72, 8-9 (D. Md. May. 20, 2020).

Petitioner argues that the weight of the medical evidence shows that Petitioner suffers from a disease that will cause long-term health problems, especially since Petitioner has already contracted the disease, and suffers from its symptoms and other recurring health problems.

Petitioner, as an individual who has already contracted the virus, and continues to suffer from the long-term consequences of that disease, has entered the ranks of so-called

"long-haulers," who will have to deal with the aftermath of his infection for an indeterminate length of time.

> This has become a medically-recognized condition.
> Long Covid challenges common assumptions that were in place in the early pandemic and which often persisted despite patient testimony. In the making of Long Covid, conventional hierarchies of evidence, and normative routes for scientific dissemination were frequently disrupted.
>
> The aetiology of Long Covid is currently under scrutiny and may be multiple. Definitions of COVID-19 itself remain unstable: the pathology has been defined as a respiratory, cardiovascular, endothelial, or systemic condition). Whether COVID-19 will, for some, survive viral persistence and develop into a disease-specific, chronic or permanent condition, and/or whether SARS-COV-2 infection generates a new autoimmune disease remains unknown.
>
> Having this condition increases your chances that your next contraction of the virus will find you in a weakened state, with higher chances of morbidity.

Carfi A., Persistent symptoms in patients after acute COVID-. JAMA. 2020;324(6):603–605.

### III. BOP INABILITY OR UNWILLINGNESS TO FOLLOW CDC POLICY AND ITS OWN POLICY DIRECTIVES HAVE RESULTED IN MASS INFECTIONS AND PETITIONER CONTRACTING COVID-19

It is axiomatic that the COVID-19 virus can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. People of all ages and medical backgrounds who have experienced serious cases of COVID-19 describe

6

painful symptoms including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath.

Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurological injury. According to a new study cited in the Wall Street Journal this month, "the new coronavirus can leave some patients with signs of heart inflammation and injury months after they get sick...even in cases where their illness wasn't severe." Wall Street Journal, September 24, 2020. According to Charles Murry, director of the University of Washington's Center for Cardiovascular Biology, "We basically die with the heart-muscle cells we're born with, so anything that results in the death of heart muscle has the potential to irreversibly damage the heart's mechanical ability and the heart's electrical function." The study was published in July, 2020, in the journal JAMA Cardiology.

These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support can quickly exceed local health care resources. This level of medical support does not exist in the federal Bureau of Prisons and certainly not at Petitioner's institution. DOJ, Office of Inspector General Review of FCOP Medical Staffing Challenges, at 1, (Mar. 2016).

People who experience serious cases of COVID-19 who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and the loss of respiratory capacity. Petitioner is currently experiencing just those symptoms, as she struggles to breathe, has a chronic cough, experienced headaches, fever, chills, diarrhea, and loss of taste, smell, and appetite. She has received no extensive medical testing to determine what course of treatment would be most suitable. The long term prognosis for an individual with Petitioner's medical condition is guarded, and without specialized medical treatment unavailable at Petitioner's institution, would be at a heightened risk of stroke and further heart complications.

### IV PETITIONER'S PLACE OF CONFINEMENT HAS VIOLATED MOST CDC RULES, FAILED TO PROPERLY QUARANTINE, AND SUBJECTED PETITIONER TO UNNECESSARY HEALTH RISKS AND MENTAL AND PHYSICAL INJURY

Petitioner argues that the COVID-19 outbreak originated when prisoners transferred from other institutions and immediately placed without having been first tested or quarantined. Instead of testing all prisoners it chose not to do so, probably to keep its positive numbers down. Given the constant intermixing between the housing units and common areas it is reasonable to assume that these positive prisoners soon spread the disease to the rest of the compound.

**BOP does not test prisoners until they show symptoms.** Unfortunately, research has shown that the virus is highly contagious, and can be spread by individuals who do not show any sign of the disease. This BOP policy means that individuals like

Petitioner are at grave risk of contracting the virus, which is often deadly to people with preexisting conditions, according to the national Center for Disease Control (CDC).

While recent outbreaks in the general population have ebbed and flowed, jails and prisons across the country have become virus hot-spots, where the BOP's inability (or unwillingness) to control the virus puts the community at which their facilities are located at greater risk.

