Case No. 20-5943

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 07, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| CHEROSCO BREWER, | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SUTTON, Chief Judge; McKEAGUE and DONALD, Circuit Judges.

SUTTON, Chief Judge. On consecutive nights, officers pulled over Cherosco Brewer because his car had illegally tinted windows. Each time a drug dog alerted on his car, and each time the officers found drugs and a gun. After the government brought drug-distribution and firearm charges, Brewer moved to suppress the evidence from the traffic stops. The district court denied the motion, and a jury convicted Brewer of the offenses. We affirm.

At roughly 1 a.m. on November 11, 2015, Louisville police officers stopped Brewer's car because the windows contained excessive tint. "All of the windows looked black," the officers observed, and they could not "see the shadow of anyone . . . in the car," even under "light posts." R.43 at 11–12. Detectives Tyler Holland and Holly Hogan approached the car, and the passengers, Brewer and a woman, lowered their windows when asked to roll them down. The officers saw a towel draped over the dashboard, covering the interior lights. Holland asked Brewer to step out

of the car, frisked him for weapons, and retrieved his driver's license. He went to the squad car to check for warrants and write a ticket. Meanwhile, Hogan asked the passenger to step out of the car, frisked her, obtained her information, asked her about any outstanding warrants, and ran the license plate.

Several minutes later, other officers and a drug dog named "Diesel" arrived. While Hogan waited on the license plate check and Holland began writing a citation—nine to ten minutes after the officers initially stopped Brewer—Diesel alerted on the driver's door. The officers found a loaded handgun and individually packaged marijuana under the steering column of the car. They arrested Brewer.

The next night around 11 p.m., a different officer, Detective Stewart, stopped a car with pitch-black windows only to find Brewer, released on bond, in a different car. Stewart recognized Brewer. He asked Brewer to step out of the car, frisked him, then went back to his squad car to run Brewer's information. While he did so, an officer helping with a traffic stop across the street walked Diesel over and Diesel indicated at the driver's door. This time the officers found baggies of cocaine under the dashboard. On this occasion, it took about four minutes after the initial stop to discover the drugs.

A federal grand jury indicted Brewer on firearm and drug-trafficking offenses. Brewer moved to suppress the evidence from the traffic stops. After conducting a hearing, the district court denied the motion. A jury convicted Brewer on all counts. He appeals the denial of his motion to suppress and the jury's verdict.

*Motion to suppress.* The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In reviewing a district court's ruling on a motion to suppress

after a hearing, we construe any uncertainties in the factual record in favor of the court's decision. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008).

Brewer has no quarrel with the police officers' authority to stop him each night for excessive window tint, for which the record suggests not just reasonable suspicion but in fact probable cause. *See* K.R.S. § 189.110. He trains his argument instead on whether the officers unduly prolonged each stop.

When police stop a car, the ensuing interaction must suit the circumstances. Police officers, generally speaking, may not prolong a traffic stop "beyond the time reasonably required to complete the mission of issuing a ticket for the violation" and to "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 350–51, 354 (2015) (quotation omitted). As part of the stop, officers may "check[] the driver's license, determin[e] whether there are outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Id.* at 355. They also may order a car's occupants to step out of the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). In the course of completing these tasks, officers may investigate matters unrelated to the traffic stop when additional suspicion arises from the encounter. *Rodriguez*, 575 U.S. at 355.

Officers may frisk someone for weapons if they have reasonable suspicion that the person is "armed and dangerous" and "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The quantum of suspicion, ever a function of the circumstances facing the officers, requires more than a "hunch" but falls "considerably short" of a preponderance standard. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (quotation omitted).

These stops did not violate the Fourth Amendment.  As to the first stop, recall the situation the officers faced.  In the course of a late-night stop, they obtained Brewer and his passenger's identification, asked them each to step out of the car, frisked them for weapons, searched for outstanding warrants against Brewer, and explained that process to each passenger.  They also began writing a citation and running the car's tags.  None of these acts unlawfully prolonged the stop.  Most indeed represent normal incidents to a traffic stop. *Rodriguez*, 575 U.S. at 355; *Mimms*, 434 U.S. at 111; *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

What about getting the passenger's information and talking to her about outstanding warrants?  Questions "unrelated to the justification for the traffic stop" are not a problem "so long as those inquiries do not measurably extend the duration of the stop."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  Just so here.  Officer Hogan questioned the passenger while Officer Holland dealt with Brewer, and we do not see how Officer Hogan's separate conversation delayed Holland's investigation or the stop as a whole.