## VI. COVID-19 CONTINUES TO BE A RISK TO THE GENERAL POPULATION BUT HAS A MUCH GREATER IMPACT ON PRISONERS

As the Court well knows, COVID-19 has spread across the globe and throughout the United States. Policymakers at every level of government have recognized the dire risks of COVID-19. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. Bill Chappell, Corona virus: COVID-19 is Now Officially a Pandemic, WHO Says, NPR (Mar. 11, 2020), https://tinyurl.com/tpy4v8s.

To mitigate the COVID-19 pandemic, governmental authorities in the United States have issued guidelines and advice for citizens to follow. For example, the CDC's guidance document recommends the following: - "Work or engage in schooling FROM HOME whenever possible." - "AVOID SOCIAL GATHERINGS in groups of more than 10 people." - "Avoid eating or drinking at bars, restaurants, and food courts." - "AVOID DISCRETIONARY TRAVEL, shopping trips, and social visits." - "DO NOT VISIT nursing homes or retirement or long-term care facilities unless to provide critical assistance." CDC, The President's Corona virus Guidelines For America at 2 (emphasis in original), https://tinyurl.com/v9kngde. III. The Pandemic's Effect on Communal Living Spaces Communal living spaces present especially serious risks related to

9

COVID-19. One highly publicized example is nursing homes. These communities are "at risk because residents live in tight proximity, with staff interacting closely with them." Jon Kamp, Corona virus Outbreaks Spreading in Nursing Homes, The Wall Street Journal (Mar. 19, 2020).

Custodial living spaces, such as prisons and jails, and halfway houses present the same risks. Incarcerated individuals are more vulnerable to contract the disease because they live in cells with multiple people in close quarters, are regularly required or allowed to inhabit communal spaces for eating, bathing, or awaiting transport to or from court, and are nearly always in close contact with other people. The active vulnerability of the prison population in turn compounds the risk to the public health because lawyers, correctional officers, and other staff are coming into and out of the prison and therefore can carry to the outside world any diseases that festered inside. Understanding these concerns, governmental authorities increasingly are attempting to release prisoners affected by COVID-19. See, e.g., Julia Marsh, NYC to begin releasing inmates amid coronavirus outbreak, New York Post (Mar. 18, 2020), https://tinyurl.com/trba737. Courts around the country are addressing issues relating to incarceration; for example, the extension of self-surrender dates due to COVID-19.

Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurological injury.

These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and their

10

condition can seriously deteriorate in as little as five days or sooner. People can also spread COVID-19 but be asymptomatic. Most people who develop serious disease will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support can quickly exceed local health care resources. This level of medical support does not exist in the federal Bureau of Prisons and certainly not at Petitioner's institution.

The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent—ten times the average rate. Preliminary data from China showed that 20 percent of people in high-risk categories who have contracted COVID-19 there have died. People who experience serious cases of COVID-19 who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and the loss of respiratory capacity.

In one such case, Wilson v. Williams 20-cv-794, a federal Judge in Cleveland, Ohio, Judge James Gwin, granted an injunction compelling officials at the Elkton Federal Correctional Institution to identify and release medically vulnerable inmates due to the spread of Covid-19. The BOP has proven itself incapable of handling the outbreak, and it meager health-care resources are quickly overwhelmed. In FCI Elkton, the Ohio

11

National Guard had to be called in to take over the medical crisis there that resulted in hundreds of sick prisoners and staff and many deaths. At FCI Oakdale, Louisiana, a similar failure on the part of BOP medical staff to contain the outbreak required the CDC to take over testing and treatment. At FCI Forrest City, the CDC built a tent hospital on prison grounds, and after extensive testing CDC has found that over half of the prisoners and many staff are COVID-19 positive, and there have also been many deaths. In three California BOP facilities, the situation is even more dire. Carswell Federal medical center has had more than half of it occupants testing positive.