As for the frisks, the officers reasonably suspected that Brewer and his passenger had guns. Both officers knew from experience that people driving with excessively tinted windows often have guns with them.  Brewer and his passenger only cracked their windows, and both seemed nervous.  A towel covered the dashboard lights, making it difficult to see inside the car.  In countless traffic stops over their combined 12 years of service, neither officer had seen an effort to conceal a car's interior in this way.  Add to the mix that the stop happened around 1 a.m. in a "hot spot[]" for "violent crime," and it is fair to conclude that the officers acted reasonably in frisking the two individuals.  R.47 at 6; *see Lyons*, 687 F.3d at 763.

Brewer counters that the stop nonetheless took too long. But he does not point to any cases holding that it is unreasonable as a matter of law to take up to ten minutes to process a stop in these kinds of circumstances. That is hardly outside the norm for run-of-the-mine traffic stops.

He adds that the number of backup officers should have reduced the time needed. Perhaps, and maybe indeed that happened. But it is hardly self-evident that the number of officers made the stop unreasonable. Keep in mind that two officers dealt with each of the car's occupants, and the other officers handled the dog and supplied backup.

In the alternative, Brewer argues that the number of backup officers itself violated the proscription that a *Terry* stop employ "the least intrusive means reasonably available." *Florida v. Royer*, 460 U.S. 491, 500 (1983). But backup officers by themselves do not make a stop unreasonable, particularly when they do not infringe anybody's liberty. No such infringement occurred when it comes to their conduct.

Brewer also claims the district court clearly erred by relying on Holland's testimony that he checked for warrants against Brewer and began filling out a citation before Diesel alerted. *United States v. Lott*, 954 F.3d 919, 922–24 (6th Cir. 2020). Brewer suspects Holland stalled until Diesel arrived and claims the body cam proves it. But the video shows that, after Diesel alerted, Holland ran Brewer's information again and returned to completing the citation. The interaction does not leave a "definite and firm conviction" that Holland unduly stalled when it comes to a stop that still took less than ten minutes. *Kerman v. Comm'r*, 713 F.3d 849, 867 (6th Cir. 2013).

Brewer invokes a slew of cases, most of them unpublished and from outside the circuit, which in his words "found reasonable suspicion" "*lacking* in cases presenting far *greater* 'suspicion'" than the "circumstances relied upon here." Appellant's Br. 45 (quotation omitted). But most of Brewer's cases do not deal with *Terry* frisks, none deals with a novel effort at

concealment that no officer had seen before, and none reveals a stop that the record indicates took less than ten minutes.

Brewer does no better when it comes to challenging the second stop. The officer knew Brewer had been found with a gun the night before in similar circumstances. That by itself justifies the frisk. The rest of the stop consisted of the kinds of routine activities permitted by *Rodriguez* and *Mimms* and took just four minutes.

*Sufficiency of the evidence*. To convict Brewer for drug distribution, the government had to establish that Brewer knowingly possessed marijuana and cocaine with intent to distribute the drugs. 18 U.S.C. § 841(a). Ample evidence supported the convictions. No one doubted that Brewer possessed marijuana. Up for debate was whether he knowingly possessed the cocaine and whether he possessed the drugs with intent to distribute them. As to possession of the cocaine, the only difference between the marijuana and the cocaine was that the cocaine was found in a car registered to someone else. That does not change the calculus due to the "other incriminating evidence" linking Brewer to the drugs, namely that they were packaged for immediate sale and accessible to Brewer from the driver's seat in hiding places commonly used by drug dealers. *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (en banc) (quotation omitted). As an expert testified, that same evidence—packaging for resale and hiding the drugs in a place often used by drug dealers—closed any gap when it comes to the intent-to-distribute element for both types of drug distribution. That the drug amounts were small in quantity makes no difference; drug dealers often limit the amounts they carry to avoid detection. Like many drug dealers, Brewer drove someone else's car (usually a rental car), had tinted windows, multiple cell phones, large amounts of cash, and a gun. On this record, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As to the firearm conviction, the government needed to prove that Brewer possessed a gun in furtherance of drug trafficking. 18 U.S.C. § 924(c). We consider (1) whether the gun was strategically accessible, (2) whether the gun was loaded, (3) the type of weapon, (4) the legality of its possession, (5) the type of drug activity, and (6) the time and circumstances under which the firearm was found. *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). The loaded handgun was easily accessible to Brewer in the driver's seat, illegally possessed, found late at night, and hidden in a car with drugs packaged for sale. That readily suffices to meet the modest *Jackson v. Virginia* sufficiency standard.

We affirm.