According to the BOP website, and California health officials, at Federal Correctional Institution Terminal Island, which holds 1,055 prisoners, 570 had tested positive for Covid-19, and ten staff members have also tested positive. and two prisoners have died. At the same time, the BOP had said that there were at least 50 confirmed cases of the virus at Federal Correction Institution Lompoc, including 40 prisoners and 10 staffers, and at nearby U.S. Penitentiary, Lompoc, 83 inmates and 15 staff have the virus and one inmate has died . All testing for the virus at all three facilities was done by the Los Angeles Department of Public Health, not the BOP. The American Civil Liberties Union in numerous court filing across the country has accused the BOP of undercounting the extent of its COVID-19 problem, and highlighted the BOP's lack of testing to determine the extent of the virus' penetration in the federal prison system.

### V. PETITIONER IF RELEASED WOULD NOT BE A RISK TO REOFFEND

Petitioner regrets and is remorseful for his wrongdoing and would be the perfect candidate for home confinement, and would be supported his large, loving family. He

would live with his girlfriend, who holds gainful employment, and who has already secured lawful employment for Petitioner.

Section 3582(c)(1)(A)(i) authorizes the modification of a sentence of imprisonment if "extraordinary and compelling reasons warrant such reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," as set out in United States Sentencing Guideline § 1B1.13. This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after consideration of the factors set forth in section 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction."

Pursuant to the requirement of 28 U.S.C. § 994(t), as authorized by 28 U.S.C. § 994(a)(2)(C), the Sentencing Commission promulgated a policy statement that sets out the criteria for a reduction in sentencing, which, as set forth in U.S.S.G. § 1B1.13 includes, in relevant part:

(1)(A) extraordinary and compelling reasons warrant the reduction;

the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and the reduction is consistent with this policy statement.

Following the passage of the First Step Act of 2018, during the pandemic, district courts across the country have granted sentence reductions under § 3582(c)(1)(A). See United States v. Marin, No. 15-CR-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020); United States v. Muniz, Case No. 4:09-CR-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 20

13

United States v. Powell, No. No. 1:94-CR-00316 (D.D.C. Mar. 28, 2020); United States v. Gonzales, No. 2:18-CR-0232, 2020 WL 1536155 (E.D. Wash. Mar. 31, 2020); United States v. Hewitt, No. 3:04-CR-095, Dkt. 91 (N.D. Fla., April 1, 2020); United States v. Rodriguez, No. 2:03-CR-00271, Dkt. 136 (E.D.Pa., April 1, 2020); United States v. Garcia, No. 95-CR-142, (E.D. Wis., March 27, 2020); United States v. Esparza, No. 1:07-CR-294, Dkt. 124 (D. Idaho, April 7, 2020); United States v. Plunk, No. 3:94-CR- 036 (D. Alaska, April 9, 2020); United States v. Burrill, No. 3:17-CR-491, Dkt. 308 (N.D.Cal., April 10, 2020); United States v. Ben-Yhwh, No. 1:15-CR-830, Dkt. 206 (D. Hawaii, April 13, 2020).

## CONCLUSION

For the foregoing reasons, Petitioner requests this Court to grant him a compassionate release as permitted by 18 U.S.C. § 3582(c)(1)(A). These circumstances demonstrate extraordinary and compelling circumstances to justify a reduction in Petitioner's custodial sentence, and asks this Court to reduce the sentence to time served with the supervised release condition of home confinement for the remainder of the custodial term.

Respectfully Submitted,

By: _Cherosco Brew_

## CERTIFICATE OF SERVICE

Petitioner does hereby certify that he caused to be served a true and correct copy of this Petition was duly served on all attorneys of record on the / day of February, 2021, through the Prison Mail System.

14

Signed: _____

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

UNITED STATES PRIORITY MAIL

U.S. POSTAGE
$7.95
PM 2-DAY
60089 0006
Date of sale
02/18/21
06   2S
11486702

PRIORITY MAIL 2-DAY®

EXPECTED DELIVERY DAY: 02/22/21

0006

C075

SHIP TO:
601 W BROADWAY
STE 601
Louisville KY 40202-2228

USPS TRACKING® NUMBER

9505 5066 0126 1049 5359 29

EP14F May 2020
OD: 12 1/2 x 9 1/2

21 FEB 25 PM
FILED (JS)
US DISTRICT COURT CLERK
WESTERN DISTRICT OF KY

FROM:

Chevosco Brewer
18898-033
320 Shaw St Rd
Leitchfield,
Ky 42754

TO:

USDC-WD-Ky
@ Louisville
601 W. Broadway
U. 601
Louisville, KY
40202